1          IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
2                    DALLAS DIVISION

3  DAVID TYLER MOSS AND BRANDON    (   CAUSE NO. 3:14-CV-3088-BF
   KEATING                         )
4                                  (
           Plaintiffs,             )
5                                  (
   vs.                             )
6                                  (
   MARKO PRINCIP, Individually,    )
7  MARKO PRINCIP, d/b/a VIDEOGAMES (
   YOUTUBE CHANNEL, MARKO PRINCIP,)
8  d/b/a GAME GUIDE, LLC,          (
   VIDEOGAMES YOUTUBE CHANNEL,     )
9  AND BRIAN MARTIN                (   DALLAS, TEXAS
                                   )   MARCH 28, 2016
10         Defendants.             (   9:00 a.m.
   _____

11

12

13                          VOLUME 1

14

15 _____

16                     TRIAL ON THE MERITS

17         BEFORE THE HONORABLE PAUL STICKNEY
             UNITED STATES MAGISTRATE JUDGE
18                     and a jury
   _____

19

20

21

22

23         SHAWN M. McROBERTS, RMR, CRR
           1100 COMMERCE STREET, RM. 1654
             DALLAS, TEXAS  75242
24               (214) 753-2349
           shawn_mcroberts@txnd.uscourts.gov
25

1                          A P P E A R A N C E S

2          FOR THE PLAINTIFFS:    WYDE & ASSOCIATES
                                  10100 NORTH CENTRAL EXPRESSWAY
3                                 SUITE 590
                                  DALLAS, TEXAS  75231
4                                 (214) 521-9100
                                  BY:  MR. DAN L. WYDE
5
                                  BARNES & THORNBURG, LLP
6                                 2100 McKINNEY AVENUE
                                  SUITE 1250
7                                 DALLAS, TEXAS  75204
                                  (214) 258-4124
8                                 BY:  MR. VICTOR D. VITAL

9          FOR THE DEFENDANTS:    LAW OFFICES ROBERT D. WILSON
                                  18111 PRESTON ROAD, SUITE 150
10                                DALLAS, TEXAS  75252
                                  (214) 637-8866
11                                BY:  MR. ROBERT D. WILSON

12         OFFICIAL REPORTER:     SHAWN M. McROBERTS, RMR, CRR
                                  1100 COMMERCE STREET, RM. 1654
13                                DALLAS, TEXAS  75242
                                  (214) 753-2349

14

15

16

17

18

19

20

21

22

23

24

25

# INDEX

**Pretrial Conference**                                                  **Page**
                                                                         4


**Voir Dire**                                                            **Page**
THE COURT                                                                16
MR. VITAL                                                                22
MR. WILSON                                                               36


**Jury Seated**                                                          **Page**
                                                                         49


**Jury Sworn**                                                           **Page**
                                                                         50

**Opening Statements**                                                   **Page**
MR. WYDE                                                                 59
MR. WILSON                                                               68


**EXAMINATION**

**Witness Name**                                                         **Page**
DAVID TYLER MOSS
   Direct By MR. WYDE ............................................... 76


**Plaintiffs' Exhibit**                                                  **Page**
No. 2 Admitted Into Evidence                                             86
No. 13 Admitted Into Evidence                                            89
No. 28 Admitted Into Evidence                                            161

```
 1              THE COURT:  Good morning.

 2              MR. VITAL:  Good morning, Your Honor.

 3              THE COURT:  Be seated, please.

 4         Court is in session in the matter of David Tyler Moss

 5    versus Marko Princip, et al.

 6         Who is here for the Plaintiff?

 7              MR. VITAL:  Your Honor, Victor Vital and Dan Wyde

 8    for the Plaintiffs, both of whom are here.

 9              THE COURT:  Thank you.

10         For the Defendants?

11              MR. WILSON:  Your Honor, Robert Doyle Wilson on

12    behalf of Marko Princip, Brian Martin, and the other named

13    Defendants.

14              THE COURT:  Okay.  This is the time and place set

15    for the pretrial conference in this matter.

16         Is the Plaintiff ready to proceed?

17              MR. VITAL:  Yes, Your Honor, the Plaintiff is ready

18    to proceed.

19              THE COURT:  The Defense?

20              MR. WILSON:  Yes, Your Honor.

21              THE COURT:  I am a little bit concerned in this case

22    about the breaks we have to take.  It bothered me this week,

23    and I kept thinking about it.  We have to take a break Tuesday

24    and Wednesday afternoon, and it is a lot of down time for this

25    jury.  So I've been considering moving the trial, but I hate
```

1    to do that since everyone's here.  And I don't necessarily

2    want to pick a jury today and have them sit, because this is

3    only a two- or three-day trial.

4          MR. VITAL:  Yes, Your Honor.

5       May I approach the lectern?

6          THE COURT:  Please.

7          MR. VITAL:  To Your Honor's point about the down

8    time in the trial, I asked to approach the lectern so I can

9    ask Your Honor if you have had a discussion with Judge Solis.

10          THE COURT:  Judge Solis cannot move his case.  He

11    retires May 1st.  That is 30 days.

12          MR. VITAL:  I understand that.  What I was wondering

13    is if that's a cattle call docket or if it's a specific -- I

14    don't know what's set for that day because I wonder if we can

15    work -- we should -- we might be able to do some work on

16    Wednesday.  In other words, my sentencing I don't think will

17    eliminate the entire afternoon, unless Your Honor has

18    intelligence or information from Judge Solis about what his

19    docket looks like that day.  But I would suggest, if we can --

20          THE COURT:  How long is your sentencing?

21          MR. VITAL:  I would not think it would take longer

22    than an hour.

23       I am just going the think out loud.  What I'm thinking is

24    I wonder if I need to be up there the entire time.  I don't

25    think I need to be up there the entire time, if Judge Solis is

1    fine with me under Your Honor's care and jurisdiction only to

2    be called up there when he needs me, as opposed to sitting up

3    there the entire afternoon.

4        My preference would be to try the case.  We have our

5    clients here, and they've been here since Friday, and they've

6    had travel and expense and such.  That's number one.

7        Number two, I just like trying cases, and I prefer to be

8    down here trying the case on Wednesday than sitting upstairs

9    waiting to be heard.  Although my sentencing is important,

10   what I'm telling Your Honor is I can be in trial only to be

11   called when I need to be called, go up there, handle that, and

12   come back.

13           THE COURT:  Okay.  I did talk to Kevin Frye, and he

14   said that there's a possibility the Judge could take you

15   first, if you went at 1:30 and if we broke for our lunch hour

16   about then it wouldn't be too much of an interruption.

17       What says the Defense?

18           MR. WILSON:  Your Honor, we defer to the Court's

19   decision.  Whatever is judicially economic for the Court.

20       I tried to move heaven and earth, Judge, with Judge Crone

21   on Tuesday at 2:00 p.m.

22           THE COURT:  I understand that.

23           MR. WILSON:  And I fatally failed.  So I've got to

24   be there and --

25           THE COURT:  What time do you have to leave Tuesday?

```
 1           MR. WILSON:  Well, I could probably leave here at
 2    1:00, your Honor.  It starts at 2:00 in the afternoon in
 3    Plano, so I could get up there in probably 40, 45 minutes.
 4    But this is a resentencing on a money restitution issue where
 5    the AUSA is seeking to throw the Defendant back in jail for
 6    failure to pay some monies, and so I surmise -- They have
 7    listed eight witnesses that they's got.  I've got two.  And so
 8    that's going to take me all day on Tuesday.  And I apologize.
 9           THE COURT:  All right.
10           MR. WILSON:  I even tried to move it forward, and I
11    couldn't get the judge to move it up so it wouldn't conflict
12    with your case here today.
13           THE COURT:  It's not a problem.
14       The other issue that I have is the jury charge.  It was
15    kind of a mess, quite frankly.  If there was a way to get
16    these questions to the jury shortened, because some of the
17    questions are "Is there an agreement?  Is the agreement
18    breached?  If so, what percentage?"  So first we go, "Is there
19    an agreement?"  If the answer is no, foreperson sign.  That's
20    the end of the case; you don't go to the other instructions.
21           MR. WYDE:  I apologize, Your Honor.  It's been quite
22    some time.  It is a privilege to be in front of you.
23       I have -- On the subject of conflicts, I have a non-jury
24    matter in front of Judge Tena Callahan at the George Allen
25    courthouse.  I filed -- Mine is a petition in intervention for
```

```
 1    attorney fees from a former client.  That case is going on

 2    Thursday and Friday.  They don't need me for any substance of

 3    issues.  I am not an attorney of record anymore, except for

 4    myself.  And I've already filed a motion for continuance in

 5    that.

 6         If the jury was out on this case deliberating, say,

 7    Thursday afternoon, give or take, I was going to probably ask

 8    you if I could simply go down there for 60 minutes and --

 9              THE COURT:  That's fine.

10              MR. WYDE:  I didn't want to spring that on you on

11    Thursday.

12              THE COURT:  Victor will be here.  Right?

13              MR. WYDE:  Yes, to my knowledge.  I just wanted to

14    let you know I have already taken care -- I have no other

15    conflicts.

16              THE COURT:  That's no problem.

17              MR. WYDE:  Yes, sir.  I just didn't want to wait

18    until Thursday to spring that on you.

19              THE COURT:  No problem.  Thanks, Dan.

20         All right.  So the jury charge, we need to streamline it

21    down.  I just feel uncomfortable asking the jury 43 questions

22    or more.

23         And the Defendants got some questions in there for

24    damages, and I read through the answer and counterclaim and I

25    don't see that you've asked for any damages.
```

1              MR. WILSON:  Would you like me to address that,

2     Judge?

3              THE COURT:  Yes, please.

4              MR. WILSON:  That is correct, Your Honor.  Again,

5     the jury charge was done by Victor and myself to give us the

6     most global opportunity for the Court to take a look at it.

7     And, again, as we know, directed verdict issues, et cetera, I

8     think that thing is going to be pared way down, probably about

9     three quarters of what it is right now.  I would assume that

10    Victor and Dan and I ought to be able to get that done before

11    it goes to the jury.

12             THE COURT:  Okay.  And I notice also that the

13    Defense put in there a question about ten jurors have to

14    agree.  Of course that's state court and not federal court, so

15    we may not have ten jurors sitting to hear the case.

16             MR. WILSON:  I understand, Your Honor.

17             THE COURT:  All right.  Well, if that's the case, I

18    think we can probably proceed today.

19             MR. VITAL:  May I approach just on the issue of the

20    jury charge?

21             THE COURT:  Yes, sir.

22             MR. VITAL:  There is a universe where there's a "no"

23    answer on whether there's a written agreement but there's a

24    "yes" answer on whether there's a partnership.

25             THE COURT:  Right.  But even then, if you say "If

1    you answer 'no,' you're done" to those type of questions.

2           MR. VITAL:  On the issue of contract, yes, Your

3    Honor.

4       And I will take a stab tonight at dwindling the questions

5    down further so that we can economize and make it more

6    friendly for not only Your Honor but especially the jury.

7           THE COURT:  Okay.  Thank you.

8       All right.  I've signed the pretrial order.

9       We've got 25 jurors coming down.  What we'll do is -- How

10   many does the Plaintiff wish to have seated in the jury,

11   knowing that all deliberate?  If we lose one or two, we

12   wouldn't have alternates.

13          MR. VITAL:  I would -- Your Honor, may I stand and

14   address the Court from here, or would you like --

15          THE COURT:  That is fine.

16          MR. VITAL:  My preference would be to have six if we

17   have a pool that small.

18          THE COURT:  We will be able to seat more than that.

19   How many would you optimally like to have.

20          MR. VITAL:  Six.  And if you would like to have two

21   as alternates.

22          THE COURT:  They have to deliberate.  In civil cases

23   they all deliberate if they are picked.

24          MR. VITAL:  Right.

25          THE COURT:  So there wouldn't be alternates.

1              MR. VITAL:  I am fine with six to eight.  I see you

2    have eight note pads here.

3              THE COURT:  That's what we had on our last one.  It

4    is not indicative --

5              MR. VITAL:  Civil juries I have tried down here I

6    have had eight.  Obviously for reasons of it being easier and

7    quicker for the Plaintiff, in all candor and transparency, I

8    prefer six, but I'm fine with eight.

9              THE COURT:  Mr. Wilson?

10              MR. WILSON:  I would prefer eight, Judge.

11              THE COURT:  We will see how many we can get.  We

12    will go for eight.

13         How much time does the Plaintiff want for voir dire?

14              MR. VITAL:  Thirty to forty-five minutes, Your

15    Honor, if that is fine.

16              THE COURT:  I will give you 20.  Twenty minutes each

17    side for voir dire.

18         Will that work for you, Mr. Wilson?

19              MR. WILSON:  Yes, Your Honor.

20              MR. VITAL:  Will you voir dire the jury?

21              THE COURT:  I will.

22              MR. VITAL:  Thank you, Judge.

23              THE COURT:  And we also have a questionnaire.

24              MR. VITAL:  We do?  Okay.

25              THE COURT:  They should be filling it out now.

1          MR. VITAL:  Thank you, Judge.

2          THE COURT:  It's Judge Lynn's questionnaire that she

3    uses.  Since we were going with Judge Lynn's order, it was in

4    her scheduling order so we figured that we would just go ahead

5    leave it.  The questionnaire will give you a lot of

6    information about the jurors, so I think it is helpful.

7          The deal with the questionnaires is they are destroyed

8    after we look at them.  When we are finished with them nobody

9    keeps any of the information.  That is assurances to the jury

10   that they can be candid when they fill these out and they

11   don't have to worry about any of this information leaking

12   somewhere.  So we will shred them as soon as it is over.

13   That's the deal Judge Lynn makes with her jurors, and I do the

14   same.

15         MR. VITAL:  Yes, Your Honor.

16         THE COURT:  What else?  How much for opening?

17         MR. WYDE:  Approximately 20 minutes.

18         THE COURT:  Okay.

19         MR. WYDE:  Thank you, sir.

20         THE COURT:  Will that work for the Defense?

21         MR. WILSON:  It will, Your Honor.

22         THE COURT:  And we will take up closing as we see

23   how much evidence goes to the jury and so forth.

24         MR. VITAL:  One more question, Your Honor.  On voir

25   dire, is it your pleasure to have motions for cause at the end

1    of voir dire, or as cause is developed?

2              THE COURT:  No, we will do it at the end.

3              MR. VITAL:  And will you bring the jurors in for

4    additional questioning, or do I need to develop sufficient

5    cause?

6              THE COURT:  No, we will bring them in.  If there's

7    any personal matters that you want to delve into, let's bring

8    them up to the bench, or excuse the other jurors and bring

9    them in one at a time.  So keep a list of jurors you

10   individually want to question on any of those type of issues.

11   My guess is there probably won't be many.  But if there are

12   some, let's just have the whole jury recess back, and then we

13   will bring them back in here one at a time.  It is easier to

14   get it on the record, and it is easier for you guys to work

15   from your tables.

16             MR. VITAL:  Yes, Your Honor.

17             THE COURT:  What other matters, Mr. Wilson?

18             MR. WILSON:  Your Honor, I didn't know if you wanted

19   to get into the exhibits.  I thought we were going to be

20   discussing a little bit of those.

21             THE COURT:  Pre-admitting?

22             MR. WILSON:  Well, no, Judge, we are not

23   pre-admitting the exhibits.  We just have some concerns that I

24   don't know if the Court wants to be made aware of some of them

25   now or want to take it up.

1          THE COURT:  Yes, let's go ahead and take it up.

2          MR. WILSON:  Again, I don't like to do unfair

3    surprise to the other side, Your Honor.

4      Your Honor, the Defendant Marko Princip in his

5    deposition -- Is it all right if I discuss from here?

6          THE COURT:  That's fine.

7          MR. WILSON:  Thank you, Judge.

8      In his deposition, Your Honor, approximately probably

9    half of the exhibits that you've seen in Plaintiffs' trial

10   exhibit book, if you look through it, Judge, the Plaintiff was

11   unable to authenticate a bunch of these emails, these alleged

12   Skype chats, et cetera, et cetera, et cetera, between these

13   parties.  And so obviously -- I don't know if the Court wants

14   to take them up as they're admitted or if Plaintiffs' counsel

15   is intending to limiting that.  I'll do it either way.  But I

16   just want to make the Court aware that we've got concerns

17   under FRE 106 and then 1003 under the Federal Rules of

18   Evidence that the -- We know they are all duplicates.  There

19   is no dispute about that.  But we do have concerns about the

20   authenticity, and that a lot of them look like they are just

21   regular typed, you know, discussions of Word transcripts.

22      If Your Honor has the binder in front of you now, I can

23   tell you one that we're okay with and then give you an example

24   of another email that clearly might cause some concern for the

25   Defendants.

1          THE COURT:  We haven't received one from the

2    Plaintiff.

3          MR. VITAL:  You haven't, Your Honor?  I thought we

4    had delivered one down.  I have a set I can deliver to Your

5    Honor.

6       If I may, it sounds like we are just going to have to lay

7    foundation in the course of direct examination for the

8    authenticity of exhibits, is what I'm hearing, and we will do

9    that during the direct examination of our clients.

10          THE COURT:  You just have to bring them up at the

11    time that they offer the exhibits.

12          MR. WILSON:  I will do that, Judge.  Again, I am

13    just trying to give Plaintiff notice.  I was concerned that

14    half of them -- I just didn't want us to get too bogged down

15    in admissibility issues, but we will take them as the Court

16    sees them.

17          THE COURT:  Okay.  Thank you.

18       What else, Mr. Wilson?

19          MR. WILSON:  Nothing from the Defense, Judge.

20          MR. VITAL:  That's all I have, Your Honor.

21       If I may have leave to step in the hallway, I will call

22    my assistant and have -- Would you like a thumb drive,

23    Mr. Phillips, or the actual hard copies?

24          THE COURT:  I need the hard copy.

25          MR. VITAL:  Yes, Your Honor.  May I have leave to

1    step outside?  And I will have that done immediately.

2                THE COURT:  Sure.

3                MR. VITAL:  Thank you very kindly.

4                THE COURT:  They are going to email us as soon as

5    they are finished with the questionnaire and then we will

6    bring them in, so it might be 15 minutes or so.  Will that

7    work?

8                MR. VITAL:  Yes, Your Honor.

9                THE COURT:  Okay.  Thank you.  We will stand in

10   recess until 9:30.

11                      (Brief recess.)

12                THE COURT:  Good morning.  Please be seated.

13        I'm Judge Stickney, United States magistrate judge for

14   the Northern District of Texas.  And welcome.

15        I'm sorry it has taken so long to get you upstairs, but

16   it's like wrangling squirrels.  They get up on the wires and

17   everything.

18        The first thing I'm going to do is have you sworn under

19   oath so that we can begin the voir dire process, and ask you

20   some questions, and then I will give the lawyers a chance to

21   ask some questions, and then we will make our selections and

22   YOU will know who our jurors are.

23        A couple of you have indicated that you may have a

24   particular conflict, and we've received those messages and we

25   will take those into consideration as well, and talk to you

 1    about them in private if you wish.

 2        But first thing I will do is swear you under oath.

 3            (Whereupon, the oath was administered by the Clerk.)

 4            THE COURT:  All right.  Thank you.

 5        The purpose of the voir dire is to ask some questions of

 6    you to enable the Court to determine whether or not any of you

 7    should be excused for cause.  It's also to enable counsel for

 8    the parties to exercise their individual judgment with respect

 9    to their peremptory challenges--that is, challenges for which

10    they need not give a reason.  And we are all looking for fair

11    and impartial jurors to sit on this particular case.

12        Now, this case is expected to take three days to try.  It

13    may run into Friday, though.  So it would be the whole week I

14    think is what we should plan on.  It's a breach of contract

15    case that the Plaintiff has alleged the Defendant has breached

16    a contract, among other things, and the lawyers will further

17    explain that to you.

18        First off, I would like to introduce the attorneys that

19    represent the Plaintiff.

20        Mr. Vital, if you would introduce yourself and members at

21    your table.

22            MR. VITAL:  Thank you very kindly, Your Honor.

23        I am Victor Vital.  I am A trial lawyer here in town.

24    And along with Dan Wyde, another trial lawyer here, we are

25    proud to represent our clients Brandon Keating and David Tyler

 1    Moss.

 2              THE COURT:  Thank you.

 3              MR. VITAL:  Thank you, Judge.

 4              THE COURT:  Are any of you personally acquainted

 5    with or related to any of the members that have been

 6    introduced for Plaintiff?

 7         Are any of you have any business dealings -- I'm sorry?

 8              UNIDENTIFIED PANEL MEMBER:  I am, Your Honor.

 9              THE COURT:  How are you related to --

10              THE PANEL MEMBER:  I used to be a former Dallas

11    County assistant prosecutor, and actually was a prosecutor in

12    Dan Wyde's court.

13              THE COURT:  All right.  Is there anything about that

14    that would cause you difficulty in serving in this case?

15              THE PANEL MEMBER:  I don't believe so.

16              THE COURT:  All right.  Thank you, sir.

17         Anybody else have any other relationship or business

18    connections with any of the Plaintiffs?

19         All right.  Let me ask the Defense, Mr. Wilson, if you

20    would introduce yourself.

21              MR. WILSON:  Thank you, Your Honor.

22         Good morning.  My name is Robert Doyle Wilson.  I am an

23    attorney here as well in Dallas, Texas.  This is Brian Martin

24    to my left, and to my far left, which will be your right, is

25    Marko Princip.  We are the Defendants in this case.

1              THE COURT:  Thank you.

2       Do any of you know or are personally related to or have

3    any acquaintance with Defense counsel or his clients?

4       Anybody have any business dealings with Mr. Wilson or his

5    firm or any of the Defendants in this case?  All right.

6       Now, Mr. Vital, I'm going to ask you to list your

7    witnesses, other than parties, if you would, and then I'll ask

8    the prospective jurors if they have any knowledge of any of

9    these people.

10             MR. VITAL:  Thank you very kindly, Your Honor.

11       On our witness list, other than the parties to the case,

12   we have Paul Smoot.

13             THE COURT:  And where is he from?

14             MR. VITAL:  I believe he's from California, Your

15   Honor.  Dan Japikse from Boston, Massachusetts.  And we have

16   another listed as possible, but he's not going to testify.

17             THE COURT:  All right.  Thank you.

18       Anybody know any of those individuals that were

19   mentioned?  Ever heard of them or any knowledge about?  Okay.

20   Thank you.

21       Mr. Wilson?

22             MR. WILSON:  Your Honor, Defendants will obviously

23   have Brian Martin and Marko Princip as well as Dejan Princip,

24   which is one of the Defendants' father.

25             THE COURT:  Thank you.

1          Does anybody know any of these witnesses for the Defense?

2    All right.  Thank you.

3          Now, we have given you some questionnaires that you

4    filled out, and they cover my next questions which would be

5    service of -- prior jury service.  And you filled all those

6    out, so I don't need to go into those again because we have

7    these questionnaires.

8          We also want you to know that these questionnaires, while

9    we looked at them, they will all be shredded and destroyed

10   immediately after the jury is selected.  So nobody is ever

11   going to see these questionnaires, other than us, just so you

12   know that.  Okay?

13         Now, I'll ask the panel as a whole, if you are selected

14   to sit on this case, will you be able to render a verdict

15   solely on the evidence presented at the trial and in the

16   context of the law as I will give it to you in my

17   instructions, disregarding any other ideas, notions, or

18   beliefs about the law that you may have encountered in

19   reaching your verdict?  Anybody have a problem with following

20   the Court's instructions?  Thank you.

21         Is there any member of the panel who has any special

22   disability or problem that would make it difficult for you to

23   serve?  Hearing problems, health problems, anything?

24         Yes, ma'am.

25               UNIDENTIFIED PANEL MEMBER:  I have an ear infection

 1    that's making it hard to hear.

 2                THE COURT:  All right.  Are you on medication?

 3                THE PANEL MEMBER:  No.

 4                THE COURT:  Okay.  But you've been able to hear me

 5    so far?

 6                THE PANEL MEMBER:  So far, yeah.

 7                THE COURT:  Okay.  I'm sorry.  Juror Number --

 8                THE COURT SECURITY OFFICER:  No. 16, Your Honor.

 9                THE COURT:  All right.  Thank you.

10         Anybody else?

11         And we'll take up those other issues.  I think one of the

12    jurors had a doctor's appointment on Thursday and that might

13    be a problem.  Was that Juror No. 12?

14         What time on Thursday?

15                THE PANEL MEMBER:  2:00 p.m.

16                THE COURT:  All right.  Thank you.

17                THE COURT SECURITY OFFICER:  That was Juror No. 12.

18    At 2:00 p.m., Your Honor.

19                THE COURT:  I've learned through my almost -- well,

20    my 18 years on the bench, that doctors are more important than

21    judges, and anyone else for that matter, so we will try to

22    make sure you can make that appointment.

23         All right.  Having heard -- All right.  The next thing

24    we'll do is I'm going to give the attorneys a brief amount of

25    time in which to ask you any particular questions that they

 1    have.

