```
 1                 IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF TEXAS
 2                          DALLAS DIVISION

 3  DAVID TYLER MOSS AND BRANDON   (  CAUSE NO. 3:14-CV-3088-BF
    KEATING                        )
 4                                 (
            Plaintiffs,            )
 5                                 (
    vs.                            )
 6                                 (
    MARKO PRINCIP, Individually,   )
 7  MARKO PRINCIP, d/b/a VIDEOGAMES(
    YOUTUBE CHANNEL, MARKO PRINCIP,)
 8  d/b/a GAME GUIDE, LLC,         (
    VIDEOGAMES YOUTUBE CHANNEL,    )
 9  AND BRIAN MARTIN               (  DALLAS, TEXAS
                                   )  MARCH 29, 2016
10          Defendants.            (  8:30 a.m.
    _____

11

12

13                           VOLUME 2

14

15  _____

16                      TRIAL ON THE MERITS

17           BEFORE THE HONORABLE PAUL STICKNEY
                UNITED STATES MAGISTRATE JUDGE
18                        and a jury
    _____

19

20

21

22

23            SHAWN M. McROBERTS, RMR, CRR
             1100 COMMERCE STREET, RM. 1654
                 DALLAS, TEXAS  75242
24                  (214) 753-2349
            shawn_mcroberts@txnd.uscourts.gov

25
```

1                          A P P E A R A N C E S

2           FOR THE PLAINTIFFS:   WYDE & ASSOCIATES
                                  10100 NORTH CENTRAL EXPRESSWAY
3                                 SUITE 590
                                  DALLAS, TEXAS  75231
4                                 (214) 521-9100
                                  BY:  MR. DAN L. WYDE
5
                                  BARNES & THORNBURG, LLP
6                                 2100 McKINNEY AVENUE
                                  SUITE 1250
7                                 DALLAS, TEXAS  75204
                                  (214) 258-4124
8                                 BY:  MR. VICTOR D. VITAL

9           FOR THE DEFENDANTS:   LAW OFFICES ROBERT D. WILSON
                                  18111 PRESTON ROAD, SUITE 150
10                                DALLAS, TEXAS  75252
                                  (214) 637-8866
11                                BY:  MR. ROBERT D. WILSON

12          OFFICIAL REPORTER:    SHAWN M. McROBERTS, RMR, CRR
                                  1100 COMMERCE STREET, RM. 1654
13                                DALLAS, TEXAS  75242
                                  (214) 753-2349

14

15

16

17

18

19

20

21

22

23

24

25

## <u>INDEX</u>

**EXAMINATION**

**Witness Name**                                                                              **Page**
    Cross By MR. WILSON ........................................... 30
    Redirect By MR. WYDE ......................................... 66
MARKO PRINCIP
    Cross By MR. VITAL .......................................... 70


**Plaintiffs' Exhibit**                                                                       **Page**
No. 16 Admitted Into Evidence                                              5
No. 49 Admitted Into Evidence                                             83
No. 56 Admitted Into Evidence                                            103
No. 30 Admitted Into Evidence                                            122


**Defendants' Exhibit**                                                                       <u>Page</u>
A Admitted Into Evidence                                                  44
B Admitted Into Evidence                                                  59

```
 1              THE COURT:  Are we ready to continue on?
 2              MR. WYDE:  When you say we, Mr. Wilson and Mr. Vital
 3    were visiting out there.
 4              THE COURT:  We will give them time.
 5                        (Brief recess.)
 6              THE COURT:  Ready to go?
 7              MR. WILSON:  Oh, yes.  Appreciate that.
 8              THE COURT:  Victor, are you ready?
 9              MR. VITAL:  Yes, Your Honor.  I am ready to proceed.
10              THE COURT:  All right.  Let's bring them in.
11         Mr. Moss, if you would take the stand again.
12              THE COURT:  Let's put on the record, we released
13    Juror No. 10 with no objection by either party.  Her name is
14    Ray Elizabeth Grafton.  It was due to illness.
15         Did I state that correctly for the Plaintiff?
16              MR. VITAL:  You sure did, Your Honor.  No objection.
17              THE COURT:  For the Defense?
18              MR. WILSON:  No objection.
19              THE COURT:  So we are going to proceed with the
20    seven remaining jurors, and hopefully we will make it through
21    and won't have anymore illnesses.
22              (Whereupon, the jury entered the courtroom.)
23              THE COURT:  Thank you.
24         We left off last evening with Mr. Moss on the stand.
25         Mr. Wyde, would you like to continue?
```

```
 1            MR. WYDE:  Thank you, sir.

 2       May I approach the lectern?

 3            THE COURT:  Please.

 4            MR. WYDE:  Good morning, ladies and gentlemen.

 5  Q.   (BY MR. WYDE)  Ty, let me show you what's been marked as

 6  Plaintiffs' Exhibit No. 16.

 7            MR. WYDE:  And, Judge, in an effort to move things

 8  along, I think we will offer that into evidence at this time.

 9            THE COURT:  Objection?

10            MR. WILSON:  No objection, Your Honor.

11            THE COURT:  It's admitted.

12  Q.   (BY MR. WYDE)  Ty, can you tell us what Exhibit No. 16

13  is, if you will?

14  A.   This is a Skype chat between me and Mr. Princip.

15  Q.   All right.  So more communications between you and

16  Mr. Princip?

17  A.   Yes, sir.

18  Q.   And what date does Exhibit No. 16th start?

19  A.   November 15th, 2012.

20  Q.   And what date does it end, if you will?

21  A.   On November 19th, 2012.

22  Q.   Okay.  So this conversation covers a period of about four

23  days.  Is that correct?

24  A.   Yes.

25  Q.   And yesterday you recall we were visiting over a two-page
```

1    Exhibit No. 28 that started on November 19th.

2    A.    Yes, sir.

3    Q.    So is it accurate to suggest that No. 16 kind of

4    encompasses No. 28?

5    A.    Yes, sir.

6    Q.    Okay.  Now, that being the case, tell the jury, when you

7    invested with Mr. Princip in the VideoGames YouTube Channel,

8    what did you want your role to be?

9    A.    I wanted to be an advisor; a silent investor really.

10    Q.    And tell the jury why.

11    A.    I just really didn't want my name on the channel to be

12    public.  I just wanted to be kind of separate from it.

13    Q.    Okay.  At that time were you aware, if at all, of any

14    YouTube issues with Mr. Princip?

15    A.    I had heard a lot of different things from people;

16    nothing that I knew myself, but I heard a lot of different

17    things.

18    Q.    Of course, you didn't have any personal knowledge of

19    that, did you?

20    A.    No.

21    Q.    Just this chatting that goes on on the internet?

22    A.    Yes.

23    Q.    All right.  Now, let's move on to -- After you signed the

24    contract in May of 2012, will you tell the jury, what are the

25    four or five things that you did to stay involved with the

1    channel?

2    A.    Okay.  We talked about the design of the channel, the

3    background, like images, stuff like that; we talked about the

4    content, like you asked me how I liked the videos that was

5    going up, and I tell him what I did like and what I didn't

6    like.

7    Q.    When you say you tell him, who are you referring to?

8    A.    I'm sorry.  Mr. Princip.

9    Q.    Okay.

10   A.    We spoke about Mark Cuban.  He was wanting to reach out

11   to him to be an investor into the company, because he had some

12   kind of relation to him, like I think his mom or something --

13   his mom was a teacher of his son's class, or something like

14   that, so he had a connection to him.  So we talked about that.

15   And, yeah, just basically like how the channel is doing, the

16   views, as far as the money related to it with the CPM;

17   basically discussed all the aspects of the channel.

18   Q.    And do you recall what month you actually did receive

19   your the $1500 that you invested?

20   A.    It was August 4th of 2012.

21   Q.    Did you receive a payment in September, if you recall?

22   A.    Yes, I did.

23   Q.    And do you remember the amount?

24   A.    Pretty sure it was $200.

25   Q.    What about in October?

```
 1   A.   Yes, I did.

 2   Q.   And what was that amount, if you remember?

 3   A.   I think it was 1600.

 4   Q.   And when was the last payment you received?

 5   A.   I can't remember the exact date.  It was sometime

 6   November.

 7   Q.   And how much was that?

 8   A.   I think maybe $1200.

 9   Q.   Have you reviewed all of your PayPal records?  Did you

10   receive any payments by any other method, by any chance?

11   A.   No, sir.

12   Q.   Okay.  So you didn't get any checks in the mail,

13   obviously, transfers from some bank account into your bank

14   account, or anything like that?

15   A.   No, sir; just PayPal.

16   Q.   So what is the absolute total that you received for your

17   investment?

18   A.   With the 1500 back, I think it was about $4500, along

19   with the 3,000 in percentage payments that I got.

20   Q.   Right.  The 1500 and the 3,000 all total to 4500.  Is

21   that correct?

22   A.   Yes, sir.

23   Q.   And in October, or I should say in November of 2012, did

24   you attempt to collect money from Mr. Princip based on how the

25   channel was doing?
```

```
 1    A.   Yes, sir.

 2    Q.   Let me show you this particular exhibit and ask if it

 3    is --

 4              THE COURT:  I'm sorry.  Is this Exhibit 16?

 5              MR. WYDE:  Yes, sir.

 6              THE COURT:  Thank you.

 7    Q.   (BY MR. WYDE)  If I could ask you, Ty, to walk us through

 8    this part of the conversation here.

 9    A.   Okay.  He says, "Got 2 step on it, so just let me know

10    when it goes off so I can give you the code."  Then he gives

11    me the email and password.  And 2 step is just another way of

12    logging into the YouTube channel.  You have to get a text

13    message to your phone to actually be able to log into it.

14    That way it's more secure.  He was basically -- We were trying

15    to hook up my phone to it.

16    Q.   I wanted to back up just a few seconds earlier in your

17    chat, or actually a couple of minutes.  What were you asking

18    Mr. Princip here on November 15th, 2012 at 7:14?

19    A.   I said, "Still haven't got the reports," referring to the

20    reports from the channel, the views and numbers and everything

21    that the money he's making.

22    Q.   Why did you have to get this channel password again?  Was

23    that not the original one?

24    A.   No, it changed.

25    Q.   Okay.  Did you change it?
```

1   A.    No, I did not.

2   Q.    Okay.  And so up until this point in November of 2015

3   [sic], since you entered into the contract in May, do you

4   recall ever being sent the password during that time, between

5   the contract signing and this point?

6   A.    I think the very first time he sent me one username and

7   password, and then it changed to this.

8   Q.    All right.  Now, as a partner, do you have an opinion as

9   to whether or not you believe you were entitled to know the

10  password all the time?

11  A.    Yes, sir.

12  Q.    And what would your opinion be?

13  A.    It says it in my contract that I'm supposed to have

14  access to it, the login.

15  Q.    Okay.  So can you tell the jury what you're doing here,

16  if you will, in this conversation?

17  A.    So we are talking about the months of September, October,

18  and August, just talking about the views.  I say it's got 3.1

19  million views in September, and at a $3 CPM for every thousand

20  views, $3, the math on that is $9,450.

21  Q.    All right.  And does Mr. Princip reply back to you that

22  this $3 CPM is not accurate at this point in time?

23  A.    No, sir.

24  Q.    There is no text messages, phone calls, emails, any other

25  form of communication, Twitter, to you saying, "Sorry, but

1   we're only getting a dollar per thousand clicks"?

2   A.   No, sir.

3   Q.   All right.  And let me take you to the next part of the

4   conversation and ask if you can explain this aspect of it, if

5   you will, to the jury.

6   A.   Okay.  This is, again, talking about the views it had in

7   August, 3.1, almost 3.2 million views, which again at $3 CPM

8   is $9,543.  And then September had 2.4, almost 2.5 million

9   views, which again at the $3 CPM is $7,407.  And then also for

10  my 30 percent cut of September, my figure should have been

11  $2,222, which would then total 5,058.

12  Q.   5,085?

13  A.   I'm Sorry.  5,085.

14  Q.   So at this point in time as of roughly September, do you

15  think it reasonable that you get compensated -- like on

16  October 15th, that you would have gotten compensated for the

17  month of September?  Would that have been reasonable to you?

18  A.   Can you repeat that one more time?

19  Q.   What day of the month were you due to be paid, per your

20  agreements?

21  A.   The 15th of the month.

22  Q.   Okay.  So would it be reasonable to you if Mr. Princip

23  had been paying you, say, on October 15th for September?

24  A.   Yes, sir.

25  Q.   That wouldn't be any problem with you?

```
 1   A.   No, sir.

 2   Q.   Okay.  And the same for each month after that would be

 3   okay with you?

 4   A.   Yes, sir.

 5   Q.   Was that your understanding, or were you thinking that it

 6   was supposed to go from the 15th of August to the 15th of

 7   September and you get paid immediately on the 15th of

 8   September for the last two weeks in August and the last first

 9   two weeks in September?

10   A.   No, sir.

11   Q.   Okay.  Are these statistics kept on kind of a monthly

12   basis, a calendar month?

13   A.   Yes, sir.

14   Q.   And where do you go to find these statistics?

15   A.   To the YouTube channel.

16   Q.   And do you click in -- you sign into the channel?

17   A.   At the time I had access to the channel, yes.

18   Q.   Right.  And all of these numbers are right there on the

19   channel.  Correct?

20   A.   Yeah.  You can see them without logging in.

21   Q.   But you -- do you have to have these numbers -- do you

22   have to have a password or the username or email to get into

23   these numbers?

24   A.   To see the actual revenue the channel is making, yes.

25   Q.   The actual revenue?
```

```
1    A.    Yes.

2    Q.    But you see the views without logging in?

3    A.    Yes.  I am basing that off the $3 CPM.

4    Q.    Okay.  So can you tell me what's going on here about --

5    Can you tell me what's going on here on November 15th about

6    this NIKZ?  Who is that?

7    A.    I'm not sure who it is exactly.

8    Q.    Okay.  And what did you understand Mr. Princip to be

9    saying to you?

10   A.    He was saying that -- I don't know how to say it, NIKZ

11   was managing pretty much everything on the channel.

12   Q.    Were you consulted, pursuant to your contract, on

13   somebody else now managing the channel?

14   A.    No, sir.

15   Q.    Okay.  Were you asking him at this point in time on

16   November 15th to pay you at that point?

17   A.    Yes, sir.

18   Q.    And that would have been for the month of October.  Is

19   that correct?  The revenue for the month of October?

20   A.    Yes, it should have been.

21   Q.    Okay.  Did you request payment again November 15th, 2012

22   at 11:11 in the evening?

23   A.    Yes, sir.

24   Q.    Now, Mr. Princip responds that his phone is dead.  Is

25   that correct?
```

1    A.    Yes, sir.

2    Q.    And, of course, you texted back or you communicated to

3    him that he owes you $5,085.  Is that accurate?

4    A.    Yes, sir.

5    Q.    I guess you talked to this NIKZ person, or communicated

6    with him somehow, some way?

7    A.    I think I reached out to him over Twitter.  That's how I

8    talked to him.

9    Q.    It's been at least three years and some months since this

10   occurred.  Is that right?

11   A.    Yes, sir.

12   Q.    Do you have any idea who that person is?

13   A.    Not that I remember, no.

14   Q.    Okay.  And then do you tell Mr. Princip if you don't get

15   paid in full the money that he owes you pursuant to the

16   contract, you'll contact your attorney?

17   A.    Yes, sir.

18   Q.    Okay.  At that time was I your attorney?

19   A.    No, sir.

20   Q.    And does Mr. Princip admit, at least later on in this

21   conversation here on the 16th, that he's screwed up?

22   A.    Yes, sir.

23   Q.    Okay.  And he somehow some way is blaming Machinima that

24   -- where he recruits I guess other subscribers to their

25   network, but he is blaming Machinima for not being able to pay

1    you?

2    A.   Yes, sir.

3    Q.   Okay.  And then does he offer here -- how does he offer

4    to pay you off?

5    A.   He says, "I can't pay it in full tonight.  I'm sorry.  I

6    can pay it off in 1/4ths if you want."

7    Q.   And then you suggest to him that he's not paying

8    attention or he's ignoring you.  Is that accurate?

9    A.   Yes, sir.

10   Q.   And what is his response?

11   A.   He said, "Well, I wouldn't say I've ignored you."

12   Q.   Okay.

13   A.   And he also apologized.

14   Q.   Right.  And does he -- What is the reason why he's not

15   able to pay you; I guess one of the reasons he gives you?

16   A.   He says, "After MLG Dallas"--which I don't know who that

17   is--"got a speeding ticket and my dad took my phone."

18   Q.   Okay.  Now, do you have to have a phone to use PayPal?

19   A.   No, sir.

20   Q.   Tell the jury what you -- how you would access PayPal,

21   and obviously how long, how difficult that transaction might

22   be.

23   A.   You can do it on your computer.  It is not that hard.

24   Q.   So you just need an internet connection.  Is that right?

25   A.   Yes, sir.

1    Q.   And you can use a computer, a phone, a laptop, a tablet,

2    or, for that matter, he could have written a check and put it

3    in the mail to you.  Is that accurate?

4    A.   Yes, sir.

5    Q.   Okay.  Now, do you advise him as a partner that not

6    telling the truth or somehow, some way not dealing fairly with

7    people is not in his long-term best interest?

8    A.   Yes, sir.

9    Q.   Okay.  And can you tell the jury a little bit about this

10   exchange?  What are these quote -- these comments in quotes,

11   if you will?

12   A.   That's, like, different things that Mr. Princip has told

13   me, like about getting payments and reasons why he can't pay

14   me.

15   Q.   All right.  Do you reference Mr. Lovinger?  I say Mr.  He

16   was a teenager at the time.  Is that accurate?

17   A.   Yes, sir.

18   Q.   Have you been in contact with Mr. Lovinger?

19   A.   I think at this time we maybe had chatted like once or

20   twice.

21   Q.   Okay.  Now, is Mr. Princip -- Who are these alleged

22   directors?

23   A.   The directors are the people that are submitting content

24   to the YouTube channel.

25   Q.   Okay.

1    A.    People uploading videos.

2    Q.    Yesterday I asked you about the people who create videos,

3    and I think one of the terms was creators.  Is that correct?

4    A.    Yes, sir.

5    Q.    So is the term director and creator kind of

6    interchangeable?

7    A.    It is kind of similar, yes.

8    Q.    Now, do you recall your contract, the terms of your

9    contract?

10    A.    Yes, sir.

11    Q.    Was your payment of 30 percent of the revenue conditioned

12    upon other people being paid first?

13    A.    No, sir.

14    Q.    Now, can you explain to me what's going on here November

15    19th, 2012 at about almost 1:00 a.m.?

16    A.    Okay.  That was actually where -- Like this is a Skype

17    chat again, but I copied and pasted the Skype chat where me

18    and Drew, Drew Lovinger, were talking back and forth into the

19    chat with Mr. Princip.

20    Q.    And does Mr. Lovinger -- what is he telling you here in

21    your conversation?

22    A.    That Mr. Princip owes him $3800 from this payment, and

23    that I guess he doesn't want to spend anymore money.

24    Q.    Are you -- Were you ever consulted, do you know, of the

25    arrangement between Mr. Princip and Mr. Lovinger at all?

1    A.    No, I don't know the details of it.

2    Q.    So you were never privy to that information?

3    A.    No, sir.

4    Q.    You were not consulted -- I should ask, were you

5    consulted in that arrangement, that business arrangement, if

6    you will?

7    A.    No, sir.

8    Q.    And can you read into the record for the jury what

9    Mr. Princip's comment is about Mr. Lovinger?

10   A.    He says, "I can't say much on Drew's action, but he's 15.

11   When they ask, say, 'I need to earn what the video earns,' and

12   I say, 'No,' they go to him."

13   Q.    And what is your response?

14   A.    I said, "He is only 15?  So you've manipulated a

15   15-year-old into doing all this work for you, and he put his

16   own money into the channel."  Then I'm referring to where Drew

17   put 10,000 into the channel on his own.

18   Q.    Let me move this up, if I can.  What was your -- If you

19   will, briefly repeat, what was your concern I guess about a

20   15-year-old working on this the YouTube channel?

21   A.    I didn't think a 15-year-old could run a business

22   correctly.

23   Q.    And why did you think that?  What were you basing that

24   on?

