```
 1                  IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF TEXAS
 2                            DALLAS DIVISION

 3   DAVID TYLER MOSS AND BRANDON   (  CAUSE NO. 3:14-CV-3088-BF
     KEATING                        )
 4                                  (
               Plaintiffs,          )
 5                                  (
     vs.                            )
 6                                  (
     MARKO PRINCIP, Individually,   )
 7   MARKO PRINCIP, d/b/a VIDEOGAMES(
     YOUTUBE CHANNEL, MARKO PRINCIP,)
 8   d/b/a GAME GUIDE, LLC,         (
     VIDEOGAMES YOUTUBE CHANNEL,    )
 9   AND BRIAN MARTIN               (  DALLAS, TEXAS
                                    )  MARCH 30, 2016
10             Defendants.          (  8:30 a.m.
     _____

11

12

13                            VOLUME 3

14

15   _____

16                       TRIAL ON THE MERITS

17              BEFORE THE HONORABLE PAUL STICKNEY
                   UNITED STATES MAGISTRATE JUDGE
18                          and a jury
     _____

19

20

21

22
                      SHAWN M. McROBERTS, RMR, CRR
23                  1100 COMMERCE STREET, RM. 1654
                         DALLAS, TEXAS  75242
24                         (214) 753-2349
                    shawn_mcroberts@txnd.uscourts.gov
25
```

<pre>
 1                      A P P E A R A N C E S

 2          FOR THE PLAINTIFFS:    WYDE & ASSOCIATES
                                   10100 NORTH CENTRAL EXPRESSWAY
 3                                 SUITE 590
                                   DALLAS, TEXAS  75231
 4                                 (214) 521-9100
                                   BY:  MR. DAN L. WYDE
 5
                                   BARNES & THORNBURG, LLP
 6                                 2100 McKINNEY AVENUE
                                   SUITE 1250
 7                                 DALLAS, TEXAS  75204
                                   (214) 258-4124
 8                                 BY:  MR. VICTOR D. VITAL

 9          FOR THE DEFENDANTS:    LAW OFFICES ROBERT D. WILSON
                                   18111 PRESTON ROAD, SUITE 150
10                                 DALLAS, TEXAS  75252
                                   (214) 637-8866
11                                 BY:  MR. ROBERT D. WILSON

12          OFFICIAL REPORTER:     SHAWN M. McROBERTS, RMR, CRR
                                   1100 COMMERCE STREET, RM. 1654
13                                 DALLAS, TEXAS  75242
                                   (214) 753-2349

14

15

16

17

18

19

20

21

22

23

24

25
</pre>

# INDEX

**EXAMINATION**

| **Witness Name** | **Page** |
|---|---|
| MARKO PRINCIP | |
| Direct By MR. WILSON | 7 |
| Recross By MR. VITAL | 46 |
| Redirect By MR. WILSON | 60 |
| BRIAN MARTIN | |
| Cross By MR. WYDE | 65 |
| Direct By MR. WILSON | 102 |
| Recross By MR. WYDE | 119 |
| Redirect By MR. WILSON | 128 |
| BRANDON KEATING | |
| Direct By MR. VITAL | 132 |

| **Plaintiffs' Exhibit** | **Page** |
|---|---|
| No. 11 Admitted Into Evidence | 69 |
| No. 53 Admitted Into Evidence | 122 |
| No. 1 Admitted Into Evidence | 186 |
| No. 3 Admitted Into Evidence | 200 |
| No. 20 Admitted Into Evidence | 204 |
| No. 18 Admitted Into Evidence | 231 |

| **Defendants' Exhibit** | **Page** |
|---|---|
| C Admitted Into Evidence | 17 |
| C-I Admitted Into Evidence | 45 |
| K Admitted Into Evidence | 110 |
| L Admitted Into Evidence | 112 |

1          THE COURT:  Did you need to meet with me?

2          MR. VITAL:  Yes, Your Honor.  This is just very

3  brief.

4      We have a 1003 challenges under the rules of evidence of

5  some of the exhibits that will have to be authenticated by

6  comparison to originals.

7          THE COURT:  Okay.

8          MR. VITAL:  This is a unique case.  Originals reside

9  on hard drives --

10          THE COURT:  Okay.

11          MR. VITAL:  -- and on other storage media.  These

12  hard drives are computers.  And in order to make my proof, I'm

13  going to need to make sure that the credentials -- that these

14  gentlemen do not log into their social media accounts, in

15  particular Skype, to change the way Skype looks right now for

16  certain accounts.  So I wanted to raise this issue.

17      For various reasons, I'm concerned about the accounts

18  being changed.  I'm not suggesting that these gentlemen would

19  do that, but out of an abundance of caution I would like Your

20  Honor to admonish the parties with respect to social media

21  accounts that are relevant to this case.

22          THE COURT:  For how long?

23          MR. VITAL:  Just for the balance of the week, or

24  until I'm able to meet the challenge to prove that the

25  documents that I'm offering as duplicates are true and correct

```
 1    copies of the originals.

 2              MR. WILSON:  Your Honor, if you're going to admonish

 3    Plaintiffs and/or Defendants related to that, I would request

 4    that that be done outside the presence of the jury.

 5              THE COURT:  I will admonish both Plaintiffs and

 6    Defendants not to log into Skype to change anything that's on

 7    the record.

 8       Now, what about logging into Skype and not changing

 9    anything?  I mean, certainly they have businesses to run

10    and --

11              MR. VITAL:  Right.  I don't have a problem with them

12    logging into Skype.  There is -- I just don't want them to

13    change their username or profiles or identifying names that

14    are associated with the accounts, because when the accounts

15    get pulled up, Your Honor -- If the profile names get changed,

16    for instance, I suspect it will make it more difficult for

17    me --

18              THE COURT:  Right.  I understand.

19              MR. VITAL:  And maybe it goes to the weight, but for

20    integrity purposes I think --

21              THE COURT:  Both the Plaintiffs and Defendants are

22    not to log in and change your username or profiles on any

23    accounts during the pendency.

24       Is that understood by Mr. Moss and Mr. Keating?

25              MR. KEATING:  Yes, Your Honor.
```

```
 1                    MR. MOSS:  Yes, Your Honor.

 2                    THE COURT:  Mr. Princip and Mr. Martin as well?

 3                    MR. MARTIN:  Yes, Your Honor.

 4                    MR. PRINCIP:  Yes.

 5                    THE COURT:  Thank you.

 6          What else?

 7                    MR. VITAL:  That's all, Your Honor.  Thank you very

 8     kindly.

 9                    MR. WILSON:  Thank you, Your Honor.

10                    THE COURT:  Are we ready to begin?

11                    MR. WILSON:  May I have just about three minutes?

12     Judge.  I'm marking these exhibits so it will move really,

13     really quick.

14                    THE COURT:  Okay.

15          All right.  Let's bring them in.

16                    (Whereupon, the jury entered the courtroom.)

17                    THE COURT:  Be seated, please.

18          Good morning.  Let me give you a little idea what we are

19     going to do today.

20          We are going continue on with the presentation of the

21     evidence in the case, and we will take a break mid morning,

22     and then we'll break for lunch.  One of the attorneys has a

23     sentencing before Judge Solis at 1:30, and we've asked Judge

24     Solis if he could take that case first so that it doesn't take

25     too long.  And then -- So we will break a little extra long
```

1    for lunch, and then when counsel gets back we will begin

2    probably around 2:30, and we will go till 4:30 or 5:00,

3    depending on the weather.

4        And I'll keep an eye on this storm front that's moving

5    in, and if it looks like we're going to get some severe

6    weather, and if it hits Fort Worth I'll get you out of here so

7    that you don't have to file a claim with your insurance

8    company for all the hail damage you got in the parking lot.

9    So we will try to do that.  We will see how it goes.  And we

10   will try to get as much done as we can today.

11       Mr. Princip was on the stand, if I remember correctly?

12           MR. WILSON:  Yes, Your Honor.  And I'm up to examine

13   Mr. Princip now?

14           THE COURT:  Yes.

15           MR. WILSON:  May I approach the lectern, Your Honor.

16           THE COURT:  Please.

17                        DIRECT EXAMINATION

18   By Mr. Wilson:

19   Q.   Good morning, Marko.

20   A.   Good morning.

21   Q.   Mr. Vital covered quite a bit of ground with you

22   yesterday, so today I'M JUST going to try AND follow up a

23   little of that and try to tighten up for our presentation of

24   the jury.  Okay.

25   A.   Yes, sir.

```
 1   Q.   You understand you are still under oath?

 2   A.   Yes, I am.

 3   Q.   Okay.  Marko, where were you born?

 4   A.   I was born in Serbia originally.

 5   Q.   Serbia?

 6   A.   Yes.

 7   Q.   And when did you come here to the United States?

 8   A.   In 1999.

 9   Q.   And are you a U.S. citizen?

10   A.   Yes, I am.

11   Q.   Okay.  And where did you graduate from high school here

12   in the Northern District?

13   A.   Plano West.  That's where I graduated from.

14   Q.   Okay.  And when did you graduate from Plano West?

15   A.   2011.

16   Q.   Okay.  And do you have any college?

17   A.   Yes.  I'm still going to college.  I'm in community

18   college now.  I go to Collin College, it's campus on Spring

19   Creek.

20   Q.   Okay.  You heard some testimony from I think Mr. Moss

21   when I was questioning him and I think Mr. Vital was

22   questioning you.  Was your first job ever as a child or as a

23   kid at 15 or 16, was it with Machinima?

24   A.   I did some help at -- My mom works at, like, a school,

25   and I was, like, helping -- you know, doing some stuff in the
```

```
 1   school cleaning and stuff, but I started doing some stuff at

 2   Machinima, yeah.

 3   Q.   Okay.  And what school does your mom work at?

 4   A.   She works at the Di Vinci School.

 5   Q.   The Di Vinci School.  Is that a private school?

 6   A.   It is, yeah.

 7   Q.   Okay.  And is your father employed?

 8   A.   Yes, he is.

 9   Q.   And what does he do?

10   A.   He works for Neiman Marcus.  He works for this company

11   called  Cle' de Peau.

12   Q.   Okay.  And do you have any other brothers and sisters?

13   A.   I have one sister.  She is younger.

14   Q.   Okay.  And does she go to high school now?

15   A.   No.  She's going to Collin, actually.  She's about to go

16   to SMU.

17   Q.   Okay.  And so today -- as you sit here today, how old are

18   you?

19   A.   I am 23 right now.

20   Q.   Twenty-three.  Okay.  So in 2012 you were what?

21   Eighteen?

22   A.   I was -- I just turned 18.  My birthday was in January,

23   and we started the talks in May.

24   Q.   Okay.  So you turned 18 in January of 2012, and then

25   that's when you were introduced to Mr. Moss on social media,
```

1    or whatever we -- this internet stuff.

2    A.    Yeah.

3    Q.    Okay.  Now, how did you get your position at Machinima?

4    A.    It was a job online, and I had a previous YouTube channel

5    that was called Team Noble, and since the channel had some

6    popularity, they were wondering if I could help recruit other

7    channels to join their network, which just means that they

8    would be paying the channels out.  So they just wanted me to

9    pass the word along.  It was just a job I did at home from the

10   computer.

11   Q.    So how old were you when you were doing this for

12   Machinima?

13   A.    I was about 17 or 18.

14   Q.    And how were they paying you?

15   A.    Usually just through PayPal.

16   Q.    And did you sign a contract with them at that time?

17   A.    I did, yeah.

18   Q.    And what were the terms of your initial relationship at

19   17 with Machinima?

20   A.    Well, there was a contract for the YouTube channel.  But

21   to put that aside, for my job it was just like a certain

22   amount per month for signing people.  Like -- it was a quota

23   type of thing.  So if I signed a certain amount of people, I

24   would get a certain amount.  If I didn't do anything, I really

25   wouldn't get anything.

1    Q.    Describe to the jury, what is or what was Machinima?

2    A.    Machinima is just -- It is an internet company, and they

3    post gaming stuff on their website, on YouTube, and they work

4    with other gaming channels, like this VideoGames one was, so

5    that they'll supply the ads for the channel which will get the

6    channel some money.  So that's the best way to describe it.

7    Q.    Do you know where Machinima's corporate headquarters are?

8    A.    I believe -- I think it moved to L.A. now, but I think at

9    the time it was in like Santa Monica, California.

10   Q.    Okay.  So am I wrong or am I right, anybody can upload a

11   YouTube video.

12   A.    Anyone.  Anyone.  Yeah, anyone.

13   Q.    And 99 percent of people don't get paid for their video

14   content, do they?

15   A.    Even more.  Probably 99.8 percent.  It's seldom few that

16   get paid on YouTube.

17   Q.    So YouTube is a domain name.  Is that right?

18   A.    Uh-huh.

19   Q.    I don't know if you even remember that term.

20   A.    It is a big website anyone can upload a video to.

21   Q.    You heard me say domain name because that was the only

22   game in town back when I was with America Online?

23   A.    That is a fair way to describe it, because every channel

24   has a different name.  It could be someone's name Susan

25   whatever, or a certain name you come up, like this one in this

1    case is VideoGames.  It could be any type of different name.

2    Q.   Okay.  So when AOL was out there in '84, '83, long before

3    you were born, we typed in a domain name and, boom, I went

4    right to that site.  If -- for your channel can I just type

5    that in on that little line box up there --

6    A.   Yeah, you can.  If you were just to type in youtube.com/

7    videogames, it would take you straight to that channel; the

8    one this case is about.

9    Q.   Okay.  And then, like I said, when I Google YouTube video

10   games, I get about at least six other responses--video games

11   video games, video games.

12   A.   That's just the first page.  There's is hundreds of

13   pages, thousands of results, there's thousands of different

14   channels.  Literally when I say anyone can do it, a

15   ten-year-old can do it.  Anyone can make a channel and do

16   those type of videos.

17   Q.   So why, for a dinosaur like me -- Because I love Google.

18   I love just typing it up, and usually I click the first one,

19   two, or three.  How do those people get to the first one, two,

20   or three slots?

21   A.   To be honest, it's not really anything to do with luck.

22   It's mostly -- The results on the internet, you know, are

23   mostly random, or they have to do with how long something has

24   been around.  It's usually based on that sort of thing.

25   Q.   Okay.  Is that a decision that Google makes as to who is

1    going to pop up first when I type in video games, or how does

2    that work?

3    A.    It's usually randomly generated.  Best way to describe

4    it.

5    Q.    Okay.  Now, you were working for Machinima, you were

6    signing up people, and how much money a month were you getting

7    from Machinima?

8    A.    It depended if I met the quota.  If I didn't meet the

9    quota, it would be 2500.  But the quota was to have 50 people

10   join in one month, which is a ton of people to reach out to;

11   and not just to reach out to, but to get to join.  So in

12   actuality I might have gotten 700 or 800 a month.  It just had

13   to do with how many people were making the quota.  Like, it

14   had, like, a tier-type of system, like if you get 10 people to

15   join, you get this much; 20, this much; 50, this much; that

16   sort of thing.

17   Q.    Okay.  So --

18         THE COURT:  Mr. Princip, you talk a little fast for

19   my court reporter.  If you would slow down.

20         THE WITNESS:  I apologize.  I will slow down.

21         THE COURT:  Thanks.

22   Q.    (BY MR. WILSON)  So with Machinima, then, when you are

23   getting paid to sign these people up, do they have to pay

24   Machinima a fee or anything, to your knowledge?

25   A.    No.  Everything -- People signing up is free.  The people

1    actually get paid from Machinima for posting their videos, and

2    Machinima will take a cut off of everything off of the top.

3    Q.    So -- Again, I'm trying to get the 30,000 foot view.  So

4    Machinima -- We've got the YouTube brand and their site.

5    Okay?  And then Machinima, are they also like a sub network --

6    A.    Yeah.  That's the best way to put it.  They're like a

7    store in a mall.  If YouTube's a mall, they're a store in the

8    mall.

9    Q.    Perfect.  Yeah.  I need that kind of help.

10       All right.  So now that I've got that, then we've got

11   Machinima in the mall, and then are you aware of any other

12   networks --

13   A.    Oh, there is a ton of them.

14   Q.    More than a hundred?

15   A.    I would say about a hundred, 200.

16   Q.    Worldwide or just here in the United States?

17   A.    Probably in the United States, and some few worldwide.

18   Q.    Okay.  Now, we talked -- Mr. Vital had asked you in 2012

19   if you had made money, and you had testified about that.

20       I'm going to show you what we have already marked as

21   Defendants Exhibit C.  And Plaintiffs' counsel has graciously

22   permitted that to be admitted as well.

23       Tell the jury what that document is.

24   A.    That's the 1099 I received from Machinima for working for

25   them, and it says how much -- exactly how much money I made in

1    that year, and that's what I took to get my taxes filed.

2    Q.    Okay.  And over here to the left, I know it's a little

3    been copied multiple times, but it says Marko Princip, and

4    it's got your address there on Windflower Way.  Is that

5    correct?

6    A.    Yes.  That's still where I live.  That's my home address.

7    Q.    Okay.  Do you own that home?

8    A.    I live with my parents.

9    Q.    Okay.  So you don't own a home?

10   A.    No.

11   Q.    You don't live in an apartment?

12   A.    No; never have.

13   Q.    You live with your parents?

14   A.    Yes.

15   Q.    Got your own room?

16   A.    Yes.

17   Q.    In your room is it set up with your computer or computers

18   how you exchange internet information and how you and Mr. Moss

19   were communicating --

20   A.    Yeah; just one bed, one computer, and a shelf.  That's

21   all that's in my room.

22   Q.    Okay.  So you don't have multiple computers scattered

23   around.

24   A.    No.  It is nothing crazy, no.

25   Q.    All right.  So in 2012 you made $28,000 on your 1099.

```
 1    A.   Yes.

 2    Q.   Is that 26 or 28?

 3    A.   I believe -- It's hard to tell.

 4    Q.   It might be 26.  It looks like maybe 26 or 28, but I've

 5    got your tax return here which I'll offer here in a minute as

 6    well.  So you get this 1099 and they send it to your house.

 7    Correct?

 8    A.   Yes, sir.

 9    Q.   Okay.  And you get this, I assume like most of us, prior

10    to January 31st of 2013.

11    A.   Yes, sir.

12    Q.   Okay.  And tell the ladies and gentlemen of the jury--I

13    know you tried a little bit yesterday with Mr. Vital--where

14    did this income get generated -- Well, strike that.

15         When did this income get generated from Machinima?

16    A.   When or where from?

17    Q.   When.

18    A.   That was generated for the year 2012.

19    Q.   Okay?

20    A.   All the money I made in 2012, in general; not just from

21    Machinima, but it is all the money I made in 2012 in general.

22    Q.   Okay.  And so was this also some of the money that you

23    were getting for signing people up?

24    A.   Yeah, it was.  I would say that was -- About 80 percent

25    was received for the channel I was doing at the time, which
```

1    was the one they mentioned, Team Noble, and the other 20

2    percent was for signing some people.

3    Q.    Okay.  Team Noble was your other channel that you had.

4    A.    Yes, it was.

5    Q.    And what was on the Team Noble channel that was supported

6    by Machinima?

7    A.    Yeah.  Okay.  So the best way to describe it is the

8    channel in this case is called VideoGames, and every type of

9    video game goes up.  It gets uploaded, any type you can think

10   of.

11        On the Team Noble one, it was just the game Halo.  It was

12   content on the game Halo.  Because in Halo there is something

13   called Noble Team, so it was something along those lines.

14   Q.    Okay.

15        MR. WILSON:  Now, Your Honor, we will go ahead and

16   offer Defense Exhibit C into evidence.

17        MR. VITAL:  No objection, Your Honor.

18        THE COURT:  It's admitted.  Thank you.

19   Q.    (BY MR. WILSON)  Marko, I'm going to show you Defendants'

20   Exhibit D, which we've talked about previously, and asked you

21   questions.

22        This is your 2012 tax return.  Correct?

23   A.    Yes.  And there is the person who does my taxes.  It's a

24   man by the name of Bill Goodman.

25   Q.    Okay.  And flip through here.  And we have marked this as

1    Defendants' Exhibit D.

2         You are very familiar with this document.  Correct?

3    A.    Of course.

4    Q.    Okay.  And then here on the front page you put your

5    income.  And the ladies and gentlemen of the jury will be able

6    to see it a little closer when they are -- actually when it's

7    proffered to the jury.

8         It looks like your business income was 5235.  Do you see

9    that number?

10   A.    Yes.

11   Q.    Okay.  And then down here, the next line we get down and

12   it looks like you paid taxes of approximately $600 or so.

13   A.    After expenses and everything, yeah.

14   Q.    Okay.  It looks like your CPA signed that.  Correct?

15   A.    Yes, sir.

16   Q.    Okay.  And then we go over here to the profit and loss

17   statement for your business in 2012.

18   A.    I believe you see right there it says the 26,000 amount.

19   Q.    Okay.  That's right.  So that's the 26,130.  That is the

20   same exact number as Defendants' Exhibit C.  Is that correct?

21   A.    Yes, sir.

22   Q.    Okay.  Now, in your Schedule C from a sole

23   proprietorship, profit or loss of the business, you go down

24   here, you've got some expenses, and that's where you net out

25   that 5,000 and change number.  Correct?

1    A.    Yes, sir.

2    Q.    Okay.  And so it looks like you've got expenses of about

3    $18,000 during that year.

4    A.    Yes, sir.

5    Q.    Okay.  What exactly were those expenses?  Do you recall?

6    A.    A big one that year was going on this E3 trip.  It was a

7    big gaming convention.  I went with a bunch of gamers.  They

8    are all my age.  We went and played video games.  We went on

9    the trip to play video games, as ridiculous as that sounds.

10   But also had to do with paying some directors who were posting

11   on the channel and some people helping me out and stuff.

12   Q.    How did you pay some of these expenses?  Well, strike

13   that.

14        What type of expenses did you pay for these video gamers

15   you were trying to market to?

16   A.    Well, a big one had to do with them for posting their

17   content.  We also had a graphic designer.  We had a video

18   editor.  Just people who would help put together stuff for the

19   channel.

20   Q.    Okay.  And so did you pay for their hotel?

21   A.    For that trip in particular I paid for the hotel, yes.

22   Q.    Okay.  And where was this gaming convention at?

23   A.    It was in L.A. at the convention center.

24   Q.    And how long did that last?

25   A.    I believe it was three or four days; five max.

```
 1    Q.    Okay.  So in these two documents, Exhibit C and Exhibit
 2    D, of the 26,000 in gross wages, why didn't you put the
 3    partnership that apparently Mr. Moss is claiming that you all
 4    had?
 5    A.    I had told Ty that we need to do taxes and I would like
 6    to, you know, file what I gave to him, and my accountant sent
 7    him I believe it's called a W-9 to fill out, and Ty's response
 8    was, "I don't care, dude."
 9    Q.    Okay.  So Ty did not fill out the W-2 [sic] that your CPA
10    sent for the 4500 you paid him for --
11    A.    No, he didn't.  He just said, "I don't care, dude."
12    Q.    And you haven't seen Ty's 2012 tax return, have you?
13    A.    No, I have not.  So I don't know if -- Yeah, I don't
14    know.
15    Q.    Okay.  Fast forward to 2013.  You got another 1099 from
16    Machinima.  Correct?
17    A.    Yes, sir.
18    Q.    And it looks like it's to you.
19    A.    Yes.
20    Q.    And how much did Machinima pay you during the 2013 year?
21    A.    $24,000.
22    Q.    And that is the same year, I guess, that we heard
23    testimony from Mr. Moss, as well as yourself, that this
24    15-year-old kid got ahold of your username, password, locked
25    you out, and started receiving funds from Machinima.
```

```
 1    A.    Yes, sir.

 2    Q.    Okay.  You testified that as a result of Ty's

 3    communication with Machinima, that you were fired by

 4    Machinima?

 5    A.    Yes.  That is 100 percent correct.

 6    Q.    And why were you unable to convince Machinima that you

 7    were on first base and not this 15-year-old kid?

 8    A.    With the hacking and stuff?  I'll tell you why.  After I

 9    was fired, they also released the channel from their network.

10    And once the hacker took over the channel, Machinima said, "We

11    don't care about it anymore.  What happens to it happens."

12    Q.    So Machinima wiped their hands of your little dispute

13    with this 15-year-old kid.

14    A.    Yes, sir.

15    Q.    Okay.  Did Ty -- I'm sorry.  Did Mr. Moss attempt to help

16    you at all?

17    A.    No.  He actually made matters worse by talking to the

18    hacker and kind of egging him on to do it.  And there might

19    have even be talks of the hacker telling Ty, "Hey, if I take

20    the channel from Marko, maybe you and me can work together."

21          And Ty was like, "Oh, okay."

22          And then all of the sudden, you know, once the hacker got

23    the channel, he told Ty to kick rocks.

24          So, yeah.  So he did everything -- I could even blame the

25    hacking to Ty, because after I was released from Machinima, I
```

```
 1   had no support to get the channel back, and it was a total
 2   nightmare.
 3   Q.   So is it safe to say that when you and Ty -- Strike that.
 4        Do you agree with me that in the fall of 2012, as a
 5   result of Ty's statements, comments, threats to you, that you
 6   consider the partnership over?
 7   A.   A hundred percent.
 8           MR. VITAL:  Objection, Your Honor.  It is a leading
 9   question.
10           THE COURT:  It is leading, but I will allow it.
11           THE WITNESS:  One Hundred percent.
12   Q.   (BY MR. WILSON)  And you saw the posted threat from Ty's
13   father?
14   A.   I did, yes.
15   Q.   Did that concern or alarm you?
16   A.   It did, yes.  Something I would like to mention is Ty
17   has --
18           MR. VITAL:  Objection; not --
19           MR. WILSON:  I don't.
20           THE COURT:  Not responsive.  Sustained.
21   Q.   (BY MR. WILSON)  So you felt threatened from Ty.
22   A.   Uh-huh.
23   Q.   You fired Ty.
24   A.   Yes.
25   Q.   Ty's dad threatened you.
```

1    A.   Yes, sir.

2    Q.   When did Mr. Martin come in the picture to try to assist

3    you with Mr. Moss?

4    A.   You know, after all the threats and everything getting

5    bad, I had -- since Brian is older, I asked him, "Hey, man,

6    you know, I don't know what to do about this guy.  He keeps

7    harassing me, and it's getting really bad.  Can you help me

8    out and stand of for me, you know?"  I mean, at the time I was

9    18 or 19 and Brian was 27 or 28.  So yeah, he had my back, and

10   we've always been friends so.

11   Q.   Okay.  So you trusted Brian?

12   A.   Yes, sir.

13   Q.   Now, you saw all those Skype messages before about "we're

14   making $3.  We're kicking butt.  We're doing this.  We're

15   doing that."

16   A.   Yeah.

17   Q.   Have you ever heard the term puffing?

18   A.   Of course.

19   Q.   Have you ever heard the term bragging?

20   A.   Yes.

21   Q.   Is that what you were doing?

22   A.   Guilty as charged, yes.  I was.

23   Q.   Heard of the term white lie?

24   A.   Yes.

25   Q.   Okay.  So -- And then you saw, I guess in 2014 when you

1    were able to get the channel back, you said you were making

2    30, 40 grand a month.

3    A.    Yes.

4    Q.    Another white lie, puffing, bragging?

5    A.    Of course.  I wanted to piss him off after the drama and

6    how he got me fired.  But yeah.

7    Q.    Okay.  Now, on Defendants' Exhibit F, again, it

8    encompasses Exhibit E, that's the 2013 individual tax return

9    for you.  Correct?

10    A.    Yes.

11    Q.    Okay.  And over here, again, I'll go to Schedule C of

12    this 1040 which talks about Marko Princip.  That's that same

13    $24,000 up here on the 1099?

14    A.    Yes, sir.

15    Q.    Okay.  Did you receive any other sources of money from

16    Machinima?

17    A.    Nothing.

18    Q.    Did you receive any other sources from anybody as a

19    result of hosting any of these videos that were uploaded?

20    A.    Nothing whatsoever.

21    Q.    Okay.  So other than the $24,000, that's all you made

22    that year?

23    A.    Yes, sir.

24    Q.    Okay.  And then down here we've got after expenses about

25    $9800.  Correct?

```
 1    A.   Yes, sir.

 2    Q.   And then we go over to the very first page where you are

 3    supposed to list that, and it looks like there's that same

 4    exact number of 9853.

 5    A.   That's how much I took home, yes.

 6    Q.   So that was net profit to you for 2013 with Machinima

 7    with your VideoGames channel?

 8    A.   Yes, sir.

 9    Q.   Not $5 million?

10    A.   No.

11    Q.   Okay.  Ever received a million dollars?

12    A.   In my wildest dreams.

13    Q.   Okay.  Ever received half a million dollars?

14    A.   Never, no.

15    Q.   Ever received a quarter million dollars?

16    A.   Not even close.

17    Q.   Okay.  Now, you heard Mr. Moss, I think on his direct

18    examination with Mr. Wyde, I think, as well as on your cross,

19    that this Lovinger kid did pretty well with Machinima when he

20    stole that channel.

21    A.   He took it to a different network once they let it go.

22    Q.   So Machinima got rid of the VideoGames channel?

23    A.   Yes, sir.

24    Q.   Okay.  So where did Adam take that to?

25    A.   He took it to a different network.  It was called IGM.
```

```
1    Q.    Okay.  And you heard Mr. Moss testify, and I think you
2    even confirmed--this is one thing we agree on--he was making
3    about $30,000 a month with -- What was the name of the
4    network?
5    A.    With IGM.  The kid was making a lot of money quick, yeah.
6    Q.    And why was the kid making so much money with IGM?
7    A.    As I said before, this wasn't your ordinary kid.  This
8    kid really knew what he was doing on YouTube and on the
9    internet.  He was very smart, 15 or 16 regardless.
10   Q.    Okay.  And how many followers does the kid have?
11   A.    Well, his has a different channel that he does now that
12   is very popular.
13   Q.    Okay.  You didn't answer my question.  To your knowledge,
14   my understanding is the kid had millions of people that were
15   viewing and following.  Is that correct?
16   A.    That's correct, yes.
17   Q.    Is that why he was more valuable than you?
18   A.    Yeah, yeah.  I would say yeah.
19   Q.    And in your industry, in your opinion, other than the kid
20   having so many followers, what else separates the kid from a
21   guy like Mr. Moss, Mr. Keating, you, or Mr. Martin, or me for
22   that matter?
23   A.    Well, what separated him from Brandon and Ty was that he
24   cared about what he was doing and he was good about it.  The
25   same thing goes with Brian.  That's why I work with him today.
```

```
 1   Q.   Well, take that care.  What do you mean by the kid cared?

 2   What did the kid do that cared that made him so successful

 3   with the new network IGM after Machinima fired everybody?

 4   A.   He had passion what he was doing, and he was also very

 5   young so he knew all the gaming stuff.  He was a big gamer

 6   himself; that sort of thing.

 7   Q.   Okay.  Now, 2013, the year of your income of $24,000 and

 8   the kid is making money with IGM, how do you know the kid was

 9   making $30,000 a month?

10   A.   After -- We had to file a lawsuit in Virginia--that's

11   where the kid lived--to get the channel back, and his family

12   had disclosed how much -- his parents had disclosed how much

13   money he was making.

14   Q.   Okay.  So through your attorney and through the discovery

15   process, like we've got all these documents and exhibits for

16   the jury, you saw where the kid was making pretty good money

17   with IGM.

18   A.   Yes.

19   Q.   With your channel.

20   A.   Yes.

21   Q.   Your former channel.

22   A.   Yes, sir.

23   Q.   Okay.  And where did you have to file that original

24   lawsuit?

25   A.   It was in federal court.  It was in Virginia.
```

1    Q.    Okay.  Was Mr. Moss named a party to that lawsuit?

2    A.    No.

3    Q.    Was Mr. Keating named a party to that lawsuit?

4    A.    Definitely not.

5    Q.    Was there any mention that these two gentlemen were 30,

6    60, 90, 99.9 percent partners in this channel?

7    A.    No.

8    Q.    Okay.  So the original lawsuit was filed in Virginia?

9    A.    Yes.

10   Q.    And what happened in Virginia?

11   A.    We filed the lawsuit.  It was me and Brian.  And we

12   wanted to get the channel back.

13   Q.    And you retained an attorney?

14   A.    Yes, we did.

15   Q.    Okay.  And what did the attorney do for you in order to

16   acquire the channel back from the kid?

17   A.    He went to the court.  He had the evidence.  He had all

18   the stuff.  And then we decided to strike a settlement.  And

19   the biggest reason we struck the settlement is we couldn't

20   really afford to keep paying the lawyer to keep the case

21   going.  The case -- After the first hearing, the Judge needed

22   to have another date or something, and so we didn't really

23   have money to keep the case going, the lawyer was expensive,

24   so we had to make a bad settlement, which it was.

25   Q.    Another thing Mr. Vital and I agree on--lawyers are

```
 1   expensive, aren't they?

 2   A.    Yes.

 3   Q.    How much did he cost you?

 4   A.    The lawyer?

 5   Q.    Yeah.

 6   A.    He cost us about 12,000, which was -- a big chunk of it

 7   was paid by Brian, and pretty much every dollar I had left

 8   from those past two years went into getting the channel back.

 9   Q.    That's a lot of money when you are only making 24 grand a

10   year in gross proceeds, isn't it?

11   A.    It's all I had.

12              MR. VITAL:  It's a leading question.

13              THE COURT:  Sustained.

14   Q.    (BY MR. WILSON)  So how much was the settlement with the

15   kid in order to get the channel back?

16   A.    It was for $29,000.  We had to pay their legal fees to

17   get the channel back.

18   Q.    Okay.

19   A.    Our lawyer had explained that was the easiest way to end

20   this.

21   Q.    So you all struck a settlement, case was dismissed --

22   A.    Yes.

23   Q.    -- and you were ordered to pay the $29,000 and the kid's

24   legal fees.

25   A.    Yes.
```

1    Q.    And then the kid turned the channel back over to you.

2    A.    Yes, sir.

3    Q.    Okay.  So was it in 2013 when you acquired ownership back

4    of that channel?

