1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
2                       DALLAS DIVISION

3   DAVID TYLER MOSS AND BRANDON   (  CAUSE NO. 3:14-CV-3088-BF
    KEATING                        )
4                                  (
            Plaintiffs,            )
5                                  (
    vs.                            )
6                                  (
    MARKO PRINCIP, Individually,   )
7   MARKO PRINCIP, d/b/a VIDEOGAMES(
    YOUTUBE CHANNEL, MARKO PRINCIP,)
8   d/b/a GAME GUIDE, LLC,         (
    VIDEOGAMES YOUTUBE CHANNEL,    )
9   AND BRIAN MARTIN               (  DALLAS, TEXAS
                                   )  MARCH 31, 2016
10          Defendants.            (  1:00 p.m.
    _____

11

12

13                          VOLUME 4

14

15  _____

16                     TRIAL ON THE MERITS

17          BEFORE THE HONORABLE PAUL STICKNEY
              UNITED STATES MAGISTRATE JUDGE
18                       and a jury
    _____

19

20

21

22

23          SHAWN M. McROBERTS, RMR, CRR
           1100 COMMERCE STREET, RM. 1654
              DALLAS, TEXAS  75242
24               (214) 753-2349
           shawn_mcroberts@txnd.uscourts.gov

25

```
 1                    A P P E A R A N C E S

 2         FOR THE PLAINTIFFS:   WYDE & ASSOCIATES
                                 10100 NORTH CENTRAL EXPRESSWAY
 3                               SUITE 590
                                 DALLAS, TEXAS  75231
 4                               (214) 521-9100
                                 BY:  MR. DAN L. WYDE
 5
                                 BARNES & THORNBURG, LLP
 6                               2100 McKINNEY AVENUE
                                 SUITE 1250
 7                               DALLAS, TEXAS  75204
                                 (214) 258-4124
 8                               BY:  MR. VICTOR D. VITAL

 9         FOR THE DEFENDANTS:   LAW OFFICES ROBERT D. WILSON
                                 18111 PRESTON ROAD, SUITE 150
10                               DALLAS, TEXAS  75252
                                 (214) 637-8866
11                               BY:  MR. ROBERT D. WILSON

12         OFFICIAL REPORTER:    SHAWN M. McROBERTS, RMR, CRR
                                 1100 COMMERCE STREET, RM. 1654
13                               DALLAS, TEXAS  75242
                                 (214) 753-2349
14

15

16

17

18

19

20

21

22

23

24

25
```

# INDEX

**EXAMINATION**

| **Witness Name** | **Page** |
|---|---|
| BRANDON KEATING | |
| Direct By Mr. Vital ........................................... | 7 |
| Cross By MR. WILSON ........................................... | 62 |
| Redirect By MR. VITAL ......................................... | 81 |
| Recross By MR. WILSON ......................................... | 91 |

| **Plaintiffs Rests** | **Page** |
|---|---|
| | 97 |
| BRIAN MARTIN | |
| Direct By MR. WILSON ........................................... | 98 |
| Cross By MR. WYDE ............................................. | 99 |
| MARKO PRINCIP | |
| Direct By MR. WILSON ........................................... | 121 |

| **Defendants Rests** | **Page** |
|---|---|
| | 138 |
| BRANDON KEATING | |
| Direct By MR. VITAL ........................................... | 138 |
| Cross By MR. WILSON ........................................... | 151 |

| **Plaintiffs' Exhibit** | **Page** |
|---|---|
| No. 26 Admitted Into Evidence | 11 |
| No. 35 Admitted Into Evidence | 37 |
| No. 68 Admitted Into Evidence | 60 |
| No. 69 Admitted Into Evidence | 102 |
| No. 70 Admitted Into Evidence | 105 |
| No. 71 Admitted Into Evidence | 111 |
| No. 72 Admitted Into Evidence | 144 |

| **Defendants' Exhibit** | **Page** |
|---|---|
| M Admitted Into Evidence | 75 |
| N Admitted Into Evidence | 79 |
| O Admitted Into Evidence | 99 |

```
 1            THE COURT:  Are we ready for the jury?

 2       Do we have any issues we need to take up before they get

 3   here?

 4            MR. VITAL:  Your Honor, there is one issue.  It is

 5   an evidentiary issue, and I think if we argued it now it would

 6   probably be better.

 7       Exhibit No. 10 on the Plaintiffs' exhibit list is a

 8   document -- Mr. Wyde is giving me a copy of it.

 9            THE COURT:  I have it right here.

10            MR. VITAL:  Okay.  So Exhibit 10 is an exchange --

11   I'll give Mr. Wilson a moment.

12       So Exhibit 10, we contend --

13       May I approach the lectern, Your Honor?

14            THE COURT:  Yeah.  Just tell me what it is.  I know

15   what it is.  It is an exchange regarding Lovinger.

16            MR. VITAL:  So what we have, there is an objection

17   to it based on authenticity.  What I have here that Mr. Wyde

18   has provided me, or Mr. Wyde is going to provide me, is a copy

19   of this same exchange that was attached to a pleading filed in

20   the federal court lawsuit that related to the Lovingers.

21   So --

22            THE COURT:  Is there somebody that can testify they

23   have knowledge of this conversation?

24            MR. VITAL:  Here's the issue, Your Honor.  The

25   document, we believe you can take judicial notice of its
```

1    existence, number one; and number two, the document speaks for

2    itself in that it is communication, or purports to be a

3    communication between Marko Princip and Brian Martin.

4        Now, I understand they are going to say that's not what

5    it purports to be, but because we have a copy of this text

6    exchange that was filed in federal court before this lawsuit

7    even started, I think that gives it a sufficient indicia of

8    reliability that it purports to be what it is.  And you can

9    take judicial notice that it exists on Pacer under the cause

10   number.  It is them chatting back and forth, and the document

11   purports to indicate that that is the case.

12       So we believe it's admissible, and any attack goes to the

13   weight and not the admissibility.

14            THE COURT:  Thank you.

15            MR. WILSON:  Defense strongly objects, Judge.  It is

16   just attached to the pleadings.

17            THE COURT:  On what grounds?

18            MR. WILSON:  Just because it is attached to a

19   pleading does not make it admissible.

20            THE COURT:  Hearsay.  Sustained.  The objection is

21   sustained.

22            MR. VITAL:  All right.  Thank you, Your Honor.

23       Further to the offer that we made, at the appropriate

24   time I will get Your Honor a proffer of the actual exchange

25   that has Pacer information at the top.

```
 1                THE COURT:  It is still going to be hearsay.

 2                MR. VITAL:  I understand.  I understand the Court's

 3     ruling.  Our position is that it's not hearsay because these

 4     are admissions against a party opponent, so under 801 they are

 5     exempt from hearsay.  Anything that these Defendants say can

 6     be offered against them under the rule that exempts it from

 7     hearsay because it's an admission against a party opponent is

 8     our position.

 9                THE COURT:  Thank you.

10         The ruling of the Court stands.

11                MR. WILSON:  Thank you.

12                THE COURT:  All right.  Ready for the jury?

13         Mr. Vital, are you ready for the injury?

14                MR. VITAL:  Yes, Your Honor, I am.

15                THE COURT:  Okay.  Let's bring them in.

16                (Whereupon, the jury entered the courtroom.)

17                THE COURT:  Please be seated.

18         So your meteorologist Judge was a little bit off on his

19     predictions last night, but still I was thinking as I watched

20     the storm roll in it was a pretty big storm, and better safe

21     than sorry.  So no hail here, but south of us I guess they got

22     hit pretty bad.

23         Are you south in Johnson County?  They had some big hail

24     down there.

25         Well anyhow, welcome back today.
```

```
 1            Is the Plaintiff ready to proceed?

 2               MR. VITAL:  Yes, Your Honor.

 3               THE COURT:  All right.

 4               MR. VITAL:  May Mr. Keating resume the stand?

 5               THE COURT:  Please.

 6               MR. VITAL:  If it pleases the Court, I will approach

 7    the lectern, Your Honor.

 8               THE COURT:  Yes, sir.

 9               MR. VITAL:  Thank you very kindly.

10    Q.   (BY MR. VITAL)  Mr. Keating, would you -- Let's pick up

11    where we were yesterday.  I believe we were on a Skype chat

12    yesterday that was offered into evidence as Plaintiffs'

13    Exhibit No. 18.  Do you recall that?

14    A.   Yes, sir.

15    Q.   And it was offered as a duplicate of the original which

16    we saw from the Mac Tower.  Is that correct?

17    A.   Yes, sir.

18               MR. VITAL:  Your Honor, I would ask for an

19    instruction, if it would please the Court, that the Court has

20    accepted Plaintiffs' Exhibit No. 18.

21               THE COURT:  It's been admitted.

22               MR. VITAL:  As a duplicate of the original?

23               THE COURT:  Yes.

24               MR. VITAL:  Thank you, Your Honor.

25    Q.   (BY MR. VITAL)  Now, we don't have here pictures of each
```

1    and every Skype chat that is present on the computer, do we?

2    A.    No, sir.

3    Q.    Would such effort take an extraordinary amount of time

4    for us to go through?

5    A.    Yes, sir.

6    Q.    And would you agree with me that what we did yesterday

7    was quite tedious and detailed?

8    A.    Yes, sir.

9    Q.    You understand that we are meeting a challenge that this

10    evidence is fabricated?

11    A.    Yes, sir.

12    Q.    Which is the reason for the detail and the tedium and

13    what appears to be just a lot of unnecessary talking?

14    A.    Yes, sir.

15    Q.    Okay.  If we wanted to truly show the picture -- every

16    single chat and every single picture from the computer to the

17    jury on the projector, would that take a little bit of time or

18    a great amount of time?

19    A.    If I were to take pictures --

20    Q.    Instead of us relying on what's admitted into evidence

21    without the pictures, if we were going to have to go through

22    your computer and go through each one what is admitted into

23    evidence, the duplicate, would that take a little bit or a

24    great amount of time?

25    A.    A great amount of time.

1    Q.    Do you want to go ahead and finish in a little bit or a

2    great amount of time?

3    A.    I would like to finish in a little bit of time.

4    Q.    That's how we are going to proceed?

5    A.    Yes, sir.

6    Q.    We are going to talk about what is inside of Exhibit

7    No. 18 in a moment, just like we looked at the two Yahoo

8    emails, but the final thing I need to ask you about are

9    text -- One of the final things as it relates to Mr. Princip

10    relates to text messages.

11        Do you have quite a bit of text messages that you

12    provided to Mr. Wyde?

13    A.    Yes, sir.

14    Q.    Some of which are on THE exhibit list?

15    A.    Yes, sir.

16    Q.    Without disclosing the attorney/client preparation that

17    we have gone through, have we decided not to bore this jury

18    with all of the text messages?

19            MR. WILSON:    Your Honor, I am going to object to the

20    form of the question.

21            THE COURT:    Sustained.

22    Q.    (BY MR. VITAL)    What is your understanding about how many

23    exhibits we are going to go through with text messages?

24    A.    My understanding is we are going to go through a few

25    exhibits.

1    Q.    With Mr. Princip?

2    A.    With Mr. Princip, yes, sir.

3              MR. VITAL:  May I approach the witness, Your Honor?

4              THE COURT:  You may.

5              MR. VITAL:  Plaintiffs' Exhibit No. 26.

6    Q.    (BY MR. VITAL)  I'm handing you Plaintiffs' Exhibit

7    No. 26, and I'd like you to tell the members of the jury if

8    you recognize that document.

9    A.    Yes, sir, I do.

10    Q.    What do you recognize the document to be?

11    A.    These are iMessage text messages between me and

12    Mr. Princip.

13    Q.    So at the top of one of the pages -- of the first page,

14    which says what?

15    A.    "Messages with busyforawhile@gmail.com."

16    Q.    How is it that you are calling text messages an exchange

17    that relates to an email address?  How does that work?

18    A.    Apple allows you to send text messages through phones

19    using their iMessage platform, which you would connect a Gmail

20    account to that iMessage account, and it would allow you to

21    communicate through text phones even though you don't have

22    -- you don't necessarily need a phone line or service with a

23    company like AT&T.  You can just do it through WiFi.

24    Q.    If two people have iPhones, they communicate with each

25    other through a phone number or emails?

1    A.   Yes, sir.

2    Q.   In the form of texts?

3    A.   Yes, sir.

4    Q.   All right.  Now, who reduced the text messages on your

5    phone to the pieces of paper that are within Plaintiffs'

6    Exhibit No. 26?

7    A.   I did.

8    Q.   Did you alone do that?

9    A.   I did it in front of you.

10    Q.   And did does Plaintiffs' Exhibit No. 26 fairly and

11    accurately depict actual text messages between yourself

12    Brandon Keating and Mr. Princip?

13    A.   Yes, sir, it does.

14    Q.   Now, in fairness, there are other text messages on your

15    phone that relate to Mr. Princip.  Is that correct?

16    A.   Yes, sir.

17    Q.   In expedience of time, we are going to focus on

18    Plaintiffs' Exhibit No. 26.

19           MR. VITAL:  Which I offer into evidence at this

20    time.

21           MR. WILSON:  Your Honor, we object to hearsay.  One,

22    these records say text messages which don't even have a phone

23    number for Mr. Princip.

24           THE COURT:  Overruled.  It's admitted.

25           MR. VITAL:  Thank you, Your Honor.

1    Q.    (BY MR. VITAL)  Without the tedium, this is admitted.  We

2    have your phone here.  These come from your phone.  Right?

3    A.    Yes, sir.

4    Q.    Okay.  So now that we have Plaintiffs' Exhibit No. 18 and

5    Plaintiffs' Exhibit No. 26 into evidence, I would like to

6    focus your attention on Plaintiffs' Exhibit No. 18, which are

7    the Skype chats that were admitted yesterday.

8    A.    Yes, sir.

9          MR. VITAL:  Your Honor, may the witness help me with

10   switching the cable on the projector?

11         THE COURT:  Yes.

12         MR. VITAL:  Thank you kindly.

13   Q.    (BY MR. VITAL)  Thank you, Mr. Keating.

14   Would you take a look at what's on the screen there and

15   tell us what we're looking at on the first page of Plaintiffs'

16   Exhibit No. 18?

17   A.    These are Skype chats between me and Mr. Princip.

18   Q.    Okay.  And they start in April, and do they go through

19   some period of time through May or perhaps beyond May of 2012?

20   A.    Beyond; yes, sir.

21   Q.    So we are going to focus on page 2.  On page 2, would you

22   give the jury some context for what the discussion is between

23   you and Mr. Princip?

24   A.    This is a point in the conversation where Mr. Princip

25   begins telling me about his new YouTube channel idea and we

 1    discuss the VideoGames channel.

 2    Q.    Now, on May 7th, 2012 at 8:59:02 p.m., Marko Team Noble

 3    says what to you?

 4    A.    He says, "My partner is a 17-year-old kid."

 5    Q.    When he said that his partner was a 17-year-old kid, what

 6    went through your mind at that point?

 7    A.    I was a little skeptical, but I've dealt with a lot of

 8    teenage entrepreneurs who are successful online, so I

 9    proceeded with caution.

10    Q.    And if you were going to consummate the deal and sign the

11    agreement, which you did, Plaintiffs' Exhibit No. 1, what did

12    you know you had to do?

13    A.    I knew that his parents would -- one of his parents would

14    have to sign as well.

15    Q.    Now, as the Skype went on there were additional

16    conversations about Jon, who you believed to be Jon Brandt.

17    Correct?

18    A.    Yes, sir.

19    Q.    On page 4 of Exhibit No. 18, Plaintiffs' Exhibit No. 18,

20    there is a reference to the fact that Jon is what?

21    A.    "Jon is also an amazing graphics and motion editor."

22    Q.    Did that have little or great impact on you in your

23    decision-making process to sign Plaintiffs' Exhibit No. 1,

24    which is the contract?

25    A.    It had a decent amount of impact.

1  Q.   If the statement was false, would that have concerned

2  you?

3  A.   Yes, sir.

4          MR. WILSON:  Objection; speculation.

5          THE COURT:  Overruled.

6  Q.   (BY MR. VITAL)  Would that have concerned you?

7  A.   Yes, it would have.

8  Q.   Why?

9  A.   You don't want somebody that doesn't know what they are

10  doing to be working on the channel.

11  Q.   Do you like to enter into contracts with people who don't

12  tell you the truth?

13  A.   No, sir.

14  Q.   Do you like to enter into contracts with information

15  regarding people who are partners that don't exist?

16  A.   No, sir.

17  Q.   Would you have done that here?

18  A.   No, sir.

19  Q.   Now, before we move from this page, there's a reference

20  on this page regarding -- it says, "We plan to set up the LLC

21  within the month."  Do you see that?

22  A.   Yes, sir, I do.

23  Q.   Tell the members of the jury what that's about.

24  A.   At the time that he was telling me about his plan, there

25  was no company or LLC formed for this idea, but he was telling

1    me that he planned on setting up an LLC.

2    Q.    And, in fact, the membership agreement that you entered

3    into on May 11, 2012, does it make reference to the fact that

4    an LLC was going to be formed?

5    A.    Yes, sir.

6    Q.    And whose responsibility was it to set up that LLC?

7    Yours or Mr. Princip?

8    A.    That was Mr. Princip's.

9    Q.    And did Mr. Princip, beyond just saying that he was going

10    to set it up here, tell you additional times that he was going

11    to set it up?

12    A.    Yes, sir, he did.

13    Q.    Did you come to learn after you sued him in this case

14    that that didn't happen?

15    A.    Yes, sir; that's when I found out.

16    Q.    And how do you feel about that?

17    A.    I was disappointed.

18    Q.    Putting Plaintiffs' Exhibit No. 1 on the screen, the

19    second page, does it, however, indicate that -- It indicates

20    that you will own 30 percent of the stock and interest of the

21    company.  Do you see that?

22    A.    Yes, sir.

23    Q.    Is there any stock presently for VideoGames?

24    A.    No, sir.

25    Q.    Is there interest to be apportioned and determined by

1    this jury?

2    A.    Yes, there is.

3    Q.    And what portion, per this contract, of the interest of

4    the company are you asking for?

5    A.    Thirty percent of the revenue and interest in the

6    channel.

7    Q.    And what was your expectation -- For the members of the

8    jury, what was the expectation that you thought you would get

9    the benefit of or that you thought Mr. Princip was going to

10    perform when you signed Plaintiffs' Exhibit No. 1?

11    A.    I had the expectation of the benefit of what I signed

12    for, which was 30 percent interest in the channel.

13    Q.    Was it 30 percent of a channel where he didn't live up to

14    his obligations, or was it 30 percent of a well-run channel

15    where Mr. Princip performed all of his obligations?

16    A.    It was definitely a 30 percent interest in a well-ran

17    channel.

18    Q.    Where Mr. Princip fulfilled or didn't fulfill his

19    obligations?

20    A.    He did not.

21    Q.    But did you expect him to fulfill or did you expect him

22    to breach?

23    A.    I fully expected him to fulfill that.

24    Q.    When you signed the contract?

25    A.    Yes, sir, I did.

1  Q.   Now, on the same page we were just reading from, No. 4,

2  the second sentence starts, "Any other YouTube channel

3  sponsorship or project with the exception of"--turning to the

4  next page--"Team Noble will be considered directly related to

5  the company."  Do you see that?

6  A.   Yes, sir.

7  Q.   What did you take that to mean?

8  A.   I had no part in the Team Noble channel.

9  Q.   But other than Team Noble, anything related to the

10 company for which you were signing, what did you expect?

11 A.   I expected to have a 30 percent interest in.

12 Q.   So did you expect that Mr. Princip would play word games

13 and say there is no Achievement Guide; there is only

14 VideoGames?

15 A.   No, sir, I didn't expect that.

16 Q.   Because the contract, in your mind and in black and

17 white, said that you had an interest in what, as it pertains

18 to the company Achievement Guide, or Game Guide, LLC?

19 A.   The VideoGames YouTube Channel.

20 Q.   Okay.  Is the VideoGames YouTube Channel directly related

21 to the company for which you signed this agreement?

22          MR. WILSON:  Objection, Your Honor; asking to make a

23 legal conclusion.

24          THE COURT:  Overruled.

25 Q.   (BY MR. VITAL)  Is the VideoGames channel directly

1  related to the company for which you signed this agreement?

2          MR. WILSON:  Your Honor, the document speaks for

3  itself.  It has already been admitted.

4          THE COURT:  Overruled.

5  Q.  (BY MR. VITAL)  Is the company VideoGames directly

6  related to the company for which you signed this agreement?

7  A.  Yes, sir.

8  Q.  Okay.  And, in fact, in Plaintiffs' Exhibit No. 18, if

9  the jury cares to go through it in greater detail than we will

10  go over it today in your direct examination, what will they

11  find you-all talking about in Plaintiffs' Exhibit No. 18?

12          MR. WILSON:  Objection, Your Honor; assumes facts

13  not in evidence, and that's within the jury's --

14          THE COURT:  Overruled.

15  Q.  (BY MR. VITAL)  Please.

16  A.  I'm sorry.  Can you rephrase the --

17  Q.  What did Marko Princip tell you that he was going to blow

18  up?

19  A.  The VideoGames YouTube Channel.

20  Q.  And blow up, as we've heard earlier in the millennial

21  generation, is not a bad thing?

22  A.  No, sir.

23  Q.  What does blow up mean in your mind?

24  A.  To make it extremely popular and successful.

25  Q.  And was that the benefit you expected when you signed

1  Exhibit No. 1, the contract?

2  A.    Yes, sir; absolutely.

3  Q.    In this Exhibit No. 1, May 7, 2012 at 9:11:51 p.m., there

4  is a representation by you.  It says, "Will I have any say-so

5  in the development of the company?  You should know I'm not

6  the sit back and collect money kind of guy.  I like to be

7  involved."  Do you remember saying that?

8  A.    Yes, sir, I do.

9  Q.    Why did you say that?

10  A.    For that reason.  I like to be involved in what I invest

11  in.

12  Q.    And were you, in fact, involved?

13  A.    Yes, sir, I was.

14  Q.    Have we just introduced yesterday and today exhibits --

15  what did the -- that demonstrate that you like to be involved

16  and that you were involved?

17  A.    Yes, sir.

18  Q.    Were you, however, prohibited from ever being involved by

19  any Defendant in this courtroom?

