IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

DAVID TYLER MOSS and            )
BRANDON KEATING                 )
                                )
          Plaintiff,            )
                                )
vs.                             )3:14-CV-03088-BF
                                )
MARKO PRINCIP,                  )
Individually, MARKO PRINCIP     )
d/b/a VIDEOGAMES YOUTUBE        )
CHANNEL, MARKO PRINCIP          )
d/b/a/ ACHIEVEMENT GUIDE,       )
MARKO PRINCIP                   )
d/b/a GAME GUIDE, LLC           )
VIDEOGAMES YOUTUBE              )
CHANNEL,                        )
and BRYAN MARTIN,               )
                                )
          Defendants.           )

TRANSCRIPT OF JURY TRIAL - VOLUME 5A
BEFORE THE HONORABLE PAUL D. STICKNEY
UNITED STATES DISTRICT JUDGE
APRIL 1, 2016

A P P E A R A N C E S
For the Plaintiffs:

     BARNES & THORNBURG, LLP
     2100 McKinney Avenue - Suite 1250
     Dallas, TX  75201-1803
     214/258-4124
     Email: victor.vital@btlaw.com
     BY:  VICTOR D. VITAL

and

      WYDE & ASSOCIATES
      3131 Turtle Creek Blvd - Suite 901
      Dallas, TX  75219
      214/521-9100
      Email: wydelaw@gmail.com
      BY:  DANIEL L. WYDE

For the Defendants:

      LAW OFFICE OF ROBERT D. WILSON
      18111 Preston Road - Suite 150
      Dallas, TX  75252
      214/637-8866
      Email: rwilson@wilsonlawtexas.com
      BY:  ROBERT D. WILSON

COURT REPORTER:  SHAWNIE ARCHULETA, TX CCR No. 7533
                1100 Commerce Street
                Dallas, Texas 75242

proceedings reported by mechanical stenography,
transcript produced by computer.


         TRANSCRIPT OF PROCEEDINGS - VOLUME 5A

Jury Charge                                              9

Closing Argument by Mr. Vital                           38

Opening Statement by Mr. Wyde                           50

Closing Argument by Mr. Wilson                          55

Rebuttal Argument by Mr. Wyde                           71

Reporter's Certificate                                  84

```
 1                    (In open court at 8:55 a.m.)
 2                    THE COURT:  We are going to go on the
 3     record and settle the jury instructions and we will
 4     take a break, and then we will be ready to start; so
 5     like ten minutes.
 6                    COURT SECURITY OFFICER:  Okay.  Thank you.
 7                    THE COURT:  We have a final version of the
 8     charge.
 9                    We are on the record in the matter of Moss
10     Keating v. Princip Martin, 3:14-CV-3088.
11                    In looking at the charge, are there any
12     specific objections for the plaintiff?
13                    MR. VITAL:  Yes, Your Honor.
14                    May I approach the lecturn?
15                    THE COURT:  Yes.
16                    MR. VITAL:  Comes now plaintiffs, Brandon
17     Keating and David Tyler Moss at the formal charge
18     conference of the Court, complaining of the Court's
19     instructions -- first of all, questions and further
20     to those instructions -- questions and further to
21     those questions, instructions of the Court.
22         In particular, plaintiffs have submitted and
23     the Court has accepted the submission of Question
24     Number 29, which is a waiver question:  Did Moss or
25     Keating waive their claims for damages based on the
```

1    fact that Moss or Keating did not participate in the

2    partnership?

3        And third is a quasi-estoppel defense.

4        The plaintiffs would object that there is no

5    evidence -- or insufficient evidence to support the

6    submission of those two questions to the jury.  The

7    submission of the questions to the jury yields the

8    impression that there is sufficient evidence for the

9    jury to answer those questions, which there is not

10   such evidence.

11       Furthermore, the questions are being submitted,

12   as the defendants' argument will make clear to the

13   Court of Appeals, the questions are based upon an

14   incorrect interpretation of the law in support of

15   those questions.  They are based upon the theory

16   that the plaintiffs waited too long to bring their

17   claims when they stayed within the statute of

18   limitations in bringing those claims.

19       If we were in equity on the submission of

20   laches, perhaps this would work.  But claims at law

21   are allowed to be brought within the period stated

22   by law, and legal defenses like waiver and

23   quasi-estoppel cannot preclude such claim.  So the

24   Court's acceptance of the defendants' submission of

25   those claims and allowance of the argument that

```
 1    would support those questions is improper.
 2         To mitigate the effect of the submission of the
 3    questions, the Court has given an instruction on the
 4    statute of limitations, and the plaintiffs believe
 5    that the charge should be submitted to the Court --
 6    to the jury without Questions 28 and 29 or in
 7    reference to the statute of limitations because and
 8    for the reason that the argument made in defense of
 9    these claims, quasi-estoppel and waiver, are not
10    cognizable in those facts.
11              THE COURT:  What other objections?
12              MR. VITAL:  Those are the only objections.
13              THE COURT:  Those are overruled.
14              What objections for the defendant?
15              MR. WILSON:  We have none, Your Honor.
16              THE COURT:  All right.  Thank you.
17              What other matters do we need to address?
18              Do you have your exhibits ready?
19              MR. VITAL:  Yes, Your Honor.
20              THE COURT:  We did admit the following
21    exhibits without objection, and let me just go
22    through those real quick:  Plaintiffs' Exhibit 4, 5,
23    6, 9, 13, 14, 18, was already admitted.
24              MR. WILSON:  Whoa.  18 -- no.
25              THE COURT:  28, which was already
```

```
1   admitted, 40, 41, 58, 62, 67, 68.

2           MR. WILSON:  Your Honor, did you say

3   Exhibit 18?

4           THE COURT:  That was already admitted, I'm

5   sorry.

6           MR. WILSON:  Because we had an objection.

7           THE COURT:  I had it in blue ink.

8           MR. WILSON:  Right, and it was overruled.

9   Okay.

10          THE COURT:  Thank you.  Those are all

11  admitted.

12      Now, what we will do is, the plaintiff and

13  defendant each will have 35 minutes for closing.

14  Mr. Vital will take 15 minutes, and then five

15  minutes for Mr. Wyde in dividing up their initial

16  portion of the closing, and then Mr. Wyde will have

17  15 minutes at the end.  I will give you a notice at

18  five minutes remaining on your main arguments on

19  each side.  Of course the defendant will have 35

20  minutes to use if necessary.

21      Ready to proceed?  We will take a break, but

22  are we ready to proceed?

23          MR. VITAL:  Yes, Your Honor.

24          THE COURT:  Why don't you take five

25  minutes and get things together, and we will begin
```

7

1   and we will -- we will want that podium moved over

2   so that it's facing the jury.

3            MR. VITAL:  Excuse me, Your Honor?

4            THE COURT:  Do you want to move the podium

5   so it's facing the jury?

6            MR. VITAL:  Yes, Your Honor.

7            THE COURT:  We will slide these out.  Are

8   you going to be using these demonstrative aids?

9            MR. VITAL:  Yes, Your Honor.

10           THE COURT:  You want to leave the lectern

11  where it is?

12           MR. VITAL:  I will leave it where it is so

13  I can point to it.

14           THE COURT:  Will you be using the

15  projector?

16           MR. VITAL:  Yes, the elmo.

17           THE COURT:  Leave the lectern there and

18  you can turn towards the jury.

19           MR. WYDE:  Sir, I have a micro-printer and

20  wanted to ask permission to print some of the pages

21  of the charge real quick while the jury is out if

22  that's okay, while we are off the record, so it

23  doesn't interfere with the reporter taking any

24  information down.

25           THE COURT:  Let's go off the record.

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER - 214.753.2747**

```
 1        (Pause in the proceedings.)

 2             THE COURT:  All right, let's bring them

 3   in.

 4             Any objection if I give the jury the

 5   charge now?

 6             MR. VITAL:  No, sir.  No objection from

 7   us, Your Honor.

 8             MR. WILSON:  None from the defense, Judge.

 9             THE COURT:  That way they can follow

10   along.

11             MR. WYDE:  Absolutely.

12             MR. VITAL:  Absolutely.

13             THE COURT:  Okay.

14                (Jury enters courtroom)

15             THE COURT:  Good morning.  I'm passing out

16   the jury charge, the Court's charge to the jury.

17   This is the law that will apply to this case and

18   also will give you some direction on how to proceed

19   in this matter -- it has a number of questions --

20   and I'm passing it out now so you can follow along

21   when I read it.

22        I trust you had a restful evening, and happy

23   April Fools' Day.  There won't be any jokes this

24   morning hopefully.

25        As I left my house this morning, my wife, who
```

```
 1   has tried to get me on an April Fools' joke for
 2   many, many years and has never succeeded, as I
 3   walked out my son's car was missing.  And we have
 4   had a number of thefts from our house, last year an
 5   RV stolen and other things.
 6        So I immediately said to her, you will have to
 7   deal with the police and the insurance company,
 8   because his car was stolen.  And as I'm telling her
 9   this, I look up the street and see that she had
10   moved it and parked in front of the neighbor's
11   house.  So all of those years I got paid back so
12   quickly, just like that.
13        All right.  This is the Court's charge to the
14   jury.
15        In the case of David Tyler Moss and Brandon
16   Keating v. Marko Princip d/b/a Videogames YouTube
17   Channel, Marko Princip d/b/a Achievement Guide,
18   Marko Princip d/b/a Game Guide, LLC, Videogames
19   YouTube Channel, and Brian Martin, Case
20   3:14-CR-0888.
21        Court's Charge to the Jury:
22        Members of the jury, it is my duty and
23   responsibility to instruct you on the law you are to
24   apply in this case.  The law contained in these
25   instructions is the only law you may follow.  It is
```

```
 1   your duty to follow what I instruct you the law is

 2   regardless of any opinion that you might have as to

 3   what the law ought to be.

 4        If I have given you the impression during the

 5   trial that I favor either party, you must disregard

 6   that impression.  If I have given you the impression

 7   during the trial that I have an opinion about the

 8   facts of the case, you must disregard that

 9   impression.  You are the sole judges of the facts of

10   the case.  Other than my instructions to you on the

11   law, you should disregard anything I may have said

12   or done during the trial in arriving at your

13   verdict.

14        You should consider all of the instructions

15   about the law as a whole and regard each instruction

16   in light of the others without isolating any -- a

17   particular statement or paragraph.

18        The testimony of the witnesses and other

19   exhibits introduced by the parties constitute the

20   evidence.  The statements of counsel are not

21   evidence.  They are only arguments.  It is important

22   for you to distinguish between the arguments of

23   counsel and the evidence on which those arguments

24   rest.  What the lawyers say or do is not evidence.

25   You may, however, consider their arguments in light
```

1    of the evidence that has been admitted and determine

2    whether the evidence admitted in this trial supports

3    the arguments.  You must determine the facts from

4    all the testimony that you have heard and the other

5    evidence submitted.  You are the judges of the

6    facts, but in finding those facts you must apply the

7    law as I instruct you.

8         You are required by law to decide the case in a

9    fair, impartial and unbiased manner based entirely

10   on the law and on the evidence presented to you in

11   the courtroom.  You may not be influenced by any

12   passion, prejudice, sympathy you might have for the

13   plaintiffs or the defendants in arriving at your

14   verdict.