 2          Mr. Vital, you may proceed.

 3              MR. VITAL:  Yes, Your Honor.  Thank you very kindly.

 4          May it please the Court.

 5              THE COURT:  Yes, sir.

 6              MR. VITAL:  Opposing counsel.

 7          Good morning, ladies and gentlemen.

 8          I smile when I do this because I'm doing my life's work.

 9    I like trying cases.  You all probably are not as enthused to

10    be here as I am.  Perhaps you are.

11          Is anybody happy to be here this morning?  I like it.  I

12    like it.

13          Is anybody glad to be alive today?  I figured we'd get

14    more hands there.

15          So this case you're going to hear--I'm going to talk

16    about it because I have a limited amount of time-- is a

17    contract case and a partnership dispute.  And we are here, as

18    we expect the evidence will show, that contracts were made,

19    promises were broken, and obligations of the partnership were

20    interfered with.

21          Now, you'll hear a different story from the other side,

22    but that's what our case is about--taking responsibility for

23    what you put in the written contract and living up to what you

24    said you were going to do.

25          This case is a business case, therefore, but it's a

1    different kind of business.  I say it's a different kind of

2    business.  I'm showing my age really.  These gentlemen here

3    will tell me that I'm not relevant anymore, but I need to talk

4    about this in voir dire because the business is YouTube.

5        My daughter is eight years old, and when she says she

6    wants to watch TV, she is talking about YouTube.  It's a

7    different world we live in.  And there are people who create

8    content on the internet, and they make money from the content

9    based upon sponsorships and ads and such.  If you create a

10   following on YouTube, you can actually monetize the content,

11   and that's what this case is about.

12       Is there anybody here -- If you raise your hand it's

13   okay, because I still watch TV the old-fashioned way.  And

14   when I say cable and my daughter doesn't know what I'm talking

15   about, I know what I'm talking about.  So it's a different

16   world.  Is there anybody here who doesn't know what YouTube

17   is, or who has not heard of YouTube?  All right.

18       Is there anybody here who, before I started talking, was

19   not aware that you could -- that you can be an entrepreneur

20   and make money via YouTube?  Is that new to anybody?  Okay.

21   Just a couple of people.  That's fine.

22       So voir dire means to speak the truth, and that's all

23   we're asking.  There are no right or wrong answers.  So I

24   appreciate the two individuals who raised their hands.

25       Can I have your juror numbers, please?

```
 1                  UNIDENTIFIED PANEL MEMBER:  No. 19.

 2                  UNIDENTIFIED PANEL MEMBER:  No. 13.

 3                  MR. VITAL:  And there was one on this side.

 4                  THE COURT SECURITY OFFICER:  No. 23.

 5                  MR. VITAL:  Other than those three individuals, is

 6       there anybody else, by raising your hand, that was not aware

 7       that you can make money on YouTube?  Okay.

 8           Is there anybody here who does not watch YouTube?  Okay.

 9       And if you could keep your hands raised, raise them real high,

10       and I'll have my colleague write those down.

11           We've got Juror No. 6.

12                  THE COURT SECURITY OFFICER:  No. 15, 10, 16, and 23.

13                  MR. VITAL:  Okay.  Anybody else who does not watch

14       YouTube that did not hear their juror number?

15           Would you repeat those numbers one more time.

16                  THE COURT SECURITY OFFICER:  No. 6, 10, 15, 16, 23.

17                  MR. VITAL:  Is there anybody here, or how many

18       people here feel weird about the fact that there could be a

19       partnership that concerns a YouTube channel and making money

20       on YouTube?  Does that strike anybody as odd?  It struck me as

21       odd, I'll admit.  Again, this is an old-fashioned guy that

22       still watches TV the old-fashioned way, to the extent I can

23       watch it.

24           Is there anybody else -- Okay.  Sir, what was your

25       number?
```

```
 1              UNIDENTIFIED PANEL MEMBER:  No. 19.

 2              MR. VITAL:  Okay.  Anybody else than me and Juror

 3   No. 19?  Okay.

 4       How many people here are offended by the fact that you

 5   can make money through YouTube?  Anybody here offended by that

 6   at all?  Or how many of you are offended, if at all?

 7       Okay.  Well, let me ask you some fun questions.  This is

 8   a fun question.  I like to ask this question in voir dire.

 9       How many people here have two or more bumper stickers on

10   their car?  Okay.

11              UNIDENTIFIED PANEL MEMBER:  I'm not sure.  Are we

12   talking like college stickers?

13              MR. VITAL:  Absolutely.

14              THE PANEL MEMBER:  I have them for all my kids.

15              UNIDENTIFIED PANEL MEMBER:  As well.

16              MR. VITAL:  Any sticker on your car, if you've got

17   two or more.

18       Juror No. 4.

19       Juror number --

20              UNIDENTIFIED PANEL MEMBER:  No. 22.

21              MR. VITAL:  And Juror No. 14.

22       Another kind of demographic or attitudinal question, as

23   we call it in jury selection speak, how many people here have

24   had people tell them, "You are a leader.  We see you as a

25   leader."  They treat you as a leader.  They call you a leader.
```

1    How many people here would identify as leaders because other

2    people have either told you that or interact with you as such?

3    Juror -- We got a lot of hands here.  No. 3, 4, 5, 7.

4            THE COURT SECURITY OFFICER:  No. 7, 8, 9, 11, 12,

5    13, 14, 24, 25.

6            MR. VITAL:  Okay.  Now I'm going to start talking

7    about some things that relate to business.

8        How many of you have signed contracts in the past

9    regarding anything?  All right.  Just about everybody.

10       How many of you-all -- Well, how many of you have signed

11   contracts that relate to business?  So we have less.  Okay.

12       How many of you have not signed contracts that relate to

13   business?  That's probably an easier question.

14       So Juror No. 2.  Juror --

15           UNIDENTIFIED PANEL MEMBER:  No. 10.

16           THE COURT SECURITY OFFICER:  No. 16, 17, 18, 23 and

17   24, and 25 and 26.

18           UNIDENTIFIED PANEL MEMBER:  I'm not real sure what

19   you are asking here.  I mean, I signed a contract to work in

20   my current job.  Is that what you're talking about?

21           MR. VITAL:  That counts.  How many of you have

22   signed contracts that are more than ten pages?

23       Let me ask you a question.  And I happen to know, sir,

24   that you're an attorney, so I'm going to pick on you a little

25   bit, if you don't mind.  Are you able or do you know whether

 1   you're able to make an agreement without a contract in certain

 2   cases?

 3           MR. WILSON:  We object.  I think that's an improper

 4   question.

 5           THE COURT:  Agreed.  Sustained.

 6           MR. VITAL:  Okay.  Let me ask it another way.  How

 7   do you feel about agreements that --

 8           THE COURT:  Mr. Vital, I'm going to ask you not to

 9   single out the attorneys in this, because we can advise them

10   on the law.

11           MR. VITAL:  Right.  Yes, sir.  Thank you.

12       How many people here would feel uncomfortable awarding,

13   let's say, hundreds of thousands, if not more than a million

14   dollars, in damages if there was no written contract?  By a

15   show of hands, how many people would feel uncomfortable doing

16   that--there is no written contract, but there is a person

17   asking for an award of hundreds of thousands, if not more than

18   a million dollars.

19       Okay.  We got Juror No. 6, and on the second row 7.

20           THE COURT SECURITY OFFICER:  No. 10, 15, 16, 17, 18,

21   19, 22.

22           UNIDENTIFIED PANEL MEMBER:  I'm not sure.

23           THE COURT SECURITY OFFICER:  No. 13 is not sure.

24           MR. VITAL:  Tell me what is going through your mind

25   in that regard, ma'am, if you don't mind.

 1              THE PANEL MEMBER:  I feel like I would just have to

 2     listen to the evidence and then decide fairly on that.

 3              MR. VITAL:  Right.  Right.  That's fair.  Thank you.

 4        Let me ask you, if there is an agreement but it's just a

 5     one-page agreement, so there's a written agreement that's one

 6     page, how would you feel about awarding hundreds of thousands

 7     of dollars, if not over a million dollars, in a case where the

 8     written agreement in the case is just one page?  Signed by

 9     both parties, but it's just a one-page document as opposed to

10     a multi-page document that's fancy with a lot of exhibits and

11     such.  How many people would feel uncomfortable in that case?

12     You got a one-page written agreement, awarding hundreds of

13     thousands of dollars on a one-page agreement.

14        All right.  Yes, sir.  Your juror number?

15              UNIDENTIFIED PANEL MEMBER:  No. 11.

16              MR. VITAL:  Okay.  Thank you for your honesty.  I

17     appreciate that.

18        Without having you elaborate, because I have a limited

19     amount of time, how many other people in addition to Juror

20     No. 11 would feel uncomfortable awarding hundreds of thousands

21     of dollars, if not more than a million dollars in damages, if

22     you have just a one-page contract?  Nobody else?

23        Yes, ma'am.

24              UNIDENTIFIED PANEL MEMBER:  I personally would, but

25     other people --

1        MR. VITAL:  You would feel -- So you could or

2   wouldn't feel --

3        THE PANEL MEMBER:  I personally would feel

4   uncomfortable.

5        MR. VITAL:  If the evidence in the case showed the

6   existence of an agreement that was just one page, and by the

7   standards that the Judge gave you the evidence showed over

8   $100,000, could you follow what the Judge said the law is, or

9   would your -- do you feel so uncomfortable that you probably

10  would have issues or problems doing that?

11       THE PANEL MEMBER:  For the evidence for the case,

12  no, I would not have a problem making the decision based on

13  the evidence.

14       MR. VITAL:  So tell me a little bit about the

15  discomfort that you have -- that you would have in the

16  situation of awarding hundreds of thousands of dollars just

17  based upon a one-page contract.

18       THE PANEL MEMBER:  The issues I had personally?

19       MR. VITAL:  Or if you would have any -- what your

20  concerns are.

21       THE PANEL MEMBER:  Well, I like details.  I'm a very

22  detail-oriented person, so personally I would like the

23  details.  But I know others can reach an agreement on a

24  napkin, if they choose.

25       MR. VITAL:  In a situation -- If you had -- In a

```
1    situation or a case where people weren't detail-oriented, or

2    maybe not as detail-oriented as you, you're sitting in the

3    jury box listening to the evidence--and I know I'm asking you

4    to project a little bit a situation that doesn't exist--tell

5    me what's going through your mind and how you're feeling about

6    that.  Are you judging them saying, "Man, they didn't have

7    enough details here," or -- and if you are, that's fine.

8            THE PANEL MEMBER:  It's dependent upon the case, I

9    think.  If a sheet of paper is doable for the details that

10   they need, so be it.

11           MR. VITAL:  What type of details would you be

12   looking for?

13           THE PANEL MEMBER:  Well, I would need to know a

14   little bit more about the case.

15           MR. VITAL:  Okay.  Okay.  Okay.

16      How many people feel --

17           THE COURT SECURITY OFFICER:  Counselor, I am sorry.

18   There was one more over here.

19           MR. VITAL:  Yes, ma'am.  You have -- Do you have

20   similar concerns or thoughts?

21           UNIDENTIFIED PANEL MEMBER:  Yeah.  I just might not

22   be as comfortable with thinking that one page might not cover

23   all the holes or details and something could get missed in the

24   contract and that the other person may argue against.

25           MR. VITAL:  Right.  Right.  The whole purpose of
```

 1    what we're doing is to get honest answers just like this.  And

 2    I appreciate both of the answers that I've gotten to this

 3    question.

 4        How many other people agree or have similar thoughts or

 5    concerns to the two ladies we just heard from?  Nobody else on

 6    the first row?  Nobody else on the second or the third?

 7        Let me interject another fact into this hypothetical mix

 8    of how-you-feel questions.  How would you feel about awarding

 9    hundreds of thousands of dollars, if not more than a million

10    dollars, in damages in a case where the contracts were signed

11    by young adults, 18 years old, 19 years old, who may have

12    signed contracts but they are essentially young adults?

13    How do -- Is there anybody here who has any thoughts that they

14    would like to talk about regarding holding a young adult

15    responsible for a contract they signed if it means awarding a

16    large amount of damages based upon the contract?  Anybody --

17    How many people have thoughts or concerns about doing that?

18        Yes, sir.  Juror No. 4?

19            THE PANEL MEMBER:  Well, 18 is 18.  You signed a

20    contract.  You are legal.

21            MR. VITAL:  So that's a good -- That's your thought,

22    and we appreciate that.

23        I'm going to use that to ask if there's anybody else who

24    believes, "You know what?  Maybe they were just kids."

25        Well, let me ask you.  What about me telling you, "Well,

1    the person's just a kid.  How about that?  He's just a kid"?

2              THE PANEL MEMBER:  He's still liable.

3              MR. VITAL:  So understanding that nobody gets in

4    trouble for disagreeing, how many people disagree with Juror

5    No. 4, and actually think, "Well, a factor should be that the

6    person was just a kid, and I don't know if I can award

7    hundreds of thousands of dollars in a case when a person

8    signed a contract and they were just a kid."  Anybody?

9    Nobody?

10              UNIDENTIFIED PANEL MEMBER:  Hang on a second.

11              MR. VITAL:  Yes, sir.

12              THE PANEL MEMBER:  You are really kind of confusing

13    me here.  So, first off, you know, we've all talked about we

14    got to see the evidence first before we can ever say.  But if

15    you're asking if there was a verbal agreement between two

16    people--okay?--and there was a verbal agreement that you give

17    me this and I'll give you that, and then whether or not one

18    person's frame of mind wasn't where it should have been or

19    they weren't paying attention to dotting the Is or crossing

20    the Ts, you know, I mean, we are still talking about people

21    who are old enough to go and fight and die for our country and

22    vote in our elections.  So if you are 18 years old and you

23    make an agreement, a deal is a deal.

24              MR. VITAL:  Okay.

25              THE PANEL MEMBER:  So I'm not sure what -- You are

1    throwing so many hypotheticals at me, you are kind of

2    confusing me.

3           MR. VITAL:  Actually you are right on point.  You

4    are understanding everything just perfectly, actually.

5        But what I'm wondering is -- and trust -- if there's

6    anybody that feels differently than that.  That's all.  But

7    trust me, you are actually following just fine.

8        Is there anybody who feels differently than the gentleman

9    who just spoke or the gentleman on the first row, Juror No. 4?

10    Anybody?  Okay.

11        How many people have heard the phrase all is fair in

12    business?

13        Juror No. 1, how do you feel about that phrase or what

14    are your thoughts?  What do you understand that to mean?

15           THE PANEL MEMBER:  I guess whatever contract you

16    sign is what you are obligated to uphold.

17           MR. VITAL:  Okay.  Has anybody --

18           THE PANEL MEMBER:  Even if you made a bad deal.

19           MR. VITAL:  Okay.  How many people would feel

20    uncomfortable enforcing a contract against a party if they

21    happen to make a bad deal?  Let's say they signed the

22    contract, it's a one-page contract, they make a deal, and in

23    retrospect they think, "Man, I gave away too much.  Why did I

24    make that deal?"

25        Is there anybody here, or how many people would feel

1    uncomfortable enforcing that agreement if they thought the

2    agreement was a bad deal in retrospect?  Nobody?

3         Let me -- This is a slightly different question.  How

4    many people have heard the phrase business is cutthroat?

5         Okay.  How many people -- And if you agree with this,

6    this is fine, because we have, as we have seen in this

7    election cycle, we have a large divergence of what people

8    think across this spectrum in this country.  That's just

9    politically.  So obviously regarding business and such, there

10   is going to be disagreement at times regarding what we believe

11   about concepts.

12        How many people agree with the concept that business is

13   cutthroat?

14        Juror No. 1.  Juror No. 4.  Juror No. 6.

15        Yes, ma'am?

16             THE COURT SECURITY OFFICER:  No. 16.

17             MR. VITAL:  Anybody else?

18        Further to that concept or that question, how many people

19   believe that, because business is business, it's okay to lie

20   or to deceive or to be dishonest in business, because business

21   is cutthroat?

22        Let me ask you, ma'am, Juror No. 16.  You believe that

23   business is cutthroat.  Is it okay, in your view, to lie or

24   deceive, and it's incumbent upon the other party to make sure

25   that they protect themselves?

```
 1                 THE PANEL MEMBER:  No.

 2                 MR. VITAL:  Why do you say that?

 3                 THE PANEL MEMBER:  Well, I believe business can be

 4    cutthroat, but I don't think people should lie.

 5                 MR. VITAL:  Okay.  Is there anybody here who

 6    disagrees with that, because of the concept or the thought

 7    that, "Well, you're in business, so if somebody says something

 8    to you, you shouldn't just gullibly rely on that, but you

 9    should check it for yourself.  And shame on you if you don't"?

10        Juror No. 4?

11                 THE PANEL MEMBER:  It's wrong and immoral for

12    businesses to cheat, lie, be deceitful, whatever, but it is on

13    you to make sure that you are not being deceived or cheated

14    when you step into a business.  That's part of the cutthroat

15    industry.

16                 MR. VITAL:  Okay.  Did everybody hear what Juror

17    No. 4 just said?  How many people feel the same way?  Okay.

18    If you can keep your hands raised, we will get those.

19                 THE COURT SECURITY OFFICER:  No. 1, 5, 6, 11, 13,

20    14, 15, 17, 19, 20, 21, and 26.

21                 THE COURT:  Thank you, Mr. Vital.  I appreciate it.

22    That's 20.

23                 MR. VITAL:  My time is up?

24                 THE COURT:  Yes, sir.

25                 MR. VITAL:  Thank you very kindly, Judge.  I
```

1      appreciate it.

2                THE COURT:  Mr. Wilson?

3                MR. WILSON:  Thank you, Your Honor.  Always at the

4      lectern, Your Honor?

5                THE COURT:  Please.

6                MR. WILSON:  Good morning, panel members.  Again,

7      thank you for being here today.

8           I, unlike Mr. Vital, would probably rather be with my

9      family or on the beach or on my boat, or just relaxing and

10     enjoying myself.

11          No disrespect to the Court, I love the United States of

12     America, father retired from the Navy, brother-in-law is FBI

13     Homeland Security, so I get it.  It's an important service.

14     You all are here today serving us, serving the Court, and I

15     appreciate that, and the Defendants appreciate that.

16          Mr. Vital told you that we have a business dispute.  Yes,

17     we do.  We have a partnership, or an alleged partnership, and

18     we need your help and a valuation, if there is a value.

19          Does anybody here -- I think everybody said they were

20     familiar with YouTube.  Correct?  Okay.

21          Anybody ever upload a video on YouTube?  Those with the

22     hands raised, if you don't mind, keep them raised, please.

23     Thank you.  Did YouTube ever send you a check?  No?  No?  No?

24     You can put your hands down.  So hands up if anybody got a

25     check.  No?

1     Any of the advertisers, or anybody that you might have

2  uploaded that video onto, did anybody get a check?  Nobody got

3  a check.  Okay.

4     Those of you that uploaded your videos on YouTube, I

5  think there are about eight of you, did you have to pay for

6  that?  Sorry?  No.  Did anybody pay for it?  Okay.

7     So do we all agree that anybody can put a YouTube video

8  up on YouTube, to your knowledge?  Does anybody know

9  otherwise?

10     Yes, sir.  And you are Juror number --

11               UNIDENTIFIED PANEL MEMBER:  No. 14.

12               MR. WILSON:  Yes, sir.  Mr. Smith.  Correct?

13               THE PANEL MEMBER:  Yeah.  They pull content off of

14  YouTube if it violates any copyrights or anything like that.

15  If you put something up there that's inappropriate or that

16  violates a copyright, they'll yank it.

17               MR. WILSON:  Well-noted point.

18               THE PANEL MEMBER:  And also threaten you with

19  prosecution.

20               MR. WILSON:  I would agree with that.  And that's

21  what our United States government does.

22     So with that said, it would seem that anybody could

23  create their own content provided, as Mr. Smith has stated,

24  that it does not offend or violate any constitutional rights.

25  Probably we would all agree with that.  Does anybody disagree

1    with that?  Okay.

2        Now, I notice that most of you have not ever been through

3    this process before, so I just want to give you a brief little

4    overview.

5        This trial is kind of in five parts, really, is what I

6    like to try to educate the panel members so we know what we

7    are all getting into together on this ride, as the Judge said

8    that's going to go until probably Thursday, maybe Friday.

9        This is voir dire.  This is the first part, as Mr. Vital

10   said to tell the truth, so we can discern and determine the

11   jurors that are going to be good for us.  And I will say that,

12   yes, the Defense intends and we want to win this case.  So I

13   want jurors that are going to support my clients' position.  I

14   know the Plaintiffs want that as well.  That's the first part

15   of this series, and then we will be through in a few minutes.

16       Then the lawyers come to the lectern and give you the

17   opening statement.  Again, everything I say, everything

18   Mr. Vital says, is not evidence.  Not evidence at all.

19   Nothing for you to consider.  Doesn't mean you check your

20   common sense at the door.

21       The evidence comes when the next part is the case in

22   chief, which is where our eight lucky panel members will be

23   selected to be our jury.  And for that we will -- both sides

24   will be truly grateful for your time.  It will then come from

25   the witness stand.  And I surmise that from what I know about

 1    this case, 75 percent of this case is going to be the

 2    testimony from the Plaintiffs and from the Defendants.

 3        And you heard that at the time that they were all

 4    together they were 18 years old.  They were all kids.  I liken

 5    this case to the lemonade stand that was created and then

 6    there was another lemonade stand.

 7        Has anybody ever had a lemonade stand before when they

 8    were a kid?  Anybody?  Did you do it more than once?

 9            UNIDENTIFIED PANEL MEMBER:  Just once.

10            MR. WILSON:  Just once.

11        Anybody do it more than once?  Did you do it with a

12    couple of different neighborhood kids?  Yeah?  Okay.  All

13    right.  And was that okay to do that?

14            UNIDENTIFIED PANEL MEMBER:  Yes.

15            MR. WILSON:  Okay.  You heard Mr. Vital -- Well,

16    getting back to the evidence piece, so the lion's share of

17    this case is going to come on credibility--on the Plaintiffs'

18    testimony and the Defendants' testimony.  And you're going to

19    weigh -- That's where that come sense comes in.  Credibility,

20    and try to figure out, "Okay, how did this thing happen?  Is

21    there value to this issue?"  And then you're going to see

22    documents.

23        My Juror No. 6, ma'am, you know what DocuSign is.

24    Correct?  Is it possible that somebody could sign DocuSign

25    other than Bob Wilson if Bob Wilson bought a house?  Is it

1    possible?

2              THE PANEL MEMBER:  Yes.

3              MR. WILSON:  Okay.  That's the scary thing about

4    this case, folks.  And, again, myself, like Mr. Vital, I'm

5    still in the cable age as well.  Okay?  The only time I see

6    YouTube is when my high school senior or junior on there

7    showing a funny video.

8       So a lot of these documents are emails, Skype chats.  You

9    are going to have to weigh DocuSign stuff.  You are going to

10   have to weigh that evidence and the credibility of those

11   documents as to whether they say what they say or whether the

12   testimony is something different.

13       Does anybody think an email cannot be altered--that it

14   is what it says no matter what until the end of the day?  Not

15   one person.  Right?  That's, again, a scary thing in this

16   electronic age that we're in.  But that's what this case is

17   going to be about, folks.  And I'll be the first to admit it.

18       Panel Member No. 4, you had some pretty specific views on

19   partners; partnerships.  Have you ever had a partnership

20   before?

21              THE PANEL MEMBER:  Yeah, I have.

22              MR. WILSON:  Okay.  And I assume that partnership

23   broke up?

24              THE PANEL MEMBER:  Yeah.  It was -- We actually

25   split on good terms.

```
 1              MR. WILSON:  Okay.  And why did that partnership
 2    break up?
 3              THE PANEL MEMBER:  We were taking our business
 4    functions in different directions.
 5              THE COURT:  I am sorry.  I couldn't quite hear you?
 6              THE PANEL MEMBER:  We were going in different
 7    directions with your business ideas, and we decided to
 8    mutually go our own way.
 9              MR. WILSON:  Was that okay?
10              THE PANEL MEMBER:  It was very okay.  I mean, it was
11    a great handshake agreement, and we took our businesses in our
12    own directions, and we still communicate back and forth today.
13              MR. WILSON:  If you-all were still partners today,
14    would you have expected him to contribute or assist or
15    volunteer or pay for you to continue that partnership
16    situation?
17              THE PANEL MEMBER:  It would depend on the situation
18    in the business.  You know, if we are still continuing to work
19    as a partner group with our business now, we would both be
20    contributing to the pot.
21              MR. WILSON:  In your opinion, Mr. Davis, what do
22    partners do for one another?
23              THE PANEL MEMBER:  Help each other out when the time
24    needs.  Usually in a business situation, you know, they both
25    contribute to the job being done.
```

1          MR. WILSON:  And what if one partner fires another

2    partner?  Is that okay?

3          THE PANEL MEMBER:  It could be, depending on the

4    situation.  You know, I mean, I've seen businesses that had

5    partnerships where the two partners left on bad terms, and

6    usually the business dissolves from that, and it is very

7    difficult to continue operations after that because you lost

8    half of your function in the business.