25   A.    Just because he's 15; not old enough.

```
 1    Q.    Well, is it a lot of work?

 2    A.    Yeah.  Yes; definitely.

 3    Q.    Okay.  Moving along, can you tell the jury about your

 4    comments right here on November 19th?

 5    A.    I said, "So why has a 15-year-old kid put $10,000 into

 6    your YouTube channel?"

 7    Q.    And what is Mr. Princip's response at this point?

 8    A.    He said, "Ask him.  LOL"--laugh out loud.

 9    Q.    Laugh out loud?  Okay.  So does Mr. Princip try to

10    justify I guess Mr. Lovinger's paying --

11          Let me ask this question.  Did Mr. Lovinger -- Were you

12    ever somehow, some way forwarded a partnership agreement or a

13    contract from Mr. Lovinger or regarding Mr. Lovinger and

14    Mr. Princip?

15    A.    No, sir.

16    Q.    Have you ever seen any documents exchanged between the

17    two of them where Mr. Lovinger was somehow, some way owner or

18    had a percentage of the channel?

19    A.    No, sir.

20    Q.    Okay.  So do you know or do you have any opinion as to

21    why this young man at 15, what was he doing somehow paying --

22    or what was his $10,000 used for, if you will?

23              MR. WILSON:  Your Honor, calls for hearsay from

24    Mr. Lovinger and his 10,000.

25              THE COURT:  Sustained.
```

```
 1              MR. WILSON:  Thank you, Your Honor.

 2   Q.   (BY MR. WYDE)  I will move on.

 3         And let me ask you, if I can, does -- Do you move back in

 4   this conversation to what you were originally talking about

 5   about the money that you were owed?

 6   A.   Yes, sir.

 7   Q.   And this $3,885, what is that amount that you're

 8   suggesting you're owed?  Where does that come from?

 9   A.   From the views and the $3 CPM.

10   Q.   Would that have been for September or October, or do

11   you --

12   A.   I think it would have been for October.

13   Q.   Okay.  Now, let me ask you this.  Can you read that

14   comment into the record that occurred from Mr. Princip at

15   11/19/12 1:36 a.m.?

16   A.   Mr. Princip says, "You're not part of VideoGames."

17   Q.   Okay.  What did you take that to mean?

18   A.   I didn't really take it to mean anything.

19   Q.   Right.  You're just -- when you say "okay" were you

20   saying, "I don't want to be a part of -- I don't want my part

21   my interest in this company to go away"?

22              MR. WILSON:  Objection, Your Honor.  It's leading.

23   I think the document speaks for itself.

24              THE COURT:  Sustained.

25   Q.   (BY MR. WYDE)  Well, tell the jury what you were meaning
```

1    when you say, "Okay.  Send my payment."

2            MR. WILSON:  Same objection, Your Honor.

3            THE COURT:  Overruled.  You can answer that.

4    Q.  (BY MR. WYDE)  Explain to the jury what you meant by your

5    comment.

6    A.  I was saying I pretty much didn't believe him; to send my

7    payment and he owed me money.

8    Q.  All right.  And at this point were you just -- what were

9    you attempting to do?

10   A.  Just trying to get paid.

11   Q.  All right.  Were you intending to give away your interest

12   in the channel?

13   A.  No; definitely not.

14   Q.  Right.  Does Mr. Princip ask why you think you're

15   entitled to $3,885 just a few -- I guess a minute or two

16   later?

17   A.  Yes.

18   Q.  Continuing, can you explain what -- read into the record

19   at 11/19/12 at 1:40 a.m. what Mr. Princip's comments to you

20   are when you are requesting, pursuant to your contract, your

21   share of the money.

22   A.  Mr. Princip says money, "For what?  Huh."

23   Q.  Did you -- Had you had a conversation previously in these

24   chats about whether or not Mr. Princip was going to pay these

25   directors or creators?

```
 1   A.   Yes, sir.

 2   Q.   And what had he told you previously -- What was your

 3   understanding about whether Mr. Princip was going to pay

 4   people who uploaded videos?

 5   A.   He knew some of the directors would be paid.

 6   Q.   Some?

 7   A.   Yes.  Yes, sir.

 8   Q.   And is your contract contingent, in your opinion, for the

 9   directors to get paid first?

10   A.   No, sir.

11   Q.   Does the conversation continue into -- I guess now into

12   the morning?

13   A.   Yes, sir.

14   Q.   Is this a conversation between you and Mr. Lovinger, or

15   Drew, at that time?

16   A.   It looks like this is where I again pasted the chat with

17   me and Drew into the chat with me and Mr. Princip.

18   Q.   All right.  So you sent your comments or the comments

19   from Mr. Lovinger that you had with him, you sent those to

20   Mr. Princip?

21   A.   I'm sorry.  This is actually where I think Drew was in

22   the chat here.

23   Q.   Okay.

24   A.   It's kind of confusing because of the dates, but yes.

25   Q.   So he joined your conversation somehow, some way?
```

1    A.    Yes, sir.

2    Q.    Can you explain this part of the conversation right here

3    about what you and Mr. Princip are discussing here at 1:51 in

4    the morning?

5    A.    I said, "When Team Noble went downhill and you tried to

6    bring it back, you're making people pay to post and be a

7    director on the channel."  And I was saying I read so many

8    comments about that.

9    Q.    Did you approve in any way, shape, or form of having, I

10   guess, younger YouTubers paying to have their videos uploaded?

11   A.    No, sir, but this was for Team Noble, his previous

12   channel.

13   Q.    Right.  Now, we only have, I think, just a little bit

14   more.  Did Mr. Princip take this money and -- or how did you

15   come to the opinion that he had used money to buy a new

16   computer for himself?

17   A.    Because we had talked about that.

18   Q.    Previously?

19   A.    I remember him mentioning it not long after I gave him

20   the money.

21   Q.    He went out and bought a new computer?

22   A.    Yeah.  A few days after my first investment, as far as I

23   know, at least.

24   Q.    And does Mr. Princip, here, some way 11/19/2012 discuss

25   with you about whether or not he's going to pay you or not?

1    A.   Yes, he says, "We have nothing to discuss in the future."

2            THE COURT:  Sorry.  I couldn't hear you.  Say that

3    again.

4            THE WITNESS:  He says, "We have nothing to discuss

5    in the future."

6    Q.   (BY MR. WYDE)  Regarding this one matter here, I think

7    when we were discussing when Mr. Martin somehow, some way

8    entered the picture or he introduced himself to you, was that

9    what we were discussing yesterday--this conversation?

10   A.   Yes, sir.

11   Q.   And does Mr. Martin explain to you down here -- we are

12   not repetitious.  Does he some way declare your contract void?

13   A.   Yes, sir.

14           MR. WYDE:  May I have just a moment, Your Honor?

15           THE COURT:  Sure.

16           MR. WYDE:  I'm trying to wind up.

17   Q.   (BY MR. WYDE)  Ty, just a few closing questions for you.

18   Okay?

19       May I ask what happened in -- do you know approximately

20   how many views the channel had gotten in the first -- sometime

21   by the end of December of 2012?

22   A.   It was 17 million -- I think it was close to like 18

23   million views.

24   Q.   Close to 18 million views in seven months?

25   A.   Yes, sir.

1    Q.    And can you tell the jury, what did that tell you about

2    the channel and the future of it?  What were you thinking?

3    A.    It was growing really fast in a short amount of time.

4    Q.    It's going to be successful.  Right?

5    A.    Yes, sir.

6    Q.    And you made no bones about wanting to share in that

7    success.  Is that correct?

8    A.    Yes, sir.

9    Q.    May I ask you if you ever received any payments over the

10   4500.

11   A.    No, sir.

12   Q.    Now, did you contact an attorney here in Dallas in

13   February of 2013?

14   A.    Yes, sir.

15   Q.    And who would that have been?

16   A.    Hillary Cochrane.

17   Q.    And did Ms. Cochrane, to your knowledge, send a letter or

18   a demand to Mr. Princip to pay you?

19   A.    Yes, sir.

20   Q.    Can you tell me what happened in June of 2013, a couple

21   of months later?

22   A.    Hillary Cochrane left the firm that I hired to help me

23   out in this matter.

24   Q.    Okay.  And did you attempt to keep the lawsuit going with

25   the firm that she had been with?

```
 1    A.    Yes, sir.  But they couldn't take me.

 2    Q.    Okay.  What was their explanation for not being able to

 3    further your legal matter?

 4    A.    They weren't internet savvy enough to take the case, I

 5    guess.

 6    Q.    All right.  Had you sued anybody at that point in time?

 7    A.    No, sir.

 8    Q.    Okay.  Now, when was the last that you had heard from the

 9    attorney that you had hired, Ms. Cochrane?

10    A.    I think in June of 2013.

11    Q.    Okay.  And in September of 2013, who did you contact?

12    A.    I contacted Judge Wyde.

13    Q.    You contacted our law firm?

14    A.    Yes, sir.

15    Q.    And when did you eventually hire me?

16    A.    I sent you the retainer I think in January of 2014.

17    Q.    All right.  And when do you recall a lawsuit being filed

18    on your behalf the first time in this case?

19    A.    That was in March of 2014.

20    Q.    Now, in suing Mr. Princip and the channel, what was your

21    intent?

22    A.    I just wanted to get my 30 percent share of the company.

23    Q.    To enforce the contract.  Is that correct?

24    A.    Yes, sir.

25    Q.    Has it ever been your intent to somehow, some way give up
```

1    your interest in the channel?

2    A.    No, sir.

3    Q.    Do you have an opinion, Ty, as to whether -- After

4    looking at everything that's transpired in the last 48 months,

5    if you will, and what you've learned in this lawsuit, do you

6    have an opinion as to whether Mr. Princip engaged in wrongful

7    conduct that has adversely and materially affected the

8    VideoGames channel?

9            MR. WILSON:  Your Honor, just for clarification,

10   this witness has not been designated as an expert witness and

11   is not capable of testifying in that capacity.

12           THE COURT:  He can give his opinion.  I'll allow it.

13           MR. WILSON:  Personal opinion.  Is that correct,

14   Judge?

15           THE COURT:  Yes.

16           MR. WYDE:  As a lay witness and as a partner, yes,

17   sir.  Under Rule 701, hopefully.

18   Q.    (BY MR. WYDE)  So Ty, the Judge has said you can answer

19   that question.  Do you need me to re-ask it?

20   A.    One more time, please.

21   Q.    Do you have an opinion as to whether Mr. Princip has

22   engaged in wrongful conduct that has adversely and materially

23   affected the VideoGames YouTube Channel?

24   A.    Yes, sir.

25   Q.    And would you just tell the jury the two or three things

1    that he has done to do that?

2    A.    The content of the channel, the videos he was uploading;

3    just the wrong conduct that he was doing--not paying people,

4    not paying directors; working with a 15-year-old to manage the

5    channel.

6    Q.    And do you -- Are you aware -- Did the strikes that

7    YouTube issued against the channel, was that after you signed

8    your contract?

9    A.    Yes, sir.

10   Q.    And is that something that you certainly don't want to

11   have occur?  Would you say that those strikes are wrongful

12   conduct?

13   A.    Yes; definitely.

14   Q.    Or whatever causes those strikes?

15   A.    Yes, sir.

16   Q.    Now, do you have an opinion as to whether or not this was

17   -- Mr. Princip has willfully, if you will, or persistently

18   committed a breach of his obligations regarding your

19   partnership?

20   A.    Yes, sir.

21   Q.    In other words, do you think Mr. Princip accidentally

22   didn't pay you?

23   A.    No, sir.

24   Q.    Okay.  Do you have an opinion as to whether or not you

25   think he intentionally or knowingly refused to pay you?

```
 1    A.    Yes, sir.

 2    Q.    And what is your opinion?

 3    A.    He didn't want to pay people and pay me.

 4    Q.    Okay.  Or he hasn't paid you?

 5    A.    Yes.  Yes, sir.

 6    Q.    And lastly, do you have an opinion about whether or not

 7    Mr. Princip engaged in conduct that has made it reasonably

 8    impractical, impracticable for you all to continue your

 9    partnership?

10    A.    Yes, sir.

11    Q.    So are you here asking the jury, after they hear all the

12    evidence in this case and render a verdict, to expel

13    Mr. Princip from the partnership?

14    A.    Yes, sir.

15    Q.    Okay.  Do you have an opinion as to whether or not

16    Mr. Martin interfered with your relationship, your contractual

17    relationship with Mr. Princip and the channel?

18    A.    Yes, sir.

19    Q.    And what is your opinion about Mr. Martin's conduct and

20    your contract?

21    A.    I didn't like his conduct.  I didn't think it was

22    accurate.

23    Q.    Well, when he allegedly voided your contract, does that

24    interfere with your agreement, your contract, your partnership

25    with Mr. Princip and the channel?
```

 1    A.    Yes, sir.

 2    Q.    Okay.  Can you tell the jury, lastly, what is -- what

 3    happens to the channel if it gets a third strike from YouTube?

 4    A.    YouTube will suspend the channel or basically delete it

 5    from YouTube; ban the channel.

 6    Q.    And if it's deleted or banned, what happens to the

 7    revenue that it's receiving from any networks, if you know?

 8    A.    That's all gone.

 9    Q.    It's all gone?

10    A.    Yeah.

11         MR. WYDE:  We will pass the witness.

12         THE COURT:  Thank you.

13    Cross examination?

14         MR. WILSON:  Thank you, Your Honor.

15                    CROSS EXAMINATION

16    By Mr. Wilson:

17    Q.    Good morning, Mr. Moss.

18    A.    Good morning.

19    Q.    You and I have spoke, again, about a year ago in May of

20    last year.  Remember?

21    A.    Yes, sir.

22    Q.    And I know we did this nice big fat deposition with all

23    your exhibits and questions.

24    A.    Yes, sir.

25    Q.    So I am just going to -- I'd like to say I can be brief,

1    but it is kind of hard after a four- or five-hour direct

2    examination.  I am going to try to hit as many high points as

3    I can.

4        Let's focus on what we agree on.  As you sit here today,

5    you just testified that it is impractical to continue with

6    this partnership with my client or clients.  Correct?

7    A.   It's hard to work with them, yes; definitely.

8    Q.   As you know today, your opinion the partnership is over

9    today.  You want it over today.

10   A.   No, I do not want it over.

11   Q.   So you want to be partners with a liar, a thief, a crook,

12   and all these other folks that you disparaged for the last

13   four years.  Is that what you are telling these ladies and

14   gentlemen of the jury?  You want to be partners with these

15   crooks?

16   A.   I would rather not have to deal with a liar and a crook.

17   Q.   But you just told the jury you want to be partners with

18   these crooks.  Do you want to be partners with crooks?

19   A.   When I entered the business I did.

20   Q.   It is just a yes or no.

21   A.   Yes, sir.

22   Q.   You do.  All right.

23       All right.  Let's talk about that lawyer letter.

24   Remember that one we talked about?  We will go ahead and mark

25   this as Defendant's Exhibit A.  You remember that lawyer

```
 1   letter.  Correct?
 2              MR. WILSON:  Can I approach the witness, Judge?
 3              THE COURT:  Yes.
 4   Q.  (BY MR. WILSON)  That's the lawyer you referenced in your
 5   direct examination with Mr. Wyde back in January 2013.  Do you
 6   remember that document?
 7   A.  Yes, sir.
 8   Q.  Okay.  Now, I'm sorry.  February of 2013 you made a
 9   demand, as we discussed, on Marko Princip.  And this was
10   Hillary Cochrane, who is an attorney with Bob Vial, that you
11   just testified about.  Correct?
12   A.  She was an attorney with them.
13   Q.  Okay.  And you testified I think previously with Mr. Wyde
14   that you paid her a $10,000 retainer fee.
15   A.  No, I paid him $10,000.
16              THE COURT:  That did not come out.  That wasn't
17   asked.
18   Q.  (BY MR. WILSON)  Bob Vial you paid $10,000 to?
19   A.  Yes, sir.
20   Q.  Okay.  And Hillary is an associate, I assume, of Bob
21   Vial.  She's on his letterhead?
22   A.  I am sorry.  I paid $10,000 to Dan's firm, not to
23   Hillary's firm.
24   Q.  Oh.  Did you ever pay anything to Hillary?
25   A.  Yes, sir.  I think it was $1500 retainer fee.
```

1    Q.    Okay.  Well, in your deposition you said it was $10,000.

2    Do you think your memory's better today or back in June of

3    last year?

4    A.    Definitely, after I read over the stuff, it's a lot

5    better.

6    Q.    Better today?

7    A.    Yes, sir.

8    Q.    Okay.  So in this letter you've said you invested $1500,

9    and you are entitled to a 30 percent ownership in the company.

10   Correct?

11   A.    Yes, sir.

12   Q.    Okay.  And you're entitled to revenue.  And then down at

13   the bottom you state via your attorney that "Marko Princip has

14   failed to fulfill his obligations in the partnership"?

15   A.    Yes, sir.

16   Q.    Okay.  Do we agree that the original breach of this

17   partnership agreement occurred when he probably did not pay

18   you that -- the payment on the 15th of -- what was it?  June

19   or July of 2012?

20   A.    It was after not receiving multiple payments.

21   Q.    Okay.  So he breached not only once, twice, three, four,

22   five times probably.  Correct?  On your partnership agreement.

23   A.    Yes, sir; or more.

24   Q.    Or more.  Okay.  In your opinion, tell the ladies and

25   gentlemen of the jury, how many times do you think Marko

```
 1    Princip breached your agreement that you all signed back in

 2    May of 2012?

 3    A.    I probably couldn't put a number on it.  Lots of times.

 4    Q.    More than 20?

 5    A.    I'm not sure.

 6    Q.    Okay.  And yet, as a result of that, you still think that

 7    you're partners as you sit here today under Texas law.

 8    Because that's what your contract said--it was going to be

 9    governed by the laws of Texas.  Do you remember that?

10    A.    Yes, sir.

11    Q.    Okay.  Did you and/or Marko ever record your partnership

12    documents with the Secretary of State?

13    A.    No, sir.

14    Q.    Did you or Marko ever issue stock related to this

15    partnership agreement?

16    A.    No, sir.

17    Q.    Did you -- Well, let's ask you, have you ever received a

18    K-1 partnership dispensation from Marko Princip?

19    A.    No, sir.

20    Q.    So other than your $1500 that you invested, and I think

21    you said you got back 4500 -- do you remember that testimony,

22    approximately?

23    A.    Yes, sir.

24    Q.    So you got back three times your money within what?  Say

25    three or four months?  May to October of 2012?
```

1    A.    I think four or five months.

2    Q.    You got that money back, you got your 1500 back, and then

3    you got another $3,000 back?

4    A.    $3500 yes.

5    Q.    So almost --

6    A.    I'm sorry; 4500.

7    Q.    Okay.  So you got back three times your investment within

8    four months, but it was sporadic, to say the least.

9    A.    Yes, sir.

10    Q.    At the top of page 2 of your lawyer letter you say he

11    owes you in excess of $20,000 for revenue share.  Do you see

12    that number?

13    A.    Yes, sir.

14    Q.    Okay.  That was in January of 2013, about seven, eight

15    months after you all signed your partnership agreement.

16    Remember that?

17    A.    Yes, sir.

18    Q.    Okay.  Where did you come up with that $20,000 as your

19    one-third share?  Is that what we want the jury to understand

20    here?

21    A.    Based on 18 million views in 2012.

22    Q.    Okay.  18 million views in 2012.  And was that YouTube

23    channel--and I'm old school, so I'm just going to call it --

24    that YouTube channel is really a domain name, is it not.  I

25    mean, when you type it in, it is www.youtubechannel, back

1  slash, back slash, if I want to go directly to the channel?

2  A.    I don't know if you refer to it as that, actually.

3  Q.    Well, I mean, that's one way to get in it.  Right?

4  That's the way we used to get into it probably before you were

5  born.  Are you aware of that?

6  A.    Sure.

7  Q.    Now, well, Dan and I know Victor can confirm that.  But

8  anyway.

9        Okay.  So you just log into YouTube and type in

10  VideoGames and, boom, you are into the channel.  Is that how

11  it works?

12  A.    You don't have to log in, but just to go to the channel,

13  yes.

14  Q.    But like on the YouTube, when I do YouTube, there's a

15  search and I can type in video games.  Right?