5    A.    It was the very start of '14, 2014.

6    Q.    January of 2014.

7    A.    Yes.

8    Q.    Okay.  Was Ty involved in signing any settlement

9    documents?

10   A.    No.

11   Q.    Was Ty involved in writing a check for--29 plus

12   12--$41,000 in your expenses?

13   A.    No, sir.

14   Q.    Did Ty offer to do that?

15   A.    Never; no.

16   Q.    You heard Mr. Moss, Ty Moss, state that the channel had

17   two strikes.  Two strikes.  Two strikes.

18   A.    Yes.

19   Q.    I asked him for evidence.  He had no evidence.

20        Did the kid have two strikes on him, or was that you?

21   A.    There might have been one strike on the channel at one

22   point, but it went away.  There was never two.  The channel

23   was never in any dire straits.

24   Q.    Okay.  When the channel was in your control and

25   possession for the four months before you and Mr. Moss got in

1    the fight the end of the fall of 2012, and you get lawyers,

2    and you send letters back and forth, and threats, did you have

3    any strikes on the channel during that five-month period?

4    A.    Absolutely not.

5    Q.    Okay.  So you or Mr. Moss did not have any strikes.

6    A.    No.  No.

7    Q.    Did the strikes, to your knowledge, occur under

8    Mr. Lovinger's watch?

9    A.    One of them; the one that did, yes.

10   Q.    Okay.  And then the other one that you think occurred,

11   how did that --

12   A.    The other one didn't even occur.  I don't even know where

13   he came up with the idea of two, and three you're out.  It

14   doesn't even exist, no.

15   Q.    Well, I'm assuming while you were battling for a year

16   with the kid to get the channel back, you found out about this

17   strike.

18   A.    Yes, we did.  After we got the channel back, it had the

19   strike on it.  But a strike expires in six months.

20   Q.    What was the occurrence that caused the strike while the

21   kid was controlling the channel?

22   A.    It's kind of embarrassing to say, but there is a game

23   called Grand Theft Auto, and the kid had made a video and it

24   was like the sexiest girls in Grand Theft Auto, like the game

25   characters.  It was a bit provocative, so the strike had

1    something to do with that.

2    Q.    So you got cars racing around and girls in bathing suits.

3    Not approved.  Correct?

4    A.    Video game characters; not actual girls.

5    Q.    Okay.  But you weren't involved in that.

6    A.    No.

7    Q.    Okay.  Marko, it's possible that had you never gotten

8    this channel, back we would never even hear from Mr. Moss,

9    would we?

10   A.    No.

11            MR. VITAL:  Objection --

12            THE WITNESS:  No way whatsoever.

13            MR. VITAL:  Objection, Your Honor.  It is leading.

14            THE COURT:  It is leading.  Sustained.

15   Q.    (BY MR. WILSON)  Do you think if you got the channel --

16   Do you think if you did not get the channel back, Mr. Moss,

17   would file the lawsuit, in your opinion?

18            MR. VITAL:  That calls for speculation.

19            THE COURT:  I will allow him to answer.

20   Q.    (BY MR. WILSON)  In your opinion, do you think Mr. Moss

21   would have brought this lawsuit?

22   A.    No way.  As soon as I got it back, he came knocking.

23   Q.    Okay.  And what was your response when Mr. Moss came

24   knocking?

25   A.    I said, "Where were you when the fight to get the channel

1    was going on?  Didn't you also hear from the lawyer that

2    responded to your vile letter that our stuff is over?"

3    Q.    I'm going to show you--take this out of order--Exhibit H,

4    since we are discussing that.

5        Now, this email from Mr. Moss' attorney about May of

6    2013, which is a couple of months after that February letter,

7    starts with -- Kevin Ross was the attorney you mentioned with

8    Mr. Vital that was assisting you to try to wind up and resolve

9    this partnership break-up.

10   A.    Yes, sir.

11   Q.    And in May of 2013, Mr. Ross is saying, "Sorry I missed

12   your call the other day.  I left you a message.  What is the

13   status of our offer?"

14   A.    Yes, sir.

15   Q.    And you gave him the authority to do that?

16   A.    Yes.

17   Q.    And then Ms. Cochrane, Mr. Moss' lawyer, writes back,

18   "I'm sorry we keep missing each other.  I'm out of town.  My

19   client is not satisfied with Marko paying him $1,366.50  Mr.

20   Moss is owed money.  Cannot be used as leverage.  Marko is in

21   breach of the partnership.  Moss wants compensation for his

22   losses.  Moss wishes to pursue the matter until compensated.

23   Unless client makes a more satisfactory offer; gives my client

24   complete access to the channel."

25       Did Mr. Moss ever offer to pay you for the channel?

```
 1   A.   Never; no.

 2   Q.   "I plan to file a lawsuit in a couple of weeks."

 3        That was May of 2013.

 4   A.   Yes.

 5   Q.   We didn't hear from Mr. Moss, did we, until probably

 6   another 12 to 18 months?

 7   A.   No.  That lawyer disappeared into the night.

 8   Q.   Mr. Moss disappeared into the night, didn't he?

 9   A.   Along with her, yes; they both did.

10   Q.   Now, this number of the 1366--you heard me talk about

11   winding up the partnership, et cetera--this is your breakdown

12   of what we've already admitted went to Mr. Moss.

13        Will you explain this exhibit to the jury, please, and

14   what you're saying that Mr. Moss is entitled to as you wind up

15   and wrap up the partnership?

16   A.   Yes.  The person that you see there is my father Dejan,

17   and me and him were sitting on the couch and I was telling him

18   and showing him what everything was, who got paid what, what

19   expenses there were.  There are only two, as you can see--cell

20   and internet, besides paying the directors, the 30 percent for

21   Ty, and how much he already got, and what was left.  So left

22   owed to Ty was $1300.

23   Q.   Okay.  So those same expenses that you prepared and

24   forward to Ty via his attorney --

25   A.   Yes, sir.
```

```
 1    Q.    -- are the exact same expenses that are referenced here

 2    in your 2012 tax return?

 3    A.    Yes, sir.

 4    Q.    Fast forward to 2014.  This is Defendants' Exhibit G.

 5    Again, Ford & Goodman your accounting firm or accountant.

 6    That is you.  You are still with your folks.  Right?

 7    A.    Yes.

 8    Q.    Probably 20 years old there, or 21?

 9    A.    Yes.

10    Q.    Okay.  Looks like in 2014, the year you get back the

11    channel, your income on Schedule C, your gross receipts for

12    the channel are $47,150.  Do you see that number?

13    A.    Yes, sir.

14    Q.    Did you receive any other sources of income that year

15    other than what you got for the channel?

16    A.    No, that's it.  No.  Nothing else.

17    Q.    Now, you said Machinima that fired you.

18    A.    Yes.

19    Q.    And fired you from hosting the channel.

20          Who did you take the channel to after you got it back

21    from the kid?

22    A.    We were working with this network called FullScreen.

23    Q.    FullScreen.  Okay.  So not IGM, or whatever that --

24    A.    No.  After they were working with the hacker kid, no; no

25    way.
```

1    Q.    Okay.  Now, so you take your channel.  You work with

2    FullScreen.

3    A.    Uh-huh.

4    Q.    I'm assuming, then, we've got a separate deal on what you

5    get paid for views and how all that other stuff works.  Is

6    that correct?

7    A.    Yes.

8    Q.    Okay.  This 47,150 now, is this number--again, we are

9    talking tax year 2014, income 2014--is this half of what the

10   total channel grossed?

11   A.    Yes.  The other half went to Brian Martin.

12   Q.    Okay.  So Mr. Martin made 47,150.

13   A.    Yes.

14   Q.    You all split it right down the middle.

15   A.    Yes.  Well, yes.

16   Q.    And the taxes, after you did your expenses and all that,

17   come to a number of a net receipts for your 50 percent is

18   8582.

19   A.    Yes.  There was a ton of legal expenses to get the

20   channel back.

21   Q.    Okay.  So those were factored in on this number up here?

22   A.    Yes.

23   Q.    And we've got 13,000 in expenses?

24   A.    Yes, sir.

25   Q.    Okay.  So that was your half of the legal expenses?

```
1    A.    Yeah, more or less.

2    Q.    Okay.  So do you and Mr. Martin split everything right

3    down the middle?

4    A.    Yes, we do.

5    Q.    Okay.  Do you guys cuss each other out on social media?

6    A.    Never have, no.

7    Q.    Do you guys threaten one another?

8    A.    Never have, no.

9    Q.    Threaten to show up at each other's residence and beat

10   each other up?

11   A.    No.

12   Q.    So there's that same number--8582.

13   A.    Yes.

14   Q.    That was your net that year?

15   A.    Yes, sir.

16   Q.    Okay.  And then Mr. Martin's got a similar number on his

17   return, probably?

18   A.    Yes.

19   Q.    Okay.  So that year--let's round up, because I'm not very

20   good at math; that's why I went to law school--100,000 gross

21   sales.  That's 47 plus 47 is 94?

22   A.    It's close, yes--94,000.

23   Q.    So let's just say 100,000.

24   A.    Yes.

25   Q.    That's all the channel made?
```

```
 1   A.   Yes.

 2   Q.   And that's gross sales?

 3   A.   Yes, sir.

 4   Q.   Gross receipts.

 5        Okay.  Now I'm going to show you what's been marked as

 6   Defendants' Exhibit I.  And this you just received?

 7   A.   Yes.

 8   Q.   Right out of the envelope is your 2015 FullScreen

 9   receipts?

10   A.   Yes.

11   Q.   That's a big number--148,842.  That's what you made last

12   year in 2015--150 grand?

13             MR. VITAL:  Which exhibit is this?  I'm sorry.

14             MR. WILSON:  Exhibit I.

15             THE WITNESS:  Yes, sir.

16             MR. VITAL:  I apologize.

17             MR. WILSON:  That's okay.

18   Q.   (BY MR. WILSON)  Now, every single other 1099 had your

19   name on it.  Why is Brian's name on this one?

20   A.   We had made the decision that Brian would be the CFO.

21   And either way that money gets split between us, so we both

22   are filing that total anyways.

23   Q.   Okay.  So you and Mr. Martin -- it's your sworn testimony

24   that this 148,842.61 is the gross sales for the channel for

25   last year that just ended December 31st, a couple of months
```

1    ago?

2    A.    That is every dollar the channel made in 2015.

3    Q.    And you and Mr. Martin split that?

4    A.    Yes, we did.

5    Q.    I know taxes aren't due until April 15th.  It looks like

6    you have been doing them correctly for the last three years.

7    Is it safe for me to assume your 2015 tax return is going to

8    show 50 percent of that number?

9    A.    Yes.  It could be less because our biggest expense was

10   paying that settlement amount from the Lovinger case.

11   Q.    Okay.  So the settlement of the Lovinger case went in

12   2014 as well as in 2015?

13   A.    No.  We didn't have the money to pay it until 2015.

14   Q.    Are you going to put my attorney's fees on those expenses

15   as well?

16   A.    Hopefully, yeah.

17   Q.    Okay.  Now, 148,000 in gross sales?

18   A.    Yes.

19   Q.    I'm not seeing $5 million.

20   A.    I'm not either.  No.

21   Q.    What is your -- I know Brian's the CFO, but, to your

22   knowledge, what is your relationship, what is your contract,

23   what is your understanding of what you have with FullScreen as

24   far as views and how that works?

25   A.    It's like what Ty said; it varies.  It just depends.  It

1    can be 80 cents, $2.  It varies all the time, like Ty Moss

2    said.

3    Q.    I know.  That really scared me when I heard Mr. Moss say

4    it varies every second.

5    A.    It does, yes.

6            MR. VITAL:  Objection to the sidebar.

7            THE COURT:  Sustained.

8    Q.    (BY MR. WILSON)  Does that concern you that it fluctuates

9    every second?

10   A.    Yes.

11   Q.    My question to Mr. Moss, and I don't know if I ever got

12   an answer, how do you know if what you're getting is really

13   what you're entitled to?

14   A.    Good faith, I guess.

15   Q.    Now, let's go back to -- Mr. Vital had asked you about

16   one of the exhibits that you said, "Yes, yes, yes, that's what

17   the paper says; that's what the paper says;" that one where it

18   talks about you can log in and click on views, or something

19   like that?

20   A.    Yes.

21   Q.    Okay.  Now, describe to the ladies and gentlemen of the

22   jury what that document encompasses.

23   A.    Can you remind me which document it was?

24   Q.    Yeah.  It was that one -- I will withdraw that line of

25   questioning, but I will focus on another one.

1         How does someone like you or Mr. Martin with username and

2    password access, log in to your account to see what viewership

3    is doing?

4    A.   You just log it in, it will say what your views are, but

5    the network is the one that holds the analytics, the ones that

6    see exactly how much is being made.

7    Q.   Okay.  And in those analytics, does it say next month

8    you're going to get a check for -- I don't know.  What's 150

9    grand divided by 12?  Ten grand?

10   A.   It gives you a rough estimate.  It doesn't give you to

11   the dollar.

12   Q.   Okay.  Have you ever confirmed that the number in the

13   analytics is different from the number of the check that you

14   received?

15   A.   In the analytics I might say 8,000 but you get 7300, or

16   something along those lines.

17   Q.   So the numbers are never precise?

18   A.   Not to the T, no, but it's an estimate, as I said.

19   Q.   Now, I think you testified with Mr. Vital that the

20   payments are -- with Machinima were delayed three months after

21   this viewership stuff.  Correct?

22   A.   They are backlogged, yes.

23   Q.   Okay.  We don't know about IGM.

24         Now with FullScreen, who is now hosting the channel, what

25   is their timeliness of payments to you and Mr. Martin?

```
 1   A.   It's the same for every network.  So say, for example,

 2   any views you get in the month of January, you will get paid

 3   in March; any views you get in February, you will get paid in

 4   April; in March, in May; that sort of thing.

 5   Q.   So there's a three-month delay.

 6   A.   Yes.

 7   Q.   Mr. Vital had asked you about these -- the Brandt

 8   brothers.  Do you recall that line of questions?

 9   A.   Yes, I do.

10   Q.   Okay.  Have you ever met either of the Brandts?

11   A.   No.  As far as I know, there is no Brandt brothers or no

12   Brandts in general.

13   Q.   Have the Brandts ever sued you or threatened to sue you

14   for any ownership in a partnership, or alleged partnership?

15   A.   No.  The only legal stuff I got was from Ty.

16   Q.   And then Mr. Keating then joined the lawsuit.

17   A.   He joined eight months later, yes.

18   Q.   Why do you think, in your opinion, that Mr. Keating, if

19   he's claiming partnership prior to Mr. Moss, didn't contact

20   you until almost four years later?

21        MR. VITAL:  Objection, Your Honor; calls for

22   speculation.

23        THE COURT:  It does.  Sustained.

24        MR. WILSON:  It's a party opponent, Your Honor.

25        THE COURT:  I'm sorry?
```

```
 1              MR. WILSON:  I said the Plaintiff is a party
 2   opponent admission.  I could --
 3              THE COURT:  You are not asking for statements.  You
 4   are just asking what his thoughts are, and it is speculation.
 5              MR. WILSON:  I will rephrase.
 6   Q.   (BY MR. WILSON)  Did Mr. Keating ever tell you why he
 7   sued you four years after his alleged partnership with you?
 8   A.   He didn't, no.
 9   Q.   Okay.  Did Mr. Keating in the last four years, other than
10   joining this lawsuit, ever make a demand on you to pay him any
11   money?
12   A.   No.  He made some threats my way, but never any demands.
13   Q.   Okay.  Did Mr. Keating ever get sued as a result of the
14   lawsuit with the kid?
15   A.   No; never.
16   Q.   Did Mr. Keating ever pay you any money for this
17   partnership?
18   A.   No; never.
19   Q.   Now, I saw on some PayPals where you did pay Mr. Keating
20   some money.  Tell the ladies and gentlemen of the jury, what
21   were you doing paying him some money in 2012?
22   A.   It had to do with the prior channel called Team Noble,
23   and I knew Brandon from doing Team Noble stuff somewhere along
24   the lines before Ty.
25   Q.   When did you first -- Well, strike that.
```

1      I mean, you never personally met him, did you, until his

2   deposition a year ago?

3   A.   No; never.

4   Q.   Okay.  When was the first time you met him over the

5   internet?  Do you recall what month and year?

6   A.   I believe in 2009 when I was, like, 15, when I was doing

7   the Team Noble channel.

8   Q.   Okay.  Do you know how old Mr. Keating is?

9   A.   I know he's not 38.  I believe, in my mind, he is 34 or

10   35.

11   Q.   And when you are doing the Team Noble channel, while you

12   are with Machinima, while you were 16 years old, what were you

13   doing with Mr. Keating then?

14   A.   He was helping along with the channel, too.

15   Q.   And what benefit did Mr. Keating do for you?

16   A.   He was older.  He gave me some advice on what to do with

17   the channel.  He gave me some advise on YouTube in general,

18   because he was doing it at the same time, too.

19   Q.   And then why did you pay him some of these monies through

20   PayPal?

21   A.   Those monies were -- that 4,000 was long, from a very

22   long time ago, and he was making threats my way.  I had no

23   other option but to give him that 4,000.

24   Q.   Okay.  Did you ask Mr. Martin to help you out with the

25   negotiating of the threats with Mr. Keating back in 2012?

```
 1   A.   I told him about the threats.  I didn't say to step in or

 2   anything really, but I told him about it.

 3   Q.   Okay.  Has it been your intent all along, Marko, to

 4   resolve this matter with Mr. Moss?

 5   A.   Yes; more than anything.

 6   Q.   Do you have any idea in the world -- Strike that.

 7              MR. WILSON:  One moment, Your Honor.

 8        Your Honor, I would go ahead, and although these exhibits

 9   have already been agreed and stipulated to, if I may, I'd like

10   to proffer them to the jury.

11              THE COURT:  Which exhibit?

12              MR. WILSON:  It is Exhibit C, Your Honor, all the

13   way through I.

14              THE COURT:  C, D, E, F, G, H, I?

15              MR. WILSON:  Yes, Your Honor.

16              THE COURT:  Okay.  Any objection?

17              MR. VITAL:  No objection to those, Your Honor.

18              THE COURT:  All right.  Those are admitted.

19        And you may publish them to the jury.

20              MR. WILSON:  Your Honor, I pass the witness.

21              THE COURT:  Thank you.

22              MR. VITAL:  Your Honor, before I resume and finish

23   what will be a brief redirect, may I give them a moment to

24   look at the exhibits?

25              THE COURT:  Sure.
```

1          MR. VITAL:  May I proceed, Your Honor?

2          THE COURT:  Yes, if you with ready.

3          MR. VITAL:  Yes, sir.

4     I wanted to give a jury a little time to look at the

5   exhibits.

6                    RECROSS EXAMINATION

7   By Mr. Vital:

8   Q.    Have you ever heard of the phrase self-awareness or

9   being aware of how you come across?

10  A.    Yes.

11  Q.    Is it fair that, if you noticed your demeanor, posture,

12  and disposition is different than it was yesterday?

13  A.    Yes.  I was heated because you were trying to trick me

14  yesterday.

15  Q.    Is that something that you got coached on or -- Help me

16  out with there was -- I am noticing a different demeanor today

17  than yesterday.

18  A.    No, I was not coached on anything.  It's my first time in

19  court.

20  Q.    Okay.  Suffice it to say, you have testified this morning

21  in an attempt, I believe, to put some lower numbers into the

22  record regarding the VideoGames channel than the numbers that

23  this side of the courtroom has talked about.  Right?

24  A.    You were -- At the deposition they were making me read

25  off a paper, a paper that they put together, and they said,

 1    "Does that say this here?"  And I said, "Yes."  I didn't say

 2    yes to it.  There's a difference.

 3    Q.   But it's fair that the numbers that this side of the

 4    courtroom is talking about are higher than the numbers on this

 5    side of the courtroom.

 6    A.   Yeah.  This side's the truth.  That side, you guys are

 7    wandering eyes closed to the dark.

 8    Q.   Well, it's true that if a partner makes reasonable use of

 9    the confidence that another partner places in him or her, that

10    part of that is making sure to maximize the amount of money

11    that comes into the partnership.  Is that fair?

12    A.   Me and Ty weren't partners in 2014.

13    Q.   Well, let's take it with the man that you say is your

14    partner--Mr. Martin.  Can we do that?

15    A.   Sure.

16    Q.   Okay.  And it's your belief, you are telling this jury --

17    A.   Yes.

18    Q.   -- that there is a partnership regarding VideoGames, but

19    it's just between you and Mr. Martin.

20    A.   Yes.

21    Q.   Okay.  Now, the question in that scenario is, it's a

22    fact, is it not, that in a partnership there are some

23    expectations of how one or the other is supposed to act.

24    A.   Like some implied stuff, yeah.

25    Q.   Okay.  And one of the expectations in a partnership is

1    that you-all place confidence in each other.  Is that correct?

2    A.    Yeah.

3    Q.    And part of the confidence you place in each other is to

4    make sure that with respect to the partnership and its assets,

5    that you do the best you can to maximize the assets and the

6    income to the partnership.  Is that right?

7    A.    Uh-huh.  Yes.

8    Q.    Okay.  So, in other words, if you are supposed to be

9    running a partnership for a profit, you should not be hanging

10    out on the beach all day not doing anything and just blowing

11    off your duties.  Fair?

12    A.    Yes.

13    Q.    Okay.  Now, you suggested that the kid Andrew Lovinger

14    was making money.  Correct?

15    A.    Yes, he was.

16    Q.    He was maximizing the partnership asset that was in his

17    possession at the time it was in his possession.  Is that

18    true?

19    A.    Yes, sir.

20    Q.    Okay.  And based upon his sophistication and acumen, as

21    you put it, he was able to make over $30,000 per month through

22    the VideoGames channel.  Is that right?

23    A.    It wasn't per month.  It was on a good month.

24    Q.    Whatever it was, you are claiming that he did better than

25    you.

 1    A.   Yeah.  At the time he did, yeah.

 2    Q.   Okay.  And you attributed that to his sophistication and

 3    his business acumen.

 4    A.   Yeah.  Him being a gamer, he was very into the stuff, he

 5    knew what type of videos to post.  He was very good at what he

 6    did, yeah.

 7    Q.   You have gentlemen on this side of the courtroom, in

 8    particular Brandon Keating, that is a sophisticated internet

 9    person and YouTuber himself.  Is that fair?

10    A.   Says who?  To my knowledge, no.

11    Q.   I thought you said earlier that you turned to him for

12    advice because his advice was helpful.

13    A.   I could have asked him the question.  It didn't mean that

14    he's some pro or anything.

15    Q.   You don't think that he has done well in the internet and

16    YouTube world?

17    A.   Not to my knowledge, no.

18    Q.   Have you ever heard of Maker Studios?

19    A.   He said he was an owner, and then I asked them and they

20    said no.

21         MR. VITAL:  Objection to what they said.  Move to

22    strike --

23         THE COURT:  Sustained.

24         MR. VITAL:  -- the hearsay response.

25    Q.   (BY MR. VITAL)  Well, let's move to -- There was an

```
 1    exhibit, and the exhibit was -- I think it was 8?

 2              MR. WILSON:  We are going by the alphabet.

 3              MR. VITAL:  This was -- I think it is the -- There

 4    was a 1099, and it had some handwriting on the second page.

 5         May I approach the jury?

 6              THE COURT:  You may.

 7    Q.   (BY MR. VITAL)  On your -- It was H.  I thought it was 8.

 8         Defense Exhibit H is an email from Hillary Cochrane to

 9    your prior lawyer Kevin Ross.

10    A.   Yes, sir.

11    Q.   And isn't it a fact that you had -- money had been paid

12    to Mr. David Tyler Moss.  Correct?

13    A.   Paid from this situation or generally?

14    Q.   Before this email had occurred, you had paid monies to

15    Mr. Moss.  Right?

16    A.   The 4500, yes.

17    Q.   All right.  1500 then another 3,000.  Correct?

18    A.   Correct.

19    Q.   Is it a fair take-away from the email portion of the

20    Defense Exhibit H is that $1,366.50 is insufficient to satisfy

21    the ownership interest that Mr. Moss has at the time?

22    A.   That didn't say that's what we sent to him at that time.

23    We meant that that's what's left to be given.

24    Q.   Well, you are saying that's what is left to be given, and

25    it was not taken because it was not enough is in essence
```

1    what's being said here.  Is that right?

2    A.   He asked for $25,000, and that's not -- I didn't have

3    that and, at the same time, it's not what was owed to him.

4    His demand letter said "Give me 25,000 or else," and then

5    nothing happened.

6    Q.   Well, isn't it true that $1,366.50 is not near enough for

7    what he's owed under the contract with you?

8    A.   To my knowledge it is, yeah.  On the other page can you

9    see me writing out everything.

10   Q.   Because what you did on that other page is in your own

11   handwriting --

12   A.   It was my dad's handwriting.

13   Q.   Well, in your dad's handwriting.  What your dad did at

14   your direction?

15   A.   Yes, I told him to do it.

16   Q.   What your dad did in your direction, what he did was he

17   started with total earnings of $26,130.32.

18   A.   Yes.

19   Q.   What that number is is -- it says total earnings, but

20   that's revenue.  That's the gross.  Right?

21   A.   That's how much the channel made, yes.

22   Q.   So it's really not earnings.  That number is total

23   revenue.  Right?

24   A.   No.  That was -- Every dollar the channel made in 2012 is

25   26,000.

1    Q.    Right.   And I guess I'm trying to draw your attention to

2    the fact that revenue is different than earnings.

3    A.    That's earnings; 26,000 earnings, yes.   It says total

4    earnings right there.

5    Q.    Isn't it a fact that earnings are what occur after

6    expenses?

7    A.    It says expenses under earnings, so what are you getting

8    at?

9    Q.    I'm wanting to ask you, your contract that you made with

10   Mr. Moss was that he was supposed to be entitled to 30 percent

11   off of revenue, not earnings or netting after expenses.

12   A.    So you are saying from the 26 and not from the

13   subtraction of that amount there?

14   Q.    In essence, what I'm saying, and I would like you to

15   agree with me, if you agree with the statement, is that even

16   this document that you sent to my client dishonors and

17   breaches the very agreement that you made with him, does it

18   not?

19   A.    Well, we were terminated anyway.   That is what is left.

20   He was lucky I was offering him that.

21   Q.    Well, isn't it true that you dishonored the agreement by

22   even sending this, because if you were honoring the agreement

23   you would have been saying you are entitled to 30 percent of

24   $26,130.32?

25   A.    Yes.

1   Q.   But that's not what you did.  You sent something where

2   you wanted to give him less than the agreement after you took

3   out and netted expenses.

4   A.   He himself said pay the directors.  He came up here and

5   said Marko never paid the directors.

6   Q.   It was your job to pay the directors, it was your job to

7   pay him his revenue -- Let me give you a better question.

8   A.   Sir, if you do the math, there is maybe an extra thousand

9   owed, so what are you getting at?

10  Q.   Thirty percent of 26,130.32 is higher than 1366.

11  A.   What about the $4500?  Where does that go?  In the air?

12  Q.   Sir, is it not -- What is 30 percent of 26,000?

13  A.   It's about $7500.

14  Q.   Okay.

15  A.   And then paid to him was 45, so there's 3 there.

16  Q.   Well, that's not true because 15 -- you see how -- What

17  you're trying to do is you're trying to count money that --

18          MR. VITAL:  May I approach the easel, Your Honor?

19          THE COURT:  The question is argumentative.  He has

20  answered these questions.  I think you can move on.

21          MR. VITAL:  I have a different question.

22          THE COURT:  Okay.

23  Q.   (BY MR. VITAL)  So you said you paid him 4500.  Right?

24  A.   He said that, too, yeah.

25  Q.   But 15 of the 4500 was for the return of the $1500

```
 1    injection.  Right?

 2    A.    Yeah.

 3    Q.    That didn't count towards the 30 percent.  Correct?

 4    A.    The way I viewed it it did.  I mean, it came from the

 5    money of the channel.  Where else did the money come from?

 6    Q.    Isn't it true that he was -- that David Tyler Moss was

 7    supposed to receive 30 percent in addition to receiving his

 8    1500 back?

 9    A.    Yes.

10    Q.    Okay.  So really at this point regarding 30 percent, he

11    had only received $3,000.  Correct?

12    A.    Yes.

13    Q.    Okay.

14    A.    I would also like for you to keep in mind --

15             MR. VITAL:  Objection, Your Honor; non-responsive.

16             THE COURT:  Sustained.

17    Q.    (BY MR. VITAL)  So if we add 1366 to the 3,000, that

18    doesn't get to 7500.  Is that right?  Yes or no.

19    A.    Some of the money there is after the partnership is

20    terminated, so what do you want me to say?

21             MR. VITAL:  Objection; non-responsive, Your Honor.

22             THE COURT:  Sustained.

23    Q.    (BY MR. VITAL)  If we add $1366.50 to the 3,000, that

24    still does not approach 7500, which you said is roughly 30

25    percent of 26,000.  Is that right?  Yes or no.
```

```
1    A.   Some of the money there was after the partnership was

2    terminated.

3    Q.   Did you understand the question I asked you?

4    A.   My answer is I don't know.

5    Q.   Okay.  I'll accept your answer.

6    A.   Thanks.

7    Q.   Let me take you now to 2015.  This is Defense Exhibit I.

8    Right?

9    A.   Yes, sir.

10   Q.   Now, I wrote this down.  On Mr. Wilson's examination you

11   said this was your 1099.  Right?

12   A.   No, I didn't.  I said this is all the money the channel

13   earned.

14   Q.   Okay.  Because this is Brian Martin's 1099.  Correct?

15   A.   It's all the money the channel earned, yes.

16   Q.   So who is the contract with FullScreen with?  Is it with

17   VideoGames, is it with Brian Martin, or is it with you?

18   A.   It is with Brian Martin.

19   Q.   One hundred percent?

20   A.   Are you asking if he owns the channel a hundred percent

21   or the contract is a hundred percent?

22   Q.   I am asking who the contract is with.

23   A.   It's with him.  He gets the money, then he pays me my

24   cut.

25   Q.   Okay.  When did it occur that Mr. Martin signed contracts
```

```
 1   with networks as opposed to you?

 2   A.   After we got the channel back.

 3   Q.   Okay.  So from 2014 on, all contracts with networks or

 4   whatever -- if there's just one, FullScreen, it's always been

 5   Mr. Martin.

 6   A.   Yes.

 7   Q.   Okay.  And where is ownership of the channel right now?

 8   A.   Who are the owners?

 9   Q.   As you -- In your belief, where is ownership of the

10   channel?  Does Mr. Martin own 100 percent of the channel?

11   A.   It's 50/50, me and him.

12   Q.   So it's your brief and it's your testimony that

13   Mr. Martin signed the contract with FullScreen, but you both

14   are entitled to the profits 50/50.

15   A.   Yes.

16   Q.   Okay.  So it's your testimony to the jury that this is

17   all of the profits from the channel.

18   A.   Nothing else; yes.

19   Q.   Okay.  Have you received -- where -- What other income

20   have you received or did you receive in 2015?

21   A.   Nothing else.

22   Q.   Okay.  So you're telling the jury that there is no 1099

23   or W-2 for you in -- for 2015?

24   A.   Yeah.  No.

25   Q.   What about a tax return?
```

1    A.    If I filed one?  Or what are you asking?

2    Q.    I am asking is there any tax return or tax documents

3    being prepared on your behalf for the tax year 2015?

4    A.    Yes; for my share of that money.

5    Q.    Okay.

6    A.    Brian is claiming that he paid me.  He is claiming in his

7    taxes that he paid me that amount, and that's the amount I

8    have to pay for; a W-9 sort of thing.

9    Q.    So where is the document that shows you receiving half of

10   the number reflected in Item 7 on Defense I?

11   A.    What kind of document are you looking for?

12   Q.    Was there a check?  How did you get your half of the

13   $148,842.61?

14   A.    He would get all the money in his account and he would

15   wire me, after expenses, half.

16   Q.    Okay.  And I'm asking you, in order to substantiate a

17   document that -- if you're able to show me a document or this

18   jury a document where we can, in fact, confirm that your

19   income is only a portion of 148 and not more than that.

20   A.    I can provide that if needed.  I didn't know it was

21   needed.  I didn't even know 2015 was needed until yesterday.

22   Q.    Well, yesterday when I was asking you about what the deal

23   was with Machinima, in response to one of your questions, did

24   you not confront me with the fact that you wanted me to show

25   you a document or do I have a document?  Do you recall that?

1    A.    You mean the contract with Machinima?

2    Q.    Right.

3    A.    Yes.

4    Q.    Okay.  And my response to you, if you recall was, am I

5    able to rely on your word.

6    A.    Yes.  I brought the Machinima contract today.

7    Q.    Now, with respect to being able to rely on your word--I'm

8    now transitioning to another subject--you're asking the jury

9    to rely on your word while admitting on the stand that in

10   business matters you tell lies.  Right?

11         MR. WILSON:  Your Honor, I'm going to object as to

12   argumentative.

13         THE COURT:  It is.  Sustained.

14         MR. WILSON:  Thank you.

15   Q.    (BY MR. VITAL)  You regularly lie in business, do you

16   not?

17         MR. WILSON:  Same objection, Your Honor;

18   argumentative.

19         THE COURT:  I will allow it.  Go ahead and answer.

20         THE WITNESS:  I lie as much as you try to trick

21   people.

22   Q.    (BY MR. VITAL)  How often do you think I try to trick

23   people?

24   A.    Well, me it was about 30 times yesterday, so quite a bit.

25   You said you like to try cases.

1    Q.   So your testimony to the ladies and gentlemen of the jury

2    is you lie 30 times a day?

3    A.   I was joking.  No, I don't lie that much.  If it was

4    close to April 15th --

5            MR. WILSON:  Marco, there's not a question on the

6    floor.

7    Q.   (BY MR. VITAL)  This is Defense Exhibit G.  The number

8    47,150 is -- Where did that money come from again?