20  A.    Yes, sir.

21  Q.    Who was that?

22  A.    Marko Princip and Brian Martin.

23  Q.    So the expectation that you had in being involved, would

24  you say that that expectation was met or frustrated by these

25  Defendants?

```
 1    A.    It was frustrated.

 2    Q.    But here before you signed the contract, when Mr. Princip

 3    was asking for money, is it true that he said, "Yeah, of

 4    course.  That's one of the reasons I came to you"?

 5    A.    Yes, sir.

 6    Q.    "I respect your opinion and advice"?

 7    A.    Yes, sir.

 8    Q.    "You always helped me tremendously"?

 9    A.    Yes, sir.

10    Q.    And then what do you ask him immediately after that

11    5/7/2012 at 9:12 and 55 seconds?

12    A.    I instruct him to draw up the contract and I would check

13    it out; give me a letter of intent, or LOI, as soon as you can

14    just so I can secure the funds from my account.

15    Q.    And he said that he would do that, and then asked what an

16    LOI was, and you explained it to him?

17    A.    Yes, sir.

18    Q.    Okay.  A letter of intent?

19    A.    Yes, sir.

20    Q.    I'm on page 5 of Exhibit 18.  There is another reference

21    to Jon or the young man who was supposed to be a partner?

22    A.    Yes, sir.

23    Q.    And what was the representation about Jon's involvement,

24    what he did or who he was?

25    A.    He was to be the COO of the channel.
```

1    Q.    And at 5/9/2012 at 3:19 and 33 seconds, does Marko

2    Princip say, "We're partners"?

3    A.    I'm sorry?  Yes, sir.  I see that.

4    Q.    Now, that was May 9, 2012.  The contract was signed on

5    May 11, 2012.  Right?

6    A.    Yes, sir.

7    Q.    In the contract or in the Skype communication,

8    Plaintiffs' Exhibit No. 18, would you tell the members of the

9    jury why you make a reference to when you guys go public?

10   What does that mean?  And let me show you where I'm pointing

11   or where I'm talking about.

12   A.    Yes, sir.  I'm referencing whether or not the company

13   would end up going IPO, or initial public offering.

14   Q.    And if it did, your expectation was what?

15   A.    That I would own 30 percent of that stock.

16   Q.    And was that put in the contract?

17   A.    Yes, sir, it was.

18   Q.    And you later learned that the LLC -- or the company

19   wasn't set up as an LLC, but what effect, if any, does that

20   have in your mind regarding the interest that you own that you

21   contracted for?

22   A.    I don't believe it has any effect.  I believe I'm -- I

23   expect the benefit of what I signed for, which is 30 percent

24   ownership.

25   Q.    Okay.  And 30 percent interest as the contract says?

1    A.    Yes, sir.

2    Q.    Now, on that same page, page 7 of the chat, there's a

3    reference to Team Noble or Marko May 9, 2012, 3:47:37 p.m.,

4    and he says, "Correct.  We'll have it all filled out and back

5    to you today.  Just waiting on Jon to come home."  Do you see

6    that?

7    A.    Yes, sir.

8    Q.    When Mr. Princip made that representation to you, what

9    were you expecting or what were you thinking?

10   A.    I was thinking he was waiting for Jon to get home so they

11   could fill out the contract and get it prepared for me.

12   Q.    And later on in the chat this same page, May 10, 2012 at

13   4:00:04 p.m., what does Marko say to you right there?

14   A.    He said that Jon was just waiting for his mom.

15   Q.    And what did you expect or what did that cause you to

16   believe?

17   A.    That he was waiting for his mom to sign on his behalf.

18   Q.    Because a minor needs what?

19   A.    A signature from a parent.

20   Q.    Okay.  And then on May 11, 2012 at 2:10:52 p.m.,

21   Mr. Princip says what to you?

22   A.    "Contract sent."

23   Q.    Now, that's the same day as we saw you EchoSign the

24   contract in your EchoSign account.  Is that right?

25   A.    Yes, sir.

1    Q.    Do you recall what time it was that you EcoSigned that

2    contract?

3    A.    I believe it was around 2:40 p.m.

4    Q.    Okay.  And so he sent it roughly 20 or 19 minutes before

5    you EchoSigned it.  Do you see that?

6    A.    Yes, sir.

7    Q.    Okay.  And you responded on what time and what did you

8    say?

9    A.    I responded around 2:40 and said -- I apologize.  Can

10   you --

11   Q.    May 11, 2012 at 2:37:39 p.m., what do you ask him?

12   A.    2:37:39, I don't see it.  I see it now.  "Can I send the

13   1500 through PayPal, or do you require a wire?"

14   Q.    What is that about?

15   A.    I wanted to know if he needed the money, I could have

16   wired him the money or sent it through PayPal.  I just wanted

17   to know by what means he needed the money sent by.

18   Q.    Was that part of the bargain that you were supposed to

19   fulfill?

20   A.    Yes, sir, it was.

21   Q.    Explain that to the members of the jury.  Under

22   Plaintiffs' Exhibit NO. 1, what was it that you were supposed

23   to fulfill under the contract?

24   A.    I was supposed to send him $1500.

25   Q.    And is that why you are asking about $1500 before you

1    signed the contract?

2    A.    Yes, sir.

3    Q.    And what did Marko -- Did Marco say, "PayPal is perfectly

4    fine"?

5    A.    Yes, sir, he did.

6    Q.    At what time?

7    A.    That was at 2:39 p.m.

8    Q.    And 51 seconds?

9    A.    Yes, sir.

10   Q.    So less than a minute later what did you do?

11   A.    I signed the contract and I sent it to him.

12   Q.    And we saw in your EchoSign account, but is there also

13   confirmation in this Skype communication that you signed the

14   contract?

15   A.    Yes, sir.  At 2:40 p.m. I let him know to check his

16   email, and just a moment later he replied that he got it.

17   Q.    Okay.  So the very same time that's in your EchoSign

18   account as in this Skype chat is you have having signed the

19   contract?

20   A.    Yes, sir.

21   Q.    And Mr. Princip verifies that he got it?

22   A.    Yes, sir.

23   Q.    And you make reference to or you say, "Verify you got the

24   PayPal, too"?

25   A.    Yes, sir, I did.

1    Q.   And a little bit later on this same page, Mr. Princip

2    says, "Got it.  Perfect.  Thank you"?

3    A.   Yes, sir.

4    Q.   Do you believe you lived up to and fulfilled your part of

5    the bargain here?

6    A.   Yes, sir, I did.

7    Q.   And did you further, after signing the contract,

8    Plaintiffs' Exhibit No. 1, and making the payment, also

9    undertake numerous actions to provide advice and to try to be

10   involved in the company for which you are suing and asking for

11   confirmation of your ownership?

12   A.   Absolutely; yes, sir.

13   Q.   Over what period of time?

14   A.   Leading up until I filed the lawsuit in August of 2014.

15   Q.   Going back to Plaintiffs' Exhibit No. 1, which page are

16   we looking at here?

17   A.   This is the last page of the contract.

18   Q.   Signature page?

19   A.   Yes, sir.

20   Q.   Now, when you saw the signature for Jon Brandt, who were

21   you led to believe that was?

22   A.   Jon Brandt.

23   Q.   That was the same Jon Brandt that was referenced by

24   Mr. Princip in Plaintiffs' Exhibit No. 18?

25   A.   Yes, sir.

1    Q.    The Skype chat?

2    A.    Yes, sir.

3    Q.    And when you saw Edward Brandt underneath Jon Brandt,

4    what did you believe?

5    A.    I assumed that was the father of Mr. Brandt.

6    Q.    Was that an unusual assumption, or is there something in

7    the contract that led you to believe that?

8    A.    Right below it says "the parent of Jon Brandt."

9    Q.    At any time prior to signing Plaintiffs' Exhibit No. 1,

10    were you led to believe anything other than the fact that

11    there was a real young man named Jon Brandt who was going to

12    get a parent's permission and sign the contract?

13    A.    I'm sorry.  Was I led to believe any other --

14    Q.    Right.

15    A.    No, I was not.

16    Q.    And if this contract, Plaintiffs' Exhibit No. 1, came to

17    you without a purported parent's signature on it, would you

18    have signed it?

19    A.    No, sir.

20    Q.    But because Mr. Princip had put what purported to be a

21    parent of Jon Brandt about whom he made representations to

22    you, what did you do?

23    A.    I signed the contract.

24    Q.    Does Mr. Princip's misstatements or misrepresentations to

25    you affect what you expected when you signed this contract?

1    A.    No, sir.

2    Q.    Would you tell the members of the jury what your

3    expectations were, what the benefit of the bargain was that

4    you expected when you signed Plaintiffs' Exhibit No. 1?

5    A.    I expected to receive 30 percent interest in the

6    Videogames YouTube Channel.

7    Q.    And are you seeking to not get the benefit of that

8    bargain merely because you were not told the truth by

9    Mr. Princip?

10    A.    Am I seeking not to?

11    Q.    So do you believe Mr. Princip told you the truth about

12    Jon Brandt and Ed Brandt?

13    A.    As of right now, no; no, sir.

14    Q.    You say "as of right now" because when you signed it you

15    didn't know?

16    A.    Correct.

17    Q.    My question, even though you know something different

18    about Jon and Ed Brandt, that those were fictitious

19    signatures, does that change what you expect based upon the

20    bargain that you saw when you signed this contract?

21    A.    No, sir, it doesn't.

22    Q.    Why not?

23    A.    Because at the time of signing it, that's what I was led

24    to believe.

25    Q.    In this country, do you believe you have the expectation

```
 1    to get the benefit of what somebody promises you?

 2    A.    Absolutely.

 3    Q.    And does their lie affect, in your mind, what you're

 4    entitled to?

 5    A.    No, sir, it doesn't.

 6    Q.    Going back to Plaintiffs' Exhibit No. 18, we're on the

 7    10th page of the exhibit.  Do you see on May 13th, 2012, two

 8    days after you signed the contract, that Mr. Princip said he

 9    secured $3 with Machinima "for once they secure me the URL"?

10    A.    Yes, sir I do.

11    Q.    In your industry, and now as a co-owner of this business,

12    tell the members of the jury what $3 with Machinima means?

13    A.    That was referencing the guaranteed $3 CPM.

14    Q.    And that's what we've been talking about throughout the

15    testimony in this case?

16    A.    Yes, sir.

17    Q.    When you signed -- Before you signed the contract, did

18    Mr. Princip make that same representation to you about 3 CPM?

19    A.    Yes, sir, he did.

20    Q.    And have you heard in testimony he's also made that

21    representation to Mr. Moss?

22    A.    Yes, sir.

23    Q.    Now, the question to you is, sir, when you signed the

24    contract on May 11, 2012, did you -- was the benefit of the

25    bargain that you expected, was it 30 percent of a poorly run
```

1    company or properly run channel where Mr. Princip didn't

2    breach?

3    A.    It was 30 percent of a properly run channel.

4    Q.    And is the channel properly run, in your belief?

5    A.    No, sir.

6    Q.    Okay.  Has Mr. Princip fulfilled his obligations that you

7    expected when you signed Plaintiffs' Exhibit No. 1?

8    A.    No, sir, he has not.

9    Q.    Is the deal that you've heard these Defendants talk about

10   in the courtroom the benefit of the bargain that you expected?

11   A.    I'm sorry?

12   Q.    Is the deal that these Defendants say this channel has

13   now the benefit of what you expected when you signed the

14   contract?

15   A.    No, sir.

16   Q.    If you knew then what you know now, would you have signed

17   the contract?

18   A.    No, sir.

19   Q.    But are you asking to be limited by their breaches or

20   what you -- or do you want what you expected?

21   A.    I would like what I expected.

22   Q.    In this industry, based upon this company having 3.3

23   million YouTube subscribers and based upon the fact that over

24   its life it's had 813 million views, as Mr. Moss testified, is

25   there any reason in your mind that this channel should not be

1    receiving at least 3 CPM per view?

2    A.    Absolutely not.

3    Q.    As a co-owner of this business and being involved in the

4    business and the industry, what is your belief?

5    A.    I believe it should be either at $3 or more.

6    Q.    Okay.  I believe I heard you say 5 CPM yesterday.  Was

7    that in connection with this or something else?

8    A.    That's another channel I'm part owner of.

9    Q.    Would that be unreasonable here?

10   A.    Absolutely not.

11   Q.    Are you even seeking that, however, or are you seeking

12   just the 3 CPM that you were led and expected to believe?

13   A.    I'm seeking the $3 CPM that was led and expected.

14   Q.    Okay.  And as you understand it, Mr. Moss is seeking the

15   same.  Is that correct?

16   A.    Yes, sir.

17   Q.    You all are co-Plaintiffs in this case?

18   A.    Yes, sir.

19   Q.    He signed his own contract?

20   A.    Yes, sir.

21   Q.    And you are co-Plaintiffs because you have similar

22   expectations?

23   A.    Yes, sir.

24   Q.    Would you tell the members of the jury why 5 CPM, which

25   is what you are not asking for, is a reasonable CPM for a

1    channel like the VideoGames Channel?

2    A.    Why I believe it's reasonable?

3    Q.    Yes, sir.

4    A.    Because I've seen channels with far less viewership and

5    far less subscriber account get more than $3, and I have

6    experience with channels that have $5.

7    Q.    Have these Defendants mismanaged this asset of the

8    partnership that you believe you joined?

9    A.    Absolutely; yes, sir.

10   Q.    Would you tell the members of the jury examples of how

11   they've done that?

12   A.    Well, letting the channel fall into the hands of a minor

13   and losing it and having to sue, I believe that's an example

14   of mismanagement.    Another one --

15   Q.    Let me stop you there.    You heard Mr. Princip say that

16   he's a genius, and that you heard Mr. Princip admit that the

17   kid ran the channel better than him.    What does that cause you

18   to believe as a co-owner in this business that a Defendant

19   admits that the channel was run better by a 17-year-old?

20   A.    I believe he admitted that he doesn't know how to run the

21   channel.

22   Q.    And has he put content on the VideoGames channel or

23   allowed content to be put on the VideoGames channel that

24   confirms that?

25   A.    Absolutely.

1    Q.   Explain that to the ladies and gentlemen of the jury.

2    A.   Well, there's about 2,000 videos on the channel right

3    now, and you can skim through and find a lot of videos that

4    are borderline violations of the terms of use.

5         One in particular, there's a video from February 26 of

6    this year in which the directors are speaking to a minor who

7    identifies himself as a ten-year-old child.  They ask the

8    child how big his penis is, they ask him what he would do with

9    that penis with a stripper, and they coach him into explaining

10   sex acts.

11   Q.   Now, the directors, in fairness, are not these

12   Defendants.

13   A.   No.

14   Q.   But the directors are able to upload the content because

15   of who?

16   A.   The directors submit the content to Mr. Princip and

17   Mr. Martin and then they upload it.

18   Q.   So the directors uploading that offensive content, it

19   only got uploaded because of the actions of what two people in

20   the courtroom?

21   A.   Mr. Princip and Mr. Martin.

22   Q.   If that content was brought to the attention of YouTube,

23   just based upon your understanding of this industry, what do

24   you believe would happen?

25              MR. WILSON:  Objection; calls for hearsay, Judge, as

1    to what YouTube is going to do.

2              THE COURT:  He can answer what he thinks from his

3    experience and his qualifications.

4              MR. WILSON:  He is a lay witness.

5              THE COURT:  I know.  From his experience.  Thank

6    you.

7              THE WITNESS:  From my experience, content like that,

8    YouTube typically just bypasses the strike system and just

9    terminate the channel.

10   Q.   (BY MR. VITAL)  And as you understand it, this channel

11   has how many strikes?

12   A.   I believe two.

13   Q.   Okay.  But even if it didn't have two strikes, what is

14   your experience -- Again, explain what you meant by that.

15   They would not even have to count the number of strikes?

16   A.   Correct.  I believe they would just terminate the channel

17   if they found that video.

18   Q.   Have you advised Mr. Princip before you were totally shut

19   out and had to sue that he shouldn't do certain things with

20   respect to the company and the channel?

21   A.   Absolutely.

22   Q.   Did he follow your advice?

23   A.   I don't believe he did; no, sir.

24   Q.   And whenever he didn't follow your advice about things,

25   were they things that you thought were detrimental to the

1    channel and the company?

2    A.    Yes, sir.

3    Q.    Without him listening to you, what were you -- what did

4    you have to resort to doing?

5    A.    The filing a lawsuit.

6    Q.    Okay.  I have what's in my hand Plaintiffs' Exhibit

7    No. 35.

8              MR. VITAL:  And I ask to approach, Your Honor.

9              THE COURT:  You may.

10   Q.    (BY MR. VITAL)  I'm showing you what's marked Plaintiffs'

11   Exhibit No. 35.  Would you explain to the members of the jury

12   what that is?

13   A.    These are screenshots of the VideoGames Twitter account

14   as well as Mr. Princip's Twitter account.

15   Q.    Are these screenshots or Twitter communications that you

16   were privy to before this lawsuit?

17   A.    Yes, sir.

18   Q.    Did you know about them being uploaded before this

19   lawsuit?

20   A.    The tweets?  Yes, sir.

21   Q.    Were you for or against the tweets being uploaded to

22   Twitter?

23   A.    I was against these.

24   Q.    Okay.  How were you able to identify these tweets as

25   belonging to the VideoGames Channel?

1    A.    Because I followed the VideoGames channel, and the URL of

2    the Twitter account is listed in the URL line up

3    here--twitter.com/videogames.ent.  And that's their official

4    Twitter account.

5    Q.    And I am pointing at an at handle that is at what?

6    A.    markotge.

7    Q.    Who is that?

8    A.    That's Marko; Mr. Princip.

9    Q.    Okay.  How were you able to identify that as

10    Mr. Princip's Twitter handle?

11    A.    Mr. Princip has told me in the past to follow his

12    account.

13    Q.    And the communications on the VideoGames Twitter page

14    that are in Plaintiffs' Exhibit No. 35, do they reference

15    communications that you were told by Mr. Princip he was going

16    to upload?  Are these -- Did Mr. Princip, for instance, tell

17    you he was going to make these communications before he made

18    them?

19    A.    I do not believe.  I can't recall.

20    Q.    But after he made the communications, did he tell you

21    that he had did so and why?

22    A.    Yes, he did.  He did tell me that he faked his firing.

23    Q.    Okay.  Now, we're going to get into that in a second, but

24    I need to ask you a final set of questions.

25    A.    Yes, sir.

```
 1    Q.   The information that's maintained on the VideoGames

 2    Twitter page, is that information uploaded by a person with

 3    responsibility to upload the information?

 4    A.   Yes, sir.

 5    Q.   Mr. Princip?

 6    A.   Yes, sir.

 7    Q.   And Mr. Princip has knowledge of the operation of the

 8    VideoGames channel.  Correct?

 9    A.   Yes, sir, he does.

10    Q.   And he is reasonably prompt in uploading information

11    about the company to the VideoGames webpage?

12    A.   Yes, sir.

13    Q.   And he maintains and uploads information to the

14    VideoGames webpage in the normal and ordinary course of the

15    business of the VideoGames channel.  Is that correct?

16    A.   Yes, sir.

17    Q.   That being so, do you necessarily agree with all of the

18    content he uploads to the page?

19    A.   Absolutely not.

20              MR. VITAL:  Your Honor, I offer Plaintiffs' Exhibit

21    No. 35 into evidence.

22              MR. WILSON:  Your Honor, Defendant objects.  That is

23    not Mr. Princip's Twitter account.

24              THE COURT:  Thank you.

25              MR. WILSON:  It is hearsay.
```

```
 1            THE COURT:  Overruled.  Admitted.  The Court finds

 2    it doesn't go to the truth of the matter.  It is simply to

 3    explain this witness' impression of what happened after he

 4    gave Mr. Princip advice.

 5    Q.   (BY MR. VITAL)  I'm showing you the first page of

 6    Plaintiffs' Exhibit No. 35.  Would you read the top tweet?

 7    A.   Yes, sir.  It says, "Tweet announcing that markotge is no

 8    longer working for VideoGames."  And it's signed Vince.

 9    Q.   When you saw that tweet, what did you think?

10    A.   I knew it was a lie.

11    Q.   What was the time frame, if you recall from memory, that

12    this tweet was sent?

13    A.   This was in sometime mid 2014.

14    Q.   So from the time you signed the contract through at least

15    this time, were you not involved or tried to be involved and

16    give advisement to Mr. Princip?

17            MR. WILSON:  Your Honor, I'm going to object to the

18    form of the question.  He already answered and said he tried

19    to be involved numerous times.

20            THE COURT:  Overruled.

21            MR. WILSON:  It has already been asked and answered.

22            THE COURT:  Overruled.

23    Q.   (BY MR. VITAL)  So from the time you signed the contract,

24    Plaintiffs' Exhibit No. 1, through the date this tweet was

25    sent, did you try to be involved actively, continuously
```

1    through the time that you saw this tweet?

2    A.    Yes, sir.

3    Q.    And as somebody who tried to be involved and give advice

4    regarding the company, what did you -- how did you feel or

5    what did you think when you saw this tweet?

6    A.    I felt it was wrong for Mr. Princip to operate under a

7    fictitious name.

8    Q.    And what did you do?

9    A.    I admonished Mr. Princip for it.

10    Q.    And what did Mr. Princip say?

11    A.    He said he would start going by Marko.

12    Q.    And what did Mr. Princip tell you, if you recall, or if

13    he did tell you anything, regarding his reason for putting

14    this fictitious information on the Twitter page of VideoGames?

15    A.    He said he wanted to state -- or he said he staged his

16    firing so people would think he was just bitter Marko; he was

17    being bitter and out for revenge.

18    Q.    But how was that of aid or assistance to the VideoGames

19    channel?

20    A.    It was not.

21    Q.    Okay.  Did Mr. Princip tell you who Vince was?

22    A.    Yes.

23    Q.    Who was Vince?

24    A.    It was Mr. Princip.

25    Q.    A fictitious person?

```
 1    A.   Yes, sir.

 2    Q.   And what was this fictitious Vince's last name?

 3    A.   Vince Victor.

 4    Q.   Not to be associated with me--Victor Vital?

 5    A.   No, sir.

 6    Q.   Okay.  Mr. Wilson said it could be.  That's true.

 7         Is Plaintiff' Exhibit No. 35 just one example of the type

 8    of mismanagement and poor decision-making that the Defendant

 9    Marko Princip has subjected this channel to?

10    A.   Yes, sir.

11    Q.   Would you give the members of the jury other examples?

12    A.   Not paying directors their revenue from the videos that

13    they've created.  Creating conflict within the community.

14    Using the channel as a way to intimidate people and to not

15    pursuing their revenue.  The list can go on.

16    Q.   As an owner of this business, you heard Mr. Princip admit

17    that Andrew Lovinger did a better job than him.  What is the

18    explanation for that?  What did Andrew Lovinger do, if

19    anything, that this Defendant didn't do?

20    A.   He ran -- Well, for, one he uploaded great content,

21    content that was captivating; and he also paid the creators

22    that paid those videos.

23    Q.   Did Mr. Princip do the latter?  Did he pay the creators?

24    A.   No, he did not.

25    Q.   So when you upload great content and you do right by
```

1    people, does the channel do poorly or well?