15        This case is submitted to you by asking

16   questions about the facts, which you must decide

17   from the evidence you have heard in this trial.  You

18   are the sole judges of the credibility of the

19   witnesses and the weight to be given to their

20   testimony, but in matters of law, you must be

21   governed by the instructions in this charge.  In

22   discharging your responsibility on this jury, you

23   will observe all the instructions which have

24   previously been given to you.  I shall now give you

25   additional instructions which you should carefully

1   and strictly follow during your deliberations.

2        1.  Do not let bias, prejudice or sympathy play

3   any part in your deliberations.

4        2.  In arriving at your answers, consider only

5   the evidence introduced here under oath and such

6   exhibits, if any, as have been introduced for your

7   consideration under the rulings of the Court, that

8   is, what you have seen and heard in this courtroom

9   together with the law as given you by the Court.  In

10  your deliberations, you should not consider or

11  discuss anything that is not represented by the

12  evidence in this case.

13       3.  Since every answer that is required by the

14  charge is important, no juror should state or

15  consider that any required answer is not important.

16       4.  You must not decide who you think should

17  win and then try to answer the questions

18  accordingly.  Simply answer the questions.  Do not

19  discuss nor concern yourself with the effect of your

20  answers.

21       5.  You will not decide the answer to a

22  question by lot or by drawing straws or by any other

23  method of chance.  Do not return a quotient verdict.

24  A quotient verdict means that the jurors agree to

25  abide by the result to be reached by adding together

```
1    each juror's figures and dividing by the number of
2    jurors to get an average.  Do not do any trading on
3    your answers; that is, one juror should not agree to
4    answer a certain question one way if others agree to
5    answer a question another way.
6         6.   The verdict you must render -- the verdict
7    you render must be unanimous.  You all must agree on
8    that verdict.
9         7.   Answer "Yes" or "No" to all questions
10   unless otherwise instructed.  A "Yes" answer must be
11   based on a preponderance of the evidence unless
12   otherwise instructed.  If you do not find that a
13   preponderance of the evidence supports a "Yes"
14   answer, then answer "No."  The term "preponderance
15   of the evidence" means the greater weight and degree
16   of credible evidence admitted in this case.
17   Whenever a question requires an answer other than
18   "Yes" or "No", your answer must be based on a
19   preponderance of the evidence unless otherwise
20   instructed.
21        After you retire to the jury room, you will
22   select your own presiding juror.  It is the duty of
23   the presiding juror to:
24        1.   Preside during your deliberations;
25        2.   To see that your deliberations are
```

1    conducted in an orderly manner and in accordance

2    with the instructions in this charge;

3        3.  To write out and hand to the bailiff any

4    communications regarding the case that you desire to

5    have delivered to the judge;

6        4.  To vote on the questions;

7        5.  To write your answers to the questions in

8    the spaces provided; and

9        6.  To certify to your verdict by signing as

10   presiding juror in the space provided.

11       You should not discuss the case with anyone,

12   not even with other members of the jury unless all

13   of you are present and assembled in the jury room.

14   Should anyone attempt to talk to you about the case

15   before the verdict is rendered, whether at the

16   courthouse, your home, anywhere else, please inform

17   the Court of this fact.

18       When you have answered all the questions you

19   are required to answer under the instructions of the

20   judge and your presiding juror has placed your

21   answers in the spaces provided and signed the

22   verdict as presiding juror or obtained the

23   signatures, you will inform the bailiff at the door

24   of the jury room that you have reached a verdict,

25   and then you will return into court with your

1  verdict.

2      The evidence you are to consider consists of

3  the testimony of the witnesses, the documents and

4  other exhibits admitted into evidence, and any fair

5  inferences and reasonable conclusions you can draw

6  from the facts and circumstances that have been

7  proven.

8      Generally speaking, there are two types of

9  evidence.  One is direct evidence, such as testimony

10  of an eyewitness.  The other is indirect or

11  circumstantial evidence.  Circumstantial evidence is

12  given -- is evidence that proves a fact from which

13  you can logically conclude another fact exists.  As

14  a general rule, the law makes no distinction between

15  direct and circumstantial evidence but simply

16  requires that you find the facts from a

17  preponderance of all the evidence, both direct and

18  circumstantial.

19      You alone are to determine the questions of

20  credibility or truthfulness of the witnesses.  In

21  weighing the testimony of the witnesses, you may

22  consider the witness' manner and demeanor on the

23  witness stand, any feelings or interest in the case,

24  or any prejudice or bias about the case that he or

25  she may have, and the consistency or inconsistency

```
 1    of his or her testimony considered in the light of
 2    the circumstances.  Has the witness been
 3    contradicted by other credible evidence?  Has he or
 4    she made statements at other times and places
 5    contrary to those made here on the witness stand?
 6    You must give the testimony of each witness the
 7    credibility that you think it deserves.
 8         Even though a witness may be a party to the
 9    action and therefore interested in its outcome, the
10    testimony may be accepted if it is not contradicted
11    by direct evidence or by any inference that may be
12    drawn from the evidence, if you believe the
13    testimony.
14         You are not to decide this case by counting the
15    number of witnesses who have testified on the
16    opposing sides.  Witness testimony is weighed;
17    witnesses are not counted.  The test is not the
18    relative number of witnesses, but the relative
19    convincing force of the evidence.  The testimony of
20    a single witness is sufficient to prove any fact,
21    even if a greater number of witnesses testify to the
22    contrary, if after considering all of the evidence,
23    you believe that witness.
24         No Inference from Filing Suit.
25         The fact that a person brought a lawsuit and is
```

1    in court seeking damages creates no inference that

2    the person is entitled to a judgment.  Anyone may

3    make a claim and file a lawsuit.  The act of making

4    a claim and a lawsuit, by itself, does not in any

5    way tend to establish that claim and is not

6    evidence.

7        Burden of Proof:  Preponderance of the

8    Evidence.

9        Plaintiffs David Tyler Moss and Brandon Keating

10    have the burden of proving their case by a

11    preponderance of the evidence.  To establish by a

12    preponderance of the evidence means to prove

13    something is more likely so than not so.  If you

14    find the Plaintiffs David Tyler Moss and Brandon

15    Keating have failed to prove any element of their

16    claim by a preponderance of the evidence, then they

17    may not recover on that claim.

18        Defendants Marko Princip and Brian Martin have

19    the burden of proving the affirmative defenses of

20    quasi-estoppel and waiver by a preponderance of the

21    evidence.  If you find that Defendants Marko Princip

22    and Brian Martin have failed to prove any element of

23    their affirmative defenses by a preponderance of the

24    evidence, then they may not prevail on those

25    affirmative defenses.

1           Statute of Limitations.

2           The following statute of limitations apply in

3    each cause of action.   Plaintiffs David Tyler Moss

4    and Brandon Keating brought their causes of action

5    within the applicable statute of limitations.

6           1.   Breach of Contract - 4 years, (Question

7    Nos. 1-4)

8           2.   Fraud - 4 years, (Question Nos. 9-10)

9           3.   Breach of Fiduciary Duty - 4 years,

10   (Question Nos. 5-8)

11          4.   Tortious Interference - 2 years, (Question

12   Nos. 13-14)

13          5.   Conversion - 2 years, (Question Nos. 11-12)

14          Clear and Convincing Evidence and Exemplary

15   Damages.

16          "Clear and convincing evidence" is defined as a

17   measure or degree of proof that produces a firm

18   belief or conviction about the truth of the matter

19   to be proving.

20          "Exemplary damages" means an amount that you

21   may in your discretion award as a penalty or by way

22   of punishment.

23          Punitive Damages.

24          Factor to consider in awarding punitive

25   damages, if any, are:

1        1.   The nature of the wrong.

2        2.   The character of the conduct involved.

3        3.   The degree of culpability of Princip or

4   Martin.

5        4:   The situation and sensibilities of the

6   parties concerned.

7        5:   The extent to which such conduct offends a

8   public sense of justice and propriety.

9        6:   The net worth of Princip and Martin.

10       Contracted Royalty.

11       A plaintiff is entitled to the benefit of his

12   or her bargain by putting the plaintiff in as good a

13   position as the plaintiff would have been in if the

14   contract had been performed properly.  A plaintiff

15   is further -- a plaintiff is further entitled to

16   losses that flow naturally but not necessarily from

17   the breach and were considered by the parties at the

18   time they were -- the time they made the contract to

19   be a profitable -- I'm sorry, to be a probable

20   result of any breach.

21       Proximate Cause.

22       "Proximate cause" means a cause that was a

23   substantial factor in bringing about an event and

24   without such -- and without which cause such event

25   would not have occurred.  In order to be a proximate

1    cause, the act or omission complained of must be

2    such that a person using the degree of care required

3    of him would have foreseen that the event or some

4    similar event might reasonably result therefrom.

5    There may be more than one proximate cause of an

6    event.

7         Waiver.

8         Waiver is an intentional surrender of a known

9    right or intentional conduct inconsistent with

10   claiming the right.

11        In determining whether a plaintiff has waived

12   his or her claim for fraud, you are instructed that

13   you must find by a preponderance of the evidence

14   that the plaintiff had, one, an existing right,

15   benefit or advantage to object; two, knowledge,

16   actual or constructive, of the existence of their

17   right to object; and three, an actual intent to

18   relinquish their right to object, which can be

19   inferred from their conduct.

20        You are further instructed that a plaintiff's

21   expressing renunciation -- I think that's

22   misspelled -- of a known right can establish waiver.

23   Likewise, silence or inaction for so long a period

24   as to show an intention to yield the known right is

25   also enough to prove waiver.  But the plaintiff's

1    intent is the primary factor in determining waiver.

2    So in the absence of a clear intent expressed in

3    words, acts or conduct, waiver will be implied only

4    to prevent fraud or inequitable consequences.

5    Finally, waiver may be shown by evidence of other

6    conduct of the party knowingly possessing the right

7    that misleads the opposite party into an honest

8    belief that the waiver was intended or asserted to.

9         Quasi-estoppel.

10        "Quasi-estoppel" is an equitable doctrine that

11   prevents a party from asserting to another's

12   disadvantage a right inconsistent with a position

13   the party previously took.  The doctrine applies

14   when it would be unconscionable to allow a person to

15   maintain a position inconsistent with one in which

16   he acquiesced or of which he accepted a benefit.

17   You are further instructed that, unlike equitable

18   estoppel, quasi-estoppel requires no proof of a

19   false representation or of detrimental reliance.

20        Duty to Deliberate.

21        I'm going to give this -- I'm going to move --

22   well, I have some questions to go through, but I'm

23   going to tell you about your duty to deliberate

24   first.

25        It is now your duty to deliberate and consult

1   with one another in an effort to reach a verdict.

2   Each of you must decide the case for yourself but

3   only after an impartial consideration of the

4   evidence with your fellow jurors.  During your

5   deliberation, do not hesitate to reexamine your own

6   opinions and change your mind if you are convinced

7   that you were wrong.  But do not give up on your

8   honest beliefs because the other jurors think

9   differently or just to finish the case.

10       Remember at all times, you are the judges of

11   the facts.  You have been allowed to take notes

12   during the trial.  Any notes that you took during

13   the trial are only aids to memory.  If your memory

14   differs from your notes, you should rely upon your

15   memory and not on your notes.  The notes are not

16   evidence.  If you did not take notes, rely on your

17   independent recollection of the evidence and do not

18   be unduly influenced by the notes of other jurors.

19   Notes are not entitled to greater weight than the

20   recollection or impression of each juror about the

21   testimony.