9          MR. WILSON:  And then in your situation with your

10   partner, when you all broke up or split, or got divorced, for

11   lack of a better word, I assume you just divided everything up

12   as of that day and you both went your separate ways?

13         THE PANEL MEMBER:  For the most part, you know.  I

14   mean, we took what we needed, and we mutually agreed on how to

15   divvy everything up.

16         MR. WILSON:  Okay.  Mr. Collins, are you a litigator

17   as well?

18         THE PANEL MEMBER:  No.

19         MR. WILSON:  Okay.  And so you do not -- have not

20   tried jury trials, say, in the last five years?

21         THE PANEL MEMBER:  No, I have not.

22         MR. WILSON:  And I don't think you've ever sat on a

23   jury panel.  Correct?

24         THE PANEL MEMBER:  No.

25         MR. WILSON:  Okay.  Other than Mr. Davis, and I

```
 1    assume Mr. Collins, is there anybody else on the first --

 2    Let's just take the first two rows, please, that have had

 3    partners before, have been in partnerships, whether it was a

 4    lemonade stand or whether it was a paper route or something

 5    else.

 6        And Ms. Sims, what kind of partnership were you involved

 7    in?

 8            THE PANEL MEMBER:  I am currently in a partnership

 9    with a non-profit.

10            MR. WILSON:  Okay.  And you are a mediator as well.

11    Correct?

12            THE PANEL MEMBER:  Correct.

13            MR. WILSON:  Okay.  And have you mediated, say, in

14    the last six months?

15            THE PANEL MEMBER:  No.

16            MR. WILSON:  And describe to me the partnership that

17    you're in right now and the non-profit.  You and several other

18    folks?

19            THE PANEL MEMBER:  No; just me and one other person.

20    We have a non-profit.  We aid individuals that are aging out

21    of the foster care system and provide them with professional

22    services, such as interviewing and finding jobs.

23            MR. WILSON:  So you are over at George L. Allen, I

24    assume, sometimes?

25            THE PANEL MEMBER:  Not yet.  We are just starting.
```

1    We are only a year old.

2            MR. WILSON:  All right.  Thank you.

3        And then I think, Ms. Robbins, did you raise your hand?

4    Are you in a partnership?

5            THE PANEL MEMBER:  No.

6            MR. WILSON:  But you were?  And at one time you were

7    an accountant, I saw.  Correct?

8            THE PANEL MEMBER:  Yes, but it was not related to

9    that.  It was people who went together to purchase real estate

10    to do vacation rental properties.

11            MR. WILSON:  Okay.  And so how did that work out?

12    Was it just you and another person or --

13            THE PANEL MEMBER:  No.  There were four of us.  Two

14    decided they no longer wanted to pay the mortgage and the

15    bills and ceased paying, so the other two sued them.  And we

16    ended up settling, but they did have to pay about 90 percent

17    of what they owed.

18            MR. WILSON:  Okay.  And then did you fire the two

19    non-paying partners?

20            THE PANEL MEMBER:  I'm not really sure how to answer

21    that.  They walked out and said they didn't want anything else

22    to do with the project.

23            MR. WILSON:  So did you assume at that point in time

24    when they walked that the partnership was over?

25            THE PANEL MEMBER:  No.

```
 1                  MR. WILSON:  Okay.  You assumed the partnership --

 2                  THE PANEL MEMBER:  Expected them to fulfill their

 3       obligations.

 4                  MR. WILSON:  And then was their reply that the

 5       partnership terminated, or what was their reply back to you?

 6                  THE PANEL MEMBER:  Their reply was that they had no

 7       more funds to put towards the project.

 8                  MR. WILSON:  Okay.  And was that case here in

 9       Dallas?

10                  THE PANEL MEMBER:  No.

11                  MR. WILSON:  Where was that?

12                  THE PANEL MEMBER:  Carson City, Nevada.

13                  MR. WILSON:  Did you have an attorney help you with

14       that?

15                  THE PANEL MEMBER:  Yes.

16                  MR. WILSON:  How long ago was that?

17                  THE PANEL MEMBER:  It began in June of 2010, and we

18       went to court in the summer of '11.

19                  MR. WILSON:  Thank you.

20             Anybody else in the first two rows that has an active

21       partnership today?  Mr. Kauffman?

22                  THE PANEL MEMBER:  Actually partner in two.  One is

23       a non-profit, Kauffman Leadership Academy.  It's an education

24       non-profit that we operate a charter school, home school

25       support, and community activities in Cleburne.  And the second
```

```
 1   one is a for-profit.  I have partners in Oregon that provide

 2   me money, I buy mobile homes, and rent them.

 3              MR. WILSON:  Ms. Robbins and Mr. Kauffman, I assume

 4   both those non-profits are registered with the Secretary of

 5   State.  Correct?

 6              THE PANEL MEMBER:  And the IRS.

 7              MR. WILSON:  So both of you-all registered your

 8   partnerships, though?  Oh, you never did.  Okay.  All right.

 9        In the first two rows, other than Ms. Robbins, was there

10   anybody else that did not register their partnership with the

11   Secretary of State?

12        In the third row, is there anyone that is currently in a

13   partnership with anyone?  Okay.

14        Well, I think that about wraps it up for me, folks.

15   Again, we will do some work here with the Judge.  I look

16   forward, and the Defendants do, with having to select eight

17   over there and working with you-all to reach a just and right

18   verdict based upon your common sense with all these

19   individuals which, again, will help guide both Plaintiffs and

20   myself towards what is the community standard on something

21   like this, such as a YouTube channel.  Thank you.

22              THE COURT:  Thank you, sir.

23        Now, I've got one final question for you, which is the

24   catch-all question.

25        Having heard all of the questions put to you by the Court
```

1    and counsel, does any other reason suggest itself to you as to

2    why you could not sit on this jury and render a fair verdict

3    based on the evidence presented to you and in the context of

4    my instructions to you?  Anybody?  Okay.  Thank you.

5        What I'm going to do is excuse you into the hallway, we

6    are going to make your selections, and then we will call the

7    eight names for the jury and the rest will be excused.

8        And I've got -- again, I've got those individuals'

9    requests here that you have a conflict during this time, so we

10   will take those up out of your presence as well.  And we may

11   have to have you come in for further questions, but right now

12   I'll just have you stand outside.  Thank you.

13            (Whereupon, the jury panel left the courtroom.)

14            THE COURT:  Let's even though Dan's walking out,

15   Juror No. 12 has a doctor's appointment Thursday afternoon.

16   Any objection to excusing Juror No. 12?

17            MR. WILSON:  I discussed that with Mr. Vital, Judge.

18   Defense has no objection.  I don't know what the Plaintiffs'

19   position --

20            MR. VITAL:  I don't know how Dan feels about that,

21   but given the number of breaks that we are already going to

22   have to have -- What time was her appointment?

23            THE COURT:  2:00 in the afternoon.  And I have got

24   to speak over at the Belo Thursday morning, so we lost that,

25   too.

```
1              MR. VITAL:  I don't think we can keep her.

2              THE COURT:  I will excuse No. 12, so don't consider

3    her.

4         The other juror that had a problem was EMS, but that

5    juror isn't working for his EMS the next two weeks, so that's

6    out of consideration.

7         So go ahead and make your three strikes each.

8              MR. WILSON:  Right here on the paper, Your Honor?

9              THE COURT:  Yes, sir.

10             MR. VITAL:  If it's possible, so we can have

11   privacy --

12             THE COURT:  Go on back.  Find a room back there.

13   Remember they are standing out there, so be as quick as you

14   can.

15                       (Brief recess.)

16             THE COURT:  Okay.  Are you ready to bring them back

17   in?

18        I show the Plaintiff struck No. 2, 3, 6, and that the

19   Defendant has struck 1, 5, and 14.  So we will be calling

20   No. 4, 7, 8, 9, 10, 11 15 for our jury -- 13 and 15.

21        Counsel, what I plan to do, put them under oath, give

22   them the instructions, and then go to lunch.

23             (Whereupon, the jury panel entered the courtroom.)

24             THE COURT:  Please be seated.

25        We've selected our jurors for this case, and so I'm going
```

1    to call the names of the jurors, and if you would come forward

2    over here when I call your name.

3        No. 4, Thomas Davis; No. 7, Myriah Robinson; No. 8, Greg

4    Kauffman; No. 9, Hayley Korkos; No. 10, Rae Grafton; 11,

5    Benjamin Reaves; 13, Nina Hylton; and 15, Kelly Schronk.

6        Be seated, please.

7        Now, the rest of you didn't get selected for this case.

8    Really we can only seat 8, and we had 25 of you, so some of

9    you weren't going to get here.  Please don't take it

10   personally in any way.

11       I recently sat on a jury in Fort Worth.  I was Juror

12   No. 3, and I also didn't get selected.  And the Judge wanted

13   me on the case, but neither lawyer wanted me.  And I

14   understand why that is.  After thinking about it, it was that

15   I think that the lawyers didn't want a jury of one.  And

16   that's what, in effect, sometimes having a judge or a lawyer

17   on the jury, everyone would look to them for advice or

18   information.  Well, maybe not everyone, but that's effectively

19   what would happen.  So sometimes if you are not selected for a

20   certain reason, who knows why lawyers picked you.

21       Thank you for your service.  You have to go back down to

22   the first floor and see if anyone else needs you on the panel

23   this week, but my guess is not.  I can't say for sure.  And

24   they will decide whether or not to excuse you, but you may be

25   finished for the week, or for your term of jury duty this

1    time, because right now I don't think we have any other trials

2    going on, other than some criminal matters that are before

3    some of the district judges.

4         So thank you.  Go on down to the first floor, and they

5    will give you further instructions.

6              (Whereupon, the jury panel left the courtroom.)

7              THE COURT:  Now, the jurors that were selected, I'm

8    going to first give you an oath, and then I'm going to read

9    you some preliminary instructions that kind of give you an

10   idea of your conduct here.

11        One of the instructions says the first thing you do is

12   turn off your phones.  Well, we are about to break for lunch

13   so I'm not going to have you do that.  We all get kind of tied

14   to our phones and communicate with family, friends, so forth,

15   and business.

16        So the first thing I am going to swear you under oath,

17   and then I'm going to give you some short instructions, they

18   are about five pages long, and I will read them to you, so pay

19   attention once you are sworn.

20        If you would stand and raise your right hand, please.

21              (Whereupon, the oath was administered by the Clerk.)

22              THE COURT:  Thank you.  Be seated.

23        Now, there are several rules you must follow while

24   participating in this trial.

25        First, you may not communicate with anyone about the

1    case, including your fellow jurors, until it is time to

2    deliberate.  I understand that you may want to tell your

3    family, close friends, and other people that you've been

4    called for jury service so you can explain when you are

5    required to be in court.  You should warn them not to ask you

6    about the particulars of this case, and do not tell them

7    anything that you know or that you think you know about the

8    case.  Do not discuss the case in anyone's presence or with

9    anyone until the case is finally accepted and you have reached

10   a verdict.

11       Similarly, you must not give any information to anyone by

12   any means about this case.  Do not discuss face-to-face or use

13   any electronic device or media, such as the telephone, a cell

14   or smartphone, camera, recording device, computer, internet,

15   internet service, or text, or any instant messages, anything

16   about the case, including on websites such as Facebook,

17   Myspace, YouTube, Twitter, anything else.  That includes any

18   information about the parties, witnesses, participants,

19   claims, charges, evidence, or anything else related to this

20   case.

21       Second, do not speak with anyone in or around the

22   courthouse, other than your fellow jurors or court personnel.

23   Some of the people you encounter may have some connection with

24   the case.  If you run into them in the elevator and the hall

25   ways and so forth, if you were to speak with them, that would

1    create an appearance or raise a suspicion of impropriety.

2    Even if you weren't talking about the case and talking about

3    the weather, if you ran into a witness in the elevator and you

4    were seen talking, somebody might suspect it.  So it is you

5    should become introverts.

6        Third, do not do any research on the internet or

7    libraries, books, newspapers, magazines, or any other source

8    or method about this case.  Do not make any investigation

9    about this case on own your own.  Do not visit or any view any

10   place discussed in this case, and do not use internet programs

11   or other devices to search for or view any place discussed in

12   the testimony.

13       Do not in any way research any information about the

14   case, law, or the people involved, including the parties, the

15   witnesses, parties, or myself, until after you have been

16   excused as jurors.  If you happen to see or hear anything

17   touching on this case in the media, turn away and report it to

18   me as soon as possible.  These rules protect the parties'

19   rights to have this case decided only on the evidence that's

20   presented here that they know about.

21       If you do any research, investigation, or experiment that

22   we do not know about, or gain any information through improper

23   communications, then your verdict may be influenced by

24   inaccurate, incomplete, or misleading information that has not

25   been tested by the trial process, which includes the oath to

1    tell the truth and cross examination.  It could also be unfair

2    to the parties' rights to know what information the jurors are

3    relying upon to decide the case.

4        Each of the parties is entitled to a fair trial by an

5    impartial jury, and you should conduct yourself so as to

6    maintain the integrity of the trial process.  If you decide

7    the case based on information not presented in court, you will

8    have denied the parties a fair trial in accordance with the

9    rules of this country, and you will have done an injustice.

10   It is very important that you abide by these rules.

11       Now, you've been sworn as the jury to try this case and,

12   as the Judge, I will decide all questions of law and

13   procedure.  As the jury, you are the judges of the facts.  At

14   the end of the trial I will instruct you on the rules of law

15   that you must apply to the facts as you find in this case.

16       You may take notes during the trial.  Do not allow your

17   note-taking to distract you from listening to the testimony.

18   Your notes are an aid to your memory.  If your memory should

19   later be different from your notes, you should rely upon your

20   memory.  Do not be unduly influenced by the notes of other

21   jurors.  A juror's notes are not entitled to any greater

22   weight than each juror's recollection of the testimony.

23       Until this trial is over, do not discuss this case with

24   anyone and do not permit anyone to discuss the case in your

25   presence.  That includes all spouses, children, relatives,

1    friends, co-workers, and any other person you may commute with

2    to work, and so forth.  During your jury service you must not

3    communicate any information about this case by any means.  Do

4    not talk face-to-face or use any electronic device to discuss

5    this case, as we have previously discussed.  Do not even

6    discuss the case with other jurors until the case is submitted

7    to you for your to retire to your deliberations.

8        The parties' witnesses and attorneys and persons

9    associated with the case are not allowed to communicate with

10   you, and you may not speak with anyone else in or around the

11   courthouse, as we discussed.

12       Do not make any independent investigation of this case.

13   You must rely upon what you see and hear in the courtroom.

14       There are some issues of law or procedures that I must

15   decide that the attorneys and I must discuss.  These issues

16   are not part of what you must decide and they are not properly

17   discussed in your presence.  To avoid having you leave the

18   courtroom and save time, I may discuss these issues with the

19   attorneys at the bench, which is called a bench conference.

20   When I confer with the attorneys at the bench, please do not

21   listen to what we are discussing.  If the discussions require

22   more time, I'll have you leave the courtroom until the lawyers

23   and I resolve the issues.  And I will try to keep these

24   interruptions as brief and as few as possible.

25       The trial will now shortly begin.  Lawyers for each side

1    will make opening statements.  Opening statements are not

2    evidence.  They are a road map for them to present to you

3    where the evidence will be going in this case.

4        After the openings, the Plaintiffs will present their

5    case through witness testimony and documentary and other

6    evidence, and next the Defendants will have an opportunity to

7    present their case.  The Plaintiffs may then present rebuttal

8    evidence after all the evidence is introduced.  Then following

9    all the testimony and evidence in this case, then closing

10   arguments will be presented to you by both sides.  And they

11   are not evidence as well, but rather the attorneys'

12   impressions and interpretations of what the evidence has shown

13   or not shown.  And then the case will be submitted to you to

14   go and deliberate.

15       Keep an open mind during the trial.  Do not decide the

16   case until you've heard all of the evidence.

17       Now, what the schedule is going to be in this trial, so

18   you can kind of plan ahead, is a little bit not as smooth as I

19   would like.  I would like to go everyday from 9:00 until 4:30.

20   And I intend to break at 4:30, because I think it's

21   important -- You have other commitments besides jury duty in

22   your lives, and we need to get out of here.

23       Tomorrow afternoon we have to take a break because one of

24   the attorneys has been called into another court, and even

25   though we tried to continue it, we couldn't.  So tomorrow

1    afternoon we won't be working, so we will try and work

2    tomorrow until 12:30, and then we will be done for the day.

3        Wednesday we will work probably until 12:30, but we will

4    have to break for another attorney that has a matter that

5    cannot be rescheduled before Judge Solis here, and that is

6    supposed to start at 1:30 and may last until 2:30.  And what

7    I'd like to do is take a two-hour lunch break Wednesday and

8    then come back and at least get a couple of hours in so we

9    don't waste too much of your time.

10        Thursday morning I have an appointment.  I have to speak

11    at a panel, and Judge Lynn has asked me to do it and I cannot

12    say no to Judge Lynn.  So I have to do that Thursday morning.

13    But we will discuss that, and we will see how far we get on

14    the testimony and so forth.  But we really anticipate the case

15    will get to you maybe Thursday afternoon, or maybe sooner if

16    possible.  And if so, you will begin your deliberations and no

17    later than Friday this case will be done.

18        So I'll take a break in the mornings and the afternoons

19    for 15 minutes each, and then we take about an hour and 15

20    minutes for lunch so you have time to leave and get something

21    to eat.

22        What other matters should I address as far as the

23    Plaintiffs concern?

24            MR. VITAL:  None from us, Your Honor.

25            THE COURT:  From the Defendant?

1                    MR. WILSON:  No, Your Honor.

2                    THE COURT:  We will recess for lunch and come back

3       and begin the trial.  Try to be back about 1:15 and we will

4       begin.  Thank you.

5                    (Whereupon, the jury left the courtroom.)

6                    THE COURT:  Anything we have to take up before we

7       break?

8                    MR. VITAL:  No, Your Honor.

9                    MR. WILSON:  No, Your Honor.

10                   THE COURT:  And 20 minutes will be fine?

11                   MR. WYDE:  I expect 20 will be fine.  I might ask

12      you to conclude with two minutes, or something of that nature.

13                   THE COURT:  That will be fine.

14                   MR. WYDE:  Thank you.

15                   THE COURT:  All right.  We will see you.

16                        (Lunch recess.)

17                   THE COURT:  Be seated.  Thank you.

18          Ready to get started?

19                   MR. VITAL:  Yes, Your Honor.

20                   MR. WILSON:  Yes, Your Honor.

21                   MR. VITAL:  Mr. Wyde is going to do the opening.

22      You probably inferred as much from him talking about times.

23                   THE COURT:  I did figure it out.  I know I'm a

24      little slow.

25          I know it is kind of late to ask, but there's no chance

1    this case can settle?

2            MR. VITAL:  Probably not.  I anticipate it might be

3    after we hear some testimony.  We actually had some

4    discussions, Your Honor, before lunch.

5            MR. WILSON:  We are about halfway there.

6            THE COURT:  The only thing I will tell the parties,

7    if you can arrive at a settlement, then you take it out of the

8    hands of something that's pretty uncertain, which is a jury.

9    So if you are able to work it out on your own, at least you

10   know what it's going to be and what the terms are.  So I

11   encourage you to do that; at least think about it.  You don't

12   have to.  We have come this far.  But it's always such an

13   unknown as to what these people are going to do with your

14   case.  So it's just the difference of keeping it in your hands

15   or their hands.

16           MR. VITAL:  And in just my honest opinion, I think

17   it probably could settle after they hear some testimony.  Some

18   testimony might help.

19           THE COURT:  All right.  Well, let's bring them in,

20   and you can start with openings and then you can call your

21   first witness.

22           (Whereupon, the jury entered the courtroom.)

23           THE COURT:  Thank you.

24   All right.  We are about to begin the trial.  The lawyers

25   have an allotted time to make their opening statements to you.

1    Again I remind you that what the lawyers say is not evidence.

2    The evidence will come out in the testimony and exhibits and

3    so forth.  This is just an idea of where they're going with

4    their case.

5        I'm happy to call upon the Plaintiff.

6            MR. WYDE:  I'm sorry?  I didn't hear you.

7            THE COURT:  I am happy to hear from you.

8            MR. WYDE:  Okay.  May it please this Honorable

9    Court, Mr. Wilson, Mr. Vital.

10       Ladies and gentlemen of the jury, a contract is a

11   contract is a contract, and an agreement is an agreement is an

12   agreement.  Historically oral agreements and handshakes were

13   good enough to record one party's intentions with another

14   party, but over time, as people grow older and business

15   matters, if you will, go on for months and years, people's

16   memories fade.  So in order to avoid these disputes about he

17   said he said, or she said she said, and argue about the terms

18   of agreements, we started putting things down on paper.

19       Now, you're going to hear about two agreements in this

20   case between this gentleman here, Mr. Princip, who's in his

21   early 20s now, and Mr. Keating, if you will, who's

22   approximately 38.  And then you are going to hear about an

23   agreement with Mr. Princip and Mr. Moss, Ty Moss, who is in

24   his early 20s now.

25       To Mr. Princip's credit, he got a good idea.  He thought

1    he would create a YouTube channel where people could upload

2    video games and then other people could come and kind of try

3    them out and see what video games were good and which ones

4    weren't, or which ones were popular and which ones weren't.

5        Now, Mr. Wilson here talked about a lemonade stand and a

6    bunch of kids in voir dire.  The evidence in this case is

7    going to show that this YouTube channel has 3.3 million

8    subscribers.  There are times when more people are watching

9    this YouTube channel than are probably watching MSNBC on cable

10   TV.  In the 48 months this channel has been created, 813

11   million views, the evidence is going to show you, almost three

12   times the population of this country, has gone to this

13   channel.

14       Now, why is that a big deal?  So let me back up.  This

15   isn't your children's or your lemonade stand anymore.  Imagine

16   a billboard on Interstate 30.  You know how billboards work.

17   You don't have to be a lawyer or, for that matter, other than

18   common sense to understand if 3.3 million people were driving

19   by that billboard everyday, that's advertising opportunity.

20   And that's what this channel is all about--advertising

21   opportunity.

22       Now, you and I may not want to advertise on a video game

23   channel, but there are plenty of video game companies out

24   there that want to advertise there, and they pay money.  They

25   pay -- You're going to hear from these two gentlemen, who have

1    been involved in YouTube for the last nine years roughly, nine

2    years they have been making their living doing this -- I still

3    got to get up, shower, shave, put on a coat and a tie and deal

4    with judges and other attorneys to make a living.  I haven't

5    figured out -- I may not be as smart as these guys.  They

6    figured out a way where they don't have to put on a coat and

7    tie and be lawyers.  Welcome to the new world.

8        Now, you're going to hear that Mr. Princip sold 30

9    percent of his company for what is really a very minute amount

10   of money--$1500.  Think about Michael Dell.  Think About Bill

11   Gates.  Think about Henry Ford who started Ford Motor Company.

12   When they had nothing, when they were flat broke, they were

13   willing to sell something, a small part of nothing in order to

14   get something.  And that's exactly what this gentleman did

15   here, Mr. Princip.  He can shake his head all he wants to, but

16   it's in writing.  And he sold 30 percent to Mr. Moss in May of

17   2012.  And he sold another 30 percent to Mr. Keating in May of

18   2012, and it's in writing.  And, by the way --

19       And may I have leave to leave the lectern?

20           THE COURT:  Yes.

21           MR. WYDE:  Thank you.

22       There is nothing magical about this chair, this witness

23   stand, nothing magical here.  There's no buttons, there's no

24   controls to make someone tell the truth.  The Judge told you

25   you're the finders of the fact.  That includes looking at the

 1    demeanor, looking at people how they answer you, whether they

 2    look at you kind of in your eye or in your direction or

 3    they're looking down and shifting their feet.

 4        Now, this 813 million views, these young men right here,

 5    these gentlemen are going to tell you that there are contracts

 6    that YouTube enters into with other companies so that this

 7    content that these videos can be uploaded, because if somebody

 8    creates a video, you're going to find out from evidence that

 9    YouTube doesn't want to be sued for using somebody else's work

10    product or their creativity, so they avoid copyright law.  So

11    there's an intermediary that pays, as a general rule of

12    thumb--and these folks have already stipulated to this in this

13    case--$3 per thousand views.  So you take 813 million views,

14    you divide that by a thousand, and now you are down to

15    813,000.  You multiply that by $3 a view, and we are at $2.4

16    million.  This gentleman owns 30 percent of that, and this

17    gentleman owns 30 percent of that.  They paid money to this

18    gentleman here.  They invested when there was nothing but an

19    idea.

20        Now, this gentleman is greedy.  That's what we believe

21    the evidence is going to show you.  And when this channel

22    started to make money, he didn't want to part with the money.

23        Now, we don't settle these disputes with bats and guns.

24    We don't go to people's houses and threaten them.  We have to

25    come and deal with United States magistrates and attorneys to

1    settle our disputes in a civil manner, and that's what we're

2    here to do.