16  A.    Yes, sir.

17  Q.    And like I told the jury in opening, remember I said

18  there's about six things that pop up on video games, video

19  games, video games?

20  A.    Yes, sir.

21  Q.    Marko and/or you in 2012 didn't own all six of those

22  things, did you; all six of those channels or domain names,

23  let's call it that?

24  A.    No, sir.

25  Q.    Okay.  You just own one of them.  Right?

1    A.    Yes.   VideoGames.

2    Q.    This $20,000 number you testified is based on the views.

3    Who was paying Marko?  Who was his contract with in 2012?

4    A.    Machinima.

5    Q.    Machinima.  Okay.  And did Machinima -- Well, strike

6    that.

7         Do you have any documents in your possession today, other

8    than what we've provided in discovery, from Machinima that

9    references $60,000 in revenue in 2012?

10   A.    No, other than the $3 CPM.

11   Q.    So this $3 CPM is just a number you use based upon your

12   experience of being a YouTuber for probably six years at this

13   point.

14   A.    That is what's Mr. Princip told you.

15   Q.    What Mr. Princip told you?

16   A.    Yes, sir.

17   Q.    But this is the same liar and thief that you found out

18   about before.  Correct?

19   A.    Yes, sir.

20   Q.    Okay.  So he lied to you at least three or four times.

21   Right?

22   A.    Yes.  Yes, sir.

23   Q.    So what makes you think you believe that it's $3 per

24   million views or thousand views, or whatever the views are?

25   A.    At the time I knew Machinima was signing contracts, so

1    that led to the $3 CPM.

2    Q.    Okay.  But you never did see the Machinima contract that

3    Marko signed, did you?

4    A.    Not that I can recall, no.

5    Q.    So you do not know beyond any doubt at this time as you

6    sit there what the amount of that contract was, do you?

7    A.    I don't know a percent certain, but I'm pretty sure.

8    Q.    It is just a yes or no.  Are you 100 percent certain?

9    A.    No, sir.

10    Q.    Okay.  Thank you.

11          So other than a 1099 from Machinima to Marko or you,

12    that's the proof in the pudding.  Right?  I mean, that's the

13    true tell sign as to what the revenue was that year in 2012.

14    Correct?

15    A.    Yes, sir.

16    Q.    Okay.  And then the same in 2013.  Right?  If the channel

17    is still being hosted I think by this network Machinima,

18    whatever the 2013 1099 shows from Machinima to Marko is going

19    to be what that revenue was.  Right?

20    A.    Can you repeat that one more time?  Sorry.

21    Q.    Okay.  You get paid by Machinima, or did in the past.

22    Correct?

23    A.    No, I've never been paid by Machinima.

24    Q.    Who pays you?

25    A.    YouTube.

1    Q.    YouTube pays you?

2    A.    Or Google pays me directly.

3    Q.    Because you are a partner.  That's one level above Marko.

4    Correct?  Or Marko's peers, kind of?

5    A.    No, sir.

6    Q.    No?  Okay.  Well, do you have a contract signed with

7    YouTube how much you're going to get paid?

8    A.    We have an agreement, yes; not for a set amount.

9    Q.    Not for a set amount.  Okay.

10        Well, let's rewind the clock back to 2012.  You told the

11    jury that you had two channels, and you had one that had, I

12    don't know, 600,000 viewers, and one that had 400,000.  Did

13    you have a signed contract in 2012 with whoever was paying you

14    your money that you testified about where you were making

15    $100,000 a year?

16    A.    I think I was with Revision 3 in 2012.

17    Q.    Region 3.

18    A.    Revision 3.

19    Q.    Revision 3.  Did you have a signed contract with Revision

20    3 that said how much you were going to get paid for viewer

21    ship?

22    A.    For my Tech YouTube Channel I did.

23    Q.    You did.  You signed it, they signed it, and that was

24    what it was.  Right?

25    A.    I think it was 2012.  It could have been 2013 when I

```
 1    signed it.  I can't remember the exact date.

 2    Q.    '12.  '13.  I'm just trying to give the jury some

 3    background on everybody here today.

 4    A.    Yes, sir.

 5    Q.    So your contract with them stated what?

 6    A.    With Revision 3, I had -- This was a little bit of a

 7    different deal with this network.  I would get $6,000 per

 8    month for doing two videos a week, so basically four shows a

 9    month.

10    Q.    Okay.

11    A.    I had a guaranteed amount.

12    Q.    So you -- you know, again, I'm going to go back to the

13    old school, like us lawyers here.  You were basically a

14    director.  You were paid a director's fee to put some video

15    content up on that channel.  Is that what you just said?

16    A.    No, because it was my YouTube channel.  I was the content

17    creator.  It was a partnership with Machinima.  Or with

18    Revision 3.

19    Q.    But you had to create the content.  Right?

20    A.    Yes, sir.

21    Q.    You had to direct the filming.  You had to then put it up

22    on the channel.  Right?

23    A.    They helped me out with it because they were the network

24    that was helping me manage all that.  They helped me produce a

25    lot of the stuff, too.
```

1    Q.    Okay.  But that's how you were paid was you had to create

2    the content and then it was uploaded it to them, and you had

3    to do two videos a month, and you got a flat six grand.

4    A.    Two videos a week.

5    Q.    Two videos a week.

6    A.    I'm sorry.  One video a week.  Sorry.  Four videos a

7    month is what it came out to.

8    Q.    So you got $6,000 a month back in 2012 or 2013 for

9    producing content for your channel.

10   A.    Yes.

11   Q.    Okay.

12   A.    Just for my tech channel.

13   Q.    Got it.  Okay.

14        And then let's take the other channel.  How did you get

15   paid for the other channel?

16   A.    That one was through just YouTube and Google AdSense.

17   Q.    And did you have a signed contract with Google or AdSense

18   then?

19   A.    I don't know if you refer to it as a contract, but we did

20   have an agreement with YouTube.

21   Q.    Well, an agreement can be a contract that -- birds of a

22   feather, same thing.  You saw your agreement that you signed

23   with Marko.  Right?  Both of you-all signed it.

24   A.    Yes.

25   Q.    Did you and your other company sign an agreement just

1    like that?

2    A.    Not just like that one, no.

3    Q.    Okay.  So how did your agreement form on your other

4    channel with this other company?  What were the terms of that

5    agreement?

6    A.    With which company?

7    Q.    With your second one that you mentioned.  Not the one

8    getting paid six grand a month, but this other one.

9    A.    That was the YouTube Partner Program.

10   Q.    Okay.  And how were you paid in that YouTube Partner

11   Program?

12   A.    They pay me every month.

13   Q.    How do they pay you.  How much?

14   A.    It varies depending on the views.

15   Q.    And so how much were you paid per view or per thousand or

16   million?

17   A.    It's always changing.

18   Q.    Always changing.

19   A.    Because I wasn't with the network.  I had a guaranteed.

20   Q.    So my method to my madness, Mr. Moss, is you would agree

21   with me, I hope, that every channel on YouTube, one, doesn't

22   make money.  Correct?  People don't make money.

23   A.    People do make money, definitely.

24   Q.    So you are now telling the jury that all those panel

25   members that raised their hand that said they didn't make any

```
 1    money --

 2    A.    Not everyone makes money.

 3    Q.    Okay.  Not everyone makes money on YouTube, do they?

 4    A.    You have to be a partner with them.

 5    Q.    Right.  And you have to have a relationship with them.

 6    Right?

 7    A.    Yes, sir.

 8    Q.    And every relationship is different on YouTube.  Correct?

 9    A.    Yes, sir.

10    Q.    Thank you.

11          And, again, I'm not trying to trick you.  I'm just trying

12    to let the jury know there are so many balls flying around in

13    the air, I am just trying to get it down --

14             THE COURT:  Mr. Wilson, just ask your questions.

15             MR. WILSON:  Thank you, Judge.

16    Q.    (BY MR. WILSON)  So, moving along, you stated here in the

17    second paragraph all of these things that Marko did--breach of

18    the contract that we talked about, fiduciary duty that

19    Mr. Wyde just brought up, potential claims of fraud that Marko

20    did where he's lying and being deceitful to you, and quantum

21    meruit, and if litigation becomes necessary, then reasonable

22    attorneys fees--and you demanded $25,000 on that day, which

23    was -- I think it was January --

24    A.    February it was.  February 18th, I think it said.

25    Q.    Did Mr. Princip write you a check or your attorney by
```

```
 1   February 18, 2013 for $25,000 for your portion of the channel?

 2   A.   No, sir.

 3   Q.   Okay.  That value is where you came up with your demand

 4   for $25,000, based on the number of views and based on what

 5   Marko had told you.  Correct?

 6   A.   The $3 CPM, yes.

 7   Q.   Okay.  But we know that Marko lied many times to you.

 8   Correct?  We do agree on that.

 9   A.   Yes, sir.

10   Q.   Okay.  Now, in any of your Skype chats --

11            MR. WILSON:  Judge, we offer Defendant's Exhibit

12   No. 1.

13            THE COURT:  Any objection?

14            MR. WYDE:  No, Your Honor.

15            THE COURT:  Exhibit A is admitted.

16            MR. WILSON:  Proffer to the jury, Your Honor?

17            THE COURT:  All right.

18   Q.   (BY MR. WILSON)  You testified about the two strikes

19   against the VideoGames channel.

20   A.   Yes, sir.

21   Q.   Do you have any documents from YouTube here today that

22   show that the channel did have two strikes against it?

23   A.   No.  It was Mr. Princip who told me that.

24   Q.   And, again, we know that Mr. Princip lied to you multiple

25   times.  Correct?
```

1    A.    Yes, sir.

2    Q.    Okay.  And your co-Plaintiff here, Mr. Keating, I did not

3    see him one time mentioned in any of your Skype chats.  Do we

4    agree on that, or did I just miss something?

5    A.    Yes, because I didn't know about his partnership at the

6    time.

7    Q.    Okay.  But it's your opinion, as you sit here today, that

8    actually Mr. Princip and Mr. Keating -- it's your personal

9    opinion that their partnership actually pre-existed your

10    partnership.  Right?

11    A.    Yes.  They signed a contract ten days before mine.

12    Q.    Okay.  And that's your personal opinion that you think

13    that Mr. Keating was a partner.  So, again, Marko never told

14    you that in six months of communications via Skype and text

15    and everything else.  Correct?

16    A.    Not that I can remember, no.

17    Q.    Okay.  And then forgive me.  I would say Marko mentioned

18    probably what?  Another four other individuals were his

19    partners in all those Skype chats, give or take one.  Would

20    you agree with me on that?

21    A.    Yes, sir.

22    Q.    I think you mentioned up there in the Skype chats that it

23    was the brothers Brandt, or whatever, there was two Brandt

24    people.  Correct?  That were in the Skype chats--Jon and Ed or

25    something?

```
 1   A.    I just remember Jon Brandt.

 2   Q.    Okay.  And then there was an Adam Lovinger.  Right?

 3   A.    I know him as Drew, yeah; Drew.

 4   Q.    None of those other alleged partners sued Marko or

 5   VideoGames, did they?

 6   A.    No, sir.

 7   Q.    Okay.  And are you aware, in your personal understanding

 8   under Texas law, that you as an alleged partner are also

 9   liable as a partner if the partnership is sued?  Are you aware

10   of that?

11   A.    Can you repeat that one more time?  Sorry?

12   Q.    Yes.  Are you aware that in Texas law, do you have a

13   personal opinion that you as a partner are also liable for the

14   partnership if the partnership gets sued?

15              MR. WYDE:  I am going to object based on it calls

16   for a legal conclusion.

17              THE COURT:  Sustained.

18              MR. WYDE:  Ask the jury to disregard the question.

19              THE COURT:  They have heard the question.  They

20   can't put it out of their brains.

21              MR. WYDE:  Judge, one for two gets me in the --

22              THE COURT:  Okay.

23              MR. WYDE:  Excuse me.

24   Q.    (BY MR. WYDE)  The Adam Lovinger lawsuit that you

25   mentioned to the jury previously.  Right?
```

```
 1   A.   Yes, sir.

 2   Q.   Sued Marko and VideoGames channel as well.  Correct?

 3   A.   Yes, sir.

 4   Q.   At the time your testimony is, is that you think you were

 5   still a partner in the VideoGames channel.  Correct?

 6   A.   Yes, sir.

 7   Q.   Were you sued in that lawsuit?

 8   A.   I didn't know about the lawsuit until later.

 9   Q.   That's not my question.  Were you personally sued in that

10   lawsuit?

11   A.   No, sir.

12   Q.   Okay.  Did you have to pay any legal fees on behalf of

13   VideoGames as they were defending that lawsuit against Adam

14   Lovinger?

15   A.   No, sir.

16   Q.   Are you aware of the payment made by VideoGames to Adam

17   Lovinger to have the channel returned back to Marko Princip?

18   A.   No, sir.

19   Q.    How did Marko Princip at 15 or 16, in your personal

20   knowledge, acquire the domain name--I'm going to call it the

21   domain name--VideoGames channel/YouTube?  Do you know?

22   A.   He was I think 19 or 20 at the time.

23   Q.   You didn't answer my question.  Do you know how you

24   acquired it?

25             THE COURT:  You asked whether he acquired when he
```

```
 1    was 15 or 16, and he doesn't have knowledge of that.

 2              MR. WILSON:  All right.  Thank you, Your Honor.

 3    Q.   (BY MR. WILSON)  Do you know how he acquired it?

 4    A.   Yeah.  He told me that he reached out to Machinima and

 5    they got him the username because it wasn't active anymore.

 6    Q.   And you were aware that he was working for Machinima.

 7    Correct?

 8    A.   Yes, sir.

 9    Q.   Okay.  And then in those chats in there, I think there

10    was some discussions that Marko feared you were contacting

11    Machinima and he was going to lose his job at Machinima.

12    Correct?

13    A.   Yes, sir.

14    Q.   And were you aware he was fired ultimately from

15    Machinima?

16    A.   I'm not sure.  I know he stopped working there or wasn't

17    working with them.

18    Q.   Okay.  You testified, Mr. Moss, about your two different

19    contracts that you had in 2013 related to your two channels.

20    Remember?

21    A.   Yes, sir.

22    Q.   Okay.  Would you agree with me, sir, that as you sit here

23    today in 2016, that the terms that you had in 2012 or 2013 are

24    not the same terms that you have here today for your two

25    channels?
```

```
 1   A.   I'm not with that same network anymore.

 2   Q.   Okay.  So would that be a yes?

 3   A.   Yes.  Yes, sir.

 4   Q.   Okay.  And what network are you with now?

 5   A.   I'm currently just partnered with YouTube.

 6   Q.   And how does YouTube compensate you today for your two

 7   channels?

 8   A.   The same way--based on the CPM.

 9   Q.   Okay.  And what amount is that?

10   A.   That amount is always varying with YouTube.  I'm not with

11   a network.

12   Q.   It varies every month or week?

13   A.   It varies every second, because there is thousands if not

14   millions of ads on the videos that are always interchanging

15   out, so every ad is a different paying ad.

16   Q.   Well, how do you know that YouTube isn't lying to you

17   about what they're paying you?

18   A.   Because you can -- I mean, you can go on AdSense and see

19   the numbers, I guess.

20   Q.   But you just said that they changed the dollar per

21   viewership.  Correct?

22   A.   Yes.  You can -- I mean, you can see it on the YouTube

23   analytics, though.

24   Q.   Okay.  So what contract do you have with them that

25   doesn't cause them to change the terms in seconds throughout
```

1    the day, year, months?

2    A.    Can you re-ask it one more time?  Sorry.

3    Q.    Yes.  What contract do you have that -- Well, I take it

4    you don't have a contract that forbids you from changing the

5    terms and conditions of your agreement with them.  Correct?

6    A.    As far as I know, they'd have to sign a new agreement

7    with me to just change it on me.  It's in my agreement, I'm

8    pretty sure it says, about the CPM fluctuating.

9    Q.    So give the ladies and gentlemen of the jury an example.

10   Last month what did you make gross off your two channels?

11   A.    I'm not even sure.

12   Q.    Five grand?  Ten grand?

13   A.    I'm not sure, with my companies and everything maybe

14   3,000, 4,000, 5,000; somewhere in between that.

15   Q.    Okay.  So your two channels last month, you got a check

16   for $3,000?

17   A.    Not a check, but a direct deposit.

18   Q.    Okay.  And then the month before that, what was it?

19   A.    Same; like similar amount.

20   Q.    Okay.  And how much do those amounts deviate?

21   A.    I mean, it depends on the amount of views you get.

22   Q.    Okay.  Would you agree with me that your -- that YouTube

23   and/or the network pricing has decreased over the last four

24   years?

25   A.    YouTube's only gotten bigger, so no.

1    Q.   Okay.  So you're making more money now.

2    A.   It depends on how many views you get.  One month it could

3    be a lot of views and then one month could be less.

4    Q.   Well, I'm asking you.  The terms of your deal that you

5    had in the 2012 and 2013, are they better or worse than they

6    are at 2016?

7    A.   I mean, it depends on the views you get, again.

8    Q.   Well, let's break it down real simple.  What did you make

9    in -- What was your IRS tax return in 2013?

10   A.   I really can't remember off the top of my head.

11   Q.   A hundred grand?  I mean, you testified about $100,000.

12   A.   I know it was probably around a hundred thousand, yes.

13   Q.   And what was it for 2015?

14   A.   I really -- I can't remember off the top of my head.  I'm

15   sorry.

16   Q.   Well, you just got your 1099s a few months ago.  Right?

17   A.   Well, I've been traveling, so I'm not even there.  My

18   accountant does my stuff.  I don't know.

19   Q.   So you have no idea what your 1099s for 2015 say for

20   those two channels?

21   A.   Not off the top of my head, no, I do not.

22   Q.   Not even a guess.  Not even close.

23   A.   I really can't remember, no.  My accountant does this

24   stuff.

25   Q.   Okay.  On the Skype chats, you know, we went through so

1    many pages, Mr. Moss.  I saw by your name sometimes it said

2    "sleep."  What does that mean?  Were you sleeping?

3    A.    Like I was mentioning before, Mr. Princip said "out."

4    It's just your Skype status, I guess, so people don't bug me

5    basically.

6    Q.    So "sleep" means don't bug me; you're sleeping, or --

7    A.    Well, that's for the people that I'm not chatting to.

8    You can still chat with people.  You are still online

9    basically.

10   Q.    Okay.

11   A.    It's just a way to let people know that know what you're

12   doing, like a status thing.

13   Q.    Now, would you -- You would agree with me.  Right?  That

14   you and Marko were negotiating the terms of this agreement,

15   which was the first exhibit offered in this case -- My

16   goodness.  I don't know.  I must have seen -- I'm not very

17   good at math, but was it maybe a thousand different lines back

18   and forth?

19   A.    Yes; a lot.

20   Q.    Okay.  You would agree with me that you were scared about

21   paying the $1500?

22   A.    I wouldn't say scared really.

23   Q.    Well, in that Skype chat, though, you had, I would say,

24   no fewer than 50 questions about sending a $1500 check.  Would

25   you agree with that?

1    A.    Yes, sir.

2    Q.    You had no fewer than, I don't know, maybe three or four

3    concerns about other partners or other people involved.

4    Correct?

5    A.    Yes, sir.

6    Q.    Okay.  You never personally met Marko or shook his hand

7    until I think your deposition last May.  Isn't that correct?

8    A.    Yes, sir.

9    Q.    So everything was done over the internet.  Is that --

10    A.    Yes, sir.

11    Q.    Okay.  And so you had, I don't know, ten different

12    warning signs about sending the $1500, but you sent it anyway,

13    didn't you?

14    A.    I mean, I felt like I did my due diligence to ask him

15    questions --

16    Q.    Okay.

17    A.    -- about everything.

18    Q.    Did you follow up with this Jon Brandt that was a partner

19    mentioned in the Skype?

20    A.    Not from what I recall, no.

21    Q.    Okay.

22    A.    I don't think I talked to him.

23    Q.    Other than talking to Marko--who you've stated is a liar

24    and a cheat--on the Skype stuff, did you do any other

25    independent research about Marko?

1    A.    I mean, looking on Twitter and other social media

2    platforms seeing what people said about him, yes.