9    A.   From the channel.

10   Q.   From Machinima?

11   A.   Yes.

12   Q.   When did you --

13   A.   Which year is this?

14   Q.   This is for the tax year 2014.

15   A.   It wasn't Machinima, then.

16   Q.   Who was that -- Who are those monies from?

17   A.   That was from FullScreen.

18   Q.   Okay.

19           MR. VITAL:  May I approach the witness, Your Honor?

20           THE COURT:  You may.

21   Q.   (BY MR. VITAL)  So you are telling the jury that the 2014

22   income reflected on Defense Exhibit G came from FullScreen.

23       I handed you the Defendants' exhibits.  Is there a 1099

24   document from FullScreen in those documents?

25   A.   They sent it to Brian's name, like that one for 2015, so

```
 1   he had to tell me what my cut was.

 2   Q.   So the answer to that question is no?

 3   A.   Yes.

 4        MR. VITAL:  Okay.  May I approach the witness, Your

 5   Honor?

 6        THE COURT:  You may.

 7   Q.   (BY MR. VITAL)  Has Mr. Martin shown you the 2014

 8   for -- from FullScreen?

 9   A.   Yeah, he did.

10   Q.   Okay.  So you've seen it?

11   A.   Yeah, I have.

12   Q.   But it's just not here in the courtroom?

13   A.   He can get it if need be.  He has it.

14   Q.   The answer to that question is no?

15   A.   It's not in the courtroom, no.

16   Q.   Okay.

17        MR. VITAL:  Pass the witness, Your Honor.

18        THE COURT:  Thank you.

19      Any other questions, Mr. Wilson?

20        MR. WILSON:  Your Honor, just one.

21                    REDIRECT EXAMINATION

22   By Mr. Wilson:

23   Q.   Well, I lied.  Probably going to be a little more than

24   that.

25      Marko, are you frustrated with this lawsuit?
```

```
1    A.   More than you know, yes.

2    Q.   You are angry about this lawsuit?

3    A.   Yes.

4    Q.   Would you rather be anywhere else in the world than here

5    in this courtroom?

6    A.   That's hard to put in words, but yes.

7    Q.   Okay.  What do you want the jury to know about this

8    lawsuit?

9    A.    I would like the jury to know that I feel -- my whole

10   life I've been decent, loyal, a hard-working person.  I have

11   never had any intentions of screwing anyone over or messing

12   with anyone.

13        The whole issue with Ty got terminated, it ended.  I

14   thought I could resolve it without lawyers.  It wasn't

15   resolved.  Two years passed.  As soon as he found out we got

16   the channel back, he decided to file the suit.  And then eight

17   months later his friend Brandon got involved, too.

18        I've been dealing with this case for probably three

19   years, three years now.  It's a long time.  It really stresses

20   me out, this case.  I never had been go to a case where I had

21   to go to court and stuff and deal with all this stuff.  It is

22   not something a 23-year-old wants to deal with at all.

23   Q.   Do you know, as Mr. Vital had asked, have you turned in

24   this 1099 to your CPA to do your 2015 tax return?

25   A.   Yes, I have.  It's in the process of being done.  If it
```

1  was later in the month, I'm sure I would have had it by now.

2  Q.   Okay.  And do you think you can make a call and see if

3  your CPA maybe already has the 2015 return done?

4  A.   Of course; yeah, I can.

5  Q.   And are you absolutely positive that, much like 2014,

6  it's going to reflect half of that?

7  A.   It will be a little less because we had to pay for that

8  settlement in 2015 because we didn't have the money before

9  that, so it will have that expense.

10 Q.   I'm talking about your Schedule C where you put revenue,

11 are you going to be showing 50 percent of that revenue --

12 A.   Yes, I will.

13 Q.   -- of that 1099 that went to Mr. Martin?

14 A.   Yes.

15 Q.   Okay.  And so Mr. Martin, as the CFO, has been paying you

16 all those funds.

17 A.   Yes, he has.

18 Q.   And Mr. Martin has been assisting you with all of these

19 disputes and all the other business?

20 A.   Yes, he has.

21 Q.   Okay.  Marko, would you agree with me that you are

22 probably not equipped for financial matters?

23 A.   Yes.

24 Q.   Would you agree with me that that's why you got Brian

25 working with you?

```
 1   A.   Of course, yes.

 2   Q.   And has that relationship worked out very well for you

 3   for the last four years or so?

 4   A.   Yes.  Besides this court issue, I haven't had any other

 5   issues; nothing ever.

 6   Q.   And does Brian upset you like Mr. Moss did?

 7   A.   No; never.

 8   Q.   Like Mr. Keating did?

 9   A.   No; especially not, no.

10   Q.   And Brian doesn't threaten you, does he?

11   A.   He never has, no.

12          MR. WILSON:  Pass the witness, Judge.

13          MR. VITAL:  No further questions, Your Honor.

14          THE COURT:  You may step down.  Thank you, sir.

15      Let's take our morning recess.  We will be back at 10:25.

16   Remember my admonitions previously.

17      We stand in recess.

18          (Whereupon, the jury left the courtroom.)

19          THE COURT:  Be seated, please.

20          MR. VITAL:  Forgive my presumption, Your Honor.

21          THE COURT:  I wasn't going to let you ask any

22   questions anyway.

23      I was just going to talk to you about the jury

24   instructions and where we're at on it.  Here is the problems I

25   had with them is I normally give instructions that set out the
```

```
 1    law, and then it's got short questions.  But your questions

 2    set out the law.  Do you follow me on that?

 3              MR. VITAL:  Right.

 4              THE COURT:  Which I'm fine with.  I can give them

 5    that way.  It's just that when I was reading them before I was

 6    thinking something different.  So I think that they are in

 7    pretty good shape.  We will give short questions and then -- I

 8    mean short instructions, and then the law will be given to

 9    them at each question.

10              MR. VITAL:  Yes, Your Honor.

11              THE COURT:  In other words, "Did you find there was

12    a violation of the partnership agreement?"

13        "Do you find there is a partnership agreement?"

14              MR. VITAL:  Right.

15              THE COURT:  And then it goes through what the state

16    of the law is on each of those.  I'll take out the annotations

17    and the case law references.

18              MR. VITAL:  Right.

19              THE COURT:  And I will get a clean copy.  And Ian is

20    working on that now, so hopefully we will get that pretty

21    soon.

22        What more do you have?

23              MR. VITAL:  In terms of the charge or of evidence?

24              THE COURT:  Evidence.

25              MR. VITAL:  We --
```

```
 1                THE COURT:  Mr. Keating?

 2                MR. VITAL:  We are about to call Mr. Martin, and

 3    then we will have Mr. Keating.  We are in really good shape,

 4    Your Honor.

 5                THE COURT:  Good.

 6          And I also got Judge Solis to take you first today.

 7                MR. VITAL:  Thank you very kindly, Your Honor.  I

 8    appreciate that.

 9                THE COURT:  No problem.

10          We are in recess.  Thank you.

11                        (Brief recess.)

12                THE COURT:  All right.  We can bring them in.

13                (Whereupon, the jury entered the courtroom.)

14                THE COURT:  Be seated, please.

15          Plaintiffs may call their next witness.

16                MR. WYDE:  Thank you, Your Honor.

17          And may it please the Court.  We call Brian Martin.

18                THE COURT:  Mr. Martin?

19                (Whereupon, the oath was administered by the Court.)

20                        BRIAN MARTIN,

21    Testified on cross examination by Mr. Wyde as follows:

22    Q.   Mr. Martin, on April 13th of--or excuse me--April 23rd of

23    2014, did you make a statement to Brandon Keating that you

24    wanted to roll FH up with VG somehow?

25    A.   FH meaning FuturisticHub?
```

1    Q.    That would be it?

2    A.    About the question what do you mean roll up?

3    Q.    Yes.  Merge the two.  Correct?

4    A.    Not with anything to do with him, no.

5    Q.    Uh-huh.  That is an answer to a different question, sir.

6    A.    VG and FH are both --

7              MR. WYDE:  Excuse me.  Non-responsive.

8              THE COURT:  Wait for him to ask the next question.

9    Q.    (BY MR. WYDE)  You just used the word FuturisticHub.  Is

10   that correct?

11   A.    Yes.

12   Q.    Is that the term or name for your video channel?

13   A.    My animation channel on YouTube, yes.

14   Q.    Okay.  And did you -- I'll ask the question again.  Did

15   you on April 23rd of 2014, in a communication with Brandon

16   Keating, say it was your goal that you wanted to roll

17   FuturisticHub up with VideoGames somehow?  Did you make that

18   statement?

19   A.    Yes.  At the time Brandon and I were talking, yes.

20   Q.    Uh-huh.  So have you shared your goal of rolling this

21   VideoGames channel into your channel with Mr. Princip?

22   A.    It's a different context.  When it comes to rolling, it's

23   not like a merger or anything.

24   Q.    Well, the jury will get to decide that issue, if you

25   will.  So have you discussed your goal in rolling up

1    VideoGames into FuturisticHub with your partner?

2    A.    It's already rolled up, yes.

3    Q.    Really?

4    A.    Yes.

5    Q.    You've already taken the VideoGames channel and merged it

6    into your channel?

7    A.    Yeah, we are about together.  I am on all the

8    descriptions of the channel, yes.

9    Q.    So you've merged that.  Did you do that in order to avoid

10    Mr. Princip losing control of the VideoGames channel based on

11    the jury's verdict in this case?

12    A.    When it comes to merging, it's just promotional basis.

13    Q.    So if the jury returns a verdict in this case declaring

14    Mr. Moss as a 30 percent owner, Mr. Keating 30 percent

15    owner --

16        MR. WYDE:  (To Mr. Princip) I'm sorry.  You wanted

17    to say something?

18        THE COURT:  Go ahead, Mr. Wyde.

19    Q.    (BY MR. WYDE)  And Mr. Princip 20 percent owner, and

20    maybe you 20 percent an owner, give or take, then you

21    understand you're going to have to give up control of that

22    channel.

23    A.    Absolutely not.  FuturisticHub is under a different

24    contract.

25    Q.    Are you telling this Court and telling this jury that if

1    their verdict says that these gentlemen own 60 percent of

2    VideoGames YouTube Channel, you're going to refuse to turn

3    over control of that channel?

4         MR. WILSON:  Your Honor, objection to the form of

5    the question.  It is argumentative.

6         THE COURT:  Sustained.

7         MR. WYDE:  Non-responsive.

8         THE COURT:  I sustained the objection.  You don't

9    have to answer.

10   Q.  (BY MR. WYDE) We will cross that bridge here quite

11   possibly later this afternoon, hopefully.

12        Now, let me --

13        MR. WILSON:  Your Honor, I'm going to object to the

14   sidebar.

15        THE COURT:  Sustained.

16        MR. WYDE:  Yes, sir.

17   Q.  (BY MR. WYDE) Now, let me ask you, sir, if you have any

18   written contract you can produce documenting your alleged

19   ownership interest in the VideoGames YouTube Channel prior to

20   October 23rd, 2013.

21   A.  A little bit after, actually.

22   Q.  Let me show you what's been marked as Plaintiffs' Exhibit

23   No. 11, and see if you can identify that after I tender it to

24   Mr. Wilson.

25        MR. WILSON:  No objection.

```
 1              MR. WYDE:  Permission to publish?  Sorry about that.

 2              THE COURT:  Is it admitted?

 3              MR. WYDE:  He had no objection.

 4              MR. WILSON:  No objection, Your Honor.

 5              THE COURT:  Are you offering it, then?

 6              MR. WILSON:  May I give this to the witness?  It is

 7    pretty tiny print.

 8              THE COURT:  It is admitted.

 9              MR. WILSON:  Can you make that out okay, Mr. Martin?

10              MR. VITAL:  Your Honor, I understand it is not my

11    witness, but because of OCD, was Plaintiffs' Exhibit No. 11

12    admitted?

13              THE COURT:  Yes.

14              MR. VITAL:  Thank you very kindly, Your Honor.

15    Q.   (BY MR. WYDE)  The week of September 23rd to roughly --

16    or, excuse me.  Late September and early throughout October,

17    were you attempting to negotiate a settlement in the Drew

18    Lovinger lawsuit?

19    A.   Yes.

20    Q.   Okay.  And the attorney you were dealing with that

21    represented Mr. Lovinger was a gentleman by the name of Paul

22    Smoot.  Is that correct?

23    A.   That is correct.

24    Q.   Okay.  And Mr. Smoot corresponded with you and told you

25    that you had no authority to be involved in this settlement of
```

1    the Lovinger lawsuit.  Is that correct?

2            MR. WILSON:  Objection as to hearsay as to what --

3            THE COURT:  Sustained.

4    Q.  (BY MR. WYDE)  Well, Mr. Smoot asked you, did he not, and

5    you, in return, provided this document to Mr. Smoot so that he

6    would allow you to be involved in the settlement negotiations.

7    Isn't that correct?

8            MR. WILSON:  Objection to the form of the question.

9    It is still hearsay.

10           THE COURT:  Overruled.

11   Q.  (BY MR. WYDE)  You can answer that question.

12           THE COURT:  You may answer.

13           THE WITNESS:  Can you repeat the question, please?

14   Q.  (BY MR. WYDE)  No.

15           MR. WYDE:  I apologize, Your Honor, but time is

16   precious and I want to move on.

17   Q.  (BY MR. WYDE)  So please listen to this question.  Did

18   you provide this document to Mr. Smoot?

19   A.   I don't recognize this document.

20   Q.   Okay.  You don't recognize this document?

21           THE COURT:  Mr. Wyde, why don't you hand him the

22   document so he can see it a little bit better.

23           MR. WILSON:  I have an extra copy, Judge.  I offered

24   to do that.

25           THE COURT:  I think it is easier than him looking at

1    the screen.

2        Mr. Martin, have you had enough time to see this

3    document?

4            THE WITNESS:  Yes, I have, Your Honor.

5            THE COURT:  Mr. Wyde?

6    Q.  (BY MR. WYDE)  Do you recognize that document Plaintiffs'

7    Exhibit No. 11?

8    A.   It looks like the document that was --

9            MR. WYDE:  Objection; non-responsive.

10           THE WITNESS:  Yes, I do.

11   Q.  (BY MR. WYDE)  Okay.  So now you recognize the document

12   since Mr. Wilson has provided you a copy.  Is that correct?

13   A.   Now I am reading down where it says --

14           MR. WYDE:  Objection; non-responsive.

15           THE COURT:  Overruled.

16       Go ahead and answer.

17   Q.  (BY MR. WYDE)  Do you recognize the document, sir?  Yes

18   or no.

19   A.   Yes.

20   Q.   Thank you.

21       Now, this document actually -- Let's walk the jury

22   through this.  Okay?  You told us a moment ago you were

23   attempting to negotiate a settlement on behalf of the

24   VideoGames YouTube Channel back in October of 2013.  Is

25   that correct?

```
 1    A.    Yes.

 2    Q.    And I asked you, do you have any written documentation

 3    that showed you were any kind of an owner in the VideoGames

 4    YouTube Channel before this document was created.

 5    A.    Yes, I do.

 6    Q.    Where is that document?  What document do you have and

 7    why haven't you provided it to us?

 8              MR. WILSON:  Objection, Your Honor.  It was not

 9    requested in discovery, and I move for that to be stricken.

10              MR. WYDE:  It was requested.

11              THE COURT:  We will take that up later.

12         Do you have this document, is the question.

13              THE WITNESS:  Not on me, but it is at home.

14    Q.    (BY MR. WYDE)  Nonetheless, it's not on your -- Your

15    lawyer Mr. Wilson has not included that document on his

16    evidence list.

17              MR. WILSON:  Objection, Your Honor.  The form of

18    that question is prejudicial.

19              THE COURT:  Sustained.

20    Q.    (BY MR. WYDE)  Sir, as a party to this lawsuit, do you

21    have that document here in court today?

22    A.    No, I do not.

23    Q.    Okay.  Have you brought that document to court as of

24    yesterday?

25    A.    No, I did not.
```

```
1    Q.   Do you have it from any time that this jury has been

2    impaneled?

3              MR. WILSON:  Your Honor, I am going to object again.

4    This whole line of questioning is prejudicial.

5              THE COURT:  Sustained.  It has been asked and

6    answered.  He doesn't have the document.  You might ask him

7    what the document is.

8              MR. WYDE:  Well, the point, if I may continue?

9              THE COURT:  Thank you.

10   Q.   (BY MR. WYDE)  Sir, you understand that this lawsuit is

11   about ownership of that channel?

12   A.   Yes, I do.

13   Q.   Okay.  And is it my understanding that you have failed to

14   bring a document that has something to do with your ownership

15   interest to this courtroom?

16             MR. WILSON:  Your Honor, I am going to object to the

17   form of the question.

18             THE COURT:  Overruled.

19        You may answer.

20             THE WITNESS:  Yes.

21   Q.   (BY MR. WYDE)  Okay.  Now, let's look at a document that

22   is here, and let's walk the jury through this document.

23        What is the effective date of this particular document?

24   A.   This document says October 23rd, 2013.

25   Q.   Yes.  And are you a named person in this document?
```

```
 1   A.   Yes.

 2   Q.   And you're referred to as a partner.  Is that correct?

 3   A.   That is correct, sir.

 4   Q.   And Mr. Princip is referred to as a partner.  Is that

 5   correct?

 6   A.   That is correct.

 7   Q.   And the terms and conditions are outlined a little bit

 8   lower, but this is basically a document that you created.  Is

 9   that correct?

10   A.   Yes.

11   Q.   And it was in response to Mr. Smoot's request to you to

12   provide some proof that you had an ownership interest in the

13   VideoGames YouTube Channel.

14        MR. WILSON:  Your Honor, again, objection; hearsay

15   as to what Mr. Smoot --

16        THE COURT:  Okay.  I'll allow the question.

17   Q.   (BY MR. WYDE)  You provided this document to Mr. Smoot,

18   the Lovingers' attorney, so that he would include you in the

19   settlement agreement.  Is that correct?

20   A.   This is one of them, yes.

21   Q.   Okay.  Now, where do you live?

22   A.   I live in Plano, Texas.

23   Q.   You've moved to Plano?

24   A.   Yes, I have.

25   Q.   Then why does it say that this was going to be governed
```

1    under the laws of California?

2    A.    I moved from Corona, California.

3    Q.    So you inserted your home state's law into this document.

4    Correct?

5    A.    Yes.

6    Q.    Okay.  And Mr. Princip lives in Dallas.  Is that correct?

7    Or Plano.

8    A.    Yes.

9    Q.    So there's no one right now, to your knowledge, that has

10    an ownership interest in this channel that lives in

11    California.  Is that correct?

12    A.    That is correct.

13    Q.    Can you read this paragraph to us, please, into the

14    record?

15    A.    "The agreement will be governed under the laws of the

16    state of California.  The agreement's primary purpose is to

17    ensure that Mr. Marko Princip agrees to obtain a legal joint

18    ownership of the VideoGames YouTube Channel to Mr. Brian

19    Martin, and in return retain 25 percent revenue of VideoGames

20    for the remainder of the channel's existence and operations

21    until mutual agreements on any changes should occur."

22         MR. WYDE:  May I have just a moment, Your Honor?

23         THE COURT:  Certainly.

24    Q.    (BY MR. WYDE)  Was this document drafted on or about

25    October 23rd, 2013?

```
 1   A.   As in created?

 2   Q.   Well, it doesn't have a date on the document, does it?

 3   It just has a date typed in.  Is that correct?

 4   A.   That is correct.

 5   Q.   It doesn't have any signatures on the document, does it?

 6   A.   No.

 7   Q.   So you didn't actually obtain a signature on this

 8   document from Mr. Princip, did you?

 9   A.   No.

10   Q.   Of course, your signature is nowhere on this document

11   either, is it?

12   A.   Not on this one, no.

13            MR. WYDE:  I'm inquiring as to another exhibit and

14   whether Mr. Wilson has an objection.

15            THE COURT:  Okay.  What exhibit number?

16            MR. WYDE:  No. 55, Your Honor.

17            THE COURT:  Okay.  Thank you.

18   Q.   (BY MR. WYDE)  Did you previously text message on many

19   occasions with Brandon Martin.  Excuse me.  Brandon Keating.

20   A.   To what date?  I'm --

21   Q.   Do you have Brandon Keating's phone number in your phone?

22   A.   No.

23   Q.   Okay.  You understand that Mr. Keating is going to get up

24   and take the stand after you, do you not?

25   A.   Yes, I do.
```

```
 1   Q.   You understand that Mr. Keating is going to tell us that
 2   his phone number -- what his phone number is, and produce a
 3   number of text messages between you and he.  You understand
 4   that.
 5              MR. WILSON:  Your Honor, objection.  It is
 6   argumentative.
 7              THE COURT:  Sustained.  He doesn't know that.
 8              MR. WYDE:  I'm just asking if he's aware of what's
 9   coming, Your Honor.
10              THE COURT:  I understand, but it's speculation on
11   his part, so it's sustained.
12              MR. WYDE:  I understand.
13   Q.   (BY MR. WYDE)  Do you deny text messaging with Brian
14   Keating throughout January, February, March, April, May, June
15   of 2014?
16   A.   Yes.
17   Q.   You do.  So every text message Mr. Keating produces here
18   shortly that has your name on it, he somehow fabricated.  Is
19   that what you want the jury to believe?
20   A.   Yes.
21   Q.   Okay.  So, nonetheless, you admitted a few minutes ago
22   that pursuant to a text message with your name on it, you
23   admitted you've merged FuturisticHub with the VideoGames
24   YouTube Channel.  Is that right?
25   A.   We are talking about promotional merger.  It has nothing
```

1    to do with company-based.

2    Q.    Well, sir -- And I asked you if it was your goal and if

3    you ever said back on April 23rd of 2014 to roll up.  Okay?

4    That was your term--to roll it up VideoGames into

5    FuturisticHub.  And you have already done that, haven't you?

6    A.    That's a technical term.

7    Q.    You've already done that, have you not?

8    A.    Not have rolled up.

9    Q.    Uh-huh.  So let's discuss the last part of this alleged

10   agreement.

11         So the Lovinger lawsuit was obviously ongoing at this

12   point in time.  Correct?  When this agreement was written?

13   A.    That's correct.

14   Q.    And you offered to finance part of the lawsuit in return

15   for an ownership interest in the channel.  Correct?

16   A.    No.

17   Q.    Can you -- Isn't it true, sir, that you were trying to

18   move the channel from Mr. Princip to yourself to keep Drew

19   Lovinger from actually controlling the channel?

20   A.    No.

21   Q.    Well, does it say, "Brian Martin will receive the

22   VideoGames channel from his attorney and sign the VideoGames

23   network contract as agreed upon"?

24   A.    Yes, it does.

25   Q.    Okay.  Why did you need an agreement like that with

```
 1    Mr. Princip if you already had some kind of an ownership

 2    interest?

 3    A.   Because I couldn't find it at the time, the original

 4    contract.

 5    Q.   You can't find the original.  And that would be the one

 6    that you haven't brought to court.

 7    A.   That's correct.

 8    Q.   So -- And then, of course, in return Mr. Brian Martin and

 9    Marko Princip are going to be -- will legally become

10    co-ownership and claim all rights to the VideoGames YouTube

11    Channel.  Is that correct?

12    A.   Yes.

13    Q.   Okay.  "This ownership will be recognized legally as

14    original VideoGames co-owners from the date the channel was

15    created to agreement to co-ownership."  Is that correct?

16    A.   That's correct.

17              MR. WYDE:  Now, may I go to the chart?

18              THE COURT:  Yes.

19              MR. WYDE:  Is it okay if I center it for the

20    courtroom?

21              THE COURT:  Sure.

22    Q.   (BY MR. WYDE) So we know in May of 2012 Mr. Princip

23    allegedly had a hundred percent of this channel, this asset.

24    Correct?

25    A.   That's correct.
```

1    Q.   And according to Mr. Moss, he invested 1500, and was

2    going to be a more or less a silent partner, and was, in turn,

3    supposed to receive 30 percent of the revenues.  Correct?

4    A.   That's from what I've seen.

5    Q.   So if the jury agrees with that, and I believe Mr. Wilson

6    has already stipulated here that Mr. Moss is a 30 percent

7    owner of the channel -- Did you hear that on the first or

8    second day of the testimony?

9    A.   He's not.

10          MR. WILSON:  It assumes facts not in evidence.  One,

11   it is a misstatement of what I said.

12          THE COURT:  He can testify as to what he heard in

13   evidence.

14          MR. WYDE:  I believe on direct examination --

15          THE COURT:  He can testify if he heard that.

16   Q.   (BY MR. WYDE) You didn't hear Mr. Wilson stand up and

17   say we agree that we have a contract with Mr. Moss?

18          MR. WILSON:  Objection to the form of the question.

19   It is not evidence.

20          THE COURT:  Attorney statements are not evidence in

21   the case.  Sustained.

22       Go ahead.

23   Q.   (BY MR. WYDE) So if the jury finds that Mr. Moss'

24   contract is valid and there is a continuing agreement, then

25   that would leave Mr. Princip with 70 percent.  Correct?

1   A.   By the math, yes.

2   Q.   Okay.  And then -- We haven't really heard from Mr.

3   Keating, but if I suggested to you that the contract he's

4   going to testify to is dated May 11th of 2012, if you will,

5   and he claims he owns 30 percent, then that would leave

6   Mr. Princip with 40 percent.  Do you agree with that?

7   A.   Only by the math, yes.

8   Q.   Yes.  I understand that.  We can agree to disagree.

9   Right?

10  A.   That's correct.

11  Q.   Thank you.

12       So on October of 2013, if you got 50 percent of 40 is 20.

13  Do you agree?

14  A.   By the math, yes.

15  Q.   And that would leave Mr. Princip now with only 20

16  percent.  Do you agree with that?

17  A.   By the math, yes.

18  Q.   Okay.  And that's really why we're here.  Isn't that

19  correct?

20  A.   Yes.

21  Q.   Because Mr. Princip until the cows come home cannot, will

22  not, and under no circumstances ever agree that he sold that

23  extra 30 percent to Mr. Keating.  Isn't that right?

24  A.   He never did.  That's a fake contract.

25  Q.   You weren't actually a part of any conversation back in

1    May 111th of 2012.  You weren't part of any conversation

2    between Marko Princip and Brandon Keating.

3    A.    That's not true.  I've been Marko's friend since 2010.  I

4    was there the whole time.

5    Q.    I didn't ask you if you've been his friend.  Can you

6    produce a text message, an email, a Skype, a Twitter, a note

7    from a carrier pigeon, between you and Marko Princip and

8    Brandon Keating regarding the entry of this contract dated May

9    11th, 2012?

10   A.    At this point, no, I can't.

11   Q.    And you realize, you being well-versed in the legal

12   realm.  Right?  Are you licensed to practice law?

13   A.    No.

14   Q.    You know what the term barratry is?

15            MR. WILSON:  Your Honor, I'm going to object to

16   that.

17            THE COURT:  Sustained.

18            THE WITNESS:  No.

19   Q.    (BY MR. WYDE)  The point being that you are not privy to

20   any communications between Mr. Keating and Mr. Princip back in

21   May 11th of 2012, then the fact is, is that you don't know

22   anything other than what somebody else has told you.  Correct?

23   A.    No.  I've seen the actions myself.  I know what I saw.

24   It was all abuse on their side.

25   Q.    You are never going to admit to that, are you?

1    A.    Admit to what?

2    Q.    That Mr. Keating has a legitimate contract with

3    Mr. Princip.

4    A.    He's a fraud.  I'm not going to admit that.

5    Q.    He's a fraud?

6    A.    Yes, he is.

7    Q.    Because you would wind up losing -- going from --

8    A.    It has nothing to do.

9    Q.    -- down to 20 percent and lose 30 percent ownership,

10    wouldn't you?

11    A.    It has everything to do with ethics.  He's a fraud.

12            MR. WYDE:  Objection; non-responsive.

13            THE COURT:  No.  He answered the question

14    appropriately.

15    Q.    (BY MR. WYDE)  The fact of the matter is, is that you're

16    going to lose 30 percent of your interest in this channel.

17            MR. WILSON:  Objection, Your Honor.  It calls for

18    speculation.

19            THE COURT:  Sustained.

20    Q.    (BY MR. WYDE)  Isn't that why you're testifying the way

21    you are?

22            THE COURT:  I will allow that question.

23    Q.    (BY MR. WYDE)  Isn't that why you're testifying the way you

24    are--that if the jury rules against you, you're about to lose

25    30 percent of this channel that you've already somehow, some

```
 1   way, tried to roll into your own business?

 2              MR. WILSON:  Your Honor --

 3              THE COURT:  Overruled.

 4        You may answer.

 5              THE WITNESS:  The reason why I'm testifying is

 6   because I don't --

 7              MR. WYDE:  Objection to non-responsive.  I asked if

 8   he was going to lose 30 percent of this channel, and he wants

 9   to testify as to why he's testifying.

10              THE COURT:  I will allow his answer.

11        Go ahead and answer.

12              THE WITNESS:  I don't appreciate bad business

13   ethics.  I've seen the contract.  It's fake.  And I'm here to

14   protect my business.  I put blood and sweat into this thing

15   with Marko and I working together, and they did absolutely

16   jack.

17              THE COURT:  Okay.

18              THE WITNESS:  Thank you, Your Honor.

19   Q.   (BY MR. WYDE)  Now, let's discuss briefly whether you've

20   admitted lying to Mr. Smoot with a conversation with

21   Mr. Princip.

22        Are you aware that at or near the time of October 23rd of

23   2013, when you were having email communications with

24   Mr. Smoot, you emailed or text messaged Mr. Princip, you

25   communicated with him and said, "I just lied to Paul about
```

```
 1    being an owner.  I just want easy money from the Lovingers."
 2        Did you make that comment?
 3    A.    No.
 4    Q.    Okay.  On March 24th, 2014 at 6:13 p.m., did you text
 5    Brandon Keating and state to him that, "You're just saying
 6    that I'm protecting a business I'm heading"?  Did you ever use
 7    those words?
 8    A.    No.
 9    Q.    Well, you were heading up the business at that time,
10    weren't you?
11    A.    I wasn't really speaking to him at that time, no.
12    Q.    And didn't you say that, "It's a good thing that I'm
13    taking over a hundred percent soon to protect everything"?
14    A.    No.
15    Q.    So that would be a text message that somehow Mr. Keating
16    just created that includes your name in it.  Correct?
17    A.    Much like the contract, yeah; sure.
18    Q.    And do you recall Mr. Keating, as part of that text
19    messaging on March 24th of 2014, saying to you, "A hundred
20    percent?  You're confusing me"?
21    A.    No.
22    Q.    Uh-huh.  And back on March 24th of 2014, you were aware
23    that Ty Moss had already sued Mr. Princip, weren't you?
24    A.    I knew there was something going, but I only knew all
25    about it since 2012.
```

```
 1    Q.   We can ask the Court to pull it up, but you know the

 2    lawsuit against Mr. Princip was filed March 21st, 2014.  You

 3    know that.

 4    A.   No; not completely.

 5    Q.   Right.  You don't know, as a party to this, when this

 6    lawsuit was originally filed?

 7    A.   No.

 8    Q.   That's not something that that would be important to you?

 9    A.   Ty wasn't important to me at the time.  I knew he and

10    Brandon were both frauds.

11    Q.   Yeah.  Mr. Princip, though, was important to you.

12    Correct?

13    A.   Yes.  He's my partner.  Of course.

14    Q.   Right.  And when your partner gets sued over something

15    that you allegedly own half of, I bet there's quite a bit -- a

16    few text messages, emails, and Skype chats between the two of

17    you when he got served those papers.  Correct?

18    A.   From what I understand, it was personal.

19    Q.   Again, I don't quite understand your answer, you know.

20         Let me ask it again.  Did Mr. Princip inform you

21    immediately, for the most part, that he had been sued by

22    Mr. Moss in March of 2014?

23    A.   No.

24    Q.   Well, you had been aware that Mr. Moss had already

25    previously, back in the previous year, contacted this attorney
```

1    Ms. Cochrane, and she had sent a demand letter to Mr. Princip.

2    Correct?

3    A.    I have seen some of those, yes.

4    Q.    Right.  So you knew that lawyers were getting involved at

5    least a year in advance, did you not?

6    A.    From what I understand it was just a demand letter.  I

7    didn't know it went that far.

8    Q.    Let me ask it again.  You knew lawyers were getting

9    involved, because Mr. Moss' attorney had sent a letter to

10   Kevin Ross Mr. Princip's attorney?

11   A.    Yes.

12   Q.    And on March 24th, 2014 at 6:14 p.m., you're denying here

13   under oath in a federal courtroom, knowledgeable about what

14   perjury is.  Correct?

15   A.    Yes.

16   Q.    That Brandon Keating -- Excuse me.  That you said that

17   you're "going to secure everything.  Within hours everything

18   will go through me."  You're denying that comment.

19   A.    Absolutely.

20   Q.    A hundred percent, so Marko isn't getting attacked?

21   A.    Absolutely.

22   Q.    Okay.  So -- And you wanted everything to go through you

23   and you wanted to have these secret documents so that people

24   like myself and Mr. Vital wouldn't be able to find you and

25   wouldn't be able to bring you into this lawsuit.  Correct?

```
 1   A.    No, that's not correct.

 2   Q.    Did you say on March 24th, 2014 at 6:21 p.m. that -- in

 3   response to a text message from Mr. Keating that, "I'm not

 4   blowing anyone over.  I'm simply placing a clean name on the

 5   channel so legal can't be done"?

 6   A.    I never had any text messages, so these text messages I

 7   don't understand and don't even know; not with Mr. Keating.

 8   Q.    Did you say to Mr. Keating, "If I don't get blanked over,

 9   no one gets blanked over"?

10   A.    Again, if these are text messages, no.

11   Q.    Did you say to Mr. Keating in that same text message,

12   "I'm not going to run a company that has a name that seemingly

13   is being the reason for lawsuits"?

14   A.    No.

15   Q.    "Marko knows he will never lose a thing and that legally

16   I'll own it until all lawsuits are gone."

17   A.    No.

18   Q.    And did you not conclude that text message with, "What is

19   the problem with that?"

20   A.    I have no idea what you're talking about.

21   Q.    Uh-huh.  And on that day, did you not text Mr. Keating

22   and tell him that you're done talking about VG?

23   A.    I did not text Mr. Keating at all.

24   Q.    Did you not state that -- tell Mr. Keating that you're

25   "just a middleman, and don't accuse me of what you don't
```

1    understand, please and thanks"?