2    A.    It flourishes.

3    Q.    And is that what you like and would expect, based upon

4    this lawsuit?

5    A.    Absolutely.

6    Q.    Now, I'm going to go back to Plaintiffs' Exhibit No. 26,

7    the text messages from your phone from Mr. Princip that were

8    admitted into evidence.  I'm going to go through a few of

9    them; not all of them, but just a few of them, if that's okay.

10   A.    Yes, sir.

11   Q.    Now, first of all, give us some context.  What is the

12   date of the first text message in this text exchange?

13   A.    It's June 17th, 2014.

14   Q.    Okay.  And it starts with a tweet or a text from a Mark

15   to Marko and Brian.  Do you see that?

16   A.    Yes, sir.

17   Q.    Okay.  As you understand it and based upon your personal

18   knowledge here, who is the Mark who's communication was pasted

19   into this text exchange?

20   A.    That is Mr. Princip.

21   Q.    Well, no.  I'm saying --

22   A.    I apologize.  Yes, this is -- Mark is Mark Allenbaugh.

23   Q.    So -- And it says, "Most sincerely yours, Mark."  That is

24   Mark Allenbaugh?

25   A.    Yes, sir.

1    Q.    Who was Mark Allenbaugh?

2    A.    He was the attorney representing Mr. Princip and

3    Mr. Martin in the Andrew Lovinger lawsuit.

4    Q.    And you heard these Defendants admit that from the

5    witness stand?

6    A.    Yes, sir.

7    Q.    Now, based upon what you were being sent here, what is

8    your understanding of what Mr. Princip is communicating to you

9    was his arrangement with Mr. Allenbaugh?

10    A.    So for Mr. Allenbaugh to come on the case, they agreed to

11    give him 25 percent of what the channel grossed, and this

12    communication is regarding the fact that they were refusing to

13    pay him that 25 percent gross.

14    Q.    Now, when you say "they," is it you and Mr. Moss or is it

15    somebody else in this courtroom?

16    A.    No, sir; Mr. Princip and Mr. Martin.

17    Q.    So we see in the email right below that paste or the text

18    right below that pasted exchange, it says and Brian replied to

19    that email, "Not going to happen."

20         "Laugh out loud" is the second text underneath that.  Do

21    you see that?

22    A.    Yes, sir.

23    Q.    Who wrote that?

24    A.    That was Mr. Princip.

25    Q.    Was that consistent or inconsistent with how these

```
 1   Defendants respect contracts?

 2   A.    It is consistent.

 3   Q.    Do they respect contracts, in your belief, or no?

 4   A.    No.

 5   Q.    Is this an example of that?

 6   A.    Yes, sir.

 7   Q.    Now, it's hard to read what you say.  I'm going to ask

 8   you to look very closely to what your response and advice is

 9   to this Defendant Mr. Princip.  What was your advice?

10   A.    I told them, "That's playing with fire."

11   Q.    And you say, "Bro"?

12   A.    Yes, sir.

13   Q.    A common phrase you use.  So you say, "That's playing

14   with fire, Bro"?

15   A.    Yes, sir.

16   Q.    What did Mr. Princip say?

17   A.    "I'm ready to get burned."

18   Q.    Or "Ready to be burned"?

19   A.    "I'm ready to be burned."

20   Q.    And who did Mr. Princip say was -- It says, "Like I said,

21   Brandon, I have nothing to lose and everything to gain."  Do

22   you see that?

23   A.    Yes, sir.

24   Q.    Is that consistent with what you've seen these Defendants

25   do in this courtroom?
```

```
 1    A.    Yes, sir.

 2    Q.    Is that consistent with your intersections with these

 3    Defendants?

 4    A.    Yes, sir, it is.

 5    Q.    And what did Mr. Princip say who was going to take the

 6    fall for his actions regarding Mark Allenbaugh, the attorney

 7    he made an agreement with?

 8    A.    He said that he going -- Mr. Princip was going to take

 9    the fall.

10    Q.    "I got my own place now and the Panamera"?

11    A.    Yes, sir.

12    Q.    Is that the Porsche Panamera?

13    A.    Yes, sir.

14    Q.    "I'm in it to make money"?

15    A.    Yes, sir.

16    Q.    Now, to be honest, you are in this -- This is for a

17    for-profit venture you are in.  Is that correct?

18    A.    Yes, sir; absolutely.

19    Q.    Do you operate under the same business ethics that these

20    Defendants do --

21    A.    Absolutely not.

22    Q.    -- in making your money?

23    A.    No, sir.

24    Q.    So when you told Mr. Princip he was playing with fire in

25    June of 2014, just a couple of months before you filed this
```

1    lawsuit, why were you telling him that?

2    A.   It's my opinion that the last person you want to--excuse

3    me--piss off is a lawyer with time.

4    Q.   I agree.

5         So we're going to go to the -- We're going to flip

6    through -- This is in evidence and it can be reviewed by

7    everyone, but we're going to go to page 5 of the text

8    exchange.  Is this still a text exchange between you and

9    Mr. Princip?

10   A.   Yes, sir, it is.

11   Q.   Now, I'm going to a communication.  I'm pointing at it.

12   It's June 19, 2014 at 2:20:32 p.m.  Do you see that?

13   A.   Yes, sir.

14   Q.   Would you read what that text says from Mr. Princip?

15   A.   It says, "VG made 11,000 June 15th, total cause I was" --

16   Q.   Let's stop.  VG is what?

17   A.   VideoGames.

18   Q.   Okay.  Read on.

19   A.   "...total cause I was putting overlays only on all of the

20   videos to fuck over Mark."  I'm sorry.  Soar "To F over mark."

21   Q.   Okay.  But it says F-U-C-K.

22   A.   Yes, sir.

23   Q.   In the text.

24   A.   Yes, sir.

25   Q.   Was that the same Mark that you-all were texting about

1    earlier--Mark Allenbaugh, his attorney?

2    A.   Yes, sir.

3    Q.   What did you take this communication to mean he was doing

4    with this channel--he, Mr. Princip?

5    A.   He was hampering the channel's revenue in an effort to --

6    Q.   To be spiteful?

7    A.   To be spiteful; yes, sir.

8    Q.   Was him hampering the channel to be spiteful to a person

9    he made an agreement consistent with your expectations when

10   you signed the contract, Plaintiffs' Exhibit No. 1?

11   A.   No, sir, it was not.

12   Q.   Now, in a bout of honesty, Mr. Princip later on in this

13   page, on that page has a bout of honesty, does he not?

14   A.   Yes, sir, he does.

15   Q.   What does he say?

16   A.   He says, "Honest Marko coming out again.  And don't

17   judge."

18   Q.   Let's stop there.  Based upon the way you communicate

19   with Mr. Princip in your generation of communication, what is

20   he asking you not to do -- what is he saying and what is he

21   asking you not to do before he makes his honest disclosure?

22   A.   Not to judge him.

23   Q.   And what was his honest disclosure?  What was honest

24   Marko's disclosure that he didn't want to be judged for?

25   A.    "I put the blame on Brian."

1    Q.   And who is the Brian that you believed and knew he was

2    referring to?

3    A.   It was Mr. Martin.

4    Q.   Now, when you're having this text exchange with

5    Mr. Martin, Mr. Martin has no idea, as far as you know, that

6    these things are being said about him by his co-Defendant

7    Mr. Princip?

8             MR. WILSON:   Object, Your Honor, as to speculation

9    as to what Mr. Martin thinks.

10             THE COURT:   Sustained.

11    Q.   (BY MR. VITAL)  Did Mr. Princip tell you Mr. Martin was

12    in the room with him?

13             MR. WILSON:   Your Honor, I think the document speaks

14    for itself.

15             MR. VITAL:   It's a little different.

16    Q.   (BY MR. VITAL)  Do you know where Mr. Martin was?

17    A.   No, sir, I don't.

18    Q.   In your mind, did you think Mr. Martin was being talked

19    about behind his back?

20    A.   Yes, sir, I did.

21    Q.   Were these things that you would want Mr. Princip to say

22    about you?

23    A.   No, sir.

24    Q.   And, in fact, in this same communication, were you

25    concerned about what he says about you behind your back?

1    A.    Yes, sir.

2    Q.    Okay.  We'll get there in a second.

3         Now, turning to the next page of the text exchange,

4    Mr. Princip towards the end of the page--I'm pointing at a

5    text--what does it say?

6    A.    It says, "I didn't read it fully, to be honest, cause I

7    know Brian."

8    Q.    You understood Brian to be who?

9    A.    Mr. Martin.

10   Q.    And what did he say about Brian?

11   A.    "Like, besides to me, he's a big liar."

12   Q.    So you understood Mr. Princip to be communicating what

13   about himself and Mr. Martin in this text exchange?

14   A.    That they are both liars.

15   Q.    Is that consistent or inconsistent with what you've seen

16   in this courtroom?

17   A.    That is consistent.

18   Q.    With how these Defendants interacted with you after you

19   signed Plaintiffs' Exhibit No. 1?

20   A.    It's consistent.

21   Q.    So would you tell the members of the jury whether you

22   expected somebody like Brian Martin to even pop up and be

23   interacting with you the way he did when you signed

24   Plaintiffs' Exhibit No. 1?

25   A.    I did not.

```
 1   Q.   Have I placed on the screen additional text exchanges
 2   from Plaintiffs' Exhibit No. 26?
 3   A.   Yes, sir, you have.
 4   Q.   That continue to have text communications between you and
 5   Mr. Princip?
 6   A.   Yes, sir.
 7   Q.   On June 19th, 2014 at 3:54:24 p.m., approximately two
 8   months before you sued -- joined the lawsuit in this case,
 9   what did Mr. Princip say about Brian?
10   A.   He said, "Brian is just a pawn, man.  He always has
11   been."
12   Q.   And before we read your exchange, how concerned were you
13   with what this Defendant Mr. Princip was possibly saying or
14   doing with respect to you?
15   A.   I was very concerned.
16   Q.   And did you give voice to that in this text exchange?
17   A.   Yes, sir, I did.
18   Q.   What did you say?
19   A.   "If you're telling me this about Brian, it makes me
20   wonder what you're telling Brian about me."
21   Q.   And he says he tells Brian Mr. Martin what about you?
22   A.   "Nothing, because the truth he's never liked you."
23   Q.   Was that consistent how Mr. Martin was interacting with
24   you?
25   A.   Yes, sir.
```

1    Q.   And what was your counsel and advisement to Mr. Princip

2    right after he said that?

3    A.   I said, "You should honor the agreement you had with

4    Brian, man."

5    Q.   Now, you didn't have an agreement with Brian.  Right?

6    A.   No, sir.

7    Q.   Explain to the members of the jury, then, why you would

8    care to offer this advice to this Defendant Marko Princip?

9    A.   I feel that anybody that makes an agreement with anyone,

10   they should honor it no matter who it is, no matter how much

11   you don't like them.

12   Q.   Is that why you have filed suit to enforce Plaintiffs'

13   Exhibit No. 1?

14   A.   Yes, sir.

15   Q.   What did Mr. Princip say about Mr. Martin?

16   A.   He says, "He acted like he had out of respect for me.

17   It's not on paper, though."

18   Q.   What did you take that to mean?  That if an agreement is

19   not in writing and on paper it doesn't matter?

20   A.   No, sir, I did not take it as such.

21   Q.   What did you take "It's not on paper, though"?  What did

22   that mean?

23   A.   That there was no contract between them.

24   Q.   Okay.  Now, have you heard these Defendants talk about

25   and, in your mind, fabricate the existence of some agreement

```
 1   between the two of them?

 2   A.   Yes, sir.

 3   Q.   Okay.  But the honest Marko in communications to you said

 4   something consistent or inconsistent with that?

 5   A.   I'm sorry?

 6   Q.   Was Mr. Princip telling you that -- Is Mr. Princip here

 7   telling you something totally different than what these

 8   Defendants are now claiming in court?

 9   A.   Yes, sir.

10   Q.   That they have some paper agreement somewhere at home and

11   they can't find it?

12   A.   Yes, sir.

13   Q.   Okay.  And you say -- Let me zoom in here.  What do you

14   say there in response to him?

15   A.   I said, "Whether he likes me or not, a deal is a deal."

16   Q.   Is that what Mr. Wyde said to the ladies and gentlemen of

17   the jury when he talked to them in opening statement?

18   A.   Yes, sir.

19   Q.   A lawyer that you had not met before said the very same

20   thing years later that you said to him?

21            MR. WILSON:  Your Honor, I am going to object.  That

22   is bolstering as to what Mr. Wyde told them.

23            THE COURT:  Yes.  Sustained.

24            MR. WILSON:  Thank you.

25   Q.   (BY MR. VITAL)  And even though you say "a deal is a
```

1    deal," what does Mr. Princip say?

2    A.    "Dude, I'm sorry, Brandon, but I don't have a

3    conscientious [sic], man, and haven't for years."

4    Q.    Did you hear me ask this Defendant whether he made that

5    statement?

6    A.    Yes, sir, I did.

7    Q.    And did he admit it or deny it?

8    A.    He denied it.

9    Q.    And it's right here in black and white in Plaintiffs'

10   Exhibit No. 26?

11   A.    Yes, sir.

12   Q.    That he admits he doesn't have a conscience?

13   A.    Yes, sir.

14   Q.    Is that consistent with his actions, his demeanor, his

15   posture, and his testimony to the ladies and gentlemen of the

16   jury all week?

17   A.    Yes, sir, it is.

18   Q.    Is it your -- You're been in the world for 35 years.

19   Right?

20   A.    Yes, sir.

21   Q.    Is it your belief or understanding that people like that

22   will keep acting like that unless they are --

23            MR. WILSON:    Objection, Your Honor.

24            THE COURT:    Sustained.

25            MR. WILSON:    Thank you.

1    Q.    (BY MR. VITAL)  You say on the next page, "But what about

2    your integrity?"  What does he say?  How much integrity does

3    he say he has?

4    A.    "Zero."

5    Q.    Now, he gives a reason for that.  Do you know about his

6    childhood?

7    A.    No, sir, I don't.

8    Q.    He said he was bullied his whole life and abused by his

9    dad.  Do you see that?

10    A.    Yes, sir.

11    Q.    Do you have sympathy or not for this Defendant if he had

12    a rough upbringing?

13    A.    Absolutely.

14    Q.    Okay.  Do you appreciate, however, having somebody

15    interact with you in a way that you don't deserve, treating

16    you with no integrity?

17    A.    No, sir.

18    Q.    Now, we won't go into this out of -- for expedience of

19    time, but are there other references in Plaintiffs' Exhibit

20    No. 26 that reference Mr. Princip admitting or either asking

21    you for a copy of the contract which is now in evidence,

22    Plaintiffs' Exhibit No. 1?

23    A.    Yes, sir.

24    Q.    Okay.  In here--Plaintiffs' Exhibit No. 26?

25    A.    Yes, sir.

1    Q.    Which the jury can go through, if they choose?

2    A.    Yes, sir.

3    Q.    Okay.  Are you happy or sad about the fact that I'm now

4    going to put this one up and we are not going to go through it

5    anymore?

6    A.    I'm happy.

7    Q.    Do you exchange messages, or have you in the past

8    exchanged messages -- Have you communicated with Mr. Martin

9    before in the past?

10   A.    Yes, sir.

11   Q.    And what forms of media have you done that?

12   A.    We've communicated through Facebook, text message, Skype,

13   and possibly Twitter.  I'm not sure about Twitter, though.

14   Q.    Has Mr. Martin, in your mind, interfered with the

15   agreement that you made with Mr. Princip?

16   A.    Yes, sir, he has.

17   Q.    Would you explain to the members of the jury the various

18   ways in which he's done that?

19   A.    He's tried on a few occasions to tell me that I'm not an

20   owner of VideoGames, as well as reflected that to a network.

21   Q.    Okay.  Was that the reason that Plaintiffs' Exhibit No. 3

22   was sent by Mr. Princip to you to confirm that you were a

23   partner and did own 30 percent, but he would prefer you not to

24   speak to Mr. Martin?

25   A.    Yes, sir, it is.

1    Q.    Okay.  But Mr. Martin persisted in doing what?

2    A.    Interfering.

3    Q.    Did he admit or deny your involvement in the VideoGames

4    channel?

5    A.    He denied it.

6    Q.    Did he allow you to fulfill the benefit of what you

7    contracted for ever?

8    A.    No, sir, he did not.

9    Q.    So did he allow you to do that?

10   A.    No, sir.

11   Q.    Did he allow you to be an advisor and involved in the

12   VideoGames channel, as you were led to believe and as you

13   expected when you signed Plaintiffs' Exhibit No. 11?

14   A.    Maybe in one conversation, but for the most part, no.

15   Q.    Okay.  Now, you heard Mr. Martin yesterday on the witness

16   stand deny that he ever had communications with you.  Do you

17   recall that?

18   A.    Yes, sir, I do.

19   Q.    Was that true or false?

20   A.    That was false.

21   Q.    You heard Mr. Princip or Mr. Martin deny that a certain

22   phone number was associated with him.  Did you hear him do

23   that?

24   A.    Yes, sir.

25   Q.    Was that true or false?

1    A.    That was false.

2    Q.    Do you, in fact, have Mr. Martin's at least prior phone

3    number saved in your phone?

4    A.    Yes, sir, I do.

5    Q.    Now, do you know it from memory?

6    A.    No, sir, I don't.

7    Q.    But if I gave you your phone could you find it?

8    A.    Yes, sir.

9         MR. VITAL:  May I approach the witness, Your Honor?

10        THE COURT:  You may.

11   Q.    (BY MR. VITAL)  Now, I'm handing you what?  I just handed

12   you what?

13   A.    Handing me my cell phone.

14   Q.    Is it the same cell phone that has the Chicago Bears on

15   it?

16   A.    Yes, sir.

17   Q.    You understand you are in Cowboys country?

18   A.    Yes, sir.

19   Q.    Proceed with caution.

20   A.    I will.

21   Q.    That cell phone has one or both of these Defendants in

22   the contacts?

23   A.    Both of them.

24   Q.    Okay.  Now, we know it has Mr. Princip because we just

25   went through Plaintiffs' Exhibit No. 26.  It at least has him

1    as busyforawhile in there?

2    A.    Yes, sir.

3    Q.    One of the same emails Mr. Wyde wrote on our handy chart

4    here.  Correct?

5    A.    Yes, sir.

6    Q.    Now, would you go through your phone and tell me if you

7    can find a contact for somebody named Brian Martin?

8    A.    Yes, sir.  I have it right here.

9    Q.    Would you read what the name says for that contact?

10   A.    It says Brian Martin, VideoGames.

11   Q.    Who saved that as VideoGames?

12   A.    I did.

13   Q.    Would you tell the members of the jury what the phone

14   number is associated with that account?

15   A.    949-230-3459.

16   Q.    And do you recall testimony in this courtroom taken down

17   by the court reporter that denied that he was ever associated

18   with that phone number?

19   A.    Yes, sir.

20   Q.    When you heard that testimony, did you know that

21   testimony to be a true or false when it was given?

22   A.    I believe it was false.  I know it was false.

23   Q.    So you and I, when we went back to the office yesterday,

24   checked your phone for what?

25   A.    My text messages.

 1   Q.   And did we check for that contact that you now recited on

 2   the record for the ladies and gentlemen of the jury?

 3   A.   Yes, sir.

 4   Q.   And were there also text messages associated with that

 5   phone number?

 6   A.   Yes, sir.

 7   Q.   Did we find text messages that were the very

 8   communications that Mr. Wyde confronted Mr. Martin about that

 9   he denied he ever had?

10   A.   Yes, sir.

11   Q.   And did you also hear him deny that he ever communicated

12   with you ever via text message?

13   A.   Yes, sir.

14   Q.   And based upon what we have here in court, is that true

15   or false?

16   A.   That's false.

17   Q.   Now, before I approach you, I'm going to -- I'm going to

18   ask for indulgence, if the court reporter would search the

19   transcript to confirm the number that Mr. Martin gave or

20   denied yesterday, the phone number that begins 949.

21          THE COURT REPORTER:   "Question:  Have you ever had a

22   phone number, cellular phone number 949-230-3459?"

23      "Answer:  No."

24          MR. VITAL:  Your Honor, may I approach the board?

25          THE COURT:  You may.

```
 1              MR. VITAL:  Mr. McRoberts, would you read that
 2    number one more time?
 3              THE COURT REPORTER:  949-230-3459.
 4    Q.   (BY MR. VITAL)  May I see your phone?
 5    A.   Yes, sir.
 6    Q.   I put on the document camera what?
 7    A.   My cell phone.
 8    Q.   And would you read what the phone number is on the
 9    document camera?
10    A.   949-230-3459.
11    Q.   Now, I'm hitting the details button on the iPhone.  Do
12    you see that?
13    A.   Yes, sir.
14    Q.   Contacts application?
15    A.   Yes, sir.
16    Q.   I am going to hit the name Brian and go back even
17    further.  Am I not doing that?
18    A.   Yes, sir, you are.
19    Q.   Now, what does that take us to when we do that?
20    A.   My text messages between me and Mr. Martin.
21    Q.   Okay.  And do you have quite a bit of those?
22    A.   Yes, sir.
23    Q.   And in order to capture those -- To confirm or to rebut
24    and negate Mr. Martin's testimony, were you able to capture
25    those with some application that reduced them or memorialized
```

1    them to paper?

2    A.    Yes, sir.

3    Q.    What did you do?

4    A.    I used an application that's called PhoneView.  It allows

5    you to connect the computer to your iPhone and pull text

6    messages into a PDF format.

7    Q.    Have you ever used that application before?

8    A.    Numerous times.

9    Q.    And has it always fairly and accurately reduced to

10   written form the exact same text messages on your iPhone?

11   A.    Every time; yes, sir.

12   Q.    Without any errors?

13   A.    Correct; yes, sir.

14            MR. VITAL:  May I approach the witness, Your Honor?

15            THE COURT:  You may.

16   Q.    (BY MR. VITAL)  I've handed you what I've just marked

17   Plaintiffs' Exhibit No. 68.  Would you tell the members of the

18   jury what that is?