22       When you go to the jury room to deliberate, you

23   may take you with a copy of this charge, the

24   exhibits that I have admitted into evidence and your

25   notes.  You must select a presiding juror to guide

1    you in your deliberations and to speak for you here

2    in the courtroom.

3        Your verdict must be unanimous.  After you have

4    reached a verdict, your presiding juror must fill

5    out the answers to the written questions on the

6    verdict form and sign and date it.  After you have

7    concluded your service and I have discharged the

8    jury, you are not required to talk to anyone about

9    the case.

10       Now, here is the Verdict Form.

11       Question No. 1:  Did Princip fail to comply

12   with the partnership agreement with Moss?

13       Answer "Yes" or "No," and then you fill in the

14   answer.

15       Question No. 2:  Did Princip and Keating agree

16   to the membership agreement?

17       In deciding whether the parties reached an

18   agreement, you may consider what they said and did

19   in light of the surrounding circumstances, including

20   any earlier course of dealing.  You may not consider

21   the parties' unexpressed thoughts or intentions.

22       Answer "Yes" or "No," and then there is answer

23   and a line.

24       If you answered "Yes" to Question No. 2, then

25   answer Question No. 3, otherwise do not answer

1    Question No. 3.

2         Question No. 3:  Did Princip fail to comply

3    with the membership agreement with Keating?

4         Answer "Yes" or "No."

5         Answer, blank.

6         Question No. 4:  Who is a part of the

7    Videogames YouTube Channel partnership presently, on

8    today's date?

9         In determining whether a partnership exists,

10   the following factors are to be considered:

11        1.  Receipt or right to receive a share of

12   profits of the business;

13        2.  Expression of an intent to be partners in

14   the business;

15        3.  Participation or right to participate in

16   control over the business;

17        4.  Sharing or agreeing to share losses for

18   liabilities of the business;

19        5.  Contributing or agreeing to contribute

20   money or property to the business;

21        6.  A partnership does not have to be

22   registered with the state or any other governmental

23   entity.

24        No single one of these factors is

25   determinative, but all of them should be considered

1    in totality.  All of these factors do not have to be

2    present for a partnership to exist between two or

3    more parties, but the most important factors are the

4    sharing of profits (or the right to receive a share

5    of profits) and control of the business (or the

6    right to participate in control of the business).

7    An agreement by the owners of a business to share

8    losses is not necessarily to create a partnership.

9         The name of the agreement is not determinative

10   nor is whether the parties thought or believed they

11   were creating a partnership.  The factors outlined

12   above are what the law requires you to consider in

13   determining whether a partnership exists.

14        Answer by listing the name(s) of the partner(s)

15   along with the percentage(s) of ownership in the

16   Videogames YouTube Channel Partnership, and there

17   are lines there.  Looks like they go onto the next

18   page too.

19        Question Nos. 5, 6, 7 and 8:  As

20   Moss's/Keating's partner, Princip/Martin owed

21   Moss/Keating a fiduciary duty.  To prove he complied

22   with his duty, Princip/Martin must show:

23        1.  The transactions in question were fair and

24   reasonable to Moss/Keating; and

25        2.  Princip/Martin made reasonable use of the

```
 1  confidence that Moss/Keating placed in him; and
 2       3.  Princip/Martin acted in the utmost good
 3  faith and exercised the most scrupulous honesty
 4  towards Moss/Keating; and
 5       4.  Princip/Martin placed the interest of
 6  Moss/Keating before his own interest and did not use
 7  the advantage of his position to gain any benefit
 8  for himself at the expense of Moss/Keating; and
 9       5.  Princip/Martin fully and fairly disclosed
10  all important information to Moss/Keating concerning
11  the transaction.
12       Answer Question No. 5 only if your answer to
13  Question No. 4, at the least, included Princip and
14  Moss; otherwise, do not answer 5.
15       Question No. 5:  Did Princip comply with his
16  fiduciary duty to Moss?
17       Answer "Yes" or "No."
18       Answer, blank.
19       Answer Question No. 6 only if your answer to
20  Question 4, at the least, included Princip and
21  Keating; otherwise, do not answer Question No. 6.
22       Question No. 6:  Did Princip comply with his
23  fiduciary duty to Keating?  "
24       Answer "Yes" or "No."
25       Answer, blank.
```

 1        Answer Question No. 7 only if your answer to

 2   Question No. 4, at the least, included Martin and

 3   Moss; otherwise, do not answer.

 4        Question No. 7:  Did Martin comply with his

 5   fiduciary duty to Moss?

 6        Answer "Yes" or "No."

 7        Answer, blank.

 8        Answer Question No. 8 only if your answer to

 9   Question No. 4, at the least, included Moss and

10   Keating; otherwise, do not answer Question No. 8.

11        Question No. 8:  Did Martin comply with his

12   fiduciary duty to Keating?

13        Answer "Yes" or "No."

14        Answer, blank.

15        Question Nos. 9 and 10.

16        Fraud occurs when:

17        1.  A party makes a material representation;

18   and

19        2.  The misrepresentation is made with

20   knowledge of its falsity or made recklessly without

21   any knowledge of the truth and as a positive

22   assertion; and

23        3.  The misrepresentation is made with the

24   intention it should be acted on by the other party;

25   and

1        4.  The other party relies on the

2    misrepresentation and thereby suffers injury.

3        "Misrepresentation" means:

4        1.  A false statement of fact or;

5        2.  A promise of future performance made with

6    an intent at the time the promise was made not to

7    perform as promised.

8        Question No. 9:  Did Princip commit fraud

9    against Moss?

10        Answer "Yes" or "No."

11        Answer, blank.

12        Question No. 10:  Did Princip commit fraud

13    against Keating?

14        Answer "Yes" or "No."

15        Answer, blank.

16        Question No. 11:  Did Martin wrongfully

17    exercise dominion or control over personal property

18    owned or possessed by Moss?

19        Answer "Yes" or "No."

20        Answer, blank.

21        Question No. 12:  Did martin wrongfully

22    exercise dominion or control over personal property

23    owned or possessed by Keating?

24        Answer "Yes" or "No."

25        Answer, blank.

1          Question Nos. 13 and 14.

2          Interference is intentional if committed with

3     the desire to interfere with the contract or with

4     the belief that intentional interference is

5     substantially certain to result.

6          Question 13:  Did Martin intentionally

7     interfere with the Princip/Moss partnership

8     agreement?

9          Answer "Yes" or "No."

10         Answer, blank.

11         If you answered "Yes" to Question 2, then

12    answer Question No. 14; otherwise, do not answer

13    Question No. 14.

14         Question Number 14:  Did Martin intentionally

15    interfere with the Princip/Keating membership

16    agreement?

17         Answer "Yes" or "No."

18         Answer, blank.

19         Question Nos. 15, 16, 17 and 18.

20         To be part of a conspiracy, Princip/Martin and

21    another person or persons must have had knowledge

22    of, agreed to, or intended a common objective or

23    course of action that resulted in the damages to

24    Moss/Keating.  One or more persons involved in the

25    conspiracy must have performed some act or acts to

1    further the conspiracy.

2         If you answered "Yes" to either or both of

3    Question Nos. 7 or 11, then answer Question No. 15;

4    otherwise do, not answer Question No. 15.

5         Question No. 15:  Was Princip part of a

6    conspiracy with Martin that damaged Moss?

7         Answer "Yes" or "No."

8         Answer, blank.

9         If you answered "Yes" to either or both of

10   Question Nos. 8 or 12, then answer Question No. 16;

11   otherwise, do not answer Question No. 16.

12        Question No. 16:  Was Princip part of a

13   conspiracy with Martin that damaged Keating?

14        Answer "Yes" or "No."

15        Answer, blank.

16        If you answered "Yes" to either or both of

17   Question Nos. 5 or 9, then answer Question No. 17;

18   otherwise, do not answer Question No. 17.

19        Question No. 17:  Was Martin part of a

20   conspiracy with Princip that damaged Moss?

21        Answer "Yes" or "No."

22        Answer, blank.

23        If you answered any or all of Question Nos. 6

24   or 10, then answer Question No. 18; otherwise, do

25   not answer Question No. 18.

```
 1        Question No. 18:  Was Martin part of a
 2   conspiracy with Princip that damaged Keating?
 3        Answer "Yes" or "No."
 4        Answer, blank.
 5        Answer Question No. 19 only if your question to
 6   Number 14, at the least, included Princip;
 7   otherwise, do not answer Question No. 19.
 8        Question No. 19:  Do you agree with any of the
 9   following three statements?
10        1.  Princip engaged in wrongful conduct that
11   adversely and materially affected the Videogames
12   YouTube Channel partnership.
13        2:  Princip willfully or persistently
14   materially breached his obligations regarding the
15   Videogames YouTube Channel partnership.
16        3.  Princip engaged in conduct relating to the
17   Videogames YouTube Channel partnership that has made
18   it not reasonably practical to carry on the business
19   and partnership.
20        Answer, "Yes" or "No."
21        Answer, blank.
22        Answer Question No. 20 only if your answer to
23   Question No. 4, at the least, included Martin;
24   otherwise, do not answer Question No. 20.
25        Question No. 20:  Do you agree with any of the
```

1  following three statements?

2       1:  Martin engaged in wrongful conduct and

3  adversely and materially affected the Videogames

4  YouTube Channel partnership.

5       2:  Martin willfully or persistently materially

6  breached his obligations regarding the Videogames

7  YouTube Channel partnership.

8       3:  Martin engaged in conduct relating to the

9  Videogames YouTube Channel partnership that has made

10  it not reasonably practical to carry on the business

11  of the partnership.

12       Answer "Yes" or "No."

13       Answer, blank.

14       If you answered "Yes" to Question No. 1, then

15  answer Question No. 21; otherwise, do not answer

16  Question No. 21.

17       Question No. 21:  What sum of money, if any, if

18  paid now in cash would fairly and reasonably

19  compensate Moss for his damages, if any, that result

20  from such failure to comply?

21       Consider the following elements of damages, if

22  any, and none other:  Loss of contracted royalty, if

23  any.  Do not add any amounts for interest on

24  damages, if any.  Answer separately in dollars and

25  cents for damages, if any.

1      1.  Loss of contracted royalty in the past.
2    Answer, dollar sign and blank.
3      2:  Loss of contracted royalty that a
4    reasonable probability will be sustained in the
5    future.
6      Answer, dollar sign and blank.
7      If you answered "Yes" to Question No. 2, then
8    answer Question No. 22; otherwise, do not answer
9    Question No. 22.
10      Question No. 22:  What sum of money, if any, if
11    paid now in cash, would fairly and reasonably
12    compensate Keating for his damages, if any, that
13    result from such failure to comply?
14      Consider the following element of damages, if
15    any, and none other:  Loss of contracted royalty, if
16    any.  Do not add any amount for interest on damages,
17    if any.
18      Answer separately in dollars and cents for
19    damages, if any:
20      1.  Loss of contracted royalty in the past.
21    Answer, dollar sign, blank.
22      2.  Loss of contracted royalty that in
23    reasonable probability will be sustained reasonably
24    in the future.
25      Answer, dollar sign, blank.

```
 1       Question Nos. 23 and 24:  What sum of money, if
 2  now, if paid now in cash, would fairly and
 3  reasonably compensate Moss/Keating for their
 4  damages, if any, that were proximately caused by
 5  such conduct?
 6       Consider the following element of damages, if
 7  any, and none other:  Loss of contracted royalty.
 8       In answering questions about damages, answer
 9  each question separately.  Do not increase or reduce
10  the amount in one answer because of your answer to
11  any other questions about damages.  Do not
12  speculate -- do not speculate about what any party's
13  ultimate recovery may or may not be.  Any recovery
14  will be determined by the Court when it applies the
15  law to your answers at the time of the judgment.  Do
16  not add any amount for interest or damages, if
17  any -- interest on damages, if any.
18       If you answered "Yes" to any or all of Question
19  Nos. 5, 7, 9, 11 or 13, then answer Question No. 23;
20  otherwise, do not answer Question No. 23.
21       Question No. 23:  For Moss.
22       Answer separately in dollars and cents for
23  damages, if any:
24       1.  Loss of contracted royalty in the past.
25       Answer, dollar sign, blank.
```

1          2.  Loss of contracted royalty that in

2     reasonable probability will be sustained in the

3     future.