3        Mr. Moss' contract is one page.  Now, Mr. Keating is a

4    little bit older.  He is the ripe old age of 38.  My boots are

5    older than him, by the way.  But the fact of the matter is

6    Mr. Keating had a four-page contract, because this wasn't his

7    first rodeo, as they say.

8        Why?  What motive would they have?  Well, certainly they

9    have a motive.  They want their money.  But they have a

10   written contract.  And, by the way, we intend to introduce

11   evidence where Mr. Princip paid back the money.  The problem

12   was he doesn't want to pay up the 30 percent of the company.

13       Now, when Mr. Princip gets in trouble, you're going to

14   hear about a gentleman by the name Mr. Martin.  Mr. Martin was

15   the ripe old age of 28 a couple of years ago.  Now he's 30.

16   So none of these are 18-year-old teenagers anymore.

17       Things aren't always as they appear.  Our clients are

18   wearing coat and ties.  Their clients are dressed down to look

19   younger.  But the fact of the matter is nobody can change the

20   hundreds of text messages and emails between Mr. Moss and

21   Mr. Princip that went on for years.  Nothing can change the

22   hundreds, if not thousands, of emails between Mr. Princip and

23   Mr. Keating that went on for years.  And you won't find in any

24   one email that these people can produce or that has been

25   produced to us where Mr. Keating has been told by Mr. Princip,

1    "You aren't a partner.  You don't own 30 percent."  You will

2    see an email from this gentleman Mr. Martin who comes in after

3    the fact and he tries to tell Mr. Keating and Mr. Moss that

4    "Your contracts are void."

5        Now, I don't think any of you believe that if you are in

6    a partnership one partner can turn around and, I hate to speak

7    law, lawyer, but unilaterally, on their own, simply say,

8    "You're not partner anymore" after you already invested and

9    signed a contract.  But then in the end these young men over

10   here aren't necessarily well-versed in the law.

11       So what you're going to hear at the end of this, if you

12   will, the Judge is going to give you a set of instructions.

13   It's called the charge.  And, in fact, the Judge was asking us

14   earlier today if we as lawyers could kind of cut it down,

15   because at the end of the case when both sides finish with

16   their evidence and the closing arguments, the Judge is going

17   to read these instructions to you, and then he's going to send

18   you back to the jury room and that's where you deliberate.

19   That's how this works.  So the charge contains all the law,

20   and then you determine the facts.

21       In this document there are some questions that Mr. Vital

22   is going to stand up here when he gives his closing argument

23   in hopefully 72 hours from now, and he's going to ask you did

24   Mr. Princip engage, and Mr. Martin for that matter, in

25   wrongful conduct that adversely and materially affected the

1    VideoGames YouTube Channel.  And we're going to ask you to

2    answer yes to that question.

3        The next question is going to be did Mr. Princip or

4    Mr. Martin willfully and persistently commit material breaches

5    of their obligations, each one's obligations, regarding the

6    VideoGames YouTube partnership.  And Mr. Vital is going to

7    stand here and say to answer that question yes.  See, one

8    partner can't deny another partner their share.  That's not

9    how it works.  That's why it's called a partnership.

10       The last question is did Mr. Princip or Mr. Martin engage

11   in conduct relating to this VideoGames YouTube Channel

12   partnership that has made it not reasonably practicable to

13   carry on the business in the partnership.  Not reasonably

14   practical to carry on the partnership.  And we're going to ask

15   that you answer yes to that question, because these two

16   gentlemen own 30 and 30.  I didn't have to go to law school to

17   know that 60 percent is controlling interest in the company.

18   This gentleman here owned 40.  He had a hundred.  He sold 30.

19   He sold another 30.  That means he has 40.  But he has the

20   username and the password, and he don't want to let go of it

21   because he's keeping 100 percent of the money.  That's what

22   this dispute is going to boil down to--greed.

23       Now, how do you keep what may not be yours?  You have to

24   do that by some form of deception, possibly dishonesty.  Not

25   because I say it, but because that's what these emails, that's

1    what this evidence is going to show you.  Their words, not my

2    words.  This was going on long before I got involved in 2014.

3        So in January, the evidence is going to show you, of

4    2013, after this channel had been around for about seven

5    months, Mr. Princip allowed this extremely valuable asset,

6    almost like a diamond, if you will, almost like a gold vein or

7    a gold mine, to fall into the hands of a 15-year-old.  His

8    name is Drew Lovinger.  The evidence is going to show that

9    Mr. Lovinger didn't get paid by Mr. Princip to upload all

10   these videos, so Mr. Lovinger changed the username and the

11   password, and he kept the asset until these gentlemen had to

12   sue him and pay $30,000 to get the channel back.  After all,

13   it only made 120,000 or 140,000 that year in 2013 in its first

14   full year in existence, and it didn't have near the

15   subscribers and near the viewership that it has now.

16       Now, they did not consult -- this gentleman Mr. Princip

17   did not consult his partner Mr. Keating, who was already much

18   already than him and much more experienced in these matters,

19   which is a breach of a partnership duty.  He did not consult

20   Mr. Moss about how to handle this, which they were both

21   entitled, as partners, to be aware of.

22       Mr. Moss came to me in 2014 and Mr. Keating came to me

23   later in 2014, and that's how this lawsuit started.

24       Now, in October of 2013 when Mr. Princip wanted

25   Mr. Keating and Mr. Moss, the evidence is going to show you,

1    to kind of forget about this thing, just forget about it, it's

2    not a big a deal, just forget about it, it's not very

3    successful, he went to this gentleman Mr. Martin who then

4    threatened Mr. Moss and threatened Mr. Keating to say, "You

5    don't own nothing.  Your contract's void."

6        And, in fact, these two gentlemen here conspired, and I

7    don't use that term often, but they entered into a little

8    agreement to try to wrest control back of the channel to them.

9    And Mr. Princip, in order to get Mr. Martin's help, had to

10   give him half of his interest.  These are -- this is

11   documented in emails to the lawyer who was representing the

12   15-year-old kid that got sued.

13       The evidence is going to show that at the end of this

14   matter these two young men owned 20 and 20, and these owned 30

15   and 30.  But they're not going to give it up.  And they never

16   have to admit it.  They can deny every contract, they can deny

17   every signature, they can deny every email, they can claim

18   it's all fabricated.  There's nothing in this room that makes

19   anyone tell the truth.  So I suggest you, too, take everything

20   with a grain of salt.  You do ask to see the emails, because

21   these gentlemen have been cheated out of actually $1.5 million

22   over the last 48 months.

23       Ultimately this day has been very long in coming for

24   these gentlemen.  And in some ways it's unfair to draft eight

25   people that have no say so, no real dog in the hunt, as they

1    say.  But the fact of the matter is this is our system of

2    justice.

3         And so Mr. Vital is going to stand here after you hear

4    from our two clients and these two clients, and possibly one

5    or two other witnesses, which we're not sure about, and then

6    we're going to hand our case off to you.  And you're going to

7    take that charge back there, like Judge Stickney's going to

8    tell you, and you're going to have to answer these questions.

9    And we're confident, we're confident that you will recognize

10   that a contract is a contract is a contract.

11        Thank you for your patience and your time for being here,

12   and we look extremely forward to working with you throughout

13   the next couple of days.

14        May it please this Court.

15             THE COURT:  Thank you, Mr. Wyde.

16        Mr. Wilson, any comments, opening statement for

17   Mr. Princip and Mr. Martin?

18             MR. WILSON:  Yes, Your Honor.

19        May I approach the lectern?

20             THE COURT:  Please.

21             MR. WILSON:  Thank you.

22        Your Honor, court reporter, opposing counsel, Plaintiffs

23   and clients.

24        Ladies and gentlemen of the jury, thank you again for

25   being here, and thank you again for being here this week.

1           Mr. Wyde did a very fine job of telling you what's in

2      play.  And as I told you before, again, don't check your

3      common sense at the front door.

4           I told you, again, you're going to hear testimony from

5      the witness stand.  I told you I had concerns about emails,

6      about DocuSigns that were signed, that weren't signed.  You

7      are going to see, as Mr. Wyde did correctly point out, when I

8      talked to you-all about the five phases of what we are all in

9      for on this weekly journey here.  And, again, we are now in

10     our opening statement, so we are down two now, so we only have

11     three more to go.  Okay?

12          Then we will get in the case in chief this afternoon.

13     The Plaintiff will put on their case, and then we will put on

14     a response probably later on this week.

15          And then you will get the jury charge.  The jury charge

16     is check the box yes, no, and value.  Remember we talked about

17     value?  And I said we agree.  You heard Mr. Wyde say millions

18     of dollars.  I don't think I heard one person that had YouTube

19     or uploaded YouTube they made any money.  You're going to hear

20     testimony from my clients, who are extremely familiar on this

21     channel, because this young man developed the channel when he

22     was 15 years old--okay?--that none of it's original content.

23     It's all stuff that's uploaded by other people.  Okay?  And

24     you get paid on views, like a fraction of a cent on views.

25     And you will hear that from my client.

1          These folks aren't going to have any testimony from

2     anybody at YouTube, they're not going to have anybody from

3     Machinima, if you forgive my butcher of the English language,

4     who pays these folks.  But you are going see their tax

5     returns.  Tax returns don't lie.  Right?  Perjury?  We don't

6     want to go to jail.  Okay?  You're not going to see any of

7     that from these guys.

8          These guys still operate with YouTube, still have YouTube

9     channels and video games and doing their stuff.  I am sure you

10    are going to hear from the testimony.  I know because I

11    deposed them before.  I don't think they are going to lie

12    today or this week versus what they told me a year ago.

13         So, again, I told you in the beginning that this was kind

14    of a scary case, and I told you we need help on the value, and

15    I told you about the lemonade story, and told you about in

16    2012 when Mr. Keating apparently is claiming that him and some

17    other guys were partners in an entry known as Achievement

18    Guide, there is no such thing as a company known as

19    Achievement Guide; never been formed, probably never made one

20    dollar.  But you are going to hear all that in the testimony.

21    Okay?  And you may or may not see that exhibit.  We will just

22    kind of have to see how these things go, again, because we are

23    considering what exhibits you look at, what Your Honor gives

24    you, and then when you get those exhibits you got to weigh

25    that and see "Am I buying all it says it is?  We know words

1    can be taken out of context, et cetera, et cetera."  And then,

2    remember I said 75 percent is what's going to come on here on

3    credibility where you have to determine that.

4         Well, in 2012, a few months later, Plaintiff Moss and

5    Marko Princip do form a partnership.  I agree.  You will see

6    the exhibit.  They both signed.  This guy pays $1500.  Six

7    months later they get in a fight.  They chat each other out by

8    texts and Skype--" You're a thief.  You're a crook.  You're

9    this.  You're that."  I think you will hear the testimony.

10    You will probably see some of these exhibits.

11         I would think partnerships are like marriages.  Right?

12    If somebody says, "You're fired," I would think you're fired.

13    When somebody gets a lawyer and demands money from you in the

14    fall of 2012 and in January of 2013, I would think the

15    partnership's over.

16         I would also think that if you didn't contribute one

17    dollar towards defending against a lawsuit, which you heard

18    about how the channel was stolen -- Because these kids are

19    pretty good with the internet.  Change password, change this.

20    YouTube over here.  YouTube over there.  And you fight it, and

21    you end up having to pay thousands of dollars on that, this

22    partner didn't contribute, I don't think we have a

23    partnership.

24         So one of the big questions I'm hoping you're going to

25    see on the charge is when were these guys finished.  I would

1    think when you get a lawyer and you demand some money and you

2    don't contribute and you don't pay for three years, but yet

3    then you jump out of the woods and retain Mr. Wyde to come

4    after the Defendants for $1.5 million, it's not fair.

5         Nor are you going to have anybody testify as to the value

6    of this channel except for these guys and their tax returns.

7    And that's where it all is, is where was it in 2012, and then

8    how do you think you get to ride on the train for free for

9    four years and get any amount of money.

10        And that's why I told you in opening I'd rather be on my

11   boat, I'd rather be with my family.  But again, it's a court

12   of law.  Anybody can sue anybody at any point in time.  That

13   is the bad thing about our country.  But the good thing is, is

14   everybody gets their opportunity, their day in court, and then

15   we have eight reasonably-minded jurors to figure out what do

16   we do here in Dallas County.

17        I know what I think should happen.  I know you're going

18   to see the charge, and I think we all know when you have a

19   partnership you are there through thick and thin, thick and

20   thin, thick and thin, and you are paying and you are paying

21   and you are contributing and doing something.  You don't just

22   hide out for two years, don't do anything, and all of the

23   sudden spring up and file a lawsuit and think, "Oh, I get to

24   take advantage of all this."

25        Millions of dollars?  Absolutely not.  Swear.  It's not

1    there.  And they're not going to have any testimony for it.

2        So, again, as Your Honor had stated, Mr. Wyde's version

3    and my version are a road map of what I think the evidence is

4    going to show, what I'm hoping that it's going to show to

5    you-all.  And I am hoping, like I said, that

6    reasonably-minded, common sense people are going to know that

7    if we have a partnership, we are together like a marriage, we

8    are paying bills together, we are doing stuff together, we are

9    contributing together.  But if you are fired, you are fired.

10   And that's where Mr. Wyde and I disagree is that when you're

11   fired, you wrap up the business, partners go their separate

12   way, we figure out where are we on the value on that day.  And

13   he had a value on that day in January of 2013.

14       YouTube's a crazy thing.  I think there are millions and

15   millions, as Mr. Wyde said, of views, subscriber.  Subscriber

16   doesn't mean anything.  Just because you subscribe doesn't

17   mean you watch it everyday; doesn't mean you get paid everyday

18   on that subscriber.  You heard 20 people here, 10 people here

19   say no, they never got paid on it.  You don't get paid on it.

20   Advertisers don't pay you on your channel.  That goes to

21   YouTube, not to these folks.  But, again, you'll hear all that

22   in the testimony.

23       This 813 million number, where Mr. Wyde got that I have

24   no idea.  But if you're an old dinosaur like me, and believe

25   it or not Mr. Wyde and I -- we are all about the same age.  I

1    am mid 50s, too.  I'm still on Google.  Okay?  And that's

2    exciting to me.  And you Google VideoGames YouTube

3    Channel--you are not supposed to do that now; you heard what

4    the Judge said--but you are going to see, you will get six

5    different things that pop up.  One of those six is my client.

6    You can click on anything, but when you click on it you don't

7    have to pay for it.

8        I agree with Mr. Wyde.  It is greed--okay?--plain and

9    simple.  And it's the Plaintiffs' greed.  And my folks did not

10   want to lay this at your feet.  We didn't want to be here.  We

11   still don't want to be here, but we have to be here.  We've

12   been sued to be here.

13       Mr. Wyde says this is a gold mine.  It's not a gold mine.

14   Okay?  Anybody can do it.  Anybody can start a YouTube

15   channel.  Anybody can go and solicit and try to get people to

16   upload videos.  Anybody can try to construct a contract, which

17   you'll find out, with Machinima, or any of these other folks,

18   with YouTube.  And these boys have been doing that.  This

19   gentleman is 38 years old.  He's retired from -- when he did

20   it when he testified about it.  So there are ways to do that,

21   but you have to create those contracts.  It just doesn't

22   happen overnight.

23       And, again, I encourage you-all to think about the

24   weight, I encourage you-all to retro back to 2012, 2013, hear

25   the story of how these gentlemen met, hear their relationship,

1    and then you will hear how it vanished for three years, and

2    then these guys jump out to sue for I guess I now hear $1.5

3    million.

4        So again, ladies and gentlemen of the jury, I appreciate

5    your time.  As I explained, you will see this charge that

6    you're going to get.

7        You will see some affirmative defenses which we have.

8    One of them is quasi estoppel, which means that by your

9    actions you are estopped from trying to claim three or four

10   years worth of income because you didn't contribute.  You

11   didn't help mow the yard while I was at the office.  You

12   didn't do the laundry.  You didn't go to the grocery store.

13   It wasn't a partnership, like a marriage partnership is

14   supposed to be.  And, again, you'll find out that these two

15   gentlemen are very successful, make very good money, and have

16   their own things that they're working on all throughout this

17   time.

18       Thank you.

19           THE COURT:  Thank you, Mr. Wilson.

20       First witness?

21           MR. WYDE:  Yes, Your Honor.  We call David Tyler

22   Moss to the stand.

23           THE COURT:  Mr. Moss.

24           MR. WYDE:  Judge, he's never been in a courtroom or

25   testified to my knowledge, so may I?

```
 1              THE COURT:  Yes.  Mr. Moss if you would raise your

 2    right hand, please?

 3              (Whereupon, the oath was administered by the Court.)

 4              THE COURT:  Thank you.  Be seated.

 5              MR. WYDE:  Sir, may I have leave to kind of

 6    reposition so I don't turn my back on --

 7              THE COURT:  Yes.

 8                   DAVID TYLER MOSS,

 9    Testified on direct examination by Mr. Wyde as follows:

10    Q.   Would you introduce yourself to Judge Stickney and to the

11    ladies and gentlemen of the jury?

12    A.   My name is David Tyler Moss.

13    Q.   And may I ask, what do you normally go by?

14    A.   TY--T-Y.

15    Q.   Okay.  Well, Ty, how old are you?

16    A.   I am 23.

17    Q.   And where do you normally reside?

18    A.   North Carolina.

19    Q.   Okay.  Can you tell us, how far did you go in school?

20    A.   I finished eighth grade, and I started home schooling in

21    high school but I didn't finish it out.

22    Q.   Okay.  Now, how do you make a -- Let me ask you.  Are you

23    married now at the ripe old age of 23?

24    A.   No, I'm not.

25    Q.   Any children?
```

1  A.    No.

2  Q.    Okay.  How do you make a living, Ty?

3  A.    I'm a YouTuber.  I post videos on YouTube also have a

4  clothing company called NoSleepTeam.

5          MR. WYDE:  May I fix his mic?

6  Q.    (BY MR. WYDE)  Pull that a little bit closer to you.

7  There you go.

8      Now, Ty, tell us, if you will, when you say are a

9  YouTuber, explain to those on the jury that might not know,

10  what does that mean?  What are you thinking?

11  A.    I post videos on YouTube and I make a living from that.

12  I have two different YouTube tech reviews, like reviewing tech

13  products like iPhones and gadgets and stuff like that.  I also

14  have a blog channel, which is short for video blog, where I --

15  it is sort of like a reality show where I film and it is just

16  me talking to my camera, showing what I'm

17  doing--skateboarding, hanging out with friends, things like

18  that.

19  Q.    You said skateboarding.  Did you actually -- Are you kind

20  of a -- were you trying to become a professional skateboarder

21  when you were young?

22  A.    Yeah.  That is actually what got me into YouTube I was

23  home schooling, I was doing skating, traveling to contests and

24  stuff like that--kind of why I started home schooling; I was

25  missing so much school.  And then when I was having free time,

1    I started posting YouTube videos, and that kind of turned into

2    my job.  I was making, like, more than my parents, so it's

3    kind of why I didn't finish home school.

4            THE COURT REPORTER:  I'm sorry, but if you would

5    slow down, it would really help.

6            THE WITNESS:  I'm sorry.

7    Q.   (BY MR. WYDE)  So you understand that the reporter is

8    recording, so if you will just kind of slow your cadence down

9    that will make his job a little bit easier.  Okay?

10       So, Ty, today let's just ask about one -- one of your

11   channels.  How many people subscribe to your channel?

12   A.   On my Tech YouTube Channel I have I think 460,000, and on

13   my have Blog YouTube Channel I have 230,000; a little bit over

14   that.

15   Q.   Is that -- when you say 400 and how many?

16   A.   460,000.

17   Q.   Is that people?

18   A.   That's people that have clicked to subscribe to my

19   channel, so they get notified when I post new videos.

20   Q.   All right.  Now, do you have any agreements with other

21   companies so that you're paid money based on the number of

22   subscriptions or views?

23   A.   Yeah.  I have an agreement with YouTube I am a YouTube

24   partner.  They have a partner program where you get paid

25   through ads.

1        THE COURT:  Can you say that again?

2        THE WITNESS:  I'm a YouTube partner.  They have

3   YouTube partner program where you basically sign up and it

4   lets you put ads on your videos so you can make money from

5   your videos, on ads that display on the videos around them.

6   Q.   (BY MR. WYDE)  So these 460,000 or the 200 how many?

7   A.   230,000.

8   Q.   230,000 that come to either one of your channels, are you

9   suggesting that there's companies that will pay you so they

10  can advertise to those subscribers?

11  A.   Yes, sir.

12  Q.   And can you explain to the jury what the average -- or

13  what your contracts require those companies to pay?

14  A.   It varies all the time.  It could be anywhere from 80

15  cents to $3 or more per thousand views.  That's how you -- You

16  get paid CPM.  It is calls per million.  Calls per thousand.

17  I'm sorry.  And, yeah, it's generally around $1.50 to $3.00.

18  Q.   Let's take that a little bit slower, because, you know,

19  you are speaking a slightly different language than I am

20  familiar with, if that's okay with you.  When you said CPM, is

21  that cost or clicks?  I'm sorry.  I didn't understand what --

22  A.   It's clicks per thousand.  M is the Roman numeral for

23  thousand.

24  Q.   Okay.  So if you have a thousand views, you might be paid

25  how much money?

```
 1   A.   It could be anywhere from 80 cents to $3, or it could be
 2   all the way up to 50, depending on who's advertising on your
 3   video.
 4   Q.   Okay.  Now, does the advertiser just come to you and pay
 5   you the money?  Who pays -- How does the ad get onto your
 6   channel?
 7   A.   Well, the way I do it is -- I'm not a partner of the
 8   network.  There's networks that will manage your channel to
 9   manage your advertising and sponsorship, but I'm currently
10   with just YouTube Program.  It is pretty much Google will
11   manage all the ads and put them on there for you
12   automatically.
13   Q.   Well, what is the relationship between Google and
14   YouTube?
15   A.   Google owns YouTube Google puts all the ads on YouTube.
16   Q.   So you have a contract with YouTube as I understand it?
17   A.   Yes.
18   Q.   And then --
19   A.   Or an agreement, I guess you would say.
20   Q.   And then if I wanted to advertise -- Let's say I was a --
21   you had skateboard videos and I wanted to advertise on your
22   skateboard videos, let's say I manufacture skateboard helmets
23   or skateboards, where would I go to buy that advertising?
24   A.   You would go to Google AdWords.
25   Q.   Google where?
```

```
 1    A.    Google AdWords.

 2    Q.    Okay.

 3    A.    And they would go through their ad program.  That's the

 4    program that puts ads on YouTube.

 5    Q.    Okay.  And then somehow someway I would upload my

 6    commercial to Google and then they would put it on your

 7    channel?

 8    A.    Yes.  I believe through the AdWords program is how you

 9    would do that.  I have never done that.

10          THE COURT REPORTER:  I'm sorry, but you are going to

11    have to slow down.

12          THE WITNESS:  Sorry.

13    Q.    (BY MR. WYDE)  As I asked earlier, have you ever

14    testified before in court?

15    A.    No, I haven't.

16    Q.    Okay.  Are you nervous?

17    A.    A little bit, yeah.

18    Q.    Now, you understand that if asked a question and you

19    don't understand it, simply say, "can you repeat that" or --

20    A.    Yes.  Yes, sir.

21    Q.    Okay.

22          MR. WYDE:  Excuse me, Your Honor.  I misplaced a

23    piece of paper.

24    Q.    (BY MR. WYDE)  Now, let's talk briefly about how you

25    first met Mr. Princip.
```

```
 1    A.    Okay.

 2    Q.    Can you tell the jury how that happened?

 3    A.    He had a YouTube channel.  I think he was reviewing,

 4    like, movies at the time.  I was doing on my Tech YouTube

 5    Channel, so he kind of knew of my YouTube channel, I knew of

 6    his.

 7    Q.    Excuse me.  Let me stop you there.  Mr. McRoberts, the

 8    court reporter, is kind of giving me the eye, and he's I think

 9    asking you to slow your cadence down.  So do me a favor and

10    take a deep breath.

11          All right.  How did you meet or become acquainted with

12    Mr. Princip?

13    A.    Okay.  It was early on in YouTube, so he had a YouTube

14    channel, it was successful, had a lot of viewers.  So did I.

15    We both had big YouTube channels.  And we kind of just found

16    each other through that, and started talking over I think

17    Twitter and Skype, social media platforms.

18                MR. WYDE:  May I have leave to get a chart briefly?

19                THE COURT:  Yes.

20    Q.    (BY MR. WYDE)  I'm going to, with permission of the

21    Court, just write down some of these terms.

22                THE COURT:  Okay.

23    Q.    (BY MR. WYDE)  Let me briefly ask you about -- You've

24    told us a little bit about what YouTube is.  Probably all the

25    jurors understand that.
```

1       What is Skype?  If you will, explain that way of

2  communicating.

3  A.    Skype is a messaging application.  You can do text chats,

4  kind of like text messages on your phone, you can voice chat

5  just with the audio, or you can video chat, like I guess like

6  they do in Star Trek, sort of.