3    Q.    Okay.  And I thought in one of those Skypes that Mr. Wyde

4    just offered towards the tail end of your direct examination,

5    you had some other information about Marko that he had lied

6    and cheated some other folks before, too.  Correct?

7    A.    Yes.  Yes, sir.

8    Q.    But you still entered into a business agreement with him.

9    Right?

10   A.    I mean, that was after the fact, but yes.

11   Q.    Okay.  So -- And then you testified after the fact that

12   you knew you were with a liar and a cheat but you still want

13   to be with a liar and a cheat.  Right?

14   A.    I want my 30 percent cut of the company.

15   Q.    Right.  But you said you still want to be partners with a

16   liar and a cheat, though.  Right?

17   A.    Yes, sir.

18   Q.    Other than your $1500, have you ever paid any other money

19   to Marko?

20   A.    No, sir.

21   Q.    Have you ever paid any other money to VideoGames?

22   A.    No, sir.

23   Q.    Did you ever pay any money to Mr. Martin?

24   A.    No, sir.

25   Q.    Ever pay any money to Mr. Keating?

```
 1   A.   No, sir.

 2   Q.   To any of these other people--Mr. Brandt, Adam Lovinger?

 3   A.   No, sir.

 4   Q.   Okay.  These -- You testified about these analytic

 5   reports.  Remember where you can just, I'm assuming, go into

 6   anybody's channel or domain name and click on an analytic

 7   report if you have the username or password.  Right?

 8   A.   Yes, sir.

 9   Q.   Would you agree with me that just because you click on

10   the analytical reports of VideoGames channel or your channel

11   or Mr. Keating's channel, or anybody's channel, that it

12   doesn't tell you how much money you're making every month or

13   every year, does it?

14   A.   That's what it's for.

15   Q.   Did you hear my question?

16   A.   The analytic reports?  Yes.

17   Q.   Does it say that VideoGames is getting a check for five

18   grand this month?

19   A.   I mean, it breaks everything down.  It tells you how much

20   you are making per video, per day, for every month.

21   Q.   Listen to my question again, Mr. Moss.  Does it break it

22   down to the point that says you are going to receive $5,000

23   this month based on the activity that occurred?

24   A.   Yes.

25   Q.   Okay.  So, then, have you confirmed when you log into
```

1    your channel that it does match up with your 1099 that you

2    receive every year?

3    A.    Yes, sir.

4    Q.    Okay.  And so you are telling these ladies and gentlemen

5    of the jury that if we had five different YouTube channels, if

6    I had username and password, I could go in there and I could

7    determine what every single domain name, group for lack of a

8    better word, is going to get a check for that month or the

9    month previous.

10    A.    Yes, sir.

11    Q.    Okay.  It shows the terms of their agreement with

12    whatever network is sponsoring that channel.  Is that correct?

13    A.    Well, it differs.  If you are with a network, sometimes

14    they will have the analytics reports.

15    Q.    Okay.  So you can't get everything.  You may have to go

16    through another network.

17    A.    You still have access to it.

18    Q.    Okay.  But you have to go through another network, maybe

19    another door to get that information?

20    A.    I mean, if you have your channel, you log in kind of

21    through the network to see your analytics instead of YouTube.

22    I don't know if it's a separate door, but --

23    Q.    Well, let's take YouTube.  How many of those channels are

24    really YouTube and however many are through another network?

25    What percentage?

1    A.    What do you mean?  I'm sorry.

2    Q.    Well, again, I'm still trying to ramp up with the

3    internet world here.  I understand that YouTube has got their

4    thing going with you.

5    A.    Yes, sir.

6    Q.    And then Marko has got his thing going with Machinima,

7    which I assume is a separate network.  So what percentage of

8    all the millions of channels out there on YouTube are with

9    YouTube versus a third party network?

10    A.    I couldn't put a percentage on it, but I know it's -- I

11    think it's millions of channels now that are with networks.

12    Q.    Okay.  So maybe -- would you agree with me less than

13    maybe ten percent have your deal which is a direct one-on-one

14    with YouTube?

15    A.    Repeat that one more time.

16    Q.    That YouTube -- You already testified about YouTube is

17    your direct network.

18    A.    Yes, sir.

19    Q.    Okay.

20    A.    Right now.

21    Q.    Out of all of the YouTube channels out there, what

22    percentage is with -- directly with YouTube and not with third

23    party networks?

24            THE COURT:  I think he has already answered that and

25    said he doesn't know.

1          MR. WILSON:  Fine, Your Honor.  I'll move on.  I'm

2     okay with --

3     Q.   (BY MR. WILSON)  Again, I don't know as a financier, as

4     we talked about before, Mr. Moss.

5          MR. WILSON:  May I have a moment, Your Honor?  I am

6     going to get another exhibit.

7          THE COURT:  Yes.

8          MR. WILSON:  I am going to mark this as Defendant's

9     Exhibit B.

10    Q.   (BY MR. WILSON)  And this is Twitter messages with you,

11    and ask if you are familiar with that document.  And do you

12    know a Pete Moss?

13    A.   Yes, sir.  That's my dad.  His name is actually David

14    Moss also.

15         MR. WYDE:  No objection, Your Honor.

16         THE COURT:  And what is this document?

17         MR. WILSON:  This is a Twitter feed, Your Honor.

18    I'll get the witness to give me a foundation for it.

19         May I approach the witness, Judge?

20         THE COURT:  Yes.

21         MR. WILSON:  I am sorry.  It's Exhibit 3 in my

22    binders.

23         THE COURT:  Is it one of the Plaintiffs' exhibits?

24         MR. WILSON:  It is one of the last pages of Exhibit

25    3.  I apologize.

```
 1              MR. WYDE:  I think it is Defendants' Exhibit No. 3,

 2   your Honor.

 3              MR. WILSON:  Defendants' Exhibit No. 3.  It is a

 4   Twitter feed with Mr. Moss.

 5              THE COURT:  Okay.  And you are offering this?

 6              MR. WILSON:  Yes.

 7              THE COURT:  It's admitted.

 8              MR. WILSON:  Thank you, Judge.

 9        It's the last couple of pages of it.

10   Q.  (BY MR. WILSON)  Mr. Moss, we've already offered this

11   into evidence.  I want to put this up on the screen just so we

12   are clear.  You are -- All right.  At the top it says Ty Moss,

13   your hash tag Drew Kardashian.  Is that correct?  In this

14   Twitter feed.

15   A.   Can you read that?

16   Q.   Right here.  This is you at the top--Ty Moss?

17   A.   Not the Drew Kardashian.  I'm pretty sure that's Andrew

18   Lovinger.

19   Q.   Okay.  Well, you are in this conversation, though.

20   Right?  You see this?

21   A.   Yeah; with Marko and Lovinger.

22   Q.   Is this saying, "Block me.  Okay.  I can just tweet it

23   out publicly to all my followers if you want"?

24   A.   Yes, sir.  They blocked me from the VideoGames Twitter

25   account.
```

```
 1   Q.   All right.  So that's your statement to lots of folks on
 2   Twitter.  Right?
 3   A.   Yes, sir.
 4   Q.   Now, again, I'm a dinosaur.  Does that go to all of your
 5   Twitter followers, Marko's Twitter follows, and then probably
 6   all of their followers as well?
 7   A.   They have to actually, like, look at my account.  That's
 8   not tweeted -- it's public, but it's not, like, to my
 9   followers directly.  It is tweeted at them.  It is almost like
10   a message to them, sort of.
11   Q.   But they see that.
12   A.   If they go to my Twitter, yeah.
13   Q.   What did you mean by that statement--"Block me.  I can
14   just tweet it out publicly to all my followers if I want."
15   What were you going to tweet out?
16   A.   I don't remember exactly what we were talking about then,
17   but I just know they blocked me from the account.
18   Q.   Let's roll down here.  This is you talking again.  "After
19   I'm done with Marko, I will own VideoGames YouTube Channel."
20   Is that correct?
21   A.   Yes, sir.
22   Q.   All right.  That's a statement you made January 23rd,
23   2013, just a little before that letter that went out.  Right?
24   A.   Yes, sir.
25   Q.   Okay.  And then you said Pete Moss is your father.  It
```

1    looks like he jumps in here.  And so is it safe to assume you

2    advised your father about the dispute that you and Marko were

3    having?

4    A.    He kind of did that on his own.

5    Q.    How would your father know about this?

6    A.    He's my dad.

7    Q.    So you discussed it with him.  Right?

8    A.    And he knew my business matters, yes.

9    Q.    Okay.  And so this is your father talking to Marko that

10   "Marko owes Ty Moss money and many others money.  He is a

11   thief.  WTF."  Right?

12   A.    Yes, sir.

13   Q.    I don't think I'm as old as Dan, but I think I know what

14   WTF means.  Is it what I think it means without having to say

15   it?

16   A.    Yes.

17   Q.    Okay.  And then your father goes on it looks like that

18   same day in the evening at 5:13 and says, "Looks like you have

19   shit the wrong people this time.  Better pay the money that

20   you owe."

21   A.    Yes, sir.

22   Q.    So not only in August or September of 2012, but as recent

23   as January of 2013, with all of the stuff these jurors have

24   seen, you guys are throwing some pretty nasty bombs back at

25   each other for being partners, aren't you?  Would you agree

```
 1   with that?

 2   A.    I mean, that was my dad, so.

 3   Q.    I know, but you threatened to file a lawsuit, you

 4   threatened to get a lawyer, you called Marko a thief and a

 5   crook.  Right?

 6   A.    Yes.

 7   Q.    Okay.  All right.

 8            MR. WILSON:  Your Honor, can we go ahead and proffer

 9   these to the jury?

10            THE COURT:  All right.

11   Q.    (BY MR. WILSON)  Do you understand any -- Based on the

12   dysfunction, I'm going to call that, between you and Marko,

13   and all of this after months of dysfunctions and the threats

14   and the threats of the lawsuits, do you not see why the acts

15   of partners against one another in this situation clearly show

16   that the partnership was on terminal life support at that

17   point in time?

18            MR. WYDE:  Objection.  Again, it calls for a legal

19   conclusion regarding the status of a legal entity.

20            THE COURT:  Sustained.

21   Q.    (BY MR. WILSON)  Why don't you tell the ladies and

22   gentlemen of the jury, what do you think partners are supposed

23   to do for one another?

24   A.    It's a partnership.

25   Q.    Okay.  So why don't you give me some examples.
```

```
 1   A.    They are partners in a company, and -- I don't know.  I
 2   was a silent investor, so I wasn't really supposed to do much.
 3   Q.    Okay.  As a silent investor, are you supposed to call
 4   your primary shareholder a thief or a crook in public media?
 5   Do you think that's justified?
 6   A.    I mean, I felt like he was --
 7   Q.    It is just a yes or no?
 8   A.    Yes, sir.
 9   Q.    You think that's justified.  Okay.
10         And do you think it's justified when partners sue or
11   threaten to sue other partners, that that's justified out
12   there in public as well?
13   A.    Yes, sir.
14   Q.    And you want this jury to believe, even though your
15   actions of calling your majority partner a thief, a crook, and
16   blasting him on social media, threatening a lawsuit, filing a
17   lawsuit, that as you sit here today you're still a partner
18   with this guy?  That's what you want them to believe.  Right?
19   A.    I didn't call him a thief on social media.
20   Q.    Listen to my question.  Is that what you want them to
21   believe--you're still a partner today.  Right?
22   A.    Yes, sir.
23   Q.    Even though your actions and his actions speak louder
24   than these words.  Correct?  That's what you want the jury to
25   believe.
```

```
 1   A.   Yes, sir.

 2   Q.   And you want the jury to award you I think it was $1.5

 3   million your lawyer said?  Is that correct?

 4   A.   Yes; something around that.

 5   Q.   $1.5 million.  And you have no documents from the

 6   Internal Revenue Service or -- Is that correct?  In your

 7   exhibits, other than Mr. Princip's tax returns and

 8   Mr. Princip's 1099 from Machinima?

 9   A.   Can you repeat that one more time?  I'm sorry.

10   Q.   You don't have any documents in your exhibits from the

11   Internal Revenue Service to justify your $1.5 million here

12   today for the jury, do you?

13   A.   I think we do have some from Mr. Princip, yes.

14   Q.   Okay.  All right.  So your $1.5 million, basically you

15   value this company at--I'm not too good in math--but what?

16   $4.5 million?  So your 30 percent is a third of $4.5 million.

17   Is that how you value this channel?

18   A.   I would say it's more than that, probably.

19   Q.   More than that.

20   A.   Yes.

21   Q.   Okay.  But other than Marko's tax returns, Marko's 1099s

22   from Machinima, you have no documents from Machinima to

23   warrant that value, do you?

24   A.   No, sir.

25   Q.   Okay.  You have no documents from the Internal Revenue
```

1    Service to warrant that value, do you?

2    A.    No, sir.

3    Q.    You have no documents from YouTube to warrant that value,

4    do you?

5    A.    No, sir.

6    Q.    And you have nobody, I assume, out in the hall or

7    somewhere here in the city that is willing to write a check

8    for $5 million for this channel, do you?

9    A.    I mean, I could reach out to people that definitely would

10    be interested.

11    Q.    That will write a check for $5 million?

12    A.    For VideoGames YouTube Channel.

13            MR. WILSON:  Your Honor, may we adjourn?

14            THE COURT:  Adjourn?  You want to take a recess?

15            MR. WILSON:  Do you mind; maybe take a break?

16            THE COURT:  Let's take our break.  We will be in

17    recess for 15 minutes.  Remember my admonitions from previous.

18    Don't form any opinion.  We will be back at 10:25.

19            MR. WILSON:  Thank you, Your Honor.

20                    (Brief recess.)

21            THE COURT:  Are we ready for the jurors?

22            MR. VITAL:  Yes, Your Honor.

23            THE COURT:  How much more do you have, Mr. Wilson?

24            MR. WILSON:  Your Honor, I am going to pass the

25    witness.

```
 1            THE COURT:  Okay.  Here's an observation I made and
 2    you can do what you want with it.  When you are doing your
 3    examination and you publish something to the jury, I think you
 4    lose their attention for the testimony while they're looking
 5    at the document.  So if you would like, we can publish all of
 6    these at the end when you finish your exam, if you like, but
 7    I'm -- If you want to publish them right then, that's fine
 8    with me.  Okay?
 9            MR. WILSON:  Thank you, Your Honor.
10            (Whereupon, the jury entered the courtroom.)
11            THE COURT:  Be seated, please.
12        What says the Defendant?
13            MR. WILSON:  Your Honor, we will pass the witness at
14    this time.
15            THE COURT:  Any other questions, Mr. Wyde?
16            MR. WYDE:  Briefly, addressing the questions that
17    were raised in his -- I realize I don't have a right to
18    full --
19            THE COURT:  Sure.
20                    REDIRECT EXAMINATION
21    By Mr. Wyde:  ?
22    Q.   Now, Ty, if you will, when Mr. Wilson asked you about
23    wanting to remain a partner with a liar, thief, a cheat or
24    what have you, do you want to be in business with a liar a
25    thief or a chief?
```

```
 1   A.   No, sir.

 2   Q.   Okay.  Tell the jury --

 3             MR. WILSON:  Your Honor, I'm going to object to the

 4   form of that question.  It was already asked and answered.

 5             THE COURT:  I think he is entitled to clarify your

 6   questions on his redirect, so I will allow it.

 7   Q.   (BY MR. WYDE)  Tell the jury what you're asking for here.

 8   You realize this is your day in court, not my day.  What are

 9   you asking the jury to do regarding your 30 percent ownership

10   in the channel?

11   A.   To be given my 30 percent as well as Mr. Keating.

12   Q.   Okay.  Do you want to be a partner of Mr. Keating?

13   A.   Yes, sir.

14   Q.   And knowing everything you know in this case about, if

15   you will, do you have an opinion about whether or not he's a

16   legitimate partner?

17   A.   Yes; definitely.

18   Q.   Okay.  And does he have, if you know, what percentage of

19   the channel?

20   A.   Also 30 percent.

21   Q.   All right.  So between the two of you, that would be 60

22   percent.  Is that correct?

23   A.   Yes, sir.

24   Q.   Now, do you realize, if you will, or do you know, if the

25   jury returns a verdict in your favor, so-to-speak, or
```

1    Mr. Keating's favor, that Mr. Princip's ownership interest is

2    still remains in tact?

3    A.    Yes, sir.

4            MR. WILSON:    That calls for a legal conclusion.

5            THE COURT:    Sustained.

6    Q.    (BY MR. WYDE)  Are you asking -- Are you here seeking to

7    strip Mr. Princip of his ownership interest?

8    A.    No, sir.

9    Q.    Okay.  You -- Is it accurate or -- Do you just want to be

10    able to control the channel or manage the channel in a

11    legitimate manner?

12    A.    Yes, sir.

13    Q.    Okay.  That's what you are asking for.

14    A.    Yes, sir.

15    Q.    Now, lastly, Mr. Wilson wanted to ask you some questions

16    about the value of the channel.  Can you put a specific value

17    on the channel's worth today?

18            MR. WILSON:    Objection.  It's already been asked and

19    answered Your Honor.

20            THE COURT:    Overruled.  You can answer.

21            THE WITNESS:    I would say millions and millions of

22    dollars.  If you search VideoGames on Google, it comes up as,

23    like, the third link.  Just that alone is worth a lot of

24    money.

25    Q.    Okay.  And tell the jury why that -- why you think that's

1    valuable?

2    A.   It's -- a top link in Google, I don't think you can even

3    buy that.  You have to get lucky, kind of, to get that.  It's,

4    like, almost invaluable to me, at least, I would say.

5    Q.   Nonetheless, is there anybody out in the hall making an

6    offer to buy the channel, to your knowledge?

7    A.   No, sir.

8    Q.   Have you ever heard the old saying something is worth

9    what a willing buyer and a willing seller kind of agree upon?

10   A.   I've never heard that.

11   Q.   All right.  Fair enough.

12        Nonetheless, you have an opinion that the channel is

13   quite valuable, though.  Is that correct?

14   A.   Yes, sir.

15   Q.   And is that conditioned upon the channel being properly

16   managed?

17   A.   Yes, sir.

18   Q.   Because if it's not, or a third strike occurs, then what

19   would the channel be worth?

20   A.   Nothing.

21   Q.   Okay.  Basically --

22   A.   Suspended.

23   Q.   Basically one could possibly sell the name of the domain.

24   Is that right?

25   A.   No.  Once you lose it, that's it.

1   Q.   The domain would be gone, too?

2   A.   I mean, the account and channel and everything, as far as

3   I know, yes.

4   Q.   That's your understanding.

5   A.   Yes, sir.

6   Q.   Okay.

7            MR. WYDE:   That's all the questions I have.   Thank

8   you for your time.

9            THE COURT:   What other questions, Mr. Wilson?

10            MR. WILSON:   Nothing from the Defense, Judge.

11            THE COURT:   Thank you.

12       You may step down, Mr. Moss.

13            THE WITNESS:   Thank you, Your Honor.

14            THE COURT:   Who's your next witness?

15            MR. VITAL:   Marko Princip, Your Honor.

16            THE COURT:   Mr. Princip, if you would raise your

17   right hand, please?

18            (Whereupon, the oath was administered by the Court.)

19            MR. VITAL:   May it please the Court?

20            THE COURT:   Yes.

21            MR. VITAL:   Good morning, ladies and gentlemen.

22                     MARKO PRINCIP,

23   Testified on direct examination by Mr. Vital as follows:

24   Q.   Mr. Princip, you and I have never had an occasion to say

25   one word to each other, I think.

```
 1    A.   We haven't, no.

 2    Q.   I'm new to this case.

 3    A.   I noticed.

 4    Q.   I'd like to talk to you about the VideoGames channel in

 5    an attempt to, in a manner of speaking, seek the truth.  Is

 6    that okay with you if we go on a journey for the truth?

 7    A.   I'm here to speak the truth.

 8    Q.   Okay.  So let's start with some basics regarding the

 9    VideoGames channel.

10         The VideoGames channel was created in 2012.  Is that

11    right?

12    A.   Yes.

13    Q.   And, in fairness, it was the thought creation of

14    you--Mr. Princip.

15    A.   Yes.

16    Q.   But in order to get that thought creation into reality,

17    as we've seen, you made outreach to some people to help you.

18    Is that fair?

19    A.   Not for the thought; for just money.

20    Q.   Well, your thought -- You needed money to help you

21    further the thought to turn it into what became the VideoGames

22    channel.

23    A.   Yeah.

24    Q.   Okay.  And as we saw going back and forth, one of the

25    people that you went back and forth with in an attempt to seek
```

1  money was my client David Tyler Moss, who just testified.