2    A.    I never texted Mr. Brandon Keating.

3    Q.    And Mr. Keating didn't explain to you about -- in this

4    text messaging on March 24th in the 6:00 p.m. hour that all of

5    your channels had been suspended, including LifeInATent.  Did

6    you actually own a channel that was included in LifeInATent?

7    A.    Yes, I did.

8    Q.    And it was suspended.  Correct?

9    A.    Yes, it was.

10    Q.    Okay.  So if you never texted Mr. Keating, how would he

11    know that?  How would he know that your channel had been

12    suspended if he had never --

13    A.    Because LifeInATent was on the side of Mr. Keating's

14    channel.  He created an IShatOnU channel in 2008 or so.

15    LifeInATent was created in 2010.  We were actually trolls

16    together back then.

17    Q.    So you knew Mr. Keating from -- Did you just tell me you

18    knew Mr. Keating as far back as 2010?

19    A.    On YouTube, yes.

20    Q.    And you never once texted him or emailed him or called

21    him or anything like that?

22    A.    Never cared to, no.  No business.

23    Q.    You just knew -- How do you know each other if you don't

24    communicate with one other?

25    A.    Through YouTube; making videos, of course.

```
 1    Q.   And you would never -- And you want the jury to believe

 2    honestly, Mr. Martin, you want the jury to believe that you

 3    had no text messages, no emails, no chats, no communication

 4    with Mr. Keating, even though you had been -- you have known

 5    him--that was your term--since 2010?

 6              MR. WILSON:   Objection --

 7    Q.   (BY MR. WYDE)   That's what you want to believe.

 8              MR. WILSON:   The question is argumentative, Judge.

 9              THE COURT:   I will allow it.

10         You can answer.

11              THE WITNESS:   Yes.  No business.

12    Q.   (BY MR. WYDE)   And you deny that on April 15th -- What is

13    Endermol--E-N-D-E-R-M-O-L?

14    A.   Never heard it.

15    Q.   Uh-huh.  So Mr. Keating -- If Mr. Keating testifies that

16    on April 15th you said, "No problem.  See you there.  Thanks.

17    Also, what deal would Endermol do for me on FuturisticHub?"

18    A.   Never said that.

19    Q.   It would be your testimony that somehow Mr. Keating was

20    just dreaming up that you were shopping other networks.

21         Isn't Endermol a network?

22    A.   He used to be a network owner so, of course, he could

23    make that up.  He knew about FuturisticHub, at the time,

24    probably, too.

25    Q.   And you never told Mr. Keating on April 15th of 2014 that
```

1    the VideoGames YouTube Channel will be at 10 million views a

2    month?

3    A.    Never spoke to him.

4    Q.    Right.  And if we take 10 million --

5            MR. WYDE:  And may I approach the chart again?

6            THE COURT:  Yes.

7    Q.    (BY MR. WYDE)  If you have 10 million views and you

8    divide that by a thousand, if that's -- what you're getting is

9    $3 per view, safe to say you're going to wind up with the

10    number 10,000.  Correct?

11    A.    By the math, yes.

12    Q.    And if you multiply the 10,000 times $3 --

13            THE COURT:  I don't know that these are really

14    proper questions for this witness.

15            MR. WYDE:  Well, I'm just --

16            THE COURT:  I mean, you can make this argument to

17    the jury.

18            MR. WYDE:  Yes, sir.  And I don't have a lot left.

19            THE COURT:  You are just asking him to be a

20    calculator.  We don't need that.

21    Q.    (BY MR. WYDE)  Well, that would come to $30,000 a month.

22    Correct?

23    A.    Only by the math.

24    Q.    So when Mr. Vital was questioning Mr. Princip talking

25    about $30,000 a month, you used the exact same figure in your

```
 1   text messages with Mr. Keating.  Isn't that true?

 2   A.   That would be by math.  Anyone can do that.

 3   Q.   I didn't ask you by math, sir.  I asked you --

 4   A.   No, I never spoke to Mr. Keating.

 5   Q.   The exact same numbers somehow coincidentally, just a

 6   huge coincidence, that 10 million views works out to be

 7   $30,000 a month.  That's what you want the jury to believe.

 8   A.   Anyone can calculate that.  It's basic math.

 9   Q.   So Mr. Keating back in literally 2014, before he ever met

10   us, before he ever entered this lawsuit -- You know he only

11   entered this lawsuit sometime in the fall of 2014.  Correct?

12   A.   He started making threats way before that.

13            MR. WYDE:  Objection; non-responsive.

14            THE COURT:  Sustained.

15   Q.   (BY MR. WYDE)  Sir, do you know -- do you know when

16   Mr. Keating entered this lawsuit?

17   A.   No.

18   Q.   And yet Mr. Keating has sued you.  Is that correct?

19   A.   No; not at all.

20            MR. WYDE:  We'd ask the Court to take judicial

21   notice of the style of the case.

22            THE COURT:  You are asking this witness what he

23   knows.  And I know what has been filed with the Court, and the

24   jury will actually get a copy of everything.

25   Q.   (BY MR. WYDE)  So you don't understand -- Mr. Wilson
```

1    hasn't explained to you that Mr. Keating has sued you and

2    Mr. Princip --

3              MR. WILSON:  Your Honor, objection to the form of

4    the question.

5              THE COURT:  That is hearsay anyhow, so it is

6    sustained.

7         Why don't you move onto something else?

8              MR. WYDE:  I don't need to hear any sidebars.  If

9    you have an objection, just make your objection.

10             MR. WILSON:  I don't need to hear you going into

11   attorney/client --

12             MR. WYDE:  Mr. Princip --

13             THE COURT:  Let's take a ten-minute recess, and I'm

14   going to talk to the lawyers a little bit.

15        We will be in recess for ten minutes.

16             (Whereupon, the jury left the courtroom.)

17             THE COURT:  Be seated.

18        Listen, this has gone far enough.  Ask this witness

19   questions about pertinent facts to the case.

20        Make your proper objections.

21        Do not argue with each other in front of the jury.  That

22   doesn't help anyone, especially the jury.

23        So we will take a few more minutes, and we will continue

24   on with the testimony.

25             How much more do you have, Dan?

1          MR. WYDE:  I need to visit with Mr. Vital about any

2     other exhibits that have either been agreed to or disagreed

3     to.  I could ask Mr. Wilson has he agreed to Plaintiffs'

4     Exhibit No. 54?

5          MR. WILSON:  We have objected to that, but if you

6     will show it to me or I will look at it again and see --

7          THE COURT:  Why don't you take this time.  The jury

8     is out.  Go ahead and do that.

9        We will be in recess.

10                    (Brief recess.)

11          THE COURT:  All right.  Ready for the jury?  Can we

12    bring them back?

13          MR. VITAL:  Yes, Your Honor.

14          THE COURT:  Okay.  Did you sort out the documents,

15    the exhibits?

16          MR. WILSON:  Yes.

17          THE COURT:  Okay.

18          (Whereupon, the jury entered the courtroom.)

19          THE COURT:  Be seated, please.  Thank you.

20        Mr. Wyde, you may proceed.

21    Q.   (BY MR. WYDE)  So let me just be clear.  You're denying

22    any communications, regardless of the form of the

23    communication, with Brandon Keating.

24    A.   Yes.

25    Q.   Even if your -- Not a problem.

1          Let me go back to Exhibit No. 19, I believe.

2          Oh, did you ever use the name D'Mart?

3     A.    No.

4     Q.    You never used the name Brian D'Mart, D-'-M-A-R-T?

5     A.    No.

6     Q.    So if there's a Brian D'Mart that's part of a

7     conversation, some kind of electronic conversation with

8     yourself and Mr. Princip and Mr. Keating, that wouldn't be the

9     same Brian Martin you are?

10    A.    No.

11    Q.    Discussing FuturisticHub or VideoGames YouTube Channel?

12    That would be another Brian D'Mart?

13    A.    I don't recognize Brian D'Mart.

14    Q.    When you say you don't recognize it, are you saying here

15    under oath that you've never been referred to or used the name

16    Brian D'Mart?

17    A.    No.

18    Q.    No, you've never used it?

19    A.    Never used it.

20    Q.    Okay.  You sat here and you heard Ty's conversation or

21    his direct testimony and -- I believe yesterday morning and

22    the day before.  Do you admit being a part of conversations

23    with Mr. Ty Moss?

24    A.    Yes.

25    Q.    And did that part of those conversations include, back on

1    November 19th of 2012, you terminating or attempting to

2    terminate, or you attempting to at least terminate Mr. Moss'

3    contract with Mr. Keating?  I mean Mr. Princip.

4    A.    Yes.

5    Q.    Okay.  And you can't produce any written document wherein

6    Mr. Princip had conveyed to you any ownership interest prior

7    to October 23rd of 2013.  Is that correct?

8    A.    That's correct.

9    Q.    And this is your comment to Ty Moss back on November 19th

10   of 2012, 11:17 in the evening--"Your contract is void."

11   A.    That's correct.

12   Q.    And a part of your -- what you I believe said in a prior

13   email with Mr. Moss or Mr. Keating, or if you deny any

14   communications with Mr. Keating, that you have represented

15   yourself as having some kind of a certain amount of knowledge

16   in legal matters.  Is that correct?

17   A.    Yes.

18   Q.    Can you explain to the jury the concept of tortuous

19   interference with a contract?

20   A.    No.

21   Q.    Okay.  Are you aware, as you sit here testifying today,

22   that if the jury finds that Mr. Moss had a contract with

23   Mr. Princip and you interfered with that contract, that you

24   can be held liable?  Are you aware of that?

25   A.    No.

1    Q.    That has never been explained to you.

2    A.    Never.  Marko came up to me and asked for my help because

3    of all the threats and the abuse.  He appointed me.

4    Q.    Well, wouldn't that be a pretty good reason why you would

5    want this YouTube channel, that now you find so valuable, to

6    be rolled into your channel, isn't that a pretty good reason

7    why you would want people that actually have experience in

8    legal matters helping make these decisions so you don't expose

9    the channel to liability?

10   A.    Can you repeat the question?

11   Q.    Yeah.  If you had somebody that actually knew what they

12   were doing when it came to legal matters with these contracts

13   and things of that nature, you understand that that would help

14   prevent the channel from being sued?  Do you understand that?

15   A.    It can, yes.

16   Q.    And that's why you wanted to represent to Mr. Princip and

17   Mr. Smoot and Mr. Moss that you were well-versed in these

18   matters.  Correct?

19   A.    No.  It was a matter of protecting the abuse that he was

20   having.

21   Q.    The abuse when Mr. Moss demanded his share of the money?

22   A.    There is more abuse before that.  That is why the

23   partnership was ending.

24   Q.    And let me ask this question.  In November of 2012 when

25   you tried to unilaterally void or interfere with Mr. Moss'

```
 1    contract, had Drew Lovinger been sued?  Had you sued Drew

 2    Lovinger?

 3    A.    No.  I barely knew the guy.

 4    Q.    Had Mr. Princip sued Drew Lovinger?

 5    A.    No.

 6    Q.    And, by the way, if Mr. Princip gave the username and the

 7    password to Drew Lovinger to upload videos, you admit that

 8    that's what Mr. Princip did.  Right?

 9    A.    At the time, yes, he had to have the password.

10    Q.    Right.  Right.  Mr. Lovinger, the 15-year-old, Master

11    Lovinger excuse me, but young Andrew, or Drew, Mr. Princip

12    reached out to him to upload these videos back in the summer,

13    spring, fall, winter of 2012.  Right?

14    A.    That's correct.

15    Q.    So when Mr. Princip gets up and testifies that the

16    channel has been hacked and stolen, Mr. Princip was the one

17    who handed him the password and the username in the first

18    place.  Correct?

19    A.    That's correct.  He is using the word hacked as very

20    loosely.  He doesn't know the technical term very well.

21    Q.    Oh, okay.

22    A.    It was hijacked.  He used that word, though.

23    Q.    Well, if I likened a username and a password to, say, car

24    keys, and I handed my car keys to -- let's say I handed them

25    to the valet to go park my car.  Okay?  They, you being
```

1    well-versed in the legal arena, know that the valet can go

2    park your car.  Right?

3    A.    Right.

4    Q.    He's not going to be accused or she's not going to be

5    accused of theft, is she?

6    A.    Well, yes, but there is complications that led to the --

7              MR. WYDE:  Objection; non-responsive.

8              THE COURT:  Sustained.

9    Q.    (BY MR. WYDE)  So when I came back from wherever I went

10   and I want to get my car back and the valet says, "Oh, I'm

11   sorry; that valet's gone," that's when my car has been stolen

12   or hacked.  Correct?

13   A.    In a sense, yes.

14   Q.    And that's what happened in this case.  Mr. Princip

15   mismanaged this extremely valuable asset by turning over

16   entire control to a 15-year-old.  Correct?

17   A.    No.

18   Q.    And then you got involved and started threatening people

19   and decided to try to void everyone's agreements.  Isn't that

20   correct?

21   A.    No, that is false.

22   Q.    Then in June of 2014 you texted Mr. Keating and explained

23   to him that it's always been your goal to roll in, merge the

24   VideoGames YouTube Channel into your channel.

25   A.    No.

100

```
1    Q.   And pursuant to this agreement in October of 2013, you

2    attempted to backdate interest -- your interest in this

3    channel.  Isn't that correct?

4    A.   No.

5    Q.   And that's exactly what this document says, doesn't it?

6    A.   This is the first page.  Where is the rest?

7    Q.   Because in October of 2013 you knew about Ty Moss.

8    Right?

9    A.   Yes, I did.

10   Q.   You knew about Ty Moss?

11   A.   Yes.

12   Q.   You knew he had a contract for 30 percent.  Correct?

13   A.   I knew there was an abusive partnership, but yes.

14   Q.   Well, and you're not saying that Mr. Princip -- Are you

15   saying Mr. Princip hid -- he hid all involvement with

16   Mr. Keating from you?

17   A.   No.

18   Q.   So you were aware that Mr. Keating had allegedly,

19   supposedly entered into a contract with Mr. Princip?

20   A.   I wasn't aware of anything about Brandon Keating or

21   anything.

22   Q.   I just asked you, sir, if Mr. Princip, your partner, the

23   person you're trying to help, had made you aware of

24   Mr. Keating's involvement in the channel.

25   A.   He made me aware of the abuse only; not involvement.  It
```

1    was their abuse and their greed wanting the channel.

2    Q.   And what you refer to as abuse is text messages and

3    emails or Skype chats asking for their share of the money they

4    put up.

5    A.   Physical abuse is what I'm talking about.

6    Q.   Oh, physical abuse.

7    A.   Yes.

8    Q.   They've never met each other, have they, except at

9    deposition?

10   A.   Brandon physically threatened Marko and his household,

11   showed him a concealed -- a screenshot of a concealed weapons

12   permit or something, scared his family half to death --

13             MR. WYDE:  Objection; non-responsive.

14             THE COURT:  Overruled.

15   Q.   (BY MR. WYDE)  Okay.  So -- And let's conclude with how

16   you've treated your partner.  Marko Princip is now down to 25

17   percent of the YouTube channel.  Is that right?

18             MR. WILSON:  Objection, Your Honor.  It calls for a

19   legal conclusion.

20   Q.   (BY MR. WYDE)  Right here.  This is your agreement with

21   Mr. Princip.  Correct?

22   A.   That's not the agreement.

23   Q.   (BY MR. WYDE)  Oh, is this just a lie that you sent to

24   Mr. Smoot?

25   A.   That is that's not the full agreement.  This is only one

1    page.

2    Q.   So you came -- After two and a half years of this

3    lawsuit, after wresting control of the channel back from the

4    15-year-old, who Mr. Princip gave the username and the

5    password to, after going through all the Lovinger drama, and

6    then getting a demand letter from Mr. Moss' first attorney,

7    and then ultimately Mr. Keating -- then Mr. Moss filing a

8    lawsuit in March of 2014, and Mr. Keating getting involved in

9    August of 2014, after all of that you didn't think it was

10   important enough -- you didn't think it was important enough

11   to produce your contract that's not here today.

12   A.   I have it, but it's not here today.

13              MR. WYDE:   No further questions.

14              THE COURT:   Thank you.

15        Mr. Wilson?

16              MR. WILSON:   Thank you, Your Honor.

17              MR. WYDE:   Mr. Wilson was asking me if Plaintiff

18   Exhibit No. 11 has been admitted, and certainly we would like

19   for it to be.

20              THE COURT:   It is.

21                       DIRECT EXAMINATION

22   By Mr. Wilson:

23   Q.   Good morning, Mr. Martin.

24   A.   Good morning, sir.

25   Q.   Where were you born?

1    A.    I was born in Corona, California.

2    Q.    All right.  Where did you graduate high school?

3    A.    Yes, I have.

4    Q.    I know.  Where?

5    A.    Where?  Jurupa Valley High School.

6    Q.    Where is Corona, California?

7    A.    It is better known as next to Riverside, California; 45

8    minutes just east of Los Angeles.

9    Q.    Okay.  And did you, like Marko, like Mr. Moss--we haven't

10   heard from Mr. Keating yet--but when you were a teenager did

11   you start dabbling into the internet and YouTube and all that

12   other stuff?

13   A.    Absolutely.

14   Q.    Okay.  What was your first job?

15   A.    I was customer service at a local bowling alley.

16   Q.    Okay.  And then when did you start getting into the

17   YouTube arena?  Or let's just call it the internet arena.

18   A.    I have been on the internet since America Online.  I

19   would say -- I was born in '84, so I would say four years old.

20   Q.    Okay.  So I was right.  It was about 1984.

21   A.    It was pretty close, yes.

22   Q.    But you're not still on AOL, are you?

23   A.    It's a dinosaur compared to these days.  No.

24   Q.    I'm still on AOL.  I'll take that.

25         Anyway, back to the subject at hand.  When did you first

1    start making money off of the internet experience?

2    A.    I started doing affiliate marketing I would say in 2004.

3    Q.    And who did you do that for?

4    A.    It was just myself.  I was just selling other people's --

5    With an affiliate link, you are allowed to put it on blogs,

6    and if they buy something you get a percentage of it.

7    Q.    Okay.  So you are how old when you did that?

8    A.    I was about 20 years old.

9    Q.    Okay.  And then how did you know for sure that somebody

10   was going to pay you if you put some of their content out

11   there?

12   A.    When it comes to affiliate marketing, it would just show

13   up how much you have made, and you get a little check.

14   Q.    And how long did you work with this company or in this

15   affiliate marketing arena?

16   A.    I didn't like it very much.  I didn't like the idea of

17   selling, so it was probably a year.

18   Q.    Okay.  So 20 to 21, and then you are how old now, if you

19   don't mind my asking?

20   A.    I was 20 years old.

21   Q.    Okay.  And you are how old now?

22   A.    Right now I'm 31.

23   Q.    Thirty-one.

24   A.    Yeah.

25   Q.    Okay.  So you've been, like you said, in the internet for

1    a long time.

2    A.    Yes.

3    Q.    Okay.  This exhibit is dated 2013.  Correct?

4    A.    That is correct.

5    Q.    Okay.  Are there some other pages to that exhibit?

6    A.    Yes, there is.

7    Q.    Do you know where those might be?

8    A.    I don't know.

9    Q.    Okay.  How many other pages are contained in that little

10   snapshot there?

11            MR. WYDE:  I'm going to object to testifying to the

12   document that, one, has not been produced to us, any further

13   documents.  I am representing to the Court that is the only

14   page I got, so it wasn't produced in discovery and it's not

15   present in court, and so I would object to referencing that.

16            MR. WILSON:  Your Honor --

17            THE COURT:  Overruled.  Go ahead.

18            MR. WILSON:  You produced it to me.

19   Q.    (BY MR. WILSON)  So how many other pages --

20            MR. WYDE:  I am sorry, Judge.  If Mr. Wilson's

21   representation is I've produced these pages to him, where are

22   these other pages?  I don't know what other pages he's

23   referring to.

24            THE COURT:  I understand.

25            MR. WILSON:  I will move on.

```
 1              THE COURT:  The objection is overruled.  You may ask

 2    the question of how many pages he believes exist of this

 3    document.

 4              MR. WILSON:  Thank you.

 5    Q.   (BY MR. WILSON)  How many other pages?

 6    A.   I would say a few.

 7    Q.   Okay.  And on any of those pages are there signatures?

 8    A.   Yes, there is.

 9    Q.   Okay.  So my eyes are bad, as you can tell, so this was

10    an agreement, this was all signed, and this was all done and

11    memorialized on or about October 24th, 2013.  Is that correct?

12    A.   That's correct.

13    Q.   Okay.  And --

14              MR. WYDE:  I'm sorry.  Did you say 2014 or 2013?

15              MR. WILSON:  2013.  I'm sorry.  2013.  Three years

16    ago.

17              THE WITNESS:  Yes 2013.

18    Q.   (BY MR. WILSON)  Okay.  All right.  I'm going to go ahead

19    and show you what's been marked as Defendants' K, I think.

20              THE COURT:  Okay.

21    Q.   (BY MR. WILSON)  This is -- We have heard a lot of talk

22    about this settlement and this Lovinger lawsuit, et cetera, et

23    cetera.  Do you remember that?

24    A.   Yes, I do.

25    Q.   Okay.  Are you familiar with this document?
```

107

1   A.   Very seldom, but I have seen it.

2   Q.   I'm sorry?

3   A.   Seldom, but I have seen it, yes.

4   Q.   Okay.  And is there anything that you would dispute the

5   authenticity of this, which appears to be signed by your

6   attorney at the time?

7   A.   It's authentic.

8   Q.   Okay.  And then it looks like Marko has signed it as

9   well?

10  A.   Yes.

11  Q.   Okay.  So in this lawsuit that you-all filed, up here at

12  the top it talks about Martin and Princip, and it's against I

13  guess the mom and dad and the kid Andrew Lovinger.  Is that

14  correct?

15  A.   That is correct.

16  Q.   Okay.  And then Marko testified that the lawsuit was

17  originally in Virginia, and then now it's back in California?

18  A.   Yes.

19  Q.   Why and how did it transfer back to California?

20  A.   The lawsuit was very, very confusing.  It didn't start

21  out in Virginia; it started in California; and then it went to

22  Virginia for federal.

23  Q.   Okay.  So, suffice it to say, you and Marko originally

24  filed it as a California state action?

25  A.   We had two lawyers in California, yes.

108

1    Q.    Okay.  And then, suffice it to say, Lovinger had it

2    transferred back to the federal court in Virginia?

3    A.    That is correct.

4    Q.    And that's where you had to get your Virginia lawyer?

5    A.    We had Mark Allenbaugh.  He was practicing -- able to

6    practice in Virginia.

7    Q.    As well as California?

8    A.    That is correct.

9    Q.    Okay.  And then under the effective date, it looks like

10   that Marko had signed this back in 2014.  Is that correct?

11   A.    That is correct.

12   Q.    Okay.  And that's about when you-all got the channel

13   back--January of 2014?

14   A.    Yes, sir.

15   Q.    Okay.  And then it looks like the lawyer unfortunately --

16   I've done this myself several times at the first of the year.

17   It looks like he signed it, though, but it was like -- saying

18   January, but 2013.

19   A.    That is correct.

20   Q.    So that probably should have been 2014.

21   A.    Yeah.

22   Q.    Okay.  And then on page 2, where Marko had testified

23   about that 29,000, it looks like Marko was off a little bit by

24   a thousand dollars.  It was $30,000.  Correct?

25   A.    That is correct.  The additional 1,000 was actually what

1    was paid first.  We paid 1,000, so it was 29 left over.

2    Q.    Okay.  And then down here in the settlement terms, it

3    talks about the Lovingers are going to transfer all right,

4    blah, blah, blah, et cetera, with VideoGames to you and

5    Mr. Princip.

6    A.    That is correct.

7    Q.    All intellectual property, everything.

8    A.    Yes, sir.

9    Q.    Okay.  Nowhere was Mr. Moss sued in that action, was he?

10   A.    No, he was not.

11   Q.    Nowhere was Mr. Moss brought in the California action or

12   the Virginia action?

13   A.    Absolutely not.

14   Q.    Lovinger did not counter-sue Moss or Keating, did he?

15   A.    Absolutely not.

16   Q.    So just for calendar purposes, we lose the channel in

17   January of 2013.  The kid had the password.  Right?

18   A.    Throughout 2013, that's correct.

19   Q.    Okay.  And did you have the password?

20   A.    No.

21   Q.    Did Marko have the password?

22   A.    Before 2013, yes.

23   Q.    Okay.  Did anybody else have the password, to your

24   knowledge, other than you, the kid, or Marko prior to the

25   kid's changing the password and stealing the channel?

110

```
1    A.   No.

2    Q.   Okay.  As we sit here today, fast forward about three

3    years and three months later, anybody have the password other

4    than you and Marko?

5    A.   I currently have the password only.

6    Q.   Okay.

7              MR. WILSON:  Your Honor, we go ahead and offer

8    Defendants Exhibit K.

9              THE COURT:  Any objection to K?

10             MR. WYDE:  May I see that?  I am sorry.  Which

11   document?

12             MR. WILSON:  The one you gave me.

13             MR. WYDE:  I have no objection to that document.

14             THE COURT:  It's admitted.

15   Q.   (BY MR. WILSON)  Okay.  So we get the channel back in

16   January of 2014, and you testified about -- that you engaged

17   into a contract with FullScreen?

18   A.   That is correct.

19   Q.   Okay.  And I'm going to show you a document here in a

20   minute which is that contract with FullScreen.

21             MR. VITAL:  May we approach, Your Honor?

22             THE COURT:  Yes.

23             (The following was had outside the hearing of the

24             jury.)

25             MR. WILSON:  This is -- Mr. Wyde took the deposition
```

111

 1    of Marko.  These are the documents that Hunter Reed produced,

 2    and that's where this came from.

 3         Do you want me to give you the reference I just pulled it

 4    out of the book?

 5              MR. VITAL:  Do you have the transcript?

 6              MR. WILSON:  It's the original transcript right

 7    there.  It's Exhibit No. 35.

 8              THE COURT:  Let's go off the record.

 9              (Discussion held off the record.)

10              MR. VITAL:  Okay.

11              THE COURT:  I am glad I was able to help you with

12    that.

13              MR. VITAL:  Thank you very kindly, Judge.

14              (The following was had in the presence and hearing

15              of the jury.)

16    Q.   (BY MR. WILSON)  Okay.  Brian, we were talking about

17    FullScreen.  I am going to show you what I have marked as

18    Defendants' Exhibit L.  And this looks like effective in

19    November 24th, 2014, you and FullScreen on behalf of "Dear

20    VideoGames" up there in the upper left-hand corner.  Do you

21    see that?

22    A.   Yes, sir.

23    Q.   This was the terms of your agreement with what all

24    you-all were doing.  Is that about right?

25    A.   Yes, sir.  That is right.

 1    Q.    Okay.  And then we've got consideration down here for

 2    some money.  And then it's, I don't know, ten pages or so, and

 3    then it looks like on the very second to last page FullScreen

 4    signed that document, it's approved by FullScreen with their

 5    stamp, and that's you.

 6    A.    Yes, sir.  That's correct.

 7    Q.    Okay.  You're the talent?

 8    A.    Yes, sir.

 9    Q.    Okay.  So you are signing on behalf of VideoGames?

10    A.    Yes, sir.

11    Q.    Okay.  And why, after you got the channel back, did you

12    go with FullScreen?

13    A.    There is tons of networks.  They are just one of the best

14    ones at the time--good security, good customer service, good

15    everything.

16    Q.    Okay.

17              MR. WILSON:  Your Honor, we will go ahead and offer

18    Defendants Exhibit L into evidence.

19              THE COURT:  Objection?

20              MR. WYDE:  None.

21              THE COURT:  It's admitted.

22    Q.    (BY MR. WILSON)  I told the ladies and gentlemen of the

23    jury in voir dire this case is very scary to me because of all

24    this internet stuff.  Internet fraud, I'm going to call it.

25              Let's take my iPhone.  How can I create a fake text, if I

```
1    wanted to do that, to disparage somebody or trick somebody or

2    do something like that?  How would I do that with my iPhone

3    and then somehow print it off into some kind of content to try

4    to sway an individual to think that it really happened?

5    A.   In digital you are able to edit anything; anything --

6              THE COURT:  I'm sorry.  I couldn't hear you.

7              THE WITNESS:  Digital you are able to edit

8    anything--names, numbers, emails.

9    Q.   (BY MR. WILSON)  So give the ladies and gentlemen of the

10   jury an example.  Do you have an iPhone?

11   A.   Yes, I do.

12   Q.   So on my iPhone if I wanted to -- Let's just say I wanted

13   to have a communication with, I don't know, just anybody for

14   that matter.  How would I -- Let's just say from Marko.  How

15   would I script a conversation, a text message conversation in

16   my phone even though it didn't come from Marko and I made it

17   look like it came from Marko?  How do you do that?

18   A.   You can have a conversation with someone else; it could

19   be a friend or something, and edit the contact information.

20   Q.   So you are saying I can go into my contacts, I can put it

21   as Marko, and then just text back and forth from my own phone,

22   if I wanted to do something like that?

23   A.   And then you can edit out the name, yes.

24   Q.   Okay.  Now, how about Skype?  You know, we've seen some

25   of these Skype chats where they, to me, look like just a
```

114

1    regular secretary typing across the board.  How do you commit

2    internet fraud or fake conversations through Skype chats like

3    that?

4    A.   If you notice where it said Marko, where it said he was

5    in college or he was sleeping, he edited that himself.  He

6    could have put anything on that line.  He added "sleep" to

7    make sure everyone was assured that he was sleeping.

8         THE COURT:  Who edited?

9         THE WITNESS:  Anybody.  Like when it appears that

10   Marko is talking, he can actually edit--or anyone else--you

11   can edit a name on Skype.

12   Q.   (BY MR. WILSON)  So you mean, if I'm Skyping with Marko I

13   can change the content of our conversation?

14   A.   You can change anything, yes.

15   Q.   So I don't know if you've heard, but you hear about these

16   emails with Hillary Clinton.  Is it possible to create fake

17   email addresses over the internet and make it looked like it

18   happened when it didn't?

19   A.   Absolutely.  Hackers do it all the time.

20   Q.   So other than subpoenaing, I guess, the actual server

21   that shows those addresses where they physically came from, is

22   that the only way to know whether it's truly legitimate,

23   authenticated, and valid?

24   A.   Absolutely.  They go by IP address, and they do subpoena

25   the servers, yes.

```
 1   Q.    Okay.  So in Hillary's situation, if they think there's

 2   fake emails or it's not disclosure, they could subpoena the

 3   server and then subpoena the IP addresses, and then you

 4   cross-reference to see whether those conversations really

 5   occurred and that they didn't all happen just in one day?

 6   A.    Yes, sir.  That's correct.

 7   Q.    Okay.  When Mr. Wyde had asked you about roll in, roll

 8   up, roll on, what does that mean to you?

 9   A.    It was just a technical term basically saying I wanted to

10   use VideoGames to help promote my gaming animation channel.

11   Q.    Okay.  So do you also have another business that you

12   operate and run?

13   A.    I do, yes.

14   Q.    Okay.  And so you get separate 1099 or other W-2 income

15   other than what you're getting from FullScreen?

16   A.    I'm with Machinima on this channel, but yes.

17   Q.    Machinima.

18   A.    Yes, sir.

19   Q.    Okay.  So you saw the 2015 1099 from FullScreen.

20   Correct?

21   A.    That's correct.

22   Q.    Okay.  But you also work with Machinima?

23   A.    Yes.

24   Q.    Okay.  And Machinima pays you as well?

25   A.    Yes, they do.
```

1   Q.   Are you paid as a W-2 employee, or do you know if you are

2   paid a 1099?

3   A.   1099, sir.

4   Q.   Okay.  And what other sources of income do you have?

5   A.   That would be it.

6   Q.   Okay.  So let's just take the last three years here from

7   2013 to 2016 while you've been running the channel, or

8   assisting Marko.  Has it just been your income coming from

9   Machinima and then VideoGames channel?

10  A.   Yes, it has.

11  Q.   Okay.  And if you can tell the ladies and gentlemen of

12  the jury, what percentage of Machinima money versus what you

13  receive from FullScreen money as of -- Let's just take last

14  year, 2015.  We saw 2015, that 1099.  I think you each are

15  going to split about $70,000, or a little over that.  How much

16  additional income are you going to have, do you estimate, on

17  your 1099 from Machinima?

18  A.   The Machinima contract is a separate contract for a

19  separate channel.  Each channel has a separate contract.  I

20  made $100,000 in that year on my channel, but it has nothing

21  to do with VideoGames.  It is a separate network.

22  Q.   Okay.  And that's in 2015?

23  A.   That is correct.

24  Q.   Okay.  So, again, so the jury gets this, you've got this

25  channel VideoGames, which is supported by FullScreen.

1    A.    Yes, sir.

2    Q.    Okay.  And then you've got your channel, which is

3    supported by Machinima.

4    A.    Yes.

5    Q.    And then Marko said there are a lot of other networks out

6    there that support other people's channels that make money.

7    A.    That's correct.  They even have the ability where you can

8    create your own network.  So there's -- YouTube's at the top,

9    then you've got a network, and a sub network that anyone can

10   create under the main network, and that's how it is is three

11   levels.

12   Q.    Would you agree or disagree with me that since 2012 the

13   market has gotten a lot more competitive for you internet guys

14   that try to earn money on YouTube?

15   A.    Yes, it has.  And with technology there is also this

16   thing called AdBlock where you are able to install an

17   extension on a browser.  I'm not sure if anyone has heard of

18   AdBlock, but you are able to run that, and millions have

19   actually downloaded that, and it will block all ads,

20   especially on the YouTube channel.  You won't be able to see

21   ads and won't be paid, so it has been increasingly hard for a

22   lot of creators to generate revenue.