19   A.    These are the -- This is the PDF document that I printed

20   out my text messages between me and Mr. Martin.

21   Q.    Are there any conversations or communications in

22   Plaintiffs' Exhibit No. 68, other than communications between

23   you and your party opponent the Defendant Brian Martin?

24   A.    No, sir.

25   Q.    And do you know Brian Martin in any other way other than

1    your involvement in VideoGames?

2    A.    I knew of Mr. Martin before my involvement with

3    VideoGames.

4    Q.    So by -- A better question would be, did you have any

5    personal interaction with Mr. Martin other than in connection

6    with you being an owner in VideoGames?

7    A.    No, sir, I do not believe I did.

8    Q.    And him interfering with your involvement in VideoGames?

9    A.    Correct.

10             MR. VITAL:  Offer Plaintiffs' Exhibit No. 68 into

11   evidence, Your Honor.

12             THE COURT:  Objection?

13             MR. WILSON:  Objection as to hearsay, Your Honor.

14             THE COURT:  It's overruled.

15       Admitted.

16   Q.    (BY MR. VITAL)  Now, the document does speak for itself.

17   I will not go through it, but it's here in evidence for the

18   ladies and gentlemen of the jury.

19       Are there few or many communications in Plaintiffs'

20   Exhibit No. 68 that reference Mr. Martin and VideoGames and

21   him talking about that with you?

22   A.    There are many.

23             MR. VITAL:  May I have a moment, Your Honor?

24             THE COURT:  You may.

25             MR. VITAL:  Pass the witness, Your Honor.

1          THE COURT:  Thank you.

2      Let's take a 15-minute recess.  We will come back in 15

3   minutes.  Remember what I said about not forming any opinion

4   about the case, and don't discuss it with anyone.

5          (Whereupon, the jury left the courtroom.)

6          THE COURT:  How's the case looking?  You're done?

7          MR. VITAL:  After this witness, we have exhibits

8   that have not been objected to but we will offer, but we can

9   do that without a witness.

10      So the question we're contemplating is with respect to a

11   possible recall of Mr. Martin, whether we rest or call that

12   rebuttal.  But maybe that's form over substance, but --

13          THE COURT:  I'm just trying to get an idea of time.

14          MR. VITAL:  So we may -- I doubt that I have much

15   redirect, so in our case, us talking, maybe 45 more minutes.

16          THE COURT:  Okay.  Mr. Wilson, I understand you

17   think an hour of cross?

18          MR. WILSON:  I'll try to streamline it, Judge, to

19   about four or five topics, and maybe get it down to 30 or so.

20   I will try to move quickly.

21          THE COURT:  We should be able to finish evidence

22   today?

23          MR. VITAL:  Yes, Your Honor; absolutely.

24          THE COURT:  And we will deal with instructions and

25   argue in the morning.

```
 1              MR. VITAL:  Yes, Your Honor.

 2              MR. WYDE:  Unless the Court wanted us to continue

 3    going on.

 4              THE COURT:  We will see how we feel.

 5              MR. WYDE:  I meant go on with more evidence.

 6              MR. VITAL:  He only speaks for himself, Your Honor.

 7              THE COURT:  I've had enough evidence.

 8              MR. WILSON:  When they rest, I may have a witness or

 9    two, but it will be very brief and quite to the point.

10              THE COURT:  Thank you.

11         I will see you in ten minutes.

12                        (Brief recess.)

13              THE COURT:  Ready for the jury?

14              MR. WILSON:  Yes, Your Honor.

15              THE COURT:  Let's bring them in.

16              (Whereupon, the jury entered the courtroom.)

17              THE COURT:  Be seated, please.

18         All right.  Mr. Keating, if you would please take the

19    stand.

20              THE WITNESS:  Yes, Your Honor.

21                        CROSS EXAMINATION

22    By Mr. Wilson:

23    Q.   Mr. Keating, I'm going to unfortunately probably bounce

24    around, but probably go where you last left off and go back to

25    the beginning.  I know you've been on the witness stand for
```

1    several hours.

2    A.    Yes, sir.

3    Q.    Anything you don't understand, ask me to restate or

4    rephrase it.

5    A.    Yes, sir.

6    Q.    Remember I took your deposition back a year ago in June

7    of 2015.

8    A.    Yes, I do remember.

9    Q.    Okay.  And you recall the questions that I asked you as

10    well as yesterday when we read your deposition testimony for

11    us.

12    A.    Some of the questions, yes, sir.

13    Q.    Okay.  The contact that you just showed on your phone,

14    that was your phone with the Chicago emblem.  Correct?

15    A.    Yes, sir.

16    Q.    Would you agree or disagree with me, as well as

17    Mr. Martin's testimony yesterday, that you could have put my

18    name in there and either had my live phone number or a fake

19    phone number for Bob Wilson?

20    A.    Would I disagree that I could -- You mean change the name

21    of the contact for the phone number?

22    Q.    No.  Listen to my question.

23    A.    Yes, sir.

24    Q.    Agree or disagree, in our iPhones you can create any

25    contact you want to.

```
 1    A.   Yes, sir.

 2    Q.   You can put any phone number under that contact.

 3    A.   Yes, sir.

 4    Q.   You'd agree with me that the only way to know that Bob

 5    Wilson's number is Bob Wilson's real number is to go to my

 6    carrier and subpoena my personal record with them, my contract

 7    with them, and my payments to them.   Correct?

 8    A.   I believe there are other ways, but that is one of the

 9    ways, yes, sir.

10    Q.   Is that the most profound, distinguished way to do it?

11    A.   Yes, sir, it is.

12    Q.   I will tell you, I am with Verizon, so if you subpoenaed

13    Verizon records, you would find out that this is my phone and

14    this is my phone number.   Right?

15    A.   I believe so, yes, sir.

16    Q.   Okay.   The number that you suggested or assumed is

17    Mr. Martin's number, do you know who his carrier is?

18    A.   No, sir, I don't.

19    Q.   Do you have any subpoenaed documents here -- Well, you

20    don't know the carrier so obviously you don't have any

21    subpoenaed documents from that carrier to show to the jury.

22    A.   No, sir, I don't.

23    Q.   Okay.   So other than your testimony that it is his number

24    and his testimony that it isn't his number, it's up to the

25    jury to decide basically.   Right?
```

1    A.    I believe it is, yes, sir.

2    Q.    Okay.  I was disturbed by the statement that you said my

3    clients had uploaded some poor content choices --

4    A.    Yes, sir.

5    Q.    -- on the channel.  Remember that statement?

6    A.    Yes, sir.

7    Q.    Okay.  Tell me, how do I spell that IShatOnU?

8    A.    It is I-S-H-A-T --

9    Q.    I-S-H-A-T --

10   A.    -O-N-U.

11   Q.    What do you think shat means?

12   A.    Shat is past tense for fecal matter.

13   Q.    Okay.  So it is shit.  Right?

14   A.    Yes, sir.

15   Q.    You don't find that domain name, that link, that site of

16   a Navy man, a policeman, inflammatory at all?

17   A.    Inflammatory?  No, sir, I don't.

18   Q.    Thank you.

19             MR. WILSON:  Your Honor, we will go ahead and offer

20   this as exhibit -- it's going to have to be at the end.  May I

21   reference it later, because I've got the others pre-marked,

22   but I will hold it until I finish my cross?

23             THE COURT:  Okay.

24             MR. VITAL:  No objection, Your Honor.

25             MR. WILSON:  Thank you, Mr. Vital.

```
 1    Q.    (BY MR. WILSON)  I want to go to -- I think it was

 2    Plaintiffs--Mr. Vital--18?

 3              MR. VITAL:  No. 68.  Was that what I gave you last

 4    night?  Yes; 68.

 5    Q.    (BY MR. WILSON)  We are going to go ahead and call this

 6    on my side of the team Defendants' Exhibit M.  Okay?

 7    A.    Yes, sir.

 8    Q.    Down at the bottom.  Got it?

 9    A.    Yes, sir.

10    Q.    Okay.  Now, again, I know the ladies and gentlemen of the

11    jury have heard a lot of these Skype things, a lot of these

12    text things, whether they're real, live, Memorex.  You

13    probably know what Memorex is.

14    A.    Vaguely.

15    Q.    Okay.  All right.  I bet you Mr. Wyde knows what it is.

16          So I'm going to go to your page 5 on this last exhibit

17    that your attorney -- Let me jump in here and let me minimize

18    that out.  I have some highlights there just for purposes --

19          Now, would you read where I have that highlighted by BK,

20    that looks like it was sent from your phone on March 17th,

21    2014?  Can you read that, or do you want me to zoom in --

22    A.    There is two of them there highlighted.

23    Q.    Yeah.  I'm going to get down to that.  I just want you to

24    read what your comment was right there.

25    A.    Yes, sir.
```

 1   Q.   And this was, again, your conversation with Brian Martin.

 2   A.   Yes, sir, it was.

 3   Q.   Okay.  What did you tell Brian?

 4   A.   I said, "It would be wise to not connect the company to

 5   the channel.  Never agree to removing myself.  No confusion on

 6   my part.  No worries if you misunderstood.  The question now

 7   becomes how do we resolve this."

 8   Q.   So in 2014, you sought to try to resolve these issues, I

 9   assume, prior to you jumping on board with Mr. Moss as the

10   Plaintiff in this lawsuit.

11   A.   Yes, sir.

12   Q.   Okay.  And then would you agree with me, sir, that other

13   than -- I think you said you made a $1500 payment in 2012?

14   A.   Yes, sir.

15   Q.   You have not paid anything else to Marko Princip.

16   A.   Yes, sir, I have.

17   Q.   Oh, how much more?

18   A.   I believe there was -- I'm not sure if I paid him

19   directly or if I paid a company.  I paid for the design of the

20   logo for the channel.

21   Q.   Is that in your contact that's already been marked as

22   Plaintiffs' 1?

23   A.   No, sir.

24   Q.   Okay.

25   A.   And there was another, as well, that I paid money as

1    well.

2    Q.    Okay.  But that was not referenced in your contract.

3    A.    No, sir, it was not.

4    Q.    Okay.  Or your agreement, which is your Plaintiffs' 1.

5    A.    Correct, sir.

6    Q.    All right.  And Plaintiffs' 1, you would agree with me,

7    because Mr. Vital pointed it out, makes no mention of word,

8    term, or company name VideoGames, does it?

9    A.    No, sir, it doesn't.

10   Q.    It says Achievement Guide, does it not?

11   A.    Yes, sir.

12   Q.    And does it say Achievement Guide, LLC, or just

13   Achievement Guide?

14   A.    I would have to see the document again.  I'm not sure.

15   Q.    Okay.  Well, be that as it may, in 2012 when you met

16   Mr. Princip -- Well, YOU met him before that several years.

17   Correct?

18   A.    Yes, sir.

19   Q.    Okay.  You were 30, I think, and he was just a

20   teenager--16, 17 at the time.  Does that sound about right?

21   A.    Round about right, yes, sir.

22   Q.    Okay.  2009 you sold one of your companies and became a

23   multi-millionaire.  Right?

24   A.    No, sir.  That was in 2012.

25   Q.    Okay.  Multi-millionaire?

```
 1    A.    Yes, sir.

 2    Q.    Okay.  The contract, Exhibit No. 1, multi-millionaire, is

 3    not -- Achievement Guide is not registered with the Secretary

 4    of the State of Texas, is it?

 5    A.    Not that I'm aware of, no, sir.

 6    Q.    You were never issued stock as a minority owner, partner,

 7    shareholder, anything else, were you?

 8    A.    No, sir, I was not.

 9    Q.    Okay.  Why, then, does a multi-millionaire not prepare

10    partnership agreements when you thought you were 30 percent

11    partner with this kid?

12    A.    I'm sorry?

13    Q.    Why does a millionaire like you --

14    A.    Yes, sir.

15    Q.    -- does not spend money to create a partnership agreement

16    and register it with the Secretary of State?

17    A.    I felt in my opinion that the contract was sufficient.

18    Q.    Looking back on it today, don't you wish you would have

19    done that, Mr. Millionaire?

20    A.    I still believe the contract is still sufficient.

21    Q.    Okay.  Does the contract say what happens when the

22    company's over?

23    A.    No, sir, it doesn't.

24    Q.    Does the contract say what happens when a fight breaks

25    out and one partner unilaterally fires another one?
```

```
 1   A.   No, sir.

 2   Q.   Don't you think those things are mentioned in a

 3   partnership agreement?

 4   A.   I would not know.  I'm not a hundred percent, sir.

 5   Q.   You've had partnership agreements before.  Correct?

 6   A.   Yes, sir.

 7   Q.   Do you have, in the event of a dissolution, in the event

 8   of a break-up, in the event of winding up, what happens when

 9   the partners become dysfunctional?

10   A.   I believe so, yes, sir.

11   Q.   And you have it registered with the state, don't you?

12   A.   I didn't register the company.  It was a partnership

13   with, like Maker Studios.  But, yes, I believe it was

14   registered with the state.

15   Q.   And did you get some shares?

16   A.   Yes, sir, I did.

17   Q.   Okay.  And you got a K-1.  Right?  Or a 1099?

18   A.   I did get a 1099, yes, sir.

19   Q.   Okay.  Never got a 1099 from Marko Princip in this

20   Achievement Guide situation, did you?

21   A.   I believe I did one time.

22   Q.   Okay.  Did you get a K-1?

23   A.   No, sir, I did not.

24   Q.   Do you have your 1099 to offer the jury here today?

25   A.   I do not, no, sir.
```

```
 1   Q.   Tell the ladies and gentlemen of the jury why your

 2   agreement with Mr. Moss on DocuSign or EchoSign, or whatever

 3   we call it, does not have an email signature line, but the

 4   Moss agreement does have an email signature line under that

 5   document?

 6        MR. VITAL:  Your Honor, I would like to object.  I

 7   think he misstated.  Any answer would be misleading, because

 8   he started with the contract with Mr. Moss, and I believe it

 9   was a misstatement.  I just didn't want him to answer it.  You

10   said, "Your contract with Mr. Moss."

11        MR. WILSON:  Forgive me.

12        THE COURT:  Why didn't you rephrase the question?

13        MR. WILSON:  I will.  Thank you, Judge.

14   Q.   (BY MR. WILSON)  Your agreement with Mr. Princip,

15   EchoSign, did not have email signature lines under that when

16   you-all were EchoSigning back and forth, allegedly.  Correct?

17   A.   Signed for Mr. Princip?

18   Q.   An email underneath your signature lines.

19   A.   I believe it had an email under mine.

20   Q.   This is the document.

21   A.   Oh, okay.  Correct.  I see.

22   Q.   All right.  Why isn't there an email under Marko's?

23   A.   Because Mr. Princip did not sign through EchoSign.

24   Q.   Okay.  And why is Mr. Brandt's email not on there?

25   A.   I imagine he didn't sign it through EchoSign either.
```

1   Q.   Okay.  Well, then how did you sign it through EchoSign if

2   he sent you wet signatures?

3   A.   Mr. Princip sent me the contract to my email account, and

4   then from there I uploaded it to EchoSign and signed it.

5   Q.   All right.  Now, you testified that you knew when you

6   signed this agreement it said Edward Brandt was a kid.  Right?

7   A.   No, sir.  I knew that Jon Brandt was a kid.

8   Q.   Jon Brandt was a kid.  You said in your business, you

9   know, experience that you always check with the parent because

10  you're concerned--previously on your direct examination--that

11  the parent needs to sign that contract.  Right?

12  A.   No, sir.  I say that I have the parent -- I make sure the

13  parent signs.

14  Q.   Right.  Did you contact the Brandts prior to signing this

15  agreement?

16  A.   No, sir, I did not.

17  Q.   As a matter of fact, you didn't contact them, did you

18  not, until after this lawsuit was filed?  Right?

19  A.   Correct.

20  Q.   Okay.  And they told you they didn't sign it, did they?

21  A.   Correct.

22  Q.   And as you sit here now today, don't you think,

23  Mr. Millionaire Businessman, that probably would have been

24  pretty smart to find out whether the kid had signed this?

25          THE COURT:  Mr. Wilson, I'm going to have you

1    address the witness by his given name and not a nickname.

2              MR. WILSON:  I apologize, Your Honor.  I withdraw.

3              THE COURT:  Thank you.

4    Q.   (BY MR. WILSON)  Don't you think, as you sit here today,

5    that it probably would have been a good idea to contact the

6    kid's parents or to confirm that this child was a part of this

7    agreement between you and Marko?

8    A.   Well --

9    Q.   It is just a yes or no, sir.  As you sit here today, do

10   you think it would have been a good idea to call the kid's

11   parents?

12   A.   Yes, sir.  Yes, sir.

13   Q.   But you didn't do it.

14   A.   No, sir, I did not.

15   Q.   Again, I'm going to call this Defendants' M, and these

16   were your texts.  And BK is Brandon Keating, and then off to

17   the left in gray is purportedly Mr. Martin.  Correct?

18   A.   I -- Yes, sir.

19   Q.   Okay.  And we start right here with Mr. Martin, "Ty

20   thinks he has a case is a laughable matter."  Do you see that

21   statement?

22   A.   Yes, sir.

23   Q.   That's March 22, 2014.  Are you aware that that was right

24   about the same time that Mr. Moss had sued Marko Princip?

25   A.   I am aware.

1    Q.    Okay.  And then over to the right you have five

2    statements that you text back, allegedly, to Mr. Martin.  Tell

3    the ladies and gentlemen of the jury what you told him?

4    A.    I said, "It sounds like it's just a subpoena.  Did Marko

5    send you the paper?  Ty doesn't have a case.  He can't.  He

6    settled.  You know what that means Bro?  Ha, ha, ha.  My bad.

7    Wrong Brian."

8    Q.    Okay.  So at that point in time you thought Ty had

9    already settled his lawsuit, I assume, probably back with the

10   Hamilton letter back in 2013?

11   A.    Yes, sir.

12   Q.    And then we go down where Mr. Martin states, "Yep.  It

13   means a payday for you.  That's awesome."  And what do you

14   reply back?

15   A.    "Thanks, buddy.  Yeah, it's a payday for a lot of my

16   friends.  This is just the beginning.  LOL.  Everyone I work

17   with ends up millionaires."

18   Q.    And then right here with that statement where Brian sends

19   back to you, "Thanks.  Yeah.  Hey, question.  Is there any

20   reason Ty knows my full name and my city I live in?  Quite

21   disturbing."  And then you respond what?

22   A.    I said, "No clue.  I imagine it's not hard to find.  The

23   good thing is it's just small claims court.  Small claims

24   court usually don't award more than $5,000."

25          MR. WILSON:  Your Honor, this document is already

1  admitted, but we will go ahead and offer Defendants' Exhibit M

2  into evidence.

3          MR. VITAL:  No objection, Your Honor, on the

4  assumption that it's the exact same thing as 68.

5          THE COURT:  It's Exhibit No. 68.  Right?

6          MR. WILSON:  It's Plaintiffs' 68.  It is now

7  Defendants' Exhibit M, Your Honor.

8          MR. VITAL:  No objection.

9          THE COURT:  Okay.  Admitted.

10  Q.  (BY MR. WILSON)  Yesterday, Mr. Keating, you had some

11  Skype chats, I think with Marko, and they talked about

12  Broadband or an email or something where Marko said -- where

13  he sent to Broadband, I guess, that said, "No, Mr. Keating is

14  a 30 percent owner of the business."  Do you remember seeing

15  that?

16  A.  Yes, sir, I do.

17  Q.  Okay.  And would you agree or disagree with me that Marko

18  probably used you because of your experience and your length

19  of time in the internet world?

20  A.  I could agree with that.

21  Q.  Okay.  And would you agree with me that he may have

22  advised Broadband of that to bolster his situation, to brag

23  about his situation as a 19-year-old kid, 20-year-old kid at

24  that time?

25  A.  Would he use the email to brag about his association with

1    me?

2    Q.    Right.  When he sent it to Broadband, do you think he

3    said, "Hey" -- you know and copied you Brandon Keating, so

4    Broadband sees that you are in that chain?

5    A.    No, sir.

6    Q.    Okay.  You don't think that he was trying to influence

7    Broadband, based on your experience that you were saddled to

8    the wagon as well?

9    A.    No, sir, I don't think that was the point of the email.

10   Q.    Okay.  Let's talk about the money piece, because it is

11   all about the money.  Right?  Today.

12   A.    Not all about the money, but money is a factor, yes, sir.

13   Q.    I mean, you're not walking away from the lawsuit.  You

14   want some money.  Right?

15   A.    I do want some money, yes.

16   Q.    Okay.  So let's talk about the money.  This is the sales

17   revenue that I have already offered into evidence, as you will

18   recall.  In 2012, the 1099 Marko Princip showed $26,130 for

19   the sales revenue for the channel.  Do you recall that

20   document?

21   A.    Yes, sir.

22   Q.    Okay.  Do you have anything with you, any exhibits to

23   offer from Machinima to discredit the fact that the sales

24   revenue for the VideoGames channel in 2012 is $26,130?

25   A.    No, sir, I don't.

1   Q.   Okay.  2013 -- Well, you see in 2012 the fight with

2   Mr. Moss.

3   A.   Yes, sir.

4   Q.   Okay.  2013, Kid Lovinger has the channel, but Marko

5   still gets a check from Machinima; as we know, the 1099 that

6   he filed with his tax return, which you saw.

7   A.   Yes, sir.

8   Q.   $24,671.

9   A.   Yes, sir.

10  Q.   Same question.  You got any documents from Machinima or

11  any other network carrier of the VideoGames channel that shows

12  that that number, 24,671, is not the number that Marko got

13  that year?

14  A.   No, sir, I don't.

15  Q.   2014, you saw the tax return for Marko.  Again, the 1099

16  showed 8582.  Now, I put times two on there because Brian

17  Martin already testified and Marko testified that he was in

18  the game at that point.  Do you recall their testimony?