4          Answer, dollar sign, blank.

5          If you answered "Yes" to any or all of the

6     Question Nos. 6, 8, 10, 12 or 14, then answer

7     Question No. 24; otherwise, do not answer Question

8     No. 24.

9          Question No. 24:  For Keating.

10          Answer separately in dollars and cents for

11     damages, if any:

12          1.  Loss of contracted royalty in the past.

13     Answer, dollar sign.

14          2.  Loss of contracted royalty that in

15     reasonable probability will be sustained in the

16     future.

17          Answer, dollar sign, blank.

18          Question Nos. 25, 26, 27, and 28:  If you

19     believe by clear and convincing evidence that

20     Princip/Martin acted with actual fraud or with a

21     specific intent to cause substantial injury or harm

22     to Moss/Keating, then what sum of money, if any, if

23     paid now in cash, should be assessed against

24     Princip/Martin and awarded to Moss/Keating as

25     exemplary damages, if any, for such the conduct --

```
 1   for such conduct.

 2        Answer in dollars and cents, if any.  As to

 3   each of the following.

 4        Answer Question No. 25 only if you answered

 5   "Yes" to either or both of Question Nos. 5 or 9;

 6   otherwise, do not answer Question No. 25.

 7        Question No. 25:  For Princip as to Moss.

 8        Answer, dollar, sign blank.

 9        Answer Question No. 26 only if you answered

10   "Yes" to either or both of Question Nos. 6 or 10;

11   otherwise, do not answer Question No. 26.

12        Question No. 26:  For Princip as to Keating.

13   Answer, dollar sign, blank.

14        Answer Question No. 27 only if you answered

15   "Yes" to any or all of Question Nos. 7, 11, 13;

16   otherwise, do not answer Question No. 27.

17        Question No. 27 for Martin as to Moss.

18        Answer, dollar sign, blank.

19        Answer Question No. 28 only if you answered

20   "Yes" to any or all of Question Nos. 8, 12 or 14;

21   otherwise do not answer Question No. 28.

22        Question No. 28:  For Martin as to Keating.

23        Answer, dollar sign, blank.

24        Question No. 29:  Did Moss or Keating waive

25   their claims for damages based on the fact that Moss
```

1    or Keating did not participate in the partnership?

2        Answer "Yes" or "No."

3        For Moss:  Answer, blank

4        For Keating:  Answer, blank.

5        Question No. 30:  Should Moss or Keating be

6    barred from asserting their claims for damages by

7    the theory of quasi-estoppel?

8        Answer "Yes" or "No."

9        For Moss:  Answer, blank.

10       For Keating:  Answer, blank.

11       And then there is a signature page, Verdict of

12   the Jury, which will foreperson will preside.

13       If you need to communicate with me during your

14   deliberations, the presiding juror should write the

15   inquiry and give it the court security officer.

16   After consulting with the attorneys, I will respond

17   either by writing or by meeting with you in the

18   courtroom.

19       Keep in mind, however, you must not disclose to

20   anyone, not even to me, your numerical division on

21   any question.

22       Now we will hear closing arguments.  Again,

23   these are arguments by counsel.  They are not

24   evidence.  I've given them a time limit, and I will

25   give them warnings when they get close to the end of

```
 1    their time limit.

 2         Happy to hear from the plaintiff.

 3              MR. VITAL:  May it please the Court, Your

 4    Honor.

 5              THE COURT:  Yes, sir.

 6              MR. VITAL:  Co-counsel, opposing parties,

 7    Court, court staff.  Good morning, Ladies and

 8    Gentlemen.

 9         Mr. Wyde stood up before you at the beginning

10    of this week and said what I am about to say now.  A

11    contract is a contract is a contract.  A deal is a

12    deal is a deal.  An agreement is an agreement is an

13    agreement.

14         In my limited time before you, I don't have

15    time to go through the evidence.  But as we discuss

16    the evidence and the charge of the Court, it's my

17    firm belief, and based upon the many times when I

18    was asking questions and would turn to you-all,

19    you-all followed the evidence quite well.

20         So what I would like to spend my time with you

21    doing, as opposed to going through the evidence in

22    specific detail, is to talk to you about how the

23    evidence relates to the Court's charge, which His

24    Honor just read to you, to guide your deliberations.

25              And just as a reference point, we have our
```

```
 1    exhibits in evidence, which you are free to review

 2    back in the jury room, including one that was

 3    admitted for demonstrative purposes, which the Court

 4    will instruct you what that means, but you are

 5    entitled to have that for demonstrative purposes as

 6    well, as you deliberate in the jury room.

 7         With that, I would like to turn your attention

 8    to the Court's charge and discuss with you the

 9    charge of the Court and endeavor, if I can -- as one

10    who went to law school but is still learning the

11    law -- to work with you-all on how it is that we

12    consider the questions of the Court in connection

13    with the evidence.

14         I always said, and it was my favorite thing to

15    say when the lightbulb went want off in law school,

16    that -- what we as lawyers learn how to do is, we

17    see the world differently than other people.  Juror

18    Number 4, you might see a banana peel on the ground

19    just as a banana peel.  If I'm in a grocery store

20    and I see a banana peel, I see a possible premises

21    liability claim.  We call it legal goggles.

22         So there are facts.  And then we put these --

23    in law school, all you learn how to do are wear

24    these glasses that I call legal goggles.  They give

25    me goosebumps every time I talk about this.  I love
```

```
 1   what I do.

 2        We learn how to wear legal goggles so that when

 3   wrongs are committed, they are not just wrongs that

 4   are offensive, we can put goggles on and we see, oh,

 5   that's a breach of contract.  Oh, that's fraud.

 6   That's all I'm going to help you do this morning is,

 7   with the benefit of the legal goggles that I have

 8   learned to wear, the judge giving you the jury

 9   instructions, that gives you a little bit of

10   mini-goggles.  We know a whole lot of law and you

11   guys only know -- you don't even need to know the

12   amount of law we need to know.

13        The judge has given you enough law, and with

14   the mini-legal goggles we have, we are going to look

15   at the evidence and tell you why the evidence

16   supports the answers that I'm going to suggest that

17   you give this morning.

18        When we get to the verdict form,

19   Question No. 1, the answer to that question is going

20   to be yes.  It's very simple.

21        The reason the answer is going to be yes is

22   because there was an agreement that they don't

23   dispute with Mr. Moss.  And there was all but an

24   admission that they didn't live up to the terms of

25   the agreement.  They didn't pay this gentleman what
```

1    he was entitled to, 30 percent.  They shut him out

2    of the partnership.

3        Plaintiffs' Exhibit 2 was his agreement.  It

4    said that he was entitled to participate.  They

5    didn't allow him to participate.  And as a matter of

6    fact, what happened when Mr. Princip found out that

7    this thing was valuable, in November he refused to

8    pay him, and then he got his henchman, Mr. Martin,

9    to basically step in and say, your agreement is

10   void.  They failed to comply with the agreement.

11       Then we're going to turn to Verdict Form

12   Question No. 2.  And the legal goggles that you need

13   for this question are set out under the question

14   itself.  That's the law.  They say there's no

15   agreement; we say there is an agreement.

16       So my contracts professor said in law school,

17   whether there's a contract is really not rocket

18   science, it's what they said and what they did.

19   What were the expectations of the parties at the

20   time the document was signed?  If he had fraudulent

21   intent when he signed the document, that doesn't

22   prevent or negate the fact that an agreement was

23   reached.  It's just a fraudulently-induced

24   agreement.  We will talk about fraud later.  But was

25   there an agreement?  It's in court.  It's signed by

1   the parties.  EchoSigned.  Whether part of the

2   agreement is marred by fraud is a different

3   question.  But the question of whether there is an

4   agreement is clear-cut.

5        Exhibit Number 1 is the agreement.  Exhibit 18

6   are references and confirmation that there's

7   agreement.  I forgot to put Plaintiffs' Exhibit 3,

8   and that's the Yahoo! e-mail they say is fake.

9   That's further confirmation that there is an

10  agreement, 30 percent.

11       Plaintiffs' Exhibit 26, further confirmation.

12       And most importantly, I want you to write this

13  one down.  Plaintiffs' Exhibit 30.  This is a

14  conversation that Mr. Princip was having with

15  Mr. Moss where Mr. Keating was not even involved in

16  the conversation.  And in the conversation between

17  Princip and Moss, what does Princip tell Moss about

18  Keating without Keating even being a party to the

19  conversation?  It's in evidence, and you can ask for

20  it and read it.

21       He says, I'm working together on the channel

22  with Brandon, me and my friend, who he's talking

23  about Martin who helped him pay the Lovinger

24  settlement.  So he's making admissions all over the

25  place.  There's an agreement, absolutely.  So the

1    answer to that question is "Yes."

2        Was that agreement breached or was there a

3    failure to comply with that agreement?  Absolutely.

4    The breaches are legion.  In one of the chats that's

5    in evidence, the question was asked, "Are you going

6    to form the LLC?"  And Princip says, "Yes, I'm going

7    to form it."  Did he form it?  No.  Yet his lawyer

8    is here in court saying that because the LLC wasn't

9    formed somehow that's our fault.  It's his fault.

10   He was supposed to fulfill that part of the

11   agreement.

12       Keating was prevented from participating in the

13   partnership.  There was a failure to disclose that

14   the channel had been lost, further to the fact that

15   my client was not allowed to participate in the

16   manner in which the contract allowed in which the

17   contract promised him.

18       Did he get 30 percent of even the revenue that

19   they admit to?  He didn't even get 30 percent of --

20   neither one of these gentlemen got 30 percent of

21   what they even admit to.  So it's clear, that's

22   further evidence of breach or failure to comply with

23   Moss' agreement.  And the same evidence shows that

24   there's a failure to comply with Mr. Keating's

25   agreement.  So the answer to that question is yes.

```
 1        Then Question No. 4.  They are going to make
 2   some hypertechnical arguments that there is no
 3   partnership and that these gentlemen should be shut
 4   out.  But the law is the law.  If we didn't have the
 5   legal goggles that the judge has given us regarding
 6   what the law is, we might be misguided.  But thank
 7   God the judge has given us the law, and it's in your
 8   jury charge.  Because the very arguments that these
 9   defendants want to make are not the law.
10        You don't have to register the partnership.
11   How many times did you hear Mr. Wilson ask that
12   question?  Their whole defense is rabbit trails.
13   It's a waste of time.  Asking questions that the
14   legal goggles don't require.  You don't have to
15   register a partnership.  That's a rabbit trail.
16        What is the name of the agreement?  Sure.
17   Okay.  Mr. Keating says, membership agreement.
18   Right there.  Does that matter?  No, it doesn't
19   matter.  The judge has told you with the legal
20   goggles he gave you, the name of the agreement is
21   not determinative.  Is whether they thought they
22   were forming a partnership determinative?  That
23   doesn't matter, either.
24        The most important factors to whether there's a
25   partnership exists in this case.  If you read the
```

1    agreement, the membership agreement that Mr. Keating

2    has is the right to share in the profits and the

3    right to participate in the business.  Most

4    important factors, sharing of profits or right to

5    receive profits.  And we have to really rely on

6    right, because did they give us a share of the

7    profits or full share?  They didn't.  But we had

8    that right.