7  Q.    You mean like when Kirk says to -- opens the flip phone

8  up and you can see who he's talking to?

9  A.    Yeah.  You can actually see their face.

10  Q.    And then, of course, Spock can see Kirk and Kirk can see

11  Spock when they are talking to each other.

12  A.    Yes, sir.

13  Q.    Is that really what Skype is?

14  A.    Yes.

15  Q.    Okay.  And you can do that through phones or, for that

16  matter, a computer that has a camera on it?

17  A.    Yes; both.

18  Q.    Okay.  And, of course, text messaging in Skype -- when

19  you text message on Skype, is that any different than text

20  messaging with your phone?

21  A.    It is a little bit different, but it is just doing it

22  through the Skype application.

23  Q.    Okay.  And, of course, you can also just make a telephone

24  call.  Is that what you meant by the voice aspect?

25  A.    Yes.

1    Q.    Okay.  And that's called Skype.  Is that correct?

2         What is Twitter?

3    A.    Twitter is a social media website that allows you to post

4    140 characters at most.  It is like a micro-blogging, so you

5    can only post a short few sentences to your account, and then

6    people can follow you to actually read what you post.

7    Q.    So is Twitter kind of like the YouTube channels that you

8    have where somebody can just say -- they can sign up to follow

9    what you're up to?

10   A.    Yes.  And you can also follow other people to see what

11   they're doing.

12   Q.    And it's up to 140 letters or numbers.  Is that what you

13   mean by character?

14   A.    Yes, sir.

15   Q.    All right.  So with regard to meeting Mr. Princip, you

16   met him through either texting or Twittering or Skyping.  Is

17   that accurate?

18   A.    Yes, sir.

19   Q.    All right.  And then tell us, if you will, roughly when

20   was that?

21   A.    It was before 2012.

22   Q.    Did you eventually enter into a contract or an agreement

23   with Mr. Princip?

24   A.    Yes, sir.

25                MR. WYDE:  May I approach the witness?

```
 1              THE COURT:  You may.
 2    Q.   (BY MR. WYDE)  Ty, let me show you what's previously been
 3    marked, I think, as Exhibit No. 2.
 4              MR. WYDE:  Is that right Mr. Vital?
 5              MR. VITAL:  That's right.
 6              MR. WYDE:  You point out all the mistakes I make for
 7    you.
 8              MR. VITAL:  All the time.
 9              MR. WYDE:  Thank you very much.
10    Q.   (BY MR. WYDE)  Do you recognize that particular document,
11    Ty?
12    A.   Yes, sir.
13    Q.   Does it actually have your signature on it?
14    A.   Yes, sir.
15    Q.   What other signature does it also include?
16    A.   Marko Princip.
17    Q.   Okay.  And is that document a true and accurate depiction
18    of the one that you signed with Mr. Princip?
19    A.   Yes, sir.
20    Q.   All right.  Well, if you were in North Carolina -- And,
21    by the way, do you know where Mr. Princip lives?
22    A.   In Dallas, Texas.
23    Q.   All right.  And that's kind of why we're here.  Is that
24    correct?
25    A.   Yes, sir.
```

```
1    Q.   Well, how do you know he signed that document?

2    A.   We were talking over Skype when we signed the contract.

3    Q.   Did he email it to you?

4    A.   Yes.

5    Q.   And then you signed it and emailed it back to him?

6    A.   Yes, sir.

7    Q.   Okay.  And we're going to go in -- through some of the

8    emails back and forth here shortly, but is that a true and

9    accurate copy--has it been changed in any way--of the

10   agreement that you entered into with Mr. Princip?

11   A.   Yes, it is accurate.

12            MR. WYDE:  I'm going to ask that No. 2 be admitted

13   Plaintiffs' No. 2.

14            MR. WILSON:  No objection.

15            THE COURT:  It's admitted.

16            MR. WYDE:  I'm going to request to publish.

17            THE COURT:  You may publish.

18   Q.   (BY MR. WYDE) Let me show you again, if I can, another

19   exhibit marked Plaintiffs' Exhibit No. 13.

20            MR. WYDE:  May I reapproach?

21            THE COURT:  Yes.

22            MR. WYDE:  Not to steal Mr. Wilson's thunder, but I

23   think he is not going to object to this, but I will still ask

24   him the predicate just briefly, if that's okay with you.

25            MR. WILSON:  Yes, provided you remove the notes
```

 1    first.

 2              MR. WYDE:   Absolutely.

 3    Q.   (BY MR. WYDE)   What is this document I'm handing you now?

 4    A.   These are Skype chats with Mr. Princip.

 5    Q.   And what is the date that they begin?

 6    A.   On 5/7/2012; May 7th.

 7    Q.   And what was the date of your contract, if you remember?

 8    A.   May 21st, 2012.

 9    Q.   Is it accurate, then, that you were chatting or

10    communicating with Mr. Princip roughly two weeks before you

11    signed the contract?

12    A.   Yes, sir.

13    Q.   So this wasn't something you just kind of entered into

14    lightly?

15    A.   No.

16    Q.   And whose money did you invest?

17    A.   My money.

18    Q.   Your money?

19    A.   Yes.

20    Q.   Not your mom's money?

21    A.   No, sir.

22    Q.   Not your dad's money?

23    A.   No, sir.

24    Q.   Okay.  Were you in -- What were you doing for a living in

25    2012, four years ago?

1    A.    I was doing YouTube videos.

2    Q.    At the ripe old age of 19?

3    A.    I think I was maybe about to turn 20 at the time.

4    Q.    Okay.  Have you made more than $100,000 in this business

5    per year?

6    A.    Yes.

7    Q.    On a couple of occasions?

8    A.    Yes.

9    Q.    So that certainly beats finishing high school, does it

10   not?

11   A.    Yes.

12   Q.    Do you have any plans to continue in education?

13   A.    No.

14   Q.    All right.  I understand.

15         But you support yourself.  Is that correct?

16   A.    Yes, I do.

17   Q.    Okay.  What is the ending date of this chain of emails,

18   if you don't mind me asking?

19   A.    5/21/2012.

20   Q.    Is that roughly the day you signed the contract?

21   A.    Yes.

22   Q.    Okay.

23         MR. WYDE:  We'll offer what has been previously

24   tendered as Plaintiffs' Exhibit No. 13.

25         MR. WILSON:  No objection, Your Honor.

```
 1                THE COURT:  It's admitted.

 2                MR. WYDE:  Permission to publish?

 3                THE COURT:  You may.

 4   Q.  (BY MR. WYDE)  Okay.  Let me show you, Ty, if I can --

 5   Can you start with this one that's highlighted, so-to-speak,

 6   and just tell us -- walk us through a little bit about this.

 7   Does your name appear on this exchange?

 8   A.  Yes, sir.

 9   Q.  And what is your name for the record, if you will?

10   A.  Ty Mosss.  And I have three Ses.  That is my Skype

11   username.

12   Q.  And who is Marko?

13   A.  That is Mr. Princip.

14   Q.  Okay.  And had you actually met him in person up at this

15   point in time?

16   A.  No, I hadn't.

17   Q.  Okay.  Have you -- Did you ever Skype with him?

18   A.  Yes.

19   Q.  Did you ever see him through video conversation?

20   A.  I don't think we ever video chatted at the time, but I

21   had seen his face on YouTube and he had seen mine.

22   Q.  You can have your picture or face on YouTube?

23   A.  Yes.

24   Q.  And so is the Mr. Princip here in court the same person

25   that you videoed or chatted with over -- through Skype or saw
```

1    on YouTube?

2    A.    Yes, sir.

3    Q.    No doubt about that in your mind?

4    A.    No.

5    Q.    Okay.  Now, let me ask you about who broached the subject

6    about you investing?

7    A.    Mr. Princip did.

8    Q.    And is that what is going on with this particular chat

9    here about "I want to run something by you"?

10   A.    Yes, sir.

11   Q.    Was this more or less the beginning of this request for

12   you to invest?

13   A.    Yes, sir.

14   Q.    Okay.  Can you tell me about this chat here on May 7th of

15   2012, roughly at I believe 3:45 in the afternoon, 3:47?

16   A.    Yes.  This is where he approaches me to try to invest in

17   his YouTube channel, because he wanted to send some people to

18   a conference called E3.

19   Q.    All right.  Now, what was Achievement Guide up there?

20   Can you explain that?

21   A.    I think Achievement Guide was what he was referring to

22   VideoGames before it actually became VideoGames and he got the

23   name of that.

24   Q.    He got the -- later the name VideoGames.  Is that

25   correct?

1    A.    Yes; YouTube.com/videogames.

2    Q.    And was Achievement Guide a channel that he was running

3    on YouTube previously to VideoGames?

4    A.    Not that I know of.

5    Q.    Not that you know of?

6    A.    No.

7    Q.    All right.  Now, what is he telling you, if you can,

8    about what a new channel?  What's it going to do?

9    A.    Yeah.  He wanted me to help him find a sponsor for the

10   trip, for the E3 trip, so he could send some YouTubers -- some

11   other YouTubers that had big channels to the E3 conference,

12   which is a gaming conference, so that they could promote the

13   YouTube channel, the VideoGames Channel.

14   Q.    Let's break that down.  What was Mr. Princip telling you,

15   according to this text, that the channel was going to kind of

16   specialize in?

17   A.    It's going to be about game guides, news, reviews, stuff

18   like that, covering video game topics.

19   Q.    All right.  And what is this term Team Noble?

20   A.    That was his previous YouTube channel, which is, like,

21   very similar to VideoGames.

22   Q.    So did you -- do you have an opinion as to whether

23   Mr. Princip was actively involved in YouTube while you-all

24   were talking about this?

25   A.    Yes, he was.

1    Q.    Okay.  So this wasn't his first rodeo either, in your

2    opinion?

3    A.    No, it wasn't.

4    Q.    Do you know what I mean by that--first rodeo?

5    A.    Yes, sir.

6    Q.    First time to do something like this?

7    A.    Yes.

8    Q.    Okay.  So E3 you said is a gaming conference?

9    A.    Yes, sir.

10   Q.    Why would that have anything to do with this business

11   deal?

12   A.    What he told me, Mr. Princip, was that he was going to

13   send some of the YouTubers that had big followings on YouTube

14   to the E3 conference, he would pay for their trip, and in

15   return would promote the VideoGames YouTube Channel so that it

16   would basically blow the YouTube VideoGames Channel up,

17   because they all have followings.

18   Q.    Okay.

19   A.    So they would get a free trip.

20   Q.    Mr. McRoberts is kind of shooting -- I am just -- Let me

21   slow you down a little bit.  When you say blow up the channel,

22   what does that mean to you as a 23- or 24-year-old?

23   A.    Get it all out of views and subscribers.

24   Q.    Not physically, you know, destroy the channel or

25   anything, but actually increase the following.

1    A.    Yes.

2    Q.    All right.  So let's go to -- Can you tell us about this

3    entry here down here at the bottom?

4    A.    Okay.  He wanted 2500 to send the people to E3, so that

5    way it would cover the cost of the trip.

6    Q.    And is the term "blow through the roof" what you were

7    kind of referring to a minute ago, the same thing?

8    A.    Yes, sir.

9    Q.    All right.  And then what does Mr. Princip represent to

10   you that will start happening with money?

11   A.    He said it would start rolling into our hands.

12   Q.    Now, did you immediately send him $1500 or $2500?

13   A.    No, not right then.

14   Q.    Okay.  Let me ask you about a couple of entries on this

15   particular chat.  Is this -- Who is chatting or who was

16   communicating on this document?

17   A.    This is Mr. Princip and me.

18   Q.    All right.  And does he talk about some of the details

19   about who's going to run it and what you're role would be?

20   A.    Yes.

21   Q.    Okay.  What was his comment to you?

22   A.    He said literally I would run -- he'd run the channel and

23   I'd collect money that month.  That easy.

24   Q.    And he asked you about these giveaway sites.  And what

25   was your response to that?

1    A.    He was asking me about some guy named Vitally, which I

2    hadn't talked to him in a long time.

3    Q.    Okay.  And that's not Mr. Vital by any chance over here?

4    A.    No.

5    Q.    All right.  So let's finish up with this page, and let me

6    ask you about a couple of more questions on this and then we

7    will keep moving on it.

8         On May 7th of 2012 at 3:50 in the afternoon, does he

9    discuss money with you?

10   A.    Yes.  He says he wants about $3,000.

11   Q.    Okay.  Above that does he ask for 2500?

12   A.    Yeah; before 3,000.

13   Q.    Okay.  And what does he tell you -- Now, his name on this

14   isn't Marko like it was the previous page.  Excuse me.  What

15   is the name Marko Team Noble is that what is your

16   understanding of that name?

17   A.    That's Mr. Princip's Skype account and then he just has

18   Team Noble in parentheses because it is his old YouTube

19   channel he was still going by that, I guess.

20   Q.    Now, let me ask you about some of your experience.  Can

21   you discuss this chat right here with this term Rev3?

22   A.    That was the YouTube network I was with, Revision 3,

23   which actually went to Discovery Networks, Discovery Digital.

24   Q.    You completely lost me.

25   A.    I am sorry.

1    Q.   That's okay.  Explain again to the jury what is Rev3?

2    A.   Revision 3 is a YouTube network.  YouTube networks are

3    kind of like the middle man for YouTubers so they don't have

4    to deal with YouTube, and YouTube also doesn't have to deal

5    with YouTubers.  They manage advertising, sponsors, brand

6    deals, and they also copyright strikes.  If you got any issue

7    with their channel, they pretty much manage their channel for

8    you and advise you on how to get your channel bigger, how to

9    grow it.

10   Q.   All right.  I am going to ask you, so a network -- is

11   Rev3 a network?

12   A.   Yes.  Or it used to be.  Now it's Discovery Digital.

13   Q.   All right.  So it's changed hands?

14   A.   Yes.

15   Q.   All right.  And the purpose of the network, since you've

16   been making your living doing this -- I don't understand why

17   you have to have a network.  For example, you told me earlier

18   you just upload your own stuff to YouTube.

19   A.   Yes, sir.

20   Q.   Why do you need -- Why would somebody need a network if

21   they -- I apologize.  Let me re-ask this question.

22        If you upload your own video to YouTube, the stuff that

23   you create, do you have to have a network?

24   A.   No, you don't.

25   Q.   Okay.  Would -- In your opinion, since you have an

 1    agreement with YouTube, are they concerned about copyright

 2    problems or being sued if you are uploading your own

 3    information?

 4    A.    Yes, sir.

 5          MR. WILSON:  Objection, Your Honor; calls for

 6    speculation from what YouTube would do.

 7          THE COURT:  Overruled.

 8    Q.    (BY MR. WYDE)  All right.  Just your opinion.  It doesn't

 9    have to be considered the God's honest truth, but is it your

10    understanding that if you are uploading your own videos that

11    you create, do you need a network?

12    A.    You don't have to, no.

13    Q.    And do you have an opinion as to whether YouTube would

14    require you to have a network?

15    A.    No, you are not required --

16          MR. WILSON:  Objection.

17          THE COURT:  Overruled.

18    Q.    (BY MR. WYDE)  So -- and that's kind of the arrangement

19    you have.  Right?

20    A.    Yes, sir.

21    Q.    Now, what about -- tell the jury -- let's say somebody

22    sends you a video, and since you have 460,000 people following

23    you, they want -- you know, they want their video on your

24    channel because there's almost a half a million people that

25    are going to see it.  Right?

```
 1    A.    Yes, sir.

 2    Q.    What are the rules -- what are your understanding of the

 3    rules for that type of an uploading of a video?

 4    A.    You would have to own the content and you would have to

 5    have the rights and licenses to use it on your YouTube

 6    channel.

 7    Q.    So if you are uploading someone else's video, do you have

 8    to go through a network?

 9    A.    No, you don't.

10    Q.    Well, I don't understand --

11    A.    If they give you the rights to do it.

12    Q.    Okay.

13    A.    Sorry.

14    Q.    So if I create a video and I want to put it on your

15    channel but I don't want to give you the rights to my video, I

16    just want you to publish it so a half million people will see

17    it, do you need to have -- I have to go -- do you have to go

18    through the network?

19    A.    Yes.

20    Q.    Okay.  So if it's not your video and you don't have -- or

21    you don't have the rights to that video, you have to go

22    through a network?

23    A.    Yes.

24    Q.    That's your understanding.

25    A.    Yeah, as far as I know.
```

```
1    Q.    And how long have you been doing that?

2    A.    Seven years.

3    Q.    Okay.  So I didn't make this too muddy, why do you have

4    to have a network?

5    A.    You have a network to manage your YouTube channel, manage

6    the advertising on it, and also manage your copyright strikes

7    and stuff like that.

8    Q.    Okay.  Because if you don't own the content, you just

9    uploaded somebody else's content, you don't really own that.

10   A.    Yes.

11   Q.    All right.  Now, what do you call the people that

12   actually create these videos?

13   A.    YouTubers.

14   Q.    Okay.  Is there any other term?

15   A.    Or content creators.

16   Q.    Creators.

17   A.    Yeah.

18   Q.    All right.  Now, let's talk about -- would Google, or

19   YouTube actually, send the creator or the channel owner the

20   money, or would they typically send the advertising money to

21   the network?

22   A.    If you are with the network, they will send it to the

23   network and then the network pays you.

24   Q.    Okay.  So they are kind of an intermediary between

25   YouTube and the creators.
```

 1    A.   Yes, sir.

 2    Q.   All right.  Now, let me ask you about -- And is Rev3 --

 3    that was a network.  Is that accurate?

 4    A.   Yes.

 5    Q.   All right.  Now, I will try to pick it up and see about

 6    this one here.  On May 14th did Mr. Princip contact you?

 7    A.   Yes, sir.

 8    Q.   And can you tell us what he was discussing with you on

 9    May 14th at 2:29 in the morning?

10    A.   Yes.  He said he could see that my YouTube channel was

11    doing really good.

12    Q.   And your response was?

13    A.   I said it's doing all right.

14    Q.   Now, you use this term VLOGS here?

15    A.   Yes.

16    Q.   And I thought you used that term earlier, but I don't

17    hear as well as I used to.  Tell the jury what a VLOG is.

18    A.   It is just a term for video blog, just like you went on a

19    website and posted a blog but it is in video form.

20    Q.   Did your conversation continue -- Let me ask you about

21    this last comment from Mr. Princip here.  What does he say at

22    the very end about -- on May 14th at 2:30 about your being

23    involved with him?  What does he say about that?

24    A.   He was saying imagining getting them all over to 100K,

25    which is a hundred thousand views he is referring to.

```
1    Q.   What is his term for -- what does he tell you you would

2    be doing?

3    A.   I'd be banking.

4    Q.   And what do you think banking means?

5    A.   Making money, revenue.

6    Q.   Let's continue through this.  Am I correct on May 15th

7    you haven't signed any agreements with anybody at this -- with

8    Mr. Princip at this point.  Is that correct?

9    A.   No, sir.

10   Q.   All right.  Can you tell me what is going on here in this

11   chat with you and Mr. Princip?

12   A.   He asks me to invest in his VideoGames YouTube Channel.

13   Q.   All right.  And what were the terms?

14   A.   He asked for $1500 for a 30 percent stake in the company.

15   Q.   And naturally you just wrote him a check and sent it to

16   him.  Correct?

17   A.   I did it through PayPal.

18   Q.   Well, not at that point in time.

19   A.   Not at that point in time.

20   Q.   So tell me, if you will, what was the questions that you

21   were asking him?  What did you want to know?

22   A.   I wanted to know what he wanted the money for.

23   Q.   And he replies with what?

24   A.   For the E3 trip, the gaming conference I was referring

25   to.
```

1   Q.   Okay.  And does Mr. Princip explain that somebody else

2   has also invested in this channel at the time?

3   A.   Yes.  Dan Japikse I think is how you say his name.

4   Q.   Okay.  And are you familiar with him?

5   A.   Not very much.

6   Q.   Okay.  Did Mr. Princip make some comment to you about

7   Mr. Japikse selling his channel, his YouTube channel?

8   A.   Yeah.  He was referring actually selling a network, like

9   Revision 3, for 700K, $700,000.

10  Q.   Okay.  Is it fair to suggest that these are big money

11  deals, aren't they?

12  A.   Yes, sir.

13  Q.   And you're -- How old are you?

14  A.   I think I was 19 at the time.

15  Q.   What do you tell Mr. Princip here on May 15th about 8:00

16  in the evening?

17  A.   I told him before I would invest I would need a contract

18  first.

19  Q.   Okay.  And what does he say?

20  A.   He said of course, and he would send me one.

21  Q.   Or that --

22  A.   He would never do anything without one.  I'm sorry.

23  Q.   And do you even ask him about this 30 percent interest?

24  A.   Yeah.  I ask him why he was giving away 30 percent for

25  the trip to E3.

1    Q.    And his response?

2    A.    Because he's taking all the YouTubers to E3.

3    Q.    And what was the purpose, again, in him taking these

4    people to this gaming conference?  How was that going to help

5    his channel?

6    A.    Because they were going to be promoting the YouTube

7    channel to actually get it views and subscribers because they

8    were running it to theirs.

9    Q.    They were going to try to get -- you said views?

10   A.    Yes.  When they post it on their YouTube channel and talk

11   about it and tell their viewers to go check out the new

12   VideoGames channel, that that would get it views and

13   subscribers.

14   Q.    So that really is for marketing purposes.  Is that fair?

15   A.    Yes, sir.

16   Q.    Okay.  Now, can you tell me what you meant by asking this

17   question down here at the bottom of the page?

18   A.    Yeah.  I was asking him how he was going to get all those

19   big YouTubers to actually, like, shout out the YouTube channel

20   and promote it.

21   Q.    And what do you mean by big YouTuber?  Explain what your

22   thinking of what that term means to you?

23   A.    Lots and lots of views and subscribers.

24   Q.    You got 460,000 on one of your channels.  Does that make

25   you a big YouTuber?

1    A.    Yes, sir.

2    Q.    So you are talking about people who have hundreds of

3    thousands of views?

4    A.    Or subscribers or views, yes.

5    Q.    Right.  So if Mr. Vital here has only like 15 friends on

6    Facebook, he wouldn't be a big, overly popular deal, would he?

7    A.    No, sir.

8    Q.    All right.  Of course you know I am just having fun with

9    him.

10         Now, let me go to this question here.  On May 15th, again

11   in the 8:00 hour, can you tell me -- Well, let me ask you

12   about this top page here, this top line.  What does

13   Mr. Princip tell you about this 30 percent?

14   A.    He is saying he didn't want to give away too much of the

15   company.

16   Q.    But, nonetheless, he has offered you 30 percent for

17   $1500.  Is that correct?

18   A.    Yes, sir.

19   Q.    All right.  Now, can you tell me about this chat down

20   here on May 15th?

21   A.    I was asking him what happened with Team Noble, his other

22   YouTube channel, because it wasn't getting, like, views and it

23   wasn't as big anymore.

24   Q.    Uh-huh.  And did he tell you he'd had surgery and

25   somebody else had left for college?

```
 1    A.    Yes, sir.

 2    Q.    All right.  Now, let me continue.  This is still the 8:00

 3    hour and you all are chatting back and forth.  Is that

 4    accurate?

 5    A.    Yes, sir.

 6    Q.    Can you explain to me what's going on in this

 7    conversation here with regard to your comment "I don't know"?

 8    A.    I was just saying I don't know about investing because I

 9    just put some money in something else.

10    Q.    And what does Mr. Princip tell you here in the next line

11    about what you would have to do?

12    A.    He told me that I could make money doing absolutely

13    nothing.

14    Q.    Without doing absolutely anything?

15    A.    Without doing absolutely anything, yes, sir.

16    Q.    Okay.  Does Mr. Princip tell you you're going to have to

17    pay other expenses or anything like that?

18    A.    No.

19    Q.    Okay.  Does he explain to you what your role would be in

20    decision-making with this venture?

21    A.    Yeah.  He said I would be an advisor to the company.

22    Q.    Okay.  Now, can you tell the jury what this part about

23    Mr. Princip saying here in this comment right here, and it

24    begins here?

25    A.    He is saying he signed with a $3.50 deal, which is going
```

1  back to what he was saying earlier with the CPM--for every

2  thousand views we would get $3.50.  Then he is saying with the

3  mobile, no matter if they are watching on their phone or their

4  computer, every view is $3.50 per thousand.

5  Q.   Is the $3.00 to 3.50 range at this point back in 2012, is

6  that kind of standard in the industry?

7  A.   Yes, sir.

8  Q.   And you've been doing it for five years at this point in

9  time from 2007?

10  A.   Something around that, yes.

11  Q.   When did you actually start doing this?

12  A.   My biggest YouTube channel I know started February 14th,

13  2008.  I had my VLOG YouTube Channel, but my tech channel was

14  the one that took off.

15  Q.   So eight years ago you were 16.  Is that correct?

16  A.   Yes.

17  Q.   Give or take?

18  A.   Something around that.

19  Q.   Okay.  So when you saw this number here $3.50 plus, or

20  3.50 plus mobile deal with Machinima, is that part of the

21  jargon of YouTubing?