2  A.    Yes.

3  Q.    And you are the same Marko Princip that was in the Skype

4  chats that were Plaintiffs' Exhibit No. 13.  You recall that?

5  A.    Yes.  I admitted to dealings with Ty.

6  Q.    And Plaintiffs' Exhibit No. 16, you are that same

7  person--Marko Princip?

8  A.    Yes.

9  Q.    When you had the thought to create the VideoGames

10  channel, in the early formulation of your thinking you did not

11  know exactly what you were going to call the channel.  Is that

12  fair?

13  A.    No, I knew it was going to be VideoGames.

14  Q.    Well, at one point you were talking about Achievement

15  Guide?

16  A.    I was talking about the type of content.  Achievement

17  Guide is -- in video games there's something called

18  achievements which you get when you reach a certain level or

19  get an amount of points or something, so I said on the channel

20  there would be achievement guides, news, reviews that I said

21  would be the type of content on the channel.

22  Q.    So you weren't thinking about calling the channel

23  Achievement Guide?

24  A.    No.

25  Q.    Okay.  Looking at Plaintiffs' Exhibit No. 13, first page,

```
 1   this is you--Marko, Team Noble?

 2   A.   Uh-huh.

 3   Q.   It says, "Making a new channel," and it says Achievement

 4   Guide is one word.  Right?

 5   A.   Yes.

 6   Q.   And you put that in quotation marks, didn't you?

 7   A.   Yes.

 8   Q.   And just so I'm clear, when you wrote on May 7th -- or on

 9   May 7, 2012, 3:47:14 p.m., that is you, the same Mr. Princip

10   speaking there that is here testifying in this courtroom?

11   A.   Yes.

12   Q.   That represented to my client David Tyler Moss that you

13   are making a new channel.  That's what it says.  Right?

14   A.   Uh-huh.

15   Q.   You have to say yes.

16   A.   Yes.  Yes.

17   Q.   And that new channel, right after you said "making a new

18   channel"  you put in quotation marks Achievement Guide, didn't

19   you?

20   A.   Yes.

21   Q.   Achievement Guide, game guides.  Right?  That's what you

22   wrote.

23   A.   Yes.

24   Q.   Now, isn't it fair that the reason that you don't want to

25   admit that you had initially thought that this was going to be
```

```
1    Achievement Guide is because the contract with Brandon Keating
2    references Achievement Guide?
3    A.    You are asking me a question?
4    Q.    Yes, sir.
5    A.    No, because, as I said before, the contract Brandon had
6    was doctored to -- made by Brandon.  I didn't sign that one.
7    Q.    So the -- Okay.  We will break that down in a second.
8    But my question to you -- I guess you're denying that by
9    separating yourself from the word Achievement Guide, that is a
10   cute way of denying Mr. Keating's contract.
11   A.    No, it's because Brandon's a liar and a cheat.
12   Q.    Well, isn't it true that you have wrote to him that Brian
13   Martin is a liar?
14   A.    That I said that Brian was a liar?  I never said that
15   once.
16   Q.    Did you say that you have zero integrity?  Do you recall
17   telling Brandon Keating that in a text message?
18   A.    That I have zero integrity?  No.
19   Q.    You have a Gmail address called busyforawhile@gmail.com,
20   don't you?
21   A.    Yes, I do.
22          MR. VITAL:  Okay.  May I approach the board here?
23          THE COURT:  You may.
24   Q.    (BY MR. VITAL)  Sir, isn't it true that through your
25   gmail account, busyforawhile@gmail.com, that you wrote to my
```

1    client on his iPhone, texting him on his iPhone, that you have

2    zero integrity?

3    A.    I said this in the deposition.  I said that text messages

4    between me and someone else would have my phone number, just

5    as you guys included messages between me and Ty that had my

6    phone numbers.  So I admitted to those.  But ones that didn't

7    have my phone number associated to them, I didn't admit to

8    those.  So no.

9    Q.    So you did not text -- You are saying that you did not

10   text to his iPhone, Brandon Keating's iPhone, that you have

11   zero integrity.

12   A.    No.

13   Q.    Did you text to Brandon Keating's cell phone from

14   busyforawhile@gmail.com that "Brian is just a pawn, man.  He's

15   always been"?

16   A.    No.

17   Q.    Did you write on --

18          MR. VITAL:  May I have leave from the lectern, Your

19   Honor?

20   Q.    (BY MR. VITAL)  Let me state these questions with an

21   iPhone in my hand.  Do you know what an iPhone is?

22   A.    Yes.

23   Q.    Okay.  You know that Brandon is from Chicago?

24   A.    Yes.

25   Q.    You watch football?

```
 1    A.    Yes.

 2    Q.    NFL?

 3    A.    Yes.

 4    Q.    What symbol do you see on the iPhone?

 5    A.    Bears.

 6    Q.    All right.  So I'm holding an iPhone in my hand.  Let me

 7    ask these questions one more time, sir.

 8          Are you telling this jury that you did not text my client

 9    Brandon Keating from busyforawhile@gmail.com and tell him that

10    you have zero integrity?

11    A.    As I'm aware you have no records from any phone company,

12    so yeah, I'm sticking to what I'm saying.  No.

13    Q.    Do you have an iPhone?

14    A.    Yes.

15    Q.    When you open your iPhone, are you able to see people

16    that you have had texts with?

17    A.    Yes.

18    Q.    And if you don't delete those texts, they can go back

19    many years, can they not?

20    A.    They can, yeah.  It depends who they're talking to.

21    Q.    And if they're talking to busyforawhile@gmail.com, they

22    can stay on a phone without records from for many years.  Is

23    that true or false?

24    A.    False.  Let me tell you why.

25    Q.    No.
```

1  A.    You can put anyone's number as any name in your contact.

2         MR. VITAL:  Objection; non-responsive, Your Honor.

3         THE COURT:  Sustained.

4  Q.    (BY MR. VITAL)  Did you tell my client Brandon Keating

5  that "Brian is a big liar; bigger than me, honestly"?

6  A.    No.

7  Q.    Okay.  Have you ever been in court?

8  A.    First time.

9  Q.    You understand that this is not a game.

10  A.    I'm not playing any games.

11  Q.    Okay.  Do you want what perjury is?

12  A.    Yes.

13  Q.    Okay.  Let's go back to where we were before I digressed.

14  We were at Plaintiffs' Exhibit No. 13, page 1, and we made

15  reference to Achievement Guide game guides.

16         Question:  I know that you want to deny the contract

17  Mr. Keating has, but that contract also references the phrase

18  Achievement Guide, doesn't it?

19  A.    Could Brandon not have seen these chats with Ty and come

20  up with that contract?  Could he not have done that?

21         MR. VITAL:  Objection; non-responsive.

22         THE COURT:  Sustained.  You just have to answer the

23  question.

24         THE WITNESS:  Just repeat it one more time.

25  Q.    (BY MR. VITAL)  the question was something along the

1    lines of isn't it a fact that the contract that you're calling

2    a false contract--and I understand you're saying it's a false

3    contract--but that contract with Brandon Keating also

4    references in the same time frame the word or phrase

5    Achievement Guide?

6    A.    Yes.

7    Q.    Did you mean it when you wrote in Plaintiffs' Exhibit

8    No. 13 to my client Mr. Moss that you intended to blow up the

9    channel?

10   A.    Yes.

11   Q.    And you have, in fact, done that, have you not, sir?

12   A.    Yes.

13   Q.    The channel is more successful now than it was back in

14   2012.  Isn't that correct?

15   A.    Yes.

16   Q.    Now, there's been a reference in this case to tax

17   returns.  Right?

18   A.    Yes.

19   Q.    You produced some tax returns in this case?

20   A.    For every year, yes.

21   Q.    Did you produce tax returns for 2015?

22   A.    I have it, yes.

23   Q.    Do you have in this courtroom a tax return for 2015?

24   A.    I believe I do.  I'm not a hundred percent.

25   Q.    Okay.  Isn't it true that when you file a tax return for

1    2015, that's for 2014 revenue or 2014 earnings?  Right?

2    A.    Yes.

3    Q.    So if we have tax return in this courtroom for 2014,

4    that's going to be for 2013.  Correct?

5    A.    Give me one second.

6         THE COURT:  I think the tax returns speak for

7    themselves.  They say tax return for such and such a year.

8    Q.    (BY MR. VITAL)  Do you have -- have you given us a tax

9    return that's dated 2014?

10   A.    Yes.

11   Q.    Okay.  Do you know what revenue or earnings are on the

12   tax return for 2014?  If you don't, you can say, "I don't

13   know."

14   A.    I don't know to the exact dollar, the exact cent, but I

15   believe it is $45,000.

16   Q.    And that was earned by you in what year?

17   A.    In 2014.

18   Q.    Okay.  In 2014.

19        Let me ask you regarding 2013.  In 2013 you didn't own

20   the channel, or it had been hijacked by a kid.

21   A.    I received two payments that were back payments meaning,

22   meaning for the month of December you get in February, for the

23   month of November you get paid in January.  So I received

24   those last two last payments from '12, but other than that I

25   didn't get any other payments in '13.

1   Q.   That wasn't my question.  My question was the channel got

2   hijacked by a kid in 2013.

3   A.   Yes.  That is true.

4   Q.   The channel was under a kid's control in 2013, for the

5   most part, all of the year.  Right?  Except for a few months

6   early on in January.

7   A.   Yeah.  Yeah.

8   Q.   So for the first few weeks of the year 2013, you had

9   control of the channel, only to lose it in the latter part of

10  January 2013, and you did not have the channel in your control

11  for the rest of 2013.  Is that right?

12  A.   Yes.

13  Q.   And in that time frame when a 15-year-old kid was running

14  the channel, the channel in its first full year of operation

15  made $140,000 to $150,000, didn't it?

16          MR. WILSON:  Objection, Your Honor.  That assumes

17  facts not in evidence.

18          THE COURT:  Sustained.

19  Q.   (BY MR. VITAL)  The channel was under the control of

20  someone other than you.  Right?

21  A.   Yes.  It was hacked.

22  Q.   By a kid.  Right?

23  A.   He wasn't just any kid, but yeah.

24  Q.   And you know for a fact -- My question is, isn't it true

25  that it made $140,000 to $150,000 in that year?

```
 1                    MR. WILSON:  Same objection, Your Honor; assumes

 2     facts not in evidence.

 3                    THE COURT:  That's overruled.  You can answer.  Do

 4     you know the answer to that question?

 5                    THE WITNESS:  I believe it was 120, 130.

 6     Q.   (BY MR. VITAL)  Isn't it true that it was 140, 150?

 7     A.   I believe it was 10 less.  That's what I believe.

 8     Q.   Okay.  If you said otherwise in a deposition -- or do you

 9     recall saying differently in a deposition that you gave in

10     this case?

11     A.   I would range it from 120 to 140, that amount.

12     Q.   You wouldn't take it up to 150?

13     A.   No.  No.  No.

14     Q.   When you gave a deposition in this case, was the

15     deposition in this case obviously before today?

16     A.   Yeah.  It was about August of last year.

17     Q.   August 3rd, 2015.  Is that right?

18     A.   Yes.

19     Q.   Okay.  And when you gave that deposition testimony, you

20     were under oath.  Is that right?

21     A.   Yes.

22     Q.   Same as you are today.

23     A.   Yes.

24     Q.   And today you're telling this jury 120 to 140.  Is that

25     what your testimony is?
```

1    A.    Yes.  And also I have proof of what -- that a kid earned

2    for that channel for that year.

3    Q.    Okay.  That wasn't my question.

4    A.    Okay.  Well, yes.  Yes.  I said 120 to 140.

5    Q.    And the testimony you gave in your deposition in August

6    of 2015 obviously was much closer in time to the testimony

7    that you're giving today.  Right?

8    A.    Yes.

9    Q.    Do you recall being asked the question from January 2013

10   to January 2014 and giving the answer, "I might have sent it,

11   but I had this thing that the Lovinger family prepared, which

12   is like a whole spreadsheet, but it earned 140, 150, something

13   like that"?  Do you recall giving testimony like that?

14   A.    That's the range I gave, yes.

15   Q.    All right.  Now, you received a 1099 from Machinima for

16   the period of time that you had control of the channel before

17   it got hijacked by the kid.  Right?

18   A.    Yes.

19   Q.    Okay.  And just for those few weeks, Machinima gave you a

20   1099 for compensation of $24,671.28?

21   A.    It was for the two months prior, because I told you the

22   payments are back one month.  November would be paid out in

23   January, December in February.

24   Q.    Isn't it --

25                MR. VITAL:  May I approach the witness, Your Honor?

1            THE COURT:  You may.

2    Q.   (BY MR. VITAL)  I'm handing you Plaintiffs' Exhibit

3    No. 49, and ask you to confirm for me that this is a 1099 for

4    2013.

5    A.   Yes, sir.

6    Q.   From Machinima to you?

7    A.   Yes, sir.

8            MR. VITAL:  Offer Plaintiffs' Exhibit No. 49 into

9    evidence.

10           MR. WILSON:  No objection, Your Honor.

11           THE COURT:  It's admitted.

12   Q.   (BY MR. VITAL)  Now, Plaintiffs' Exhibit No. 49 shows

13   that Machinima paid to you a non-employee -- or it says

14   non-employee compensation $24,671.28.  Is that right?

15   A.   Yes.

16   Q.   Okay.  And we have established that you only had control

17   of the channel just for a few weeks before it got hijacked.

18   Right?

19   A.   Sir, I told you those payments were for November and

20   December, and they were paid out January and February.

21           MR. VITAL:  I object, Your Honor.  Object as

22   non-responsive to the question asked.

23           THE COURT:  Overruled.

24   Q.   (BY MR. VITAL)  Whatever the case is, the channel was in

25   its infancy in 2012.  Is that fair?

 1    A.    Yes.

 2    Q.    And you're saying in its infancy for the first few months

 3    or the last few months or two months of the year 2012, the

 4    channel yielded enough where Machinima paid you 24,000 some

 5    odd dollars.  Right?

 6    A.    Yes.

 7    Q.    And then in the first full year of operation under a kid,

 8    it made, you say between 120 and 140; in your deposition you

 9    said 150.  Is that fair?

10    A.    Well, you read to me 140 to 150.

11    Q.    Well, I read to you what you said.

12    A.    Then, yeah, that's what I said, yeah.

13    Q.    That's what you said; not me.  That's your testimony?

14    A.    I was saying what you read to me, yes.

15    Q.    From your deposition.

16    A.    Yes.

17              MR. VITAL:  May I approach the witness, Your Honor?

18              THE COURT:  You may.

19    Q.    (BY MR. VITAL)  I'm showing you Plaintiffs' Exhibit

20    No. 26.  Are you able to identify that as text messages from

21    busyforawhile@gmail.com is your email account --

22    A.    These are the ones I objected to.

23              THE COURT:  I'm sorry.

24    Q.    (BY MR. VITAL)  I wasn't finished with my question.

25              THE COURT:  Let him finish his question.

```
 1    Q.   (BY MR. VITAL)  I've handed you for the record

 2    Plaintiffs' Exhibit No. 26.  And my question, isn't it true

 3    these are the text messages between busyforawhile@gmail.com

 4    and Mr. Keating on his iPhone?  The physical paper copy of

 5    those text messages?

 6    A.   These text messages were not with me.  I don't know who

 7    they were with.

 8    Q.   But busyforawhile@gmail.com is your email address?

 9    A.   As I said before, an iPhone you can put any name to

10    anything.  You can put one number and put the name John,

11    George, whatever and change it whenever.  I don't see my cell

12    phone number anywhere on that thing.

13    Q.   All right.  Okay.

14         Now, the reason that the channel was taken over by Drew

15    Lovinger is because you refused or failed to pay money to Drew

16    Lovinger and others.  Is that right?

17    A.   There was a lot of reasons.

18    Q.   But one of the reasons that he decided to take control of

19    the channel from you was because you weren't doing right by

20    people, was his belief.

21    A.   His belief is he just wanted to make all the money.

22              THE COURT:  I'm sorry.  I couldn't hear you.  His

23    belief was?

24              THE WITNESS:  That he wanted to make all the money.

25    He just wanted to steal it.
```

1    Q.    (BY MR. VITAL)  So you are denying that he was owed money

2    and you refused to pay him as well as other content creators?

3    A.    In the other case with him, never was it arisen that I

4    never paid him or that he was owed.  He just wanted to take

5    over the channel.

6    Q.    So you referenced another case.  What is this other case

7    you are talking about?

8    A.    It's the case that you mentioned also where he stole the

9    channel and we, you know, went to get the channel back.

10   Q.    And to get the channel back, he paid you some money

11   because he wrongfully took the channel?

12   A.    You mean for us to pay him?

13   Q.    Who paid money back and forth to end the lawsuit?

14   A.    We settled and we paid for it to get it back.

15   Q.    Right.  So let me ask my original questions and we will

16   get back to that.

17        Isn't it true that control of the channel was wrested

18   from you, Marko Princip, because you did not do right by

19   people, like Andrew Lovinger and other content creators, so he

20   hijacked the channel?

21   A.    Well, I would exclude others.  I don't know who the

22   others are.  But as far as what his reasoning for taking it

23   was, he wanted to make everything.

24        MR. VITAL:  Objection; non-responsive, Your Honor.

25        THE COURT:  Overruled.

```
 1    Q.    (BY MR. VITAL)  All right.  So you saw in the exchange

 2    that he stated that you owed him money, in the text -- or

 3    Skype chat exchange, which was Plaintiffs' Exhibit No. 13 or

 4    16.  You saw that earlier?

 5    A.    Yeah.

 6    Q.    Okay.  So are -- This will just be yes or no, and I will

 7    be done with it.  Did you owe him money that you didn't pay

 8    him or not?

 9    A.    No.

10    Q.    Okay.  But you lost the channel, and to get the channel

11    back you had to pay money to him.  Right?

12    A.    We couldn't keep the case going.  We were out of money

13    and we had to end it quick.

14    Q.    You settled the case.  Right?

15    A.    Yes.

16    Q.    And you paid this young man and his family $30,000 to get

17    control of the channel back.  Right?

18    A.    That was their legal fees.

19    Q.    But you paid -- They didn't pay your legal fees, did

20    they?

21    A.    No.

22    Q.    You paid their legal fees.

23    A.    Yes.

24    Q.    Okay.  To get the channel back.

25    A.    Yes.
```

1    Q.    All right.  You lost the channel to Drew Lovinger as a

2    result of poor management of the channel.  Is that fair?

3    A.    No, it wasn't the result.  It was because it got hacked.

4    He stole it.  Just like someone's car gets stolen, a channel

5    can get stolen.

6    Q.    A channel got stolen, and instead of -- you are saying

7    this kid hacked the channel for no justifiable reason, and you

8    ended up paying him to get your channel back.  Is that what

9    you are telling the jury?  Yes or no.

10   A.    Yes.  It was a series of unfortunate events, but yes,

11   that's what happened.

12   Q.    Now, before the channel was hacked, the channel had a

13   deal with Machinima.  Correct?

14   A.    Yes.

15   Q.    And the deal with Machinima was somewhere between 3 CPM

16   to 3.5 CPM.  Correct?

17   A.    I don't remember the exact deal.

18   Q.    Well, isn't that a good reason that we have paper?

19   Because you put things in paper and in writing, and though you

20   don't remember them, we can see what you wrote?

21   A.    I mean, you can see what I wrote in the Ty contract,

22   yeah, but I don't see you guys having the original Machinima

23   contract or anything.

24   Q.    Well, that's kind of a technicality or a gotcha.  The

25   question is not whether we have the contracts, but whether we

1    can rely on your word.  Are we able to rely on your word?

2    A.    Yeah.

3    Q.    All right.  So if I don't have a contract here, but as an

4    honorable person you are telling me I can rely on your word,

5    can I rely on your word that the channel was signed to a 3 to

6    3.5 CPM deal with Machinima?