23   Q.    Okay.  So take you and Marko's example as we sit here in

24   2016, you saw Mr. Wyde saying 3 million or 2 million

25   subscribers, or all this nonsense.  Some of those could have

118

1    AdBlock and, therefore, you are not going to make one penny on

2    them?

3    A.    Absolutely.  Or the videos could be -- Like in

4    VideoGames, a lot of it is third-partied content, which is

5    basically if it detects like music or lyrics from a song or

6    other people's content, pictures, anything, it would be

7    detected as third party, and what that means is the actual

8    owner will be credited and VideoGames will not.

9    Q.    If you had to estimate, given you-all's channel, what do

10   you think the number of subscribers have AdBlock on there

11   where you are not getting paid anything?  Fifty percent?

12   Thirty percent?

13   A.    I looked at the analytics.  We are at 6.8 percent for PC,

14   and mobile is about 60 percent; so I would say half.

15   Q.    Okay.  So half the people have AdBlocks, and you don't

16   get any money when they check out your channel or do what they

17   do?

18   A.    That's correct.  On top of the third parties.

19   Q.    Okay.  You heard Marko testify that probably less than

20   one percent of all people actually even make any money on

21   these YouTube channels that they have.  Does that sound about

22   right?

23   A.    Yes, it does.  Absolutely agree.

24   Q.    Brian, if there's anything else that you want the jury to

25   understand about this experience, this drama, this lawsuit,

1    anything, what would that be?

2    A.    At this point I'm feeling very cheated because all this

3    has to do with greed.  I put my heart and soul into this with

4    my partner Marko, our tears.  We have suffered, we have bled

5    together, we succeeded together, and for them to come around

6    years later to do this, thinking that it's worth $1.5 million,

7    and I wish, I really do.

8    Q.    You heard when I asked Marko.  You would take 1.5 million

9    for this, wouldn't you?

10   A.    I would.

11   Q.    You would take a quarter million dollars for this,

12   wouldn't you?

13   A.    Yes.

14   Q.    It's worth what the tax returns say, isn't it?

15   A.    Absolutely.

16   Q.    All right.

17        MR. WILSON:  Pass the witness, Judge.

18        THE COURT:  Thank you.

19        Mr. Wyde, what other questions?

20                        RECROSS EXAMINATION

21   By Mr. Wyde:

22   Q.    My first question is, are you suggesting that this

23   Exhibit L is a network agreement?

24   A.    The one for FullScreen?

25   Q.    Is it your testimony that this document marked

1    Defendants' Exhibit L is a network agreement?

2    A.    Yes.

3    Q.    Okay.

4              MR. WYDE:  Could I have just a moment to visit with

5    Mr. Vital?

6              THE COURT:  Sure.

7              MR. WILSON:  Your Honor, I don't know if I admitted

8    L or not, but I think there was no objection for L.

9              THE COURT:  I think I did.  It's admitted.

10             MR. WYDE:  I'm looking for one other binder.  I

11   apologize.  I will have it in just a second.

12             THE COURT:  Okay.

13             MR. WYDE:  I am just looking for one.

14             THE COURT:  I found out my courtroom deputy turned

15   the thermostat down to 60, and she turned it up to 70 this

16   morning so it feels a little warmer in here, doesn't it?  So

17   maybe we won't have to wear Superman sweatshirts.

18   Q.    (BY MR. WYDE)  Let me show you what's been marked as

19   Plaintiffs' Exhibit No. 53.

20             MR. WYDE:  I believe Mr. Wilson, you said you had no

21   objection.  Is that correct?

22             MR. WILSON:  No objection, Your Honor.

23             THE COURT:  Okay.

24             MR. WYDE:  May I approach the witness?

25             THE COURT:  You may.

```
 1    Q.   (BY MR. WYDE)   What is Marko -- one of Marko Princip's

 2    Gmail accounts?

 3    A.   busyforawhile@gmail.com.

 4    Q.   busyforawhile@gmail.com.

 5              MR. WYDE:   You want me to write that down?

 6              MR. VITAL:   It's on the board.

 7              MR. WYDE:   Oh, is it?

 8    Q.   (BY MR. WYDE)   busyforawhile@gmail.com.

 9         Is one of Mr. Princip my.raw.nerve@yahoo.com?

10    A.   I don't recognize that one.

11    Q.   You don't recognize that one?

12    A.   No, I do not.

13    Q.   Okay.   You were -- Were you involved intimately or, you

14    know, in a great amount of time or a lot with Mr. Smoot in

15    trying to settle this Drew Lovinger lawsuit?

16    A.   Yes.

17    Q.   You were.   And didn't Mr. Princip correspond with you

18    constantly at that time?   Because you were the one really

19    doing most of the negotiating on his behalf.   Isn't that

20    accurate?

21    A.   Yes.

22    Q.   So let me show you this document here and ask if now you

23    recognize Mr. Princip's email account.

24    A.   No, I do not, but I recognize his first and last name.

25    Q.   Okay.   So his first and last name appears on this email.
```

```
1    And what is the email account?

2    A.   my.raw.nerve@gmail.com.

3              MR. WYDE:  Permission to publish?

4         This has all been admitted.  I ask the Judge, has

5    Plaintiffs' Exhibit No. 53 been admitted?

6              THE COURT:  Are you offering it?

7              MR. WYDE:  I am requesting it be admitted.

8              THE COURT:  All right.  It's admitted.

9              MR. WILSON:  No objection from the Defense, Judge.

10             MR. WYDE:  I thought we did that.  I apologize.

11   Q.   (BY MR. WYDE)  So back in October of 2012 when you were

12   telling Ty Moss that his contract was void, is it your

13   testimony that you didn't ever correspond with Mr. Princip at

14   this email account at my.raw.nerve?

15   A.   I corresponded with his name, because in Gmail you type

16   in Marko and it types in Princip, you push enter, and I didn't

17   pay attention to the email.

18   Q.   Sir, do you have any doubt that this is a communication

19   between Mr. Princip and Paul Smoot?

20   A.   I can't authenticate that.

21   Q.   I didn't ask you to authenticate it, sir.  Do you have

22   any doubt --

23   A.   Yes.

24   Q.   You do.  You do.  You doubt that this email account --

25   this email from Mr. Princip to the attorney, the Lovingers'
```

123

```
 1    attorney, somehow, some way isn't authentic?

 2    A.    Yes.  That looks like something SpecElement can do.

 3    Q.    Well, so let's see if I understand, because you are now

 4    suggesting that Mr. Princip created this email fraudulently?

 5    A.    I have no idea about the email.

 6    Q.    Right.  You're -- Now, Mr. Keating is not involved in

 7    this one, is he; this email?

 8    A.    No.

 9    Q.    Okay.  So Mr. Smoot must have fraudulently created this

10    email, the attorney.

11    A.    He was a very crooked lawyer, so I have no idea.

12    Q.    Right.  It's kind of easy to run down somebody who's not

13    present here, isn't it?

14          So do you see the bottom of that that says

15    "agreement1.pdf 61k"?

16    A.    AGR, yes.

17    Q.    What does that mean to you?

18    A.    It is a bunch of numbers and letters.

19    Q.    Uh-huh.  Well, if I show you a settlement agreement,

20    mutual release, that I believe you've already looked at that

21    was admitted --

22              MR. WYDE:  What was yours, Mr. Wilson, the proper

23    number?

24              MR. WILSON:  This is the final settlement.

25              THE COURT:  K.
```

124

```
 1              MR. WYDE:  Yes, sir.  Thank you.
 2   Q.   (BY MR. WYDE)  I'm not going to sit here and go side by
 3   side for too much, but let's take a look at this one here.
 4   Okay?
 5        So the one that Mr. Wilson offered was signed by -- was
 6   never signed by you, was it?
 7   A.   No.
 8   Q.   Uh-huh.  And the one by -- But it was signed by
 9   Mr. Princip.
10   A.   Yes.
11   Q.   Let's look at the one and the dates on that.
12        So this settlement agreement that Mr. Wilson offered into
13   evidence, you wouldn't have any question about the
14   authenticity of this document, would you, since it's coming
15   from your attorney?
16   A.   No.
17   Q.   You just question the authenticity of documents coming
18   from other people's attorneys.  Is that fair?
19   A.   Yes.
20   Q.   Okay.  So this one's dated 1/4/2014.  Is that correct?
21   A.   Yes, it is.
22   Q.   And it's signed by Marko Princip.  Is that correct?
23   A.   Yes, it is.
24   Q.   Okay.  Your signature doesn't appear on this one, does
25   it?
```

```
1    A.    Because I didn't agree to it.  This never passed.

2    Q.    So how can you have a full settlement in a lawsuit if you

3    are supposedly an owner of the company and you didn't agree to

4    it?  Can you answer that question?

5    A.    This wasn't the full settlement.

6    Q.    Can you answer that question?  You didn't agree to the

7    settlement in the lawsuit.  Isn't that correct?

8    A.    Not that settlement.

9    Q.    Because Mr. Princip at that time was telling you you're

10   not an owner in this company.

11   A.    Not true.

12   Q.    Isn't that correct?

13   A.    No.

14   Q.    Well, let's keep going.  So -- Now, if you will notice in

15   the first paragraph it doesn't redact the name of Drew

16   Lovinger, does it?  Or does it even include the name Drew

17   Lovinger?  "Abby Lovinger and Adam Lovinger on behalf of

18   Andrew Lovinger."  Correct?

19   A.    "Their minor son."

20   Q.    So let's take a look at one that's dated -- that Marko

21   Princip signed on October 12th.  Settlement agreement and

22   mutual release.  You agree that that is what the title is?

23   A.    That is what it says.

24   Q.    You agree that these black out parts are because Drew

25   Lovinger's name is there, and generally you redact minors'
```

```
 1    names from legal documents.  You know that from your
 2    experience in the legal arena.  Correct?  Is that correct or
 3    not?
 4    A.   That's what it says.
 5    Q.   No, I'm asking you, sir.
 6    A.   Experience in legal?  Are you calling me an attorney.
 7    Q.   No, sir.  Do you know why that is blacked out?  Do you
 8    know or don't you?
 9    A.   No.
10    Q.   So let's look at the last page.  Full execution.  What's
11    the date of that?
12    A.   October 12th, 2013.
13    Q.   And the reason why your name is not on this document is
14    because --
15              MR. WYDE:  I'm looking for Exhibit No. 11, Your
16    Honor, Plaintiffs' Exhibit No. 11.
17    Q.   (BY MR. WYDE)  May I see what that document is, sir?
18    A.   Yes.
19              MR. WYDE:  I found it.
20    Q.   (BY MR. WYDE)  So October 12th, 2013 there is a signature
21    for Adam Lovinger, and there's a signature for Abby Lovinger
22    on behalf of their son, and there's a signature from Marko
23    Princip.  Is that correct?
24              MR. WILSON:  Your Honor, that is a misstatement.
25    There is no signatures.
```

```
 1              MR. WYDE:  Signature line.  More than happy to

 2    correct that.

 3              THE COURT:  All right.

 4    Q.  (BY MR. WYDE)  October 12th.  But you now -- So as of

 5    October 12th, you weren't included in that lawsuit.  Isn't

 6    that correct?

 7    A.   This was a different settlement, so, I mean, this was

 8    actually --

 9    Q.   Sir --

10    A.   It was different.

11    Q.   Sir, that's why you had to have this document created on

12    October 23rd, because you had no legal interest in the

13    VideoGames YouTube Channel as of the date that the settlement

14    was going to be entered into by the Lovingers and Mr. Princip.

15    Isn't that correct?

16    A.   That's not correct.

17    Q.   Have you ever had a phone number, cellular phone number

18    949-230-3459?

19    A.   No.

20              MR. WYDE:  Your Honor, I was looking for one

21    document, one page, but I don't want to waste anyone's time.

22    I reserve my right to recall once I find that one page in this

23    mountain of paper.

24         So with that, though, I pass the witness.

25              THE COURT:  All right.  Thank you.
```

1    What else, Mr. Wilson?  Any other questions?

2         MR. WILSON:  May I approach the lectern, Judge?

3         THE COURT:  Yes.

4         MR. WILSON:  Thank you.

5                    REDIRECT EXAMINATION

6    By Mr. Wilson:

7    Q.   Brian, Plaintiffs' document that they just put up here,

8    do you see that case file right there?

9    A.   Yes.

10   Q.   Do you know --

11        MR. WILSON:  Do you-all have my Exhibit K?

12   Q.   (BY MR. WILSON)  Do you see where it has that case number

13   right there?

14   A.   Yes, I do.

15   Q.   Okay.  That is the same case number as this one right

16   here.  Do you see that, that CV-775?

17   A.   Yes, I do.

18   Q.   Okay.  So I assume your lawyer filed this.  That's a

19   federal file mark that we use on Pacer.  Are you aware of

20   that?

21        MR. WYDE:  Object to assuming a fact not in

22   evidence.  We don't know if he had legal counsel or not.

23        THE COURT:  Overruled.

24        MR. WILSON:  Thank you, Your Honor.

25   Q.   (BY MR. WILSON)  You are aware that is a federal file

1    mark stamp.

2    A.    Yes.

3    Q.    And you are aware that I guess your lawyer must have

4    filed that with the court and it's, I guess, just page 37 of

5    78.

6    A.    Yes.

7    Q.    Okay.  But that -- Is your testimony that was not the

8    final settlement agreement?

9    A.    That is correct.

10   Q.    Okay.  So this one you're saying is the final settlement

11   agreement.

12   A.    Yes, that is the final.

13   Q.    This one does not have the case mark.  Do you see that?

14   A.    Yes, I do.

15   Q.    I see the terms and conditions were changed from the

16   earlier Plaintiffs' exhibit to our later exhibit.  Tell the

17   jury why --

18        THE COURT:  I'm sorry, Mr. Wilson.  What exhibit is

19   that, for the jury?

20        MR. WILSON:  This is Defendants' Exhibit K.

21        THE COURT:  Thank you.

22   Q.    (BY MR. WILSON)  Tell the ladies and gentlemen of the

23   jury why this Exhibit K was changed compared to the previous

24   exhibit by the Plaintiffs?  I know it was subsequent in time.

25   Why did you-all change and modify some of the terms and

 1    conditions and some of the language?

 2    A.    We were doing settlement agreements.  There were several

 3    that came through.

 4    Q.    Okay.  Now, I saw in the Plaintiffs' exhibit that there

 5    were some pretty nasty allegations in this original thing that

 6    was filed with the court.  Right?

 7    A.    Yes.

 8    Q.    It looks like you accused him of felony theft.  Right?

 9    A.    Yes.

10    Q.    Criminal prosecution.

11    A.    Yes.

12    Q.    Right?  And then down here it says Martin, acting on

13    behalf, stated that Lovinger interfered with your intellectual

14    property rights to the YouTube channel video games.

15    A.    That is correct.

16    Q.    Okay.  Are you aware, to your knowledge, if your lawyer

17    ever filed this subsequent settlement document, Defendants'

18    Exhibit K, with the court?

19    A.    Yes.

20    Q.    He did.  So I should be able to go on Pacer in our lunch

21    break and print that thing off and hopefully have the final

22    signed version that would probably be dated after this

23    negotiated one that your lawyer filed.

24    A.    Yes.

25    Q.    Okay.  Mr. Martin, is there anything else that you think

131

1    the jury need clarification on after your examination either

2    with myself or with Mr. Wyde?

3        MR. WYDE:  I would appreciate -- I am grateful that

4    he is asking on my behalf --

5        THE COURT:  Sustained.

6     Well, and since this is redirect, I will only allow you

7    to go over questions that were asked by Mr. Wyde in his last

8    go at it.

9        MR. WILSON:  Thank you, Your Honor.

10        THE COURT:  So if there's anything that you wish to

11    add on that that you want the jury to know about your answers

12    and the questions previous counsel just asked you, is there

13    anything else?

14        THE WITNESS:  I just want to say that a lot of these

15    documents that are presented before you, all these settlement

16    agreements, a lot happened behind the scenes.  There is a

17    series of unfortunate events, like Marko said.  And we did

18    come to a final settlement.  We had talked, it was probably

19    five, six different times until we came to a final.

20        MR. WILSON:  Pass the witness, Judge.

21        THE COURT:  All right.  Thank you.

22     You may step down, sir.  Thank you.

23        THE WITNESS:  Thank you, Your Honor.

24        THE COURT:  Thank you.

25     Who's your next witness?

132

```
 1              MR. VITAL:  Brandon Keating, Your Honor.

 2              THE COURT:  All right.  We will break pretty soon.

 3    Can you make it another 20 minutes or so?  Because then we

 4    will break for a couple of hours.

 5        Mr. Keating?

 6              MR. VITAL:  He heeds to go to the men's room.

 7              THE COURT:  Maybe we should break now.

 8              MR. VITAL:  I would prefer to do some work, so --

 9              THE COURT:  Let's all take a ten-minute recess,

10    then.

11                         (Brief recess.)

12              THE COURT:  Okay.  Let's bring them in.

13              (Whereupon, the jury entered the courtroom.)

14              THE COURT:  Thank you.  Be seated.

15        Your next witness is?

16              MR. VITAL:  Brandon Keating, Your Honor.

17              THE COURT:  Mr. Keating, if you would come forward.

18              (Whereupon, the oath was administered by the Court.)

19                         BRANDON KEATING,

20    Testified on direct examination by Mr. Vital as follows:

21    Q.   Mr. Keating, would you please state your name for the

22    record?

23    A.   My name is Brandon Keating, Sr.

24    Q.   And would you tell the members of the jury who you are,

25    just a little -- Who is Brandon Keating, Sr.?
```

```
1    A.    I am a father, a husband, and an internet entrepreneur,
2    as well as an investor.
3    Q.    How old of a man are you?
4    A.    I am 35 years old.
5    Q.    If you could pull the microphone just a little closer and
6    speak a little louder?
7    A.    I am 35 years old.
8    Q.    And you mentioned a family.  Would you tell us about your
9    family presently?
10   A.    I have a wife, I have four children, and a stepdaughter.
11   Q.    Okay.  Where do you live?
12   A.    I live in Inverness, Illinois.
13   Q.    Where did you go to high school?
14   A.    I went to high school in Newport, Oregon.
15   Q.    Did you graduate high school?
16   A.    I did not.
17   Q.    Tell the members of the jury about that.
18   A.    I dropped out of high school in 11th grade, and from
19   there I joined Job Corps to focus on vocational training.
20   Q.    For those of us who might not know what that is, would
21   you tell the members of the jury what Job Corps is?
22   A.    Job Corps is a federal program designed to help youth
23   between the age of 16 to 24 to expand your education as well
24   as train them in different vocational skills.
25   Q.    What vocational skills or life skills did you focus on in
```

1    Job Corps?

2    A.    I focused on business administration as well as

3    accounting.

4    Q.    Were you successful in Job Corps?

5    A.    I advanced and completed as well.

6    Q.    What does that mean in terms of what you were able to

7    gain for your life skills and business skills in the world, if

8    you could explain that to the jury?

9    A.    While at Job Corps I learned a lot of technical skills

10   regarding computers, as well as basic operations surrounding

11   businesses, and got my GED as well.

12   Q.    When did you finish the Job Corps program?

13   A.    That was in 2000.

14   Q.    Whereabout or when in 2000, just roughly, if you don't

15   remember the month?

16   A.    Maybe March, April time frame.

17   Q.    What did you do after that?

18   A.    After Job Corps I worked random security jobs around

19   Portland, Oregon.

20   Q.    For how long did you do that?

21   A.    I would say approximately a year and a half.

22   Q.    Is there something or some place that you went job-wise

23   or career-wise after -- at that point in time when you

24   finished the random security jobs?

25   A.    Yes.  I joined the Navy.

135

1    Q.    Why did you do that?

2    A.    Well, September 11th had just happened, and I had kids,

3    and I felt just obligated -- I felt that there was an

4    obligation to serve my country.

5    Q.    So in response to feeling that obligation, you went to

6    the Navy?

7    A.    Yes, sir.

8    Q.    What did you do in the Navy?

9    A.    I was in law enforcement.

10   Q.    What does that mean?  How were you in law enforcement?

11   A.    I was a military police officer.

12   Q.    And sometimes I understand what you're saying, but

13   because I've talked to you I am going to ask you questions

14   like I don't know so that you can elaborate at times for the

15   ladies and gentlemen of the jury.  Okay?

16   A.    Yes, sir.

17   Q.    Okay.  So explain what one does in law enforcement in the

18   Navy.

19   A.    When I was in the Navy I was a watch commander.  I was in

20   charge of a police unit.  I had five police officers under me,

21   and we functioned as a typical police department but on the

22   military base.

23   Q.    How long were you in the Navy?

24   A.    Six years.

25   Q.    Where were you?

1    A.    I was in Port Smith, Virginia.

2    Q.    Were you ever any place else other than Virginia while in

3    the Navy?

4    A.    Yes, sir.  I was deployed to a combat zone as well as

5    deployed to Bahrain.

6    Q.    What year were you discharged -- Are you currently in the

7    Armed Services?

8    A.    No, sir.

9    Q.    You have been discharged?

10   A.    Yes, sir.

11   Q.    Were you honorably or dishonorably discharged?

12   A.    I was honorably discharged.

13   Q.    When was that?

14   A.    That was in 2007.

15   Q.    So in 2007 you are honorably discharged from the Navy.

16        Would you explain to the members of the jury what you did

17   at that point?

18   A.    After my discharge from the Navy, I was a stay-at-home

19   dad to my daughter, and I spent most of my time raising my

20   daughter and spending time on the computer at home.

21   Q.    Okay.  Forgive me for the way it sounds, but I'm going to

22   gig you a little bit in the question.

23        So when you are on the computer, are you basically a

24   stay-at-home unemployed dad, or what were you doing on the

25   internet?

1   A.    At the time I was running a recording studio.  I was

2   trying to promote my music using different internet platforms,

3   learning about which ones would be effective and which ones

4   were not.

5   Q.    Did that go well for you?

6   A.    Not for me.

7   Q.    But as you were meandering on the internet and spending

8   time on the computer when you are staying at home, why don't

9   you explain to the members of the jury where that took you in

10  terms of what you're doing presently, as briefly as you can?

11  A.    I eventually landed on YouTube, and I learned that it was

12  a great video format video platform, and I took a liking to it

13  pretty quickly.  And I spent a lot of time studying different

14  YouTubers seeing, you know, what I guess the emerging industry

15  was.

16  Q.    Did you have your own YouTube channel -- Let me ask you a

17  question.  Have you had a YouTube channel before?

18  A.    I did have a YouTube channel, but I did not upload to it.

19  Q.    Okay.  When did you ever have your first YouTube channel?

20  A.    The first YouTube channel would have been late 2005.

21  Q.    So while you were still in the Military?

22  A.    Yes, sir.

23  Q.    Okay.  When did you have your first YouTube channel

24  following your discharge from the Navy?  What was your next

25  -- So did you start a YouTube channel or do you have a YouTube

1    channel or did you ever upload videos to YouTube following

2    2007?

3    A.    Yes, sir.  I had a YouTube channel that I did upload

4    frequently on.

5    Q.    Okay.  When did you establish that YouTube channel?

6    A.    It was in 2009.

7    Q.    How many followers or subscribers did you have on that

8    channel?

9    A.    At one point I got up to about 200,000.

10   Q.    Okay.  Is that fair?  Poor?  Okay?  Good?  How would you

11   qualify that?

12   A.    Today I wouldn't consider -- I would consider it a fair

13   amount.  Back in 2009 it was one of the larger YouTube

14   channels.

15   Q.    Okay.  Did you monetize the content on your YouTube

16   channel?

17   A.    Yes, sir, I did.

18   Q.    Would you explain to the members of the jury and tell

19   them, not me, what it means to monetize content on YouTube?

20   A.    So when you are a creator on YouTube, you have the

21   capability of applying for the YouTube Partner Program.  If

22   you get accepted by the YouTube Partner Program, they allow

23   you to place Google ads on your videos, and from those videos

24   you would earn revenue.

25   Q.    Did you have a deal with the network, or were you a

139

```
1    YouTube partner?

2    A.    I was a YouTube partner.

3    Q.    And what is the difference between being -- as far as you

4    understand -- Let's take it back to 2009.

5    A.    Yes, sir.

6    Q.    Back in 2009 were there networks?

7    A.    I believe there was one network in 2009 that I can

8    recall.

9    Q.    Okay.  Now --

10   A.    I apologize.  Two.

11   Q.    You believe there were two?

12   A.    Yes, sir.

13   Q.    How many networks -- That was back in 2009?

14   A.    Yes, sir.

15   Q.    Now we are in 2016?

16   A.    Yes, sir.

17   Q.    How many networks do we have now?

18   A.    I would put it anywhere from 50 to maybe a hundred.  I'm

19   sure there is networks that I do not know about.

20   Q.    You've been in this YouTube community and business

21   consistently since 2009?

22   A.    Yes, sir.

23   Q.    To what do you attribute the proliferation of all of

24   these networks that you talked about exist now versus the two

25   that existed back in 2009?
```

140

1    A.    I'm sorry.  Can you rephrase your question?

2    Q.    I could have given it to you using regular language.

3          Why are there so many networks now in 2016 compared to

4    just the one or two that you think existed in 2009?

5    A.    Yes, sir.  Well, now in 2016 there's been a kind of a

6    shift where eyeballs go is how we say it in the industry.

7    Q.    Excuse me?

8    A.    Where eyeballs go.  So people who receive content, it

9    would either be television, YouTube, or anywhere else.  And

10   over the years more and more people started using YouTube, so

11   the more people that use YouTube the more people that watch

12   YouTube.  Advertisers understand that there is this new

13   emerging platform, so more advertisement dollars would role

14   in, and effectively more people began creating companies

15   because they saw the wave of advertisers coming in.

16   Q.    Okay.  That is as of now you and us in this courtroom,

17   that's the state of the marketplace for networks or regarding

18   dealing with networks now.  Right?

19   A.    Yes, sir.

20   Q.    All right.  Now, let's go from 2006 to 2012.

21   A.    Yes, sir.

22   Q.    So we are going back in time approximately four years.

23   Right?

24   A.    Okay.

25   Q.    Okay.

1    A.    Yes, sir.

2    Q.    Would you tell the members of the jury how many networks

3    existed back then in the 2012 time frame?

4    A.    In 2012, there were, I would say, roughly six to ten

5    networks in 2012.

6    Q.    We heard Machinima.  That was one?

7    A.    Yes.

8    Q.    In 2012 was FullScreen around as well?

9    A.    Yes, it was.

10   Q.    Okay.  As well as, per your estimate, six to eight more?

11   A.    Yes, sir.

12   Q.    Okay.  Now, let's go back -- Since we stepped ahead for a

13   second, let's go back to 2009.  You have your own channel.

14   You're a YouTube partner.  Right?

15   A.    Yes, sir.

16   Q.    So your revenue that you receive from your channel comes

17   from whom or what?

18   A.    At that time it was coming from Google.

19   Q.    And what was the basis upon which they provided revenue

20   to you?

21   A.    They would direct deposit the money into my account.

22   Q.    For -- What were the metrics or terms that you achieved

23   or had to achieve to get money from Google?

24   A.    You had to be approved for the YouTube Partner Program

25   and then, as well, approved for Google AdSense.

1    Q.    And based upon being approved for Google AdSense, how did

2    that result in money to Brandon Keating for the channel you

3    had in 2009?

4    A.    When I would upload videos I would put -- I'm sorry.  Can

5    you rephrase the question?

6    Q.    How did you make money?

7    A.    Through videos.

8    Q.    So you are making money because you have a YouTube

9    channel.  I'm trying to figure out why Google is getting you

10   money.  What is it your channel is doing or how does the money

11   come through?

12   A.    I was getting a lot of views, and that's essentially what

13   drew YouTube's attention to my channel.  And from there I was

14   able to get approved for Google AdSense.

15   Q.    So whether you are with YouTube or whether you are with a

16   network, the essential basis of a YouTuber, as we've heard it

17   in this courtroom, is making money based upon uploaded content

18   is what?  So what's the basic business model?  You-all,

19   whether you are with a network or you are with a YouTube

20   partner, you make money based upon people doing what?

21   A.    Advertising on the content and having viewers.

22   Q.    Because -- Let's ask you to tell the jury.  If you have

23   videos on your YouTube channel and you have ads, but

24   absolutely nobody looks at videos that have ads associated

25   with them, how much money are you making?

1    A.    You will not earn much.

2    Q.    Okay.

3    A.    If nobody's watching, you will earn none.

4    Q.    So if you have video content, you have ads, but you have

5    no clicks, you make no what?

6    A.    You make no money.

7    Q.    But if you have video content and ads, and you receive

8    lots of clicks on those videos with ads, you can receive what?

9    A.    That would generate into a significant amount of money.

10   Q.    So the business model in this industry for YouTubers, and

11   I think you speak for everybody here in the courtroom who

12   makes a living on YouTube, is to do what with respect to

13   content on your YouTube page?

14   A.    You would make great content and monetize it.

15   Q.    Okay.  And is the business model such that -- If the goal

16   of a partnership or a business is to maximize income, what is

17   the motivation, or what are you trying to drive viewers to do?

18   A.    To watch your videos.

19   Q.    Okay.  How long did you have, or do you still have that

20   YouTube channel that we've been talking about back in 2009?

21   A.    Yes, sir, I still have it, but I don't upload to it

22   anymore.

23   Q.    Did you turn to some other business venture within the

24   internet economy after 2009?

25   A.    Yes, sir.  In 2011 I pivoted my company and turned it

144

```
 1    into a YouTube network.

 2    Q.    You said you pivoted.

 3    A.    Yes, sir.

 4    Q.    Okay.  What does that mean?

 5    A.    So --

 6    Q.    First of all, what was your company?

 7    A.    My company's name was Vidfair.

 8    Q.    Spell that for the court reporter and the ladies and

 9    gentlemen of the jury.

10    A.    It's V-I-D-F-A-I-R.

11    Q.    Before we talk about how you pivoted, would you tell the

12    members of the jury what Vidfair did?

13    A.    In 2009-2010 Vidfair was a production company where we

14    would produce YouTube videos for monetization.

15    Q.    How did you produce videos?

16    A.    From my webcam and from my home computer.

17    Q.    Did you upload those videos, or what did you do with the

18    videos?

19    A.    I was the one who edited them as well as uploaded them to

20    YouTube.

21    Q.    On what page did you upload them?

22    A.    It was called IShatOnU.

23    Q.    Okay.

24            MR. WILSON:  I what?

25            THE WITNESS:  IShatOnU--I-S-H-A-T-O-N-U.
```

145

1   Q.   (BY MR. VITAL)  Tell the members of the jury why or how

2   you pivoted -- Let's talk about why you pivoted your company

3   Vidfair to being a network, and then we will talk about how

4   you did that.  Why did you do that?

5   A.   Well, the content I was making was not -- would not be

6   considered great content.  Although it did get a lot of views,

7   I wasn't too pleased with the production quality, so I wanted

8   to get away from creating videos and move more towards using

9   my skill to help other YouTubers become big on YouTube.

10  Q.   So how did you pivot Vidfair from producing videos, the

11  quality of which you weren't super proud of, to being a

12  network?  How did you do that?

13  A.   So I reached out to YouTube and I let them know I was

14  ready to transition into doing something else on the platform,

15  and I applied for a content management system and they allowed

16  me to operate a network within the community.

17  Q.   Okay.  I'm not asking you to get in the minds and

18  speculate about YouTube.  I'm asking your personal belief.

19       Before I ask you that, I will represent to you I don't

20  have a YouTube channel.  Can I go to YouTube and become --

21  Tell me what you did again.  You approached YouTube and you

22  did what?

23  A.   So in 2009 I applied to be a YouTube partner.

24  Q.   Okay.  But then when you pivoted the business in 2011,

25  what is it that you did?

1    A.    I reached out to YouTube and asked them if I could start

2    a network.

3    Q.    Okay.  And why do you have to reach out to YouTube, or

4    why did you believe you had to reach out to YouTube to start

5    this network?

6    A.    You cannot get a CMS account and you can't start a

7    network on YouTube without their permission.

8    Q.    Do I get to go -- I Victor Vital, trial lawyer in Dallas,

9    Texas, if I want to create a network, or I wanted to back in

10   2011, and I approached YouTube, I'm asking you what you

11   believe or how you believe they would have responded to me.

12   And feel free to denigrate me if I have to.

13   A.    I won't denigrate you.

14   Q.    You can if it's a truthful answer.  How would they

15   respond to me?

16   A.    If you were to go to YouTube and ask to start a network,

17   and you had no history with the platform and you couldn't show

18   that you're able to drive traffic, they would most likely

19   ignore you.

20   Q.    Using that answer, would you explain to the members of

21   the jury why you believe you were able to pivot Vidfair to a

22   network and you were able to interact with YouTube and have

23   them respond to you respectfully?

24   A.    I was able to demonstrate to them what I was going to use

25   the network for, and I was able to show that I was able to

1    drive traffic and gain a substantial amount of views.

2    Q.    In other words, what type of credibility did you have in

3    the YouTube economy at the time you approached YouTube to

4    pivot Vidfair to a network?

5    A.    I believe I had good credibility.

6    Q.    Did they respond to you and interact with you as such?

7    A.    Yes, sir, they did.

8    Q.    Without telling the jury what they said to you, tell the

9    jury what happened when you approached --

10        You talked about CMS.   What is that?

11   A.    That is a content management system.   It's a back door

12   system into YouTube's website that allows you to pull data

13   from any channel that you would sign to your network.

14   Q.    So incorporating into your next answer that concept of

15   CMS, when you approached YouTube, tell the members of the jury

16   what happened and how they interacted with you with respect to

17   this CMS.