19  A.   Yes, sir.

20  Q.   You recall them splitting the sales revenue?

21  A.   I believe I recall that, yes, sir.

22  Q.   That number was $17,000 that year on their 1099.  Do you

23  have any documents from Machinima or FullScreen or anybody

24  else that was carrying that network VideoGames channel to

25  discredit that $17,000?

```
 1    A.   No, sir, I don't.

 2    Q.   Lawsuit filed.  Right?

 3    A.   Yes, sir.

 4    Q.   2014.  You and Mr. Moss.

 5    A.   Yes, sir.

 6    Q.   Fast forward to 2015.  We've got a pretty good jump

 7    there.  You saw that 1099.

 8    A.   Yes, sir.

 9    Q.   $148,842?

10    A.   Yes, sir.

11    Q.   Same question.  Do you have anything from FullScreen,

12    Machinima, or anybody else to discredit that the gross

13    revenue--not expenses, not deductions, not directors paid,

14    nothing--but the actual sales were $148,842?

15    A.   No, sir, I don't.

16    Q.   That gets me to a total revenue of $217,000.  And I

17    divided that by four years, which is about $54,000 gross

18    revenue per year.  Do you see where I got those numbers?

19    A.   I see how you got the numbers, yes, sir.

20    Q.   Okay.

21              MR. WILSON:  Your Honor, we will go ahead and mark

22    Defendants' Exhibit N into evidence.

23              THE COURT:  I thought it was in evidence.

24              MR. WILSON:  N as in Nancy.

25              THE COURT:  Any objection?
```

```
 1              MR. VITAL:  No objection, Your Honor.

 2              THE COURT:  It's admitted.

 3    Q.   (BY MR. WILSON)  Mr. Keating, you heard Mr. Moss'

 4    testimony that he values this channel at $5 million.

 5    A.   Yes, sir.

 6    Q.   Okay.  And what do you value this channel at?  You said

 7    millions earlier, I think on your direct examination with

 8    Mr. Vital.

 9    A.   Yes, sir.

10    Q.   What do you value the name, the domain name VideoGames,

11    YouTube, whatever it's called?

12    A.   VideoGames YouTube channel.  I cannot put a specific

13    value on it without knowing all of the details, but I would

14    imagine it is several millions.

15    Q.   Okay.  Can I say 2 million for argument's sake?

16    A.   You can say 2 million.

17    Q.   Okay.  Not that I agree.  Thirty percent.  Thirty

18    percent.

19    A.   Yes, sir.

20    Q.   Sixty percent.  Forty percent.  Are you prepared to write

21    a check for 800 grand to buy the minority shareholders out?

22    A.   No, sir, I'm not.

23    Q.   Okay.  What have you paid your attorneys to date?

24    A.   Me personally or both of us combined?

25    Q.   You personally.
```

1           MR. VITAL:  Before he answers, objection under I

2    believe it is Rule 54.  That's not a jury issue.

3           THE COURT:  Sustained.

4    Q.   (BY MR. WILSON)  Do you have a contract signed with your

5    attorneys?

6    A.   Yes, sir, I do.

7    Q.   Is it hourly?

8    A.   I believe so, yes, sir.

9           MR. WILSON:  Okay.  I think I'm just about through,

10   Your Honor, if I might have a moment.

11          THE COURT:  Okay.

12   Q.   (BY MR. WILSON)  The Skype chats, texts in 2012, and then

13   you come back in 2014.  Would you agree with me there that all

14   of your exhibits, your correspondence, it looks to be that

15   2012 you are having communications with the Defendant and/or

16   Defendants, and then in 2014 you again commence communication

17   with these gentlemen?

18   A.   I communicated with them in 2013 -- well, Mr. Princip in

19   2013 as well.

20   Q.   Okay.  After you paid that money -- And then you saw

21   where the dysfunction came down between Mr. Moss.  Correct?

22   A.   Yes, sir.

23   Q.   And you saw the exhibits, and you saw he got a lawyer,

24   and the lawyer made a demand and, you know, the fight

25   ensued --

 1    A.    Yes, sir.

 2    Q.    -- a few months after the disconnect.

 3    A.    Yes, sir.

 4    Q.    Okay.  Would you agree with me that you and Marko had a

 5    disconnect, financial disconnect?  You didn't get any money,

 6    you didn't get any statements, you didn't get any K-1s for

 7    approximately two years.

 8    A.    Correct.

 9    Q.    Okay.

10    A.    Yes, sir.

11    Q.    And you didn't seek a lawyer and file a lawsuit or demand

12    until two years later until you got Mr. Wyde.  Would you agree

13    with me?

14    A.    Yes, sir.

15            MR. WILSON:  Pass the witness, Judge.

16            THE COURT:  Thank you.

17        Other questions?

18            MR. VITAL:  Yes, Your Honor.

19                        REDIRECT EXAMINATION

20    By Mr. Vital:

21    Q.    You are not a lawyer, are you?

22    A.    No, sir.

23    Q.    But do you understand -- do you have an understanding

24    that you have a certain amount of time before you file a

25    lawsuit?

```
 1          Have you heard of statute of limitations?
 2   A.    Yes, sir, I have.
 3   Q.    Do you believe that you have timely pursued your claims?
 4   A.    Yes, sir.
 5   Q.    Okay.  Do you have any understanding or belief that you
 6   have waited too long to be barred by the statute of
 7   limitations?
 8   A.    No, sir.
 9          MR. WILSON:  Your Honor, objection as to relevance.
10          THE COURT:  Sustained.
11   Q.    (BY MR. VITAL)  Okay.  Let me ask you this.  Do you
12   believe or is it your understanding that you have the right to
13   seek a lawyer and that you have timely done so?
14          MR. WILSON:  Same objection, Judge; relevance.
15          THE COURT:  Sorry, but you brought it up.  I will
16   allow it.
17          THE WITNESS:  Yes, sir.
18   Q.    (BY MR. VITAL)  Okay.  And why do you believe that?
19   A.    Why do I believe that I --
20   Q.    That you have acted timely in pursuing these Defendants
21   in this case?
22   A.    Well, several occasions leading up to hiring Judge Wyde,
23   I've attempted to -- I was led to believe that we were working
24   together, so it would have been just a few months after being
25   finally just -- I believe it was a decent amount of time.  I
```

1    apologize.  A short amount of time.

2    Q.    Right.  And the channel was outside of Mr. Princip's

3    control in 2013.  Is that correct?

4    A.    Yes, sir.

5    Q.    And Andrew Lovinger's control.

6    A.    Yes, sir.

7    Q.    What was going on between you and Mr. Princip during that

8    time?

9             MR. WILSON:  Your Honor, I'm going to object.  One,

10    it's been asked and answered; and two, it's outside of my

11    cross.

12            THE COURT:  I will allow it.

13    Q.    (BY MR. VITAL)  Go ahead.  What was going on between you

14    and Mr. Princip in the year 2013 when the channel was in the

15    control of Andrew Lovinger?

16    A.    There were a few conversations where I had reached out to

17    him and said, "Hey, this channel is still earning money.  We

18    should probably go get the channel."  And I offered maybe two

19    or three times to hire an attorney so we can go after the

20    channel.

21    Q.    Did you offer a small or a large amount of money to do

22    that?

23    A.    In 2013 I don't believe I put a monetary amount on how

24    much I would offer.

25    Q.    But did you offer to pay an attorney?

```
1   A.    Yes, I did.

2   Q.    Now, do you understand -- What's your understanding from

3   your contract regarding whether you were required to do that.

4   A.    I was not required.

5   Q.    Then why did you offer it?

6   A.    Because I still felt entitled to 30 percent of that

7   channel.

8   Q.    And what did you believe about the channel when you

9   offered this man, Marko Princip, money to pursue the Lovinger

10  situation?

11  A.    I believed that the channel had been stolen.

12  Q.    Okay.  And why did you believe that?

13  A.    Because Mr. Princip told me so.

14  Q.    And why -- What is it about the channel that led you to

15  offer something that you weren't contractually required to

16  offer?

17  A.    I apologize.  Can you rephrase?

18  Q.    Well, you said the contract -- it is your understanding

19  that the contract didn't require or obligate you to pay legal

20  fees.

21  A.    Yes, sir.

22  Q.    Why did you offer to do that?  Was there anything about

23  the channel that motivated you to do that?

24  A.    The channel was growing significantly and it had a lot of

25  views; it was still getting an enormous amount of views, so I
```

1    knew there was revenue being generated through the channel,

2    and I felt that I had 30 percent ownership of that revenue.

3    Q.    You talked about Mark Allenbaugh.  Was he hired in 2013

4    or 2014?

5    A.    I believe he was hired in 2013.

6    Q.    Were you involved in the decision to hire Mr. Allenbaugh?

7    A.    No, I was not.

8    Q.    How did you learn that Mr. Allenbaugh had been hired by

9    these Defendants to get control of the channel back from

10   Andrew Lovinger?

11   A.    On January 9th of 2014, I had reached out to Mr. Princip,

12   again seeing the channel growing, and told him, "Hey, I'm

13   ready to put $100,000 down on a lawyer so we can go get this

14   channel."

15   Q.    When was that?

16   A.    I believe it was around January 9th of 2014.

17   Q.    And then I cut you off.  Go ahead.

18   A.    And then throughout the conversation Mr. Princip told me,

19   "You know, it's too much stress.  I just want to let it go."

20   And he tried to get me to forget about it, but I was

21   persistent.  I said, "No, this channel is earning money.  We

22   need to go get this channel.  This is your baby.  You created

23   it.  Why aren't you fighting for it?"

24   Q.    What did he eventually tell you?

25   A.    Mr. Princip eventually admitted to me that they either

1    already settled or were about to settle to get the lawsuit

2    channel back.

3    Q.    Were you involved in the decision -- You said you weren't

4    involved in the decision to hire Mr. Allenbaugh.  Right?

5    A.    Correct.

6    Q.    And Mr. Princip was misleading you or not disclosing that

7    he had been hired.

8    A.    Correct.

9    Q.    Were you involved in the decision about what terms on

10    which to settle the case?

11    A.    No, sir.

12    Q.    Okay.  And then control of the channel was back with

13    Mr. Princip at the end of January 2014?

14    A.    January 15th of 2014 he got the channel back.

15    Q.    Okay.  So he got control of the channel before you knew

16    about Mr. Allenbaugh?  Or when did you learn about

17    Mr. Allenbaugh?

18    A.    It had to have been around -- either the day on January

19    9th or leading up until they got the channel back.  I can't --

20    Q.    You said January 9th.  I thought you said January 19.

21    A.    January 9th was when I found out about the lawsuit.

22    Q.    So this amount of time that Mr. Wilson talked about on

23    cross examination, how many months did you wait before you

24    filed a lawsuit after they got control of the channel back?

25    A.    I believe seven months.

1    Q.    And during that seven months, were you having arguments

2    and trying to assert your ownership regarding one of these

3    Defendants in this case?

4    A.    Yes, sir.

5    Q.    And who was that?

6    A.    Mr. Martin.

7    Q.    In light of this timeline that we have talked about, why

8    didn't you file a lawsuit sooner after they got control of the

9    channel back?

10   A.    Well, sooner than getting the channel back, or between

11   getting the channel back and the time I did file?  Why not

12   between that time?

13   Q.    Right.

14   A.    All the way up until August of 2014, I was being led to

15   believe that I am still an owner, I was still participating,

16   giving advice, negotiating deals on behalf of VideoGames, so

17   at that point up until before I filed the lawsuit I still

18   assumed I was 30 percent owner.

19   Q.    And Plaintiffs' Exhibit No. 3 is the email where

20   Mr. Princip confirmed you were 30 percent?

21   A.    Yes, sir.

22   Q.    That is on June 21st, 2014?

23   A.    Yes, sir.

24   Q.    Is this one of the reasons that you were led to believe

25   that there was still an attempt on behalf of these Defendants

1    to participate -- to allow you to participate in the

2    VideoGames channel?

3    A.    One of the many, yes, sir.

4    Q.    Was this a reason that you did not file a lawsuit as of

5    at least June 21st, 2014?

6    A.    Yes, sir.

7    Q.    Just a couple of months before you filed suit?

8    A.    Yes, sir.

9    Q.    Do you think you waited too long?

10    A.    No, sir.

11    Q.    Okay.  Now, in 2014 we saw some exchanges, text exchanges

12    in Plaintiffs' 68, Defendants' N, regarding Mr. Moss.  Right?

13    A.    I'm sorry?

14    Q.    You recall text exchanges that Mr. Wilson showed you on

15    cross examination where you were talking to Mr. Martin --

16    A.    Yes, sir.

17    Q.    -- about Mr. Moss?

18    A.    Yes, sir.

19    Q.    And you said that you thought -- or in those exchanges

20    you thought that Mr. Moss had settled his claims.

21    A.    Yes, sir.

22    Q.    Why did you believe that?

23    A.    Mr. Princip told me that he settled his case with

24    Mr. Moss for $1300.

25    Q.    Did you learn that to be true or false?

1    A.    I learned that to be false.

2    Q.    Did we not see an exhibit in this courtroom where

3    Mr. Moss' attorney specifically rejected that amount because

4    it was not enough?

5    A.    We did.

6    Q.    Okay.  Did you learn that the case had not been settled?

7    A.    Later, yes, sir.

8    Q.    So is it your belief that Mr. Princip was truthful or not

9    truthful to you regarding Mr. Moss and the status of his

10    claim?

11    A.    He was not truthful.

12    Q.    And when you learned that, did you learn that you had

13    similarities or dissimilarities to Mr. Moss?

14    A.    I learned that we had a lot of things in common.

15    Q.    You laughed a little bit.  Did I catch that for the

16    record?  Or chuckle just a little bit?

17    A.    Yes, sir.

18    Q.    Explain to the members of the jury the similarities that

19    you learned that you had with Mr. Moss as it pertains to these

20    Defendants.

21    A.    I learned that Mr. Moss had a contract along the same

22    terms as I for 30 percent of the channel, and he went through

23    about the same amount of hassle as I did to collect money.

24    Q.    You were asked about some channel called IShatOnU.

25    A.    Yes, sir.

```
 1    Q.    What was that channel about or was that a channel or

 2    website?

 3    A.    It was a YouTube channel.

 4    Q.    What was that channel about?

 5    A.    It was an internet character where I put on a mask, I

 6    would speed up my voice, and I would make videos regarding

 7    current news within entertainment.

 8    Q.    With -- What was the genre?  Was it comedy satire?

 9    A.    It was a mix between news and comedy.

10    Q.    Okay.  And why did you call it IShatOnU?

11    A.    Well, the character pretty much would find people in

12    entertainment, or find news stories of people who -- like, for

13    example, like Chris Brown with the Rihanna incident, I

14    would --

15    Q.    Which Rihanna incident?  I know what it is, but --

16    A.    The one January of 2009 when he assaulted Rihanna.

17    Q.    Let me speed things along.

18    A.    Okay.

19    Q.    Was the purpose of your website to expose people's

20    misdeeds that needed to be exposed?

21              MR. WILSON:  Your Honor, I'm going to object to the

22    relevance.

23              THE COURT:  You brought it up, so I will allow it.

24              THE WITNESS:  Yes, sir.

25    Q.    (BY MR. VITAL)  Explain that to the ladies and gentlemen
```

1    of the jury.

2    A.    So I would find stories of people who either did

3    scandalous things or bad things and I would pick on them.

4    Q.    Would -- What was your motivation in that regard, or what

5    was it inside of Brandon Keating that caused him to want to

6    expose misdeeds and essentially shat on people?

7    A.    I just felt like I needed to expose scandal, expose

8    people for bad deeds.

9    Q.    Do you currently have that channel?

10   A.    I still own the channel, but I don't produce on it.

11   Q.    If you did produce on it, are the type of misdeeds by

12   these Defendants the type that should be shat on?  You can

13   tell the truth.

14          MR. WILSON:  Objection, Your Honor.  It is

15   argumentative.

16          THE COURT:  Sustained.

17          MR. VITAL:  I pass the witness, Your Honor.

18          THE COURT:  Other questions?

19          MR. WILSON:  Yes, Judge.

20                    RECROSS EXAMINATION

21   By Mr. Wilson:

22   Q.    Mr. Keating?

23   A.    Yes, sir.

24   Q.    Do you have an email, text, or Skype showing where you

25   offered to pay $100,000 in lawyers fees on the Lovinger case

1    for the jury to look at?

2    A.    No, sir.  I believe that was during a Skype conversation.

3              MR. WILSON:  Objection after everything after "No,

4    sir."

5              THE COURT:  Okay.

6    Q.    (BY MR. WILSON)  So the answer is no?

7    A.    No, sir.

8              MR. WILSON:  Nothing further for this witness,

9    Judge.

10             THE COURT:  Thank you.

11             MR. VITAL:  No further questions, Judge.

12             THE COURT:  Thank you.  You may step down.

13             THE WITNESS:  Thank you, Your Honor.

14             MR. VITAL:  Your Honor, may we approach the bench

15   regarding our proof?

16             (The following was had outside the hearing of the

17             jury.)

18             MR. VITAL:  We are prepared to close our evidence.

19   I just wanted to close it subject to offering exhibits instead

20   of boring the jury with offers.  So we will close, but I just

21   wanted to determine --

22             THE COURT:  Rest.

23             MR. VITAL:  Rest.  Thank you.  We are prepared to

24   rest subject to offering the balance of our exhibits that have

25   no objections asserted to them.

1           THE COURT:  Okay.

2           MR. WILSON:  Your Honor, I still think is it not --

3    I believe that the issue of attorney's fees is going to be a

4    fact issue because of when offers of compromise were made.

5           THE COURT:  Only if they prevail.  I am not going to

6    let you get into that attorney fees issue.

7           MR. WILSON:  It is going to be in the charge.

8    Correct?  If they prevail?

9           THE COURT:  It is not in the charge.

10          MR. VITAL:  It is not in the charge.  It is in the

11   pretrial order, because it needs to be determined, but it is

12   not in the charge.

13          MR. WILSON:  My reading --

14          THE COURT:  The Court will determine attorney fees.

15          MR. WILSON:  My understanding is it needs to be in

16   the charge if they need to determine what the attorneys

17   fees --

18          THE COURT:  You submitted a joint charge.  It is not

19   in there.

20          MR. WILSON:  They are in there.

21          THE COURT:  It is not in there.

22          MR. WILSON:  Well, I know it is not in there, but we

23   argue that the attorney fee issue needs to be in there.  I

24   need to ask -- I need to cross examine them for the jury to

25   consider that.  That's a fact issue as to whether they are

1   going to pay them for 2012 or go ahead and pay them all the

2   way through, whether it is 1500 --

3          THE COURT:  So what you are saying is the attorney

4   fees issue, if he prevails -- in other words, the award of

5   attorney fees if he prevails, if the Plaintiffs prevail, would

6   be a consideration for the jury?

7          MR. WILSON:  I think it should be, yes, Judge, in

8   this particular case.

9          MR. VITAL:  Your Honor, my position on that is

10  Mr. Wilson has talked about state practice.

11         THE COURT:  It's here in federal court.

12         MR. WILSON:  I have Fifth Circuit cases --

13         MR. VITAL:  In state practice we submit it to the

14  jury.  In federal it is a post-verdict issue handled under

15  protocol set forth in Rule 54 on affidavits.

16         THE COURT:  Right.

17         MR. WILSON:  Your Honor, my reading of it is,

18  though, if it is an issue at trial on the issues of --

19         THE COURT:  But it is not an issue at trial because

20  nobody has brought it up, and it is not in your proposed

21  instructions.  The way it works is the prevailing party is

22  entitled to attorney fees decided by the Court.

23         MR. WILSON:  Okay.  I will -- When we adjourn the

24  jury, I will decide whether I will make an offer of proof or

25  whatever.

 1          THE COURT:  Okay.  Shall we excuse the jury while

 2   you make your motions?

 3          MR. VITAL:  Yes, Your Honor.

 4          MR. WILSON:  I still have to call our two people,

 5   though.

 6          THE COURT:  I understand.

 7          (The following was had in the presence and hearing

 8          of the jury.)

 9          THE COURT:  Let's take a ten-minute recess, and we

10   will bring you back and then the Plaintiffs intend to close,

11   and they have some things to discuss with me, then we will

12   bring you back in and the Defendant can put on their case.

13          (Whereupon, the jury left the courtroom.)

14          THE COURT:  Would you shut the door for me?  Thanks.

15      What says the Plaintiff?

16          MR. VITAL:  Your Honor, the Plaintiff rests its

17   evidence subject to the ability at least to offer the

18   remaining exhibits, to which there will be no objections,

19   before we close the evidence.

20          THE COURT:  Which exhibits, then?

21          MR. VITAL:  That's all, Your Honor.

22          THE COURT:  Okay.  Which exhibits are you offering?

23          MR. VITAL:  They are on our exhibit list.  I just

24   need to match the exhibits to the ones that Mr. -- The ones

25   that haven't been offered, and true those up with the list

1    that Mr. Wilson gave me that he didn't have an objection to,

2    and that will only take me two to five minutes.

3             THE COURT:  Okay.  Any motions that the Plaintiff

4    wish to make at this time?

5             MR. VITAL:  Your Honor, the only motion we would

6    make, and make for the record, we believe that the evidence is

7    overwhelmingly sufficient for Your Honor to instruct a verdict

8    in favor of the Plaintiff on one or more of the claims

9    asserted in the first amended complaint and as memorialized in

10   the signed joint pretrial order in this case.

11        Assuming or at least anticipating that the motion could

12   be denied, we are prepared to argue to the jury, but we

13   believe at least on one or more of the elements or claims that

14   would be submitted to the jury, the evidence is at least

15   sufficient to instruct a verdict in our favor.

16             THE COURT:  Thank you.  The motion is denied without

17   prejudice, subject to remaking at the end of the Defendants'

18   case.

19        Any motions for the Defense.

20             MR. WILSON:  No, Your Honor; no motions.

21             THE COURT:  All right.  And the Defense is ready to

22   proceed?

23             MR. WILSON:  Yes, Your Honor.

24             THE COURT:  And Mr. Wilson, how long do you think

25   you will take?

1          MR. WILSON:  I hope maybe just 10 or 15 minutes.  I

2    don't know what their cross is going to do, but just a few

3    questions with both.

4          THE COURT:  I remind the Plaintiffs that they will

5    be limited to the direct examination questions.

6          MR. VITAL:  Yes, Your Honor.

7          THE COURT:  All right.  Let's take another five

8    minutes or so, if you need to use the restroom.

9          MR. VITAL:  If I may interpose one point.  Would

10   that be with the exception of the limited cross that Mr. Wyde

11   reserved before we rested?

12         THE COURT:  Okay.

13         MR. VITAL:  Thank you kindly.

14                    (Brief recess.)

15         THE COURT:  Are you ready for the jury?

16         MR. VITAL:  Yes, Your Honor.

17         THE COURT:  Let's bring them in.

18         (Whereupon, the jury entered the courtroom.)

19         THE COURT:  Thank you.  Be seated.

20      What says the Plaintiff?  Plaintiff rests?

21         MR. VITAL:  Plaintiff rests, Your Honor, subject to

22   the conditions discussed earlier on the record.