9         Do we have a right to control or a right to

10   participate in the business?  That's what he

11   promised.  That's what was promised when a part of

12   this business was conveyed to both of these

13   gentlemen, that they could participate.  They had a

14   right to participate.  They had a right to share the

15   profits.

16        And another red herring we heard in this case.

17   Oh, you did not help pay for the lawsuit, the

18   Lovinger lawsuit.  What does the law say?  Number

19   one, let's look at the agreements.  Do the

20   agreements say that they have to pay for expenses or

21   that they had a right to share in the profits and

22   have a say?  That's all the agreements say, and

23   that's what the law allows.  That's what the law

24   permits.

25        Another rabbit trail to the fact that these

     1   weren't registered, the other rabbit trail was, oh,

     2   who paid for the lawsuit?  What expenses did you

     3   pay?  Let me read what it says:  "An agreement by

     4   the owners of the business to share losses is not

     5   necessary to create a partnership."  It's not

     6   necessary.

     7        Is there a partnership?  I've given you a few

     8   exhibits that there's some disagreement in the back

     9   regarding whether there's a partnership and how to

    10   fill this out.  And as I have this on the screen,

    11   I'm going to suggest to you that there is a

    12   partnership based upon the evidence and that Moss

    13   owns 30 percent; Keating -- excuse my writing --

    14   owns 30 percent; Princip -- let's talk about this

    15   for a moment.  What does he own?  If in May of 2012

    16   he gave 30 percent to both of these gentlemen,

    17   that's 60 percent, so he only has 40 percent left.

    18   So if he gave something to Mr. Martin, how much did

    19   he have to give?  The judge -- sometimes I talk too

    20   much and judges sometimes shut me down.  May I have

    21   leave for the flip chart?

    22             THE COURT:  Yes.  You have five minutes.

    23             MR. VITAL:  Thank you, Your Honor.

    24        You recall he wouldn't let me finish the map

    25   here.  What we wrote down was common sense.  He only

---

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER - 214.753.2747**

1    had 40 percent to give.  Here's the point.  Princip

2    has 20 percent.  Martin has 20 percent.  Because at

3    the time of the backdated agreement, Plaintiffs'

4    Exhibit 11, conveying Martin, part of the

5    partnership, if he gave him half, he only had -- he

6    only had 40 percent to give, so half is 20.  That's

7    the answer to that question.

8         And with the warning regarding my time, I'm

9    just going to go through here and suggest what some

10   answers are so I can tell you about some important

11   questions.

12        Question No. 5, breach of fiduciary.  The

13   answer is yes.

14        Question No. 6, breach of fiduciary duty, yes;

15   yes.

16        And what I'm going to suggest to you, because

17   we put in the charge -- or we asked His Honor to put

18   in the charge only things that we thought we could

19   support.  There were some things that we pulled

20   back.  We're asking you to answer "Yes" to

21   everything from question -- from Question 5 through

22   Question 20.

23        You saw fraud in the courtroom.  You saw fraud

24   and conspiracy in furtherance of the fraud that was

25   committed before trial right here in the courtroom.

1    Lie after lie that we have to show and disprove

2    right in front of you.  Is there a fraud?  Is there

3    a conspiracy?  Is there tortious interference?

4    Absolutely.

5         The bottom line, this case is really simple.

6    Mr. Princip made a promise to these gentlemen to let

7    them participate.  He then didn't want to honor the

8    promise and then got his henchman, Brian Martin, to

9    strong-arm these guys so they can say it's 50-50.

10        That's simply what this case is about.  Because

11   we wear legal goggles, we just call it tortious

12   interference and fraud and things like that.  It's

13   really simple.  You can't give away something, then

14   try to take it back and deny people through fraud

15   and violations of the law and then try to strong-arm

16   them out and try to get your buddy in and come to

17   court and lie in open court.

18        Benefit of the bargain.  There is an

19   instruction about benefit of the bargain.  The

20   damages aren't limited by their breach, the damages

21   are what a proper performance would have been.

22        813 million views is the testimony, divided by

23   a thousand views -- a thousand views is 813,000

24   times 3 CPM.  Should they have ever lost the 3CPM

25   deal?  If they didn't breach their obligations, it

```
 1   should have been at least 3CPM -- equals
 2   two-thousand four-hundred and thirty-nine thousand
 3   dollars (sic) times 30 percent for Mr. Moss.
 4        And if you round down for the money he
 5   received -- so that equals 731,700.  If you round
 6   down from the money he received, we're asking you to
 7   put 725 there.
 8        What about the future damages question?  725 is
 9   the number we're asking for for the past.  It's
10   reasonable to assume this partnership or this
11   channel will live at least five more years.  If you
12   take 725 and divide that by four, that's nine
13   hundred- -- divide that by four and multiply that by
14   five years, that's $906,250.
15        So for the damages in this case -- and Mr. Wyde
16   will talk to you about punitive damages -- for each
17   gentlemen we're asking for -- and the blank on each
18   should be filled out -- 725.  That's the benefit of
19   their bargain.  725, 725,000 for the past and
20   906,250 for the future.
21                 THE COURT:  Thank you, Mr. Vital.
22                 MR. VITAL:  Thank you, Your Honor.
23                 THE COURT:  Mr. Wyde?
24                 MR. WILSON:  Thank you, Your Honor.
25                 THE COURT:  Mr. Wyde has five minutes.
```

1   The plaintiff gets to go first and last because they

2   have the burden of proof.

3            MR. WYDE:  May it please the Court,

4   Counsel, members of the court staff and our clients,

5   Ladies and Gentlemen of the jury.  What is a partner

6   supposed to be?  Think about this.  In our culture,

7   in our system of justice in this country, a contract

8   or an agreement can be something that's actually

9   holy, if you think about it.

10       In obviously certain religious terms, it's even

11  referred to sometimes as a covenant, God and

12  whomever.  And a covenant is nothing more than a

13  contract or an agreement, if you think about it.

14  You do this and we'll do that.

15       Let me dial it back a little bit and let me not

16  be quite so melodramatic with you possibly.  But

17  what about the American Dream?  I once heard a

18  politician say that the American Dream is not just

19  owning your own home but owning your own home and

20  getting your children out of your home.  How can you

21  own a home in this country without a contract?  It's

22  really not feasible today.

23       How about a marriage?  If you've ever been

24  married or you get married, most people are going to

25  have to go to the clerk's office and get a license

1    to get married.  And then once you do that,

2    unfortunately, due to the rate of divorce in this

3    country, who declares you divorced?  Who terminates

4    that contract, that marriage contract, after you are

5    married?  A judge.

6         So for anybody to stand up and say, "Your

7    contract is void," unless it's the judges of the

8    facts, yourselves, or a judge of the law, I hate to

9    break this to anybody that doesn't understand this,

10   but you are still married.  You don't get to go out

11   and get remarried again.  That's referred to as

12   bigamy, which is not allowed.

13        How about a last will and testament.  It's a

14   contract with yourself, theoretically, what we call

15   a unilateral contract to dispose of your property.

16   Like Victor says, we lawyers have a tendency to make

17   simple things complicated, and we can wear these

18   legal goggles.  But as you can tell from my accent

19   I'm not -- I'm not extremely intelligent, so I try

20   to see these things in a simple light, if you will.

21        Mr. Wilson stood up in voir dire and said that

22   he would rather be on his boat or at the beach.  And

23   frankly I'm going to suggest to you that there is

24   nowhere else this week I would rather have been than

25   representing Mr. Keating and Mr. Moss.  We

1    appreciate your time here this week, but to suggest

2    that I wanted to be anywhere else is absolutely not

3    true.

4         Let me finish with what Mr. Vital was saying.

5    You understand how we got to the figure of the 725.

6    You heard testimony it could have been $5 per clicks

7    per thousand.  We're not asking for that.  We're

8    asking for the representations that you award -- the

9    representations that were made, that you hold these

10   people to their word, to their contract, to their

11   agreement.

12        This 906, as Mr. Vital was concluding, is

13   actually, if you divide the 725 by the previous four

14   years that the channel has been in existence, it

15   really works out to be about, I think, $181,250, but

16   we multiplied that per-year basis times the five

17   years.  That's how you get to that.  So you simply

18   divide the 725 by four.

19        Let me finish with this.  The judge -- when you

20   get to this question about Numbers 25, 26 and 27

21   about punitive damages, punitive means to punish.

22   It's also referred to as exemplary damages, which

23   means to make an example.  Again, I speak in plain

24   terms.  I hope that's helpful to you.  If not, you

25   toss it to the side.

53

```
 1        But you're going to need to go back to pages 10
 2   and 11 when you get to these questions, and that's
 3   where you find the definition of clear and
 4   convincing evidence and exemplary damages, right
 5   there.
 6        So on Questions 25, 26 and 27, let's look at it
 7   in a simple context.  If these gentlemen here were
 8   damaged to the tune of $725,000 over the last four
 9   years, we're not asking that you punish or make an
10   example of Martin and Princip based on future
11   damages.  We're asking that you punish the conduct
12   that you've seen to date.  We're not asking you to
13   punish them for something in the future.  You make
14   an example out of them.  And there's all sorts of
15   clichés and phrases, send a message -- send a
16   message is one of the biggest ones.
17        813 million people are going to be looking at
18   your message.  Okay, Dan, maybe that's a little
19   melodramatic.  Maybe it's only 3.3 million
20   subscribers.  Your verdict is going to be heard by
21   at least 3.3 million subscribers.
22        This is not anybody's lemonade stand.  This is
23   big business.  And the conduct, the greed, and the
24   dishonesty, and the conduct that you've witnessed
25   here in court, the continuation, quite frankly, of
```

1    the conspiracy, to cheat Mr. Keating and Mr. Moss

2    out of their share is continuing right now to this

3    day.  That's not my conduct, that's not Mr. Vital's

4    conduct, it's not Mr. Wilson's conduct.

5         Mr. Wilson is not responsible for his clients'

6    conduct.  They are grown adults.  There are people

7    their ages that have won the Congressional Medal of

8    Honor.  They chose to act in the manner they acted.

9         You get to decide today, not the judge, no one

10   else, the seven of you get to send that message, the

11   seven of you get to decide the numbers to put in

12   that blank.  I'm suggesting that from their conduct

13   they have earned the punitive damages of 1,450,000,

14   which is twice the 725.  If you think it's more,

15   that's your prerogative.  If you think it's less,

16   that's your prerogative.  But as attorneys, it's our

17   job to give you as best guidance we can.  As jurors,

18   it's your job to make that decision.  And we're

19   confident at this point that these young men that

20   you will see or you have witnessed, they have earned

21   every dollar of those punitive or exemplary damages.

22        I'm going to sit down.  Mr. Wilson is going to

23   make his comments.  And the bad news is, you still

24   have to listen to me for about ten more minutes.