22  A.   Yes.

23  Q.   So tell the jury what $3.50 plus mobile deal is?

24  A.   That's you will make $3.50 for all the views whether it's

25  on mobile or whether they are on their computer.

106

```
 1    Q.    So a view means to do what?

 2    A.    To watch the video.

 3    Q.    Okay.  And to watch the video you have to go where?

 4    A.    You go to the YouTube video page itself.

 5    Q.    So if I'm sitting down at a computer like this one, I can

 6    just go to www.youtube?

 7    A.    Yes.

 8    Q.    And then I can then click on the video or the channels I

 9    want to watch?

10    A.    Yes, sir.

11    Q.    And if I click on the YouTube -- the VideoGames YouTube

12    Channel, the channel that's the subject of this lawsuit, is

13    that considered a view?

14    A.    No, not clicking on the channel.  You actually have to

15    click on the video itself.

16    Q.    Okay.  Well, how many videos would be on this -- the

17    VideoGames channel?  How many videos are on there as of today,

18    if you know?

19    A.    I think they have thousands.

20    Q.    Thousands of videos?

21    A.    Yeah.  Yes, sir.

22    Q.    Okay.  And if you -- Let's say Juror No. 27 decides to

23    create a video and put it on that channel, is it possible for

24    Juror No. 27 to actually receive money from people watching

25    their video?
```

1    A.    Yes, sir.

2    Q.    So the money can actually be tracked per video.  Is that

3    correct?

4    A.    Yes, sir.

5    Q.    Based on the views of that video?

6    A.    Yes, sir.

7    Q.    Now, regarding this conversation that continues on May

8    15th, can you tell me what Mr. Martin is saying -- Excuse me.

9    What Mr. Princip is saying in this first part?

10   A.    If you can move it down a little bit more.

11   Q.    I apologize.

12   A.    Okay.  So he was talking about Tmargin, which is a

13   YouTuber that was going to be promoting the YouTube channel,

14   which also has -- his channel is big.  It has a lot of

15   followers.

16   Q.    What does -- Can you tell the jury or read this quote to

17   them from Mr. Princip here?

18   A.    He says, "In the contract you will have a 90-day

19   guarantee of getting your money back."  And he pays back those

20   who invest every cent before me makes a cent.

21   Q.    He will pay back those who invest before he makes a cent?

22   A.    Yes, sir.

23   Q.    Did that happen in your situation?

24   A.    No, sir.

25   Q.    Okay.  How long did it take you to get back any money

1    from Mr. Princip after you signed the contract?

2    A.    I don't know exactly how late he was, but he was days or

3    weeks late.

4    Q.    All right.

5    A.    Sometimes months in some cases for 30 percent.

6    Q.    All right.  We will come back to that.  Okay?

7        So explain to me here what you're asking him about in

8    this text here that is at 8:29 in the evening?

9    A.    I said, "Why don't you get someone else to invest in the

10   VideoGames YouTube Channel?"  Because the people he wanted to

11   invest had more of a following than I did.  They were making

12   more money than me.

13   Q.    And his response?

14   A.    Because he wanted my advice.

15   Q.    Your advice?

16   A.    Yes.  He said I was better suited for big business.

17   Q.    Do you ask him about what happens if, you know, this

18   thing doesn't make any money?

19   A.    Yeah.  I was wondering what if the channel doesn't make

20   money and am I still going to be paid back.

21   Q.    And his response?

22   A.    He said it's not going to happen.

23   Q.    Let me ask you about the top of this -- in the next page,

24   this conversation here.  Could you go back to this?  For those

25   of us who don't speak YouTube quite as well as you do, what

```
 1    does this LOL mean?

 2    A.    Laugh out loud.

 3    Q.    Laugh out loud.  Does it also mean from others sometimes

 4    lots of love?

 5    A.    I haven't heard that.

 6    Q.    You hadn't heard that one.  You just know the laugh out

 7    loud.  Right?

 8    A.    Yes, sir.

 9    Q.    So what does Mr. Princip tell you in this -- top of this

10    next page about where he's -- what else he's doing for a

11    living or where he's working?

12    A.    He said he had a job with Machinima and he was making

13    $2500 a month, which Machinima was a YouTube network.

14    Q.    That was my next question.  So when you talk about these

15    networks Rev3 and Machinima, and Mr. Princip is making how

16    much a month working at Machinima?

17    A.    $2500 a month.

18    Q.    Okay.  Let me ask you this.  Does that -- is that

19    important to you?  I mean, does that carry any weight that

20    he's working at a network?

21    A.    Yeah.  That was pretty cool to be able to work with

22    somebody that was working at a network.

23    Q.    All right.  And, of course, those are the companies that

24    are between either -- between YouTube and the creators.

25    Right?
```

1    A.   Yes, sir.

2    Q.   So these networks, they play an important role.  Would

3    you say that?

4    A.   Yes; definitely.

5    Q.   Okay.  And they collect money and they distribute money.

6    Is that right?

7    A.   Yes, sir.

8    Q.   Okay.  Can you tell the jury what happens in this comment

9    right here about this when you start looking at this name,

10   whether the name that Mr. Princip wants to call this channel

11   is even available?

12   A.   Yes.  I was saying I was looking at the

13   youtube.com/videogames, and he was saying that he was going to

14   be able to get the YouTube channel name, because someone else

15   actually had the account before he got it but they weren't

16   using it.

17   Q.   And what do you tell him back here now a bit later in the

18   hour around 8:33?  What do you tell Mr. Princip about the

19   name?

20   A.   I was actually referring to youtube.com/ty.  I wanted

21   that name, but I couldn't get it from YouTube.

22   Q.   That is right here.  Is that correct?

23   A.   Yes, sir.

24   Q.   Okay.  So you wanted to try to get your own name for your

25   own channel.  Correct?

111

```
1   A.    Yes, sir.

2   Q.    But what does he tell you down here about -- or what do

3   you ask him about the investment part back here now?

4   A.    I told him to let me know once he gets the

5   youtube.com/videogames and I will think about it.

6   Q.    So you still haven't made any decision.  Is that correct?

7   A.    No, sir.

8   Q.    Okay.  Now, can you tell me what Mr. Princip represents

9   to you on May 15th, roughly 8:39 in the evening, in this

10  particular exchange?

11  A.    He said if I'm interested he will make a letter of intent

12  that would pretty much -- or pretty much what it is is that he

13  is saying that I be paid back in 90 days.

14  Q.    Okay.  And you say what?

15  A.    "K."

16  Q.    Let's move through, if you will -- Can you tell me what

17  goes on here roughly on the 16th, May 16th, at almost 4:00 in

18  the afternoon?

19  A.    Mr. Princip asked me if I have had a chance to think over

20  investing, and he managed actually to get the

21  youtube.com/videogames link.

22  Q.    Okay.  Was that a big deal?

23  A.    Yes.  It is a really big deal.

24  Q.    Because -- Explain to the jury why that would be a big

25  deal.
```

1   A.   Because it's the name VideoGames.  Like that's a really

2   big name to get.

3   Q.   Is it because it's easily recognizable?

4   A.   Yes.  Everybody knows what VideoGames is.

5   Q.   Would it be the same as having -- like saying Kleenex if

6   you wanted to sell facial tissues or whatever?

7   A.   Yes, sir.

8   Q.   Because that's what everybody calls them.  Right?

9   A.   Yes, sir.

10  Q.   Okay.  So what does Mr. Princip ask you here at 1:28 in

11  the morning on the 19th?

12  A.   He asks me again if I had a chance to think over the

13  deal.

14  Q.   And your response is?

15  A.   I told him I couldn't invest $1500 into something I don't

16  know anything really about.

17  Q.   So what does Mr. Princip then kind of offer you?

18  A.   He said even if I could do 1K, or a thousand dollars,

19  that would be great.  And even if I could do 500.

20  Q.   Well, I'm a little bit confused.  I thought he was making

21  $2500 a month at Machinima.  Is that correct?

22  A.   Yes, sir.

23  Q.   And yet he's begging you more or less for $500 to invest

24  in his channel?

25  A.   Yes, sir.

```
1    Q.   Do you have an opinion as to whether or not he was

2    desperate for money at this point in time?

3    A.   Not at that point in time, no.

4    Q.   I mean, why is he asking you for as little as $500, do

5    you think, if he has $2500?

6    A.   I'm not sure.

7    Q.   You don't know?  All right.  Let's keep moving.

8         Now, what does he promise you if you are willing to

9    invest any amount of money at this point in time here on the

10   19th; I think this part here?

11   A.   He told me he would give me the channel login the

12   username and password to log in, plus the revenue reports to

13   actually see how much money it's making.

14   Q.   Explain again to the jury, how do you determine how many

15   views a channel has?  Where is that?

16   A.   You can see on the YouTube channel's "about" page it has

17   it at the very bottom.

18   Q.   Okay.  Let me ask you if you have looked at the

19   VideoGames YouTube Channel lately?

20   A.   Yes, sir.

21   Q.   Did you look at it yesterday prior to testifying?

22   A.   Yes, sir.

23   Q.   And did you have to -- What did you have to do to figure

24   out how many views it had had during its existence?

25   A.   I went to the youtube.com/videogames and then clicked on
```

114

1   the "about" tab.

2   Q.   So you don't even have to have a password or a login to

3   see how many views the channels had?

4   A.   No, sir.

5   Q.   And in the 48 months since this channel has basically

6   been created.  Right?  May of 2012.  This is late March 2016.

7   Fair enough?

8   A.   Yes, sir.

9   Q.   How many views has this channel had?

10  A.   813 million plus.

11  Q.   How many subscribers to this channel?

12  A.   Over 3 million.

13  Q.   And so Mr. Princip is saying here that if you invest

14  you'll have access to this information.  What other reports

15  would you be getting access to, I should ask?

16  A.   I'd have access to the analytics report, which is all the

17  views and how much money the channel is actually making, the

18  revenue from it.

19  Q.   Okay.  Can you take a moment and just read the next three

20  or four lines to the jury, please?  What did you respond to

21  Mr. Princip?

22  A.   I said, "Why would you give up 30 percent for just $1500

23  if it's going to be so big?"

24  Q.   And his response?

25  A.   "Because that initial $1500 helps me start the channel."

1    Q.    So without your 1500, at least it seems like in this

2    exchange, he wasn't going to be able to start the channel.  Is

3    that correct?

4    A.    Yes, sir.

5    Q.    And what is his comment here one line, two lines below

6    that?

7    A.    He says, "You can't become a pro-BMX rider without a

8    bike."

9    Q.    Tell the jury what a BMX rider is, you being a

10   skateboarder.

11   A.    A professional bike rider.

12   Q.    Okay.  Motorcycles or bicycle?

13   A.    Bicycle.

14   Q.    And what do you ask him here at 1:47 in the evening?

15   A.    I said, "So what do you need the $1500 for exactly?"

16   Q.    And he tells you what?

17   A.    He told me again that it covers the costs the remaining

18   costs for this E3 trip.

19   Q.    And that was going to be kind of initial marketing for

20   the channel.  Is that correct?

21   A.    Yes, sir.

22   Q.     Does he also represent to you that somebody else

23   invested in this channel?

24   A.    Yes; Dan Japikse.

25   Q.    And how much did Mr. Japikse invest?

1   A.   $1,000.

2   Q.   And can you tell me about this comment here on May 19th

3   at 1:48 a.m.?  What is he saying on this last line--2400?

4   A.   Okay.  He is saying the total invested into it the 2400,

5   because he put $1400 into it and Dan put another thousand.

6   Q.   So is this a continuation of that conversation, if you

7   will?

8   A.   Yes, sir.

9   Q.   All right.  And so why does Mr. Princip say he's offering

10  you 30 percent?

11  A.   He's offering me 30 percent "because I need this reminder

12  badly, and your input/advice will come in handy as we grow."

13  Q.   And what do you ask him later in that conversation about

14  the return of your money?

15  A.   I said, "So if I give you the $1500, how and when will I

16  get paid back?"

17  Q.   So you still haven't made any decision yet, have you?

18  A.   No, sir.

19  Q.   Okay.  Now, in this conversation here, apparently later

20  in the day does Mr. Princip disclose to you what his -- I

21  guess his Gmail -- one of his Gmail accounts is?

22  A.   Yes.

23  Q.   And is that this right here this -- Can you read that out

24  loud for the record?

25  A.   markoguide1693@gmail.com.

1    Q.    I skipped ahead.  I have a page out of order.

2          But on November 15th later in the -- Let's move to May

3    19th, if I can, as we get close to the contract date.  And can

4    you tell me about what you're being asked or what this part of

5    the conversation -- Do you ask how and when you're going to

6    get paid back?

7    A.    Yes.

8    Q.    And what is Mr. Princip's response to that?

9    A.    He said, "Within 60 days over PayPal.  The easiest way."

10   Q.    All right.  And just in case anybody here doesn't

11   understand what PayPal is, explain to the jury what you

12   understand PayPal to be.

13   A.    It's kind of like an online bank you can send money to

14   and pay for things through.

15   Q.    Can you tell me about this comment here that Mr. Princip

16   makes to you?

17   A.    "Like I told Dan, I'll pay you back before I make a

18   cent."

19   Q.    And does Mr. Princip represent that he'll put this into a

20   contract?

21   A.    Yes.  He said he will put it all in writing and draft a

22   contract.

23   Q.    Does he tell you that if he can pay you back sooner he

24   will do that?

25   A.    Yes, he said in 10 to 20 days or soon as he can.

1    Q.   And what do you ask on May 19th at 1:55 in the morning

2    about what happens after you're paid back?

3    A.   Yes.

4    Q.   What does he say?

5    A.   He says, "Nothing.  You keep making money.  LOL."

6    Q.   So was it being represented to you that even though you

7    got the $1500 back you would continue to make money?

8    A.   Yes, sir.

9    Q.   You would have an interest in the company?

10   A.   Yes, sir; 30 percent of everything.

11   Q.   All right.  Does Mr. Princip ever say anywhere in these

12   chats that you have to pay for expenses or other things of

13   that nature?

14   A.   No, sir.

15   Q.   Now, do you ask him about the creators and if they're

16   going to get compensated?

17   A.   Yes, I asked him -- I can't see it.

18   Q.   Excuse me.  I'm sorry.  Can you tell the jury why you

19   would ask that question?

20   A.   I was wondering why people would be posting content on

21   the channel if they weren't going to be making money from it

22   and the channel would be making money from it.

23   Q.   Have you, in your experience of uploading videos, even

24   your own videos, have you spoken to, chatted with, other

25   people that create videos and somehow they have an expectation

1   that they're going to be paid?

2            MR. WILSON:  Objection as to hearsay, Your Honor.

3            THE COURT:  Sustained.

4            MR. WILSON:  Thank you.

5   Q.   (BY MR. WYDE)  Do people that create videos, in your

6   opinion, expect to be compensated from time to time?

7            MR. WILSON:  Same objection, Your Honor.

8            THE COURT:  I will allow this.

9            THE WITNESS:  Yes, sir.

10  Q.   (BY MR. WYDE)  Some people upload videos just for the fun

11  of it--is that a fair statement--without any expectation of

12  money?

13  A.   Yes, sir.

14  Q.   In fact, a lot of people do when it's just their own

15  personal stuff.  Right?

16  A.   Yes, sir.

17  Q.   Then is there a class of people out there, a group of

18  people that are trying to make money on their own videos?

19  A.   Yes; YouTube partners.

20  Q.   That's what you do.  Right?

21  A.   Yes, sir.

22  Q.   And you can't make money unless you're paid, so-to-speak.

23  Right?

24  A.   Yes, sir.

25  Q.   Okay.  Now, can you tell me about this term here first

1    six guys in the box?  Is that a term of art or jargon?

2    A.   The first six guys in the box, he's referring to --

3    there's a little box on the side of your YouTube channel that

4    you can basically feature other YouTube channels in.  And,

5    yeah, you put -- the top six guys that are in the YouTube box

6    are going to be who is, like, promoting the channel.

7    Q.   Tell the folks of the jury, why does that help the

8    VideoGames channel and why does that help these six guys?

9    A.   Because the guys all have big YouTube channels with lots

10   of followers, and when they are promoting it and VideoGames is

11   also promoting them on the side of the channel, kind of like

12   it works hand in hand; everybody gets promotion out of it.

13   Q.   So the VideoGames YouTube Channel is going to be

14   promoting the people that upload or send them video games.

15   Correct?

16   A.   Yes, sir.

17   Q.   And then those people that upload and send video games to

18   YouTube are going to promote the VideoGames YouTube Channel on

19   their channel.  Is that accurate?

20   A.   Yes, sir.

21   Q.   Okay.  Can you tell the jury about this conversation

22   here?

23   A.   Okay.  Starting where?

24   Q.   Where the pen is on the side.

25   A.   I said, "Why would they do that when if they did it on

121

1    their own channel they would make way more money?"

2    Q.    And Mr. -- So you are asking why would people promote the

3    VideoGames YouTube Channel when they have their own channel?

4    A.    Yes.

5    Q.    Okay.  And you're still kind of iffy on this deal.  Is

6    that a fair statement?

7    A.    Yes, sir.

8    Q.    And you are asking every question that you can come up

9    with?

10   A.    Yes, sir.

11   Q.    All right.  Can you tell us what Mr. Princip's response

12   to that question is?

13   A.    He said, "No one will get paid.  And you might say,

14   'Marko, you're greedy.'  I did the same thing for Team Noble,

15   and in return they get promotion and sponsor products like

16   Gunnar Glasses, etc."

17   Q.    What does he say about why someone might promote the

18   VideoGames YouTube Channel?

19   A.    Because he is taking them to E3.

20   Q.    Kind of wining them and dining them.  Is that --

21   A.    Yes, sir.

22   Q.    Okay.  And do you actually discuss with Mr. Princip about

23   the cost of attending this conference?  Do you just kind of

24   take it for granted that these people can't afford to go on

25   their own?

1   A.   No, I knew at the time they could probably all pay for

2   their own trips, because it doesn't cost that much to fly out,

3   and they were all making probably more money than I was.

4   Q.   At the time?

5   A.   Yes.

6   Q.   Do you remember how much you were making at the time?

7   A.   Not in 2012 I can't remember exactly.

8   Q.   More than $5,000 a month or less?

9   A.   More than $5,000.

10  Q.   More than $5,000 a month.  In 2012 you were making more

11  than $5,000?

12  A.   Not in 2012; 2013.

13  Q.   A year later.

14  A.   Yes, sir.

15  Q.   All right.  So do you ask -- What is the question mark

16  meant for?

17  A.   That was just like basically making the response before

18  that a question.

19  Q.   You wanted an answer to your question.  Right?

20  A.   Yes, sir.

21  Q.   Okay.  So tell me what Mr. Princip's response eventually

22  is here?

23  A.   He said, "They're stingy, man."

24  Q.   They don't want to spend their own money?

25  A.   Yes, sir.

1    Q.   Can you tell us what you were thinking about at this text

2    here at 2:08 in the morning?

3    A.   I said, "The thing that worries me is that Team Noble

4    isn't around anymore, and I don't want the same thing to

5    happen after I put my $1500 into it."

6    Q.   Well, explain to the jury what you meant -- who owned or

7    who ran Team Noble?

8    A.   As far as I knew, Mr. Princip was.

9    Q.   Okay.  And how -- Had you ever visited that channel on

10   YouTube?

11   A.   Yes, sir.

12   Q.   What kind of content did it have?

13   A.   Video game content; just like VideoGames.

14   Q.   And are you -- How do you know it wasn't around anymore?

15   A.   It was still around, but it just wasn't getting any views

16   anymore.

17   Q.   Okay.

18   A.   Kind of like tanked as a channel.

19   Q.   So did you have any concerns about investing in another

20   Mr. Princip channel or another channel run by Mr. Princip if

21   it wasn't really going to continue to grow?

22   A.   Yes, sir.

23   Q.   Okay.  Now -- And what are you asking about here in this

24   conversation, this part of the conversation, if you will, of

25   Mr. Princip?

124

1    A.    I asked him what kind of videos these people are going to

2    be making.

3    Q.    And what does he tell you?

4    A.    He told me achievement guides, game reviews, but mostly

5    game news.

6    Q.    And can you tell us about this comment here?

7    A.    He was referring to making a video about the new Call Of

8    Duty Black Ops game, about the weapons in it.

9    Q.    Call -- What title?

10   A.    Call Of Duty.

11   Q.    Is that a big video game?

12   A.    That's one of the biggest.

13   Q.    Okay.  In the world?

14   A.    Yes, sir.

15   Q.    And does Mr. Princip make any comments to you about what

16   goes on on your channel?  Excuse me.  I am trying to get this

17   centered.

18   A.    Sort of like the videos I make on my Ty YouTube Channel.

19   Q.    So that's the second channel you have like 230,000

20   people?

21   A.    That's the bigger one--460,000, yes.

22   Q.    Okay.  And you reviewed various technology products.  Is

23   that correct?

24   A.    Like iPhones and Apple products, stuff like that.

25   Q.    You are kind of like a *Consumer Reports*?

1  A.   Yes, sort of like that.

2  Q.   When you do that, do you actually work the phone, or

3  whatever device you're working, and then you're videoing

4  yourself at the time?

5  A.   Yes.

6  Q.   So people can see -- Like if I wanted to go out and get

7  the brand new Galaxy phone, you already have it maybe and you

8  are showing me what's good about it and what's bad about it on

9  a video?

10 A.   Yes, sir.  I would review the phones and say what I like

11 about them and what I don't like.

12 Q.   How much does that cost me?

13 A.   It's free if you watch it on YouTube.

14 Q.   Okay.  And if you got enough people watching you on this,

15 that's where the advertising comes from.

16 A.   Yes, sir.

17 Q.   Okay.  I get it.

18      Now, let's talk about -- Can you tell me about this

19 representation made to you here by Mr. Princip?

20 A.   He said that he would be handling the ideas, the promo

21 part, and then he said his partner does the editing and

22 graphics.

23 Q.   Do you know who that is, or who that was at that time?

24 A.   I think he was referring to Dan Japikse.

25 Q.   Do you know for a fact one way or the other?

126

```
1    A.    No, not a hundred percent.

2    Q.    Let's go on to your comment or response to him on May

3    19th.  What did you tell him?

4    A.    I said, "It's hard for me to send somebody $1500 that I

5    just know over the internet."

6    Q.    And does Mr. Princip come back and tell you about who his

7    partner is at this point in time?

8    A.    Yes--youtube.com/brandtflakes, which I think is Jon

9    Brandt is his name.

10   Q.    Can you spell his last name for Mr. McRoberts?

11   A.    B-R-A-N-T.

12   Q.    No.  Oh, Brandt.  Excuse me.  That's the last

13   name--Brandt?

14   A.    I think that's the correct spelling of it.  I'm not a

15   hundred percent sure.

16   Q.    Okay.  Does his name pop up later in these contracts?

17   A.    Yes, sir.

18   Q.    All right.  Now, what does Mr. Princip suggest to you at

19   this point?

20   A.    He said, "Why not do it," and he would also offer me a 15

21   percent stake for just 750.

22   Q.    Okay.  And what does Mr. Princip say about you and your

23   time on the internet or YouTube?

24   A.    He says that he's been watching me on YouTube for so

25   long, or for a long time.
```

```
 1   Q.   At that time you'd been on YouTube for at least two

 2   years, if not three--maybe from 16 to 19, give or take?

 3   A.   Yes, sir.

 4   Q.   Okay.  Does Mr. Princip make representations about the

 5   kind of person he is?

 6   A.   Yes.  He says he's a very open person and easy person to

 7   work with.

 8   Q.   And did you -- Do you have an opinion about that now

 9   three to four years later?

10   A.   It's not true at all.

11   Q.   All right.  And what happens here on May 19th?  What does

12   Mr. Princip ask you?

13   A.   "What's holding you back the most?"

14   Q.   And what does Mr. Princip tell you right here in this

15   text at 3:02:50 in the morning or 3:02.24?

16   A.   "I mean, if you're worried it will start good, then

17   neglected, that you don't have to worry, man.  Honestly, I

18   need money more now than ever."

19   Q.   He says to you, "Honestly, I need money more now than

20   ever"?

21   A.   Yes, sir.

22   Q.   And this is still the same -- Basically you've only been

23   talking to him literally since the 12th.  Is that right?

24   A.   Yes, sir.

25   Q.   Or the 7th.  Excuse me.  Is that when this whole thing
```

 1    started?

 2    A.    Yes; the 7th.

 3    Q.    May 7th.  So 12 days later, even though he is supposedly

 4    making $2500 a month with the network, he says that he needs

 5    the money more now than ever?

 6    A.    Yes, sir.

 7    Q.    Okay.  Do you still inquire about how you're going to get

 8    the $1500 back if you do this?

 9    A.    Yeah.  I said, "And if they do it, will it make enough to

10    pay me back the $1500."

11    Q.    And when you are referring to the people doing it, what

12    people were doing what?

13    A.    The YouTubers I mentioned before promoting the YouTube

14    channel.