7    A.    My word was that I don't remember.

8    Q.    Say again?

9    A.    That I don't remember.

10   Q.    Even though we went through a series -- I think your

11   lawyer said thousands and thousands or over a thousand lines

12   of Skype chats, some of which refer to the deal out of your

13   mouth as 3.5 CPM?

14   A.    Well, the deal could have changed.  It was four years

15   ago.

16   Q.    I understand the deal could have changed, but the deal at

17   the time was 3 to 3.5 CPM, based upon your word.  Right?

18   A.    It could have been at the start and then changed, but

19   that's what me and Ty put in the contract, yeah.

20   Q.    All right.  So that's, yes, 3 to 3.5 CPM in 2012 with

21   Machinima.  Correct?

22   A.    Okay.  Yeah.

23   Q.    Okay.  And if the deal was worse than that later on, it's

24   because you lost control of the channel.  Right?

25   A.    It was done with Machinima after that, yeah.

```
 1   Q.   Because Andrew Lovinger got a deal with somebody else.

 2   Correct?

 3   A.   As soon as he took it it was done, yeah.

 4   Q.   And his deal was not as good as 3 to 3.5 CPM, was it?

 5   A.   I don't think so, but I don't know.

 6   Q.   And notwithstanding that, the channel still made up to or

 7   between $120,000 to $150,000 in 2013.  Correct?

 8   A.   It saw extreme growth that year.

 9   Q.   Now, the fact that the channel lost its deal with

10   Machinima is not David Tyler Moss' fault, is it.

11   A.   It is.  All that stuff he was telling them, he got me

12   fired.  He did a lot of damage with the reputation of

13   Machinima.  He even also told the hacker that, "Oh, well,

14   okay.  Go for it."  And once the hacker got it, he told Ty,

15   "See ya."  And that's why Ty disappeared for those two years.

16   But yeah, it did have a lot to do with Ty, everything being

17   messed up with Machinima.

18   Q.   So did it not have anything to do with the fact that you

19   lost control of the channel?

20   A.   No.

21   Q.   Okay.  Well, when you got the channel back, you didn't

22   have a deal with Machinima anymore.  Is that right?

23   A.   Well, after what happened with them and I got fired, the

24   relationship there was done.

25   Q.   Do you understand what the word -- the phrase personal
```

1    responsibility means?

2    A.    Yes.

3    Q.    Okay.  You have some responsibility here that you need to

4    account for.  Isn't that true?

5    A.    For getting hacked or for what?

6    Q.    For the fact that the channel started off at 3 to 3.5

7    CPM, and based upon how you dealt with and treated people, we

8    are at the point where possibly you are saying the channel is

9    not as valuable as it should be.

10    A.    Repeat that one more time.

11    Q.    Are you accountable in any way for any failures that have

12    occurred with respect to VideoGames?

13    A.    I would say no.

14    Q.    Not one bit.

15    A.    No.  Like I said, a series of unfortunate events.

16    Q.    Isn't it true that in order to upload videos to the

17    VideoGames YouTube Channel, there has to be access to the

18    channel?

19    A.    Yeah.

20    Q.    So Andrew Lovinger was a content creator, was he not?

21    A.    He was -- Creator is the videos that go up, the people

22    who made them.  He was an uploader, is the best way to put it.

23    Q.    So to be an uploader, he would have to have access to the

24    account.  Right?

25    A.    Yes.

1    Q.    Which means he would have to have credentials to the

2    account.  Right?

3    A.    Yes.

4    Q.    So if David Tyler Moss gave him credentials to the

5    account, that would be entirely consistent that someone needed

6    to have access to the account to upload videos.  Is that

7    right?

8    A.    Yes.

9    Q.    Now, after multiple weeks going back and forth with you

10   asking many times to have David Tyler Moss make an investment

11   and then him asking a lot of questions and then eventually

12   making that investment, you all signed a contract.  Right?

13   A.    Yes.  I admitted that.

14   Q.    Which is Plaintiffs' Exhibit No. 2, which are going to

15   put on the document cam.

16        Now, Plaintiffs' Exhibit No. 2 are the terms that you and

17   David Tyler Moss agreed to regarding the partnership that you

18   all entered into.  Is that correct?

19   A.    Yeah.

20   Q.    And you understand that in the United States of America

21   you are able to write the terms by which you want to interact

22   with another person.

23   A.    Yes.

24   Q.    And that's what you did here.

25   A.    Yeah.  I went on Rocket Lawyer, I got a template, and I

1    put my name, his, and whatever else was needed.

2    Q.    And that was -- That document, Plaintiffs' Exhibit No. 2,

3    expressed the terms and the intention of you for how this

4    partnership would operate.  Right?

5    A.    For both of us, yeah.

6    Q.    For both of you.  That's fair.

7    A.    Yeah.

8    Q.    Now, in this document, Plaintiffs' Exhibit No. 2, you

9    stated what your obligations were, what you were supposed to

10   do.  Is that correct?

11   A.    That's true, yeah.

12   Q.    And you stated what my client David Tyler Moss was

13   supposed to do.  Right?

14   A.    That's true, yeah.

15   Q.    Now, we've heard your lawyer talk about this lawsuit that

16   we've talked about the Lovingers.  Right?

17   A.    Correct.

18   Q.    And that you came out-of-pocket and you spent some money.

19   Right?

20   A.    For the lawsuit?

21   Q.    Yes.

22   A.    Yes.

23   Q.    And you had expenses associated with that.  You have to

24   hire lawyers like us when you go to court.  Right?

25   A.    Yes, sir.

```
 1   Q.   And we charge you a lot of money, don't we?  We can agree

 2   on that.

 3   A.   Of course.

 4   Q.   Okay.

 5   A.   Some more than others.

 6   Q.   That's true, too.

 7        The fact is, what you did not do in this agreement is you

 8   did not tell my client in the document where we expressed the

 9   obligations of the parties that he had to take care of any

10   expenses, did you?

11   A.   I didn't, but it was implied.

12   Q.   Oh, it was implied.  Is that -- Is the implication

13   somewhere in this document?

14   A.   You'd hope there'd be some ethics in business.

15   Q.   My question to you is you signed a document --

16   A.   I don't see it in that agreement, no, but I just said it

17   was implied.

18   Q.   You say it was implied, but it's not on the black and

19   white written page that the ladies and gentlemen of the

20   jury --

21   A.   Oh, okay.  Sure.  I agree.

22   Q.   Okay.  And, as a matter of fact, the reason that it's not

23   in there and the reason it is not implied is because you

24   represented to him before he signed this document, Plaintiffs'

25   Exhibit No. 2, that he could do absolutely nothing, didn't
```

1    you?

2    A.    I said that, yeah.

3    Q.    So if my client signs a document based upon that

4    representation, is he entitled, in your view, to be able to

5    rely on your word that he can sign this document and be able

6    to do absolutely nothing?

7    A.    If the channel gets stolen and he does nothing, what does

8    that say about him?

9    Q.    I'm asking you is he entitled to rely on your word before

10   he enters --

11   A.    It depends all on the circumstance.  What does nothing

12   mean?  If the house goes on fire, are you going to leave when

13   someone says don't leave.

14   Q.    So is that yes or no?

15   A.    I'm sorry.  No.  It all depends on the circumstance.

16   Q.    So he's not entitled to rely on your word.

17   A.    I didn't say no to that.  I said it depends on the

18   circumstance.  You know, if the channel got hacked, and he

19   said, "I don't care; whatever," and he disappears for two

20   years, then, yeah, it is common sense.

21   Q.    Was it common sense that if you tell him he can do

22   absolutely nothing, that he should be able to do absolutely

23   nothing?

24   A.    If business is going and if the channel is going as

25   planned, yeah, but if it gets stolen and he doesn't care, then

1    what does that say about him?

2    Q.   Is it fair that he can sign a written document and rely

3    on what the written document says he can and doesn't have to

4    do, and if it's silent to --

5    A.   We said nothing in the Skype chats -- it didn't say in

6    the agreement nothing.  Obviously if the channel gets stolen

7    and he does nothing, what does that say?

8    Q.   I have to finish my question.

9         My question to you is, and this is the final question I

10   will ask on this subject before showing you the Skype chat is,

11   is he entitled to rely on the written contract as well as the

12   things that you told him before he entered into that contract?

13   A.   Written contract, yes.

14   Q.   And the written contract does not say a word about him

15   having to share any expenses, including attorneys' fees.

16   Isn't that true?

17   A.   That's true, yeah.

18   Q.   And if you made a bad deal with my client, whose fault is

19   that?  Is that my client's fault or your fault?

20   A.   Both.

21   Q.   Remember we talked about personal responsibility?  Isn't

22   it your -- If you make a deal for yourself that you wish was

23   different, isn't that your fault?

24   A.   Both.  I knew what I was getting into.  He knew what he

25   was getting into.  When stuff went wrong and he didn't care,

1    what does that say about him?  When he was gone for three

2    years --

3              THE COURT REPORTER:  I'm sorry.  You really need to

4    slow down.

5              THE WITNESS:  When he was gone for three years and

6    didn't care about nothing, what does that say about him?  When

7    he harassed me and threatened me for years, what does that say

8    about him?

9              MR. VITAL:  Objection; non-responsive, Your Honor.

10             THE COURT:  Sustained.

11             MR. VITAL:  I am in Plaintiffs' Exhibit No. 13.  I

12   am at page 8.

13             MR. WILSON:  It has already been admitted, Your

14   Honor.  No objection from the Defense.

15             THE COURT:  Thank you.

16   Q.   (BY MR. VITAL)  The contract that you signed, and if you

17   need to look at it I'll bring it to you, but you signed the

18   contract on May 21st, 2012.  Correct?

19   A.   Yes.

20   Q.   And so did David Tyler Moss.

21   A.   Yes.

22   Q.   And six days before he signed the contract, there were

23   these Skype chats about you telling him, "Well, with this

24   honestly, you make money without doing absolutely anything."

25   Right?

```
 1              THE COURT:  What is it, Mr. Wyde?

 2              THE WITNESS:  As long as the business is in tact,

 3    yes.

 4              MR. WYDE:  I was concerned when I was standing up

 5    here that maybe some of the jurors weren't able to see around

 6    us.  Is it acceptable if any of the jurors want to move they

 7    can move to other chairs?

 8              THE COURT:  That's fine.

 9              MR. WYDE:  I'm a little bigger than Mr. Vital, so I

10    was worried that maybe I was casting a bigger shadow.

11              THE COURT:  That's fine.

12              MR. VITAL:  Thank you very kindly.

13    Q.   (BY MR. VITAL)  So you did say absolutely nothing.  And

14    then you added in the contract that he can be an advisor.

15    Right?

16    A.   Yes.

17    Q.   And in your last answer you added some language that was

18    not in the Skype chat.  Is that right?

19    A.   About stuff being implied.

20    Q.   Okay.  Isn't it true--I'm transitioning for a moment to

21    Mr. Keating--that Mr. Keating signed his contract with you

22    using EchoSign?

23    A.   No, that's not true.  That was not an EchoSign agreement,

24    the one that he put in there.  It was something with a pen.

25    And I even said in the Ty chats I do all my contracts through
```

1  EchoSign.

2          THE COURT:  Just a second.  Put the microphone back

3  on the table, if you would.  Your voice is loud enough we can

4  pick it up.  When you put it that close and it distorts it, I

5  can't understand you.

6      Could you say that again?

7          THE WITNESS:  I apologize.  Can everyone hear me if

8  I talk like this?

9          THE COURT:  Uh-huh.

10          THE WITNESS:  I was just trying to be clear.

11          THE COURT:  I understand.

12          THE COURT:  Could you answer that again?

13          THE WITNESS:  Could you ask it again.

14  Q.  (BY MR. VITAL)  Isn't it true that Brandon Keating signed

15  his agreement with you using EchoSign?  Yes or no.

16  A.  No, that was not an EchoSign agreement.  The Ty one was.

17  His wasn't.  His was something that he put together himself

18  and filled out my signature in a pen.

19  Q.  Let me ask you this.  Isn't it true that via text

20  messages you confirmed that you signed the contract?

21  A.  With who?

22  Q.  With Mr. Keating.

23  A.  No.

24  Q.  Okay.  But you know what EchoSign is.  Right?

25  A.  Yes.  And, as I said, that agreement he showed is not --

1          MR. VITAL:  Objection, Your Honor.  It is

2   non-responsive.

3          THE COURT:  What is the question--Does he know what

4   EchoSign is?

5   Q.   (BY MR. VITAL)  Do you know --

6   A.   I know what it is, yes.

7   Q.   And EcoSign allows you, if you wanted to, to log into

8   your computer right now to see agreements that you have

9   signed.  Is that right?

10  A.   Yes.

11  Q.   Okay.  Likewise, if my client has an EchoSign account --

12  A.   It would need to show also my email in that account; not

13  just the document that he puts in there.

14  Q.   I wasn't finished asking my question.

15  A.   I had to say that.

16  Q.   Are you done?

17  A.   For now.

18  Q.   Okay.  Let me restart.

19         So if my client has an EchoSign account and logged into

20  this courtroom, and he EchoSigned the agreement that you deny

21  on May 11, 2012, that would be in the EchoSign account,

22  wouldn't it?

23  A.    If he writes my signature then puts it in there, or if he

24  puts anyone's signature and puts it in there, yeah, sure, it

25  would.  I admitted to the Ty agreement.  I will never admit to

101

1    the Brandon one, no matter how -- what he did or anything.

2    I'll never admit to it.  I admit to the Ty one.

3    Q.    And the reason you won't admit to it --

4    A.    Is because it never happened and he made it up.  That's

5    why.

6    Q.    The reason you won't admit to it is because if you admit

7    to that, these gentlemen collectively have 60 percent and you

8    have no control over the channel.

9    A.    That's not true at all.  Brandon is the biggest liar I

10    know, and he made it up and he joined this case months later

11    as a plan with Ty.  I admitted to working with Ty.  I admitted

12    the Ty dealings.  I'll never admit to any dealings with

13    Brandon.

14    Q.    So isn't it true that, based upon the testimony you are

15    giving this jury, that Mr. Keating would have had to have

16    hatched this lie or conspiracy back in May of 2012?

17    A.    No.  He could put any -- you can put any date on a

18    contract and put it to the program.  You can put 1985.

19    Q.    Well, doesn't EchoSign keep a record of when it is you

20    EchoSign contracts?

21    A.    Yeah.

22    Q.    So basically you're telling this jury, if they in this

23    courtroom see a contract EchoSigned by him with you in May of

24    2012, that he must have hatched this lie back in May of 2012.

25    Is that what you are telling the jury?

102

```
 1   A.   That could be the case.  I don't think that happened, but

 2   that could be the case.

 3   Q.   Okay.  Isn't it a fact, sir, that the contract with Mr.

 4   Keating does exist and it mentions $1500, and you actually

 5   paid him back his $1500 like you paid Mr. Moss back his $1500?

 6   A.   I will clarify that.  Me and Brandon had some business

 7   with the Team Noble channel.  It had something to do with

 8   that.  And I said that in the deposition also.

 9   Q.   But isn't it true that the document, the PayPal

10   transaction, made reference to the fact he was being paid back

11   for VideoGames?

12   A.   I said it came from money from VideoGames.

13   Q.   All right.

14        MR. VITAL:  May the record reflect I always help

15   Mr. Wyde with his exhibits?

16        I'm at Plaintiffs' Exhibit No. 56.

17        May I approach the witness, Your Honor?

18        THE COURT:  You may.

19   Q.   (BY MR. VITAL)  I'm handing you Plaintiffs' Exhibit

20   No. 56.  Those would be PayPal transaction records involving

21   you and Mr. Keating.  Is that right?

22   A.   Yes.

23        MR. VITAL:  Offer Plaintiffs' No. 56 into evidence.

24        THE COURT:  Any objection?

25        MR. WILSON:  Your Honor, did the witness look at
```

1    both pages?

2        No objection to 56, Judge.

3            THE COURT:  They are admitted.

4            MR. VITAL:  I am going to place it on the elmo, if I

5    may, Your Honor.

6            THE COURT:  You may.

7    Q.  (BY MR. VITAL)  So the first page of Plaintiffs' Exhibit

8    No. -- This is a screenshot of the PayPal transaction.  Right?

9    A.   Yes.

10   Q.   Okay.  And this PayPal transaction is between you and

11   Mr. Keating.  Correct?

12   A.   Yes.

13   Q.   And you are paying Mr. Keating $1500.  Is that correct?

14   A.   For something to do with Team Noble, yes.

15   Q.   It just happens to be the exactly same amount in the

16   contract that you are denying.  Right?

17   A.   Well, I mean, it is convenient for him to put it there,

18   yeah, but -- Yeah.

19   Q.   Okay.  And payment is made November 15, 2012.  Right?

20   A.   Yeah.

21   Q.   And when you make these payments, you are able to say

22   what the payment -- you are able to put a subject for the

23   transaction, are you not?

24   A.   The subject is what your PayPal name is, and my business

25   name on PayPal was VideoGamesYT.

1    Q.    The subject says, "VideoGamesYT has just sent you $1500

2    USD with PayPal."  Right?

3    A.    If you sent money, it would say, "Victor has sent."

4    Whoever has sent it is what it says.

5    Q.    But the bottom line is the business that you were running

6    at the time was VideoGames.  Right?

7    A.    Among others, yeah.

8    Q.    Team Noble had been terminated.  Correct?

9    A.    At that time, no, it hadn't.

10    Q.    Okay.  When do you think it was terminated?

11          MR. WILSON:  Your Honor, I ask that counsel rephrase

12    the question.  Team Noble, or do you mean VideoGames?

13          MR. VITAL:  No, I meant Team Noble.  He is

14    attributing this to Team Noble.

15          THE WITNESS:  I don't recall when Team Noble was

16    terminated.  It was a few years ago, but I don't remember the

17    exact time.

18    Q.    (BY MR. VITAL)  Are we able to look somewhere and find

19    that?

20    A.    The exact time it was terminated?

21    Q.    Yes, sir.

22    A.    Look.  Sure.

23    Q.    Where could we look?

24    A.    I am asking you.

25    Q.    You are going to have to help me out.  Where would we

105

1    look to see when the channel was terminated?

2    A.    I wouldn't know.

3    Q.    You just said that we could look to find when the channel

4    was terminated.  Right?

5    A.    I said look.  That's what I said.

6            MR. VITAL:  May I have a moment, Your Honor?

7            THE COURT:  You may.

8    Q.    (BY MR. VITAL)  Okay.  Now, in response to my last

9    question, you told me that this $1500 payment had something to

10   do with Team Noble, which is now terminated, but you can't

11   tell the jury when it was terminated.

12   A.    My best guess is 2013.

13   Q.    Okay.  And what you told the jury is that -- How does

14   this subject get created, again, according to you?

15   A.    It's the person's name.  If my name on there was Marko,

16   if it was Victor, whoever's name is on there is the name it

17   says was sent something.

18   Q.    Right?

19   A.    It's not something you type out.  It is your name on

20   there.

21   Q.    Well, what if it said, "VideoGames royalties"?

22   A.    What if?  What's the question?

23   Q.    If it said, "VideoGames royalties," how would that get

24   there?

25   A.    Well, I explained I paid him with money that I earned

1    from VideoGames.

2    Q.   All right.  So -- Because on this next page of the PayPal

3    transaction, there is a record of -- in January 2015 --

4    January 15, 2013 you paid him $4,000.  Right?

5    A.   Yeah.  You can also see gmail.com right there.  It's

6    pretty clear.

7    Q.   And it says -- the subject says, "VideoGames royalties."

8    Right?

9    A.   Yes.

10   Q.   Okay.  And isn't this case about the payment to my

11   clients, these gentlemen, of royalties from the revenue stream

12   of VideoGames?

13   A.   I paid him money I earned from VideoGames.

14   Q.   That wasn't my question.  I'm asking you, isn't this case

15   about the payment of royalties, 30 percent to each of these

16   gentlemen, as they claim, from the revenue stream of

17   VideoGames?

18   A.   For Ty, yes.  For Ty.

19   Q.   But you understand that Brandon Keating also claims to be

20   entitled to royalties, 30 percent, from VideoGames.  Right?