18   A.    I went through an application process, and I waited I

19   can't recall how long.   I got a response.   They wanted to jump

20   on the phone with me.   I spoke with someone at YouTube

21   explained what I was trying to do.   And, in turn, they

22   approved my application.   They sent me a few links to go

23   through what they call like a trainer's course, but it's on

24   the website.   It explains what you're to do, what you're not

25   to do with a network, what kind of channels you can sign, what

1    kind of channels you can't sign.  And subsequently they gave

2    me access to their content management system.

3    Q.    How old were you at the time?

4    A.    I believe I was 28.

5    Q.    Okay.  That was --

6    A.    Actually I apologize.  No, I was --

7    Q.    How old are you now?

8    A.    I was 30 at the time.  I am 35.

9    Q.    Okay.  And as a 30-year-old, when you gain access to this

10    content management system, what did that allow you to do?

11    A.    It allowed me to find anybody creating YouTube videos and

12    offer them a partnership.  Rather than going through YouTube's

13    process, they could sign directly with me.

14    Q.    So is this now the divergence--you can either be a

15    YouTube partner or you can be with a network?

16    A.    Yes, sir.  Or you could just not be anything; you could

17    just not make money.

18    Q.    Okay.  Now, what is it that you were introducing as --

19    You had a network.  Now, Vidfair was a network?

20    A.    Yes, sir, it was.

21    Q.    What was it that you were doing with Vidfair as a

22    network?  Again, explain that in a little bit more detail.

23    A.    I would locate emerging YouTubers, I would find YouTubers

24    throughout the world who may not necessarily have a huge

25    following but I saw potential, I would sign them to my

1  company, I would help them grow their channels, and I would

2  help them monetize their content as well.

3  Q.    How many companies or individuals did you approach?

4  A.    I approached thousands.

5  Q.    How many were you successful in having engage with

6  Vidfair?

7  A.    I signed about 100 people to my network; a hundred

8  YouTube channels.

9  Q.    And let's take one as an example.  Do these deals have

10  confidentiality terms?

11  A.    Yes, they do.

12  Q.    Okay.  Well, let's speak hypothetically, then.  Would you

13  explain to the members of the jury how you or your network

14  Vidfair would sign somebody up?

15  A.    After discovering the channel, I would reach out to them

16  through either email or directly through YouTube.  I would

17  explain to them who I am, I would explain to them what my

18  company did and what we could offer them, and we would go into

19  negotiations as to whether or not they would want to join the

20  network.

21  Q.    Okay.  And if they did, what did they do?

22  A.    They would sign a contract.

23  Q.    And did that contract make reference to how they would

24  make money?

25  A.    Yes, sir, it did.

150

1    Q.   What was the basic business model by which a YouTuber

2    would make money in connection with Vidfair?

3    A.   We typically sign channels to the network off of what we

4    call the rev split.  So whatever the channel earned through

5    Google AdSense, that money would be paid to Vidfair, and then

6    whatever the contracts stated the YouTuber's percentage would

7    be, we would then turn around and pay the YouTuber that

8    percentage.

9    Q.   At the time was there another model by which you -- a

10   YouTuber could make money with a network?

11   A.   Yes, sir, there was.

12   Q.   What was that model?

13   A.   There were quite a few.  Well --

14   Q.   Was there a model that's been talked about in this case?

15   A.   Yes.  It's a guaranteed CPM.

16   Q.   And we've heard what CPM is, so I won't go into that --

17   A.   Yes, sir.

18   Q.   -- but that was prevalent in the YouTube community back

19   in 2011?

20   A.   Yes, sir, it was.

21   Q.   And what was the average CPM back then in 2011?

22   A.   The average -- Aside from a guaranteed CPM?

23   Q.   Right.

24   A.   In 2011 it varied probably from 80 cents to maybe up to

25   3.00, 3.50.

1    Q.    If you had a guaranteed CPM, what was the average?

2    A.    If you had a guaranteed CPM, it stayed at $3, or whatever

3    the CPM deal was you signed.

4    Q.    Now, let's go to 2012, 2013, 2014.  Was it usual or

5    unusual to have a guaranteed CPM of 3?

6    A.    That was usual.

7    Q.    3 CPM was not unusual?

8    A.    No, sir, it was not.

9    Q.    It was usual.

10    A.    Yes, sir.

11    Q.    Were there individuals who ran successful pages that were

12    getting rates higher than 3 CPM in 2012, 2013 and 2014?

13    A.    Yes, sir, there was.

14    Q.    I am going to talk about VideoGames for a second and then

15    go back to you personally.

16          VideoGames has how many subscribers?

17    A.    The last I checked it was over 3.3 million subscribers.

18    Q.    How does that number of subscribers compare on a

19    continuum of one to ten with other YouTube pages that have

20    heavy subscriptions?

21    A.    I would put it up about a seven, seven or eight.

22    Q.    Okay.  With you putting the VideoGames channel that high,

23    does that give you no, a little bit, or a lot of leverage in

24    terms of negotiating a CPM deal if you know what you are

25    doing?

1    A.    That would give you a lot of leverage.

2    Q.    With your experience, what would you do with that?

3    A.    What would I do with the channel?

4    Q.    No.  In terms of a -- What type of rate would you be able

5    to negotiate, based upon your experience and knowledge of the

6    industry?

7    A.    I could probably get 5 to 6.

8    Q.    And would you explain CPM?

9    A.    Yes, sir.

10    Q.    Would you explain to the members of the jury why you say

11    that?

12    A.    I currently own a piece of a YouTube channel called New

13    Media Rockstars, who is assigned to a network called Zealot

14    Networks, and they are currently receiving $5 for every

15    thousand views.

16    Q.    And what are their number of subscribers?

17    A.    They have 500,000 subscribers.

18    Q.    They have 500,000, and this channel has how many?

19    A.    3.3 million subscribers.

20    Q.    Now, if we go to YouTube or Google right now and we put

21    in VideoGames without a space in between it, where does

22    VideoGames show up in the Google search results?

23    A.    I believe it shows up as number one.

24    Q.    If you separate video from the word games, where does it

25    show up in the Google results today?

1    A.    I believe it is number three.

2    Q.    Whether it is one or three, how valuable or not valuable

3    is that level of placement for this channel VideoGames?

4    A.    I don't even think I could begin to explain how valuable

5    that is.

6    Q.    It's valuable?

7    A.    Absolutely.

8    Q.    Okay.  Mr. Moss in his testimony said the placement is

9    worth -- He used the word millions.  Would that be a fair

10    statement?

11    A.    That would be a fair statement.

12    Q.    Based upon the level of revenue that could be generated

13    based upon subscribers that you can drive to the channel?

14    A.    Yes, sir.

15    Q.    Among other things?

16    A.    Yes, sir.

17    Q.    Okay.  Now, let's go back to you being a network and

18    signing people.  How long did -- was Vidfair a network?

19    A.    I operated Vidfair for just over a year.

20    Q.    So from 2011 to 2012?

21    A.    Yes, sir.

22    Q.    Tell the members of the jury what happened in 2012.

23    A.    My company was acquired by a bigger network in 2012.

24    Q.    What was that bigger network?

25    A.    It was called Maker Studios.

1    Q.    And what -- Was it a total acquisition?

2    A.    Yes, sir, it was.

3    Q.    Did you have a business lawyer?

4    A.    Yes, sir, I did.

5    Q.    So you will understand this question.  Was it a merger or

6    was it an asset deal, asset acquisition?

7    A.    It was an asset acquisition.

8    Q.    At what price were the value -- At what value were your

9    assets sold in that asset deal to Maker Studios?

10   A.    It was over seven figures.

11   Q.    Okay.  And at the time you started Vidfair, what was your

12   initial investment of capital?

13   A.    There was no investment of capital.

14   Q.    It was all sweat equity?

15   A.    Bootstrapping; yes, sir.

16   Q.    You turned sweat equity into how much value again in

17   terms of the asset transaction?

18   A.    Several million.

19   Q.    Okay.  How did that deal come about?  Did you seek that

20   deal or did Maker Studios seek you out?

21   A.    No, sir, they sought me out.

22   Q.    And I guess a willing buyer and a willing purchaser

23   arrived at a number that you thought was fair and they thought

24   was fair?

25   A.    Yes, sir.

1    Q.   So you sold your assets, and you're no longer the owner

2    of those assets that was the Vidfair network.  Right?

3    A.   No, sir, I'm not.

4    Q.   So how are you making a living at that point?  If you had

5    to make a living, what is it that you were doing after you

6    sold the network to Maker Studios?

7    A.   So part of the deal was I joined Maker Studios as a

8    general manager.

9    Q.   Okay.  As a salaried employee?

10   A.   Yes, sir.

11   Q.   Okay.  How long did you do that?

12   A.   I would say approximately a year and six -- maybe a year

13   and seven months, up until October of 2014.

14   Q.   And in October of 2014 what happened?

15   A.   I was let go.

16   Q.   Okay.  And what are you doing today to sustain -- to make

17   a living?

18   A.   Currently I run a production studio, as well as I have

19   other investments kind of scattered around the industry.

20   Q.   Now, I know what this is because I've gone to the

21   internet.  Is your business New Millennial?

22   A.   Yes, sir, it is.

23   Q.   Are you the owner of that business?

24   A.   Yes, sir, I am.

25   Q.   Along with your wife?

1    A.    Yes, sir.  She's a partner.

2    Q.    And what is it that that business does?

3    A.    We are a production company.  We produce branding deals

4    or we produce branding commercials, we produce new media

5    content, as well as we're getting into producing feature

6    films.

7    Q.    So we've taken the jury -- And that's what's going on

8    currently with you.  Right?

9    A.    Yes, sir.

10   Q.    I'm going to push the rewind button, and we're going to

11   go back to 2012.  Okay?

12   A.    Yes, sir.

13   Q.    In 2012, you were either selling to or about to sell to

14   or had sold to Maker Studios.  Correct?

15   A.    Yes, sir.

16   Q.    In that same year, 2012, did you start to interact with

17   anybody that's here in this courtroom today?

18   A.    Yes, sir.

19   Q.    Who was that?

20   A.    It was Mr. Princip.

21   Q.    Would you tell the members of the jury what your first --

22   what you recall your first interaction being with Mr. Princip

23   in 2012?

24   A.    Well, first interactions in 2012, we would discuss

25   YouTube; just the YouTube industry.

1  Q.    Okay.  So I guess I should ask you, as of 2012, what was

2  the nature of your relationship with Mr. Princip?

3  A.    He was an acquaintance and somebody that would often ask

4  for advice in the YouTube community.

5  Q.    How long was he -- Did you know him personally or just

6  through YouTube?

7  A.    We knew each other through YouTube, Skype, Twitter.

8  Q.    Okay.  So I'm going to ask you as a Generation Xer, who

9  is almost a Baby Boomer--I missed the baby boom years just by

10  a tad -- I prefer paper versus electronic, but I digress with

11  my sidebar.

12      Tell them, how is it that you can have a relationship

13  with somebody that you never met before in person?  How does

14  that work?

15  A.    Well --

16  Q.    So you are saying you knew Mr. Princip but you never met

17  him?

18  A.    Correct; yes, sir.

19  Q.    So when you answer this question, don't look at me at

20  all.  Look at them.  How is it you have a relationship with

21  this gentleman but you never ever laid eyes on them and had

22  skin touch each other shaking hands, please.

23  A.    We discussed many things through Skype.  We often would

24  have conversations in Skype, on the phone, through Twitter.

25  We discussed many different aspects of life.  I mean, we

1    communicated a great deal.  So while I may not have met him

2    personally, we still shared intimate details about our lives,

3    and we had what I thought was a connection, like a friendship.

4    Q.   Let me give you an example.  If I go to a coffee shop and

5    I bump into somebody, or somebody -- they have on a shirt I

6    like, I can strike up a conversation with them and we might

7    become fast friends.  And that has happened for me before.

8         How in the world is it that you ever get to meet somebody

9    through the internet and then start talking to them and you

10   never even met them before?  How does that work?  So I'm

11   asking the question again, because I'm trying to have you

12   communicate in words that everybody might understand how that

13   can even happen.

14   A.   Correct.  Or yes, sir.

15   Q.   And not offending you.  I'm just asking you to explain

16   your way of life in a way that makes sense.

17   A.    Yes, sir.  So being active in the YouTube community, it's

18   beneficial to try and network with others in the YouTube

19   community.  So if you are a YouTuber that wants to be

20   successful, you will reach out to other YouTubers or

21   communicate with other YouTubers who are doing the same thing

22   as you.  And it's easy to strike up a friendship based off of

23   things you share in common.  We were both creators, so that

24   kind of -- that led to subsequent discussions.

25   Q.    Okay.  And do you recall, if you do, who it was who

1   approached whom to develop the relationship?  Did you approach

2   him saying, "You look like you have cool content"?  Did he

3   approach you?  How did that initial virtual connection happen?

4   A.    This would have been around 2009 maybe, so I'm not a

5   hundred percent sure, but I believe he reached out to me

6   first.

7   Q.    Okay.  And you mention that from time to time he,

8   Mr. Princip, would ask you for advice.

9   A.    Yes, sir.

10  Q.    How soon in time in your relationship, your virtual

11  relationship, with Mr. Princip did that start?

12  A.    I couldn't recall.

13  Q.    Did you have a reputation in the network and YouTube

14  community as being somebody who was a mentor of such for young

15  YouTubers?

16  A.    Yes, sir, I did.

17          MR. WILSON:  Your Honor, I object, as that is

18  bolstering.

19          THE COURT:  Overruled.

20  Q.    (BY MR. VITAL)  Please.

21  A.    Yes, sir, I did.

22  Q.    Tell the members of the jury about that.

23  A.    I've discovered a lot of YouTubers just starting out, and

24  I've given them advice to help them grow their channel, and a

25  lot of those channels have had success afterwards.

1    Q.   Did you do that sometimes for no money?

2    A.   Yes.

3    Q.   Why so?

4    A.   I like helping people.

5    Q.   Would you tell the members of the jury what type of

6    advice early on -- Before the events that took place in this

7    case, what type of information or advice would Mr. Princip

8    seek from you, Mr. Keating?

9    A.   Usually it was just my opinions on his channel; anything

10   that I could suggest that might help his channel be more

11   visible, maybe help improve his content.

12   Q.   What was his channel?

13   A.   When I first met Mr. Princip, it was a channel called

14   MyRawNerve.

15   Q.   Okay.  And was that a successful channel in terms of

16   subscribers?

17   A.   In 2009, yes, sir, it was.

18   Q.   Okay.  So like you, he had fairly -- a fair to good

19   amount of subscribers such that he had some rep in the YouTube

20   community?

21   A.   Yes, sir.

22   Q.   And by rep I mean reputation.  You understood that?

23   A.   Yes, sir.

24   Q.   Okay.  How long did Mr. Princip have the MyRawNerve

25   YouTube channel that you gave him advice about?

161

```
 1    A.    I don't know how long he had the channel for.

 2    Q.    How -- Is it still around?

 3    A.    No, sir.

 4    Q.    Did he have a channel after that?

 5    A.    Yes, sir.

 6    Q.    What was that channel?

 7    A.    It was called Team Noble.

 8    Q.    And he explained Team Noble and what it meant.  There is

 9    a game Halo where courageous men and women fight aliens.  Is

10    that what Halo is?

11    A.    I don't play Halo.  I'm sorry.

12    Q.    I played it with my son.  I did.  It's a pretty fun game.

13          So he mentioned -- So you don't know anything about noble

14    and what that means.

15    A.    No, sir.

16    Q.    But suffice it to say, Team Noble had few, average, or

17    many followers?

18    A.    From what I can remember, I believe it was around 100,000

19    to 200,000 followers.

20    Q.    Is that fairly decent?

21    A.    It is fairly decent, yes.

22    Q.    So if Mr. Princip approaches you regarding a business

23    deal regarding a new channel called VideoGames, how would you

24    -- how did you view -- That question assumed a fact.

25          Did Mr. Princip approach you about a channel called
```

162

1   VideoGames?

2   A.   He approached me about starting a YouTube channel, but at

3   the time it wasn't called VideoGames.

4   Q.   What did he call it?

5   A.   He said it was going to be called Achievement Guide.

6   Q.   Now, in one of the exhibits, either Plaintiffs Exhibit 13

7   or 16, a Skype chat with Tyler Moss, do you remember him using

8   that same phrase--Achievement Guide?

9   A.   Yes, sir, I do.

10  Q.   What did he tell you Achievement Guide was going to do as

11  a channel?

12  A.   He told me it would be Team Noble 2.0, so essentially

13  what Team Noble was doing.

14  Q.   Game guides?

15  A.   Yes, sir.

16  Q.   Okay.  What does VideoGames do right now?

17  A.   They upload videos that deal with video games.

18  Q.   And what is a game guide?

19  A.   A game guide -- From my understanding, what a game guide

20  is, is like a walk-through, telling people how to play a video

21  game and beat it quickly.

22  Q.   Okay.  So there was this cool video game on one of the

23  old platforms, and the character was Sam Fisher, and he was a

24  black ops guy, and you would have to matriculate through these

25  levels.  And if you couldn't get to a level when I was playing

163

1    these games with my son, there were these cheat sheets, and I

2    forgot where you go to.  Is game guides and the VideoGames

3    channel, do they have these cheat sheets, or if you are stuck

4    on this level here is how you get through the level to the

5    next level, or show people how to play the games?

6    A.    I believe that's what a game guide is, or it would also

7    be referred to as a walk-through.

8    Q.    Are there walk-throughs on the VideoGames channel?

9    A.    I have not seen any.

10   Q.    Okay.  Would you tell the members of the jury what it is

11   that the VideoGames channel is doing?

12   A.    Right now?

13   Q.    Right.  What it was -- When Mr. Princip approached you

14   regarding VideoGames in this concept of a channel, whatever it

15   was going to be called, what was the channel supposed to do?

16   A.    It was going to be featuring other directors, other

17   YouTube creators' videos.  They would create the videos to be

18   placed on this channel.  It would be like a central hub for

19   video game videos.

20   Q.    Okay.  So if Mr. Princip approached you regarding

21   something called Achievement Guides, how are you drawing any

22   connection between that and the VideoGames channel?

23   A.    Well, at the time of the discussions he told me that he

24   was thinking it would be called Achievement Guide, but he

25   would have to come up with a name for the channel later.

1    Q.   Okay.  So what he represented to you initially as

2    starting off as Achievement Guide, are you telling the jury

3    that that is the same thing now as VideoGames?

4    A.   Yes, sir, I am.

5    Q.   Okay.  And the Skype chat that we saw with Mr. Moss

6    referred to the same phrase--Achievement Guide.  Right?

7    A.   Yes, sir.

8    Q.   Based upon a contract that's now in evidence, whether

9    it's voided or not, there's no dispute that that contract that

10   came into existence after he represented Achievement Guide

11   relates to VideoGames.  Right?

12   A.   Yes, sir.

13   Q.   Okay.  So when Mr. Princip approaches you regarding

14   Achievement Guide, or to invest in some channel, does he have

15   enough credibility within the YouTube community that it's

16   worth even listening to him?

17   A.   Yes, sir.

18   Q.   So you did what?

19   A.   I listened to him.

20   Q.   And what is it that Mr. Princip represented to you?

21   A.   He told me that it would be bigger than the channel that

22   he had run previously and that it would be making a lot of

23   money, and he asked me to invest in it.

24   Q.   And did you invest in it?

25   A.   Yes, sir, I did.

1    Q.    How much did you invest?

2    A.    $1,500.

3    Q.    Now, there's been some talk in this courtroom about fake

4    contracts and fake Skype chats and such.  Let's talk about

5    your contract with Marko Princip.  Do you have a fake contract

6    that you made up that is not with Mr. Princip?

7    A.    No, sir.

8    Q.    Are you familiar with -- What is EchoSign?

9    A.    EchoSign is a company that was purchased by Adobe and

10   it's a digital contract website.  You can digitally sign

11   contracts through EchoSign.

12   Q.    So I have in my right hand--for the record you'll have to

13   call it out--a what?

14   A.    A pen.

15   Q.    An ink pen.  Right?

16   A.    Yes, sir.

17   Q.    I can use this ink pen to sign what?

18   A.    Documents.

19   Q.    And contracts?

20   A.    Yes, sir.

21   Q.    Now, we are in a new age.  You're telling me that this

22   ink pen that I have in my right hand I don't have to use one

23   of these to sign a contract?

24   A.    No, sir.

25   Q.    I can sign a contract how?

```
 1   A.   You can sign it digitally through what is called an

 2   E-signature.

 3   Q.   And those are provided through EchoSign?

 4   A.   Yes, sir.

 5   Q.   Which, again, is a company or product of what?

 6   A.   Adobe.

 7   Q.   Adobe, which is also the company that has given us the

 8   wonderful thing called PDF.

 9   A.   Yes, sir.

10   Q.   Okay.  And when you EchoSign these contracts, do you get

11   to create a PDF through the Adobe system and flip it to the

12   person that you are contracting with?

13   A.   Yes, sir.  When you -- I am sorry.  Yes.

14   Q.   Okay.  Have I omitted something in my ignorance of

15   E-commerce, which I probably have?

16   A.   Yes, sir.  When you sign a contract on EchoSign --

17   Q.   You are supposed to say no.  I'm joking.  Go ahead.

18   A.   When you sign a contract on EchoSign, after signing it

19   and they digitally encrypt it, they then sent it to an email

20   that you put in that you would like to contract then shipped

21   to.  So you can send it, but EchoSign automatically does that

22   for you.

23   Q.   So what you're saying is you can sign a document and then

24   put "to," and if you want it to go to busyforawhile@gmail.com

25   or my.raw.nerve@gmail.com, you can type that in there?
```

1  A.   Yes, sir.

2  Q.   And does it give you the option to then send that

3  digitally signed agreement?

4  A.   It automatically sends it for you.

5  Q.   To the address that you typed in?

6  A.   Yes, sir.

7  Q.   Okay.

8            MR. WILSON:  May we approach, Your Honor?

9            THE COURT:  Yes.

10           (The following was had outside the hearing of the

11           jury.)

12           MR. WILSON:  Can you get the exhibit?  I will wait.

13      Your Honor, here is Exhibit No. 1.

14           THE COURT:  Okay.

15           MR. WILSON:  I've been kicking and screaming since

16  day one about that exhibit, because your client testified that

17  he spoke to Mr. Brandt who allegedly signed the contract who

18  said he never signed the contract.  It's all in his

19  depositions here of what he said.

20      I can take him on voir dire right now and discredit this

21  contract because, obviously, one of those signatures is a

22  fraud or false and his client admitted to it.  I don't want to

23  embarrass you.

24           MR. VITAL:  That is on cross examination, or I can

25  lay a predicate is all I can do.

168

```
 1              THE COURT:  I've got nothing before me.

 2              MR. VITAL:  That's all I can do is lay a predicate.

 3              THE COURT:  We are going to break in a second.

 4    Maybe we can wait.  Let's break.

 5              (The following was had in the presence and hearing

 6              of the jury.)

 7              THE COURT:  All right.  We are going to break for

 8    lunch, but it's going to be a long lunch.  I expect we will

 9    get counsel back by 2:30, because Judge Solis is the fastest

10    talker I know, so he will be pretty quick.  And we've arranged

11    that counsel gets to go first in his court, and he's got five

12    sentencings.

13         So we will be in recess.  Remember my admonition.  Don't

14    form an opinion.  And we will see you back at 2:30.

15                        (Lunch recess.)

16              THE COURT:  Be seated, please.

17              MR. VITAL:  May Mr. Keating resume the witness

18    stand, Your Honor?

19              THE COURT:  Yes.

20         You may proceed.

21              MR. VITAL:  Thank you very kindly, Your Honor.

22    Q.   (BY MR. VITAL)  When we --

23              MR. VITAL:  May I approach the witness?

24              THE COURT:  You may.

25    Q.   (BY MR. VITAL)  Before we broke for lunch I was going to
```

1   show you and now I am going to show you what is marked as

2   Plaintiffs' Exhibit No. 1.  Would you flip through all the

3   pages of that document, and after flipping through all the

4   pages of that document tell me if you recognize that document.

5   A.   Yes, sir, I do.

6   Q.   What do you recognize that document to be?

7   A.   This is the contract that I signed with Mr. Princip.

8   Q.   Marko Princip, one of the Defendants in this case?

9   A.   Yes, sir.

10  Q.   And just to join issue, this is the contract that we've

11  heard you claim is a real contract.  These gentlemen say is a

12  fake contract.

13  A.   Yes, sir.

14  Q.   Are you able to -- This obviously -- Is this the original

15  or is this a copy?

16  A.   No, sir.  That's a copy.

17  Q.   You talked about the EchoSign process is the original

18  electronic.

19  A.   Yes, sir.

20  Q.   And does it reside somewhere?

21  A.   Yes, sir.

22  Q.   And where does it reside?

23  A.   It resides on an Adobe server.

24  Q.   In order to access the Adobe server to get the original,

25  do you have to have some type of credentials?

170

1    A.    Yes, sir.  You have to have an account with Adobe

2    EchoSign.

3    Q.    Do you have such an account?

4    A.    Yes, sir, I do.

5    Q.    How long have you had such account?

6    A.    I believe I created it in early 2011.

7    Q.    And the document that you just identified for the record,

8    Plaintiffs' Exhibit No. 1, the original of this document

9    resides on the Adobe server that can be accessed through your

10   account?

11   A.    Yes, sir.

12   Q.    Which you've had since before the date you entered into

13   what you identified as Plaintiffs' Exhibit No. 1?

14   A.    Yes, sir.

15   Q.    Now, can you -- I have a computer in front of me that is

16   presently connected to the internet.  I'll represent that to

17   you.  Can you access your Adobe account from any computer?

18   A.    Yes, sir.

19   Q.    I've been holding up this computer here.  What is this I

20   have in my left hand?  Would you identify what this is?

21   A.    That is my personal MacBook.

22   Q.    MacBook is Apple's version of a laptop --

23   A.    Yes, sir.

24   Q.    -- for lack of a better term?

25   A.    Yes.

171

1  Q.   This is connected to the internet.  Can you get to your

2  Adobe account?

3  A.   Yes, sir.

4  Q.   But can you also get to your Adobe account through this

5  fine Lenovo machine of Dan Wyde's that is before me?

6  A.   I would disagree with "fine," but yes, I can.

7  Q.   Because this is pretty prehistoric, is it not --

8  A.   Yes, sir.

9  Q.   -- that Mr. Wyde has?

10 A.   Yes, sir.

11 Q.   He needs to upgrade his equipment?

12 A.   I will not make that judgment.

13       MR. VITAL:  Your Honor, it is a bit unusual -- To

14 make my predicate, I have to ask Mr. Keating to step down from

15 the witness stand and before the jury log into his Adobe

16 account so that I can make my predicate.

17       THE COURT:  Yes.

18       MR. VITAL:  Thank you.

19 Q.   (BY MR. VITAL)  And, for the record, would you tell --

20 Before you do anything, where are you in the courtroom right

21 now?

22 A.   I'm not sure what you call it.  It's a podium.

23 Q.   It is where the lawyer stands?

24 A.   Yes, sir.

25 Q.   And sitting in front of you where the lawyer stands is a

1    lectern.  Correct?

2    A.    Yes, sir.

3    Q.    And would you tell the record and the ladies and

4    gentlemen of the jury--I am talking to the record--would you

5    tell the record what is on top of the lectern?

6    A.    It is my attorney's laptop computer.

7    Q.    And it is currently open to a webpage called what?

8    A.    Google.

9    Q.    So what are you going to do for the ladies and gentlemen

10   of the jury and the record, keystroke-wise, to get to where

11   you need to go?  Say it first, then do it.

12   A.    I'm going to go to the address bar and type in

13   www.echosign.com, and it is going to take me to EchoSign's

14   website.

15   Q.    And EchoSign is a product of Adobe?

16   A.    Yes, sir.

17   Q.    And please do that, and tell me when you are done, and

18   the record.

19   A.    Yes, sir.

20   Q.    Let's stop.

21   A.    Yes, sir.

22   Q.    Did you finish the keystroke that you just told the

23   record and the ladies and gentlemen of the jury?

24   A.    Yes, sir, I hit enter.

25   Q.    And would you tell us through your testimony what it is

1   that we are looking at?  Be clear, understanding that you are

2   talking to a piece of paper that somebody might read later on.

3   A.    Yes, sir.  It took me to the web address acrobat--that's

4   A-C-R-O-B-A-T--.adobe--that's a-d-o-b-e--.com/us/en/documents/

5   esignatures.html.

6   Q.    And from here to get to the original of what you

7   identified as Plaintiffs' Exhibit No. 1, what do you need to

8   do next?

9   A.    I will need to slick "sign in" and proceed to sign in.

10  Q.    Would you do that, please?

11  A.    Yes, sir.

12  Q.    For the record, you have clicked "sign in"?

13  A.    Yes, sir.

14  Q.    And what are you doing right now?

15  A.    I am now clicking.

16  Q.    You can do it at the same time?

17  A.    I am clicking in email and typing in my email address, my

18  email address being bgkeatingsenior@gmail.com.

19  Q.    And that's where this says "sign into your account" and

20  you just said email, and that's the email you typed in?

21  A.    Yes, sir.

22  Q.    And you just tabbed to password?

23  A.    Yes.  But I'm not going to say that out loud, if that's

24  okay.

25  Q.    You won't say it out loud, but you are going to type in

174

1    your password?

2    A.    Yes, sir.

3    Q.    Would you do that now, please?  And we don't want

4    Mr. Wyde "remembering me," so you don't want to put "remember

5    me"?

6    A.    Yes, sir.  I am clicking "never" so Google Chrome does

7    not save my password to my lawyer's computer.

8    Q.    And what is the computer doing right -- what is it --

9    A.    It has now logged me in and taken me to my -- I

10   apologize.  I'm clicking "never" again so it does not remember

11   the password.  It is taking me to the Adobe document Cloud

12   dashboard.

13   Q.    And I'm pointing at -- to a word and a name.  What does

14   it say to me?

15   A.    It says, "Hello, Brandon."

16   Q.    Who is that?

17   A.    That is me.

18   Q.    Okay.  Because you put in your unique credentials for

19   this authentic account that you have?

20   A.    Yes, sir.

21   Q.    Now, if we want to find this document electronically, and

22   this document is Plaintiffs' Exhibit No. 1, what do we do

23   next?

24   A.    I would have to click "manage."

25   Q.    And would you do that, please?

 1    A.    Yes, sir.  I have clicked "manage," and it's now going to

 2    take me to my what's called "legacy files."

 3    Q.    And while that's loading, what is your understanding of

 4    why it's called "legacy files"?

 5    A.    This is an account that I used to run under my company

 6    Vidfair, LLC.  You will notice in the signature packet it says

 7    "Brandon Keating, Vidfair, LLC."

 8    Q.    Now, this is the first page that -- This is the screen

 9    that pops up when you click on "manage"?

10    A.    Yes, sir.

11    Q.    Let's run through some of the things that are on this

12    screen right now that the jury is seeing and that the record

13    will reflect.

14    A.    Yes, sir.

15    Q.    There are -- There is the word "draft."  Do you see that?

16    A.    Yes, sir.

17    Q.    There is "waiting for me to sign"?

18    A.    Yes, sir.

19    Q.    Okay.  And there is "waiting for me to pre-fill"?

20    A.    Yes, sir.

21    Q.    Do you see that?

22    A.    Yes, sir.

23    Q.    "Out for signature"?

24    A.    Yes, sir.

25    Q.    Now, off to the right of what I just read there, there is

1    what appears to be a contract document or something.  Would

2    you explain to the members of the jury, if it's not

3    confidential, what it is that that is?

4    A.   Yes, sir.  So the first -- This is -- I apologize.  This

5    is an investment agreement with Zealot Networks I was going to

6    sign.  And the reason why it is showing now, it is the first

7    document within my account on the list and it selected it as a

8    default.

9    Q.   And is waiting for you to sign or "waiting for me to

10   sign"?

11   A.   Yes, sir.

12   Q.   And obviously, being a 2014 document, waiting for you to

13   sign, either you signed this otherwise or decided not to make

14   this investment.

15   A.   Correct; yes, sir.

16   Q.   Okay.  Now, if we want to go from this screen to

17   documents that you actually have signed --

18   A.   Yes, sir.

19   Q.   -- through the EchoSign electronic signature function,

20   what do we do?

21   A.   You would scroll down.  There is a scroll bar directly to

22   the right of the document panel.

23   Q.   And would you scroll down to get to the place where it's

24   your testimony that the authentic copy or the original copy of

25   Plaintiffs' Exhibit No. 1 lives or resides?

177

```
 1    A.    Yes, sir.  Before I continue, may I add something just

 2    for the record?  It is now showing that I am scrolling past

 3    all the signed documents.  It is no longer waiting to sign.

 4    Q.    And how many documents does your account show that you

 5    have signed since you have had this account?

 6    A.    Hundreds.

 7    Q.    Okay.  And would you scroll down, please --

 8    A.    Yes, sir.

 9    Q.    -- until you get to what you are telling the jury is

10    Plaintiffs' Exhibit No. 1?

11    A.    I've located it.

12    Q.    Okay.

13    A.    It is highlighted here.  It says "game guide contract."

14    Q.    I want us to stop right here.

15              MR. VITAL:  May I approach the chart here, Your

16    Honor?

17              THE COURT:  Yes.

18    Q.    (BY MR. VITAL)  Now, there is -- The first thing that's

19    highlighted in the document panel, as you called it, to the

20    left is a what?

21    A.    I'm sorry.  The first thing that was highlighted or is

22    highlighted now?

23    Q.    That is highlighted right now.

24    A.    It's the game guide contract.

25    Q.    Okay.  But -- So in the panel you are hovering over that
```

1    contract.  Correct?

2    A.   Yes, sir.

3    Q.   And that causes it to change a different color than the

4    rest of the documents.  Right?

5    A.   Yes, sir.

6    Q.   Because it's highlighted?

7    A.   Yes, sir.

8    Q.   What I'm asking you to do is look farther to the left of

9    what's highlighted and tell the ladies and gentlemen of the

10   jury what those series of letters and punctuation marks are.

11   A.   Yes, sir.  Under the "name" column it says

12   "my.raw.nerve@gmail."