23         THE COURT:  What says the Defendant?

24         MR. WILSON:  Your Honor, we call Mr. Martin back to

25   the stand.

1          THE COURT:  Mr. Martin, if you would come forward.

2     You are still under oath.

3          THE WITNESS:  Thank you, Your Honor.

4          THE COURT:  Yes, sir.

5                    BRIAN MARTIN,

6     Testified on direct examination by Mr. Wilson as follows:

7     Q.   Mr. Martin, you recall yesterday there were a couple of

8     different settlement documents going back to the federal

9     lawsuit that you and Marko defended against the Lovinger

10    family.  Correct?

11    A.   That is correct.

12    Q.   Okay.  And we've marked as Defendants' Exhibit O that

13    document that is filed with the federal court in that case.

14         Is that the case number at the top?

15    A.   Yes, sir; that's correct.

16    Q.   Is that THE document you WERE referring to as the final

17    signed document by all the parties?

18    A.   Yes, sir; that's correct.

19    Q.   And then on the very last couple of pages, it appears

20    that the Lovinger family and the infamous kid Adam Lovinger

21    signed that on January 4th of 2014.

22    A.   Yes, sir; correct.

23    Q.   And shortly thereafter I assume you all acquired the

24    channel?

25    A.   That's correct.

1   Q.   Okay?

2            MR. WILSON:  Your Honor, we go ahead and offer

3   Defendants' Exhibit No. 0 into evidence.

4            THE COURT:  Any objection?

5            MR. VITAL:  No, Your Honor.

6            THE COURT:  Admitted.

7            MR. WILSON:  Nothing further for this witness,

8   Judge.

9            THE COURT:  All right.  Thank you.

10       Any cross?

11           MR. WYDE:  Yes.

12           THE COURT:  Mr. Martin, if you would have a seat

13  again, please.

14           THE WITNESS:  Sorry, Your Honor.

15           THE COURT:  And your cross examination now is going

16  to go outside the foundation for this exhibit?

17           MR. WYDE:  I reserved --

18           THE COURT:  Because you have reserved some of your

19  cross for this witness?

20           MR. WYDE:  Yes.

21           THE COURT:  All right.  Thank you.

22                       CROSS EXAMINATION

23  By Mr. Wyde:

24  Q.   Mr. Martin, on Wednesday September 25th of 2013, did you

25  write an email to Drew Lovinger's father?

1    A.    Yes, I did.

2    Q.    And did you address -- Did that email come from an email

3    address of Brian D-Mart?

4    A.    Yes, it did.

5    Q.    And did you identify yourself in that email as "This is

6    Brian Martin"?

7    A.    Yes, I did.

8    Q.    In that email on September 25th, 2013, did you state that

9    the channel was making over $15,000 a month?

10   A.    I believe that's what it was, yes.

11   Q.    So at $15,000 a month in September of 2013, if we

12   multiply that times 12, that would be $180,000 a year at

13   least.  Correct?

14   A.    That is correct.

15   Q.    So $180,000 in 2013, $180,000 in 2014, and $180,000 in

16   2015 would be $540,000.  Is that correct?

17   A.    By the math, yes.

18          MR. WYDE:  May I approach this board?

19          THE COURT:  Yes.

20   Q.    (BY MR. WYDE)  I wrote down on this flip chart that was

21   going to be offered into evidence at the close of the evidence

22   that you used the name Brian D'Mart.  Is that correct?

23   A.    Yes.

24   Q.    And have you also spelled that with the word Brian, first

25   name Brian, but D-E-M-A-R-T or Brian D --

```
1    A.    D-E, yes.

2    Q.    Brian D-E?

3    A.    D.

4    Q.    Okay.  So you used Brian D.  Correct?

5    A.    That's my middle initial.

6    Q.    Okay.  But you have also used Brian D-E.  Isn't that

7    correct?

8    A.    No.

9              MR. WYDE:  I tender what's going to be marked as

10   Plaintiffs' Exhibit No. 69 to Mr. Wilson and request it be

11   admitted into evidence, pending any objection.

12             THE COURT:  Okay.  For me would you identify this

13   document?

14             MR. WYDE:  Yes.  It's an email from -- It's offered

15   in rebuttal.

16             THE COURT:  I'm sorry.  It's an email from --

17             MR. WYDE:  An email dated 9/25/2013.

18             THE COURT:  Okay.  Thank you.

19             MR. WILSON:  It's a rebuttal exhibit, Judge.  May I

20   have a moment to look at it, because it wasn't offered before

21   trial?

22             THE COURT:  Yes, you may.

23        I just need something to put on my list.

24             MR. WILSON:  Your Honor, although it is untimely and

25   was not identified in discovery, Defendants will allow it to
```

1    be admitted.

2              THE COURT:  Okay.  Thank you.

3              MR. WYDE:  I request an instruction to the jury that

4    under the rules of discovery --

5              THE COURT:  I will tell them.  But you are offering

6    this exhibit?

7              MR. WYDE:  Yes.

8              THE COURT:  Exhibit 69 is admitted.

9        The way the rules work is that in their case in chief

10   they have to present evidence that's been thoroughly vetted

11   through discovery and so forth, but rebuttal evidence is

12   different and it doesn't have to be made available.  This is

13   what's called rebuttal evidence.

14       Thank you.

15   Q.   (BY MR. WYDE)  And, for the record, I didn't ask you

16   about any -- or I didn't ask you about any questions or

17   conversations or communications yesterday between you and

18   Mr. Drew Lovinger's father, did I?  That subject never came up

19   yesterday.

20   A.   No, it did not.

21   Q.   Okay.  Now, did you receive email communications from

22   Paul Smoot during -- on September 27th of 2013?

23   A.   A number of them.

24   Q.   And was that to the email address my3dworldyt@gmail.com?

25   A.   Yes, it was.

1    Q.    Okay.  Are you aware of an email between the co-Defendant

2    Mr. Princip and Mr. Smoot dated October 10th of 2013 wherein

3    Mr. Princip wanted to come to a legal arrangement without you

4    being involved?

5    A.    No.

6              MR. WYDE:  May I approach the witness?

7              THE COURT:  You may.

8    Q.    (BY MR. WYDE) I show you what's been marked Plaintiffs'

9    Exhibit No. 70 to see if you have ever seen this document

10   before.

11   A.    No, I have not.

12   Q.    Can you tell me the email address that that document was

13   sent from?

14   A.    It was sent from my.raw.nerve@gmail.com.

15   Q.    Do you have any reason to question that that email

16   address belongs to Marko Princip?

17   A.    I have every reason to question that it is fake and it

18   can be frauded; but yes, it does look like it.

19              MR. WYDE:  Objection.  I was asking about the email

20   address.  He was addressing the content, which had not --

21              THE COURT:  Okay.  Do you know if that's Marko

22   Princip's email address?

23              THE WITNESS:  Yes, Your Honor, it is.

24              THE COURT:  Okay.  Thank you.

25              MR. WYDE:  I'll tender that to Mr. Wilson, since he

1    hasn't seen it, and request it be admitted, pending any

2    objections.

3              MR. WILSON:  Your Honor, we -- I don't even need to

4    see it.  I have got an objection that, one, it was not

5    provided timely in discovery; two, it is highly prejudicial to

6    the Defendants to spring it on us this late; thirdly, it

7    wasn't provided to the Court in the exhibits, per the pretrial

8    order two weeks ago, and it is not filed with the Court, and

9    it's hearsay as well.

10             MR. WYDE:  May I?

11             THE COURT:  It is rebuttal evidence, and in the

12   Plaintiffs' filings with the Court they reserved the right to

13   present rebuttal evidence.

14             MR. WILSON:  Your Honor, if I may, in my discovery

15   request I asked them specifically to provide rebuttal

16   documents, if they've got it, and it was not timely provided.

17             THE COURT:  Which they don't necessarily have to do,

18   and they objected to it.

19        Now, in regards to the hearsay, what's your response?

20             MR. WYDE:  Yes, sir.  Under the Federal Rules of

21   Evidence, specifically rule I believe 801(e) -- excuse me.

22   Yes, (e) -- excuse me.  (2)(e) which is an opposing party

23   statement and statements between co-conspirators is also an

24   additional reason why it would be admitted.

25             THE COURT:  I do find the exception applies.  I

1    admit the document.  Exhibit No. 70 is admitted.

2              MR. WYDE:  May I publish the exhibit at this time.

3              THE COURT:  Yes.

4              MR. WILSON:  Sorry, Your Honor.  Did you admit the

5    exhibit?

6              THE COURT:  I did.  I overruled the objection and

7    admit the exhibit.

8    Q.   (BY MR. WYDE) So you indicated, Mr. Martin, that this

9    was from Marko Princip.  Correct?

10   A.   Correct.

11   Q.   That is the name of your co-Defendant in this case.

12   Correct?

13   A.   It appears so, yes.

14   Q.   And you indicated that my.raw.nerve@gmail.com is his

15   email.  Correct?

16   A.   That's correct.

17   Q.   You know who Paul Smoot is.  Is that correct?

18   A.   Yes, I do.

19   Q.   All right.  And can you read into the record what this

20   exhibit says?

21   A.   "Dear Mr. Smoot, I have talked with Brian and sorted

22   everything out.  I am willing to do the deal with Drew for the

23   percentage, and the agreement can be just between myself and

24   Drew.  Let me know if you want to do a call.  Best, Marko."

25   Q.   And the date of this email was what day?

1    A.    October 10th, 2013.

2    Q.    And do you recall my question to you yesterday about the

3    alleged October 23rd agreement between you and Mr. Princip?

4    A.    Yes, I do.

5    Q.    I believe it was Plaintiffs' Exhibit No. 11.

6          MR. WYDE:  Is that right, Victor?  Thank you.

7    Q.    (BY MR. WYDE)  So when I suggested to you yesterday that

8    you weren't a partner, up until October 23rd of 2013, you

9    disagreed with that.  Correct?

10   A.    Yes.

11   Q.    And, of course, now we have an email from Mr. Princip to

12   Mr. Smoot, the Lovingers' attorney, basically saying that you

13   didn't really need to be included in any kind of settlement

14   discussions.  Is that correct?

15   A.    That's what it says.

16   Q.    And that would seem to make sense that Mr. Smoot might

17   agree with Mr. Princip that if you are not a partner, why

18   should you be a party to any agreement.  Do you understand

19   that?

20   A.    Yes, sir, I understand.

21         MR. WYDE:  Can I have just a moment?

22         THE COURT:  Certainly.

23         MR. WYDE:  I don't have much more, or I hope I

24   don't.

25         THE COURT:  All right.

1    Q.    (BY MR. WYDE)  Did you, Mr. Martin, on October 14th of

2    2013, send an email to Mr. Smoot from my3dworldyt@gmail.com?

3    A.    Yes.  We were in talks.

4    Q.    Okay.  Did the email address Mr. Smoot's concern -- or I

5    should ask, did you try to address Mr. Smoot's concern that

6    you had not provided any evidence of ownership in the

7    VideoGames YouTube Channel?

8    A.    Yes.

9    Q.    Did that email also -- or did you state in that email,

10   sir, that one thing you simply could not believe is if the

11   Lovingers are wanting the channel, and still how immoral they

12   can be for waiting to keep something that wasn't theirs to

13   begin with?

14   A.    Yes.

15   Q.    So as I understand it, you made a communication to

16   Mr. Smoot, the Lovingers' attorney, about how immoral it would

17   be for this young man to keep the YouTube VideoGames channel

18   when it wasn't his.  Is that correct?

19   A.    No.  It is immoral, yes.  It is not his channel.

20   Q.    Do you see the irony, sir, that you sit here today having

21   been through an argument with Drew Lovinger claiming that it's

22   immoral for him to keep the channel, when these two gentlemen

23   right here sit here and present written contracts saying they

24   own 30 percent of the channel?

25            MR. WILSON:  Objection; argumentative, Your Honor.

1           THE COURT:  Sustained.

2           THE WITNESS:  Absolutely not.

3           MR. WYDE:  I just asked if he saw the irony.

4           THE COURT:  It is argumentative.

5           MR. WYDE:  Okay.

6    Q.  (BY MR. WYDE)  Sir, are you aware of an email from

7    Mr. Princip on October 24th of 2013, the day after you

8    allegedly signed this agreement with him and yourself,

9    Plaintiffs' Exhibit No. 11, are you aware that he sent

10   Mr. Smoot a communication stating that he was the sole

11   owner of the channel?

12   A.  No.

13          MR. WYDE:  May I approach the witness?

14          THE COURT:  You may.

15   Q.  (BY MR. WYDE)  Let me show you, sir, what has been marked

16   as Plaintiffs' Exhibit No. 71.  And take a minute to identify

17   that document.

18   A.  I don't understand it, no.  I haven't seen it.

19   Q.  Well, let me ask, if I can, sir, is this an email from

20   my.raw.nerve@gmail.com on October 24th of 2013 to Mr. Smoot?

21   A.  On the document, yes.

22          MR. WYDE:  I will tender the whole document to

23   Mr. Wilson.  I have also included a redacted version to

24   delete any hearsay.

25          THE COURT:  Okay.

1          MR. WYDE:  And request it be admitted, pending his

2     objection.

3          MR. WILSON:  Your Honor, again we object to the

4     document.  It wasn't timely provided in discovery.  We did ask

5     for admissions by party opponents.  It was not provided, it

6     was not provided in the pretrial order, and it was not

7     provided in the exhibit book.  And it is hearsay as well, and

8     very late on the last day of trial to try to prepare for these

9     types of documents.

10         THE COURT:  You will have to hand it up to me so I

11    can see it.  I have to see the document before I can rule on

12    it.

13         MR. WILSON:  It is kind of cut and pasted, too.

14         MR. WYDE:  For the record, what I did is redacted

15    all of Mr. Smoot's comments so it would only be an admission

16    by a party opponent.  That should be the third page.

17         THE COURT:  What's the exception to hearsay?

18         MR. WYDE:  Again, this is a comment by -- a

19    communication by Mr. Princip, so under 801(2).  It is an

20    admission by a party opponent, as well as, as we allege,

21    conspiracy to commit fraud.  (2)(E), admissions by one

22    co-conspirator are admissible against another co-conspirator,

23    so consequently that document --

24         THE COURT:  Show me what portion of this that is the

25    statement against self-interest.  Come up here and show me, if

110

1    you wouldn't mind, Mr. Wyde.

2            MR. WYDE:  I may have miscopied it.

3            THE COURT:  Because I am not understanding.

4            MR. WYDE:  The first page, starting on the bottom

5    line.

6        Actually I am really offering this third page, which is

7    from --

8            THE COURT:  Okay.

9            MR. WILSON:  What exception did Mr. Wyde --

10           THE COURT:  Co-conspirator exception.

11           MR. WYDE:  801(2)(E).

12           THE COURT:  Thank you, Mr. Wyde.

13           MR. WYDE:  Yes, sir.

14           MR. WILSON:  Your Honor, if I may, all those

15   exceptions Mr. Wyde are citing in the rule relate to criminal

16   action with the United States government prosecuting, I found.

17   I don't see a civil exception.  I can show the Court.

18           THE COURT:  These are the rules of evidence.  They

19   apply to both.

20           MR. WILSON:  I know.  But I can show you my book

21   that --

22           MR. WYDE:  Actually I think -- This isn't -- May I

23   be heard?

24           THE COURT:  Yes.

25           MR. WYDE:  I feel silly saying this to you, Judge,

1    but it's common sometimes that there are exemptions to the

2    rules -- exemptions to hearsay, things that are just not

3    hearsay, and then, of course, exceptions.  Under 801 of the

4    Federal Rules of Evidence, actually it is (d)(2)--excuse

5    me--admissions an opposing party statement.  Statement is

6    offered against an opposing party and was made by the party

7    and an individual or in a representative capacity, that would

8    be capital (A); And then (E), was made by the party's --

9    co-conspirator during and in furtherance of a conspiracy.

10          None of that, as you know, and also since the rules have

11   been codified in 1984, there is no Federal Civil Rules of

12   Evidence and Federal Criminal Rules of Evidence.  They have

13   been merged.  So that would be my logical argument that that's

14   why hearsay -- this is exempt from hearsay.

15               THE COURT:  Okay.  Thank you.

16               MR. WYDE:  I really do appreciate you letting me be

17   heard on that.

18               THE COURT:  Yes, sir.

19               MR. WILSON:  Your Honor, we object for the reasons I

20   stated.  It was not timely provided in discovery, it's unfair

21   surprise, it's prejudicial on the 11th hour of the trial when

22   we requested in discovery admissions by party opponents or

23   conspirators and was not provided.

24               THE COURT:  Thank you.

25          Overruled.  The Court allows it in as a hearsay

1    exception.

2        MR. WYDE:  Permission to publish?

3        THE COURT:  You may.

4    Q.  (BY MR. WYDE)  So, Mr. Martin, if you could explain to me

5    why -- Is the date of what's being published and been admitted

6    I believe as Exhibit No. 71, is that October 24th of 2013?

7    A.   Yes, it is.

8    Q.   Is it from -- does it purport to be a communication from

9    my.raw.nerve@gmail.com?

10   A.   Yes, it does.

11   Q.   And is this markoguide1693@gmail.com also an email

12   account attributed to Mr. Princip?

13   A.   I have no idea.

14   Q.   You don't know that?

15   A.   No.

16   Q.   All right.  And let me ask you about "This call started,

17   and he asked me what role with the channel was."

18       What does Mr. Princip respond?

19   A.   Where it says, "He said"?

20   Q.   Well, where it begins, "I told him."

21   A.   "I told him the channel was mine from the start.  The

22   email is markoguide1693@gmail.com was mine."

23   Q.   Now, do you see when he says, "I told him the channel was

24   mine"?  The word mine, M-I-N-E.

25   A.   Yes, I see that.

```
 1   Q.   He doesn't say "ours," does he?

 2   A.   Well, no, it doesn't, but he is the original founder of

 3   the channel.

 4   Q.   Right.  And, of course, included in him stating at this

 5   point that you're not a partner, he's also denying Mr. Moss'

 6   partnership.  Correct?  As of that date.  Correct?

 7   A.   Yeah; that is correct.

 8   Q.   And he's denying Mr. Keating's partnership as of that

 9   date, too.

10   A.   Yes.

11   Q.   And this is on the day after you sent Mr. Smoot

12   Plaintiffs' Exhibit No. 11, where you and Mr. Martin had just,

13   I guess within the last 24 hours, entered into some kind of an

14   agreement.  Correct?

15   A.   Yes.

16   Q.   Now, does Mr. Martin reference Brian in the next sentence

17   here?

18   A.   Mr. Martin?

19   Q.   Excuse me.  I apologize.  Does Mr. Princip reference

20   Brian in the next sentence?

21   A.   Yes, he does.

22   Q.   And does he say that, "He said if I plan to sign all of

23   the rights over to Brian."

24   A.   Yes, he does.

25   Q.   Does this kind of purport to be a communication at least
```

1    from Mr. Princip to or from Mr. Smoot?

2    A.   It just looks like writing anyone can do.  I can't really

3    tell.

4    Q.   Right.  This is just more evidence of the entire fraud

5    that Mr. Keating is purported to create over the last three

6    years of the channel.  Is that correct?

7    A.   I can't authenticate that, so.

8    Q.   I didn't ask you to authenticate it.  The Judge has

9    already done that for us.  I hope you understand.

10   A.   I can't --

11              MR. WILSON:  Objection, Your Honor, as to the

12   sidebar.

13              THE COURT:  Sustained.

14   Q.   (BY MR. WYDE)  Well, sir, doesn't this email say that

15   Mr. Princip is telling you, no, he's not going to sign the

16   rights over to you?

17   A.   That's what it says.

18   Q.   Right.  And then it says, "He then said if I don't he's

19   going to sue me."  Isn't it true that you threatened to sue

20   Marko Princip if he didn't sign the channel over to you?

21   A.   No, not at all.

22   Q.   All right.  And you realize this email is part of an

23   exhibit that's part of the Lovinger lawsuit?

24   A.   I do.

25   Q.   You've seen this before, haven't you?

115

```
 1    A.    I don't recall.

 2    Q.    Well, you were intimately involved in the Lovinger

 3    lawsuit, weren't you?

 4    A.    Not with Paul J. Smoot.  They had their separate talks,

 5    Marko and them.

 6    Q.    Right.  And you had talks with Mr. Smoot, too.  Correct?

 7    A.    Yeah.

 8    Q.    And you all three had talks together, didn't you?

 9    A.    Yes.

10    Q.    Do you understand now why Mr. Moss and Mr. Keating might

11    not want to be partnered up or want you or Mr. Princip to be

12    involved in running the channel anymore?  Do you understand

13    that?

14    A.    No.

15    Q.    You don't see that at all?

16    A.    No.

17          MR. WILSON:  Your Honor, I'm going to object.  That

18    is a misstatement of what Mr. Moss said.  Mr. Moss said he

19    still wants to be partners.

20          THE COURT:  Overruled.  The answer will stand.

21    Q.    (BY MR. WYDE)  You understand that when you can't trust

22    your partners, it's kind of hard to make a successful go of a

23    business.

24          MR. WILSON:  Objection; argumentative.

25    Q.    (BY MR. WYDE)  Do you understand that?
```

```
 1                THE COURT:  I will allow it.

 2                THE WITNESS:  No, I trust my partner.

 3   Q.   (BY MR. WYDE)  Really?  When he's talking about you suing

 4   him and him suing you.

 5   A.   To me that doesn't even look like anything he would say.

 6   Sorry.

 7   Q.   Not a problem.

 8        Now, before wrapping up, sir, I'm going to ask you about

 9   some alleged communications -- communications between you and

10   Mr. Keating.

11        Let me show you what's been marked as Exhibit No. 72, and

12   see if this is your picture on this exhibit.

13   A.   That's a public picture, yes.

14   Q.   Okay.  So that's your picture on a Facebook

15   communication.  Is that correct?

16   A.   Yes, it is.

17   Q.   Okay.  You actually use the word "Brandon" in this

18   communication next to your picture.  Is that correct?

19   A.   I can't say it was me, but that's what it says.

20   Q.   Okay.  And is it fair to suggest that this communication

21   is you denying Brandon any alleged ownership in the channel?

22   A.   I never had that conversation with Brandon.

23   Q.   I didn't ask you about whether you did or did not.  Is it

24   part of that communication that you are saying to a Brandon

25   that "You're not -- you have no contract"?  Isn't that the
```

1    gist of the communication?