25   The good news is, this case will be yours, and we

1   will sit here and wait for you instead of you

2   waiting on us.  Thank you.

3              THE COURT:  Thank you Mr. Wyde.

4              Mr. Wilson.

5              MR. WILSON:  Thank you, Your Honor.

6              Approach the lectern, Judge?

7              THE COURT:  Yes, sir.

8              MR. WILSON:  Counsel, Plaintiffs,

9   Defendants, Madame Court Reporter, Ian, Judge.

10             THE COURT:  Yes.

11             MR. WILSON:  Ladies and Gentlemen of the

12  jury, again, thank you for being here all week long.

13  And yes, I do wish I was on a boat and yes, I do

14  wish I was on a beach, and I will be on the boat

15  this weekend.  It's not a big boat, though.

16      Again, as I discussed in opening, anybody can

17  file a lawsuit about anything.  Got to defend it.

18  That's what we do.  We have to defend ourselves.

19      Mr. Wyde -- and a lot of times, you know, I

20  always work backwards going forwards -- talked about

21  plaintiffs wanting their share.  They wanted their

22  share of this business.  I offered Mr. Moss to buy

23  his share of the business.  No money.  I offered

24  Mr. Keating same thing, millions, 800,000.  No

25  money.

1      My mom used to have a saying, we've all heard

2  it here in Texas, all hat, no cattle.  Numbers don't

3  lie.  Tax returns.  I brought you 1099s.  Another

4  statement -- this isn't my mom's, it's the old lady

5  from Wendy's for those of you who remember --

6  Where's the beef?  Where's the beef?

7      You saw me put up the sales revenue for four

8  years.  I think it totaled 200,000.  Where in the

9  heck do they get three-quarters of a million

10  dollars?  Where in the heck do they get $1.7

11  million.  Where does an 18-year-old that's filing

12  tax returns at 25 or 30 grand gross a year have

13  $1.5 million?

14      Remember now, a 30-year-old man communicating

15  with a 15, 16-year-old boy.  And then they enter a

16  contract at 18 years old, 18 years old with a

17  multimillionaire business man.  Achievement Guide is

18  the name of the contract.

19      Yes, Mr. Vital was right -- I'm sorry, Game

20  Guide, LLC, to be formed later.  This

21  multimillionaire, at the time that he entered into

22  an agreement with an 18-year-old, didn't even have

23  partnership documents drawn up, dissolution

24  agreements, break-ups, winding up partnerships.  I

25  think several of you on the jury panel said you've

 1    been in partnerships before, you know when they end
 2    they end, they break up.  Marriages break up.  You
 3    divide it up.  You move on.
 4         Thirty percent of nothing is still nothing.
 5    Okay?  You even heard Mr. Keating say, "Oh, yeah, I
 6    was concerned about a minor being involved."  Well,
 7    how about being concerned about doing a contract
 8    with an 18-year-old kid?  I've got a 17- and
 9    18-year-old and I wouldn't enter into a contract
10    with my own kids.  He was so worried, but he didn't
11    do any research, Mr. Internet guy that has a network
12    that could have found the grants and didn't.
13         Again, Mr. Princip has denied the existence of
14    this document.  Whether you believe it or not, it's
15    still Game Guide.  There is no Game Guide.
16    30 percent of nothing is still nothing.
17         You heard Mr. Keating say, no Game Guide, no
18    registration, no LLC.  Y'all didn't see him bring
19    any 1099s from YouTube or Google or Yahoo! that
20    showed revenue of Game Guide.
21         You heard me ask both plaintiffs, "Do you have
22    anything that shows this business is worth millions
23    other than my sales receipts, my 1099s that I've
24    shown you?"
25         No.  No, we don't.  No, we don't.  But it's

1   worth millions.  Both of them, right here on the
2   witness stand, the ability, the opportunity to write
3   a check, be done with this.  Nope.  Again, it's a
4   money-grab, folks.  A money-grab.  And you know
5   what?  A 30,000-foot view, there is no money to
6   grab.  He lives with his mother and his father.  He
7   lives in an apartment.
8       That's why I want to be on the boat and the
9   beach, because this whole case is a waste of
10  everyone's time.
11      You saw is the attorney letter, Plaintiffs'
12  Exhibit A, and you will have it back there in the
13  courtroom again.  You saw where he demanded money.
14  You saw the follow-up letter by Marko's attorney, an
15  e-mail by Marko's attorney, to offer to wind up, to
16  resolve the partnership, to be done with the
17  partnership.
18      Never heard a response.  Heard a threat of a
19  lawsuit in 2013.  Didn't hear anything for over a
20  year until the spring or summer of 2014, when
21  Mr. Wyde jumps on board and files this lawsuit.
22      This is Question No. 4, again, the most
23  important one of all, folks, in my opinion:  Who is
24  part of the Videogames YouTube Partnership presently
25  on today's date?

1          Moss broke up with Marko; Marko broke up with

2    Moss in 2012.  You see the threats from Daddy Moss,

3    "You shit on the wrong people.  It's time to pay the

4    money that you owe."  Marko offered to pay the money

5    that he owed.  You saw the breakdown of it.  It is

6    Defendant's Exhibit H, which was the e-mail back and

7    forth from Mr. Moss' then attorney, about, hey, we

8    owe you 1,366.  We're done.  Here's the breakdown of

9    the expenses and the receipts.  1,366 and we're

10   done.  Mr. Moss testified he didn't do -- hasn't

11   done one durn thing since all that correspondence

12   letter went down related to the channel.

13         Let's talk about Question No. 4.  Expression of

14   an intent to be partners in the business.  Well,

15   when you tell somebody to pound sand, and you've got

16   some dad calling your partner a thief, and you go on

17   social media and blast this guy, is that partners?

18   No, that's not partners.  That's not intent to be

19   partners.  No, he didn't send flowers.  No, he

20   didn't send candy.  No, he didn't send nice letters.

21   No, he didn't say, hey, let's work this out, let's

22   figure this out.  No, he went dark for a year and a

23   half.

24         That's where, when I get to my last two

25   questions, we talk about waiver.  Did he waive any

SHAWNIE ARCHULETA, CSR/CRR
FEDERAL COURT REPORTER - 214.753.2747

1    of these claims in the future?  The quasi-estoppel,

2    which I will get to later on in the jury charge as

3    well, did he waive that by his actions or inactions

4    to do anything?

5        Again, folks, at the end of the day, the

6    30,000-foot view in that American Airlines or

7    Southwest or whatever you all like to fly, there is

8    no money.  There is no money.  There is nothing that

9    warrants this channel worth a million dollars,

10   2 million, three, four, five, even a quarter-million

11   dollars when I asked him to buy it.  So it's not

12   there.  So it is about money, and there is no money

13   to give.

14       So they have brought nobody from YouTube to

15   value this Videogames YouTube Channel.  They have

16   brought nobody from any other network that says,

17   yeah, I'm ready to buy it for five million bucks.

18   Here's as check, let's be done with it.  That's why

19   I want to be on the boat and the beach, because this

20   is a big waste of time over $25,000 a year.  And it

21   took your week, and it took my week, and I can only

22   imagine how it's affected these guys over the years.

23       In my opening, I told you, do not check your

24   common sense at the door.  Weigh all things.  Think

25   about the 18-year-old doing a contract with a

1   multimillionaire.

2       I told you the five parts of the trial.  This

3   is the last of the five, so we've knocked four of

4   them out.  This is the closing arguments, and then

5   we're done.  And yes, plaintiffs go first and yes,

6   they get to go last because the burden is on them.

7       I liked -- Mr. Wyde did reference marriage and

8   a home.  Remember that?  Okay.  Well, Mr. Moss and

9   Mr. Princip -- we admit, yes.  Put yes on Number 1.

10  As a matter of fact, I filled it out and I will show

11  you my version of the jury charge.  There was an

12  agreement.  They were going to build a home.  Got in

13  a fight.  Moss wanted out of the home.  Moss left

14  the home.  Marko tried to buy him out of that

15  percentage of the home.  It was a 26,000-dollar home

16  that year.

17      Defendant's Exhibit 8, it's a 26,000-dollar

18  home that year.  I even put in one of the questions,

19  I'm not going to beat you up over $1,300, round it

20  up.  Pay the man eight grand.  That's when he left

21  the home.

22      Now, since he left the home, the home added a

23  garage for 24,000, maybe some flowers in the front

24  or something, landscape for 17,000.  148, I think he

25  probably added a new driveway and a second floor and

```
 1   a pool to the home.  Mr. Keating wasn't in the home.
 2   Mr. Moss wasn't in the home.  Neither one of them
 3   paid the electric bill, paid the light bill, paid
 4   the network hosting bill.  But again, that's the
 5   value of the home.  That's what the IRS taxes say.
 6   That's what both of the networks that were with
 7   these folks or with this channel say.  That's the
 8   home.  That's not a five-million-dollar home.  You
 9   can't pay something that you don't have, and that's
10   why it's a money-grab.  But whatever the verdict is,
11   it's an empty grab because it's not there.
12        I told you in my opening that this was a
13   lemonade stand.  In my opinion, the way the
14   paperwork has been done, it's a pretty poor lemonade
15   stand.  I told you this was going to be a scary
16   case; it was scary.  I told you it was -- I don't
17   think I said stupid, because I usually don't use
18   that word that much, but I've got to use it now.
19   And one of my favorite movie's soundtracks is
20   Forrest Gump.  Stupid is as stupid does.  I never
21   knew what that meant until this case, really.
22   Stupid is is stupid does.
23        When you talk smack, tell white lies and say
24   your channel made 40 grand only to piss off somebody
25   else on the internet and a million people see it,
```

```
 1   that's stupid is, that's stupid does.  Stupid is,
 2   stupid does is, you're nowhere to be found on
 3   dealing with a lawsuit.  You're not sued in the
 4   Lovinger lawsuit if you were a partner.  So we've
 5   got a federal court case involving this very channel
 6   suing these partners in Virginia which you have seen
 7   is the settlement agreement, which is the very last
 8   and final one.  And nowhere in this one -- remember
 9   which is the one that I told you Marko had signed
10   on -- in January?  That's the final settlement
11   agreement right there.  Okay?  And that's
12   Defendants' O.  And it all talks about Videogames.
13   Videogames, Videogames.  These two guys own
14   Videogames.  These two guys were sued, not these
15   guys.  These guys weren't brought in.  These guys
16   didn't do anything to get the channel back.
17        Again, the channel is what it is.  It's worth
18   what the numbers say it is.  It's not worth the five
19   million that these boys say it is.  And when I
20   offered it up to them at ten cents on the dollar,
21   neither one of them wanted to write a check for it.
22   Remember?
23        How am I doing on time, Your Honor, do you
24   know?
25             THE COURT:  You've got ten minutes or so.
```

```
 1            MR. WILSON:  Ten more minutes.  Thank you,
 2    Your Honor.
 3            Again, I told you -- here I will go back and
 4    look at the verdict form right quick.
 5            Your verdict you render must be unanimous.  You
 6    must all agree to each and every single answer.
 7    That's tough; I know it's tough.  It's hard to just
 8    agree on the weather with my best friend.  So you
 9    all have a task in front of you.  I respect that, I
10    appreciate that, and I understand that, and it is
11    going to be painful.
12            And so with the yeses and the nos, they need to
13    be unanimous; with the money pieces, they need to be
14    unanimous.  And there are a lot of questions.  There
15    are 30 questions or more in this.
16            Waiver.  These are the two questions I
17    discussed with you that the defendants have put in
18    the charge, which I think are the last two in the
19    charge, 29, 30, 30, 31.
20            Waiver.  In action for so long a period as to
21    show intention to yield a known right is enough to
22    prove waiver.  Inaction for two years is a long time
23    to be away from the house and not paying the
24    utilities and not helping with the pool or the
25    driveway or the kids.  That's a waiver.
```

 1       Quasi-estoppel.  I know these are all lawyer

 2  document -- or lawyer terms, et cetera.