15    Q.    The guys that were supposed to be going to the E3

16    conference.  Is that right?  Or the gaming expo?

17    A.    Yes, sir.

18    Q.    Okay.

19          THE COURT:  Let's take a break here.  Let's take 15

20    minutes.  We will come back in at 3:20 and continue on.

21          Don't form any opinion about anything.  Don't discuss the

22    testimony or anything about the case.  And as much as you want

23    to, you can't go on YouTube and check these things out.

24          We will be in recess.

25          (Whereupon, the jury left the courtroom.)

129

```
 1                  THE COURT:  I will see you at 3:20.

 2                          (Brief recess.)

 3                  THE COURT:  Be seated, please.

 4        Ready?

 5                  MR. VITAL:  Yes, Your Honor.

 6                  THE COURT:  Okay.  Bring them in.

 7                  (Whereupon, the jury entered the courtroom.)

 8                  THE COURT:  Thank you.  Be seated.

 9        You may proceed.

10   Q.   (BY MR. WYDE)  Mr. Moss.

11                  MR. WYDE:  If I could have him come back up to the

12   seat?

13                  THE COURT:  Yes, please.

14   Q.   (BY MR. WYDE)  Let me ask you, when we -- before we get

15   into the conversation just prior to you signing the contract,

16   did you ask, if I understand correctly, that you just didn't

17   know how well the channel would do from the start?  Is that

18   correct?

19   A.   Yes, sir.

20   Q.   Now, as part of that continuing conversation, does

21   Mr. Princip ask you about "Where would lying get me?"

22   A.   Yes, sir.

23   Q.   Okay.  Well, now, of course, everybody knows hindsight is

24   20/20.  Do you know what that means?

25   A.   I have actually never heard that.
```

1    Q.   Well, we can all look from -- today look back and we can

2    recognize either the mistakes we make or the decisions we

3    make, AND it is easy to do that from this time looking back.

4    It's not so easy to determine whether or not we're making a

5    bad decision or a mistake or a great decision at the time we

6    make it.  Do you understand that?

7    A.   Yes, sir.

8    Q.   Okay.  So that being the case, can you tell me what

9    Mr. Princip says to you on May 19th at 3:05 in the morning

10   here about whether or not where lying would get him?

11   A.   It says, "Where would lying get me?  LOL."

12   Q.   Okay.  So four years, almost four years later now, can

13   you tell the jury, after you invested the $1500 where did that

14   get Mr. Princip?

15   A.   The YouTube channel to have 3 million subscribers,

16   813 million views, and I guess here now in the courtroom.

17   Q.   I am sorry?

18   A.   Here now in the courtroom.

19   Q.   What about -- Ultimately we are going to talk about more

20   about this in damages, but tell the jury, how much money

21   you've made off this channel the entire time since you

22   invested your money?

23   A.   I think around $4,000.

24   Q.   $4,000.  And do you have an estimate about -- based on

25   the number of views and the representation that Mr. Princip

1  made about $3 per thousand or $3.50 per thousand, so on and so

2  forth, do you have an estimate, being involved in this

3  business, about how much money the channel has made?

4         MR. WILSON:  Your Honor, at questiion asks for him

5  to -- it calls for speculation as to what the channel has

6  made.  Or I can take him on voir dire if I need to.

7         THE COURT:  I will sustain it for now.

8         MR. WILSON:  Thank you, Judge.

9  Q.   (BY MR. WYDE)  Let's go into this conversation right here

10  about -- does Mr. Princip discuss about what the $1500 was

11  going to be for again?

12  A.   He said, "I'm not trying to make $1500 for myself."  And

13  then he said, "Do you remember TN"--which is Team Noble--"in

14  its prime?"

15  Q.   Uh-huh.

16  A.   And it was getting 200,000 views per video.

17  Q.   Okay.  And so these views, if you will, that's -- is that

18  part of how the money, that advertising money, is calculated?

19  A.   Yes, sir.

20  Q.   Okay.  So -- And basically what does he say in this

21  comment here about discussing the investment again?

22  A.   He said, "This is really you help me, I help you, kind of

23  thing."

24  Q.   Okay.  So from that comment, did you think this was a

25  one-way deal or two-way deal, or what were your thoughts?

1    A.    A partnership.

2    Q.    Where you were going to provide money and in return you

3    were going to get what?

4    A.    Money from the channel, my 30 percent cut.

5    Q.    All right.  Does Mr. Princip contact you the next day on

6    the 21st here at approximately 12:17 in the afternoon?

7    A.    Yes, sir.

8    Q.    Okay.  And you tell him that you aren't really available

9    quite then.  Is that an accurate summation?

10   A.    Yes, sir.

11   Q.    Okay.  So let's -- Let me -- I asked you about the name

12   Brandt earlier.  Can you tell us here on May 21st in the -- at

13   8:00 in the evening who -- that Mr. Princip references as his

14   partner?

15   A.    He is referring to Jon Brandt.

16   Q.    And did you later come to find out who Mr. Jon Brandt

17   might be from this lawsuit?

18   A.    Yes, sir.

19   Q.    And tell the jury what your understanding of who Jon

20   Brandt was or is?

21   A.    He's someone who is helping run the channel with Marko

22   Princip.

23   Q.    Was he an adult or teenager?

24   A.    I think he's a teenager.

25   Q.    Nonetheless Mr. -- does Mr. Princip represent that Jon is

1    his partner?

2    A.   Yes, sir.

3    Q.   So at this point he's kind of led you to believe that Jon

4    is a partner and Dan Japikse might be a partner.  Is that

5    correct?

6    A.   Yes, sir.

7    Q.   So "Why don't you become a partner?"  Is that how you

8    took that or --

9    A.   Yes, sir.

10   Q.   Would you be more inclined to join a venture where there

11   were other people that had already joined, or would you be

12   less inclined to join a venture where there is other people?

13             MR. WILSON:  Objection as to relevance, Your Honor.

14             THE COURT:  He can answer.

15             THE WITNESS:  I guess it would depend on who they

16   are.

17   Q.   (BY MR. WYDE)  Right.  Right.  But if you are the first

18   one to join in, would you be more apprehensive or less

19   apprehensive?

20   A.   I mean, it would depend on the deal.

21   Q.   Okay.  Fair enough.

22        Let's go on to 8:50 in the evening.  Can you tell what

23   Mr. Princip asked you?

24   A.   "So where do we stand now as far as you investing goes?"

25   Q.   And you even -- go back -- If I'm not mistaken, you even

134

1  kind of repeat yourself on occasion here and ask Mr. Princip

2  what?

3  A.    "How many people are you sending to E3 again?"

4  Q.    Okay.  And does Mr. Princip lead you to believe that --

5  Are these allegedly the people he was sending, if you will, to

6  this gaming conference?

7  A.    Yes, sir; the highlighted part.

8  Q.    Okay.  Well, are these like birth names or are these --

9  Who is FaZe Clan, if you know, and Obey Alliance?

10  A.    They are the YouTubers that are going to promote the

11  YouTube channel, VideoGames.  They are YouTube names.

12  Q.    Does -- Can you tell me about what Mr. Princip was

13  discussing here about making people sign contracts?  What was

14  that part of that conversation about?

15  A.    He said that he made them sign contracts.

16  Q.    To go to E3?

17  A.    No, to do the videos, promoting the channel, for him to

18  pay for their trip to E3.

19  Q.    Okay.  I don't want to put any words in your mouth, so

20  explain that to me again.

21  A.    He is saying that he made them sign contracts for them to

22  promote the YouTube channel in return for sending them to E3.

23  Q.    So if he sends them -- if he pays for their way to go to

24  the E3 conference, these people had somehow, some way, signed

25  some contracts to promote the YouTube channel?

1    A.    Yes, sir.

2    Q.    Is that your understanding?

3    A.    Yes, sir.

4    Q.    Okay.  And does he state here that he made everyone sign

5    a contract?

6    A.    Yes, sir.

7    Q.    Does Mr. Princip here on May 21st at 9:00 in the evening

8    represent when you'll get your money back?

9    A.    He said I would make my money back within 60 days.

10   Q.    So later that evening around 9:00 p.m., can you tell me

11   what Mr. Princip suggests to you?

12   A.    He says, "Literally, man, this amount of money XXXX is

13   going to help me and you."

14   Q.    Okay.  And is that part of this conversation that

15   continues, if you will, on the next page -- I guess what I'm

16   attempting to ask you about is the number of Xes.  Does this

17   represent a certain amount of money to you when you're talking

18   about four XEs?

19   A.    Four Xes would be a thousand.  Five Xes would be $10,000.

20   Q.    10,000?

21   A.    10,000.

22   Q.    You don't know if it is a thousand or 2,000 or 3,000, but

23   it is literally thousands, if you will?

24   A.    Five figures.

25   Q.    Okay.  And does Mr. Princip ask you to trust him here on

1    5/21/12 at 9:10 in the evening?

2    A.    Yes, sir.

3    Q.    Okay.  So you actually discuss with him now who's going

4    to write the contract and what's going to be included in it.

5    Is that a fair statement?

6    A.    Yes, sir.

7    Q.    Okay.  And does Mr. Princip guarantee your money back

8    whether or not the channel makes any money?

9    A.    Yes, sir.

10   Q.    Do you repeat here -- down here are you repeating the

11   terms of the agreement?

12   A.    Yes, sir.

13   Q.    Okay.  This is, in my opinion, huge so I want to ask you

14   about this.

15        Let me ask you about this entry here at 5/21/12 at 9:12

16   in the evening.  Can you tell us what your questions are and

17   read into the record what Mr. Princip's responses are?

18   A.    I said, "And I'll make 30 percent of everything the

19   channel makes even after I get paid back?"

20        And then he tells me, "Every 15th of the month I'll

21   PayPal you the 30 percent what Machinima pays me."  And he

22   will also attach a view report from Machinima so that I'll

23   know I'm getting paid 30 percent to the penny.

24   Q.    And what about the login?  Why is that important?

25   A.    Because that's how you have to access the YouTube channel

1    and log into it.

2    Q.    To see what?

3    A.    To see the analytics reports of how much money it's

4    making; the views and all that.

5    Q.    Can you see the views and the subscribers without logging

6    into the channel?

7    A.    Yes.

8    Q.    But you can't see how much money it makes unless you log

9    in?

10    A.    Yes, sir.

11    Q.    And that requires a username and a password.  Is that

12    accurate?

13    A.    Yes, sir.

14    Q.    Okay.  And to this day do you have the username or the

15    password at this point?

16    A.    No, sir.

17    Q.    And does Mr. Princip represent that he will include those

18    terms into the contract?

19    A.    Yes, sir.

20    Q.    Okay.  Does he talk about anywhere in this conversation

21    like a length of time of the agreement?  Did he ever say, "I

22    only want to be a partner for 12 months," or 18 months or two

23    years or anything of that nature?

24    A.    No, sir.

25    Q.    To your knowledge, from the time of May 2012 literally

```
 1    through up until the time you brought this lawsuit in I think
 2    sometime in the spring or summer of 2014, was there ever an
 3    end-date for this partnership?
 4              MR. WILSON:  Objection, Your Honor; calls for a
 5    legal conclusion.
 6              THE COURT:  Overruled.
 7              THE WITNESS:  No, sir.
 8    Q.  (BY MR. WYDE)  Okay.  Is there any end-date in your
 9    contract?
10    A.   No, sir.
11    Q.   Okay.  And we're going to look at that here in just a
12    second.
13         All right.  And on May 21st at 9:17 in the evening, does
14    Mr. Princip explain these -- Can you read to the jury these
15    brief comments here on May 21, '12 starting at 9:16?
16    A.   Sure.  "I promise.  I can't express enough how much I
17    appreciate your help, really.  I'm trying to make YouTube my
18    job again with this.  Yeah, I make $2500 being a Machinima
19    recruiter and TN"--Team Noble.
20    Q.   Okay.  Well, what is a Machinima recruiter, supposedly?
21    A.   I think that was where he was working with Machinima as a
22    network, like recruiting other YouTube channels that actually
23    sign with the Machinima network.
24    Q.   Okay.  And what do you tell Mr. Princip here about doing
25    YouTube as a living?
```

```
 1   A.    I said, "It's not easy doing YouTube as a job."
 2   Q.    And at that point in time what were you doing for a
 3   living?
 4   A.    YouTube.
 5   Q.    Now, did you actually tell him that, you know, from time
 6   to time you lose subscribers?
 7   A.    Yes, sir.
 8   Q.    Okay.  And how many had you lost in the previous few
 9   days?
10   A.    2,000.
11   Q.    Okay.  And is it fair or accurate that if you are losing
12   subscribers, those are the people that are most interested in
13   your channel.  Right?
14   A.    Yes, sir.
15   Q.    They are kind of the most loyal, as opposed to people
16   that show up and view it maybe once?
17   A.    I was actually referring to data accounts there that
18   people weren't using anymore.
19   Q.    Okay.
20   A.    But yes, sir.
21   Q.    Now, do you actually ask Mr. Princip to go ahead and
22   write up the contract?
23   A.    Yes, sir.
24   Q.    And what name did you ask him to use for you?
25   A.    David Tyler Moss.
```

1    Q.    Okay.  Can you tell me what this chat or this exchange is

2    down here at 5/21, 9:15 in the evening, "posted file"?

3    A.    That's the contract that he sent me.

4    Q.    And when it says PDF here, are you able to explain to the

5    jury what a PDF document is?

6    A.    I don't know what it stands for, but it is basically just

7    a Word document; sort of like -- it is more like a picture,

8    kind of.

9    Q.    All right.  So do you continue this conversation asking

10   -- after you receive the contract about Mr. Princip signing?

11   A.    Yes, sir.

12   Q.    Okay.  And what does he tell you he's going to do?

13   A.    He's going to E-sign it using EchoSign.

14   Q.    And why would he have to do that if -- What difference

15   does it make whether you have a scanner four years ago?

16   A.    He was doing it because he didn't have a scanner, and he

17   could do it -- it's like signing something digitally, and I

18   co-sign.

19   Q.    As opposed to printing it off, signing it, and then

20   scanning it back in and sending it through email?

21   A.    Yes, sir.

22   Q.    He didn't have that capability?

23   A.    Yes, sir.

24   Q.    And what are you asking about this part here?

25   A.    I said, "It should be on the same forum.  Right?  And we

 1    both have a copy."

 2    Q.    Is that a typo when it says forum?  You use the word

 3    forum?

 4    A.    Yeah.  I was referring to the contract.

 5    Q.    You wanted to have an identical copy.  Is that what you

 6    are suggesting?

 7    A.    Yes, sir.

 8    Q.    Okay.  And what do you ask about right here?

 9    A.    I was asking on the final contract, because we needed to

10    revise it, if it will have both of our signatures on it.

11    Q.    And did you actually inquire as to what EchoSign was?

12    A.    Yes, sir.

13    Q.    Okay.  You had not used that before?

14    A.    No, sir.

15    Q.    What does Mr. Princip tell you EchoSign is?

16    A.    It's a program from Adobe.

17    Q.    Is this the answer he's giving here I guess at the very

18    top of this page?

19    A.    Yes, sir.

20    Q.    Okay.  And what does he explain, continue to explain

21    about EchoSign?

22    A.    "You can click to view terms and accept and it stores the

23    contract in their site."

24    Q.    All right.  And does he even give you the website or the

25    address to EchoSign?

1    A.    Yes, sir--echosign.com.

2    Q.    Okay.  Does he make representations that it's used by

3    businesses all the time?

4    A.    Yes, sir.

5    Q.    Okay.  Now, at this point, you know, after chatting with

6    Mr. Princip for two weeks, had you given him any of your email

7    addresses?

8    A.    Right here I did, yes.

9    Q.    All right.  And do you have more than one?

10    A.    Yes.  I have a lot of email accounts.

11    Q.    Okay.  And this first account, what's the difference

12    between the first one and the second one?  Is there any?

13    A.    It looks the same to me.

14    Q.    Okay.  And do you have one that actually includes a third

15    S on the end of Moss?

16    A.    No.  Not that I know of.

17    Q.    Okay.  I don't know why I thought that.  So the Ty Moss

18    email is your email.  Is that correct?

19    A.    The one at Yahoo, yes.  Actually I do own the Gmail one,

20    too, but I use the Yahoo.

21    Q.    Does Mr. Princip come back and tell you that there's two

22    slots for the signatures on this contract?

23    A.    Yes, sir.

24    Q.    And does he suggest, "All you have to do is hit click and

25    accept"?

1    A.    Yes, sir.

2    Q.    And do you ask him about whether or not it needs to be

3    dated?

4    A.    Yes, sir.

5    Q.    And what is his response?

6    A.    He says, "You can, but it's at the top."

7    Q.    Can you tell me about this conversation here?  What are

8    you asking?

9    A.    I ask him, "Can we both have it so both of our signatures

10   are on the same piece of paper?"

11   Q.    And I guess at 9:54:44 p.m., what did you -- what message

12   did you get I guess from Mr. Princip about whether or not this

13   contract had been signed by both of you?

14   A.    He said, "Okay.  Just sent it."

15   Q.    Okay.  Well, you raised the issue about whether or not it

16   had the signatures in the right place, did you not?

17   A.    Yes, sir.

18   Q.    Okay.  And what does Mr. Princip respond to your comment

19   about?  What does he say?

20   A.    "Put them straight to the bottom, and I can do it where

21   it takes out those slots."

22   Q.    And does he offer to do another contract, if you will?

23   A.    Yes, sir.

24   Q.    And do you take him up on that?

25   A.    Yes, sir.

1    Q.    Okay.  You wanted everything kind of proper.  Is that a

2    fair statement?

3    A.    Yes, sir.

4    Q.    So at 10:00 or 10:02 do you and Mr. Princip have a

5    contract where the signatures are in the right place,

6    according to the way you wanted it, as well as the date in the

7    right location?

8    A.    Yes, sir.

9    Q.    Now, can you tell me about this email address right here?

10   A.    That's Mr. Princip's email.

11   Q.    Okay.

12   A.    markoyt1693@gmail.com.

13   Q.    I'd like for you to read that to me again, if you don't

14   mind.

15   A.    markoyt1693@gmail.com.

16   Q.    markoyt1693@gmail.com?

17   A.    Yes, sir.

18   Q.    And the date he sent that to you was 5/21 of '12?

19   A.    Yes, sir.

20   Q.    At what?  10:03?

21   A.    10:03:52 p.m.

22   Q.    Thank you.

23         So let me show you, again, what's been marked as Exhibit

24   No. 2 that's I think already been admitted.

25              MR. WYDE:  Is that correct, Bob?

1            MR. WILSON:  Yes, it has.

2    Q.   (BY MR. WYDE)  And ask before I put this on the overhead

3    or make sure the Judge has admitted it, that that's the final

4    contract you and Mr. Princip agreed to?

5    A.   Yes, sir.

6            MR. WYDE:  May I publish at this time?

7            THE COURT:  You may.  It's Exhibit 2.  Is that

8    correct?

9            MR. WYDE:  Yes, sir.

10   Q.   (BY MR. WYDE)  Can you, Ty, tell me what the title of

11   this document is?

12   A.   "Partnership agreement."

13   Q.   Now, was this the first contract that you had ever signed

14   or entered into in your life?

15   A.   No, sir.

16   Q.   Okay.  So had you done one with YouTube at this point in

17   time or before?

18   A.   I don't know if it's considered a contract with YouTube,

19   but I signed a contract with a network, a YouTube network.

20   Q.   With a network?

21   A.   Yes, sir.

22   Q.   The name of this agreement is going to be known as what?

23   A.   "VideoGames YouTube Channel, the agreement."

24   Q.   Okay.  And the effective date of the agreement, if you

25   will?

```
 1   A.    Is May 21st, 2012.

 2   Q.    And who were the partners to this agreement?

 3   A.    David Tyler Moss--myself--and Marko Princip.

 4   Q.    Okay.  Does it indicate here about there is an intent to

 5   be legal partners in business?

 6             MR. WILSON:  Your Honor, objection.  It is calling

 7   for the witness to make a legal conclusion.

 8             THE COURT:  He can state what's on the contract.

 9             MR. WILSON:  No objection to that.

10   Q.    (BY MR. WYDE)  I am asking you to tell the jury some of

11   the fine print, if you will.

12   A.    Yes, sir.

13   Q.    Legal partners in business?

14   A.    Yes, sir.

15   Q.    The primary place of the business is going to be at what

16   location?

17   A.    18032 Windflower Way, and that's in Dallas, Texas.

18   Q.    And do you know what that address is?

19   A.    That's Mr. Princip's address, or I think it was at the

20   time.

21   Q.    Okay.  I mean, that's just your understanding.  Is that

22   correct?

23   A.    Yes, sir.

24   Q.    You had never been to visit him at that location, had

25   you?
```

1   A.   No, sir.

2   Q.   Okay.  Can you tell me what Mr. Princip suggests to you

3   as the partnership's primary purpose?

4   A.   "The primary purpose is to ensure that David Tyler Moss

5   earns 30 percent of what the channel earns and anything

6   associated with the VideoGames brand."

7   Q.   Okay.  Now, I think I asked you this question when I was

8   trying to learn about your business a little bit.  Can you

9   tell the jury briefly how a YouTube channel -- what other ways

10  a YouTube channel can make money?

11  A.   It can make money through telling T-shirts, like

12  merchandise, like I do; branding deals, like getting sponsors;

13  or the advertising that runs in the videos, which is

14  automatically there.

15  Q.   This branding deal, is there a value in having a name?

16  A.   Yes, sir.

17  Q.   Okay.  And if a name is recognized by or subscribed to by

18  3.3 million people, is there value in that, in your opinion?

19  A.   Yes, sir.

20  Q.   Okay.  And what is the name that we're talking about here

21  and the brand, if you will?

22  A.   VideoGames.

23  Q.   Okay.  YouTube Channel?

24  A.   Yes, sir.

25  Q.   This was part of this negotiation with you and

1    Mr. Princip.  Is that accurate?

2    A.    Yes, sir.

3    Q.    And he is telling you pretty much anything associated

4    with this channel you get 30 percent of.  Is that accurate?

5    A.    Yes, sir.

6    Q.    Okay.  Does it next talk about contributions to this

7    particular partnership?

8    A.    Yes, sir.

9    Q.    Okay.  Does it talk about how much you are going to

10   contribute?

11   A.    Yes, sir.  $1500.

12   Q.    Okay.  Do you see that the dollar sign is behind the

13   1500?

14   A.    Yes, sir.

15   Q.    Do you know why that is, by any chance?

16   A.    No, sir.

17   Q.    Okay.  And can you read this full statement so that -- in

18   case it's not being published entirely to the jury?  Can you

19   read that full statement for me?

20   A.    "David Tyler Moss will invest $1500 into VideoGames

21   Company.  In return, he gets 30 percent ownership of company,

22   and he will make 30 percent off everything revolving around

23   our brand, channel revenue, website revenue, app revenue, and

24   etc."

25   Q.    Okay.  Does that say, "Except if I unilaterally or I

1  decide to terminate your interest" anywhere?

2  A.    No, sir.

3  Q.    Those words are not anywhere part of your contract, are

4  they?

5  A.    No, sir.

6  Q.    Okay.  Does it also -- Can you tell the jury, obviously,

7  what the contract says here on this next line?

8  A.    "David Tyler Moss is an advisor to the company, and has

9  equal say in every decision we make."

10  Q.    Well, let me ask you, did you later learn about sometime

11  in January of 2013, approximately seven to eight months later,

12  that the channel had been kind of hijacked by a Drew Lovinger?

13  A.    Yes, sir.

14  Q.    Did I ask you about him earlier?

15  A.    I think so.  I don't remember.

16  Q.    You don't remember?

17  A.    I don't remember.

18  Q.    Well, it says "in every decision."  Is that correct?

19  A.    Yes, sir.

20  Q.    Not just the big decisions, but every decision.

21  A.    Yes, sir.

22  Q.    Okay.  Did you want to invest into something that you

23  didn't have some say-so in?

24  A.    No, sir.

25  Q.    So were you aware that Mr. Princip went out and hired

1    Drew Lovinger to manage the channel?

2    A.    No, sir; not at the time I wasn't.

3    Q.    Okay.  I'm just asking, did Mr. Princip consult with you

4    before doing that?

5    A.    No, sir.

6    Q.    Okay.  So you weren't provided the opportunity to weigh

7    in on that decision, were you?

8    A.    No, sir.

9    Q.    Okay.  Can you just tick off about three or four things

10   to the jury that you would want to know before you turned over

11   your 30 percent of this company you owned to a stranger that

12   was I think 15 years old?  What would you want to know about

13   Mr. Lovinger?

14   A.    I would want to know who he is, I guess where he's from,

15   and what he does.

16   Q.    Would you have inquired as to any prior successes he has

17   had?

18   A.    Yes.

19   Q.    What about failures?

20   A.    Yes.

21   Q.    Okay.  How long he's been doing YouTube work?

22   A.    Yes, sir.

23   Q.    Those kinds of things.  Right?

24   A.    Yes, sir.

25   Q.    Would you make the same questions to him that you made to

1    Mr. Princip before you gave him the $1500, or invested the

2    1500?