21   A.   A big businessman who does his dealings over Skype and

22   some supposed chats; yeah, that Brandon.

23   Q.   Okay.  That was a little different than what I asked.

24   The question I asked is, isn't it true that the claim in the

25   case against you, sir, is that my client Brandon Keating --

107

 1    You have to let me finish.  My client Brandon Keating claims

 2    30 percent of the royalties -- a 30 percent royalty on the

 3    revenue stream from the channel.  Right?

 4    A.    He claims that, sure.

 5    Q.    And he claims that, and in a transaction that the jury

 6    has in evidence of a PayPal record, when you sent him $4,000

 7    at the beginning of 2013, the subject says, "VideoGames

 8    royalties."  Right?

 9    A.    I see Team Noble up there also, so think what you want.

10    Q.    Does it say -- Okay.  It says what it says.  You see

11    VideoGames.

12    A.    It says that, and it says teamnoble.com.

13    Q.    So a fair question would be that Plaintiffs' Exhibit

14    No. 56, the second page, just happens to say the exact same

15    thing that this gentleman's case is about to these ladies and

16    gentlemen of the jury.  Right?

17    A.    Whatever.  Sure.

18    Q.    I'm going to ask you a number of statements.  I'd like

19    you to tell me if you've made these statements to Mr. Keating.

20    Okay?

21    A.    Where are the statements from?

22    Q.    They are from you.

23    A.    I know, but on what?  On what platform?

24          THE COURT:  You don't get the ask the question,

25    Mr. Princip.

1          Go ahead and ask your question.

2               MR. VITAL:  Thank you very kindly, Your Honor.

3   Q.   (BY MR. VITAL)  Isn't it true that you told Mr. Keating

4   that you are -- that Mr. Keating is an owner of VideoGames?

5   A.   No.

6   Q.   Isn't it true that you told Mr. Keating that on $11,000

7   of revenue he was entitled to a payment of $3300?

8   A.   I told him to kick rocks, so no.

9   Q.   Isn't it true that you acknowledged to Mr. Keating in

10  electronic communications that there was a contract between

11  you and Mr. Keating?

12  A.   No.

13  Q.   Did you tell Mr. Keating that moving forward -- Let me

14  give you a time frame.  In June of 2014, do you recall telling

15  my client in June of 2014 that you intended, moving forward,

16  to work together with him?

17  A.   No.

18  Q.   Do you recall giving a deposition in this case where you

19  acknowledge saying that, but you said it was a lie?

20  A.   Repeat that.

21  Q.   Do you recall giving deposition testimony in this case

22  where you acknowledged making the statement that you intended

23  to work together with Brandon, but you stated that you were

24  lying?

25  A.   That I intended to work with him but I was lying.

1  Q.   That -- You acknowledged that you had made a statement

2  that you intended to work with him or about working with him,

3  but that you were lying.

4  A.   The suit was filed in 2014, so why would I say that?  No.

5  Q.   So did you -- You don't recall, just to refresh your

6  memory as a reference point, in a deposition telling --

7  stating on the record that you had lied about something you

8  said previously?

9  A.   What exactly?

10  Q.   So you only gave one deposition in this case.  Right?

11  A.   I want to know exactly what I said, what I lied, what do

12  you think.  That's what I want to hear, before I just say yes,

13  oh, yes, yes.

14  Q.   You only gave one deposition in this case.  Right?

15  A.   Yeah.

16  Q.   And during that deposition I wasn't present but Mr. Wyde

17  was there.  Is that correct?

18  A.   Yes.

19  Q.   And he was there with another gentleman that he was

20  previously working with.  Correct?

21  A.   Hunter Reed, yes.

22  Q.   And your lawyer was there.  Correct?

23  A.   Yes, he was.

24  Q.   So you were legally protected.

25  A.   Yes.

```
 1    Q.   I saw you think a second on that.  Sorry.  That was

 2    inappropriate.  I shouldn't have said that.

 3    A.   I was trying to remember the other name of the other

 4    lawyer.

 5    Q.   I am apologizing to you.  That was inappropriate.

 6         Let me cut to the chase.  Do you recall in the deposition

 7    -- I have an incorrect reference.  Let me ask you a different

 8    question regarding working.

 9         Did you tell anyone in that deposition that you were

10    working with Jon Brandt?

11    A.   No.

12    Q.   Okay.  You don't recall -- Now, just for reference point,

13    Jon Brandt is a person whose name appears on the contract that

14    you deny.  Right?

15    A.   Yes.

16    Q.   And in your deposition the subject of Jon Brandt came up,

17    and who is Jon Brandt.  Correct?

18    A.   Yes.

19    Q.   And in the deposition it was your position that you had

20    no idea who Jon Brandt was.  Right?

21    A.   Yes.

22    Q.   And it's fair, is it not, that the reason that you deny

23    the existence of Jon Brandt is because by denying Jon Brandt,

24    you are able to deny that you are party to the contract that

25    Mr. Keating claims?
```

111

1   A.   Well, Brandt denied that contract is real also, so.

2   Q.   Well, isn't it true that as you were negotiating with my

3   client regarding Jon Brandt, that my client insisted that Jon

4   Brandt sign the contract and you forged a signature for Jon

5   Brandt?

6   A.   That's not true at all.  Brandt says that contract never

7   happened and so do I.  Two against one.

8   Q.   Well, isn't it true in your deposition you were asked

9   about this very subject about working with Jon Brandt?

10   A.   Yes.

11   Q.   And you were asked a question, "Have you ever worked with

12   Jon Brandt?"

13        Your answer was, "No.  If I said I worked with him in

14   this thing"--which was an exhibit--"I was lying to Brandon.

15   Did I actually work with him?  No."

16        Do you recall giving that testimony?

17   A.   I recall the testimony.  I don't recall that exact

18   statement.

19             MR. VITAL:  May I approach the witness, Your Honor?

20             THE COURT:  You may.

21   Q.   (BY MR. VITAL)  Actually I'm going to start at 52.  I

22   would like you to tell me if I am reading correctly from page

23   52, starting at line 17.

24        You were asked a question, "So you haven't worked with

25   Jon Brandt since 2011?"

```
 1        Your answer was, "I don't remember ever working with Jon

 2   Brandt."

 3        Do you see that?

 4   A.   Yeah, I do.

 5   Q.   And then you were asked, "Then why did you type it?"

 6        Your answer was, "I was -- I was just referring to this

 7   agreement and I was trying to end everything with Brandon."

 8        Did I read that correctly?

 9   A.   His lawyers were making me read -- just read off of the

10   page.  That's why I kept "It's saying here.  It's saying

11   here."

12   Q.   Did I read that correctly?

13   A.   You read it, sure.

14   Q.   And then the question was, "Okay.  I -- I'm confused, and

15   so why don't we just get like what we call a final answer.  Do

16   you know a Jon Brandt?"

17        And your answer was, "No."

18        Then the final question, "Have you ever worked with Jon

19   Brandt?"

20        Your answer was, "No.  If I said I worked with him in

21   this thing, I was lying to Brandon."

22        Did I read that correctly?

23   A.   You did.  I was just reading what they gave me.

24   Q.   And in the testimony we just read, you made reference to

25   the fact that you actually did say something about an
```

```
 1    agreement and that you made statements to Brandon because you

 2    just wanted to end everything with Brandon.

 3    A.   Say that one more time.

 4    Q.   Isn't it true that you were lying about Jon Brandt

 5    because you wanted to end everything with Brandon?

 6    A.   As I said before, I don't really know a Jon Brandt at

 7    all.

 8    Q.   Well, when you testified in the deposition that I just

 9    read to you and said -- the question was, "Then why did you

10    type it?"

11         Your answer was, "I was -- I was just referring to this

12    agreement."

13         When you said "This agreement, and I was trying to end

14    everything with Brandon," this agreement is the very agreement

15    that my client claims.  Isn't that true?

16    A.   I said in that thing that I don't know Jon Brandt, and

17    I'll say it now that I don't know Jon Brandt.  I still don't

18    understand what your question is.  I don't understand what

19    your question is.

20    Q.   My question is, sir, when you said -- when the question

21    was put to you, "Then why did you type it?"

22         And you answer, "I was -- I was just referring to this

23    agreement, and I was trying to end everything with Brandon,"

24    by this agreement you were referring to the very agreement

25    that my client claims.
```

114

```
 1   A.   I was reading what they gave me.  I couldn't object to
 2   anything.  I was just reading off of it.
 3   Q.   This agreement that they put in front of you was the
 4   agreement that you are now denying.  Correct?
 5   A.   Not now.  Always.
 6   Q.   But when it says "this agreement" -- Sir, what I'm trying
 7   to ask you is, when you said "this agreement," you are
 8   referring to the agreement that you deny now.  Correct?
 9   A.   This agreement you're showing me.  What they're showing
10   me, I say, "No.  What you're showing me, no."
11   Q.   Well, when they showed you that agreement, you were
12   referring to that agreement, the one with Brandon that he
13   claims, when you said, "I was referring to this agreement and
14   I was trying to end everything with Brandon."
15   A.   All this drama, yes.
16   Q.   So you were trying to end everything with Brandon by
17   lying to Brandon about Jon Brandt.
18   A.   We had no talks about Jon Brandt or anything to do with
19   Jon Brandt.
20   Q.   Isn't that what we just read; that you said that you --
21   A.   What we just read is "Do you know Jon Brandt?"  And I
22   said, "No."
23        So where is this going.
24   Q.   If you will listen to me very closely.  I'm trying to
25   make sure we understand your testimony as clarified in your
```

```
 1   deposition.
 2        Isn't it true that what's going on here is you claim that
 3   you're lying to my client about Jon Brandt because you're just
 4   trying to end everything with him regarding the agreement that
 5   you are now denying?
 6   A.   I said that I don't know Jon Brandt, yes.
 7   Q.   And you acknowledged that you were lying.
 8   A.   About what?  Jon Brandt or what?
 9   Q.   When you gave this deposition, can we rely on this
10   deposition as the truth?
11   A.   Yeah, you can.
12   Q.   So if you said you were lying, were you lying?
13   A.   About Jon Brandt or what?  I didn't say I am lying in the
14   deposition about Jon Brandt.
15   Q.   "If I said I worked with him in this thing, I was lying
16   to Brandon."
17   A.   It's not fair to put things out of context.
18   Q.   Okay.
19   A.   Are you trying to make me say something?  I mean, what?
20   Q.   I'm going to go back to seeing if you agree with certain
21   statements or if you are going to deny them.
22        What led us to that was I asked you if you would agree or
23   admit that you in the past in conversations with my client
24   have acknowledged a contract with him, and you said no.
25   Right?
```

116

1    A.    Yes.

2    Q.    Do you recall asking my client back in 2014, "Can you

3    email me a copy of the contract between us?  The last time I

4    saw it was just when I signed it, whenever that was"?

5    A.    I don't recall saying that.

6    Q.    Could you have said it and you just don't recall?

7    A.    As I recall, no.  I will say yes or no.  Sorry.

8    Q.    So your answer is you did not make that request to

9    Mr. Keating to send you a contract between the two of you

10   because the last time you saw it was when it was signed,

11   whenever that was?

12   A.    No.

13   Q.    Do you recall that there was some, you might call it

14   drama, or arguments back and forth between Mr. Keating and

15   Mr. Martin?

16   A.    Yes.

17   Q.    Okay.  And do you recall that that happened somewhere

18   about 2014?

19   A.    Yes, sir.

20   Q.    Okay.  And do you recall that in order to stop the

21   arguing back and forth between Mr. Keating and Mr. Martin,

22   that you sent an email to Mr. Martin--I mean to

23   Mr. Keating--confirming that he was a 30 percent owner and

24   that he should not have any further conversations with Brian

25   Martin?

1    A.    No.

2              MR. VITAL:  May I approach the witness, Your Honor?

3              THE COURT:  You may.

4    Q.    (BY MR. VITAL)  I'm handing you a document that purports

5    to be an email dated June 21st, 2014 from Marko Princip,

6    busyforawhile@gmail.com, to Brandon Keating.  Do you recall

7    this email?

8    A.    This is the one I objected.

9    Q.    You claim that this doesn't exist.

10   A.    I claim that Brandon made that.

11   Q.    Okay.  But you do admit that you had conversations with

12   Brandon Keating about Brian Martin in 2014 and attempted to

13   stop the arguments back and forth between the two of them.

14   Right?

15   A.    There was drama, yeah.

16   Q.    And did you do that by confirming to him in an email that

17   he was a 30 percent owner of the VideoGames YouTube Channel?

18   A.    No means no.

19   Q.    Okay.  And did you tell him that "I will be fully

20   transparent moving forward, and all I ask is you do not speak

21   with Brian Martin anymore"?

22   A.    No.

23   Q.    Have you ever emailed Mr. Keating?

24   A.    Maybe in the past.

25   Q.    You know he has a Yahoo account.  Right?

1    A.    Yes.

2    Q.    brandongkeating@yahoo.com?

3    A.    Yes.

4    Q.    If you have a Yahoo account and you don't delete an email

5    from your Yahoo account, will it still be in your Yahoo

6    account?

7    A.    Yes.

8    Q.    Okay.  So if there was testimony in this courtroom from

9    Mr. Keating, who has a Yahoo account, and he logs into his

10   email and there happens to be an email in there from you June

11   21st, 2014, would it be fair that it's in there because that's

12   an email that you sent to him?

13   A.    I said it before and I will say it again.  I didn't send

14   that email.  He can say what he wants.

15   Q.    Well, help me out with Yahoo.  Do they maintain their own

16   servers?

17   A.    I don't know the specifics.  I will stick to what I said,

18   no.

19   Q.    Do they give people like you and Brandon Keating access

20   to the servers to insert emails in their servers?

21   A.    I don't know.  I don't know what you're asking.

22   Q.    You know what a server is.  Right?

23   A.    Yes.

24   Q.    Okay.  A server is a platform, or it's called a storage

25   media or a mechanism or means by which electronic information

1    is stored.  Correct?

2    A.    Yes.

3    Q.    And Yahoo has their own servers.  Right?

4    A.    Yes.

5    Q.    And I hope in asking this question for my own safety that

6    Yahoo maintains tight security and firewalls, et cetera, from

7    allowing common business people like Brandon Keating from

8    hacking their servers and placing emails in there.  Is that

9    fair?

10   A.    Yes.

11   Q.    Okay.  Is it fair -- is it a fair classification of your

12   defense of Mr. Keating's claim that you're just going to deny,

13   deny, deny to make us have to prove, prove, prove everything?

14   A.    One hundred percent.

15   Q.    Okay.  And even if we prove things through emails listed

16   on servers, or contracts at EchoSign, you're still going to

17   deny?

18   A.    Till the cows come home.

19   Q.    Okay.  Do you recall telling Mr. Keating -- Let me

20   withdraw that and make sure I am asking the question right.

21        I am sorry.  This is going to be Mr. Moss, so switch from

22   Mr. Keating to Mr. Moss.

23   A.    Okay.

24   Q.    Do you recall telling Mr. Moss that VideoGames the

25   channel -- Do you remember saying the words "It was getting 22

```
 1   to 25 million views a month"?

 2   A.    Yes.

 3   Q.    Okay.  And, in fairness, that is a lot of views.  Right?

 4   A.    Yes.

 5   Q.    And that many views, on the deal that you have with the

 6   network you have, is quite valuable, is it not?

 7   A.    It's sub par.

 8   Q.    It is sub par under your management.  Correct?

 9   A.    In general.

10   Q.    Well, 22 to 25 million views on the original 3 to 3.5 CPM

11   was quite valuable.  Correct?

12   A.    Yeah.  And it ended when dealings with Ty ended.

13   Q.    Okay.  Isn't it true that as a baseline, the channel

14   makes over $30,000 a month?

15   A.    No.  You can see that in my 1099s.  Not even close.

16   Q.    But you've said that in Skype chats.

17   A.    To who?

18   Q.    To Mr. Moss.  You don't recall that?

19   A.    To Mr. -- I would like to see it.  I don't remember

20   saying that to Mr. Moss.

21   Q.    Well, without seeing it, is it true or not?  Did the

22   channel make 30,000 --

23   A.    No, it didn't.

24   Q.    Okay.  As Mr. Wyde is getting the exhibit, on the deal

25   that Brandon Keating -- that David Tyler Moss had--and it is
```

 1    this jury and the Judge will determine whether it still

 2    exists--but 30 percent of $30,000 is $10,000.  Right?

 3    A.   I said it wasn't making 30, so --

 4    Q.   I am just asking you to help me out with the -- My math

 5    is correct.  Right?

 6    A.   I mean, if you are trying to do that math, sure.

 7    Q.   Okay.

 8            MR. VITAL:  May I approach the witness, Your Honor?

 9            THE COURT:  You may.

10    Q.   (BY MR. VITAL)  I'm showing you what's marked Plaintiffs'

11    Exhibit No. 30.  Do you recall exchanging text messages

12    between yourself and David Tyler Moss?

13    A.   Yeah.

14    Q.   Okay.  That is your phone number--214-662-8246?

15    A.   At the time it was, yeah.

16    Q.   And these text messages that are being sent are being

17    sent from your phone to David Tyler Moss, whose picture

18    happens to be on the side next to his texts?

19    A.   Correct.

20            MR. VITAL:  I would offer Plaintiffs' Exhibit No. 30

21    into evidence.

22            THE COURT:  Any objection?

23            MR. WILSON:  Your Honor, I'm sorry.  I was not

24    paying attention.

25            Are you offering all 20 pages?

122

```
1                MR. VITAL:  Yes, sir.

2                MR. WILSON:  Are you going to undo those stickies on

3   it?

4                MR. VITAL:  Absolutely.

5                MR. WILSON:  Your Honor, I am not trying to do the

6   Plaintiffs' job here.  I just want to confirm -- May I give

7   the witness a clean copy and have him review all the pages to

8   confirm?

9                THE COURT:  Yes.

10               MR. WILSON:  Is that okay, Mr. Vital?

11               MR. VITAL:  Go ahead.

12               MR. WILSON:  Review that.  And he is asking you to

13  authenticate that.

14               THE WITNESS:  These are fine.

15               MR. VITAL:  Offer Plaintiffs' No. 30 into evidence.

16               MR. WILSON:  No objection from the Defense, Your

17  Honor.

18       May I approach the witness again?

19               THE COURT:  Yes.

20       It is admitted.

21               MR. VITAL:  May I proceed, Your Honor?

22               THE COURT:  Yes.

23               MR. VITAL:  Thank you very kindly.

24  Q.   (BY MR. VITAL)  I think what led us to Plaintiffs'

25  Exhibit No. 30 is, I was asking you if you had ever told this
```

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

1    gentleman David Tyler Moss that the channel made over 30 a

2    month.

3    A.    I said that, yeah.  I was trying to piss him off.  But it

4    didn't actually make that.

5    Q.    It says it right here -- I understand you say you are

6    trying to piss him off.  That's your testimony now.  But you

7    told him, "Since I got it back in January" -- That's January

8    2014 when you got the channel back.  Right?

9    A.    Correct.

10   Q.    "Over 30."  Right?  That's what you said?

11   A.    I was lying at the time that time, yes.

12   Q.    Just like you were lying to Mr. Keating when you wanted

13   to get out of his contract.  Is that the same type of lying?

14   A.    No.

15   Q.    Different lying.

16   A.    Not different lying.  No as in no to Brandon's stuff.

17   Q.    Okay.  And the reason I went back to that is that's

18   exactly what you said in your deposition--you were lying.  And

19   now you are using the same word when you are trying to deny

20   something that's in black and white--lying.  Right?

21   A.    I'm not trying to deny it.  It's right there.  I'm just

22   saying that this one wasn't true.

23   Q.    Well, Mr. Tyler, David Tyler Moss is asking you, "How

24   much is it making a month?"  Right?