13   Q.   So you have seen your lawyer Mr. Wyde and me write down a

14   number of email addresses before this jury.  Is that correct?

15   A.   Yes, sir.

16   Q.   Do you see that email address written on the flip chart

17   that is in this courtroom that your lawyers have been writing

18   on?

19   A.   Yes, sir.

20   Q.   Is it the one I'm pointing at right now?

21   A.   I believe you are pointing in the middle.  A little bit

22   down.  Yes, sir, that one right there.

23   Q.   my.raw.nerve; that one?

24   A.   my.raw.nerve@gmail.com.

25   Q.   And who has the testimony established that email address

1    belongs to?

2    A.    It belongs to Mr. Princip.

3    Q.    And of your own personal knowledge, who does that email

4    address belong to?

5    A.    It belongs to Mr. Princip.

6    Q.    Why is that email address in your Adobe EchoSign account?

7    A.    The way EchoSign works is when you sign a contract, you

8    have to label who the recipient of that contract is.  And once

9    you E-sign that contract, Adobe then takes the final

10    signature, the final signed contract, and sends it to that

11    email address as -- I guess to notify them that it has been

12    signed.

13    Q.    Okay.  What I'm going to ask you to do is I'm going to

14    ask you do -- You double quick to access the contract?

15    A.    No.  I would just click once.

16    Q.    And before you do that --

17    A.    Yes, sir.

18    Q.    -- the document title is called what?

19    A.    "Game guide contract."

20    Q.    And the date is what?

21    A.    It's May 11th, 2012.

22    Q.    And is that your testimony -- Was that the date you

23    electronically signed the document?

24    A.    Yes, sir, it is.

25    Q.    Now I'm going to ask you to double click it.

```
 1    A.    Double click it or once?

 2    Q.    However many you need to access it.

 3    A.    I am going to click it once.  I apologize.  I'm going

 4    back.  I double clicked.  I'm going to click it once, and it

 5    is now clicked.

 6    Q.    So off to the right of the document panel, I'm going to

 7    ask you to be very specific, including the time --

 8    A.    Yes, sir.

 9    Q.    -- I need you to tell the members of the jury and the

10    record what information is off to the right hand side right

11    above a mini-image of the first page.

12    A.    This is the "about" information.  First is "game guide

13    contract."  That's the title of the contract.  Then in the

14    "from" section it's from Brandon Keating.  And it reflects my

15    old email address production@vidfair.com.  And then there's a

16    "to" line, and that is my.raw.nerve@gmail.com.  Then there is

17    "date," which is May 11th, 2012 at 2:40 p.m.  And the status

18    is "signed."  And I can scroll down.  I believe there may be

19    one or two pieces of information.

20            MR. WILSON:  Your Honor, before the witness

21    testifies any further, may I take him on voir dire on this

22    specific exhibit?  It will only be five questions of his

23    deposition testimony to show that clearly the document -- Our

24    objection is going to be hearsay.

25            THE COURT:  Why can't you do this on cross
```

1    examination?

2            MR. WILSON:  Well, I guess I can, Judge.  I mean, if

3    the document's admitted, I guess it goes to the weight anyway.

4            THE COURT:  So you are asking the questions as to

5    whether or not it should be admitted.

6            MR. WILSON:  Right.

7            THE COURT:  Go ahead.

8            MR. VITAL:  Your Honor, may I lay a little bit more

9    of a predicate?  Because he has jumped in front of the very

10   issue that I'm about to address in my predicate.

11           THE COURT:  All right.  Ask your further questions.

12           MR. VITAL:  Thank you very kindly.

13   Q.   (BY MR. VITAL)  Now, you mentioned scrolling down

14   further.  Is there additional information that you could read?

15   A.   There is possible information.  I'm not sure.

16   Q.   Click down and see if there is.

17   A.   Yes, sir.  "Message.  I've signed game guide contract."

18   Q.   Okay.  All right.  Now, I think what we want to know is,

19   how did this contract, this electronic document that you are

20   looking at in the Adobe account, EchoSign, how did that get to

21   you?

22   A.   It was sent to my email--production@vidfair.com.

23   Q.   Now, I'm going to ask you the document that you

24   identified as Plaintiffs' Exhibit No. 1, do you see your

25   electronic signature on there?

```
1   A.    Yes, sir.

2   Q.    How many more signatures are on that document?

3   A.    I see three signatures.

4   Q.    Those three signatures are not your signature?

5   A.    No, sir.

6   Q.    When you received the document from Mr. Princip, were

7   those signatures on the document or not?

8   A.    They were on the document.

9   Q.    Okay.  So, in other words, when you signed the document,

10  which I'm going to later offer into evidence as Defendants' 1

11  [sic], who was the last person to sign the digital copy of the

12  contract?

13  A.    The last person to sign was me.

14          MR. WILSON:  May I take the witness on voir dire

15  now, Judge?

16          THE COURT:  Are you offering this exhibit?

17          MR. VITAL:  I would -- I think I probably -- I will

18  offer it.  I don't think I finished my predicate, but if --

19          THE COURT:  Okay.  I am just wondering, when are you

20  going to finish your predicate?

21          MR. VITAL:  In about a minute.

22          THE COURT:  All right.  Why don't you continue.

23          MR. VITAL:  Okay.

24  Q.    (BY MR. VITAL)  All right.  So would you click on the

25  actual image to make it larger?
```

```
1    A.   Yes, sir.  I'm clicking the magnifying glass icon, and it

2    has taken me to the game guide contract.

3    Q.   And would you -- Without scrolling through all of it, you

4    have seen it before.  Is that correct?

5    A.   Yes, sir.

6    Q.   And are you prepared to or can you tell this jury that

7    the digital copy that you have accessed here in open court on

8    the record, is the original of the true and correct duplicate

9    which is Plaintiffs' Exhibit No. 1?

10   A.   Yes, it is.

11             MR. VITAL:  Which I offer into evidence.

12             THE COURT:  Okay.

13             MR. WILSON:  Your Honor, may I take the witness on

14   voir dire, please?

15             THE COURT:  Yes.

16   Q.   (BY MR. WILSON)  Mr. Keating, as your lawyer testified or

17   discussed in voir dire -- You know what voir dire means, don't

18   you?

19   A.   Yes, sir.

20   Q.   Remember when I took your deposition back in June of

21   2015?

22   A.   Yes, sir, I do.

23   Q.   And remember we were talking about --

24             MR. WILSON:  Let me just -- May I approach the

25   witness and get him to read.
```

1          THE COURT:  Yes.

2    Q.    (BY MR. WILSON)  Mr. Keating, remember I asked you,

3    question, "And this agreement"--to which we're referring to

4    here, Mr. Keating--"purports to have been reached between you

5    and Marko and the Brandts on May 11th, 2012.  Is that your

6    understanding?"

7          And read to the jury what your answer was that I've

8    highlighted there.

9    A.    It says, "The agreement was between me and Marko, and Jon

10   Brandt signed off on it.  I mean, I never spoke about the deal

11   with Jon.  I never spoke to him at that point, no."

12   Q.    Okay.  And then you recall when I asked you further about

13   that, I went ahead, again, which we are discussing this

14   agreement, and I asked, "Have you discussed this lawsuit with

15   Jon Brandt?"

16         And why don't you read your response where the A is on

17   line 6 of page 18 of your deposition?

18   A.    Yes, sir.  It says, "I reached out to Jon, it would have

19   been August or September of 2014, to find out if he -- if he

20   did sign this contract and if he remembered this contract.

21   That was the only time I ever spoke with Jon Brandt."

22   Q.    And then I asked you, "And did you ever speak to Edward

23   Brandt?"

24         And what was your answer to that question?

25   A.    I said, "From my recollection, I believe Edward Brandt,

1    who Marko said was his dad, doesn't exist.  I believe -- I

2    don't remember the name that was given.  I did not speak to

3    John Brandt's father.  I spoke with Jon Brandt.  And then I

4    received an email from their lawyer."

5    Q.   And then I said, "And what did the email from the lawyer

6    say?"

7         And your response?

8    A.   "What did the email say from the" -- I apologize.  "What

9    did the email from the lawyer say?"

10   Q.   That was -- My question to you was, "What did the email

11   from the lawyer say?"

12   A.   Yes, sir.

13   Q.   And what's your response?

14   A.   "The email said Jon never signed the contract and they

15   expect that we don't speak to them again about this matter.

16   That was not his contract or his father's contract.  Or his

17   signature.  I apologize."

18   Q.   Okay.

19        MR. WILSON:  Your Honor, again, Defense asserts the

20   objection of hearsay, one; and secondly, this phantom

21   individual that signed is not even here, so I don't think it

22   can be authenticated under Federal Rule of Evidence 1003, I

23   think.

24        MR. VITAL:  It is highly relevant to a fraud claim,

25   which we have to fraudulent inducement.  That is exactly the

186

1    point.  It is the most relevant evidence you can have in a

2    fraud claim.

3              THE COURT:  Mr. Keating, is this document kept in

4    the regular course of business?

5              THE WITNESS:  I'm sorry, sir?

6              THE COURT:  Do you keep this document in the regular

7    course of your business?

8              THE WITNESS:  Yes, Your Honor, I do.

9              THE COURT:  And was this document produced and made

10   with someone -- with you having knowledge of the facts that

11   were being made at the time?

12             THE WITNESS:  Yes, sir.

13             THE COURT:  It's admitted.

14             MR. VITAL:  Thank you, Your Honor.

15   Q.  (BY MR. VITAL)  To the point of the voir dire examination

16   that occurred before this jury regarding this document, at the

17   time you signed Plaintiffs' Exhibit No. 1, now in evidence,

18   did you know that the signatures of Jon and Ed Brandt were

19   fake signatures?

20   A.  I did not know that.

21   Q.  Whose responsibility is that to tell you if they are

22   sending you a contract with those signatures on it?

23             MR. WILSON:  Objection; speculation, Your Honor.

24             THE COURT:  If he knows.

25   Q.  (BY MR. VITAL)  If you know.  You are a businessman.

187

```
 1    Right?
 2    A.    Yes, sir.
 3    Q.    You do business.
 4    A.    Yes, sir.
 5    Q.    Do you expect people to give you authentic --
 6              THE COURT:  Just ask the question, Mr. Vital.
 7              THE WITNESS:  Yes, sir.
 8    Q.    (BY MR. VITAL)  What do you expect people to do when they
 9    give you a document that has information in it?  Do you expect
10    it to be true or false?
11    A.    I expect them to provide me with true and correct
12    documents.
13    Q.    Would you tell the members of the jury, when you received
14    Plaintiffs' Exhibit No. 1, whose request was it to have a
15    minor Jon Brandt sign the contract?
16    A.    It was my request.
17    Q.    Because Marko told you what?
18    A.    He told me that he was going to be the COO of the
19    channel.
20    Q.    So you thought it prudent, when you made your investment
21    to join this partnership, to have who sign the contract?
22    A.    Jon Brandt and his father.
23    Q.    And being the savvy businessman that you are, why did his
24    father have to sign the contract?
25    A.    I know that if a child or a minor signs a contract
```

1    without the permission of consent of their parent, it's not a

2    valid contract.

3    Q.    So you communicated that information to whom?

4    A.    To Mr. Princip.

5    Q.    And Mr. Princip sent you what?

6    A.    He said he would have them sign it and his father.

7    Q.    Because before he sent you Plaintiffs' Exhibit No. 1, he

8    had been begging or asking you for what?

9    A.    An investment and asking me to sign a contract with him.

10   Q.    An investment of how much?

11   A.    $1,500.

12   Q.    Which investment you were not going to give him without

13   what?

14   A.    Without a contract.

15   Q.    Which you received in your EchoSign account.

16   A.    Yes, sir.

17   Q.    Digitally signed?

18          MR. WILSON:  Objection; leading, Your Honor.

19          THE COURT:  Overruled.

20   Q.    (BY MR. VITAL)  Digitally signed?

21   A.    Yes, sir.

22   Q.    And when you digitally sign that document --

23          MR. VITAL:  May he step down from the jury box

24   again, Your Honor, just to come back?

25          THE COURT:  Yes.

1    Q.    (BY MR. VITAL)  I need you to walk through what you did

2    with the digital copy, the digital original of Plaintiffs'

3    Exhibit No. 1.  After you digitally signed it, what did you do

4    with it?  If you need to go back, you can.

5    A.    After I digitally signed it, I just clicked "digitally

6    sign" or "E-sign" and that was it.  Adobe did the rest.

7    Q.    What did Adobe do?

8    A.    Adobe then took that certified signature and emailed it

9    to my.raw.nerve@gmail.com.

10   Q.    And did you receive a response from anybody in this

11   courtroom that they, quote unquote, got it?

12   A.    Roughly 30 seconds later Mr. Princip notified me on Skype

13   that he had received the contract.

14   Q.    Would you go back to show them where the email function

15   is or how that happens where the document gets sent to

16   Mr. Princip?

17   A.    Well, I can.  I can give you an example right here and

18   just sign one of these that are waiting for signature, because

19   I believe this one here is going to be sending to my Yahoo.  I

20   can just --

21        Well, after you open it and it's waiting for a signature,

22   it lets you go through, fill out the pertinent information,

23   and at the bottom there will be a signature -- It doesn't show

24   it here.  It will be like a tab that says "click to E-sign."

25   As soon as you "click to E-sign," it says "You have signed the

190

1    document," it exits out of here, it returns here, and then it

2    will show up in the signed.

3    Q.   Okay.  Now, you may resume the witness stand.

4          MR. VITAL:  May I approach the witness, Your Honor?

5          THE COURT:  You may.

6    Q.   (BY MR. VITAL)  I have the last page of Plaintiffs'

7    Exhibit No. 1.  You recall that when you digitally signed this

8    document it was on what date?

9    A.   It was May 11th, 2012.

10   Q.   And what date does the digital signature reflect from

11   EchoSign?

12   A.   May 11th, 2012.

13   Q.   And after you signed this contract giving this man -- or

14   in response to this man's request for an investment, what did

15   you send to him?

16   A.   I sent him $1500 as soon, as I signed the contract,

17   through PayPal.

18   Q.   So I'm going to -- After you made the investment, signed

19   the contract, you had interactions with Mr. Princip?

20   A.   Yes, sir.

21   Q.   Now, because I have this computer here, I'm actually

22   going to fast forward in the story to prove up some documents

23   that happened much later so we can get this computer off the

24   lectern, because it's bothering Mr. Wyde.

25   A.   Yes, sir.

1    Q.   Okay.  And I have been known to drop things in

2    courtrooms.

3         So I'm going to -- So this contract was signed on May 11,

4    2012.  Did you happen to continue to be in communications

5    electronically with Marko Princip for up to and over two years

6    beyond that date?

7    A.   Yes, sir.

8    Q.   Throughout which point he was confirming that you owned

9    how much of VideoGames?

10   A.   Thirty percent.

11   Q.   And do we actually have an email on our exhibit list of

12   one such email?

13   A.   Yes, sir.

14   Q.   Okay.

15            MR. VITAL:  May I approach the witness?

16            THE COURT:  You may.

17   Q.   (BY MR. VITAL)  I have handed you what is marked

18   Plaintiffs' Exhibit No. 3.  I'd like you to tell the members

19   of the jury if you recognize that document.

20   A.   Yes, sir.

21   Q.   What do you recognize that document to be?

22   A.   It's an email from Mr. Princip to me.

23   Q.   And it's on what date?

24   A.   June 21st, 2014 at 1:18 a.m.

25   Q.   How are you able to recognize this document as the

```
 1   document you say it is?

 2   A.    This is in my email address.

 3   Q.    Did you receive this email in your email address?

 4   A.    Yes, I did.

 5   Q.    Now, there has been testimony in this case that this

 6   email and others have been faked or forged or fabricated.

 7   Correct?

 8   A.    Yes, sir.

 9   Q.    Is there a way for us to find the digital or electronic

10   copy of this email some place in this courtroom, or can we

11   access it some place in this courtroom?

12   A.    Yes, sir.

13   Q.    Where does that original copy live?

14   A.    It's on my Yahoo email account.

15   Q.    But now I am actually being technical.  Where does it

16   really live?

17   A.    It's on Yahoo.

18   Q.    The computer is in the courtroom, but your computer

19   accesses it by going where?

20   A.    It goes to Yahoo servers.

21   Q.    Okay.  Have you ever, except through your unique Yahoo

22   credentials, been able to hack into Yahoo's servers?

23   A.    No, sir.

24   Q.    Do you even know how to do that?

25   A.    No, sir.
```

1    Q.   Have you in connection with this case, other than through

2    your Yahoo credentials, accessed Yahoo?

3    A.   I'm sorry?

4    Q.   Have you accessed Yahoo's servers except through the

5    Yahoo designated login credentials given to you or proven by

6    Yahoo?

7    A.   No, sir.

8    Q.   Have you had the same Yahoo login credentials -- How long

9    have you had a Yahoo account?

10   A.   I believe this Yahoo account is about 15 years old.

11   Q.   Okay.  And the Yahoo email address is what?

12   A.   It's brandongkeating@yahoo.com.

13   Q.   Without any spaces between the Brandon G. Keating?

14   A.   No, sir.

15          MR. VITAL:  I would like the witness, Your Honor,

16   again to step down so we can find the original copy of what he

17   has identified as Plaintiffs' Exhibit No. 3.

18          THE COURT:  Okay.

19          MR. VITAL:  Thank you.

20          MR. VITAL:  Mr. Wyde is asking for special

21   dispensation to go to the board.

22          THE COURT:  Okay.

23   Q.   (BY MR. VITAL)  Okay.  Would you state for the record the

24   keystrokes that you just did to go to where you are right now?

25   A.   I clicked "sign out."

```
1    Q.    Of what?

2    A.    My EchoSign account.

3    Q.    And you did what?  What did you do to get to where we are

4    right now?

5    A.    I did nothing.  I am not at Yahoo yet.  I was waiting for

6    your command.

7    Q.    Would you go to Yahoo?

8    A.    Yes, sir.  I'm going to the address bar, and I'm going to

9    type in www.yahoo.com.

10   Q.    We call that a URL, all caps?

11   A.    Not all caps; lower case, sir.  I'm hitting enter.

12   Q.    And then where are we going right now on this computer?

13   A.    It's taking me to Yahoo's home page.

14   Q.    And we see that "Former WWE CEO slams GOP campaign

15   rhetoric"?

16   A.    Yes, sir.

17   Q.    This is the Yahoo page where their ads and data and

18   information they want you to read?

19   A.    Yes, sir.

20   Q.    Okay.  So is there a way for you to log into your

21   personal email Yahoo account?

22   A.    Yes, sir.  In the top right corner it says "sign into

23   your Yahoo mail."  I apologize.  "Sign in to view your mail."

24   Q.    Would you click on that?

25   A.    Yes, sir.
```

195

```
1    Q.    And what is it asking you for.

2    A.    It is taking me to the Yahoo sign-in page.

3    Q.    And asking you to do what?

4    A.    To sign in.

5    Q.    Would you do that, please?

6    A.    Yes, sir.

7    Q.    What did you just type?

8    A.    So I typed in brandongkeating.  You can sign in by either

9    typing your full email address or just your Yahoo screen name,

10   which is brandongkeating.

11   Q.    And it cues you for "next"?

12   A.    Yes, sir.

13   Q.    Would you click that?

14   A.    Yes, sir.

15   Q.    And now what is it cueing you for?

16   A.    It is asking me to put in my password.

17   Q.    Which is private to you?

18   A.    Yes, sir.

19   Q.    Would you place that in and tell us when you are done

20   with that?

21   A.    I'm done.

22   Q.    And it's cueing you or prompting you to do what?

23   A.    To click "sign in."

24   Q.    Would you do that?

25   A.    Yes, sir.
```

1    Q.    Now, I've had people tell me I need Google Chrome.  I

2    don't even know what that is.  Can you just say "never"?

3    A.    Yes, never.

4    Q.    We will say "never."

5    A.    "Never."

6    Q.    What are we looking at right now?

7    A.    This is a two-step verification system that Yahoo has in

8    place in order to prevent people from hacking into your email

9    account.

10   Q.    And what do you have to do to go ahead and proceed to

11   your Yahoo --

12   A.    I'm going to click send as a text message, and then Yahoo

13   servers will send a text message with a code to my cell phone.

14   Q.    Which is here in the courtroom?

15   A.    Yes, sir.

16   Q.    Would you do that?

17   A.    Yes, sir.

18   Q.    And it has told you it has sent a message?

19   A.    It is saying wait for the code and then enter it when it

20   gets sent to my phone.

21   Q.    Okay.  Would you find that code?

22   A.    It may take some time because we are inside the building.

23   Q.    Okay.  Would it help you if you linked to my hotspot?

24   A.    I don't believe it is the internet speed that's creating

25   it.

197

```
 1    Q.    Okay.

 2    A.    It's typically pretty fast.  Can I click "resend code"?

 3    Q.    Yes.

 4    A.    Okay.  I just received a text message from Yahoo, Yahoo

 5    verification code, and then it gives me the code.  I'm going

 6    to enter it in now.

 7    Q.    All right.  45 --

 8    A.    60.

 9    Q.    And it says "submit code"?

10    A.    Yes, sir.

11    Q.    And you click on "submit code."

12          Now what are we looking at?

13    A.    We are back at the Yahoo home page, but I'm now signed

14    into my account.

15    Q.    Because you see -- Whose name is right there?

16    A.    Brandon.

17    Q.    With I guess whatever your personal profile logo is?

18    A.    My son drew that, yes, sir.

19    Q.    Okay.  Now, see it says the mail -- you have two new

20    emails?

21    A.    Yes, sir.

22    Q.    Would you click on the emails so we can go to your

23    personal email account?

24          All right.  So what I'm going to ask you to do -- Well,

25    first I'm going to ask you, are you able to find in your email
```

```
 1    account that Yahoo has given you an original copy of
 2    Plaintiffs' Exhibit No. 3, which you identified on the record?
 3    A.    Yes, sir.
 4    Q.    How are you able to do that?
 5    A.    I have saved the emails to my Yahoo folder labeled "trial
 6    emails."
 7    Q.    For this trial?
 8    A.    Yes, sir.
 9    Q.    Would you click on that folder?
10    A.    Yes, sir.
11    Q.    So it is in your active inbox on a folder you set up for
12    this case?
13    A.    Yes, sir.
14    Q.    Is there spam in there?
15    A.    I hope no, no, sir.  This is an advertisement that Yahoo
16    has put in.
17    Q.    Okay.  So what are we looking at right now?  How many
18    emails are we looking at?
19    A.    These are four emails from Mr. Princip.
20    Q.    Okay.  Would you find the email which is a true and
21    correct copy -- Would you find the email which is the original
22    on Yahoo servers of Plaintiffs' Exhibit No. 3?
23    A.    Yes, sir.  It's the first one on the list right here.
24    Q.    Let me ask you a question.  Before you click on that, why
25    is it that you have an almost two-year-old email still active
```

```
 1    in your inbox?

 2    A.    I save all of my emails.

 3    Q.    For what purpose?

 4    A.    For records.

 5    Q.    And is that turning out to be a good or bad idea right

 6    now?

 7              MR. WILSON:  Objection, Your Honor.

 8              THE COURT:  Sustained.

 9    Q.  (BY MR. VITAL)  Would you click on the email that you are

10    telling the jury is the email which is Plaintiffs' Exhibit

11    No. 3?

12    A.    Yes, sir.

13    Q.    And would you take a look at that email and tell the

14    members of the jury if that is a true and correct copy of the

15    email that you identified on the record earlier as Plaintiffs'

16    Exhibit No. 3?

17    A.    Yes, sir, it is.

18    Q.    Is there any variation or difference between it?

19    A.    No, sir.

20    Q.    Would you say that Plaintiffs' Exhibit No. 3, a

21    duplicate, is a true and correct and faithful duplicate of the

22    original of the Yahoo servers?

23    A.    Yes, I would.

24              MR. VITAL:  Offer Plaintiffs' Exhibit No. 3 into

25    evidence.
```

```
 1              MR. WILSON:  What's the date on that email?  I
 2    can't --
 3              THE COURT:  I show 6/21/14.
 4              MR. WILSON:  2014, not 2012.
 5              THE COURT:  6/21/14 at 1:00 a.m.
 6              MR. WILSON:  No objection, Judge.
 7              THE COURT:  It's admitted.
 8    Q.   (BY MR. VITAL)  Stand right there for a second.
 9    A.   Yes, sir.
10    Q.   Now, would you tell the members of the jury why you have
11    this email in your account that says that "This email is proof
12    that you are 30 percent owner of VideoGames YouTube Channel"?
13    What were the circumstances that preceded this email being
14    sent to you by Mr. Princip?
15    A.    I had gotten into a verbal conflict with Mr. Martin, and
16    Mr. Princip assured me that I was still an owner; and as proof
17    of that, he assured me he would send me an email so I can keep
18    for my records.
19    Q.   And when you say you had gotten into a conflict with
20    Mr. Martin, is that the same Mr. Martin as the Defendant in
21    this case?
22    A.   Yes, sir, it is.
23    Q.   Okay.  In this email in which he confirmed, he
24    Mr. Princip, confirmed almost two years after signing
25    Plaintiffs 1 that you were a 30 percent owner, did he say
```

201

```
1    anything about Mr. Martin?

2    A.    Yes, sir.

3    Q.    What did he say?

4    A.    He says --

5    Q.    Read the sentence that first mentions Brian Martin.

6    A.    Yes, sir.  "I will be fully transparent moving forward,

7    and all I ask is you do not speak with Brian Martin anymore."

8    Q.    Had Mr. Princip been fully transparent from that day

9    forward?

10   A.    No, sir.

11   Q.    Up to that point, had you had numerous issues with

12   Mr. Princip?

13   A.    Yes, sir.

14   Q.    And Mr. Martin?

15   A.    Yes, sir.

16   Q.    Now, because we're in Yahoo and we fast forwarded in the

17   story, let's stay in 2014, then we will eventually go back.  I

18   just want to prove up these documents.

19   A.    Yes, sir.

20   Q.    Is there another email on our exhibit list that currently

21   resides on the Yahoo server?

22   A.    Yes, sir.

23   Q.    I'm asking you to identify for the record what I'm

24   holding in my right hand what is that?  Plaintiffs' No. 20,

25   what is that?
```

1    A.   This is an email that Mr. Princip sent me as well as the

2    lawyer for Broadband TV.

3    Q.   And what is the date of this email?

4    A.   January 15th, 2014, 10:32 p.m.

5    Q.   Okay.  And there is a reply in the same email and that's

6    just you to your lawyer?

7    A.   I forward this to my lawyer, yes, sir.

8    Q.   All right.  And it's not saying anything that was

9    privileged, but it is your position in the case.  Right?

10   A.   Yes, sir.

11   Q.   Okay.  Now, would you -- This Plaintiffs' Exhibit No. 20,

12   which is dated January 15, 2014, where would we find this

13   active in your Yahoo account?

14   A.   I'm going to scroll down.  It's in the same spot as this

15   email, just at the bottom here.

16   Q.   And would you click on it, please?

17   A.   Yes, sir.

18   Q.   And would you tell the members of the jury if what is

19   being shown there is the original of what is a true and

20   correct copy --

21        Let me give you the question again.  In my left hand is a

22   document Plaintiffs' Exhibit No. 20 which you identified on

23   the record?

24   A.   Yes, sir.

25   Q.   Is what I'm holding in my left hand, Plaintiffs' Exhibit

1    No. 20, a true and correct, faithful duplicate of the original

2    active in your Yahoo account?

3    A.    Yes, sir, it is.

4              MR. VITAL:  I offer Plaintiffs' Exhibit No. 20 into

5    evidence.

6              THE COURT:  Objection?

7              MR. WILSON:  May I have a moment, Judge?  Let me

8    take a look at that.

9         Your Honor, we will object to this as hearsay.  It

10   appears to be an email to Mr. Wyde with a following email

11   below that.

12             MR. VITAL:  There is information -- Mr. Keating is

13   forwarding this email to Mr. Wyde, which I will show to

14   counsel.  I have redacted it.  That's not what I'm offering.

15             MR. WILSON:  Is this the original email in the

16   computer?

17             THE WITNESS:  Yes, sir, it is.

18             MR. WILSON:  May I be allowed to look at that?

19             THE WITNESS:  Yes, sir.

20        May I approach the lectern, Your Honor?

21             THE COURT:  Yes.

22             MR. VITAL:  Mr. Wilson is asking me to print a copy

23   of what's active in his account, which we are able to because

24   Mr. Wyde comes equipped with equipment.  What I'm going to

25   ask, so that it doesn't delay my examination, is we print it

204

```
1    out later.

2        So I would offer the duplicate that I printed of what

3    Mr. Wilson inspected in the courtroom, which Mr. Keating just

4    pulled up live on the record.

5            THE COURT:  Objection?

6            MR. WILSON:  No, Your Honor.  That's fine, without

7    the email to Mr. Wyde.

8            THE COURT:  It's admitted.

9    Q.   (BY MR. VITAL)  Now, since it's up here and it's the

10   original, let's talk about -- And we have broken up your

11   story, but we need to get these documents in.

12       Tell the members of the jury, who are the individuals who

13   are receiving this email, Plaintiffs' Exhibit No. 20, from

14   Mr. Princip?

15   A.   Yes, sir.  Number one, a Brian D'Mart.

16   Q.   Stop.  Now, you heard my co-counsel ask Mr. Martin was

17   that his email account Brian D'Mart, or if he went by Brian

18   D'Mart.  Is that correct?

19   A.   Right.

20   Q.   Who do you understand and know from this email and

21   otherwise to be Brian D'Mart?

22           MR. WILSON:  Your Honor, I am going to object to the

23   form of that question.  It is calling for speculation as to

24   whose email address that is.

25           THE COURT:  He can answer as to who he believed he
```

1   was communicating with.

2          MR. WILSON:  It purports to be a communication from

3   Marko.

4          THE COURT:  I know.  He can say who he believed he

5   was communicating with.  It is overruled.

6          MR. WILSON:  Okay.

7   Q.   (BY MR. VITAL)  Who do you believe it to be?

8   A.   Mr. Brian Martin.

9   Q.   Okay.  Are we actually able -- Do you know what metadata

10  are?

11  A.   Yes, sir.

12  Q.   What are metadata?

13  A.   It would be within the header.  It is -- On Yahoo's

14  servers there is specific code that they assign to each email

15  which allow you to see where the original email came from, the

16  IP address, and a bunch of other information to go along with

17  it.

18  Q.   So it's data under "data"?

19  A.   Yes, sir.

20  Q.   Okay.  So the data that's live on the screen to the human

21  eye says Brian D'Mart.  Right?

22  A.   Yes, sir.

23  Q.   But in the electronic world there are data behind Brian

24  D'Mart.  Correct?

25  A.   Yes, sir.

206

1  Q.  And we can see that in the courtroom, can't we?

2  A.  Yes, sir.

3        MR. VITAL:  May he step down so the jury can see

4  those metadata to see what is behind Brian D'Mart?

5        THE COURT:  Yes.

6        THE WITNESS:  So I'm going to the email, and up at

7  the top I believe it is more -- I will go to "view full

8  header" and it is going to bring up the full header to this

9  email address, which this is the code.

10  Q.  (BY MR. VITAL)  All right.  Would you find the metadata

11  that are behind Brian D'Mart?  Would you read that email

12  address into the record?

13  A.  It's my3dworldyt@gmail.com.

14  Q.  Would you read that one more time, please; just a little

15  slower?

16  A.  my3dworldyt@gmail.com.

17  Q.  And whose email do you understand to be that email

18  address you just called off?

19  A.  That's Mr. Martin's.

20  Q.  Brian Martin's?

21  A.  Yes, sir.

22  Q.  And those were the metadata behind the name Brian D'Mart?

23  A.  Yes, sir.

24  Q.  Okay.  You can resume the witness stand, please.

25        Now, looking on the screen, you see Marko Princip's email

1    address connected as the metadata for Marko Princip.  Right?

2    A.    Yes, sir.

3    Q.    And my.raw.nerve@gmail.com?

4    A.    Yes, sir.

5    Q.    Okay.  The same -- the metadata in the same format as

6    Brian Martin's email address.  Correct?

7    A.    Yes, sir.

8    Q.    Okay.  These metadata reside on the server for Yahoo?

9    A.    Yes, sir.

10   Q.    Do you have credentials to hack and manipulate those

11   metadata?

12   A.    No, sir.

13   Q.    Do you have the capability to do that?

14   A.    No, sir.

15   Q.    Have you ever worked with the NSA?

16   A.    No, sir.

17   Q.    Are you a hacker?

18   A.    No, sir.

19   Q.    Do you know how to do that?

20   A.    No, sir.

21   Q.    Okay.  This email is kind of hard to read, and I don't

22   have the benefit of the elmo.  This is Plaintiffs' Exhibit

23   No. 20.  It's January 15, 2014?

24   A.    Yes, sir.

25   Q.    At 10:32 p.m.

```
1    A.    Yes, sir.

2    Q.    Who else does Marko Princip send this to other than you

3    and Brandon Keating?

4    A.    Nancy Glaister.

5    Q.    Do you recall -- And she is at broadbandtvcorp.com?

6    A.    Yes, sir.

7    Q.    What is that?

8    A.    It is normally just called Broadband TV.

9    Q.    Or BBTV?

10   A.    Yes, sir.  It is a YouTube multichannel network.

11   Q.    And you were a recipient of this email, this email being

12   Plaintiffs' Exhibit No. 20, were you not?

13   A.    Yes, sir.

14   Q.    What is your understanding about why you are receiving an

15   email that Mr. Princip is sending among, to among other

16   people, Nancy Glaister?

17   A.    I'm sorry.  Can you --

18   Q.    Why are you getting this email?

19   A.    Because Mr. Princip wanted me to negotiate a contract, a

20   deal with Broadband TV.

21   Q.    Okay.  And I'm going to ask you to read the email into

22   the record starting with "Nancy" and then continue through

23   "Sincerely, Marko Princip."

24   A.    Yes, sir.

25         "Nancy, we were able to get control of the channel back
```

1    last night.  Brandon is one of the owners of the channel and

2    has the right to speak on VideoGames' behalf.  He is CCed on

3    this email, and you can feel free to reach out to him

4    directly.  He will handle the negotiations regarding our

5    channel.  Sincerely, Marko Princip."