2    A.    That is what the text says.

3    Q.    Okay.

4          MR. WYDE:  We will tender Exhibit No. 72 to

5    Mr. Wilson, and request it be admitted, pending any objection.

6          THE COURT:  Objection?

7          MR. WILSON:  Your Honor, same objection.  I think

8    this is exhibit number four that the Plaintiffs failed to

9    provide in discovery after requested, it's prejudicial, it's

10   untimely, it was -- failed to comply with the Court's pretrial

11   order, and it is hearsay.

12         THE COURT:  Any objection as to foundation?

13         MR. WYDE:  I apologize?

14         THE COURT:  Any objection as to foundation?

15         MR. WILSON:  Yes, Your Honor.  It's hearsay.

16         THE COURT:  Okay.  Thank you.

17         MR. WILSON:  He could not identify the document.

18         THE COURT:  What's the exception on this one?

19         MR. WYDE:  Well, again, Mr. Wilson's -- besides it

20   being an admission by a party opponent, if you will, and going

21   to the issue of tortuous interference with the contractual

22   relations, which has been pled, it is -- Mr. Wilson's

23   objection actually goes to the weight, not the admissibility.

24   And so, therefore, Mr. Wilson's entitled to an instruction, if

25   he would like, to the jury that they can give it some, all, or

118

1    no weight whatsoever, but that now has -- we've met our burden

2    of persuasion, and now it shifts to the jury to give it

3    whatever weight it deems appropriate.

4            MR. WILSON:  My objection, primarily, Your Honor,

5    is, as I have stated with the other previous three that

6    Plaintiffs' counsel has admitted, that it's prejudicial and it

7    was untimely and violates the Court's --

8            THE COURT:  I understand your objection.  Do you

9    have any additional objections?

10           MR. WILSON:  No, Your Honor.  As well as hearsay.

11           THE COURT:  I'm going to sustain this objection for

12   this document, because I don't have enough information to be

13   convinced that it should be admitted at this time --

14           MR. WYDE:  Has the document been tendered to you?

15           THE COURT:  -- as to foundation.

16           MR. WYDE:  I don't think we tendered it to you.  May

17   I tender it to the Court, and ask you to simply reconsider

18   while I'm trying to finish up with my --

19           THE COURT:  Okay.

20       What else do you have for this witness.

21           MR. WYDE:  At this point I am going to ask

22   Mr. Martin if he wants to maintain his previous position from

23   yesterday's direct, my actual cross examination of him, that

24   he had absolutely no, I believe, electronic communications

25   with Mr. Keating whatsoever regarding either through Skype,

1    Twitter, email, text messaging, and I think I threw in carrier

2    pigeon for good measure, Your Honor.  But if he is going to

3    maintain that position today while he's on the stand and still

4    remains under oath subject to the pains and personalties --

5            THE COURT:  Well ask him.

6            MR. WYDE:  -- of perjury.

7    Q.   (BY MR. WYDE)  Sir, you heard my comment to the Court.

8    Are you still maintaining that you had no -- absolutely no

9    electronic communications since 2012, May 2012, if you will,

10   with Mr. Brandon Keating in this case?

11           MR. WILSON:  I will object, Your Honor.  It has

12   already been asked and answered.

13           THE COURT:  Overruled.

14           THE WITNESS:  Yes, sir.

15           MR. WYDE:  Then we would re-ask the Court to

16   reconsider its ruling on that document, noting that it has his

17   picture next to it, that the objections go to really the

18   weight; not the admissibility.  The jury gets to determine --

19           THE COURT:  I just have a lack of foundation for

20   this.  I don't think there is enough to it, so I'm not going

21   to.

22           MR. WYDE:  I understand the Court's ruling and

23   respect the Court's ruling.

24           THE COURT:  Thank you.

25           MR. WYDE:  I am being told what to do again by

1    Mr. Vital.  If I may have a minute, sir.

2              THE COURT:  Okay.

3              MR. WYDE:  Judge, I need to indulge -- May I have

4    just a moment?  Because this would be the very last matter

5    that I have.

6              THE COURT:  Okay.

7              MR. WYDE:  And so could I have just a moment before

8    I conclude?

9              THE COURT:  Yes.  Thank you.

10             MR. WYDE:  I pass the witness.  Thank you, if you

11   will.

12             THE COURT:  Thank you.

13             MR. WILSON:  No questions from the Defense, Judge.

14             THE COURT:  Okay.  Thank you.  You may step down.

15             THE WITNESS:  Thank you, Your Honor.

16             MR. WILSON:  May I call my next witness, Your Honor?

17             THE COURT:  Yes.

18             MR. WILSON:  Marko Princip for just a few short

19   questions.

20             THE COURT:  Mr. Princip, you are still under oath.

21        If you would take the stand.

22             MR. WILSON:  Your Honor.

23             THE COURT:  Yes, sir.

24             MR. WILSON:  May he be permitted to step down from

25   the stand as we articulate our next matter?

1          THE COURT:  Yes.

2                    MARKO PRINCIP,

3   Testified on direct examination by Mr. Wilson as follows:

4   Q.   Marko, would you do what you are going to do for the

5   ladies and gentlemen of the jury?

6          MR. WYDE:  Judge, may I see that exhibit that you

7   did not admit?

8          THE COURT:  It's right here.

9          MR. WYDE:  Thank you.

10          THE COURT:  Let's take a ten-minute break while they

11   set up.  There's no reason for you to sit in here.  Let's take

12   a ten-minute break.

13                    (Brief recess.)

14          THE COURT:  Let's bring in the jury and get started.

15          (Whereupon, the jury entered the courtroom.)

16          THE COURT:  Thank you.  Be seated, please.

17      Mr. Wilson, you may proceed.

18          MR. WILSON:  Thank you, Your Honor.

19   Q.   (BY MR. WILSON)  Mr. Princip, on your direct examination

20   yesterday we discussed about internet fraud.

21   A.   Yes.

22   Q.   Email fraud.

23   A.   Yes.

24   Q.   Text fraud.

25   A.   Uh-huh.

122

1   Q.   Will you step down in front the jury and give me an

2   example on this computer how someone creates email content to

3   someone else?

4   A.   Yes, I plan to show the jury how an email is faked and

5   how easy it is to do.

6   Q.   Come on down, please.

7        MR. WILSON:  Let the record reflect, Your Honor, I

8   have got my MacBook Air on the counter.  This is my MacBook

9   Air, and we've already gone through the password.

10       THE COURT:  Okay.

11  Q.   (BY MR. WILSON)  So you know what you're doing?

12  A.   Yeah.

13  Q.   Have you ever used my computer before?

14  A.   This is my first time.

15  Q.   Okay.  Never seen that before, have you?

16  A.   I've just seen it in the court the past couple of days.

17  Q.   Show the jury what you're going to do?

18  A.   All right.  The first thing I'm going to do is just go on

19  the internet.  Safari is just the internet on the Mac.  And

20  how to fake an email, what you can do is you can Google email

21  spoof.  It's called email spoof, where you can go to the

22  domain, and I'm just going to go to the one that I know works.

23  Q.   So are you going to fake an email to me?

24  A.   Yes.  I'm going to send an email to you as if I was your

25  assistant.

1    Q.    Okay.  And you know Michael Thomas?

2    A.    Yes, I do; met him many times.

3    Q.    All right.  Show the jury how you are going to fake an

4    email to me.

5    A.    All right.  The first thing I want you guys to see here,

6    it says -- Maybe it's a little bit cut off, but you can see it

7    says "from name."  So you can write any display name you want,

8    literally anyone.  I'm going to put Bob's assistant.  It is

9    Michael Thomas.  But it's not just the display name.  You can

10   put the from email.  So I'm going to put his email -- who I

11   want him to think the email is coming from, and I believe it

12   is -- I think I did that right.

13   Q.    Yeah.  So you are acting like you are Michael?

14   A.    Yeah, I'm pretending I'm Michael Thomas, and I want to

15   say something to Bob.

16   Q.    Okay.

17   A.    And I'm going to be putting in Bob's own email, which is

18   rwilson429@aol.com.  And I'm just going to put as the subject

19   whatever I want, like you can literally be anything.  I am

20   just going to put "From your assistant."

21        And there's also other features -- I'm not going to do

22   them, but there's other features where you can even put any

23   date you want.  I mean, you can put --

24   Q.    Do this for me.  Put it for May last year, 2015.

25   A.    Okay.  You would just unclick the current and then you

```
 1    would put it to May of 2015.

 2    Q.    Okay.  All right.

 3    A.    And then -- What's it called?  You type in any content

 4    you want.

 5    Q.    Why don't you say, "Hey, Bob.  This is a trick."

 6    A.    "Hey, Bob.  This is a trick."  It can say literally

 7    anything you want it to say.

 8    Q.    And then you are going to type Michael in there?  Sign it

 9    Michael?

10    A.    Yeah.  I will put it to Michael.  And this is just an

11    example that's going through to Bob's email.

12         When you log into your email, you have to go back to this

13    date.  You probably have a lot of emails.  It is probably

14    wiser to put it to the current date.

15    Q.    You mean I have to go scroll through thousands of emails?

16    A.    You have to go all the way back to May 2015.

17    Q.    Don't do that?

18    A.    I will just make it the current time.  And I am just

19    going to click "sent."  So this now is going to go to Bob.

20    Q.    Okay.

21    A.    So what I would like Bob to do now is log into his email

22    to see who it came from and if it came.

23    Q.    Okay.  And I also have it matched with my phone.  So I go

24    up here, Marko, and I type in www.aol.com?

25    A.    Yes, sir.
```

1    Q.    Okay.  And I click on "my mail"?

2    A.    Uh-huh.

3    Q.    And I go ahead and click "sign in"?

4    A.    Yes.

5    Q.    I go to my mail?

6    A.    And there's the email I sent him.

7    Q.    From Michael Thomas, my assistant.  And I click on this.

8    "Hey, bob.  This is a trick.  It's Michael."

9    A.    Click "show details" so they can see who it is sent from.

10   Q.    You mean click on to Michael?

11   A.    It would say "show details."

12   Q.    Let me step away.  This is out of my area?

13   A.    "Show details" is just going to show who it came from.

14   And as you can see, it came from Michael Thomas, the email

15   address I put in, and you can put any email address you want.

16   Q.    Now, you saw that long -- all that other crazy stuff that

17   shows like it's Michael's stuff.  How do you do that from AOL?

18   A.    Something that they were bringing up is something called

19   metadata, where you can go in and see who exactly sent this.

20   This can bypass metadata, so when you go look into it, it will

21   still say mthomas@wilsonlawtexas.com.

22   Q.    So if I wanted to confirm metadata, can AOL do that?

23   A.    I could try to do it right now.

24   Q.    How would we do that?

25   A.    There would be something, I'm not seeing it here, but

1    there is usually something -- it's like "view page source."

2    But as soon as you click "view page source," it would -- you

3    would just hit Control F, and it would say from that email

4    address.

5        But as you guys can see, it is that easy to fake an

6    email.  You don't need any extra knowledge or be some kind of

7    commuter wizard.  You just have to type some things into a

8    form, and the person will see it and think, "Oh, wow, Michael

9    is telling me this."

10   Q.   So you heard my testimony questions yesterday, I think to

11   Mr. Martin --

12   A.   Yes.

13   Q.   -- where Hillary Clinton has gotten in all this trouble

14   about these emails.

15   A.   Uh-huh.

16   Q.   The only way to know whether they really came from

17   Hillary or the only way that I know that really came from

18   Michael is do I have to go to whoever hosts my

19   wilsonlawtexas.com --

20   A.   Yeah.  It would getting a subpoena for Yahoo or something

21   and saying "Is this actually real or not," or is this an email

22   from -- like an email spoof, like I just did.

23             MR. WILSON:  Pass the witness, Judge.

24             THE COURT:  Questions?

25             MR. VITAL:  May he stay there for a moment, Your

127

 1    Honor?

 2            THE COURT:  Yes.

 3            MR. VITAL:  I need him to --

 4                    CROSS EXAMINATION

 5    By Mr. Vital:

 6    Q.   Would you create a spoof email to BrandonGkeating

 7    @yahoo.com?

 8    A.   I can do that, yeah.

 9    Q.   Please.

10            THE COURT:  Who do you want it from?

11            MR. VITAL:  I don't know how this works.

12            THE COURT:  Do the same--"Assistant.

13            THE WITNESS:  You wanted it from?

14    Q.   (BY MR. VITAL)  The same email address that you did

15    earlier?

16    A.   This one here.  And you wanted me to send it to

17    brandongkeating --

18    Q.   @yahoo.com.

19    A.   Okay.  Same subject?

20    Q.   Same subject.

21    A.   Then you would like me to send this off?

22    Q.   Yes, sir.

23    A.   I am just checking.  Brandongkeating@yahoo.com.  Okay.

24    It says it was sent.

25    Q.   Thank you.

1          Now, all this proves is that you know how to spoof or

2    create fake emails.  Is that correct?

3    A.    Yes.

4    Q.    Which is entirely consistent with what the evidence has

5    shown, that you know how to do things that are deceptive and

6    dishonest.

7    A.    I was accusing them of faking emails.  They weren't

8    accusing me.

9    Q.    Right.  But you saw that in the case that we put on, we

10   admitted a Skype chat, which was Plaintiffs' Exhibit No. 18.

11   Do you recall that?

12   A.    Yes.

13   Q.    And you recall that in that Skype chat there is a June

14   21st, 2014 Skype chat where you confirm that Mr. Keating is 30

15   percent of YouTube channel, and that he should not --

16   A.    Repeat the date.

17   Q.    June 21st, 2014.

18   A.    And I said it in a what?

19   Q.    Skype chat that we saw here in the courtroom.

20   A.    I don't remember seeing it.  I mean, I would have to see

21   it.

22   Q.    So here's the point.  I accept for purposes of just this

23   cross examination that somebody could create fake emails.  The

24   question is, do you think it helps when we -- the Plaintiffs

25   are able to cross reference the same fact across different

1    types of communications--emails, EchoSign, Skype, et cetera?

2    A.    Well, the matter of EchoSign is sent from Brandon, and

3    then when he was up here he said I got it sent from Marko, but

4    we clearly saw it sent from him, so where is this going?

5    Q.    So, for instance, Plaintiffs' Exhibit No. 3 was a June

6    21st, 2014 communication from you.

7    A.    That's the one I am purporting to be fake.

8    Q.    I know you are saying it is fake, but it is sent on June

9    21st, 2014.  And it states, "This is proof that you are 30

10   percent owner of VideoGames."  That's what it's saying that

11   you said to Brandon.  That's what the document says.  Right?

12   A.    I said you can change the dates on the emails.

13   Q.    And in that same email he says -- or you say, "I will be

14   fully transparent moving forward.  All I ask is you do not

15   speak with Brian Martin anymore."  Do you see that?

16   A.    I see it.

17   Q.    Now, it's very helpful, is it not, to determining the

18   truth when you can cross reference a piece of information and

19   establish it otherwise?  Do you agree with that?  If you are

20   trying to prove a fact and you can prove that fact two ways,

21   that is helpful?

22   A.    It has been a long day.  You have to rephrase that

23   question.  Sorry.

24   Q.    Okay.  I will explain or demonstrate what I'm talking

25   about.

130

```
1          In here, instead of the Skype chat, you remember

2   Plaintiffs' Exhibit No. 26, which was admitted into

3   evidence --

4               MR. VITAL:  May I approach?

5               THE COURT:  You may.

6   Q.   (BY MR. VITAL)  -- as text communications between you and

7   Mr. Keating.

8   A.   These didn't have my phone number.  The ones with Ty did,

9   that's why I admitted the Ty ones.  I didn't admit to these.

10  Q.   But these are text messages, messages with

11  busyforawhile@gmail.com.  That is your email address, is it

12  not?

13  A.   It is just as much my email address as the Michael Thomas

14  one.  He just typed it in.  It's that easy.

15  Q.   So when the jury goes back and they read this in detail,

16  you're telling this jury that Mr. Keating was so diabolical

17  that what he did was created dozens and dozens and dozens and

18  dozens of pages to fake communications between you and him.

19  Is that your testimony?

20  A.   It really makes him look bad, yeah.

21  Q.   That is what you want this jury to believe.

22  A.   For the case of getting money, yeah, people go to even

23  crazier extremes, I have seen.

24  Q.   Well, you all referred to him as a millionaire.  Do you

25  think he's that desperate for money that he would come after
```

1  you and make up fake information just to get what he's

2  entitled to?

3  A.   I myself didn't call him a millionaire.  I don't know if

4  he's a millionaire or not.

5  Q.   Okay.  Here's the point that we have heard honorable

6  dealings as it pertains to Mr. Keating, and as it pertains to

7  you things that are dishonorable--cheating and scheming.  Is

8  that correct?

9  A.   Honorable is a loose word to use when you refer to

10  Brandon.

11  Q.   Was that yes, that you, at least to the latter part of

12  the question, would agree that we have heard testimony that

13  makes you out and confirms you to be lying and scheming and

14  dishonest?

15       MR. WILSON:  Your Honor, I am going to object to the

16  form of the question.

17       THE COURT:  Sustained.

18  What else do you have, Mr. Vital?

19       MR. VITAL:  Actually may I approach the witness?  I

20  will just read it to him.

21  Q.   (BY MR. VITAL)  So you recall Plaintiffs Exhibit No. 3

22  was a June 21, 2014 conversation where you stated to

23  Mr. Keating two things, according to the email--he was 30

24  percent, and please don't speak with Brian Martin.  That's

25  what it said.  Right?

1    A.    Uh-huh.  Yes.

2    Q.    On June 21st, 2014.

3    A.    That's what the paper said.

4    Q.    And in another paper, to cross reference, Plaintiffs

5    Exhibit No. 26, isn't it true that at the bottom it says

6    No. 15, there is a text in here on that same date--June 21st,

7    2014?

8              MR. WILSON:  Your Honor, I'm going to object to the

9    form of the question.  One, it's outside the scope of my

10   direct; two, it's already been asked and answered; three, I

11   think it's bolstering.

12             THE COURT:  Overruled.

13   Q.    (BY MR. VITAL)  Do you see me pointing to a communication

14   that was received by Mr. Keating on June 21st, 2014?

15   A.    Yes.

16   Q.    Would you read what that communication says?

17   A.    Read the conversation that Brandon made?

18   Q.    Read the remark.  I believe that's you, sir.  Read the

19   remark on June 21st, 2014, the same date as Plaintiffs'

20   Exhibit No. 3, which you claim is a fake email?

21   A.    Okay.  Brandon put in this document, "Moving forward, you

22   want to get paid, do not message Brian.  Message me.  The deal

23   is between me"--Brandon, the guy writing this

24   conversation--"and Marko"--the guy sitting here.  "Good

25   night."

1   Q.   Does that happen to say essentially the same thing as

2   Plaintiffs' Exhibit No. 3 in a different medium?  Plaintiffs'

3   Exhibit No. 3 is a Yahoo email and Plaintiffs' Exhibit No. 26

4   are iPhone text messages.

5             THE COURT:  Let the documents speak for themselves.

6             MR. VITAL:  Yes, Your Honor.

7   Q.   (BY MR. VITAL)  Sir, one final question I have for you,

8   or line of inquiry, relates to an email that Mr. Wyde went

9   into with Mr. Martin.

10            MR. VITAL:  May I approach the witness?

11            THE COURT:  Yes.

12  Q.   (BY MR. VITAL)  I'm showing you what I have marked as

13  Plaintiffs' Exhibit No. 73.  Would you tell the members of the

14  jury if this purports to be a Gmail from Marko Princip,

15  my.raw.nerve@gmail.com, to Paul Smoot?

16  A.   Where did you get this from?  Paul?

17  Q.   I'm asking --

18  A.   Because you didn't get it from me.

19  Q.   I actually did get it from Paul.  That's who we got it

20  from.

21            MR. WILSON:  Objection, Your Honor.  It is hearsay,

22  assumes facts not in evidence, and counsel --

23            THE COURT:  He hasn't asked him any questions.

24            MR. WILSON:  Counsel is testifying.

25            THE COURT:  He hasn't offered to admit it.  Your

1    objection is premature.

2    Q.   (BY MR. VITAL)  So isn't it true that is what it is?

3    A.   It is just an email, yeah.

4    Q.   And you remember sending that email, do you not?

5    A.   Let me read it.

6         I don't remember it, no.

7    Q.   Is that your email address--my.raw.nerve@gmail.com?

8    A.   As much as the Michael Thomas one is, yeah.

9    Q.   And this email is not to anybody in this courtroom.  It's

10   to Paul Smoot.  Is that correct?

11   A.   I'm not calling Paul an owner in this.  I don't know what

12   this is email is.  I don't even know where this is going.

13   Q.   My question is, this email is not to anybody who is even

14   present in the room.  Is that correct?

15   A.   I don't know how it's relevant to the case.

16   Q.   But we have heard a lot of testimony that that email

17   address it's attributable to you.  Is that correct?

18   A.   Yes, I have an email address like that.

19             MR. VITAL:  Your Honor, I'm going to offer

20   Plaintiffs' Exhibit No. 73 and its attachment as an admission

21   against a party opponent.  I believe there is sufficient

22   evidence to connect this email address to this Defendant.  And

23   any issue regarding whether it's a fake is for argument or

24   weight, not admissibility.  It's an admission against a party

25   opponent.

135

1    And, in particular, the attachment to the email from his

2    email address, or what purports to be his email address, is a

3    communication admissible against a co-conspirator where the

4    co-conspirator is making statements that are damming against

5    him--Mr. Martin.

6         MR. WILSON:  Your Honor, Defendant objects.  This is

7    the fifth exhibit that Plaintiffs failed to provide in

8    discovery after request, failed to provide pursuant to the

9    Court's scheduling order, and failed to provide at the time

10   when the exhibits were submitted to the Court two weeks ago.

11   It's prejudicial to the Defendants in this 11th hour and,

12   therefore, we object as to hearsay.