 3  Quasi-estoppel is a right inconsistent with

 4  plaintiffs' position that they took.  And that

 5  doctrine would be unconscionable to allow that

 6  plaintiff to maintain the position inconsistent with

 7  one in which he acquiesced.  Okay?

 8       That meaning he lay behind the log for two

 9  years.  He didn't help us finish the second floor or

10  the pool or the driveway, and then he jumps out of

11  woods and says, pay me, pay me, pay me.  That's the

12  same one that wasn't involved in that federal

13  lawsuit that we dealt with Videogames in federal

14  court with a federal judge, and he's nowhere to be

15  found.  Again, money-grab, but there's nothing to

16  grab.

17       We talked about in the beginning you-all are

18  going to have to weigh the evidence, all those Skype

19  chats, text chats, e-mails, fake e-mails, fraud

20  e-mails, whatever.  I need an SOS to scrub my whole

21  body down after all the shat that flew around in

22  this courtroom, both sides.  But we all know what

23  the term "BS" is.  Okay?  I didn't bring the BS.  I

24  brought you the 1099s from the networks that showed

25  you the value, that showed you the dollars, showed

```
 1    you the money.  And they want money.  Plaintiffs
 2    always want money.  So I showed you the money.  Now
 3    you will have to see the money that I've shown them
 4    on those same things as far as the value of the
 5    business.
 6          Another one of my favorite sayings -- this one
 7    was my dad's -- was, If ifs and buts were candy and
 8    nuts, every day would be like Christmas.
 9          Well, I asked Mr. Keating, do you have any
10    other financials, anything to show that my
11    valuations are wrong, that my tax returns are wrong,
12    my 1099s are wrong?  Nope, nope.  Anything for the
13    jury to consider?  Nope, nope, nope.  Folks, it's
14    not Christmas today.  The ifs and the buts are not
15    Christmas.
16          How am I doing on time, Your Honor?
17              THE COURT:  Five more minutes.
18              MR. WILSON:  Thank you, Judge.
19          I don't discount the fact that those Skype
20    chats, those texts, this and that, are inflammatory
21    or words that can or couldn't be taken out of
22    context that were or were not said.  I don't dispute
23    all of that.  It's in evidence.  You're going to get
24    to see it.
25          But again, the 30,000-foot view is money.  What
```

```
 1   is the value of the money?  And yes, was the
 2   18-year-old kid talking smack?  Yes.  Was Brian, the
 3   25-year-old that's now his partner talking smack
 4   back and forth?  Probably, yeah.  Smack is smack.
 5   Money is money.  And if the money is not there,
 6   smack doesn't equal money.  1099s equal money, equal
 7   value, equal payment of a wrong that has been
 8   committed.
 9        And mind you, folks, just because a wrong has
10   been committed, just because a breach of contract
11   has been committed, does not mean you have to award
12   damages.  You can still say, yeah, breach of
13   contract, zero in damages.
14        As a matter of fact, as we go through my
15   charge, I think I told you, Verdict Form
16   Question No. 1, Mr. Wilson put yes.  Yes.  Did
17   Princip fail to comply with the partnership
18   agreement with Moss?  Yeah, he did.  He admitted he
19   did.  I told you he did, what, eight, nine times,
20   ten times.  And then these guys get into a social
21   media warfare bombing each other out.  Well, yeah,
22   and the partnership is over.
23        Did Princip and Keating agree to a membership
24   agreement?  I put no because that document we
25   objected to, it did come into evidence and you can
```

```
 1  weigh it for yourself, the Brant father, the Brant
 2  son, you heard Mr. Keating testify in his depo that
 3  the kid never signed it, the dad never signed it.
 4  So therefore, there was never a membership agreement
 5  between Princip or Keating.
 6       Did Princip fail to comply with the membership
 7  agreement with Keating?  I put that, which basically
 8  means no because you don't need to answer it if you
 9  answered no to Number 2.
10       The big thing we talked about is Videogames as
11  we are here today.  We clearly know these people do
12  not need to be together, even associated with one
13  another.  And I don't think they have been since
14  2012, but surely now they don't need to be.  This is
15  where we are on the percentage breakdown, because
16  partnerships are over like marriages are over, they
17  break up, they divorce; we split up the property.
18  We are here to do that, and hopefully you are as
19  well.
20       Then as we turn to -- remember I told you that
21  8,000-dollar number.  That's Number 21.  What's
22  going to compensate Mr. Moss?  After the breakup in
23  2012, when they both broke up and threatened each
24  other?  I rounded it up.  I said, give him $8,000.
25  Put it in there.  Put it in there.
```

```
 1        Again, you heard the testimony from my client,
 2   Mr. Martin, every year moneys have been divided.
 3   Never did these guys get a K-1, never did they --
 4   did you see anything in writing saying, send me a
 5   K-1?  K-1 is a partnership situation that you have
 6   to report to the IRS.  Never did Videogames ever
 7   report a K-1 on behalf of these guys.  So that's
 8   what the true tale is, what are we telling the IRS?
 9   What are we telling the government here?  They are
10   not partners.  But still Marko messed up.  The
11   18-year-old kid screwed up.  He was 18.  Pay
12   Mr. Moss eight grand.
13        What sum of money on the next one for
14   Mr. Keating.  I put zero.  Zero.  He's not anywhere
15   associated with Videogames.
16        Fiduciary Duty questions.  I put zero, zero.
17   We're talking about an 18-year-old kid here now.
18   We're not talking about a 54-year-old lawyer that's
19   had multiple businesses.  We are not talking about a
20   multimillionaire man that's had businesses,
21   partnerships and stocks.  We are not talking about
22   another gentleman, Mr. Moss, who has had four or
23   five different partnerships, or maybe it was three
24   he testified about.  We are talking about an
25   18-year-old kid that lives with his mom in his
```

1    bedroom.

2        Fiduciary duty.  Breach could have occurred.

3    Remember?  Okay, yeah, so maybe he did some wrong

4    things.  Yes, he did.  What are the damages?  Zero.

5    It's okay to put zero even if you find a breach.

6        Punitive damages is in there as well, and I put

7    zero, zero, zero on all of those.  Again, we're

8    trying to punish an 18-year-old kid.  That's what

9    we -- what the plaintiffs' attorneys want you to do

10   to punish an 18-year-old kid.  That's what they want

11   to do.  That's what they want you to do.  You have

12   to think about that.  Remember, don't leave your

13   common sense at the door.  We are talking about 18,

14   not a multimillionaire.

15       Did Keating -- did Moss or Keating waive their

16   damages to participate in a partnership?  Absolutely

17   yes.  I put yes for Question 29, which is what I

18   asked you about, was because nowhere did they

19   offer -- they never provided any documentary

20   evidence on that ability, one.

21       And then remember when I asked Mr. Keating

22   about, oh, I was ready to pay $100,000 towards that

23   Lovinger lawsuit.  Do you remember that testimony

24   yesterday?  Okay?  Did he have anything in writing

25   for me?  No.  Got it here with you today?  No.  Come

71

```
1   on, man.  And then I asked him to write a check for
2   the partnership which was -- was it 400 or 600,
3   maybe it was 800.  I don't know.  No, I'm not going
4   to pay.  But he wants you to put money in there so
5   the kid, Marko, who is now 23, can pay him.
6   Ridiculous.
7        Then the last question, should their claims be
8   barred under the theory of quasi-estoppel?  And I
9   put yes and yes is what I think it should be.  And
10  the reason for that is because I already read you
11  that definition that Your Honor put I think it was
12  on page 15.
13              THE COURT:  Thank you, Mr. Wilson.
14              MR. WILSON:  Thank you, Your Honor, I
15  appreciate that.
16       Thank you Ladies and Gentlemen of the jury.
17              THE COURT:  Mr. Wyde, ten minutes, please.
18              MR. WYDE:  Yes.  May it please the Court.
19              THE COURT:  Sure.
20              MR. WYDE:  Mr. Wilson is right, it's not
21  Christmas, it's judgment day.  It's judgment day for
22  Mr. Martin and for Mr. Princip, and that's what we
23  are here for, your judgment.
24       It just confounds me to no end why Mr. Wilson
25  would think that Mr. Keating or Ty Moss would pay
```

```
 1    for what they already own.  They own 30 percent
 2    each.  It's not just about the money, it's about the
 3    control of the asset.  It's about the gold mine.
 4    Hello.  The lights are on, but I don't think anybody
 5    is home.  They are not going to pay for what they
 6    already own.  Would you?  Of course not.
 7         Now, about -- have you heard anybody take this
 8    stand here and say -- may I have leave to approach
 9    the chart at the witness stand?
10              THE COURT:  Yes.
11              MR. WYDE:  -- and say that this channel
12    doesn't have 3.3 million subscribers?  Has anybody?
13    They haven't even told you that lie.  That's one of
14    the only lies you haven't heard.  And have you heard
15    anybody tell you it doesn't have 813 million views?
16    Almost three times the population of the United
17    States.  People all over the world go to this
18    channel.  There are cable channels that don't have
19    this kind of viewership, but it's not worth
20    anything.
21         Well, if you think the money is not there, then
22    why don't we just go ahead and turn it over to the
23    two gentlemen that believe the money is there?
24    Because if these two people, Martin and Princip,
25    can't manage the channel or can't make money at the
```

1  channel -- if that's their argument -- then they

2  shouldn't have any problems with you handing over

3  the channel to the 60 percent ownership, and that's

4  what we've asked for here today besides the money.

5        And frankly, you sat here and heard the

6  testimony, you sat here and observed the demeanor.

7  If I shook hands with either one of these gentlemen,

8  I would count my fingers when I got them back.  They

9  have zero credibility.  What was the term?  I have

10  no conscience; I have no integrity.  Again, I didn't

11  go to Harvard, but I think the word "no" in this

12  case, meaning none, is basically equivalent to zero.

13  Is that about right?

14          MR. VITAL:  Right.

15          MR. WYDE:  When Mr. Wilson discusses this

16  issue about waiver and estoppel -- and by the way,

17  that is included in the definitions.  I have to

18  borrow Mr. Vital's comments about putting my GOGGLES

19  back on for just a moment.  But waiver and estoppel,

20  if you will, can be explained, for example, did

21  Mr. Moss, did Ty or Brandon Keating do anything

22  inconsistent by saying -- to give up their rights?

23        Let me ask this question.  Did you see one

24  e-mail, one text message, one tweet or one Skype

25  message from either one of these two men over here

1  saying, hey, Mr. Keating, we've got this lawsuit

2  going on, and we need some money?  Will you help us

3  out even though your contract doesn't require it?

4      You heard Mr. Keating testify that he offered

5  to do that, but the lawsuit was already settled.