3    A.    Yes, sir.

4    Q.    Now, Mr. Princip put into the contract -- Did he pay you

5    back in approximately 60 days?

6    A.    Sixty days.

7    Q.    And did you, in fact, get paid back in about -- within

8    about 90 days?

9    A.    It wasn't in 60 days.  It was more than that.

10   Q.    Okay.

11   A.    It was late.

12   Q.    Okay.  We will get to that, I guess.

13         Now, what about this part about David Tyler Moss being

14   able to log into the channel whenever he wants or wants to?

15   Is that part of the agreement?

16   A.    Yes, sir.

17   Q.    Now, at this point Mr. Princip gives you the username and

18   the password or the email address and the password for the

19   channel.  Is that fair?

20   A.    Yes, sir.

21   Q.    Okay.  Now, can you log in today?

22   A.    No, sir.

23   Q.    Well, let's keep going through this contract and ask if

24   -- when you are supposed to receive your 30 percent of these

25   funds?

```
 1    A.    On the 15th of every month.

 2    Q.    Well, you signed this one on May 21st.  Did you receive

 3    money on June 15th --

 4    A.    No, sir.

 5    Q.    -- of 2012.

 6    A.    No, sir.

 7    Q.    Did you receive money on July 15th of 2012?

 8    A.    No, sir.

 9    Q.    What about August 15th of 2012?

10    A.    No, sir.  I think I did on August 16th I received a

11    little bit.

12    Q.    So you received some money on August 16th, you think?

13    A.    Yes, sir.

14    Q.    Okay.  Is it true or accurate that you had received money

15    on the 15th of every month that this channel has made money?

16    Is that true?

17    A.    No, sir.

18    Q.    Not true?

19    A.    That's not true.

20    Q.    Do you recall the last time Mr. Princip or anyone

21    basically paid you for the 30 percent of whatever the channel

22    made for that particular month?

23    A.    I think the last payment I got was sometime in November,

24    November of 2012.

25    Q.    November of 2012.
```

1    A.    Yes, sir.

2    Q.    Okay.  And does Mr. Princip even and you agree on how

3    you're going to exchange the money?

4    A.    He was going to pay me over PayPal.

5    Q.    And you provided your email address.  Is that correct?

6    A.    Yes; my PayPal email.

7    Q.    Okay.  And is there what is commonly referred to I guess

8    as an acknowledgement about this contract being executed and

9    delivered, prescribed by law?  Is that the comment written in

10    this contract that you got a copy and Mr. Princip got a copy?

11    A.    Yes, sir.

12    Q.    Okay.  Now, can you -- Are these what are referred to as

13    the Echo signatures?

14    A.    Yes, sir.

15    Q.    So that's not your real signature, is it; your real

16    signature over here on the left?

17    A.    No, sir.  You go and type it in and then it I guess

18    translates it to a cursive signature or whatever.

19    Q.    EchoSign translates it?

20    A.    Yes, sir.  Digitally sign it I think they refer to it as.

21    Q.    But did you intend to enter into this agreement?

22    A.    Yes, sir.

23    Q.    And do you believe Mr. Princip intended to enter into

24    this agreement?

25    A.    Yes, sir.

1    Q.   Can you tell me about this email address down here at the

2    bottom?

3    A.   It's my.raw.nerve@gmail.com.  That's Mr. Princip's email.

4    Q.   Is there anything else that goes along with this

5    contract?

6    A.   No, sir.

7    Q.   Now --

8         MR. WYDE:  May I publish or hand this to the jury?

9         THE COURT:  Yes.

10        MR. WYDE:  Thank you.

11   Q.   (BY MR. WYDE)  Ty, this may seem like an additional silly

12   question, but did the signature of Brian Martin appear

13   anywhere on that document?

14   A.   No, sir.

15   Q.   Okay.  So let me ask you if you had a conversation with a

16   Brian Martin about your contract with Marko Princip.

17   A.   Yes, sir.

18   Q.   Okay.  And how did that conversation take place?

19   A.   It was over Skype.

20        MR. WYDE:  Your Honor, again I don't want to put

21   words in my colleague Mr. Wilson's mouth, but I don't believe

22   he is going to have an objection to Plaintiffs' Exhibit

23   No. 28.

24        Is that correct?

25        MR. WILSON:  That is correct.  No objection, Your

1    Honor.

2              MR. WYDE:  May I approach the witness?

3              THE COURT:  You may.

4    Q.   (BY MR. WYDE)  Ty, let me show you what is approximately

5    I think one -- literally just two pages of a conversation, if

6    you will.  What kind of a conversation is that--email, Skype,

7    Twitter?

8    A.   It is our Skype chat logs.

9    Q.   Skype chat logs?

10   A.   Skype chat logs.

11   Q.   So are you a part of this conversation?

12   A.   Yes, sir.

13   Q.   And who else was a part of this conversation?

14   A.   Mr. Martin and Mr. Princip.

15   Q.   Okay.  So more than two people can be a part of this

16   Skype conversation?

17   A.   Yeah.  It was a three-way Skype chat.

18   Q.   Three-way Skype chat?

19   A.   Yes, sir.

20   Q.   What is the date that it actually started?

21   A.   November 19th, 2012.

22   Q.   2012.  So about seven months after you had started in on

23   this deal.  Is that correct?

24   A.   Yes, sir.

25   Q.   And had you met Mr. Martin in person at that time?

1   A.   No, sir.

2   Q.   Okay.  How did you first become acquainted with who,

3   quote unquote, Brian Martin was?

4   A.   In this Skype chat.

5   Q.   This was your first introduction to Mr. Martin?

6   A.   Yes, sir.

7   Q.   Okay.  And up until this point in time, had Mr. Princip

8   ever sent you any copies of any documents that somehow, some

9   way showed anybody else to be an owner of this partnership or

10  a partner in this partnership?

11  A.   No, sir.

12  Q.   As of November 19th, 2012, did you -- who did you think

13  owned 70 percent of this partnership?

14  A.   Marko.

15  Q.   Okay.

16  A.   Mr. Princip.  I'm sorry.

17  Q.   Mr. Princip?

18  A.   Yeah.  I'm sorry.

19  Q.   Right.  Now, in your contract, didn't it say you were

20  entitled to be consulted on every decision?

21  A.   Yes, sir.

22  Q.   Would that include, in your mind -- You just tell me, yes

23  or no, but would that include whether Mr. Princip was going to

24  sell part of his partnership to someone else?

25  A.   Yes, sir.

1    Q.    Because that would, in effect, be making a new partner to

2    you?

3    A.    Yes, sir.

4    Q.    Is that accurate?

5    A.    Yes, sir.

6    Q.    Did you think you had a right to know if Mr. Princip was

7    going to sell part of his 70 percent to someone else?

8    A.    Yes; definitely.

9    Q.    Okay.  Now, did you later find out as part of this

10    lawsuit that Mr. Princip had sold 30 percent of the company to

11    Brandon Keating?

12    A.    Yes, sir.

13    Q.    Were you consulted about that?

14    A.    No, sir.

15    Q.    Did you find out the alleged date that that transaction

16    took place?

17            MR. WILSON:  Your Honor, I'm going to object.  That

18    assumes facts not in evidence at this time.

19            THE COURT:  Overruled.

20        You may answer.

21    Q.    (BY MR. WYDE)  In other words -- I don't want to expound.

22    I'm just trying to -- if assuming Mr. Keating bought --

23            THE COURT:  I think you asked him when he found out

24    Mr. Keating was a partner in this.

25    Q.    (BY MR. WYDE)  When did you find out Mr. Keating was a

1    partner?

2    A.    I'm not sure exactly when I found out, like, when it was.

3    Q.    Okay.  Have you seen a copy of his contract?

4    A.    Yes, sir.

5    Q.    And is it dated before or after your contract?

6    A.    It was ten days before mine, on May is 11th.

7    Q.    Okay.  Were you ever consulted about anybody else being

8    kind of a manager of this channel?

9    A.    No, sir.

10    Q.    And would that be an important decision?

11    A.    Yes, sir.

12    Q.    Tell the jury what the most important kind of I guess

13    day-to-day person involved in a YouTube channel is?

14    A.    Whoever is running and uploading the content and doing

15    all the titles and I guess promoting the channel.

16    Q.    So whoever is reviewing the videos to add to that

17    particular channel?

18    A.    Yes, sir.

19    Q.    And to make sure that those videos are in compliance, for

20    example, with YouTube regulations?

21    A.    Yes, sir.

22    Q.    Does YouTube allow a private channel like this to upload,

23    for example, pornography?

24    A.    No, sir.

25    Q.    Would that cause the channel to be stricken or taken off

1    the --

2    A.    Yes.  It would be, like, suspended from YouTube.

3    Q.    Those are the rules?

4    A.    Yes, sir; community guidelines.

5    Q.    What is commonly referred to today as hate speech, race,

6    gender, derogatory-type comments, is any of that allowed?

7    A.    No, sir.  It depends on what it is, I guess.

8    Q.    All right.  But, nonetheless, there is rules and

9    guidelines about what you can upload.  Correct?

10   A.    Yes, sir.

11   Q.    Okay.  In your experience, has VideoGames YouTube Channel

12   been accused of running afoul of those Guidelines?

13   A.    Yes, sir.  It had two strikes on the channel at one

14   point.

15   Q.    And do you know when those occurred, by any chance?

16   A.    I can't remember the exact dates, no.

17   Q.    As a YouTube partner, can you tell the jury what happens

18   if you get a third strike from YouTube?

19   A.    YouTube will suspend your YouTube channel permanently.

20   Q.    That is just the channel.  What about the person that's

21   kind of behind the channel?  What are the ramifications if

22   YouTube finds out who that is and what's going on with them?

23   A.    You can't be on YouTube again.  You are not allowed to

24   make another account.

25   Q.    YouTube is a private company.  Right?

```
 1    A.    Yes, sir.  I guess so.

 2    Q.    I mean, YouTube can decide who they want to let on and

 3    who they don't want to let on.  Is that your understanding?

 4    A.    Yes, sir.

 5    Q.    Okay.  So they can decide, "Hey, we're not going to let

 6    you back on or somebody back on if you're not going to abide

 7    by our rules and regulations."  Is that your understanding?

 8    A.    Yes, sir.

 9    Q.    And that includes the content that's being uploaded.

10    Correct?

11    A.    Yes, sir.

12    Q.    Are there any rules, to your knowledge, about spamming?

13    A.    It's against the community guidelines and the rules.

14    Q.    And just tell the jury what spamming is, in case there's

15    somebody here that unfortunately hasn't been a victim of it,

16    or fortunately hasn't been a victim.

17    A.    Kind of like the junk mail you get in your mailbox; like

18    pointless stuff you get that you don't want.

19    Q.    Okay.  So you can't just send links to the VideoGames

20    YouTube Channel to 5 million people if you were able to obtain

21    those email addresses?

22    A.    Yeah, you are not allowed to do that.

23    Q.    Okay.  Now --

24          MR. WYDE:  We'll offer I believe what is Plaintiffs'

25    Exhibit No. 28, and request it to be admitted, Your Honor.
```

```
 1              MR. WILSON:  No objection, again, Judge.

 2              THE COURT:  All right.  It's admitted.

 3              MR. WYDE:  May I publish?

 4              THE COURT:  You may.

 5   Q.   (BY MR. WYDE)  Let me show you I think what -- Now, can

 6   you tell me who the first person that enters in on this

 7   conversation with you is on November 19th, 2012, 11:10 p.m.?

 8   A.   Mr. Martin; Brian Martin.

 9   Q.   Okay.  And what is -- I don't understand what the term

10   "out" with Marko means.  What does that mean?

11   A.   That was just like -- I think his, like, Skype thing

12   saying he's away.

13   Q.   He had been out?

14   A.   I mean, that's just his way of letting people on Skype

15   know not to bug him, kind of.

16   Q.   Okay.  But does -- So when this part comes in here, for

17   those of us that aren't quite that experienced, does

18   Mr. Princip make a comment here?

19   A.   Yes, sir.

20   Q.   So he comes back.  Is that what -- he was out and then

21   comes back online, or something of that nature?

22   A.   I mean, he is still online.  That's just showing on his

23   Skype name that it is basically saying he doesn't want people

24   to bother him because he is away.

25   Q.   Okay.
```

1    A.    You can still chat.  You are still online.

2    Q.    Oh, okay.  "Don't bother me now.  I'm busy with something

3    else."

4    A.    Yes, sir.

5    Q.    "But I'm on Skype still."

6    A.    Yes, sir.

7    Q.    Okay.  I understand now.

8          So does Mr. Princip or Marko tell you that what position

9    Brian is in?

10   A.    Can you repeat that one more time?

11   Q.    What position is Brian in, supposedly, with Mr. Princip?

12   A.    His business partner Brian.

13   Q.    Okay.  Now you're a business partner of Mr. Princip.

14   Right?

15   A.    Yes, sir.

16   Q.    Had you ever met Brian Martin until that day?

17   A.    No, sir.

18   Q.    Had you signed any agreements with Brian Martin up until

19   this time?

20   A.    No, sir.

21   Q.    Okay.  Had Brian Martin ever contacted you and said,

22   "Hey, I bought, you know, ten percent of this channel and I

23   just wanted to introduce myself"?

24   A.    No, sir.

25   Q.    Okay.  So now what does Mr. Martin say to you here after

1  Mr. Princip introduces him?

2  A.   He says, "So the hard way it is?  Let me go ahead and

3  introduce myself."

4  Q.   All right.  And what does he say?  How does he introduce

5  himself to you?

6  A.   He says, "My name is Brian.  I'm a business partner, aged

7  28.  I have experience in legal and other arenas.  I would

8  like to talk to you about your position and where everyone and

9  everything stands, but this is what is going on at the

10  moment."

11  Q.   Please continue.

12  A.   "Based on your progress toward the situation, you are

13  actually in violation of extortion."

14  Q.   Let me stop you there.  Do you know what extortion is?

15  A.   No.

16  Q.   You don't know what extortion is?

17  A.   I Googled it the other day, but I can't remember exactly

18  what it is.

19  Q.   Since you have, as a close friend of mine says, consulted

20  the Google, may I ask what your interpretation of what do you

21  think extortion is as of today?

22  A.   I can't give you a good explanation of it really.

23  Q.   Have you ever heard the term blackmail?

24  A.   Yes, sir.

25  Q.   Okay.  Do you know what Mr. Martin is referring to at

1   this point?

2   A.   No, sir.

3   Q.   You don't.  Okay.  So please continue.

4   A.   With mine or his?

5   Q.   You.  You tell Mr. Martin right off the bat -- What do

6   you tell him?

7   A.   I said, "I don't have a signed contract with you, Brian

8   Martin."

9   Q.   Okay.  And what is his response?

10  A.   "I am not sure you realize what extortion is, or the

11  laws."

12  Q.   Okay.  And what does Mr. Martin now tell you his position

13  is with this company that you own 30 percent of, or this

14  partnership that you have 30 percent of?

15  A.   He says he's the official manager of VideoGames.

16  Q.   Right.

17        MR. WYDE:  May I see the contract back?  Thank you

18  very much.  Mr. Vital was supposed to get up and get that from

19  you.  I apologize.

20  Q.   (BY MR. WYDE)  So, Ty, looking at the -- what lawyers do,

21  they go back to sometimes the fine print, my comment to you

22  is, were you supposed to be an advisor to the company?

23  A.   Yes, sir.

24  Q.   Were you actually supposed to have an equal say even

25  though you were 30 percent owner as opposed to a 50 percent

1   owner?

2   A.   Yes, sir.

3   Q.   Okay.  And did you have any say-so when Mr. Princip

4   supposedly made this gentleman here Mr. Martin a manager?

5   A.   No, sir.

6   Q.   May I ask you to continue, please, about -- Were you

7   provided any written documentation as of this date, November

8   19th, 2012, that this gentleman here, Mr. Martin, had any

9   legal say-so in VideoGames YouTube Channel?

10  A.   No, sir.

11  Q.   Can you repeat this part here about what Mr. Martin is

12  representing to you?

13  A.   Can you scoot it over a tiny bit?

14  Q.   Absolutely.

15  A.   "Now, if there is an immediate problem with Marko I have

16  no issue to removing him from the channel."

17  Q.   Okay.  Now, we left off on May 21st with some of these

18  Skypes.  Are there more Skype messages, emails, Twitters,

19  between you and Mr. Princip between May 21st after the

20  contract was signed literally up until this day November?

21  A.   Yes, sir.

22  Q.   Okay.  Would you categorize those as literally hundreds

23  of pages of emails and text messages?

24  A.   Yes, sir.

25  Q.   Okay.  We only covered literally two weeks worth, and

1    that can be kind of wearing on one's patience.  Do you agree

2    with me?

3    A.    Yes, sir.

4    Q.    I told you you had to read all these, and you said, "I'm

5    tired of reading all these," did you not?

6    A.    Yes, sir.

7    Q.    Okay.  So you can imagine jurors and Judge and everybody

8    else.

9          My question to you, though, is what disagreement did you

10    have with Mr. Princip between let's just say August when you

11    got your first payment?  Had you received a payment in

12    September, that you recall?

13    A.    I think I did receive a payment in September, like I

14    think the 16th.

15    Q.    Okay.  What about October of 2012?

16    A.    On October 11th, yes.

17    Q.    You got one then?

18    A.    But not the full payment.

19    Q.    The full payment?

20    A.    Not the full payment.

21    Q.    So you -- Were you of the opinion you were not being

22    compensated as to your share of the company?

23    A.    I didn't know at the time because I didn't have the,

24    like, revenue reports of the channel.

25    Q.    Why not?  You had been given the name and all that.

1    A.    I didn't have access to the channel.  They changed the

2    password.

3    Q.    Do you know who changed it?

4    A.    I'm assuming Mr. Princip did.

5    Q.    Okay.  At this point in time had you learned that Drew

6    Lovinger was part -- was one of the people uploading videos to

7    the channel?

8    A.    I can't remember if it was exactly that time or not.

9    Q.    But was it sometime in this time frame late 2012, if you

10   recall?  Or you just don't remember?

11   A.    No, I don't remember.  I think it was January when I

12   found out about it.

13   Q.    January of 2013?

14   A.    Yeah.  Maybe.  I'm not a hundred percent sure on that.

15   Q.    So what is the problem -- Tell the jury what your

16   disagreement with Mr. Princip is at this point in time and,

17   hence, Mr. Martin's entering the situation?

18   A.    I was just trying to get my 30 percent cut and just be

19   paid what I was owed.

20   Q.    And at this point you're suggesting that you did not have

21   access to see how much the channel was making because the

22   password or the username had been changed?

23   A.    I could only base it off what he told me.

24   Q.    So what does Mr. Martin say to you at this point?  Does

25   he represent that he has the authority to do what with

 1    Mr. Princip?

 2    A.    Remove him from the channel.

 3    Q.    All right.  Do you know how that's possible if you own 30

 4    percent and Mr. Princip owns 70?

 5    A.    No, sir.

 6    Q.    Does Mr. Martin here represent that he's an owner?

 7    A.    Yes, sir.

 8    Q.    Okay.  Where do you see that?

 9    A.    I read it earlier.

10    Q.    First off?

11    A.    He says he's the official manager, not owner.

12    Q.    So that's what you were referring to?

13    A.    Yeah.  I'm sorry.

14    Q.    No problem.

15          Does Mr. Martin here accuse you of making threats?

16    A.    Yes, sir.

17    Q.    Okay.  Had you threatened Mr. Princip?

18    A.    No, sir.

19    Q.    Okay.  At this point in time, had you ever attempted to

20    contact, for example, the network to find out how much the

21    channel was making?

22    A.    I reached out to Machinima, yes.

23    Q.    Okay.  And did the network, to your knowledge, have a

24    contract with Machinima?

25    A.    Yes, sir.  That's who the YouTube channel was signed

169

1    with.

2    Q.   All right.  So you reached out to -- Your partnership has

3    a contract with this network Machinima, and you reached out to

4    them to try to find out how much the channel was making?

5    A.   At the time I think I assumed it was around 10,000 that

6    he was -- at least I was owed.

7    Q.   Okay.  Well, how did you calculate that figure?

8    A.   Based on the $3 CPM and how many views the channel --

9    because the views are public.  You can go in there and see it.

10   How many views it was getting based on the CPM.

11   Q.   Do you know off the top of your head or as part of this

12   lawsuit have you been able to go back and estimate or see what

13   the number of views were through the end of 2012?

14   A.   I think through 2012 -- I don't know the total amount of

15   views.  I know it was getting an average of I think 460,000 or

16   something per video.

17   Q.   Per video?

18   A.   Yes.

19   Q.   Okay.  Why is per video important versus the total number

20   of views?

21   A.   I mean, the views per video, that is how well each video

22   is performing.

23   Q.   So if a video -- If you had a thousand videos and you

24   were getting ten views per video, that wouldn't be near as

25   good as getting 250 or a thousand views per video.

1    A.    Yes, sir.

2    Q.    Okay.  Now, can you explain again what your response was

3    to these alleged threats you were making?

4    A.    I just said, "My threats?"  With a question mark.

5    Q.    And Mr. Princip says somehow, some way you were trying to

6    get him fired.  Is that correct?

7    A.    No, that's not correct.

8    Q.    I mean, that's what he said.

9    A.    Yes, sir.

10   Q.    Correct?

11   A.    Yes, sir.

12   Q.    Okay.  Were you trying to get him fired?

13   A.    No.  I reached out to Machinima.  I wanted to get my 30

14   percent cut.

15   Q.    Okay.  Now, does Mr. Martin here acknowledge that you

16   have a contract with VideoGames?

17   A.    Yes.  He says, "The contract is between VideoGames and

18   yourself."

19   Q.    Right.  And yet, as part of the contract you were

20   supposed to be able to constantly be able to log in to see

21   what the channel is making.  Is that correct?

22   A.    Yes, sir.

23   Q.    And was that your complaint at this point in time?

24   A.    Yes, sir.

25   Q.    So can you read to the jury this particular comment by

1    Mr. Martin?

2    A.    Starting where?

3    Q.    With the word "So."

4    A.    "So in a way I am sincerely going to have to drop

5    business with you and the channel VideoGames as it is

6    ultimately the decision of the manager, in which I am."

7    Q.    How did you take that?

8    A.    I don't know.  I didn't believe him.

9    Q.    Well, and, you know, I will tell you, you kind of remind

10   me of a son or a nephew.  I am a lot older than you are.  But

11   you didn't even finish high school, did you?

12   A.    No, sir.

13   Q.    You haven't really attended college.

14   A.    No, sir.

15   Q.    You certainly haven't gone to law school or graduate

16   school.  Is that a fair statement?

17   A.    No, sir.

18   Q.    Everything you've earned or accumulated you kind of

19   taught yourself.  Is that a fair statement?

20   A.    Yes, sir.

21   Q.    Is it also accurate to suggest that in some ways you

22   might be much farther advanced than me, Mr. Vital, you know, I

23   hate to say this, even Judge Stickney or Mr. Wilson, on

24   technical issues, but not quite as well-educated as us in

25   legal affairs or what have you?

```
 1    A.    Yes, sir.

 2    Q.    You realize there are some things out there that you

 3    don't know.  Correct?

 4    A.    Yes, sir; definitely.

 5    Q.    Okay.  Fair enough.  And I ask you that because are you

 6    aware that Mr. Martin has no authority whatsoever to terminate

 7    your contract.

 8    A.    I did --

 9              MR. WILSON:  Objection, Your Honor.  I think that is

10    a legal conclusion.

11              THE COURT:  Sustained.

12         I hate to break in the middle of this, but I have a phone

13    conference in a few minutes and I can't be late for it,

14    unfortunately.

15         Let's try and get you back here at 8:30 in the morning

16    because we have a short day tomorrow.  We will try to go to

17    12:30.

18         You can make it to Plano by 2:00?

19              MR. WILSON:  So long as I can leave here at 1:00.

20              THE COURT:  We will finish at 12:30 tomorrow.

21         And remember what I told you earlier.  Don't discuss the

22    case.  Don't form any opinion.  Don't get on YouTube.  Don't

23    investigate.  We will see you tomorrow.

24              (Whereupon, the jury left the courtroom.)

25              THE COURT:  Okay.  See you tomorrow.
```

1                And if you have time, look at those jury instructions.

2    We will get working on them.  We've got a couple of days.

3                    MR. VITAL:  I got them down to 27 questions.  I will

4    work it down further.

5                    THE COURT:  If you can get it down to two, that

6    would be great.

7                    MR. VITAL:  Thank you, Judge.

8                    (The proceedings were concluded at 4:30 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          I HEREBY CERTIFY THAT THE FOREGOING IS A

2     CORRECT TRANSCRIPT FROM THE RECORD OF

3     PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4     I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5     FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6     COURT AND THE JUDICIAL CONFERENCE OF THE

7     UNITED STATES.

8

9     S/Shawn McRoberts                04/12/2016

10    _____DATE_____
      SHAWN McROBERTS, RMR, CRR
11    FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25