25   A.    Yeah.

124

```
 1    Q.    And you said since you got it back from the kid in

 2    January 2014, over 30.  Right?

 3    A.    It says that, yeah.

 4    Q.    And it says, "I was lying about taking Drew to court."

 5    A.    Well, I said that, but that's not true.

 6    Q.    So that lie wasn't true, but the one -- Help me out.

 7    A.    The Drew case happened.  There's proof and everything.

 8    Q.    So, if I may, so I can straighten all this out --

 9              MR. VITAL:  Excuse me for the sidebar, Your Honor.

10    Q.    (BY MR. VITAL)  Let me just ask the question.  So what

11    you're saying is right now that you were lying about 30,000 a

12    month to Mr. Moss.  Right?

13    A.    Yes.

14    Q.    Is that your testimony?

15    A.    Yes.

16    Q.    But in Plaintiffs' Exhibit No. 30 when you said you were

17    lying, you were not lying.

18    A.    I don't remember what it was.  It was just something you

19    pointed in a deposition.

20    Q.    No.  Here --

21    A.    You said do I know Jon Brandt, and I said no.

22    Q.    No, this is different.  I am asking --

23    A.    You were referring to the other one also.

24    Q.    I am asking about Plaintiffs' Exhibit No. 30.  It says,

25    "I was lying about taking Drew to" --
```

```
1    A.    Sir, it says I was not lying with a correction thing.

2    Q.    I was not lying.  So you did take him to court?

3    A.    Yes.  You can see the correction thing.  When there's a

4    typo you put the little correction thing.

5    Q.    So you were not lying.  You are saying you did take him

6    to court.

7    A.    Yes.  Yes.

8    Q.    And you got the channel back.

9    A.    Yes.

10   Q.    And what you're telling David Tyler Moss in this document

11   is that you were making over 30 since you got it back.

12   A.    That's what I said.

13   Q.    But you're saying that that's not true.

14   A.    Yes.

15   Q.    Okay.  Why would you lie to him?

16   A.    About the 30?

17   Q.    Right.

18   A.    Well, because he disappeared when the channel was gone

19   and after the big fight me and him had, so -- and after me and

20   him broke up --

21   Q.    So my question was a little different.  If you lied about

22   it being over 30,000 a month, why did you tell that lie?

23   A.    To piss him off.

24   Q.    Isn't it true that you didn't lie to him, but the channel

25   actually did make 30,000 -- at least 30,000 a month?
```

1    A.    No, that is not true.  You have no proof, and it never

2    made over 30,000 a month.

3    Q.    Well, isn't the proof the document I just admitted into

4    evidence?

5    A.    The text message?

6    Q.    Remember when we started this cross examination endeavor

7    I asked you if we are entitled to rely on your word?

8    A.    Okay.

9    Q.    So pushing technicalities to the side, I understand I

10   don't have a contract with a network that I'm looking at, but

11   I have statements from you.  Is this jury entitled to rely on

12   your statements to reach conclusions in this case?

13   A.    Yes.

14   Q.    Do you recall in your deposition confirming that, at

15   least when Drew had the channel, in your deposition testimony

16   do you recall saying it was making over 30 a month?

17   A.    When Drew had the channel?

18   Q.    Do you recall being asked the question, "Over 30.  So you

19   guys were making 30 a month?" and answering, "Drew was making

20   it, yeah"?

21   A.    Yes.

22   Q.    Okay.  And you testified as such in response to the very

23   same text exchange that I just showed you earlier--Plaintiffs'

24   Exhibit No. 30.  Right?

25   A.    You are asking me about me and about Drew.  Who are you

1    asking about?  Who was making the 30?

2             MR. VITAL:  May I approach the witness, Your Honor?

3             THE COURT:  You may.

4             MR. VITAL:  I am at pages 79 and 80.

5    Q.   (BY MR. VITAL)  Starting at line 21, were you asked the

6    question, "Since I got it back in January, over 30.  I was

7    lying about taking Drew to -- I was not lying about taking

8    drew to court."

9    A.   I'm reading the text message.  I'm not saying that.

10   Q.   So you are reading it.  Right?

11   A.   He showed me the text messages and I am reading what it

12   says.

13   Q.   Okay.  So that was your answer.  Right?  You are just

14   reading?

15   A.   I am just reading it word for word what it says.

16   Q.   And after you read it word for word, the question was,

17   "Over 30.  So you guys were making 30,000 a month."

18        Your answer was, "Drew was making it, yeah."

19   A.   That's what I said, yes.

20   Q.   Okay.  Was that a truthful answer?

21   A.   Yes.

22   Q.   Okay.  So as part of the record in this case, it is fair

23   for us to reason or to assume that the channel makes $30,000 a

24   month at least.

25   A.   When Drew was running it, yes.  Now, no, and it hasn't

 1   with me, no.

 2   Q.   Didn't you just tell us that the channel was -- earlier

 3   in your testimony that under your management the channel was

 4   doing better?

 5   A.   Better than Drew?

 6   Q.   Yes.

 7   A.   No.  I don't remember saying that.

 8   Q.   Okay.  Do you recall in your deposition confirming that

 9   the channel was making in one month estimated earnings of

10   $41,000?

11   A.   No, I don't remember that.

12   Q.   And in another month $29,000?

13   A.   Those were papers that you were showing me, and I said,

14   "No, this is not true."  I remember that.

15   Q.   You said it was not true?  Is that what you think you

16   said?

17   A.   Yeah, I think that's what I said.

18   Q.   All right.

19   A.   I'm sure, actually.

20              MR. VITAL:  May I approach the witness, Your Honor?

21              THE COURT:  You may.

22   Q.   (BY MR. VITAL)  In your deposition you were shown a

23   document that at that time was called Exhibit No. 28.  Right?

24   A.   Yes.

25   Q.   You were asked a question, "Tell me what the document

1    is."

2         And your answer--tell me if I'm reading this

3    correctly--"I believe it's some VideoGames earnings."  Right?

4    A.    Yes.

5    Q.    Question, "All right.  What -- What we're dealing with on

6    the first one is August 1st to August 9.  Is that correct?"

7         Your answer was, "Yes"?

8    A.    Yes.

9    Q.    Question, "Total estimated earnings, $10,111.21."

10   A.    Yes.

11   Q.    And you said, "Yes"?

12   A.    Yes.

13   Q.    "What about for the previous month?"

14   A.    I didn't say yes to that.  I said yes that it says that.

15   Q.    I'm asking you if I'm reading this correctly.  It says,

16   question, "What about the previous month?"

17        And your answer was, "Says estimated earnings $41,000,

18   and the one before that, 29,000."

19        Did I read that correctly is my only question?

20   A.    Yes.

21   Q.    Okay.  And the next question then was, "Okay.  So for the

22   month of June, estimated 30,000; for the month of July an

23   estimated 41,000; and for the month of August, estimated for

24   the first week 10,000."

25        Answer, "Yeah."

1    A.    He's asking does the paper say that; not is that the

2    truth.

3    Q.    And then the next question was, "Safe to say that at

4    least June, July, August of 2014, videoGames is making money."

5          And your answer was?

6    A.    Not those amounts.  I said, "Yes," though.

7    Q.    "Safe to say that at least June, July, August of 2014,

8    videoGames is making money."

9          And your answer was -- what did you say?

10   A.    "Yes."  Not to those amounts, but I said yes.

11   Q.    The answer was "yeah," wasn't it?

12   A.    It's unfair when in the deposition they're asking me to

13   read off a paper, and then you make it seem as if that's what

14   I'm saying yes to when I am reading off the paper.

15   Q.    Did you, at the time you gave your deposition, say, "Sir,

16   those are not the correct earnings"?

17   A.    He said, "What does this paper say?  Does the paper say

18   yes?"  And I said yes.

19   Q.    And you said yes to all that, and in response to the

20   final --

21   A.    I said yes, as in that's what it says right there.  I

22   didn't say yes, that's the truth.  You are trying to trick me

23   here.  Where is this going?

24   Q.    The channel was making some money, and you said yeah?

25   A.    Is it making money?  Yeah, I said yes to that.  I didn't

1    say yes to those amounts.

2        If he says, "Is your shirt blue?"  If the book says, "Is

3    your shirt blue?"  And I say, "Yes, that's what the book

4    says," but my shirt is red, where is this going?

5            MR. VITAL:  Your Honor, may I approach the board?

6            THE COURT:  You may.

7    Q.   (BY MR. VITAL)  Are you able to read what I'm writing

8    here?

9    A.   Yes.

10   Q.   What did I just write for the record?

11   A.   "Over 30 per month."

12   Q.   All right.  Now, let's talk about those amounts that you

13   just testified to in your deposition that were estimated

14   earnings for the channel in 2014 in the summer of 2014.  One

15   of the amounts was 41,000.  Right?

16   A.   I was reading off the paper that you were giving me.  I

17   wasn't agreeing to it.  I mean, how -- Is that hard to

18   understand?

19   Q.   Was one of the amounts that you were reading 41,000?

20   A.   That they put there, yes.

21   Q.   Okay.  And one of the amounts was 30,000.  Right?

22   A.   That they put there, yes.

23   Q.   And one of the amounts was 29,000.

24   A.   That they put there, yes.

25   Q.   All right.  Is that 100,000, if we did the math on that?

1    I'm asking you what is 41,000 plus 30,000 plus 29,000.

2    A.   I'm going to answer I don't know, because I'm reading off

3    a paper that you gave me, and you're trying to make it seem as

4    if I agree to all that stuff, which I didn't.

5    Q.   I am asking you simple questions.

6    A.   I don't know that math.  I don't know.

7         THE COURT:  You can move on, Mr. Vital.

8         MR. VITAL:  Okay.

9    Q.   (BY MR. VITAL)  Isn't it true that 100 divided by three

10   is 33,000?

11   A.   Yes.

12   Q.   Essentially, over 30 per month?

13   A.   Yes.

14   Q.   Okay.  Do you recall giving -- making an admission in

15   this case that you and Brandon -- or you and Brian Martin have

16   kept all of the money that relates to this channel?

17   A.   What period of time?

18   Q.   Do you recall receiving or reviewing in connection with

19   the discovery phase of this case a document called "Requests

20   For Admission"?

21   A.   Yes, I remember it.  I think I signed it or whatever.

22   Q.   And in that admission, in that document you admitted or

23   you stated that you and Mr. Martin have kept all of the money

24   that relates to the VideoGames channel.  Do you remember that?

25   A.   We get the money, yeah, but we -- you know, stuff gets

1    paid.  There is expenses to business.

2    Q.   Right.  So without looking at it, do you recall -- And I

3    will look at it if we have to, but do you recall admitting

4    that Mr. Princip and Mr. Martin have both kept the money

5    earned from VideoGames YouTube Channel for yourselves?

6    A.   Since the pie--not the pie; sorry--Ty partnership was

7    terminated, yeah.

8    Q.   Okay.  And you made a statement just a few moments ago

9    that there are expenses that you have to pay for the business.

10   Right?

11   A.   Yes.

12   Q.   One of the expenses you have to pay, or one of the

13   expenses at the time you signed the agreement with my client,

14   was paying him 30 percent.  Right?

15   A.   Yeah.  Before it ended, yeah.

16   Q.   Because my client's deal was not 30 percent of earnings.

17   It was 30 percent of revenue.  Right?

18   A.   Yes.

19   Q.   Which means he had to take his off -- you had to take his

20   off the top before you paid content creators or anybody else.

21   Right?

22   A.   So your questions have to do with the Ty agreement?

23   Q.   That's what I'm asking.

24   A.   Okay.  Yes.

25   Q.   All right.

```
 1                 MR. VITAL:  May I have a moment, Your Honor?

 2                 THE COURT:  Sure.

 3    Q.   (BY MR. VITAL)  Does Mr. Martin own an interest in the

 4    VideoGames channel?

 5    A.   Yes.

 6    Q.   How much?

 7    A.   Fifty percent.

 8    Q.   Okay.  And who owns the other 50 percent, according to

 9    you?

10    A.   Me.

11    Q.   Okay.  Is it fair that what's really going on here is

12    that when you realized the channel was very valuable, you

13    wanted to squeeze or push David Tyler Moss out of the picture?

14    A.   He was pushed out of the picture because of the fight

15    before it was valuable.

16    Q.   Well, you recall that one of the exhibits was a 1099

17    regarding roughly $24,000 of earnings for the last two months

18    November-December 2012?

19    A.   Yes, sir.

20    Q.   Okay.  And isn't it true that you realized that this

21    channel was making a whole lot of money, or was bound to make

22    a whole lot of money, in November 2012?

23    A.   That's not why I kicked him out.

24    Q.   That wasn't my question.  My question is, didn't you

25    realize --
```

```
 1    A.    Yeah.  Yeah.  Yeah.

 2    Q.    And so when you realized that is the exact time that you

 3    determined that you thought you were going to somehow

 4    unilaterally void Mr. Moss' contract.

 5    A.    No.  Repeat your question so I -- It seems like five

 6    questions in one.

 7    Q.    In November of 2012, didn't you not see a Skype chat

 8    where you confirmed -- you claimed that you were voiding

 9    Mr. Moss' contract?

10    A.    Yes.

11    Q.    And the question is, you said that in the very month that

12    you determined that this channel was going to be very

13    valuable, that you were just going to somehow void his

14    contract?

15    A.    Because it was valuable.  Is that what you are asking?

16    Q.    I'm saying that's the same -- You attempted or stated you

17    were voiding his contract in the very month that you

18    determined and realized that this channel was going to be very

19    valuable.

20    A.    No.  We had a big fight.  That's what did it.  That's

21    what did it in.

22    Q.    Well, the big fight was he wanted to be paid.  Right?

23    A.    Well, the big fight was he was harassing me to Machinima.

24    The big fight had to do with him not doing anything.  And I

25    know it said in that thing not doing anything, but we had
```

136

1    things that were implied.  Even himself said, "I review

2    technology."  We had plans for him to do videos for the

3    channel.

4    Q.    So you voided his contract based upon things that were

5    implied.

6    A.    No.  I did it based on his actions a hundred percent on

7    what he did and what he kept doing.  It wasn't just, "Okay,

8    yeah, see ya, bye."  It wasn't like that.  We talked about it

9    before and there was warnings before.  It wasn't just adios.

10   I didn't say it just like that.  I didn't just kick him to the

11   curb.  There was a wind-up to it.

12   Q.    Do you recall the exchange, the Skype chat exchanges

13   where Mr. Mass is asking to be paid 30 percent of 31,150,440

14   views?

15   A.    At the time the channel didn't have that many views.  I

16   don't remember that in those Skype chats about 30 million

17   views.

18   Q.    I am sorry.  I misquoted.  It was 3,150,440 views.

19   A.    Yeah.  What you said is correct.

20   Q.    And if we drill down on that, the value of that, his 30

21   percent, based upon 3 CPM, as the chat exchange indicated, was

22   $9,450.  Right?

23   A.    Are you asking if that was to him or in total?

24   Q.    That's what the Skype chat said.  Right?  Do you recall

25   that?

```
 1   A.    I'm asking are you -- What are you asking about it?  You

 2   are just saying it.  You are not really asking anything.

 3   Q.    I am asking you that is what the Skype chat said.  Do you

 4   recall that?

 5   A.    If I owed Ty $9,000?

 6   Q.    Do you recall the Skype chat indicating that he was

 7   claiming $9,450 based upon 3,150,000 views.

 8   A.    If he was claiming that that was the total, yeah.

 9   Q.    So you recall seeing that in the Skype chat.

10   A.    Yeah, the Skype chat happened.  I admitted to it.

11   Q.    So -- And isn't it fair, for a gentleman who is entitled

12   to receive money, to make demands and ask of that money?

13   A.    I did, yeah.

14   Q.    Okay.  And isn't it fair in America that when people

15   don't live up to their obligations for --

16         Let me state it differently.  What's not fair is for him

17   to come beat you up.  That's not fair, is it?

18   A.    Correct.

19   Q.    Okay.  Break your knees.  We don't that legally in

20   America, do we.

21   A.    I won't do that either, no.

22   Q.    I'm not implying that you do.  I think we're going to

23   agree here that when people don't live up to their obligations

24   in America and people feel like they are entitled to

25   something, they can make a demand for what they're owed.
```

1    Correct?

2    A.   He hired a law firm, and I said, "I will give you what

3    owed."  And he said, "I don't want it," and then left.  So

4    what are you asking?

5    Q.   I am asking you, people are entitled to make demands for

6    what they are owed.  Correct?

7    A.   And he did with the Vial firm, and I said, "I'll give it

8    to you."  And he said, "I don't want it."  And he left for two

9    years.  So what are you asking?

10   Q.   I'm asking you, are people entitled to make demands--yes

11   or no--for what they are owed?

12   A.   Sure.

13   Q.   Okay.  And are people also entitled to hire lawyers to

14   pursue what they believe they are owed if somebody is not

15   living up to what their obligations are?

16   A.   He did that, yes.

17          MR. VITAL:  I pass the witness, Your Honor.

18          THE COURT:  Thank you.

19       This might be a good time to break for the day because I

20   don't think we will get through Mr. Wilson's questions.

21       Tomorrow morning we will start again at 8:30, if we can.

22   I will advise you the same admonitions I gave you before--not

23   to discuss the case, don't form any opinion, and don't look at

24   anything on the internet about it.

25       Have a nice evening, and please stay healthy.  We don't

```
 1   want any of you getting sick.

 2       We stand in recess.

 3            (Whereupon, the jury left the courtroom.)

 4            THE COURT:  All right.  We will pick up with the

 5   cross or direct of Marko Princip tomorrow.

 6            MR. VITAL:  Yes, sir.

 7            THE COURT:  And how are the jury instructions coming

 8   along?

 9            MR. VITAL:  I have not had a chance to work on them

10   yesterday.  I worked on them in the courtroom, but I haven't

11   had a chance to type them up.

12            THE COURT:  Maybe tomorrow?

13            MR. VITAL:  I will do that this afternoon.

14            THE COURT:  Good.

15       And Robert, have a safe trip up there.

16            MR. WYDE:  May I ask you a question, sir?

17            THE COURT:  Yes, sir.

18            MR. WYDE:  You indicated yesterday of the schedule

19   for Wednesday and Thursday, and I just wanted to ask you to

20   repeat that because I just didn't --

21            THE COURT:  Thursday morning I have that -- That was

22   that phone conference I had with Judge Rosenthal, Judge

23   Fitzwater, and some members of the bar that I'm on a panel on

24   Thursday morning, and there is just no way I can get out of

25   it, unfortunately.  I was looking at the schedule.  It says I
```

1    start talking at 10:25 and don't finish until 11:00.  And they

2    want me there for the earlier panel, so I don't see any way we

3    can start before 12:00, so we have to start at 12:30 on

4    Thursday and try to go to 5:00.

5        So at the progress we are making, what are we thinking?

6    Will we be able to get the jury the case by Thursday afternoon

7    or Friday?  Do you think you might get there tomorrow?

8            MR. VITAL:  I actually think -- I will be candid

9    here; more candid than I have to be, but just to move things

10   along.  I don't think I have any further questions of

11   Mr. Princip.  Mr. Wyde thinks we probably do.  If I'm right,

12   then Thursday is certainly doable and possible because, based

13   upon what the jury has heard now, my direct of Mr. Keating is

14   very targeted to the issue of does he have an agreement, and

15   proving up maybe one or two of the exchanges that they are

16   making a 1003 objection to.  At this point I think they

17   probably get it.

18           THE COURT:  Okay.

19           MR. VITAL:  So I am of the view Thursday afternoon

20   is possible.

21           THE COURT:  What do you think, Robert?

22           MR. WILSON:  I agree with that, Judge.

23           THE COURT:  Okay.  Good.

24           MR. WYDE:  When do you think you will be done

25   tomorrow?

1          MR. VITAL:  Hopefully I'm just gone from 1:30 to

2   2:30, or less than that.

3          THE COURT:  If we can get more time in tomorrow,

4   that would be great, and not break for the afternoon.

5          MR. WYDE:  I was just trying to ask so --

6          THE COURT:  I agree.  Let's see what we can do

7   tomorrow.

8          MR. WILSON:  Thank you again, Your Honor, for

9   allowing me the afternoon.

10          THE COURT:  No problem.  Tell judge Crone I said

11   hey.

12          (The proceedings were concluded at 12:15.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          I HEREBY CERTIFY THAT THE FOREGOING IS A

2     CORRECT TRANSCRIPT FROM THE RECORD OF

3     PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4          I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5     FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6     COURT AND THE JUDICIAL CONFERENCE OF THE

7     UNITED STATES.

8

9     S/Shawn McRoberts                04/14/2016

10    _____DATE_____
      SHAWN McROBERTS, RMR, CRR
11    FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25