6    Q.   Now, we hear information in this email that we've heard

7    about in this case.  First sentence, "We were able to get

8    control of the channel back."

9    A.   Yes, sir.

10   Q.   We know the backstory, but just to further kind of tie

11   this email Plaintiffs' No. 20 into evidence, where did

12   control -- where was control of the channel at before this

13   email?

14   A.   In Drew Lovinger's control.

15   Q.   So when Mr. Princip is saying, "We were able to get

16   control of the channel back last night," did you have a

17   conversation with Brandon -- I mean with Mr. Princip about why

18   you were being included on this email?

19   A.   Yes, sir.

20   Q.   Okay.  Who -- Is BBTV a network?

21   A.   Yes, sir, it is.

22   Q.   Was BBTV the network that Andrew Lovinger or, as they

23   call him the kid, had the channel with?

24   A.   Yes, sir.

25   Q.   So why is it, if not based upon speculation, but if he

1    told you, why is it that you are being given authority by

2    Mr. Princip to speak on behalf of the channel?

3    A.    Because I was 30 percent owner of the channel.

4    Q.    And why is it that Mr. Princip wanted you as opposed to

5    Brian Martin or himself to speak regarding VideoGames with

6    respect to BBTV?

7    A.    Mr. Princip thought or believed that I would have more

8    pull with Broadband TV in getting the channel released from

9    their network.

10    Q.    Now, what about the fact that perhaps maybe you

11    interacted with BBTV and they were mad about that?  Is that

12    the reason they just popped off and said you were an owner?

13    A.    No, sir.

14    Q.    Did -- I'll show you --

15            MR. VITAL:  May I approach the witness?

16            THE COURT:  You may.

17    Q.    (BY MR. VITAL)  Plaintiffs' Exhibit No. 3 was the

18    Yahoo -- other Yahoo email addresses or email that you saw?

19    Is that right?

20    A.    Yes, sir.

21    Q.    And the date on that is what?

22    A.    June 21st, 2014.

23    Q.    Okay.  So that is how many months after the one on the

24    screen that we're looking at, which is Plaintiffs' No. 20?

25    A.    Roughly five months.

1    Q.   So even five months later there is still representation

2    that you own 30 percent?

3    A.   Yes, sir.

4    Q.   Now, what was the static or the confrontation that

5    happened between you and Mr. Martin between the sending of the

6    January 15 email, which is Plaintiffs' 20, and this email in

7    June, which is Plaintiffs' 3?  What happened?

8    A.   I believe at the time I was trying to get earning reports

9    from Broadband TV regarding the earnings for the channel, and

10   in order to get those reports from Broadband TV they said that

11   first both Mr. Martin and Mr. Princip would have to authorize

12   me to receive those, and Mr. Martin would not authorize it.

13   Q.   Okay.  And did you have an argument with him about that?

14   A.   Yes, sir, I did.

15   Q.   Okay.  Let me turn your attention to the fact that you

16   had -- Did you have --

17        Let's go back in time.  We are talking about 2014 with

18   the two emails that we just talked about--Plaintiffs' Exhibit

19   No. 3 and Plaintiffs' Exhibit No. 20.  Okay?

20   A.   Yes, sir.

21   Q.   Let's go back to when you signed the contract, which is

22   Plaintiffs' No. 1, on May 11th, 2012.

23        Did you have interactions with Mr. Princip following that

24   occurring?

25   A.   Yes, sir.

1    Q.    Okay.  Did you have those communications via Skype?

2    A.    Yes, sir.

3    Q.    Now, in this case we have seen Skype communications to

4    include Skypes with Mr. Moss, which were Plaintiffs' Exhibit

5    No. 13 and Plaintiffs' Exhibit No. 16.  Do you recall that?

6    A.    Yes, sir.

7    Q.    Okay.  But you had your own Skypes with Mr. Princip, did

8    you not?

9    A.    Yes, sir.

10   Q.    And when you engaged in those Skype communications, on

11   what type of machine did you engage in those Skype

12   communications back in 2012?

13   A.    It would have been a MacBook Pro as well as my Power Mac.

14   Q.    Okay.  Now, the Power Mac is smaller than a MacBook --

15   Which one is bigger?

16   A.    The Power Mac is the big computer sitting on the desk.

17   Q.    Okay.  So you have just pointed to something in the

18   courtroom.  Would you tell the members of the jury, and, most

19   importantly, the record, where it is that you just pointed?

20   A.    I pointed to my lawyers' desk, the computer on my

21   lawyers' desk.

22   Q.    His desk or table in the courtroom?

23   A.    Table, yes, sir.

24   Q.    And what is it that is sitting prominently on Plaintiffs'

25   counsel's table in the courtroom?

1    A.    It is a 2010 Mac Pro Tower.

2    Q.    Explain to the members of the jury exactly what that is.

3    A.    It's an Apple computer.

4    Q.    Okay.  And whose is this?

5    A.    It is mine.

6    Q.    Okay.  How long -- Where'd you get it?

7    A.    I bought it from Apple.

8    Q.    When did you buy it?

9    A.    2009.  I'm sorry.  The end of 2009, right before 2010.

10   Q.    Why is it so big?

11   A.    It's an old computer, but it's made for video production

12   and editing.

13   Q.    Have they gotten smaller?

14   A.    Yes, sir.

15   Q.    Okay.  What is it that you do with this thing that you

16   just identified?  What is this?  Is this like a computer?

17   A.    Yes, sir, it is.

18   Q.    So what resides -- Does it have a hard drive?

19   A.    Yes, sir, it does.

20   Q.    What resides on the hard drive?

21   A.    Any data or document that is created on a computer gets

22   stored to the hard drive.

23   Q.    Okay.  Now, using that last answer as a launching point,

24   how does the Skype application interact with the hard drive of

25   this Mac Tower?

214

1    A.    So when you have Skype conversations, text Skype

2    conversations, Skype creates an encrypted file in which it

3    stores any communication that comes through the program onto a

4    secured folder in the hard drive in the system, I believe the

5    system folders.

6    Q.    So -- And embedded in my question was a bit of a

7    presumption or an assumption.  What is -- Is there such a

8    thing as a Skype application?

9    A.    Yes, sir, it is.

10   Q.    What is a Skype application?

11         Let me back up.  What is an application?

12   A.    An application is any software program that can run

13   either on a computer or a mobile device.

14   Q.    In my hand, my right hand, is what?

15   A.    I believe that's an iPhone.

16   Q.    And you've been around me for close to a week now.  Whose

17   iPhone is this, from what you can tell?

18   A.    That's your iPhone.

19   Q.    Whose picture is that on the front?

20   A.    That is you.

21   Q.    Would you tell the members of the jury what those little

22   boxes are on the iPhone?

23   A.    Those icons represent applications that are stored on

24   your iPhone.

25   Q.    Is that the same type of application as -- Does Skype

```
 1   have an application like that?

 2   A.    They do have an application like that.

 3   Q.    So when you talk about the Skype application that you

 4   interfaced with respect to this Mac Tower, are we talking

 5   about that same type of application?

 6   A.    Yes, sir.

 7   Q.    So where does that application reside with respect to

 8   this Mac Tower?

 9   A.    On the hard drive.

10   Q.    Okay.  And when did you put that application on the hard

11   drive?

12   A.    It would have been within a week after buying the

13   computer.

14   Q.    So it certainly was on there as of April or May 2012?

15   A.    Yes, sir, it was.

16   Q.    Such that you were able to Skype chat with people in this

17   courtroom?

18   A.    Yes, sir.

19   Q.    Including whom?

20   A.    Mr. Princip.

21   Q.    Okay.

22              MR. VITAL:  May I approach the witness, Your Honor?

23              THE COURT:  You may.

24   Q.    (BY MR. VITAL)  Take your time.

25   A.    Yes, sir.
```

1    Q.    Look through Plaintiffs' Exhibit No. 18 until you are

2    satisfied that you are able to tell the record what that

3    document is.

4    A.    These are Skype conversations between me and Mr. Princip.

5    Q.    Okay.  And how are you able to recognize them as such?

6    A.    I read those documents several times since creating them.

7    I apologize.  Since the conversations took place.

8    Q.    Okay.  There is a charge in this case by the Defendants

9    that Plaintiffs' Exhibit No. 18 is a fabricated document.  Is

10   it a fabricated document?

11   A.    Absolutely not; no, sir.

12   Q.    Is it your testimony that Plaintiffs' Exhibit No. 18

13   represent true and correct Skype chats between you and Marko

14   Princip as of or beginning in April of 2012?

15   A.    Yes, sir.

16   Q.    Now, in this courtroom we have found the original of

17   Plaintiffs' Exhibit No. 1.  Do you recall that?

18   A.    Yes, sir.

19   Q.    And Plaintiffs' Exhibit No. 3 on Yahoo and Plaintiffs'

20   No. 20 on Yahoo.  Right?

21   A.    Yes, sir.

22   Q.    Okay.  Is there a way for us to find the original chats

23   that are included in Plaintiffs' Exhibit No. 18?

24   A.    Yes, sir.

25   Q.    Before you step down, I want to ask you to tell the jury

1    and the record how it is we are going to be able to do that.

2    A.    I would log into my Skype application on my Mac Pro Tower

3    and pull up the conversation between me and Mr. Princip.

4    Q.    The same Mac Pro Tower that you identified for the record

5    earlier?

6    A.    Yes, sir.

7    Q.    Now, before you do that, or in order to do that, what

8    steps are you going to have to undertake?  Are you going to

9    remove it from the table?  Tell the record what it is you are

10   going to do.

11   A.    I'm going to have to remove it from the table, place it

12   next to the projector, plug it in, turn it on, wait for it to

13   boot, maybe wait a little bit longer for it to boot, and then

14   sign into the computer.  Well, it will sign in automatically

15   under the account.  And then I will have to open up Skype and

16   sign into Skype.

17   Q.    Why is it going to take so long to --

18   A.    It's an old computer.

19   Q.    Okay.  Does it have a lot of information on it as well?

20   A.    Yes, sir.

21   Q.    In order to see it here in this courtroom, are we going

22   to have to connect it to something?

23   A.    Yes, sir.

24   Q.    What are we going to connect the Mac Tower to in this

25   courtroom so that it can be seen; so that the original data

1    can be seen in this courtroom?

2    A.    To the projector in front of me, sir.

3    Q.    Okay.  Do you have the accessories and plug-ins, or

4    whatever it is, the gadgets necessary to access and then

5    project in this courtroom the live data which are the original

6    Skype chats with Marko Princip and Plaintiffs' Exhibit No. 18?

7    A.    Yes, sir, I am.

8    Q.    How long is it going to take you to do that?

9    A.    I hope less than five, ten minutes.

10   Q.    Okay.

11          MR. VITAL:  Your Honor, I would ask that perhaps we

12   adjourn so we can set it up, or if that's appropriate --

13          THE COURT:  Okay.  We will take a ten-minute break.

14   I have been watching the weather on my computer, and my

15   wife tells me 70 miles west of Arlington they have tennis ball

16   size hail.  But I'm watching the storm, and it looks like it

17   is going to veer a little north.  I am a meteorologist, too.

18   And it's kind of moving our way.  It's about in Mineral Wells

19   now.  It will get to Fort Worth in maybe 30 minutes.  So I

20   don't know if we can wait here and have it hit your cars, or

21   if we should go.  I will just keep an eye on it.  We still

22   have a couple of hours.  They say 5:00 in Arlington, but you

23   know, they really always get it wrong.  Not as good a

24   meteorologist as I am.

25          So we will take a ten minute recess.  Don't form any

1    opinion about the case.  Don't discuss it.

2                       (Brief recess.)

3              THE COURT:  Be seated, please.

4              MR. VITAL:  May I proceed, Your Honor?

5              THE COURT:  Yes.

6    Q.   (BY MR. VITAL)  This is the first question after the

7    break.  The ladies and gentlemen of the jury just came back

8    in.  In their absence, would you please tell them and the

9    record what you did during that break?

10   A.   I connected my computer to the projector and turned it

11   on.

12   Q.   Was it the Mac Tower that you have identified for the

13   record that originally was on Plaintiffs' counsel's table?

14   A.   Yes, sir, and now it's on the floor.

15   Q.   And you connected it to what inside of the courtroom?

16   A.   I plugged it into the extension outlet on the ground and

17   then connected the video to the projector that's on the stand

18   right here.

19   Q.   The same projector that has been showing information from

20   Mr. Wyde's computer and as the document camera, affectionately

21   called an elmo?

22   A.   Yes, sir.

23   Q.   And now that projector is connected to your Mac Tower.

24   Right?

25   A.   Yes, sir.

```
 1    Q.    Okay.  Now, on the screen or the desktop of your Mac

 2    Tower is a very interesting screenshot.  Does that have

 3    anything to do with the VideoGames channel or anything like

 4    that?

 5    A.    No, sir.

 6    Q.    What is that?

 7    A.    That is a background that my oldest son put on the

 8    computer.

 9    Q.    Called Black Ops?

10    A.    Yes, sir.

11    Q.    Like the commandos or the people running black operations

12    for the government?  Is that what it is supposed to be?

13    A.    No.  It is for the video game Black Ops Call Of Duty.

14    Q.    So also on the screen -- And I'm not used to Apple, so

15    why don't you tell the members of the jury, right underneath

16    the skeleton that is under Black Ops, there are some icons.

17    What are those icons?

18    A.    The first one is the Apple finder.  The next is iMovie,

19    system preferences, then Google Chrome, then there is a Skype

20    application.

21    Q.    Stop.

22    A.    Yes, sir.

23    Q.    Is that Skype application -- Would you identify it for

24    the record?  What is the color?  What is it's color?

25    A.    It's blue and white.
```

221

1    Q.    Okay.  There is an S that is white and then there is a

2    blue backdrop?

3    A.    Yes, sir.  That's the Skype logo.

4    Q.    Is the Skype application on the Mac Tower right now the

5    same Skype application that you testified -- is it the same or

6    same type of Skype application that you testified to earlier?

7    A.    Yes, sir, it is.

8    Q.    Does Skype have more than one application or more?

9    A.    They have legacy applications.  They upgrade as they make

10   changes to the application.

11   Q.    So if you don't click the "update" tab, you are still at

12   the legacy?

13   A.    If your computer is not set to automatically update.

14   Q.    Is this a current Skype application, or is this a legacy

15   or a prior application?

16   A.    I believe this is one of the most recent versions.  I'm

17   not sure where it is in line with their updates.

18   Q.    In connection, when is the last time -- Or let me ask you

19   this.  Regardless of whether this computer, the Mac Tower,

20   connected to the projector in the courtroom, that Skype

21   application, regardless of whether the Skype application has

22   been updated or not from 2012, does the information that the

23   application grabs from the hard drive change?  Does the

24   information change?

25   A.    Which information?

```
1    Q.    Okay.  So now we're being very technical.  So on your

2    hard drive is information.  Right?

3    A.    Yes, sir.

4    Q.    Including information that Skype -- that the Skype

5    application goes and grabs.  Right?

6    A.    Yes, sir.

7    Q.    And that Skype application grabs Skype chats and

8    populates that information within the Skype application.

9    Right?

10   A.    Yes, sir.

11   Q.    And my question is, regardless of whether you update the

12   Skype application or not, whether you are running the most

13   current or a legacy application, does the information change?

14   A.    No, it does not.

15   Q.    Just the interface changes.  Right?

16   A.    As well as functionality.

17   Q.    So it might be quicker, a little more sleek, but the same

18   information.  Right?

19   A.    Yes, sir.

20   Q.    Do you have a Linkedin page?

21   A.    Yes, sir.

22   Q.    Linkedin upgrades its application, the Linkedin app, from

23   time to time?

24   A.    Yes, sir.

25   Q.    The interface changes?
```

```
 1   A.   Yes, sir.

 2   Q.   Functionality changes?

 3   A.   Yes, sir.

 4   Q.   Does the information change?

 5   A.   No, sir.

 6   Q.   Okay.  Is that the same as with Skype?

 7   A.   In a roundabout way, yes, sir.

 8   Q.   And you say a roundabout way.  How is it different, if at

 9   all?

10   A.   Well, I'm not really familiar with the functionality of

11   the Linkedin application.  I just know that certain things may

12   change within the Skype application as far as functionality,

13   look, and performance.  I'm --

14   Q.   But there is information in Plaintiffs' Exhibit No. 18,

15   which was marked for identification, which you identified.  Is

16   this information the same information that we're going to look

17   at in the courtroom right now?

18   A.   Yes, sir, it is.

19             MR. VITAL:  Your Honor, may the witness step down

20   from the jury box and access the Skype data that are on this

21   hard drive?

22             THE COURT:  Yes.

23             MR. VITAL:  Thank you.

24             THE WITNESS:  Do you want me to say what I'm doing

25   as I do it?
```

224

```
 1    Q.   (BY MR. VITAL)  Please.

 2    A.   Yes, sir.  I'm opening up the Skype application.

 3    Q.   And as you do that, are we connected to the internet or

 4    not?

 5    A.   Yes, we are.

 6    Q.   We did that as the jury was out?

 7    A.   Yes, sir.

 8    Q.   Okay.

 9    A.   So this automatically signed in.  Would you like me to

10    sign out and re-sign in.

11    Q.   You can just tell whose Skype account this is.

12    A.   This is my Skype account.

13    Q.   It says "Brandon"?

14    A.   Yes, sir.

15    Q.   How long have you had the Skype account?

16    A.   I would say since 2009.

17    Q.   Okay.  So you had it in 2012 when you were Skype chatting

18    with Mr. Princip?

19    A.   Yes, sir.

20    Q.   Okay.  In order to access legacy or old Skype chats, what

21    do you have to do?

22    A.   I have to go to history.

23    Q.   And before you go to history, is this a fake Skype page

24    or Skype, or is this -- What's running, if we were outside the

25    courtroom and we were logging in at home, or any place else,
```

225

1    at work, would it look the same there as it does here in the

2    courtroom?

3    A.    If they have this version, yes, sir.

4    Q.    Okay.  So if you took that or the jury took it home, or

5    the Judge took it home, or Mr. Wilson, and plugged it in, is

6    it always going to look the way it looks right now?

7    A.    Yes, sir.

8    Q.    Okay.  So in order to find the original Skype chats for

9    Plaintiffs' Exhibit No. 18, where do we have to go?

10   A.    I have to click on "history."

11   Q.    Would you do that?

12   A.    Yes, sir.

13   Q.    And if you see what just popped up here, there is a

14   picture of who?

15   A.    Mr. Princip.

16   Q.    There are how many pictures of Mr. Princip?

17   A.    I can see two.

18   Q.    Now, it says yesterday.  Right?

19   A.    Yes, sir.

20   Q.    Why does it say yesterday?  What did we do yesterday?

21   A.    When I opened up the Skype application on my computer

22   yesterday, it brought up this conversation, and it actually --

23   where it said "it is going to lead to a great series," that

24   was an old failed send message.  And as soon as I signed back

25   in on this computer, it re-sent the message, so it was sent to

1    that Skype yesterday.

2    Q.    Now, before this Mac Tower was in the courtroom, where

3    was it?

4    A.    It was in my basement.  Oh, I apologize.  It was at your

5    office.

6    Q.    And how did it get to my office?

7    A.    You brought it in your vehicle.

8    Q.    Okay.  But how did it originally get to my office?

9    A.    I had it shipped from Chicago.

10   Q.    And when did you get it shipped?

11   A.    It would have been the day before yesterday.

12   Q.    And why, without disclosing communications with me, did

13   we ship have you ship this to this courtroom where we are with

14   the ladies and gentlemen of the jury?

15   A.    So I can verify the Skype conversations that we have in

16   our exhibits.

17   Q.    So you called someone at home and they shipped this to my

18   office?

19   A.    Yes, sir.

20   Q.    And when you logged in yesterday, who was in your

21   presence?

22   A.    You were.

23   Q.    Okay.  And the second time we've ever logged into this

24   was when?

25   A.    I'm sorry.  The second time was here in court.

227

1    Q.    Okay.  So both times it's been logged into in Dallas,

2    I've been present?

3    A.    Yes, sir.

4    Q.    Okay.  Now, why are there two pictures of Marko?

5    A.    Those are two of the different Skype accounts Mr. Princip

6    had.

7    Q.    Okay.  There is one particular account that we're going

8    to focus on for Plaintiffs' Exhibit No. 18.  I remember which

9    one it is.  Do you remember?

10   A.    Yes, sir.

11   Q.    Which one is it?

12   A.    I believe it is markoudallas.

13   Q.    How often in the past have you interacted with

14   Mr. Princip through markoudallas?

15   A.    It goes back years.  I couldn't tell you.  Maybe

16   thousands of times.

17   Q.    Okay.

18   A.    I will say maybe around a thousand.

19   Q.    Okay.  Would you click on that -- What is that?  A

20   profile?

21   A.    Yes, sir.  Well, this is the actual chat.  So you would

22   click the chat log, and then it will open up the actual chat.

23   Q.    Now, who keeps -- Where are these Skype chats, where do

24   they reside?

25   A.    They are stored in an encrypted folder in the preferences

 1    menu.

 2    Q.    Do you have the ability -- I don't know if it can be

 3    done, but do you know how to manipulate and change data inside

 4    of Skype?

 5    A.    No, sir.

 6    Q.    Okay.  Would you click on the Skype chat that is

 7    markoudallas?  Now, you clicked on it.  Would you tell the

 8    members of the jury the first message that you see on the

 9    screen?  What does it say?

10    A.    "Brandon, you free for a quick call?"

11    Q.    Okay.  Now, what date is that?

12    A.    July 3rd, 2012.

13    Q.    Now, the first Skype communication that is within

14    Plaintiffs' Exhibit No. 18 is dated April 17th, 2012.  Are you

15    able to go back to that day?

16    A.    Yes, sir.

17    Q.    Would you -- How would you do that?

18    A.    I would have to scroll up and it will load certain

19    portions of the conversation, so I would have to keep

20    scrolling until it loads up to that day.

21    Q.    Would you do that?

22    A.    Yes, sir.

23    Q.    Are you doing that now?

24    A.    Yes, sir.

25          Can you repeat the date, please?  You said April --

1    Q.    April 17, 2012.

2    A.    Yes, sir.

3    Q.    And His Honor has it and opposing counsel Mr. Wilson has

4    it.  What I'm going to ask you to do -- Stop right now.  I'm

5    going to ask you, for verification purposes, if you are able

6    to find a message that says "follow at my.raw.nerve my new

7    Twitter" on April 17, 2012?

8    A.    Yes, sir.  It's in the middle of the screen.

9    Q.    Okay.  And for purposes of my prove-up, for the benefit

10   of counsel and the Court, the next message is April 26, 2012,

11   and it says "click"?

12   A.    Yes, sir.

13   Q.    The next message is April 26, 2012, and it says "the

14   annotation"?

15   A.    Yes, sir.

16   Q.    And the next message is April 26, 2012, and it has the

17   YouTube website address.

18   A.    Yes, sir.

19   Q.    Now, I asked you to look for a number of emails or text

20   Skype chats that are in Plaintiffs' Exhibit No. 18 yesterday.

21   And were you able to find additional Skype chats that are in

22   Plaintiffs' 18 in this Skype account?

23   A.    Yes, sir.

24   Q.    And the Skype account that you have logged into and that

25   you were looking at in the courtroom, are these the original

1    Skype chats that I'm holding in my hand as Plaintiffs' Exhibit

2    No. 18?

3    A.   Yes, sir.

4    Q.   Another way of saying that, is Plaintiffs' Exhibit No. 18

5    a true and correct and faithful duplicate of the original

6    Skype chats that are on the Mac Tower which we are looking at

7    in the courtroom?

8    A.   Yes, sir, it is.

9    Q.   Any doubt in your mind about that?

10   A.   No doubt in my mind.

11   Q.   And these Skype chats are Skype chats between you and

12   your opponent in this case Mr. Princip?

13   A.   Yes, sir.

14        MR. VITAL:  I would offer Plaintiffs' Exhibit No. 18

15   into evidence.

16        THE COURT:  Objection?

17        MR. WILSON:  Your Honor, no objection if they will

18   print that version out, but you're talking, as Mr. Keating has

19   stated, a thousand lines that -- Again, the best evidence

20   rule, this is the best evidence, and I'm assuming he can print

21   that out.

22        THE COURT:  Isn't Exhibit No. 18 a printout of that?

23        MR. VITAL:  It is.  You can take him on voir dire.

24        MR. WILSON:  May I just explain to the Judge what

25   he's asking?

1          THE COURT:  Yes.

2          MR. WILSON:  This is what Exhibit No. 18 is.  It's

3  not with the pictures, it's not with the clicks, it's not --

4  So it is not the original as it is.  And, therefore --

5          THE COURT:  It is the substance of what's on it.

6          MR. WILSON:  Exactly.  I am okay if they print the

7  original out, as I did with the other.  So I'm assuming they

8  can do that this evening and print that out.

9          THE COURT:  Okay.  Print it out.

10     It's admitted.

11         MR. VITAL:  Thank you, Your Honor.

12  Q.  (BY MR. VITAL)  You may resume your seat.

13         MR. VITAL:  I want to make sure I fulfill that

14  promise, so may I ask him some questions?

15         THE COURT:  Okay.

16  Q.  (BY MR. VITAL)  Am I able to print this out?  Is it that

17  easy?

18  A.  I believe the only way to print out the entire

19  conversation is to scroll, take a screencap of each line,

20  print out that picture, scroll a little bit more, print out

21  and take another screencap.  So you are going to essentially

22  be taking about 200, 300 screencaps.

23         MR. VITAL:  I'm glad to do that, Your Honor.  It is

24  his money.

25         THE COURT:  I don't know that it is necessary.

```
 1              MR. VITAL:  Can I ask him one question regarding
 2  Plaintiffs' 18?
 3              THE COURT:  Yes.
 4  Q.  (BY MR. VITAL)  How did you grab the information that is
 5  live on the screen to populate this document Plaintiffs'
 6  Exhibit No. 18?
 7  A.  I started from the start date, I selected from that date
 8  all the way down and scrolled until the last communication, I
 9  copied that to the computer clipboard, and then I pasted it
10  onto a text document.
11  Q.  Now, we saw Skype chats that are in evidence without
12  objection, one of which is Plaintiffs' Exhibit No. 13, did we
13  not?
14  A.  Yes, sir.
15              MR. VITAL:  May I publish Plaintiffs' No. 13 to the
16  jury?  This is a dirty copy or has notes on it.
17  Q.  (BY MR. VITAL)  Let me just ask you.  These are Skype
18  chats between Ty Moss and whom?
19  A.  I believe -- I can't read it.
20              MR. VITAL:  May I approach the witness?
21              THE COURT:  You may.
22              THE WITNESS:  Between Ty Moss and Mr. Princip.
23  Q.  (BY MR. VITAL)  On what month?
24  A.  May 7th, 2012.
25  Q.  Would you scroll down?
```

```
 1                MR. VITAL:  May he step down from the witness box?
 2                THE COURT:  Yes.
 3    Q.   (BY MR. VITAL)  Will you go down to the month of May to
 4    see what his Skype looks like for the month of May 2012?
 5         All right.  Now, this is not a Skype chat with Ty Moss.
 6    This is a Skype chat with you.  Right?
 7    A.   Yes, sir.
 8    Q.   But what is next to the name Marko?
 9    A.   It says "Team Noble," and there is a picture on the other
10    side.
11    Q.   In the first Skype chat that's Plaintiffs' Exhibit No. 13
12    in evidence Between Mr. Princip and Mr. Moss, whose name is
13    that?
14    A.   Marko, and then it says "Team Noble."
15    Q.   In parentheses what does it say?
16    A.   "Team Noble."
17    Q.   Do you see this man's picture in this exhibit?
18    A.   No, sir.
19    Q.   Please have your seat.
20                THE COURT:  All right.  Here's what we're going to
21    do.  We're going to break for the evening, because the little
22    storm that I saw is now a big storm and it's moving this way,
23    my guess is in about 40 minutes.  And it seems to be growing
24    larger on the radar, so I'm going to get you home.
25         We made a lot of progress today, we went pretty far, so I
```

```
1    don't see any problem in that.

2        Tomorrow I have to speak on this panel with Judge

3    Rosenthal, Judge Lynn, and Judge Fitzwater, and it's going to

4    take all morning, so I think we can get started at 1:00

5    tomorrow afternoon.  We may get you the case tomorrow, but my

6    guess is it's going to be Friday morning.

7        I did promise you 4:30.  We are leaving a little early,

8    but you worked pretty hard this morning.

9        Remember what I told you before about not forming any

10   opinion.

11            (Whereupon, the jury left the courtroom.)

12            THE COURT:  Be seated.

13            MR. VITAL:  Your Honor, I want to apologize for my

14   remark on the record about it will cause -- I was frustrated.

15   I am sorry to the Court for my outburst about the screenshots.

16            THE COURT:  It's fine.  Don't worry about it.

17            MR. VITAL:  And I apologize.  It was inappropriate,

18   but I'm not going to justify it.  It just was a bit of

19   frustration on my part, and it will take an inordinate amount

20   of time to do what was being talked about, but I should not

21   have reacted that way and I'm sorry.

22            THE COURT:  All right.  Listen, I'm working on these

23   jury instructions and I'm changing them up quite a bit.

24            MR. VITAL:  Yes, Your Honor.

25            THE COURT:  Where in the questions you cite to the
```

1    law basically, you say, for example--I don't have the old

2    copy--it says such as question No. 20 -- that's not a good

3    one.  No. 15, "To be part of a conspiracy, Princip, Martin,

4    and another person or persons may have had knowledge of,

5    agreed to," so forth.  "If you answer 'yes' to any of the

6    questions of 7 or 11," then I put No. 15.  Then, "Answer,

7    'yes' or 'no.'  And then No. 16.  And I don't define what a

8    conspiracy is again for 16, 17, and 18 because it's already in

9    there.

10            MR. VITAL:  That makes sense.

11            THE COURT:  And in the body of the other questions

12   when it says, "Do you find" he did something, and then it sets

13   forth the law, that's fine.  I moved the law into the body of

14   the instruction --

15            MR. VITAL:  Yes.

16            THE COURT:  -- instead.

17            MR. VITAL:  Yes, Your Honor.

18            THE COURT:  So they'll get the law and then they'll

19   get the questions.

20            MR. VITAL:  Yes, Your Honor.

21            THE COURT:  And I have consolidated some of the

22   questions that are similar rather than having to repeat all

23   the verbiage again.

24            MR. VITAL:  Yes, Your Honor.

25            THE COURT:  In the Defendants' proposed

236

1    instructions, one of them is quasi estoppel.  Another is

2    estoppel.  I don't know that we have got enough evidence yet,

3    but maybe we will.

4             MR. WILSON:  Your Honor, I'm just going with quasi

5    estoppel.  With all due respect, I have got that with the

6    Plaintiffs.  They have been two years and then they pop out of

7    the woods.  But, again, I think I have met that definition

8    under those couple of cases I cited.

9             THE COURT:  I have put it in the charge, and I have

10   got your questions, too.  How do you want me to propose your

11   question--as Defendants' questions, or just as questions.

12            MR. WILSON:  I think, Your Honor, the charge is -- I

13   have always thought is just going to be global.

14            THE COURT:  Yes, it is global, but then you've

15   got -- we've got the Plaintiffs' 21 questions and your 6

16   questions.

17            MR. WILSON:  Well, but I'm only going with one

18   question, Your Honor.  If it will simplify, I'm just going

19   with quasi estoppel --

20            THE COURT:  Where do you want that in the charge?

21            MR. WILSON:  I think, Your Honor, that is probably

22   better -- I don't know whether we do the end or the beginning.

23   Again --

24            THE COURT:  Well, it can't be at the beginning

25   because the first question is did they have an agreement.  I

237

1    changed that, too.  The first question you had, the Plaintiff

2    had, was did he breach the agreement.  But first we have to

3    establish that first he had an agreement, and then was it

4    breached.

5              MR. VITAL:  The reason I didn't ask the predicate

6    question for Mr. Moss is because I didn't think there was any

7    dispute that there was an agreement there, but I did ask the

8    predicate question --

9              THE COURT:  I understand.

10             MR. WILSON:  I think when we get to the charge --

11             THE COURT:  I just put it as 1-A and 1-B.

12             MR. WILSON:  I don't know that we need a predicate

13   for Mr. Moss.  I think we can just go to, you know, when did

14   the partnership end is basically what our response is.

15             THE COURT:  I will look at the appropriate place to

16   put in the quasi estoppel.

17        What about your damages?

18             MR. WILSON:  Your Honor, no, we've got none.  We are

19   not pleading for attorney's fees.  We did not counterclaim.

20             THE COURT:  I know, but you put it in your jury

21   instructions, so I am wrestling with that.

22             MR. WILSON:  Well, Your Honor, as I know, it is

23   normally what?  Ten or twelve drafts until we get to the final

24   that goes to the jury, so I put it out there initially trying

25   to figure out how this case was going to go.

238

```
1          From the Defense side, we are going with quasi estoppel,

2     and our main concern then, you know, is the effective date, if

3     any, of when this partnership or partnerships terminated, if

4     at all, and then value and getting into the money, which is

5     what it's all about.

6               THE COURT:  All right.

7               MR. VITAL:  May he step down, Your Honor?

8               THE WITNESS:  Thank you, Your Honor.

9               THE COURT:  And you guys can get your vehicles home,

10    too.

11              MR. VITAL:  Right.

12              (The proceedings were concluded at 4:15 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              I HEREBY CERTIFY THAT THE FOREGOING IS A

2        CORRECT TRANSCRIPT FROM THE RECORD OF

3        PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4        I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5        FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6        COURT AND THE JUDICIAL CONFERENCE OF THE

7        UNITED STATES.

8

9        S/Shawn McRoberts                04/18/2016

10       _____DATE_____
         SHAWN McROBERTS, RMR, CRR
11       FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25