13        THE COURT:  Have you seen this document?

14        MR. WILSON:  I have never seen it, Your Honor.

15        MR. VITAL:  He has seen it.  What we have done

16   before -- In between is Plaintiffs' Exhibit No. 10.  And what

17   we have done, as part of our rebuttal case, is to reach out to

18   Mr. Smoot to get the cover emails so we can prove it up.  He

19   has seen it.  He just hasn't seen the covering email which

20   confirms it's an admission against a party opponent and

21   admissible against a co-conspirator statement against

22   Mr. Martin.

23        THE COURT:  I haven't seen it.

24        MR. VITAL:  May I approach, Your Honor?

25        THE COURT:  Bring it up.

```
 1            What are the attachments?  Just all the emails?

 2                  MR. VITAL:  Your Honor, the attachment, if you look

 3     at the covering email, the covering email references a PDF as

 4     being attached.  The attached are electronic communications

 5     between Mr. Martin and Mr. Princip.

 6                  THE COURT:  What part of it is an admission?

 7                  MR. VITAL:  May I approach, Your Honor?

 8                  THE COURT:  Yes.

 9            The part you marked?

10                  MR. VITAL:  That one.  This is the first and highest

11     one.

12                  (Discussion at the bench out of the hearing of the

13                  reporter.)

14                  THE COURT:  Thank you.

15                  MR. VITAL:  Thank you, Your Honor.

16                  THE COURT:  Exhibit No. 73 is not admitted.  The

17     objections are sustained, and I will explain to you further on

18     the record why outside the presence of the jury.

19            Let's continue on.

20     Q.   (BY MR. VITAL)  Isn't it true that Mr. Martin stated to

21     you regarding Mr. Smoot that "I just lied to Paul about being

22     an owner.  I just want easy money from the Lovingers."  Did he

23     say that?

24                  MR. WILSON:  I am going to object to the form of the

25     question, Your Honor.  You sustained the objection, and he is
```

1    reading from the exhibit.

2              MR. VITAL:  I am asking if he made the statement or

3    not.  I don't have it memorized.

4              THE COURT:  Right.  Did you ever make that

5    statement?

6         Overruled.

7    Q.   (BY MR. VITAL)  Or did Mr. Martin ever make that

8    statement?

9    A.   I already said no to that thing, so no.

10   Q.   But we saw emails in this courtroom in which you

11   communicated to Mr. Smoot that you, in fact, were the owner

12   and Mr. Martin had nothing to do with VideoGames in the month

13   of October 2013.  Do you recall seeing those during

14   Mr. Martin's examination by Mr. Wyde?

15   A.   Smoot wasn't the lawyer for the Lovingers in the final

16   settlement.  They just hired him at the start.

17   Q.   That wasn't my question.  My question, sir, is even

18   though you just denied the statement that was made -- that I

19   asked you whether that statement was made, even though you

20   denied that statement, isn't that statement entirely

21   consistent with emails that this jury saw during Mr. Martin's

22   examination today by Mr. Wyde where you Mr. Princip

23   communicated with Mr. Smoot denying that this gentleman,

24   Mr. Martin, had anything to do with VideoGames?

25   A.   So you are asking if the emails were similar?

1    Q.    Is the statement that I just read that you denied

2    consistent with your denials in emails that are in evidence

3    that were shown during Mr. Martin's examination where you

4    denied -- or you confirmed to Mr. Smoot that Mr. Martin didn't

5    have anything to do with VideoGames?

6    A.    Was it confirm or deny?  You said both.

7              MR. VITAL:  I pass the witness, Your Honor.

8              MR. WILSON:  Nothing further, Your Honor.

9              THE COURT:  Thank you, sir.  You may step down.

10        What says the Defendant?

11             MR. WILSON:  The Defense rests, Judge.

12             THE COURT:  All right.  Any further evidence for the

13   Plaintiff?

14             MR. VITAL:  I have rebuttal, but I need this to stay

15   up, Your Honor.

16             THE COURT:  Okay.  We will take up any motions you

17   have on a break, but you can reserve any motions that you have

18   at this time, Mr. Wilson.

19        Go ahead and call your next witness.

20             MR. VITAL:  I call Brandon Keating in rebuttal.

21             THE COURT:  Mr. Keating, you are still under oath.

22             THE WITNESS:  Yes, Your Honor.

23                        BRANDON KEATING,

24   Testified on direct examination by Mr. Vital as follows:

25   Q.    I'm going to address two things with you.

```
 1    A.    Yes, sir.

 2    Q.    Two things only.

 3    A.    Yes, sir.

 4    Q.    Number one, a Facebook communication --

 5    A.    Yes, sir.

 6    Q.    -- With Mr. Martin; and secondly, this business that we

 7    just saw in open court from this email or fake thing.  Okay?

 8    A.    Yes, sir.

 9    Q.    Let's talk about Facebook first.

10    A.    Yes, sir.

11    Q.    I'm just trying to make a record.  Please forgive me.

12    What is Facebook?

13    A.    Facebook is a social media platform.

14    Q.    And can you communicate with people through Facebook?

15    A.    Yes, there is a messaging system within Facebook.

16    Q.    In order to message somebody on Facebook, what has to be

17    the case?

18    A.    You would have to go to their page and click "message"

19    and then it would open up a message box, or you can go to an

20    actual email-like page.  I don't know how to describe it.  I

21    don't usually use that portion.

22    Q.    I'm not on Facebook, but do you have to be a friend --

23    which is why I am asking this question.  Do you have to be a

24    friend of somebody to send them a message on Facebook?

25    A.    No, sir.
```

```
 1    Q.   So if you are on Facebook and Mr. Martin is on Facebook,

 2    can you send each other messages?

 3    A.   Yes, sir.

 4    Q.   How are you able to do that when you are not friends with

 5    each other?

 6    A.   You would go to their Facebook page and then click

 7    "message" and then it would pop up and you would just type in

 8    your message.

 9    Q.   Can you block somebody so that doesn't happen?

10    A.   Yes, you can.

11    Q.   Okay.  And in 2014 had you blocked Mr. Martin?

12    A.   No, I did not.

13    Q.   But did you receive Facebook communications from

14    Mr. Martin?

15    A.   Yes, sir.

16              MR. VITAL:  I'm going to approach the witness, if I

17    can, Your Honor --

18              THE COURT:  Please.

19    Q.   (BY MR. VITAL)  -- with Plaintiffs' Exhibit No. 72,

20    previously tendered and offered but denied by the Court.

21         As the document is being studied, may I approach my

22    client and give him his iPhone?

23              THE COURT:  Yes.

24              MR. VITAL:  May I approach the witness, Your Honor?

25              THE COURT:  Yes.
```

1    Q.    (BY MR. VITAL)  I'm showing you what is marked

2    Plaintiffs' Exhibit No. 72.  Would you tell the members of the

3    jury if you recognize that document?

4    A.    Yes, sir.

5             MR. WILSON:  Your Honor, just so the record's clear,

6    the Court has already sustained our objection once.

7             THE COURT:  Right.

8        Go ahead.

9    Q.    (BY MR. VITAL)  And you heard Mr. Martin deny that he

10   messaged you or communicated with you through Facebook when

11   Mr. Wyde asked him a question in their case in chief.  Do you

12   recall that?

13   A.    Yes, sir, I do.

14   Q.    Was that truthful testimony that Mr. Martin gave?

15   A.    No, sir, it was not.

16   Q.    What is Exhibit No. 72 a true and correct copy of?

17   A.    It is a true and correct copy of my Facebook

18   communications with Mr. Martin.

19   Q.    Now, separate and apart from having -- Do you have

20   internet access in this courtroom right now?

21   A.    Yes, sir, I do.

22   Q.    And connection to Facebook?

23   A.    Yes, sir.

24   Q.    Now, this question -- Without reference to your iPhone,

25   if you did not have your iPhone and connection to Facebook,

1    would you be able to tell the Court that this is a true and

2    correct copy of a screenshot of a communication in Facebook

3    between you and Mr. Martin?

4    A.    Yes, sir.

5    Q.    How would you be able to do that?

6    A.    I recall having the conversation with him.

7    Q.    Was the conversation meaningful to you?

8    A.    Yes, it was.

9    Q.    Was this before or after you filed the lawsuit against

10   Mr. Martin?

11   A.    This was I believe before.

12   Q.    Okay.  Are you able to confirm that if you look at your

13   phone?

14   A.    I would have to confirm.  I apologize.  I can't recall.

15   Q.    That's okay.  Are you able to find the same communication

16   on your phone right now on Facebook?

17   A.    Yes, sir.

18        Yes, this was before.

19   Q.    What date?

20   A.    June 18th, 2014 at 2:14 p.m.

21   Q.    And three days after this date is when you received a

22   Yahoo email where Mr. Princip said you're 30 percent; don't

23   communicate with Martin anymore.  Right?

24   A.    Yes, sir.

25   Q.    Was this one of the communications you were having with

1    Martin that you received a email from Mr. Princip when he told

2    you don't do that anymore?

3    A.   Yes, sir.

4           MR. VITAL:  I'm going to offer Plaintiffs' Exhibit

5    No. 72, and I'm going to request the Court's permission to

6    allow the jury to inspect, akin to a jury view, Mr. Keating's

7    iPhone to compare, once it's admitted, Plaintiffs' Exhibit

8    No. 72 to the actual Facebook page live in the courtroom.

9           THE COURT:  Same objections?

10          MR. WILSON:  Same objection, Your Honor, but one

11   more.  Under TRE 1006, optional completeness, I'm going to

12   need the see -- if the Court's going to even remotely

13   considering just offering a snippet, I want all of it in

14   there.  So I still want the Court --

15          THE COURT:  Under what rule?

16          MR. WILSON:  Under optional completeness.

17          THE COURT:  What number rule?

18          MR. WILSON:  I think it is Federal Rule of Evidence

19   1006.  Let me double check.

20          THE COURT:  All right.  Thank you.

21          MR. WILSON:  But, again, the same objection as we

22   had previously stated, but I am just throwing one more in

23   there.

24          THE COURT:  Thank you.

25          The objections are overruled.  The Court finds there is

1    foundation for the document and admits it.

2            MR. WILSON:  Will the Court allow the entire

3    conversation as I've requested, Your Honor?  Because partial

4    documents -- we need the full transcript from his entire

5    Facebook messaging system.

6            THE COURT:  Well, I don't know why you didn't ask

7    for that.  Did you ask for that previously.  I'm not going to

8    interrupt this trial now and give you all that.  It's denied.

9    Your motion is denied.

10           MR. WILSON:  Your Honor --

11           THE COURT:  But I'm not going to allow you to

12   publish the phone to the jury.

13           MR. VITAL:  Okay.

14   Q.   (BY MR. VITAL)  Do you understand what perjury is, sir?

15   A.   Absolutely.

16   Q.   Do you understand and really believe that I wanted this

17   jury to see that phone?

18   A.   Do I --

19   Q.   Do you think I was faking, or are you giving the

20   testimony you are giving today believing that I was prepared

21   to give this jury the phone so they could compare the two?

22   A.   Yes, sir.

23           MR. WILSON:  Your Honor, I object.

24           THE COURT:  Sustained.  Go on now.

25           THE WITNESS:  May I answer or no?

1            MR. VITAL:  No, he sustained it.

2            THE WITNESS:  I apologize.

3    Q.   (BY MR. VITAL)  Now to this business about this fake

4    email thingamajigger or what was done through Mr. Princip.

5    A.   Yes, sir.

6    Q.   Had you ever heard about that except in this courtroom.

7    A.   I have heard of spoofing sites before, yes, sir.

8    Q.   Have you ever used email spoofs?

9    A.   I do not believe I have.

10   Q.   Is Plaintiffs' Exhibit No. 3 an email spoof?

11   A.   Absolutely not.

12   Q.   Did we, in fact, see metadata behind Plaintiffs' Exhibit

13   No. --

14        Let me ask you this.  Do you recall clicking on the

15   metadata prior to or in connection with offering Plaintiffs'

16   Exhibit No. 3?

17           MR. WILSON:  Your Honor, I'm going to object to the

18   question.  It's been asked and answered; bolstering;

19   repetitive.

20           THE COURT:  Overruled.

21   Q.   (BY MR. VITAL)  Did we look at the metadata?

22   A.   Yes, sir.

23   Q.   And we saw in the metadata that the email -- So when we

24   looked at the metadata, we clicked on the details.  Right?

25   A.   Yes, sir.

1    Q.   And did the details show that it came from some spoofing

2    site?

3    A.   No, it showed that it came from I believe it was the

4    Google server.

5    Q.   Okay.  Connected to whose email account or address in

6    this courtroom?

7    A.   Mr. Princip.

8    Q.   Now, while Mr. Princip was testifying and under my

9    examination, I asked him to send an email.  Did you receive

10   that email?

11   A.   Yes, sir, I did.

12   Q.   Did you open that email?

13   A.   Yes, sir, I did.

14   Q.   Did you click on the metadata to that email?

15   A.   Yes, sir, I did.

16   Q.   Did the email show it came from a server in Mr. Wilson's

17   office?

18        MR. WILSON:  Your Honor, I am going to object.  It

19   assumes facts not in evidence.

20        THE COURT:  Overruled.

21   Q.   (BY MR. VITAL) It kind of does, but my next question is

22   are you able?

23        THE COURT:  Let him answer this question.

24        MR. VITAL:  Thank you.

25   Q.   (BY MR. VITAL)  Did it come from an email server in

1    Mr. Wilson's office?

2    A.    No, sir.

3    Q.    Did it have an email address indicating the server that

4    it came from?

5    A.    It said it came from the server emkei@cz, I believe.

6          MR. VITAL:  I would like to ask that Mr. Wilson fire

7    back up his computer so we can look at that website, the

8    spoofing website.

9    Q.    (BY MR. VITAL)  All right.  What is the email address for

10   the spoofing site that sent the email to your email account

11   that this jury saw Mr. Princip create live in open court?

12   A.    Wilson -- I can't remember --

13   Q.    It was something Wilson --

14   A.    @wilsonlaw, yes, sir.

15   Q.    Was it --

16         MR. VITAL:  I am going to now ask permission to

17   connect this computer that has Mr. Brandon Keating's email

18   address sent by Mr. Princip from this spoof site attached to

19   the projector.

20         THE COURT:  Why don't you have him testify to it,

21   because I don't --

22         MR. VITAL:  May I approach the witness?

23         THE COURT:  Go ahead.

24   Q.    (BY MR. VITAL)  All right.  So what are you looking at

25   right here -- Whose computer, first of all, is this?

```
 1    A.    This is Judge Wyde's.

 2    Q.    And through Judge Wyde's computer, you accessed what?

 3    A.    My Yahoo email.

 4    Q.    And did you find the email that Mr. Princip sent from

 5    this spoofing website?

 6    A.    Yes, sir, I did.

 7    Q.    Did you open it?

 8    A.    Yes, sir I did.

 9    Q.    Is it open right now?

10    A.    Yes, sir, it is.

11    Q.    Now, on the face before you click on the underlying data,

12    would you just read for the jury what it says?

13    A.    It says "From:  My assistant, Michael Thomas,

14    mthomas@wilsonlawtexas.com to brandongkeating@yahoo.com.  This

15    is a trick."

16    Q.    Now, there is a way to actually confirm in the metadata

17    that it is a trick, isn't there?

18    A.    Yes, sir, there is.

19    Q.    Because if you click on the metadata, do you see that it

20    came from the server of Mr. Wilson's office or that it came

21    from the server of this spoof site?

22    A.    It showed that it came from the server of emkei.cz.

23    Q.    In order to do, what do I need to click on?

24    A.    You need to click on "more" and then down to "view full

25    header" and then --
```

```
 1    Q.    Now, it says from Michael Thomas.  Right?

 2    A.    Yes.

 3    Q.    It says apparently to brandongkeating@yahoo.com.  Right?

 4    A.    Yes, sir.

 5    Q.    It says, "return path:  mthomas@wilsonlawtexas.com.

 6    Correct?

 7    A.    Yes, sir.

 8    Q.    But what is it THAT you are telling this jury it says

 9    that connects this email address actually to the spoofing

10    account as opposed to Mr. Wilson's actual server?

11    A.    Well, here it says, "wilsonlawtexas.com does not

12    designate a permitted sender host."

13    Q.    What does that mean?

14    A.    That means that it actually didn't come from it.  So if

15    you scroll down --

16    Q.    So that confirms that it's fake.  Right?

17    A.    Well --

18    Q.    Just answer my question.  Does it confirm it is fake?

19    A.    Yes, sir.

20    Q.    Okay.  Did the email metadata that we looked at in this

21    courtroom regarding Plaintiffs's Exhibit No. 3 when we drilled

22    down and projected to the screen show that it was fake?

23    A.    No, sir, it did not.

24    Q.    Okay.  But there is something more telling in the

25    metadata that you're testifying to this jury about in open
```

1    court.  What is it?

2    A.   It says right here, "This has been received by emkei.cz,

3    post pics from user ID33."

4    Q.   So that's the server it came from?

5    A.   Yes, sir.

6    Q.   What is -- Read it one more time in the record.  What is

7    the server that -- what is it email address that's in the

8    email address typed in interface right now on this projector

9    from Mr. Wilson?

10   A.   You are talking about the domain?

11   Q.   The domain name.  What's the domain name?

12   A.   emkei.cz.

13             MR. VITAL:  Your Honor, I beg the Court's

14   indulgence.  If I am overruled I will certainly understand it.

15   My co-counsel is suggesting that perhaps it would be a good

16   idea for the jury to see what he just testified to in open

17   court.

18             THE COURT:  You mean the computer?

19        No, I don't think it is necessary.  He has testified to

20   it.

21             MR. VITAL:  I thought so.

22        I pass the witness.

23             THE COURT:  Thank you.

24        What over questions?

25             MR. WILSON:  Just a couple of questions, I promise.

1                          CROSS EXAMINATION

2     By Mr. Wilson:

3     Q.   Mr. Keating, as Mr. Vital Has said, you can actually

4     drill down on some of these things.  There is something called

5     an advanced setting where you can go even further and show a

6     metadata or false metadata?

7     A.   Yes, sir, there is.

8     Q.   Okay.  And you'd agree with me that--I know the jury's

9     looked, seen tons of these emails--that we would literally

10    have to click and confirm on every single email to confirm the

11    metadata on every one of those emails to make sure that it was

12    authentic.

13    A.   Yes, sir.

14    Q.   Okay.

15              MR. WILSON:  Nothing further, Judge.

16              MR. VITAL:  No further questions, Judge.

17              THE COURT:  Thank you, sir.  You may step down.

18              THE WITNESS:  Thank you, Your Honor.

19              THE COURT:  What says the Plaintiff?

20              MR. VITAL:  Subject to offering the exhibits we

21    referenced earlier, which we can do outside the presence of

22    the jury, we close.

23              THE COURT:  All right.  Thank you.

24              MR. WILSON:  Defense closes, Judge.

25              THE COURT:  Thank you.

1    All right.  You get to go home now.  Remember what I've

2    told you.  The case isn't over now.  We still have to hear

3    closing arguments, and I have to read what the law is.  So

4    don't form any opinion as to what your decision is on the case

5    and, as well, don't speak to anyone about the case.

6    Now, the way it works is I'm going to meet with the

7    lawyers tonight and we are going to straighten out all the

8    issues that we still have remaining about the law to give to

9    you tomorrow.  And then we will come in in the morning and I

10   will read the charge to you, which is the law, along with all

11   the questions that you'll be answering in this case.  And then

12   the lawyers will be given an opportunity to present to you

13   closing arguments.  And we haven't discussed yet how much time

14   that will be.

15   But hopefully the case will be submitted to you by 11:00.

16   It will take me -- It is about 50 pages to read.  And they

17   have to be read; I can't just hand them to you.  Okay?  I

18   would make Ian do it, but I just can't.

19   So what we will do is I'd like you here by 8:45, because

20   I'm afraid that we'll have a couple of issues if I start at

21   8:30.  But if we could start at 8:45, we can get this case to

22   you before noon, and then you would begin your deliberations

23   at that time.  But you can't form any opinion until then.

24   Okay?

25   All right.  All rise for the jury.

```
 1              (Whereupon, the jury left the courtroom.)

 2         THE COURT:  In regards to Exhibit 73, the Court has

 3    reviewed the exhibit, and it appears to be a communication

 4    between Mr. Princip and a former attorney.  I have problems

 5    with this; for one, how it even got in there.  I mean, there's

 6    all sorts of privilege issues and so forth.

 7         Then in reading it, it hasn't really been authenticated

 8    by anyone.  And in reading it, its prejudicial impact

 9    outweighs its probative value.  I'm afraid that it's just too

10    prejudicial, plus all the other objections, so that's why it's

11    not coming in.

12         MR. WYDE:  Just to let you know, because I would

13    never want to proffer a document that you think we got in some

14    kind of a spurious manner --

15         THE COURT:  I didn't think that.  I don't know how

16    you got it.

17         MR. WYDE:  I'd like to represent to the Court that

18    this document is part of an approximately 300-page filing by

19    the Lovingers' attorney.

20         THE COURT:  In that lawsuit.

21         MR. WYDE:  Yes.  And the only -- the copy that we

22    were able to get off of Pacer was not legible.  We were able

23    to contact Mr. Smoot, who was not Mr. Princip's attorney and

24    not Mr. Martin's attorney, because obviously there would be a

25    continuing obligation of attorney/client privilege, but he was
```

154

1    Mr. Lovinger's attorney, and his office said, "we'd be happy

2    to send you that conversation."

3            THE COURT:  Okay.

4            MR. WYDE:  So that's -- I want the Court -- You

5    know, my honesty or credibility with the Court is infinitely

6    more important than this exhibit.

7            THE COURT:  Thanks, Dan.

8        But the others that you got late in the discovery in the

9    sense that you didn't get them in discovery but you got them

10   here today in rebuttal, my ruling stands.

11           MR. WYDE:  And for the record, Your Honor, and I

12   don't mind telling you this, although I would like to think

13   I'm smart enough to plan for any contingency, I will tell you

14   up front I had -- it just did not really dawn on me that

15   Defendant Martin would get up and categorically deny all

16   electronic communications with the Plaintiff Keating.

17           THE COURT:  All right.  Thanks.

18       Now, the jury instructions.  I've got them here.  Have

19   you got the final copy from Ian.

20           MR. VITAL:  Yes, Your Honor.

21           THE COURT:  Here is a more final copy.

22           THE CLERK:  These are updated a little bit.

23           THE COURT:  Because you submitted something to me

24   this morning, a joint submission.  I got an email.

25           THE CLERK:  That was me, Your Honor.

1           THE COURT:  Oh, never mind.

2           MR. WYDE:  It was really a fake email, Judge.

3           THE COURT:  It was from Ian.  All right.  Let's just

4    take a look at them right now.

5           THE COURT:  We can go off the record now.

6           (The proceedings were concluded at 5:00 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    I HEREBY CERTIFY THAT THE FOREGOING IS A

2    CORRECT TRANSCRIPT FROM THE RECORD OF

3    PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4    I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5    FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6    COURT AND THE JUDICIAL CONFERENCE OF THE

7    UNITED STATES.

8

9    S/Shawn McRoberts                    04/18/2016

10   _____DATE_____
     SHAWN McROBERTS, RMR, CRR
11   FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25