6  That was already way into 2014, about October of

7  2014 or right before the -- 2013 when the lawsuit

8  was about to be settled.  Did you see one e-mail,

9  one tweet, to Ty Moss from any of these two

10  gentlemen over here going, help us out?  And you

11  know why he didn't?  Actions speak louder than

12  words.  The reason you didn't have that is because

13  they didn't want -- Mr. Martin and Mr. Princip

14  didn't want Mr. Keating and Mr. Moss to know what

15  was going on.  They thought they would quietly go

16  away after these two gentlemen here struck oil,

17  found gold.  That's exactly what happened.

18      Their silence is not Mr. Keating's waiver or

19  Ty's waiver.  Their silence, their deception, their

20  dishonesty, their fraud is not Mr. Moss or

21  Mr. Keating's fault.  That's clearly common sense.

22  I don't even understand how anybody -- and the judge

23  has instructed you in the charge that the law is

24  that you have four years to bring a breach of

25  contract claim.  You have four years to bring a

```
 1   breach of a partnership claim.  If you have four
 2   years to do that, you don't have to do anything
 3   frankly.  So why is Mr. Wilson's request in the
 4   charge?  Because we're going to defer to your
 5   judgment and give everybody the opportunity to make
 6   their arguments.  That's kind of the fair thing to
 7   do.  But just because it's in there doesn't mean it
 8   has any real value to it.
 9           MR. WILSON:  Your Honor, I object to the
10   form of that question.  That's an improper argument.
11           THE COURT:  Overruled.
12           MR. WYDE:  Let's go to -- and my
13   comment -- what Mr. Vital wanted me to tell you is
14   that our clients did nothing inconsistent regarding
15   their demand for their rights within the time
16   allowed by law.  And quite frankly, the -- there has
17   been no fraud, no unequal or unfair circumstances in
18   allowing the plaintiffs to maintain their rights by
19   coming to court and having their dispute settled the
20   way we do that in this country, pure and simple.
21       This estoppel, quasi-estoppel, got to love it,
22   lawyers.  It just means, are these people somehow
23   estopped from saying what they are saying?  Are they
24   getting to benefit from their wrongdoing?  What
25   wrongdoing?  They didn't even know about the
```

```
1    Lovinger lawsuit.  How can you do something when you
2    haven't been told about it?  Again, the lights are
3    on, but I'm not sure anybody is home.
4         They did nothing that was unconscionable to
5    allow them to maintain their position.  They did
6    nothing that was inconsistent with their conduct
7    throughout this whole trial.  And it wasn't just
8    this trial, if you will, but the binders, here they
9    are right here.  The evidence has been admitted
10   between Mr. Princip and Mr. Moss, the binders
11   between Mr. Princip and Mr. Keating, the binders
12   between Mr. Moss and Mr. Martin.  You've got to love
13   that conversation on November 19, 2012, Your
14   contract is void.  We thank you for your legal
15   opinion, but hope you won't mind if the jury
16   disagrees with you.
17        The binder between Keating and Martin --
18            MR. WILSON:  I'm going to object to the
19   sidebar.
20            THE COURT:  Overruled.
21            MR. WYDE:  There's an old saying, only an
22   idiot argues with a fool.  I'm pleased to tell you
23   that the two -- these binders here with two of these
24   conversations are Mr. Moss and Mr. Keating
25   discussing anything with Mr. Martin.
```

```
 1        Let's finish up here with some closing notes,
 2   if I may.  The channel -- remember, if you will,
 3   when I came over here and sat down in this chair --
 4   may I?  Thank you.  I told you there was nothing
 5   special about this chair.  Nothing in this chair,
 6   this stand, makes you tell the truth.  We try to add
 7   some gravity, some weight to it when the judge says,
 8   "Raise your right hand.  Do you swear to tell the
 9   truth, whole truth and nothing but the truth?"
10        "I do."
11        He can't make you tell the truth.  He can't
12   prevent either one of these gentlemen from getting
13   up here and lying to you, day in, day out.  Do you
14   think that leopard is going to change its spots?  I
15   didn't have any conversation with anybody.  I don't
16   have any -- I don't have any conversation with
17   anybody.  I didn't tweet.  I didn't e-mail.  I
18   didn't FaceBook.  I didn't do anything.
19        Exhibit Number 72 has been admitted, Your
20   Honor?
21             THE COURT:  Yes.
22             MR. WYDE:  I love this one.  And who is
23   this tough guy right here?  I don't see a contract,
24   Brandon.
25        That is exactly what I've told you and exactly
```

1  what the attorneys know.

2      What I can tell you is that the percentage is

3  50-50 in place and is subject to change because I'm

4  signing someone aboard.

5      This is Mr. Martin's FaceBook page with his

6  picture on it, yet he wants you to believe that

7  Mr. Keating sat around until the wee hours of the

8  morning day after day, night after night, month

9  after month sitting around texting himself, tweeting

10  himself and FaceBooking himself and e-mailing

11  himself so that we could come in here and spend this

12  week trying to get 30 percent of what Mr. Wilson

13  referred to as nothing?

14          THE COURT:  One minute, sir.

15          MR. WYDE:  Yes sir.

16          The channel wasn't hacked.  Mr. Martin and

17  Mr. Princip gave Drew Lovinger the user name and the

18  password.  That's how he uploaded the things.  When

19  Mr. Princip failed to pay Mr. Lovinger, he took

20  control of the channel.  There was no hacking.

21          MR. WILSON:  Objection, there's no

22  evidence of that.

23          THE COURT:  It's overruled.

24          MR. WYDE:  And the jury, you are allowed

25  to make reasonable inferences from the evidence, and

```
 1   I believe that was done on cross-examination by
 2   Victor.
 3        You would think there was some ethics in
 4   business.  That's not my quote, that was
 5   Mr. Princip's quote.  If I want to drill for oil and
 6   I don't have an oil rig and I have to go out and
 7   spend 1,500 or $3,000 to buy that oil rig to get
 8   that oil out of the ground and they promise you
 9   30 percent of the oil to each, you damn right you
10   are rock responsible for 30 percent of the oil,
11   absolutely.  Because without that $1,500 from each
12   of these gentlemen, he wouldn't have been able to do
13   a single thing.  He didn't have $500 when he was
14   begging Mr. Moss to invest.
15        Lastly, if you think this a money-grab and that
16   we're playing with Monopoly money and nothing else
17   is real, then you go ahead and fill those punitive
18   damages blanks in with 5- or $10 million.  Go ahead.
19   It's Monopoly money.  You fill in what you think is
20   right if it's not really there and it's not really
21   anything important.  We will find out about that
22   later.
23        I love this quote.  I told Mr. Ty I was $30,000
24   a month because I was trying to piss him off.
25   Uh-huh.  No lawsuits filed at that time.
```

```
 1        Mr. Wilson made the comment that figures don't
 2   lie, or he said something about figures don't lie.
 3   But the end of that comment is, liars figure, and
 4   that's what you witnessed this whole week, liars
 5   figuring.
 6        One of my favorite exhibits -- in concluding --
 7   if you will, was this contract, Plaintiffs' Exhibit
 8   11.  And you have all of the exhibits -- you have
 9   the right to take all of the exhibits back in the
10   jury room.  I apologize for telling them that,
11   judge, but the fact of the matter is that the
12   evidence belongs to you, not us.  So you can look at
13   any of these exhibits that you want to if you have
14   any questions.  But if you look at the bottom line
15   of page 11, this goes back to October 23rd of 2013,
16   he tries to backdate the whole thing.  He tries to
17   backdate it to make himself 50-50, and he's actually
18   cheating this other guy over here down to
19   25 percent.  Unmitigated gall is what my mother used
20   to refer to that as, gall.
21             THE COURT:  Thank you Mr. Wyde.
22             MR. WYDE:  Yes, I'm sitting down, Judge,
23   and my last comment to the Ladies and Gentlemen of
24   the Jury if you don't mind is, when you go back to
25   that jury room and you elect a foreperson, whoever
```

1  goes to the restroom is going to get elected

2  foreperson.  Don't leave the table until you decide

3  the foreperson.  And you can see the judge smirking,

4  Mr. Vital smirking, Mr. Wilson.  I can tell you,

5  having made my life in these rooms, do not go to the

6  restroom if you don't want to be the foreperson.

7       The last question I have to you, Mr. Princip

8  said he will deny it, Mr. Keating's ownership, until

9  the cows come home.  I ask that you bring the cows

10  home.  Thank you very much for your time and

11  attention.  Good luck in your deliberation.

12            THE COURT:  Thank you, Mr. Wyde.

13            A couple of things about the evidence.

14  You are going to go back now and begin your

15  deliberations.  The first thing you do is elect the

16  foreperson.  You cannot start your deliberations

17  until you do receive all of the evidence back in the

18  jury room.  One of the pieces of evidence is the

19  demonstrative chart that was used and written on

20  here.  That is only admitted for demonstrative

21  purposes; in other words, it's just for you to refer

22  to, if you wish, from recalling what the testimony

23  was.  It's not actually an exhibit of evidence; it's

24  a demonstrative exhibit.

25            Now, you will also be setting your own time

```
 1   schedule forward, so just let the court security
 2   officer know what time you plan to go to lunch and
 3   when you plan to recess your deliberations.
 4       I also have the original jury charge here that
 5   you will fill out.  You each have your copy, but
 6   this is the one the foreperson will sign.
 7       All right.  You may begin your deliberation as
 8   soon as you receive the evidence.  All rise for the
 9   jury.
10                 (Jury leaves courtroom)
11           THE COURT:  What says the plaintiff?
12           MR. VITAL:  Your Honor --
13           THE COURT:  Anything?
14           MR. VITAL:  Other than I would like to
15   know how close you want us to stay.  I don't intend
16   to go back to the office, but I did want to grab a
17   bite somewhere close by.
18           THE COURT:  Within ten minutes or so.
19           MR. VITAL:  And I will make sure
20   Mr. Phillips has my cell number.
21           MR. WYDE:  I need to check in with my
22   associate who is over at Judge Callahan's court and
23   let them know that closing is over or the jury is
24   deliberating, but I don't know what or if they are
25   going to need me today.
```

```
 1              THE COURT:  Okay.

 2              MR. WYDE:  But I wouldn't leave your court

 3    without obviously informing you and asking first.

 4              THE COURT:  I appreciate it.

 5              MR. WYDE:  Sure.  Absolutely.  You're my

 6    alibi.

 7              THE COURT:  There you go.

 8              MR. WYDE:  I've been informed that that

 9    other matter settled.  So Judge Callahan is done and

10    has basically said I can set my intervention for a

11    hearing at another time.

12              THE COURT:  Okay.

13              MR. WYDE:  So. . .

14              THE COURT:  Great.

15              (Court in recess; jury deliberating.)

16

17

18

19

20

21

22

23

24

25
```

```
 1              C E R T I F I C A T E

 2          I, Shawnie Archuleta, CCR/CRR, certify

 3   that the foregoing is a transcript from the record

 4   of the proceedings in the foregoing entitled matter.

 5          I further certify that the transcript fees

 6   format comply with those prescribed by the Court and

 7   the Judicial Conference of the United States.

 8          This 18th day of April 2016.

 9

10

11                        s/Shawnie Archuleta
                          Shawnie Archuleta CCR No. 7533
12                        Official Court Reporter
                          The Northern District of Texas
13                        Dallas Division

14

15

16   My CSR license expires:  December 31, 2016

17   Business address:  1100 Commerce Street
                        Dallas, TX  75242
18   Telephone Number:  214.753.2747

19

20

21

22

23

24

25
```

**SHAWNIE ARCHULETA, CSR/CRR**
**FEDERAL COURT REPORTER - 214.753.2747**